JUDGE PRESKA

# 09  CV  00300

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

EDWARD P. ZEMPRELLI, on Behalf of
Himself and All Others Similarly Situated,

                      Plaintiff,

     vs.

THE ROYAL BANK OF SCOTLAND
GROUP PLC, THE ROYAL BANK OF
SCOTLAND PLC, SIR THOMAS FULTON
WILSON McKILLOP, SIR FREDERICK
ANDERSON GOODWIN, GUY ROBERT
WHITTAKER, LAWRENCE KINGSBAKER
FISH, GORDON FRANCIS PELL, COLIN
ALEXANDER MASON BUCHAN, JAMES
McGILL CURRIE, SIR STEPHEN ARTHUR
ROBSON, ROBERT AVISSON SCOTT,
PETER DENIS SUTHERLAND,
ARCHIBALD HUNTER, CHARLES JOHN
KOCH, JOSEPH PATRICK MacHALE,
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED, GREENWICH
CAPITAL MARKETS, INC., WACHOVIA
CAPITAL MARKETS, LLC, MORGAN
STANLEY & CO. INCORPORATED, UBS
SECURITIES LLC, BANC OF AMERICA
SECURITIES LLC and RBC CAPITAL
MARKETS CORPORATION,

                    Defendants.

---------------------------------------------------------x

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS



<u>DEMAND FOR JURY TRIAL</u>

## NATURE OF THE ACTION

1.       This is a securities class action on behalf of all persons who acquired the American

Depositary Shares ("ADSs") of The Royal Bank of Scotland Group plc ("RBS" or the "Company")

pursuant and/or traceable to a false and misleading registration statement and prospectus

(collectively, the "Registration Statement") issued in connection with the Company's June 2007

initial public offering of the Company's 38 million Non-cumulative Dollar Preference Shares, Series

S (the "Offering"). This action asserts strict liability claims under the Securities Act of 1933 ("1933

Act") against RBS, its directors and the investment banks which underwrote the June 2007 Offering

(collectively, "defendants").

2.       RBS is a holding company of The Royal Bank of Scotland plc ("Royal Bank") and

National Westminster Bank Plc ("NatWest"), which are United Kingdom-based clearing banks.

RBS operates across a global network with branch offices in the United States, including in the State

of New York, and around the globe.

3.       Defendants consummated RBS's Offering pursuant to the false and misleading

Registration Statement and Prospectus, selling 38 million Non-cumulative Dollar Preference Shares,

Series S ("Series S ADSs") at $25 per share, for proceeds of approximately $950 million. The

Registration Statement/Prospectus incorporated RBS's financial results for 2004, 2005 and 2006.

4.       RBS ultimately announced huge multi-billion pound impairment charges associated

with its exposure to debt securities, including mortgage-related securities tied to the U.S. real estate

markets, causing the price of RBS's Series S ADSs issued in the Offering to decline. The ADSs

now trade at approximately $10 per share.

5.       The true facts which were omitted from the Registration Statement were:

(a)      Defendants' portfolio of debt securities was impaired to a much larger extent

than the Company had disclosed;

(b)     Defendants failed to properly record losses for impaired assets;

(c)     The Company's internal controls were inadequate to prevent the Company from improperly reporting its debt securities;

(d)     The Company's participation in the consortium which acquired ABN AMRO ("ABN") would have disastrous results on the Company's capital position and overall operations; and

(e)     The Company's capital base was not adequate enough to withstand the significant deterioration in the subprime market and, as a result, RBS would be forced to raise significant amounts of additional capital.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o]. In connection with the acts complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the underwriter defendants conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

- 2 -

**PARTIES**

10.     Plaintiff Edward P. Zemprelli acquired Series S ADSs of RBS pursuant or traceable to the Offering and has been damaged thereby.

11.     Defendant RBS is a holding company of Royal Bank and NatWest, which are United Kingdom-based clearing banks.  The Company is organized in six business divisions.  Its shares trade in an efficient market on the New York Stock Exchange.  RBS is based in Edinburgh, Scotland, United Kingdom, with executive offices in New York, New York and has a presence around the globe.

12.     Defendant Royal Bank is one of the retail banking subsidiaries of RBS, which, together with NatWest and Ulster Bank, provides branch banking facilities in the United Kingdom. Royal Bank is located in Edinburgh, Scotland, United Kingdom.

13.     Defendant Sir Thomas Fulton Wilson McKillop ("McKillop") has been Chairman of the Board of RBS since September 2005.  On October 13, 2008, McKillop announced he will retire in April 2009.  McKillop was further identified as a director in RBS's Form 20-F ("20-F") filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

14.     Defendant Sir Frederick Anderson Goodwin ("Goodwin") was Group Chief Executive Officer ("CEO") and a director of RBS until October 2008.  Defendant Goodwin signed the false and misleading Registration Statement.  Goodwin was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

15.     Defendant Guy Robert Whittaker ("Whittaker") has been Group Financial Director and a director of RBS since February 2006.  Whittaker was identified as a director in RBS's 20-F

- 3 -

filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

16.     Defendant Lawrence Kingsbaker Fish ("Fish") is, and at all relevant times was, a director of RBS.  Fish signed the false and misleading Registration Statement.  Fish was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

17.     Defendant Gordon Francis Pell ("Pell") is, and at all relevant times was, a director of RBS.  Defendant Pell signed the false and misleading Registration Statement.  Pell was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

18.     Defendant Colin Alexander Mason Buchan ("Buchan") is, and at all relevant times was, a director of RBS.  Buchan signed the false and misleading Registration Statement.  Buchan was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

19.     Defendant James McGill Currie ("Currie") is, and at all relevant times was, a director of RBS.  Defendant Currie signed the false and misleading Registration Statement.  Currie was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

- 4 -

20.     Defendant Sir Stephen Arthur Robson ("Robson") is, and at all relevant times was, a director of RBS. Defendant Robson signed the false and misleading Registration Statement. Robson was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

21.     Defendant Robert Avisson Scott ("Scott") is, and at all relevant times was, a director of RBS. Defendant Scott signed the false and misleading Registration Statement. Scott was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

22.     Defendant Peter Denis Sutherland ("Sutherland") is, and at all relevant times was, a director of RBS. Defendant Sutherland signed the false and misleading Registration Statement. Sutherland was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

23.     Defendant Archibald Hunter ("Hunter") is, and at all relevant times was, a director of RBS. Defendant Hunter signed the false and misleading Registration Statement. Hunter was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

24.     Defendant Charles John Koch ("Koch") is, and at all relevant times was, a director of RBS. Defendant Koch signed the false and misleading Registration Statement. Koch was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006,

which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

25.     Defendant Joseph Patrick MacHale ("MacHale") is, and at all relevant times was, a director of RBS.   Defendant MacHale signed the false and misleading Registration Statement. MacHale was further identified as a director in RBS's 20-F filed with the SEC for the year ending December 31, 2006, which was incorporated by reference into the Prospectus Supplement filed in connection with the Offering.

26.     The defendants referenced above in ¶¶13-25 are referred to herein as the "Individual Defendants."

27.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services on a global basis.   Merrill Lynch was an underwriter and a joint book running manager of the Offering

28.     Defendant Greenwich Capital Markets, Inc. ("Greenwich") is a fixed-income capital markets firm providing a full range of debt financing, risk management and investment services to major corporations and financial and governmental institutions around the world.   Greenwich was an underwriter and a joint book running manager of the Offering.

29.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital")  is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are subsidiaries of banking giant Wachovia).   Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting, and equity investing.  It also offers real estate financing, risk management services,

and structured products such as asset-backed and mortgage-backed securities. Wachovia Capital was an underwriter and a joint book running manager of the Offering.

30.      Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals. Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions. Morgan Stanley was an underwriter and a joint book running manager of the Offering.

31.      Defendant UBS Securities LLC ("UBS") is the U.S. investment banking and securities arm of UBS Investment Bank. UBS Investment Bank provides a range of financial products and services worldwide. UBS was an underwriter and a joint book running manager of the Offering.

32.      Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America. Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions. Banc of America was an underwriter and a joint book running manager of the Offering.

33.      Defendant RBC Capital Markets Corporation ("RBC") is the corporate and investment banking division of Royal Bank of Canada. RBC was an underwriter and a joint book running manager of the Offering.

34.      Pursuant to the 1933 Act, the defendants referenced in ¶¶27-33 above are referred to herein as the "Underwriter Defendants."

35.     The Underwriter Defendants are *liable* for the false and misleading statements in the Registration Statement.  In connection with the Offering, the Underwriter Defendants drafted and disseminated the Registration Statement and were paid fees in connection therewith.   The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired RBS Series S ADSs pursuant or traceable to the Company's false and misleading Registration Statement for the Offering and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  RBS Series S ADSs were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by RBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 8 -

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)     whether the 1933 Act was violated by defendants' acts as alleged herein;

    (b)     whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and management of RBS; and

    (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

42.     RBS operates in more than 50 countries around the world to provide a range of retail and corporate banking, consumer finance, insurance and wealth management services. RBS is one of the world's top 10 financial services groups and a leading provider of personal, business and institutional banking services. RBS is made up of five main operating divisions: Global Markets, Regional Markets, RBS Insurance, Group Manufacturing and Group Functions. It is one of the largest financial services companies in the world by market capitalization.

- 9 -

## THE FALSE AND DEFECTIVE REGISTRATION
## STATEMENT AND PROSPECTUS

43.       On or about April 8, 2005, RBS filed with the SEC a Form F-3 Registration

Statement and Prospectus using a "shelf" registration or continuous offering process.  Under the

shelf, RBS would be permitted to sell securities described in the Prospectus in one or more offerings

up to a total dollar amount of $10 billion.  The Prospectus was a part of the Registration Statement.

The securities were to be issued by RBS.  The Form F-3 incorporated RBS's Form 20-F for the

fiscal year ended December 31, 2004:

> The SEC allows us to "incorporate by reference" the information that we file
> with the SEC. This permits us to disclose important information to you by referring
> to these filed documents. Any information referred to in this way is considered part
> of this prospectus, and any information that we file with the SEC after the date of this
> prospectus will automatically be deemed to update and supersede this information.

> We incorporate by reference our Annual Report on Form 20-F for the fiscal
> year ended December 31, 2004 filed with the SEC on March 29, 2005. We also
> incorporate by reference any future filings made with the SEC under Sections 13(a),
> 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 and certain Reports on
> Form 6-K, if they state that they are incorporated by reference into this prospectus,
> that we furnish to the SEC after the date of this prospectus and until we or any
> underwriters sell all of the securities.

44.       The Form F-3 also incorporated by reference subsequently filed prospectuses:

> For the purpose of determining any liability under the Securities Act, each post-
> effective amendment that contains a form of prospectus shall be deemed to be a new
> registration statement relating to the securities offered therein, and the offering of
> such securities at that time shall be deemed to be the initial *bona fide* offering
> thereof.

45.       The Form F-3 also included assurances that the Registrant would

> reflect in the prospectus any facts or events arising after the effective date of the
> registration statement (or the most recent post-effective amendment thereof) which,
> individually or in the aggregate, represent a fundamental change in the information
> set forth in the registration statement.

46.       On April 26, 2006, RBS filed its 2005 annual report on Form 20-F with the SEC.  The

2005 Form 20-F represented that RBS had profit after tax of £5.6 billion, up from £5.3 billion the

prior year based on International Financial Reporting Standards ("IFRS").  Later, on April 24, 2007,

RBS reported its results for the year ended December 31, 2006 which showed profit after tax of £6.5

billion compared to £5.6 billion the prior year based on IFRS.  The Annual Report included a

"Group Chief Executive's review" letter by Goodwin which concluded:

> **Outlook**
>
> Our proven business model delivered strong results in 2006.  We are expanding our reach and making progress in all the major economies we operate in. We believe that the strategic choices we have made, together with the prospects for continued growth in the world economy, position us well for 2007.  We remain confident in the Group's ability to take advantage of the many opportunities to invest profitably in sustainable growth.

47.     RBS's Form 20-F also stated the following:

> **Operating and financial review**
>
> *            *            *
>
> **2006 compared with 2005**
>
> **Profit**
>
> Profit before tax was up 16%, from £7,936 million to £9,186 million, reflecting strong organic income growth in all divisions.
>
> **Total income**
>
> The Group achieved strong growth in income during 2006. Total income was up 8% or £2,100 million to £28,002 million.
>
> *            *            *
>
> **Impairment losses**
>
> Impairment losses were £1,878 million compared with £1,707 million in 2005, an increase of 10%.
>
> Risk elements in lending and potential problem loans represented 1.57% of gross loans and advances to customers excluding reverse repos at 31 December 2006 (2005 – 1.60%).

Provision coverage of risk elements in lending and potential problem loans was 62% compared with 65% at 31 December 2005. This reflects amounts written-off and the changing mix from unsecured to secured exposures.

\*        \*        \*

**Impairment losses**

\*        \*        \*

**2006 compared with 2005**

Impairment losses were £1,878 million compared with £1,707 million in 2005. New impairment losses were up 11%, £214 million to £2,093 million. Recoveries of amounts previously written-off were up £43 million, 25% to £215 million. Consequently the net charge to the income statement was up £171 million, 10% to £1,878 million. Improvements in Corporate Markets reflecting a benign credit environment partly offset higher impairment losses in Retail Markets and Citizens.

Total balance sheet provisions for impairment amounted to £3,935 million compared with £3,887 million in 2005.

Total provision coverage (the ratio of total balance sheet provisions for impairment to total risk elements in lending) decreased from 65% to 62%. The ratio of total balance sheet provisions for impairment to total risk elements in lending and potential problem loans also decreased to 62% compared with 65% in 2005. This reflects amounts written-off and the changing mix from unsecured to secured exposure.

\*        \*        \*

**Global Banking & Markets**

\*        \*        \*

**2006 compared with 2005**

Global Banking & Markets performed strongly in 2006, delivering excellent growth in income while continuing to build our strong international franchise. Total income rose by 22% to £6,826 million, contribution by 24% to £3,933 million and operating profit by 25% to £3,790 million.

GBM is a leading provider of debt financing and risk management solutions covering the origination, structuring and distribution of a wide range of assets. In 2006 we arranged over $450 billion in financing for our corporate and institutional customers, up 17% from 2005. We ranked first among managers of global asset-backed and mortgage-backed securitisations and fourth among managers of global

- 12 -

syndicated loans, while among managers of international bonds we moved from thirteenth place to eighth. These league table positions demonstrate our success in broadening and deepening our franchise.

In 2006 we have further invested in extending our product capabilities and our worldwide reach. Income in North America rose by 18% in local currency, despite flat revenues in our US residential mortgage-backed securities business, as the investments we have made in our debt capital markets, loan markets, rate and credit trading businesses have borne fruit.

In Europe, income increased by 26% in local currency as a result of good performances in Germany, France, Spain, Italy and the Nordic region. We participated in many of the largest cross-border financings in 2006. Asia-Pacific, too, showed marked progress with income increasing by 35% in US dollar terms. We have established a promising presence in the region, building our product capability and client relationships.

Net interest income rose by 7% to £1,110 million, representing 16% of total GBM income. Average loans and advances to customers increased by 20% as we further expanded our customer base outside the UK.

Net fee income rose by 27% to £861 million, reflecting our top tier position in arranging, structuring and distributing large scale private and public financings. We have increased our customer penetration, and in 2006 were the third most active underwriter of bonds for European, including UK, corporates.

Income from trading activities continued to grow steadily, rising by 15% to £2,379 million as a result of good volumes of debt and risk management products provided to our customers. A strong performance in credit products was supplemented by growth in our broadening product range, including equity derivatives and structured credit, partially offset by the impact of a slower US mortgage-backed securities market. Average trading book value at risk remained modest at £14.2 million.

Our rental and other asset-based activities have achieved continuing success in originating, structuring, financing and managing physical assets such as aircraft, trains, ships and real estate for our customers. This success has driven good growth in income from rental assets, which increased to £1,196 million from £1,074 million.

These businesses also generate value through the ownership of a portfolio of assets which we manage actively. Good results from these activities, as well as from principal investments where we work with our corporate customers and with financial sponsors, leveraging our financial capability to structure and participate in a wide variety of investment opportunities, were reflected in other operating income, which increased to £1,280 million from £744 million in 2005.

We have maintained good cost discipline while continuing to invest in extending our geographical footprint, our infrastructure and our product range. Total

- 13 -

expenses grew by 22% to £2,951 million. Variable performance-related compensation increased and now accounts for 41% of total costs.

Portfolio risk remained stable and the corporate credit environment remained benign. Impairment losses fell to £85 million, with the distribution of impairments over the course of the year reflecting recoveries in the first half.

Average risk-weighted assets grew by 11% and the ratio of operating profit to average risk-weighted assets improved from 2.6% to 2.9%.

\* \* \*

**Citizens**

\* \* \*

**2006 compared with 2005**

Citizens grew its total income by 2% to £3,317 million, while its operating profit rose slightly to £1,582 million. In dollar terms, Citizens total income increased by 3% to $6,115 million and its operating profit before tax by 2% to $2,917 million.

We have achieved good growth in lending volumes, with average loans and advances to customers increasing by 10%. In business lending, average loans excluding finance leases increased by 15%, reflecting Citizens' success in adding new mid-corporate customers and increasing its total number of business customers by 4% to 467,000. In personal lending, Citizens increased average mortgage and home equity lending by 14%, though the mortgage market slowed in the second half. Average credit card receivables, while still relatively small, increased by 19%.

\* \* \*

Impairment losses totalled £181 million ($333 million), representing just 0.31% of loans and advances to customers and illustrating the prime quality of our portfolio. Underlying strong credit quality remained unchanged as our portfolio grew, with risk elements in lending and problem loans representing 0.32% of loans and advances, the same level as in 2005. Our consumer lending is to prime customers with average FICO scores on our portfolios, including home equity lines of credit, in excess of 700, and 95% of lending is secured.

\* \* \*

**Capital Resources**

Upon adoption of IFRS by listed banks in the UK on 1 January 2005, the Financial Services Authority ("FSA") changed its regulatory requirements such that the measurement of capital adequacy was based on IFRS subject to a number of

prudential filters. The data as at 31 December 2006 and 2005 set out below has been presented in compliance with these revised FSA requirements.

\*      \*      \*

It is the Group's policy to maintain a strong capital base, to expand it as appropriate and to utilise it efficiently throughout its activities to optimise the return to shareholders while maintaining a prudent relationship between the capital base and the underlying risks of the business. In carrying out this policy, the Group has regard to the supervisory requirements of the Financial Services Authority ("FSA"). The FSA uses Risk Asset Ratio ("RAR") as a measure of capital adequacy in the UK banking sector, comparing a bank's capital resources with its risk-weighted assets (the assets and off-balance sheet exposures are 'weighted' to reflect the inherent credit and other risks); by international agreement, the RAR should be not less than 8% with a tier 1 component of not less than 4%. At 31 December 2006, the Group's total RAR was 11.7% (2005 – 11.7%) and the tier 1 RAR was 7.5% (2005 – 7.6%).

48.      On or about June 26, 2007, RBS filed its Prospectus Supplement for the Offering,

which forms part of the Registration Statement and which became effective on June 22, 2007, and at

least 38 million shares of RBS Series S ADSs were sold to the public at $25.00 per share.

49.      The Prospectus contained the following statements:

The combination of RBSG's Global Banking & Markets with ABN AMRO's Global Wholesale Businesses is expected to create a leading corporate and institutional business with both scale and global reach, increasing the Group's exposure to high growth markets in Asia and the Middle East in particular.

\*      \*      \*

RBSG believes that the combination of Citizens and LaSalle will create a leading bank in the US, with a good balance between retail and commercial banking.

\*      \*      \*

RBSG believes that ABN AMRO's retail businesses will provide it with opportunities to build businesses in selected countries with large populations and high growth rates, accelerating its wealth management strategy and adding the capability to distribute credit cards and other products.

\*      \*      \*

**THE ROYAL BANK OF SCOTLAND GROUP**

The Royal Bank of Scotland Group plc is the holding company of one of the world's largest banking and financial services groups, with a market capitalisation of

- 15 -

£62.8 billion as at December 31, 2006. Headquartered in Edinburgh, the Group operates in the UK, the US and internationally. The Group's operations are conducted principally through RBS and its subsidiaries, including National Westminster Bank Plc, except for the general insurance business (which is primarily conducted through Direct Line Group and Churchill Insurance). Both RBS and NatWest are major UK clearing banks whose origins go back over 275 years. The Group has a large and diversified customer base and provides a wide range of products and services to personal, commercial and large corporate and institutional customers.

50.     The Prospectus further incorporated by reference RBS's 2006 Form 20-F.

51.     The Prospectus omitted important information about RBS's exposure to the credit markets and how the changes in the market were affecting RBS by the time of the Offering, including omitting information about how this exposure could affect the Company's capital base. The Prospectus further misstated the effect that the ABN acquisition would have on the Company's capital position and overall operations.

52.     The Registration Statement/Prospectus contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations.

53.     The statements above were false and/or misleading because the dislocation in the financial markets was then having an increasingly severe impact on RBS's business, which significantly increased the risk level of the Series S ADSs.

54.     On December 6, 2007, RBS announced it would write down £1.5 billion, the majority of which was related to the Company's exposure to the U.S. subprime mortgage market.

55.     Despite repeatedly assuring investors of RBS's strong capital position, in April 2008, RBS launched a record £12 billion rights issue to rebuild the bank's deteriorating balance sheet. The rights offering was completed on June 9, 2008.

56.     The rights offering was necessary due to massive write-downs related to impairments in the Company's portfolio of debt securities, including mortgage-related securities, and further as a

result of the Company's acquisition of ABN.   On October 17, 2007, RBS participated in a

consortium with two other banks to purchase Dutch bank ABN. As a part of the three-way takeover,

RBS agreed to purchase a portion of ABN's operations, including its U.S. and cash management

businesses, for £71 billion. The Company entered into the merger agreement with ABN on April 22,

2007. Despite the increasing turmoil in the financial markets in the Summer and Fall of 2007, RBS

completed the acquisition in October 2007.

57.     Notwithstanding these huge write-downs and the massive rights issuance, RBS's

securities, including the Series S ADSs, did not decline appreciably due to the Company's

assurances that it did not require additional capital.

58.     On May 11, 2008, *Times Online* issued an article entitled "Americans look into Royal

Bank of Scotland sub-prime deals," which stated in part:

> THE US Securities and Exchange Commission is investigating Royal Bank of
> Scotland (RBS) over its exposure to American sub-prime mortgages.
>
> The probe was launched in March, and covers the bank's interests in
> securities backed by sub-prime home loans, as well as residential mortgages written
> by its US subsidiaries.
>
> RBS is cooperating with the investigation – one of dozens launched into the
> mortgage industry by American regulators since the crisis began to emerge last year.
>
> Details of the investigation are buried in the prospectus for the bank's
> imminent £12 billion rights issue, which will be put to a vote at a shareholder
> meeting this week.
>
> The probe is in addition to an earlier inquiry by the New York State attorney-
> general – relating to the bank's Greenwich Capital subsidiary – which came to light
> earlier this year.
>
> The documents reveal that RBS subsidiaries have received requests for
> information from "various US governmental agencies and self-regulatory
> organisations" in relation to the sub-prime mortgage crisis.
>
> The documents add: "In particular, during March 2008 RBS was advised by
> the SEC that it had commenced a nonpublic, formal investigation relating to RBS's
> US sub-prime securities exposure and US residential mortgage exposures. RBS and

- 17 -

its subsidiaries are cooperating with these various requests for information and investigations."

Wall Street sources have suggested that at least 40 separate probes have been launched by the SEC into issues stemming from the sub-prime crisis, ranging from insider trading to accounting practices.

A spokesman for RBS declined to comment on the matter beyond what was said in the prospectus.

59.     On August 8, 2008, RBS announced its first-ever loss in the Company's 40-year history as a public company after being forced to take £5.9 billion in write-downs. RBS reported a loss for the first half of 2008 of £691 million compared to a profit of £5.1 billion a year earlier based on IFRS. This represented one of the biggest losses in British banking history.

60.     On October 7, 2008, news began to emerge that the British government was holding talks with major banks, including RBS, concerning the possibility of government funding. On news of a potential bailout, shares of RBS plunged.

61.     Thereafter, on October 13, 2008, in a drastic move to raise capital, RBS announced a £20 billion capital raising plan. Under the plan, RBS would offer £15 billion in additional ordinary shares. The price for the shares was set at a fixed price per share; the fixed price represented a discount to the closing price for the Company's shares on October 10, 2008. The new shares would be underwritten by the British government. The government further committed to purchasing up to £5 billion of the new shares if investors failed to purchase shares in the offering.

62.     In mid-November 2008, shares of RBS again began to decline, trading at a price below the fixed offering price of the new shares. By the date of the offering, the price of the new shares was set at a 28% premium to the price of RBS's existing shares. As a result, investors rejected the offering, purchasing only 0.24% of the total number of new RBS ordinary shares, forcing the British government to purchase a majority of the newly issued shares.

63.     Then on November 28, 2008, RBS announced that the government would take majority control of the bank, buying a 57.9% stake in the Company.

64.     Following the Offering, the preference shares traded close to the $25 per share offering price for several months.  Thereafter, as the truth regarding the Company's deteriorating financial results began to emerge, the Series S ADSs began to decline to as low as $4.36 per share on October 10, 2008.  On January 7, 2009, RBS preference shares closed at $11.03 per share.

65.     The true facts which were omitted from the Registration Statement were:

(a)     Defendants' portfolio of debt securities was impaired to a much larger extent than the Company had disclosed;

(b)     Defendants failed to properly record losses for impaired assets;

(c)     The Company's internal controls were inadequate to prevent the Company from improperly reporting its debt securities;

(d)     The Company's participation in the consortium which acquired ABN would have disastrous results on the Company's capital position and overall operations; and

(e)     The Company's capital base was not adequate enough to withstand the significant deterioration in the subprime market and, as a result, RBS would be forced to raise significant amounts of additional capital.

## COUNT I

### Violations of Section 11 of the 1933 Act
### Against All Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

- 19 -

67.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

68.     The Registration Statement was false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

69.     RBS is the registrant for the Offering. As issuer of the shares, RBS is strictly liable to plaintiff and the Class for the misstatements and omissions.

70.     The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement. Each of the Individual Defendants signed or authorized the signing of the Registration Statement or were identified in the Prospectus.

71.     The Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

72.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

73.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

74.     Plaintiff acquired RBS Series S ADSs pursuant and/or traceable to the Registration Statement for the Offering.

75.     Plaintiff and the Class have sustained damages. At the time of their purchases of RBS Series S ADSs, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those

facts prior to mid-2008. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### Violations of Section 12(a)(2) of the 1933 Act
### Against All Defendants

76.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

77.     By means of the defective Prospectus, defendants assisted in the sale of shares of the Company's Series S ADSs to plaintiff and other members of the Class.

78.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and the other members of the Class who purchased RBS Series S ADSs pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

79.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired the Company's Series S ADSs.

80.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class

- 21 -

who purchased RBS Series S ADSs pursuant to the Prospectus sustained substantial damages in connection with their purchases of RBS Series S ADSs.  Accordingly, plaintiff and the other members of the Class who hold such shares have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein.  Class members who have sold their shares seek damages to the extent permitted by law.

**COUNT III**

**Violations of Section 15 of the 1933 Act**
**Against the Individual Defendants**

81.     Plaintiff repeats and realleges each and every allegation contained above.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

82.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

83.     Each of the Individual Defendants was a control person of RBS by virtue of his position as a director, senior officer and/or major shareholders of RBS which allowed each of these defendants to exercise control over RBS and Royal Bank and their operations.

84.     Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as a Class representative;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees an d expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 12, 2009               COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD


                                       _____
                                            SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

                                       COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       DARREN J. ROBBINS
                                       DAVID C. WALTON
                                       CATHERINE J. KOWALEWSKI
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       Attorneys for Plaintiff

- 23 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

EDWARD P. ZEMPRELLI ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 06/25/07 | 4,000 shares | $25.00 |
|  |  |  |
|  |  |  |
|  |  |  |

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

RBS

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of _____, 2009.

EDWARD P. ZEMPRELLI

- 2 -

RBS