UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

09 JUL 15 PM 11: 48

U.S. DISTRICT COURT
S.D.N.Y.

IN RE ROYAL BANK OF SCOTLAND GROUP
PLC SECURITIES LITIGATION

09 Civ. 300 (DAB)

## CONSOLIDATED COMPLAINT

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.     NATURE OF THE ACTION ................................................................................ 1

II.    OVERVIEW OF THE SEPARATE CLAIMS .................................................. 8

     A.     Ordinary Share Exchange Act Claims .................................................. 8

     B.     Preferred Share Securities Act Claims.................................................. 8

     C.     Exchange Offer Securities Act Claims .................................................. 9

     D.     Rights Issue Securities Act Claims ....................................................... 9

III.   JURISDICTION AND VENUE ....................................................................... 9

     A.     Jurisdiction Over Ordinary Share Claims ............................................. 9

     B.     Jurisdiction Over Preferred Share Claims........................................... 12

     C.     Venue ................................................................................................... 12

IV.   THE PARTIES................................................................................................. 12

     A.     Lead Plaintiffs..................................................................................... 12

           1.     Massachusetts Pension Reserves Investment Management Board.......... 13

           2.     Public Employees' Retirement System of Mississippi ............................ 13

           3.     The Freeman Group ......................................................................... 13

     B.     Defendants ........................................................................................... 14

           1.     Defendant RBS ................................................................................ 14

           2.     The Individual Defendants—All Claims ................................................. 16

           3.     Individual Defendants—Exchange Offer and Preferred Share Offerings  19

           4.     Individual Defendants—Exchange Offer Only ........................................ 21

           5.     Preferred Share Offerings Underwriter Defendants ................................ 21

           6.     Rights Issue Underwriter Defendants ..................................................... 24

     C.     Definitions Used in the Complaint for Groups of Defendants ............. 26

|   |   | 1. | The Exchange Act Defendants | 26 |
|   |   | 2. | Preferred Share Offerings Defendants | 26 |
|   |   | 3. | Exchange Offer Defendants | 27 |
|   |   | 4. | Rights Issue Defendants | 27 |
| V. |   |   | CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS | 27 |
| VI. |   |   | FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS RELATING TO EXCHANGE ACT CLAIMS | 29 |
|   | A. |   | Goodwin's Central Role in Defendants' Fraud | 29 |
|   | B. |   | The Mortgage Industry and How Mortgage Securitization Works | 34 |
|   | C. |   | Contrary to Defendants' Statements, RBS Had Exposure To Billions of Dollars in Materially Overvalued Subprime Assets | 37 |
|   |   | 1. | Defendants Repeatedly Deny the Extent to Which RBS Had Exposure to Subprime Assets | 39 |
|   |   | 2. | Market Indicators Establish the Need to Substantially Write Down Subprime Assets | 41 |
|   |   | 3. | Defendants Knew that RBS's Subprime Assets Were Materially Overvalued | 45 |
|   |   | 4. | Defendants Continued to Significantly Understate the Magnitude of RBS's Subprime Exposure | 47 |
|   |   | 5. | U.S. Authorities Investigate RBS's Subprime Exposure | 51 |
|   | D. |   | RBS's Acquisition of ABN AMRO Compounds the Company's Subprime Problems | 52 |
|   | E. |   | RBS Fails to Timely Impact Billions of Pounds of Goodwill Attributable to the ABN AMRO Acquisition | 54 |
|   | F. |   | RBS Raises Capital In a Desperate Attempt to Shore Up Its Mounting Subprime Losses | 59 |
|   | G. |   | RBS's Subprime Assets Lead to the Company's Partial Nationalization | 60 |
|   | H. |   | RBS Projects £28 Billion Loss Tied to Subprime Exposure and Goodwill Impairment | 61 |
|   | I. |   | Post-Class Period Revelations | 64 |

VII.    CONFIDENTIAL WITNESSES ................................................................. 68

VIII.   The Company's Strong and Numerous Ties to the U.S. ................................... 73

        A.     The U.S. Accounted for A Substantial Portion of the Worldwide Market
             for RBS Shares................................................................................. 73

        B.     Actions Taken By Defendants in the U.S. Were Integral to Defendants'
             Scheme to Defraud Investors ............................................................. 75

IX.    EXCHANGE ACT DEFENDANTS' FALSE & MISLEADING STATEMENTS......... 78

       The March 1, 2007 Statements ............................................................. 78

       The May 29, 2007 Statements ............................................................. 81

       The June 5, 2007 Statements ............................................................... 82

       The July 16, 2007 Statements .............................................................. 84

       The July 20, 2007 Statements .............................................................. 85

       The August 2007 Statements ............................................................... 88

       The September 28, 2007 Statements....................................................... 97

       The October 10, 2007 Statements ......................................................... 99

       The December 6, 2007 Statements ...................................................... 100

       The February 28, 2008 Statements ...................................................... 111

       The April 22, 2008 Statements ........................................................... 121

       The May 14, 2008 Statements in RBS's Form 20-F................................. 125

       The May 20, 2008 Statements ........................................................... 130

       The August 8, 2008 Statements .......................................................... 132

       The October 13, 2008 Statements ....................................................... 136

       The November 20, 2008 Statements..................................................... 138

X.     SCIENTER ALLEGATIONS................................................................. 140

        A.     The Exchange Act Defendants Knew that RBS Had Significant Exposure
             to the Subprime Market ................................................................... 140

B.      The Exchange Act Defendants Knew that RBS's Assets Were Materially Overstated ............................................................................... 141

C.      RBS's Board Learned of the Company's Undisclosed Subprime Exposure No Later Than Summer 2007 ............................................ 144

D.      Defendants' Fraudulent Scheme Triggers Government Investigations ............. 144

E.      RBS Fails to Take Required Goodwill Impairments in Order to Induce Participation in the Rights Issue ....................................................... 145

F.      Virtually All of RBS's Directors Are Removed as Defendants' Fraudulent Scheme Unravels ....................................................... 147

G.      The Individual Defendants' Personal Financial Motives................................... 148

H.      Goodwin's Additional Motive ......................................................................... 151

XI.    IFRS VIOLATIONS ................................................................................................ 152

A.      RBS Was Required to Follow International Accounting Standards................... 152

B.      RBS Fails to Properly Report Goodwill .......................................................... 152

C.      RBS Fails to Timely Test and Impair Goodwill ................................................ 155

D.      RBS Fails to Properly Value Asset Backed Securities and Related Credit Market Exposures ....................................................................... 158

E.      RBS Fails to Disclose Risks Associated with Financial Instruments ................ 159

F.      RBS Fails to Disclose Changes in Financial Position and Performance. ........... 163

G.      RBS Failed to Maintain Effective Internal Controls......................................... 164

XII.   LOSS CAUSATION ALLEGATIONS................................................................... 167

April 21, 2008 ................................................................................................... 168

April 22, 2008 ................................................................................................... 170

October 6, 2008................................................................................................. 171

October 7, 2008................................................................................................. 173

October 13, 2008............................................................................................... 175

January 19, 2009 ............................................................................................... 177

XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE ............................................. 178

XIV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................................... 180

        COUNT I
             AGAINST THE EXCHANGE ACT DEFENDANTS FOR VIOLATIONS
             OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5
             THEREUNDER ............................................................................................. 181

        COUNT II
             AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF
             SECTION 20(A) OF THE EXCHANGE ACT ................................................. 183

XV.    SECURITIES ACT CLAIMS RELATING TO THE PREFERRED SHARE
       OFFERINGS .......................................................................................................... 184

XVI.   FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS
       RELATING TO THE PREFERRED SHARE OFFERINGS ...................................... 187

       A.    RBS Accumulated Billions of Dollars of Subprime Assets  While
             Assuring Investors That the Company Maintained A Strong Capital Base
             and Controlled for Risk ...................................................................................... 187

       B.    RBS Announces Massive Losses Due to Its Accumulation of Subprime
             Assets and Acquisition of ABN AMRO and Is Bailed Out by the British
             Government ......................................................................................................... 191

       C.    Preferred Share Purchasers Suffer the Consequences of RBS's Materially
             False and Misleading Statements and Material Omissions ................................. 194

XVII.  THE MATERIALLY FALSE AND MISLEADING STATEMENTS  IN THE
       PREFERRED SHARE OFFERING MATERIALS ...................................................... 194

       A.    The April 8, 2005 Registration Statement ......................................................... 194

       B.    May 22, 2006: The Series Q Offering ............................................................... 196

       C.    December 18, 2006: The Series R Offering ....................................................... 202

       D.    June 26, 2007: The Series S Offering ............................................................... 205

       E.    September 24, 2007: The Series T Offering ...................................................... 212

       F.    September 28, 2007: The Series U Offering ...................................................... 217

       COUNT III
             AGAINST EACH OF THE PREFERRED SHARE OFFERINGS
             DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE
             SECURITIES ACT ............................................................................................. 219

COUNT IV
 AGAINST EACH OF THE PREFERRED SHARE OFFERINGS
 DEFENDANTS FOR VIOLATIONS OF SECTION 12(A)(2) OF THE
 SECURITIES ACT ............................................................................................ 222

COUNT V
 AGAINST EACH OF THE INDIVIDUAL DEFENDANTS AND THE
 PREFERRED SHARE INDIVIDUAL DEFENDANTS FOR
 VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT ........................ 225

XVIII. SECURITIES ACT CLAIMS RELATING TO THE EXCHANGE OFFER ................ 226

COUNT VI
 AGAINST MCKILLOP, GOODWIN, WHITTAKER, CAMERON, FISH,
 FISHER, PELL, BUCHAN, CURRIE, FRIEDRICH, HUNTER, KOCH,
 KONG, MACHALE, ROBSON, SCOTT, SUTHERLAND AND
 CAMPBELL FOR VIOLATIONS OF SECTION 11 OF THE
 SECURITIES ACT ............................................................................................ 238

COUNT VII
 AGAINST RBS AND THE INDIVIDUAL DEFENDANTS FOR
 VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT .............. 240

COUNT VIII
 AGAINST INDIVIDUAL DEFENDANTS MCKILLOP, GOODWIN,
 WHITTAKER, CAMERON AND FISH FOR VIOLATIONS OF
 SECTION 15 OF THE SECURITIES ACT ...................................................... 242

XIX. SECURITIES ACT CLAIMS RELATED TO THE RIGHTS ISSUE ........................... 244

COUNT IX
 AGAINST RBS, MCKILLOP, GOODWIN, WHITTAKER AND  THE
 RIGHTS ISSUE UNDERWRITER DEFENDANTS FOR  VIOLATIONS
 OF SECTION 12(A)(2) OF THE SECURITIES ACT ...................................... 250

COUNT X
 AGAINST MCKILLOP, GOODWIN, WHITTAKER, CAMERON AND
 FISH FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT ..... 253

XX. PRAYER FOR RELIEF ............................................................................................ 254

XXI. JURY TRIAL DEMAND ......................................................................................... 256

Plaintiffs make the following allegations upon personal knowledge as to their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on their counsel's ongoing investigation. The investigation of counsel is predicated upon, among other things, a review of public filings by the Royal Bank of Scotland Group plc ("RBS" or the "Company"), and its subsidiaries and affiliates, with the United States Securities and Exchange Commission ("SEC"), including, among other things, reports filed on Forms 6-K and 20-F, registration statements, prospectuses and offering circulars published in connection with the public sale of RBS securities, press releases and public statements issued by the Company, media reports about the Company, publicly available data relating to the prices and trading volumes of RBS securities, reports issued by securities analysts who followed RBS, internal RBS documents regarding relevant facts furnished through anonymous sources, and interviews with former employees of the Company and other knowledgeable third parties.

I.      **NATURE OF THE ACTION**

1.      This is a class action on behalf of those who purchased RBS securities through several public offerings and on the open market between March 1, 2007 and January 19, 2009, inclusive ("Exchange Act Class Period") and investors who purchased RBS Series Q, R, S, T and U preferred share offerings.

2.      RBS, established in 1727 by Royal Charter of King George I, is one of the oldest and, prior to former CEO Sir Frederick Goodwin's tenure, was one of the most conservative banks in the United Kingdom (the "U.K.").

3.      Goodwin was promoted to CEO of RBS in 2001 and under his leadership, RBS's assets increased over 650%, from £368 billion ($558 billion)[1] to £2.4 trillion ($4.5 trillion) in

---

[1] As a convenience to the reader, Plaintiffs have endeavored to convert foreign currencies into U.S. dollars throughout this Complaint, at the exchange rate in effect at the relevant times.

2008, surpassing the gross domestic product of the U.K.  Goodwin's tenure atop the apex of international finance was brief, however, as he was dismissed following the collapse and virtual nationalization of RBS by the British government.  Goodwin—and the board of directors responsible for overseeing his performance—are now credited with responsibility for one of the largest financial disasters in history.

4.       For the year ended December 31, 2008, RBS reported a loss of £32.6 billion ($47.2 billion)[2]—reportedly the greatest loss generated by a commercial bank in 2008,[3] and the greatest loss in U.K. corporate history.  To avert the complete collapse of RBS, the U.K. government has acquired a 70% ownership stake in the Company.  The three hundred year-old institution lost £47 billion ($87 billion) of market value from its peak in December 2007.  A $100 investment in RBS ordinary shares in December 2007 would have been worth a mere $2.20 following the Company's collapse.  A similar investment in Citigroup would have retained a $12 value.[4]

5.       Throughout this period of rapid expansion, RBS's SEC filings described elaborate risk management procedures purportedly followed by the Company.  RBS consistently represented that it had strong financial and risk management controls in place.  In 2006 and 2007, as concerns over banks' so-called "subprime" exposure grew, analysts asked if RBS was exposed to such risky assets.[5]  In response, Goodwin and other senior officers at RBS repeatedly dismissed the analysts' concerns and assured the investment community that RBS and its

---

[2] On January 19, 2009, RBS revealed that it expected to incur a £28 billion loss, a figure which was reiterated in RBS's Form 6-K filed with the SEC on February 26, 2009.  However, on April 29, 2009, RBS reported a £32.6 billion loss as set forth in its 2008 Annual Report on Form 20-F filed with the SEC.

[3] "World's Biggest Bank Losses" *The Economist* (June 25, 2009).

[4] Chris Skinner, "The Rise and Fall of RBS:  How Fred Goodwin Went from Hero to Zero," *Seeking Alpha* (Jan. 22, 2009) (changing $5 hypothetical investment discussed in article to $100).

[5] For a detailed discussion of "subprime" mortgage lending and securitization, please see Section VI.B.

subsidiaries "***don't do sub-prime***," and emphasized both the soundness of its risk management controls and the conservative nature of its business practices.

6.     These statements were false and misleading.  In fact, in a ceaseless quest for growth, RBS had rapidly accumulated billions of pounds of risky subprime assets.  Beginning in 2003 and throughout the housing boom, RBS's Connecticut-based bond house, Greenwich Capital Markets ("Greenwich") generated vast profits by selling mortgage debt to the financial markets as asset-backed securities ("ABS") and packaging them together into collateralized debt obligations ("CDO").  These investment vehicles, created by buying various kinds of debt, pooling them together and using them to back the issuance of bonds, were in large part based on mortgage-backed securities ("MBS"), including securities backed by subprime, Alt-A and other high-risk residential mortgages.

7.     Unbeknownst to investors, however, as the market for these securities became increasingly illiquid beginning in late 2006, RBS was forced to retain interests in many of these ABS CDOs, thereby assuming the investment risk associated with these complex securities. Another U.S. subsidiary of RBS, Citizens Financial Group, Inc. ("Citizens"), also took on significant exposure to subprime and non-conforming loans, while it grew from the sixth-largest bank in Rhode Island to the eight-largest bank in the United States.

8.     As Greenwich's CDO activity reached new heights, the performance of U.S. subprime mortgages and the U.S. mortgage industry began to decline, as reflected in a sharp increase in default rates on subprime mortgages and resulting in the bankruptcies of some of the largest subprime mortgage lenders.  By summer 2007, as the market for its CDOs dried up, RBS's subprime exposure had reached at least £34 billion ($68 billion)—£20 billion ($40

billion) in its investment banking division and £14 billion ($28 billion) in Citizens.[6]  Throughout this period, however, RBS maintained in public statements and securities filings that it had no significant exposure to the subprime loan market and that its risk management practices and financial controls were sound.

9.     Meanwhile, Goodwin's acquisition spree culminated in October 2007, with RBS's lead role in arranging the then-largest bank takeover in history.  As part of a three-member consortium, RBS purchased 38% of Dutch banking giant ABN AMRO Group ("ABN AMRO"), including its wholesale and investment banking unit, for approximately $38 billion in cash and securities.  Goodwin and other RBS senior executives pronounced the deal "compelling from a financial point of view" and touted the "synergies" and "accretions" that would result from merging the two companies.

10.     Shortly thereafter, in December 2007, RBS acknowledged that the Company held portfolios of subprime loans through both Greenwich and ABN AMRO, but downplayed the extent of RBS's exposure, reporting just over £1 billion ($2 billion) in losses.  RBS assured investors that the Company was well capitalized and still on target to report profits for the year "comfortably ahead of consensus" forecasts of £9.78 billion ($20 billion).  The securities markets accepted RBS's assurances.

11.     On April 22, 2008 RBS announced a £5.9 billion ($11.6 billion) asset writedown, nearly one-third of which was attributable to subprime assets carried over from ABN AMRO. The other two-thirds were tied primarily to ABSs and other similar assets held by Greenwich and Citizens.

---

[6]  "*RBS Traders Hid Toxic Debt*," The Daily Telegraph, Mar. 20, 2009); Robert Winsett, "*Board Not Told of Sub-Prime Deals that Crippled Sir Fred's Bank*," The Daily Telegraph, Mar. 21, 2009.

12.     On that same date, although Goodwin and other RBS officers had repeatedly told analysts and investors that RBS did not have any plans (or need) to raise capital, RBS announced a £12 billion ($23.7 billion) rights issue (the "Rights Issue") to increase the Company's capital base.  The Rights Issue—which was the largest in European history—was necessitated in large part by the £5.9 billion ($11.6 billion) writedown.

13.     In explaining the need for the Rights Issue, RBS admitted that it "purchased ABN AMRO at a point when bank valuations were way higher than they are today," and that the purchase "also increased our exposure to wholesale markets at an unfortunate time . . . ."

14.     As discussed more fully in Section VI below, this admission and other materially adverse developments clearly indicated that the billions of pounds of goodwill RBS had recorded on its balance sheet in connection with the ABN AMRO acquisition (and others) might be impaired.  However, rather than test the ABN AMRO goodwill, as required by applicable accounting standards, RBS instead assured investors that no impairment was necessary.  RBS's failure to accurately account for goodwill induced investors to participate in the £12 billion ($23.7 billion) Rights Issue by overstating the strength of RBS's balance sheet.

15.     As the Exchange Act Plaintiffs allege below, Defendants clearly understood that if they wrote down billions of pounds in goodwill at this time (as was required under the relevant accounting standards), they would not have been able to raise the £12 billion ($23.7 billion) the Company so desperately needed.

16.     The Rights Issue was successful, with subscription at more than 95%, resulting in the issuance of more than 5.8 billion new RBS ordinary shares.

17.     As the Exchange Act Plaintiffs allege below, throughout the Class Period, in spite of Defendants' knowledge to the contrary, they continued to tout the purported benefits of the

ABN AMRO acquisition.  After the raising £12 billion ($23.7 billion) through the Rights Issue, Defendants assured investors that they had achieved their target capital ratios—leading the public to believe that no additional public offerings of capital would be necessary.

18.     Indeed, even after requesting a £20 billion ($41 billion) bailout from the U.K. government in October 2008 that resulted in the substantial nationalization of RBS, the Company continued to tout the ABN AMRO acquisition as a panacea for its troubles.

19.     Finally, however, on January 19, 2009, RBS admitted that, due to the volume of subprime exposure the Company had taken on between 2005 and 2008 and the failure of the ABN AMRO acquisition to yield *any* of the benefits previously touted by RBS, it would report a loss of £28 billion ($41.3 billion) for 2008, the largest in British corporate history.  Following this disclosure, RBS ordinary shares lost more than 65% of their value, closing at £0.12 ($0.17) per share.

20.     On February 26, 2009, RBS announced a sharp reversal of its global expansion, with plans to lay off up to 20,000 employees and significantly reduce or close operations in 36 of the 54 countries in which the Company operated.

21.     The conduct of former RBS executives and the adequacy of the Company's disclosures concerning its exposure to subprime assets are the subject of ongoing formal investigations by the SEC, the New York State Attorney General and the U.K. Financial Services Authority, as well as the subject of testimony before the U.K. House of Commons Treasury Committee.  Most of the senior executives and directors who presided over RBS's epic destruction of shareholder value (many of whom are defendants in this action) have resigned or been ousted.

22.     Investors in RBS securities have suffered devastating losses as a direct consequence of RBS's undisclosed speculation in subprime assets, failure to properly value those assets and failure to timely take writedowns of goodwill related to the ABN AMRO acquisition. Defendants' false statements and failure to disclose material facts caused RBS securities to trade at inflated prices during the Class Period.  As of December 31, 2007, tens of billions of ordinary RBS shares were outstanding.  These shares, which have a primary listing on the London Stock Exchange but also trade on the New York Stock Exchange ("NYSE"), the Frankfurt Stock Exchange and the NYSE Euronext, have declined 98% in value, from a high of £6.02 ($11.60) per share on March 6, 2007 to fall to £0.12 ($0.17) per share upon RBS's January 19, 2009 announcement that it would post a record-breaking £28 billion ($41.3 billion) loss for 2008.

23.     RBS also relied on a series of preferred stock issuances to fund its asset growth, expansion into the risky subprime loan market and acquisition of ABN AMRO.  RBS raised more than $5.3 billion through the sale of preferred shares in 2006 and 2007.  These securities have declined in value by as much as 83% and continue to sell for less than 50% of their original issue price.

24.     Plaintiffs are purchasers of RBS ordinary and preferred shares.  Those Plaintiffs who are purchasers of RBS ordinary shares sue for violations of the U.S. securities law arising out of materially false and misleading statements made by RBS in press releases, analyst conference calls and filings with the SEC, in violation of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as violations of the Securities Act of 1933 (the "Securities Act") arising out of the offer of RBS ordinary shares to former ABN AMRO shareholders (the "Exchange Offer") and the offer of RBS ordinary shares through the Rights Issue.  Those Plaintiffs who are purchasers of RBS preferred shares also sue for violations of the Securities

Act arising out of the misstatements and omissions in the offering materials for the preferred shares. Under Fed. R. Civ. P 23(b)(3), Plaintiffs sue on behalf of themselves and all similarly situated persons.

## II.    OVERVIEW OF THE SEPARATE CLAIMS

### A.    Ordinary Share Exchange Act Claims

25.    In Counts I and II, Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), against the Defendants identified below in ¶¶ 45-63, 99. Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS securities from March 1, 2007 through January 19, 2009 (the "Class Period").

### B.    Preferred Share Securities Act Claims

26.    In Counts III through V, Plaintiffs assert claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. § 77l(a)(2), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against the Defendants identified below in ¶¶ 45-74 79-89, 101. Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS Series Q, R, S, T and/or U Non-cumulative Dollar Preference Shares issued by RBS pursuant or traceable to the April 8, 2005 Registration Statement (the "Preferred Share Offerings"). Pursuant to Fed. R. Civ. P. 8(d), Plaintiffs specifically disclaim any allegations of fraud in connection with these Securities Act claims, which sound in strict liability and negligence and are not based on any allegations of knowing or reckless misconduct on the part of any Defendant.

C. **Exchange Offer Securities Act Claims**

27.     In Counts VI through VIII, Plaintiffs assert claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. § 77l(a)(2), against the Defendants identified below in ¶¶ 45-78, 103.  Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who tendered ABN AMRO ordinary shares in exchange for RBS ordinary shares issued by RBS pursuant or traceable to the prospectus filed with the SEC on July 20, 2007 (the "Exchange Offer Prospectus").  Pursuant to Fed. R. Civ. P. 8(d), Plaintiffs specifically disclaim any allegations of fraud in connection with these Securities Act claims, which sound in strict liability and negligence and are not based on any allegations of knowing or reckless misconduct on the part of any Defendant.

D. **Rights Issue Securities Act Claims**

28.     In Counts IX and X, Plaintiffs assert claims for violations of Section 12(a)(2) and 15 of the Securities Act, 15 U.S.C. § 77l(a)(2), against the Defendants identified below in ¶¶ 45-63, 90-98, 104.  Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS ordinary shares issued by RBS pursuant or traceable to the Rights Issue prospectus, filed with the SEC on April 30, 2008 (the "Rights Issue Prospectus").  Pursuant to F. R. Civ. P. 8(d), Plaintiffs specifically disclaim any allegations of fraud in connection with these Securities Act claims, which sound in strict liability and negligence and are not based on any allegations of knowing or reckless misconduct on the part of any Defendant.

III.   **JURISDICTION AND VENUE**

A. **Jurisdiction Over Ordinary Share Claims**

29.     The Court has jurisdiction over the ordinary share claims under 28 U.S.C. §§ 1331 and 1337; Section 27 of the Exchange Act, 15 U.S.C. § 78a; and Section 22 of the

Securities Act, 15 U.S.C. §77v.  In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the NYSE.

30.	Pursuant to the judicially prescribed "effect test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims of (a) all investors who purchased or acquired RBS securities because RBS securities traded on a U.S. securities exchange or offered for sale in the U.S., and/or (b) United States investors who purchased or acquired RBS securities in the markets outside the United States.

31.	This Court may also properly exercise jurisdiction over the claims of foreign Class members who acquired RBS securities on foreign markets (as described below) under the "conduct test" articulated by the Second Circuit (and other courts), which provides that a federal court has jurisdiction over the claims of foreign purchasers who acquired their securities abroad if: (1) the defendant's activities in the United States were more than "merely preparatory" to violations of the securities laws effecting investors outside the U.S.; and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses.  The acts alleged herein show that substantial activity in furtherance of Defendants' securities law violations occurred within the United States and damaged Class members worldwide.

32.	With respect to Plaintiffs' fraud claims, Defendants engaged in extensive fraud-related conduct in the United States, which was part of a single fraudulent scheme.  The domestic conduct was not merely "preparatory" or comprised of perfunctory acts, but led directly to the losses by both foreign and domestic investors.

33.     During the Class Period, RBS's ordinary shares traded on the NYSE in the form of American Depositary Receipts ("ADRs"), and on the London Stock Exchange, the Frankfurt Stock Exchange, and the NYSE Euronext.  There was a single worldwide and informationally efficient market for RBS securities and information concerning the Company was accessible globally and simultaneously to investors through electronic financial news reporting media.  RBS securities were priced based on trades reported from the NYSE and various exchanges throughout the world.  Investors who utilized these markets were defrauded by Defendants' conduct, causing extensive effects on domestic purchasers of RBS securities, as well as on those who purchased RBS securities on exchanges abroad.

34.     In addition, Defendants' materially false and misleading statements disseminated to the investing public alleged herein were issued in the United States and were contained in the Company's annual and interim financial statements filed with the SEC, and in conference calls aired in the United States.  Moreover, the Company's annual and interim financial statements filed with the SEC were prepared in accordance with United States securities laws.

35.     The Company's independent auditor, Deloitte LLP, is the U.K. member firm of Deloitte Touche Tohmatsu, a Swiss Verein, which has its global headquarters in New York City.

36.     In addition to issuing false and misleading statements to the investing public, as described below in further detail, RBS conducts a substantial portion of its regular business activities in the United States, including the activities central to the wrongdoing alleged herein.

37.     These facts, and the additional facts set forth below, fully justify the exercise of subject matter jurisdiction over the claims of foreign Class members who purchased RBS securities on foreign exchanges.

### B.       Jurisdiction Over Preferred Share Claims

38.     This Court has jurisdiction over the preferred share claims under 28 U.S.C.

§§ 1331 and 1337 and § 22 of the Securities Act, 15 U.S.C. § 77v.  In connection with the acts

alleged herein, Defendants directly or indirectly used the means and instrumentalities of

interstate commerce, including, but not limited to, the United States mails, interstate telephone

communications, and the facilities of the NYSE.  The Preferred Shares traded in an efficient

market.

39.     Defendants engaged in acts in the United States, that caused violations of the

Securities Act and which acts were either negligent or subject them to strict liability.  Moreover,

the Preferred Shares were issued in U.S. dollars.  This domestic conduct was essential to and not

simply "preparatory" to their violations of the Securities Act, leading to losses suffered by both

foreign and domestic investors.

### C.       Venue

40.     Venue is proper in this district pursuant to Section 27 of the Exchange Act,

Section 22 of the Securities Act, and 28 U.S.C. § 1391(b).  Many of the acts alleged herein,

including the dissemination of materially false and misleading information in connection with

the purchase or sale of a security, occurred in this District.  In addition, at all times relevant to

Plaintiffs' claims, RBS and many, if not all, of the underwriters named herein, maintained offices

in New York City.

## IV.    THE PARTIES

### A.       Lead Plaintiffs

41.     By Order dated May 5, 2009, the Court appointed the Massachusetts Pension

Reserves Investment Management Board ("MassPRIM") and the Public Employees Retirement

System of Mississippi ("MissPERS") as Co-Lead Plaintiffs on behalf of the putative class of

Plaintiffs who owned the ordinary shares of RBS, and appointed the Freeman Group as Lead Plaintiff on behalf of the putative class of Plaintiffs who purchased RBS preferred shares.

### 1. Massachusetts Pension Reserves Investment Management Board

42.     MassPRIM is a public pension fund that currently manages funds for the benefit of the current and retired public employees of the Commonwealth of Massachusetts.  As set forth in the certification previously filed with the Court, MassPRIM purchased RBS securities during the Class Period, including RBS ordinary and preferred shares and purchased 2,915,147 ordinary shares as part of the Rights Issue, and suffered damages as a result of the federal securities law violations alleged herein.  MassPRIM also received approximately 102,000 RBS ordinary shares in exchange for ABN AMRO shares, in connection with the Exchange Offer.

### 2. Public Employees' Retirement System of Mississippi

43.     MissPERS is a public pension fund that currently manages funds for the benefit of the current and retired public employees of the state of Mississippi.  As set forth in the certification previously filed with the Court, MissPERS purchased RBS securities during the Class Period, including RBS ordinary and preferred shares and purchased 1,367,800 ordinary shares as part of the Rights Issue, and suffered damages as a result of the federal securities law violations alleged herein.  MissPERS also received 38,766 RBS ordinary shares in exchange for ABN AMRO shares, in connection with the Exchange Offer.

### 3. The Freeman Group

44.     Lead Plaintiff the Freeman Group is comprised of five individuals: Jay Freeman, Ravi Srinivasan, Sheldon Cantor, Jeffrey Hathorn and Michael Mancini.  As set forth in the certification previously filed with the Court, each of the members of the Freeman Group purchased RBS preferred shares issued pursuant or traceable to the April 8, 2005 Registration

Statement for the Preferred Share Offerings, and suffered damages as a result of the federal securities law violations alleged herein.

**B.    Defendants[7]**

**1.    Defendant RBS**

45.    Defendant RBS (LSE: RBS) is a British banking and insurance holding company. RBS is based in Edinburgh, Scotland.  In the U.K., its operations include The Royal Bank of Scotland plc, founded in 1727 by a Royal Charter of King George I, the National Westminster Bank ("NatWest"), which can trace its lineage back to 1650, and Ulster Bank in Ireland.

46.    In 2000, RBS more than tripled in size with its acquisition of NatWest.  This gave it a leading market share in U.K. retail and commercial banking, and made it one of the largest banks in the world.  At its peak, it was the largest bank in the world by asset size.  By market capitalization, it was the second largest in the U.K. and Europe, behind only HSBC Holdings plc, and the tenth largest company in the world.

47.    RBS operates a wide variety of banking brands offering personal and business banking, private banking, insurance and corporate finance throughout its operations located in Europe, North America and Asia.

48.    As of February 28, 2008, RBS announced a new organizational structure, following the acquisition of ABN AMRO in October 2007, intended to incorporate those ABN AMRO businesses to be retained by the Company.  RBS divided itself into four primary operating divisions and reported pro-forma operating profits among those divisions on a historical basis: Global Banking & Markets (GBM), Regional Markets, RBS Insurance and Group Manufacturing.

---

[7] Exhibit A contains a list of Defendants and the Counts alleged against them.

49.     RBS's profits and risks were concentrated primarily among the operations of (a) GBM and (b) U.K. Commercial and Retail Banking, which is within the Regional Markets division.

50.     GBM focuses on providing debt financing, risk management and transaction banking services to large businesses and financial institutions in the U.K. and around the world. Its subdivisions include RBS Securities, which was until April 1, 2009, known in the U.S. as Greenwich Capital Markets ("Greenwich").  GBM subdivisions also include Global Transaction Services, which offers global payments, cash and liquidity management, as well as trade finance, merchant acquiring and commercial card products and services.

51.     Regional Markets includes commercial and retail banking services organized by four geographic regions: the U.K., the U.S., Europe and the Middle East and Asia.

52.     Within Regional Markets, U.K. Retail and Commercial Banking includes retail banking, U.K. Wealth Management and U.K. Corporate Banking.  RBS U.K. supplies financial services through both the RBS and NatWest brands, offering a full range of banking products and related financial services to the personal, premium and small business ("SMEs") markets through the largest network of branches and ATMs in the U.K., as well as by telephone and internet.  In the U.K. and the Republic of Ireland, the main subsidiary companies are The Royal Bank of Scotland, NatWest, Ulster Bank, Drummonds and Coutts & Co.

53.     Regional Markets' second geographic division is U.S. Retail and Commercial Banking, which includes Citizens, which provides financial services through the Citizens and Charter One brands as well as through Kroger Personal Finance, its credit card joint venture with the second largest U.S. supermarket group.  Through 2003, Charter One operated a subsidiary known as Equity One, headquartered in Cleveland, Ohio, which specialized in the origination of

subprime home loans. Those loans were held on Charter One's balance sheet at the time it was acquired by Citizens/RBS in 2004.

54. On or about October 5, 2007, RBS, as part of a consortium with Belgian bank Fortis and Spanish bank Banco Santander (the "Consortium"), acquired ABN AMRO for €71 billion ($100 billion). In the deal, RBS acquired ABN AMRO's wholesale and investment banking unit and its Asian businesses. RBS's share of the purchase price amounted to approximately 38%, and was partially funded through the Exchange Offer, in which approximately 530.6 million RBS ordinary shares were offered to ABN AMRO shareholders in exchange for their ABN AMRO ordinary or American Depositary Shares.

55. On October 17, 2007, RBS issued ADRs in connection with the Company's bid for the outstanding securities of ABN AMRO. The ADRs, each representing one ordinary share of RBS, nominal value 25p each (or a right to receive one ordinary share), were listed on the NYSE. The ADRs were issued pursuant to a Deposit Agreement between the Company, The Bank of New York Mellon, as depositary, and all owners and holders from time to time of ADRs issued thereunder.

56. As of December 31, 2007, 62.9 million RBS ADRs were outstanding.

57. On October 20, 2008, RBS announced that to maintain an appropriate price range for RBS ADRs trading on the NYSE, effective November 7, 2008, the ratio of one (1) ADR representing one (1) ordinary RBS share will change to one (1) ADR representing 20 (twenty) ordinary shares. RBS's reverse stock split went into effective on November 7, 2008 as planned, and currently each ADR represents 20 ordinary shares.

### 2. The Individual Defendants—All Claims

58. Defendant Sir Thomas Fulton McKillop ("McKillop") served as Chairman of the Board of Directors of RBS (the "Board") from September 2005 until February 2009. Following

criticism of the ABN AMRO acquisition and the U.K. government bailout of RBS, McKillop announced his early retirement as Chairman of RBS's Board on October 18, 2008.

59. Defendant Sir Frederick Anderson Goodwin ("Goodwin") served as Chief Executive Officer ("CEO") and a director of RBS until October 2008. He joined RBS in 1998 as deputy CEO to then-Chairman Sir George Mathewson ("Mathewson"). Goodwin was promoted to CEO in January 2001. Goodwin signed the April 8, 2005 Registration Statement and RBS's Annual Reports on Form 20-F filed with the SEC for the years ending December 31, 2005 and December 31, 2006, which were incorporated by reference into selected Preferred Share Offerings. On October 11, 2008, Goodwin resigned as CEO, reportedly as a condition of the British government's bailout of RBS, and announced that he would retire from the RBS Board, effective January 31, 2009. Goodwin's retirement became effective just one month before RBS reported a loss of £28 billion ($41 billion) for 2008—the largest annual loss in U.K. corporate history. Despite the condition in which he left the Company, Goodwin departed with a severance package that included a pension of approximately £700,000 ($1.2 million) per year for the rest of his life. Five months later, Goodwin agreed to reduce his severance package by 50%, and on the same date an investigation by U.K. authorities into whether Goodwin misused expense accounts and other perks came to a close.

60. Defendant Guy Whittaker ("Whittaker") has been Financial Director and a director of RBS since February 2006. Whittaker was formerly the treasurer at Citigroup Inc., based in New York. At Citigroup, where he had worked since 1980, Whittaker was responsible for managing the balance sheet, including its capital resources, funding strategy, capital markets issuance, aggregate interest rate risk and liquidity. Whittaker signed RBS's Annual Reports on Form 20-F filed with the SEC for the years ending December 31, 2005 and December 31, 2006,

which were incorporated by reference into selected Preferred Share Offerings. On May 5, 2009, RBS announced that Whittaker would resign from the Board and his position as Group Financial Director and leave RBS by October 2009.

61.     Defendant John "Johnny" Cameron ("Cameron") was a Director of RBS and the Chief Executive of Corporate Banking & Financial Markets ("CBFM"), subsequently renamed Corporate Markets in January 2006, and in that capacity was responsible for Global Banking & Markets (GBM) and U.K. Commercial Banking at all times relevant hereto. Cameron was appointed as Director of RBS in March 2006 and originally joined RBS from Dresdner Kleinwort Benson in 1998. In 2000, Cameron was appointed Deputy Chief Executive of CBFM with responsibility for the integration of the NatWest and RBS Corporate Banking businesses. In October 2001, Cameron was appointed Chief Executive of CBFM. On October 13, 2008, RBS announced that Cameron had resigned his position as a Director with "immediate effect." RBS has disclosed that, as of February 28, 2009, Cameron was no longer employed by the Company, which RBS characterized as a "retirement." It has been widely reported that Cameron's role in the downfall of RBS caused the U.K.'s Financial Services Authority to "block" Cameron from taking a position at the U.S. investment bank Greenhill, by denying him the necessary regulatory clearances to take that job.

62.     Defendant Lawrence Fish ("Fish"), a U.S. citizen, was appointed Chairman and CEO of Citizens in 1992 after serving as Chairman and CEO of the Bank of New England. In January 1993, he was appointed as a director of RBS. Fish signed the April 8, 2005 Registration Statement. In March 2007, he resigned as the CEO of Citizens and was appointed Chairman of RBS America. On December 17, 2007, Fish announced that he would retire from his day-to-day operating duties at Citizens and RBS, but would remain as a non-executive Chairman of

Citizens.  As of May 1, 2008, Fish relinquished all of his executive functions at RBS and became a non-executive director, while retaining his non-executive Chairman role at Citizens.  On August 27, 2008, RBS announced that Fish would be retiring as a director of RBS, effective December 31, 2008, which was reported to be a response to criticisms that RBS's Board lacked independence.  On or about March 5, 2009, Fish resigned from his remaining position as Chairman and director at Citizens.

63.     Defendants McKillop, Goodwin, Whittaker, Cameron and Fish are collectively referred to herein as the "Individual Defendants."

### 3.     Individual Defendants—Exchange Offer and Preferred Share Offerings

64.     Defendant Gordon Francis Pell ("Pell") has been a director of RBS since March 2000.  He signed the April 8, 2005 Registration Statement.  Pell was identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

65.     Defendant Mark Fisher ("Fisher") was a director of RBS from March 2006 to November 2008.  Fisher was identified as a director in RBS's 2006 annual report, which was incorporated by reference into the Preferred Share Offering Materials.

66.     Defendant Colin Alexander Mason Buchan ("Buchan") has been a non-executive director of RBS since June 2002.  Buchan signed the April 8, 2005 Registration Statement.  Buchan was identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

67.     Defendant James McGill Currie ("Currie") was a non-executive director of RBS from November 2001 through February 2009.  Currie was identified as a director in RBS's 2005

and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

68.     Defendant Sir Stephen Arthur Robson ("Robson") was a non-executive director of RBS from July 2001 through February 2009. Robson signed the April 8, 2005 Registration Statement. Robson was identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

69.     Defendant Robert Avisson Scott ("Scott") was a non-executive director of RBS from January 2001 through February 2009. Defendant Scott signed the April 8, 2005 Registration Statement. Scott was identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

70.     Defendant Peter Denis Sutherland ("Sutherland") was a director of RBS from January 2001 through February 2009. Sutherland signed the April 8, 2005 Registration Statement. Sutherland was identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

71.     Defendant Archibald Hunter ("Hunter") has been a director of RBS since September 2004. Defendant Hunter signed the April 8, 2005 Registration Statement. Hunter was identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

72.     Defendant Charles John Koch ("Koch") was a director of RBS from September 2004 through February 2009. Koch was identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

73.     Defendant Joseph Patrick MacHale ("MacHale") has been a director of RBS since September 2004. MacHale signed the April 8, 2005 Registration Statement. MacHale was

identified as a director in RBS's 2005 and 2006 annual reports, which were incorporated by reference into the Preferred Share Offering Materials.

74.     Defendants Pell, Fisher, Buchan, Currie, Robson, Scott, Sutherland, Hunter, Koch, and MacHale each signed the July 20, 2007 Registration Statement filed with the SEC, in connection with the registration of RBS ordinary shares issued in the Exchange Offer.

### 4.     Individual Defendants—Exchange Offer Only

75.     Defendant Chris Campbell ("Campbell") is the Deputy General Counsel & Director of RBS's legal department.  Prior to joining RBS on August 1, 2005, Campbell was the managing partner of Dundas & Wilson LLP.

76.     Defendant Janis Kong ("Kong") was a director of RBS from January 2006 through February 2009.

77.      Defendant William Freidrich ("Freidrich") was a director of RBS from March 2006 through February 2009.

78.     Defendants Campbell, Kong, and Freidrich signed the RBS July 20, 2007 Registration Statement filed with the SEC, in connection with the registration of RBS ordinary shares issued in the Exchange Offer.

### 5.     Preferred Share Offerings Underwriter Defendants

79.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services on a global basis.  Merrill Lynch is a subsidiary of Bank of America Corporation and is headquartered in New York, NY.  Merrill Lynch was an underwriter of all of the Preferred Share Offerings and a bookrunning manager for the Series T and Series U offerings.

80.     Defendant Greenwich Capital Markets, Inc. ("Greenwich") was a fixed-income capital markets firm providing a full range of debt financing, risk management and investment services to major corporations and financial and governmental institutions around the world. Greenwich was a wholly-owned subsidiary of Greenwich Capital Holdings, Inc., of which RBS was the ultimate parent. Effective April 1, 2009, Greenwich was renamed "RBS Securities Inc." Greenwich Capital Markets was an underwriter of and book running manager for all of the Preferred Share Offerings. Greenwich was an underwriter of and bookrunning manager for all of the Preferred Share Offerings.

81.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") was the corporate and investment banking side of brokerage firm Wachovia Securities. The two entities are now doing business as Wells Fargo Securities, LLC and Wells Fargo Advisors respectively. Wachovia Capital and Wachovia Securities are both subsidiaries of Wachovia Corporation, which is now doing business as Wells Fargo & Company. Wachovia Capital provided financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting, and equity investing. At all relevant times herein, Wachovia Corporation has maintained offices in New York, NY. Wachovia Capital was an underwriter of all of the Preferred Share Offerings.

82.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm which, through its subsidiaries and affiliates, provides its products and services to corporations, governments, financial institutions and individuals. Morgan Stanley is headquartered in New York, NY. Morgan Stanley was an underwriter of the Series Q, R, S and T offerings.

83.     Defendant UBS Securities LLC ("UBS Securities") is the U.S. investment banking and securities arm of UBS Investment Bank, which provides a range of financial products and services worldwide.  UBS Securities is headquartered in New York, NY.  UBS Securities was an underwriter of the Series Q, R, S and T offerings.

84.     Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America and its subsidiary.  Banc of America offers trading and brokerage services, debt and securities underwriting, debt and equity research, and advice on public offerings, leveraged buyouts, and mergers and acquisitions.  Banc of America is headquartered in New York, NY.  Banc of America was an underwriter of the Series R, S, T and U offerings.

85.     Defendant RBC Dain Rauscher Inc. ("RBC") is the corporate and investment banking division of Royal Bank of Canada.  At all relevant times herein, RBC has maintained offices in New York.  RBC was an underwriter of the Series Q, S and T offerings.

86.     Defendant Citigroup Global Markets Inc. ("Citigroup Global") is a subsidiary of Citigroup Inc. and is headquartered in New York, NY.  Citigroup Global was an underwriter for the Series Q and R offerings and a joint bookrunning manager for the Series Q offering.

87.     Defendant A.G. Edwards & Sons Inc. ("A.G. Edwards") provided securities and commodities brokerage, asset management, trust services, mutual funds, and insurance to individuals throughout the U.S. and serves government and corporate clients.  A.G. Edwards is a wholly-owned subsidiary of Wachovia Corporation and was renamed Wachovia Securities in January 2008.  As explained above, Wachovia Corporation is now doing business as Wells Fargo & Company.  At all relevant times herein, A.G. Edwards and Wachovia have maintained offices in New York, NY.  A.G. Edwards was an underwriter of the Series R offering.

88.     Defendant Goldman Sachs & Co. ("Goldman Sachs") is a global financial services firm that provides investment banking, securities and investment management services to a substantial and diversified client base, including corporations, financial institutions, governments and high-net-worth individuals. Goldman Sachs is headquartered in New York, NY. Goldman Sachs was a senior co-managing underwriter on the Series U Offering.

89.     Preferred Share Offering Underwriter Defendants Merrill Lynch, Greenwich, Wachovia Capital, Morgan Stanley, UBS Securities, Banc of America, RBC, Citigroup Global, A.G. Edwards, and Goldman Sachs served as underwriters and statutory sellers of the Preferred Share Offerings and were intimately involved in those offerings. As underwriters, these defendants were responsible for the truth, accuracy and completeness of the documents pursuant to which the Preferred Share Offerings were conducted. The offering materials issued in connection with the Preferred Share Offerings contained material untrue statements and omissions of material facts, as detailed below.

**6.      Rights Issue Underwriter Defendants**

90.     The Rights Issue was underwritten by the following investment banks, who assume liability with respect to the material untrue statements or omissions contained in the offering documents.

91.     Defendant Goldman Sachs International ("GSI"), is an investment banking firm operating in the U.K., among other markets, and is regulated by the U.K. Financial Services Authority (FSA), with principal offices at Peterborough Court, 133 Fleet Street, London EC4A 2BB.

92.     GSI is an unlimited company and a wholly owned subsidiary and affiliate of Goldman Sachs Group, Inc. ("GS") (collectively, "Goldman"). Defendant GSI was a joint bookrunner and "firm-commitment" underwriter of the ordinary shares sold in the Rights Issue.

93.     Defendant Merrill Lynch International ("MLI") is a U.K.-based broker-dealer in securities and a dealer in equity and credit derivatives, among other markets, and is regulated by the FSA, with principal offices at Merrill Lynch Financial Centre, 2 King Edward Street, London EC1A 1HQ.

94.     MLI is a wholly owned subsidiary and affiliate of Bank of America (pursuant to the January 1, 2009 merger of Merrill Lynch, Inc. and Bank of America Corp.) (collectively, "ML").  Defendant MLI was a joint bookrunner and firm-commitment" underwriter of the ordinary shares sold in the Rights Issue.

95.     Defendant UBS Limited ("UBSL"), an investment banking firm headquartered in London, Great Britain, is a U.K.-based broker-dealer in securities and is regulated by the FSA with principal offices at 1 Finsbury Avenue, London EC2M 2PP.

96.     UBSL is a wholly owned subsidiary and affiliate of UBS AG (collectively "UBS").  Defendant UBSL was a co-bookrunner and "firm-commitment" underwriter of the ordinary shares sold in the Rights Issue.

97.     Collectively, GSI, MLI and UBSL, are identified herein as the "Rights Issue Underwriter Defendants."

98.     Each of the Rights Issue Underwriter Defendants served as an underwriter and statutory seller of the ordinary shares sold in the Rights Issue, and was intimately involved in that offering.  As underwriters, these defendants were responsible for the truth, accuracy and completeness of the documents pursuant to which the Rights Issue was conducted.  The offering materials issued in connection with the Rights Issue contained material untrue statements and omissions of material facts, as detailed below.

C.      **Definitions Used in the Complaint for Groups of Defendants**

1.      **The Exchange Act Defendants**

99.      Defendants RBS, McKillop, Goodwin, Whittaker, Cameron and Fish are collectively referred to as the "Exchange Act Defendants."

100.      It is appropriate to treat the individual Exchange Act Defendants as a group for pleading purposes and to presume that the false information conveyed in RBS's SEC filings and press releases are the product of the collective actions of this narrowly defined group of defendants.  Each of these defendants, by virtue of his high-level position within RBS, directly participated in the day-to-day management of the company, and was privy to confidential information about the company, its business operations and its financial results.  Each of these defendants was responsible for establishing and monitoring the company's loss reserves and was involved or participated in the drafting, production and dissemination of the false statements alleged herein.

2.      **Preferred Share Offerings Defendants**

101.      Defendants RBS, McKillop, Goodwin, Whittaker, Cameron, Fish, Pell, Fisher, Buchan, Currie, Robson, Scott, Sutherland, Hunter, Koch, MacHale, Merrill Lynch, Greenwich Capital Markets, Wachovia Capital, Morgan Stanley, UBS Securities, Banc of America, RBC, Citigroup Global, A.G. Edwards, and Goldman Sachs are collectively referred to as the "Preferred Share Offerings Defendants."

102.      Defendants Merrill Lynch, Greenwich Capital Markets, Wachovia Capital, Morgan Stanley, UBS Securities, Banc of America, RBC, Citigroup Global, A.G. Edwards, and Goldman Sachs are collectively referred to as the "Preferred Share Offerings Underwriter Defendants."  Defendants Pell, Fisher, Buchan, Currie, Robson, Scott, Sutherland, Hunter, Koch and MacHale are collectively referred to as the "Preferred Share Individual Defendants."

### 3. Exchange Offer Defendants

103.   Defendants RBS, McKillop, Goodwin, Whittaker, Cameron, Fish, Fisher, Pell, Bucan, Currie, Freidrich, Hunter, Koch, Kong, MacHale, Robson, Scott, Sutherland and Campbell are collectively referred to as the "Exchange Offer Defendants."  Each of the Exchange Offer Defendants were intimately involved in the Exchange Offer and were either a statutory seller of the ordinary shares paid as consideration to ABN AMRO shareholders in the Exchange Offer, or signed the July 20, 2007 Registration Statement filed with the SEC in connection with the Exchange Offer (or controlled such persons).

### 4. Rights Issue Defendants

104.   Defendants RBS, Goodwin, McKillop, Whittaker, Cameron, Fish, GSI, MLI, and UBSL are collectively referred to as the "Rights Issue Defendants."  Each of the Rights Issue Defendants served as an underwriter and/or statutory seller of the ordinary shares sold in the Rights Issue (or controlled such persons).

## V.   CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

105.   This action is brought as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of (1) all persons who purchased or otherwise acquired RBS securities between March 1, 2007 and January 19, 2009; and/or (2) all persons who purchased or otherwise acquired RBS Series Q, R, S, T and/or U Non-cumulative Dollar Preference Shares issued pursuant or traceable to the April 8, 2005 Registration Statement and were damaged thereby.

106.   Excluded from the Class are Defendants; persons who, during the Class Period, were officers and/or directors of any Defendant or its parents, subsidiaries and/or affiliates, as well as members of their immediate families and legal representatives, heirs, successors or

assigns; any entity in which any Defendant has or had a controlling interest; and Defendants' liability insurance carriers and any affiliates or subsidiaries thereof.

107. The members of the Class are so numerous that joinder of all members is impracticable. As of December 31, 2008, there were more than 39 billion RBS ordinary shares issued and outstanding. More than 150 million Series Q, R, S, T and U preferred shares were issued. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least tens of thousands of members in the Class. Record owners and other members of the Class may be identified from records maintained by RBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.

109. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

110. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the Exchange Act Defendants engaged in a scheme and fraudulent course of conduct in violation of Rule 10b-5;

(c)     Whether statements made by the Exchange Act Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of RBS in violation of Rule 10b-5;

(d)     Whether the Exchange Act Defendants acted willfully or with recklessness in connection with the scheme and the misrepresentations alleged herein;

(e)     Whether Defendants' conduct caused Plaintiffs' losses;

(f)     Whether the documents issued in connection with the Exchange Offer contained untrue statements of material fact or omitted to disclose material facts in violation of the Securities Act;

(g)     Whether the offering documents issued in connection with the Rights Issue contained untrue statements of material fact or omitted to disclose material facts in violation of the Securities Act;

(h)     Whether the offering documents issued in connection with the Series Q, R, S, T and U Preferred Share Offerings contained untrue statements of material fact or omitted to disclose material facts in violation of the Securities Act; and

(i)     Whether the members of the Class have sustained damages and the proper measure of damages.

## VI.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS RELATING TO EXCHANGE ACT CLAIMS

### A.     Goodwin's Central Role in Defendants' Fraud

111.     Defendant Fred Goodwin played the central role in the fraudulent scheme that led to RBS's downfall.  *Newsweek* dubbed Goodwin "the worst banker in the world"[8] for his role in RBS's collapse, because he "aced every requirement for a hubristic CEO."  It was widely

---

[8] Daniel Gross, "*The World's Worst Banker?*," Newsweek, Dec. 2, 2008.

reported that Goodwin's goal was to grow RBS from a relatively modest U.K. bank into one of the titans of the global banking industry. Unfortunately, Goodwin's pride eventually drove him to commit a massive fraud on RBS's shareholders, in concert with the other Defendants, which, when exposed, precipitated RBS's collapse, and the downfall of all of the Company's senior officers and directors, including Goodwin himself.

112. Beginning in 2000, when he was chosen by former RBS Chairman Mathewson for the Deputy Chief Executive role at RBS, Goodwin implemented an aggressive growth-by-acquisition strategy, under which the Company made 26 acquisitions, ultimately culminating in the Company's purchase of ABN AMRO, which is now widely regarded as one of the ten most ill-conceived acquisitions in corporate history.[9]

113. While spending vast amounts of RBS's capital on these acquisitions (the Company's reserves of Tier 1 capital, a key measure of a bank's financial strength and a vital reserve to cover losses, were the lowest among its U.K. banking peers at the beginning of 2008) Goodwin simultaneously caused the Company to increase its positions in risky but potentially lucrative investments, in order to increase income to fuel even more growth.

114. According to a June 19, 2009 *Bloomberg.com* article, Goodwin accomplished this by boosting RBS's investment in complex ABSs, including investment in risky subprime assets, to a level so high that by 2008 its derivative positions surpassed the Company's net deposits.[10]

115. *Newsweek* described Goodwin's actions as "design[ing] a house that would teeter when the slightest ill wind began to blow."[11]

---

[9] Mathieu Robbins, "*Was ABN the worst takeover deal ever?*," The Independent, Jan. 20, 2009.

[10] Simon Clark, "*Decline of West Where Mathewson Rues What RBS Wrought*," Bloomberg.com, June 19, 2009.

[11] Daniel Gross, "*The World's Worst Banker?*," Newsweek, Dec. 2, 2008.

116.     In 2007, RBS began to suffer large losses as a result of the Company's billions of dollars of subprime exposure when it was forced to keep these toxic assets on its books because there were no longer any willing buyers for them.  Nonetheless, Goodwin intentionally delayed disclosure of the Company's subprime problem—affirmatively, bluntly and repeatedly denying that RBS had toxic subprime exposure—and thereby misrepresented its financial health. Goodwin carried out this fraudulent scheme by stifling dissent within RBS, bullying and berating the Company's management into submission.

117.     Before he became known as the worst banker in the world, Goodwin had a different moniker: "Fred the Shred."  So-called because of his willingness to cut costs and jobs and also, according to George Edwards, RBS's former head of corporate affairs, "because he was inclined to tear people and ideas to shreds."[12]

118.     On January 20, 2009, the *Daily Telegraph* reported, "Sir Fred, 50, became obsessed with his quest to make RBS a titan of world banking, and had such an overbearing personality that none of his staff had the clout to stop him, even when some of them began to have concerns that the bank was overstretching itself."

119.     Multiple RBS insiders have come forward to say that Goodwin used fear and humiliation in order to dominate Company management.  "Fred has one quality which is innate in him," Goodwin's former mentor, Mathewson, has said, "It would appear that he frightens people."[13]

120.     Edwards has stated, "People did not like having to present to him because he could be so unpleasant.  I can't think of him ever encouraging debate."[14]

---

[12] Simon Clark, "*Decline of West Where Mathewson Rues What RBS Wrought,*" Bloomberg.com, June 19, 2009.
[13] *Id.*
[14] Simon Clark, "*Decline of West Where Mathewson Rues What RBS Wrought,*" Bloomberg.com, June 19, 2009.

121.     Goodwin has been described by RBS insiders as "facetious and withering – a classical psychological bully."

> Goodwin held a meeting at 9.30 every morning for his top executives, usually from the bank's Edinburgh headquarters or its London office. Attendance was mandatory – either in person or via videolink – for all the bank's divisional bosses.
>
> *[The morning meetings] soon became known as the "morning beatings".* They could last for anything from 15 minutes to an hour – but rarely longer. Some former executives say they were an efficient way of resolving serious issues. The mood, however, was never pleasant.
>
> "Those meetings were never about enlightening anyone about anything," said one former senior RBS executive who attended the meetings for many years. "It was all about humiliation. It seemed that Fred was never happy until he'd found someone to humiliate . . ."
>
> Waffling was unacceptable. Answering back was dangerous. Knowing the right answer to his questions was often impossible.
>
> "He might ask what the takings were in one of the Glasgow branches last Tuesday," said a former executive. "You wouldn't know because you look after 10,000 branches. But he would say: 'You should know. Are you doing your job properly? Do you know what you're doing? Should I get someone else in to do your job?' His favourite phrase was 'I think you're asleep at the wheel'. He would finish a grilling with the line 'That's life in the big city'."[15]

122.     Jeremy Peat, RBS's chief economist from 1993 to 2005, confirmed that Goodwin often intimidated members of Company management at the morning meetings:

> "By the time it got around to me, he had usually been extremely critical of one person around the table and torn them off a strip," said Peat, 64, now director of Edinburgh's David Hume Institute, an economic research organization. "He would not necessarily shout, but it would be clear from his body language and his words that he was very cross with what he perceived they had done. And that was in front of their peers.

---

[15] Iain Dey & Kate Walsh, "*How Fred Shredded RBS*," TimesOnline, Feb. 8, 2009.  All emphasis is added unless it is noted as existing in the original source.

''It's the way he ran things,'' Peat said. ''He was impatient with anyone who didn't see things his way.''[16]

123. On April 3, 2009, at RBS's annual shareholders meeting, Phillip Hampton, who became RBS's Chairman in February 2009, told shareholders, "There's no room in RBS now for victimization or bullying. No organization can run successfully in that way."

124. By that time, however, RBS's shareholders had already suffered massive losses. As set forth below, those losses were caused by Goodwin, who ran roughshod over internal controls and bullied the other Individual Defendants into:

(a) Incurring *billions of dollars of exposure to subprime assets*, assigning inflated values to them and concealing the magnitude of those assets from RBS's investors, from at least March 1, 2007 to April 22, 2008;

(b) Giving investors excessively optimistic reports regarding the ABN AMRO acquisition and its accretive value to shareholders, without any reasonable basis for doing so, from at least July 20, 2007 to January 19, 2009;

(c) Concealing from investors the ABN AMRO-related problems that were evident to Defendants immediately after the ABN AMRO acquisition, including the magnitude of ABN AMRO's toxic subprime assets, RBS violated the requirement under International Financial Reporting Standards ("IFRS") to take *billions of dollars in write-downs and impairments stemming from the ABN AMRO acquisition*; and

(d) Reassuring investors that after completion of the Rights Issue, RBS was adequately capitalized and had achieved target capital ratios.

---

[16] Simon Clark, "*Decline of West Where Mathewson Rues What RBS Wrought*," Bloomberg.com, June 19, 2009.

### B.    The Mortgage Industry and How Mortgage Securitization Works

125.    Prior to the start of the Class Period, RBS began accumulating significant positions in securities that were backed by home mortgages and related assets, without properly disclosing them to investors.  RBS's accumulated positions in assets backed by both subprime and other mortgage loans were the single most significant factor in its subsequent writedowns totaling in excess of £8 billion ($15 billion) and goodwill impairments totaling £23 billion ($42.6 billion).  To better understand how the Exchange Act Defendants were able to conduct their fraudulent scheme, some background information regarding the mortgage industry and mortgage securitization is necessary.

126.    Until the 1990s, the mortgage industry had been traditionally characterized by a loan originator (*i.e.*, a bank) holding a direct interest in the property as collateral for a mortgage in the event the borrower defaulted on the loan.  Under the traditional model, the loan originator held the note until it matured and was exposed to the concomitant risk that the borrower would fail to repay the loan.  As such, under the traditional model, the loan originator had a financial incentive to ensure that its underwriting process properly assessed the borrower's ability to pay.  Typically this assessment required disclosure and confirmation of the borrower's income, employment, credit history and assets.  In addition, the loan originator had a financial incentive to obtain an accurate property appraisal before issuing a mortgage to ensure that the mortgage was adequately collateralized in the event the borrower defaulted and the property was foreclosed.

127.    However, beginning in the 1990s, the traditional model of loan origination changed dramatically.  Under the new model, after a loan originator issued a mortgage to a borrower, the loan originator would typically sell the mortgage into the financial markets to third-party financial institutions.  By selling the mortgage, the loan originator obtains fees in

connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages. The mortgages sold into the financial markets are typically pooled together and securitized into varieties of ABSs. ABSs are often pooled together into CDOs. (*See* Exhibit B for a detailed description of this process).

128. ABS CDOs vary in structure and underlying assets, but the basic principle is the same. A corporate entity called a "special purpose entity" ("SPE") is constructed to hold assets as collateral and to sell packages of cash flows to investors. The SPE issues ABSs in the form of bonds in different groups, or "tranches," and the proceeds are used to purchase the portfolio of underlying assets. An SPE's portfolio of underlying assets might include residential mortgage loans, student loans, commercial loans or corporate loans.

129. When the SPE's assets are made up of mortgages, the bonds it issues are called "mortgage-backed securities" ("MBS") or "collateralized mortgage obligations" ("CMO"). After receiving proceeds from the sale of the mortgage, the loan originator no longer holds the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBSs or CMOs. As illustrated below, mortgage securitization is a structured finance process in which mortgage loans are acquired, pooled together, and then sold to investors who acquire rights in the cash flow streams from the mortgage pools.



Follow the Mortgage — What happens to your mortgage after you sign on the dotted line

(Source: *The Wall Street Journal* (June 27, 2007))

130.     ABS CDOs are typically constructed from a portfolio of fixed-income assets, such as MBSs, and are used to spread the risk of the underlying assets.  The ABS CDO pools together the cash flow received when mortgage borrowers make interest and principal payments as required by the underlying mortgage terms.  That cash is then distributed to the holders of the CDO certificates in order of priority based on the specific tranche held by an ABS CDO investor.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the cash flow from the mortgage pool.  Since the senior tranche is *first* to receive payments, it is also the *last* tranche to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  As a result, the senior tranches of most CDOs were rated AAA by the credit rating agencies (*e.g.*, Moody's, Standard & Poor's and Fitch Ratings).  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the payments.  In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BB by the Rating Agencies. The process of distributing the cash-flow from the borrowers' mortgage payments continues down the tranches through to the bottom tranches (referred to as equity tranches).  This process is repeated each month and all investors receive the interest and principal payments owed to them so long as the mortgage borrowers are current on their mortgages.

131.     Different ABSs have different risk/reward characteristics based upon the quality of the underlying loans.  In the context of residential mortgage loans, Prime, or "A-paper," loans are considered to be the least risky residential mortgage loans, because, in order to obtain such a loan, the borrower typically must fully document his or her income and assets, inject at least 20%

equity into the transaction, and have a credit score of a certain level (usually 680 or higher), a debt to income ratio of 35% or lower and two months of mortgage payments in reserve.

132.    "Alt-A" (short for "Alternative A-paper") and "subprime" loans are considered riskier than prime loans, because the borrowers typically have less than full documentation, lower credit scores, higher loan-to-values or multiple investment properties.  CDOs or MBSs backed by subprime assets carry a high risk because they are based on loans made to borrowers who are more likely than others to default on repayment, and, as with any investment, this greater risk is accompanied by a greater potential reward.

133.    Importantly, the system only works if the underlying asset-backed securities held by the ABS CDO are uncorrelated – in other words, they must be unlikely to all go bad at once.[17] However, ABS CDOs holding only subprime and other mortgage-related investments (*e.g.*, investments that are dependent on mortgages for their value), were highly correlated because they were substantially comprised of subprime securities and were, therefore, extremely vulnerable to a rise in defaults on subprime mortgage loans.

C.    **Contrary to Defendants' Statements, RBS Had Exposure To Billions of Dollars in Materially Overvalued Subprime Assets**

134.    Despite Defendants' repeated assurances that RBS had no subprime exposure, as discussed below, the Company in fact had billions of dollars worth of such assets via, among other things, the CDOs and MBSs held by Greenwich and backed primarily by subprime loan portfolios, and the CMOs that Citizens purchased for repackaging into ABS CDOs by Greenwich.

135.    Greenwich collected assets to be securitized, structured the ABS and underwrote the securities to be sold to investors.  According to the Center for Public Integrity, in the peak

---

[17] *See* Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move Into CDOs*, WALL ST. J., Oct. 25, 2007.

years of underwriting MBSs, 2005 and 2006, Greenwich was ranked the second largest domestic underwriter of subprime securities. Only Lehman Brothers underwrote more subprime securities during that time frame. In those two years, **_Greenwich underwrote over $99 billion of subprime MBSs_**. The Exchange Act Defendants concealed from investors and the RBS Board the extent to which Greenwich and RBS had not only underwritten these subprime ABSs, but had also retained significant positions in subprime ABSs it had underwritten.

136. Defendant Goodwin, among other RBS executives designed the plan for Greenwich's startling growth as an underwriter of ABS backed by subprime loans. In 2006, RBS hired a new co-head of Greenwich's CDO team in order to lead Greenwich in a massive effort to repackage assets and achieve RBS's aggressive growth targets:

> [T]he number of traders on Greenwich Capital's CDO desk doubled to 25. RBS issued $16.3 billion of CDOs in 2006, up from $4 billion in 2005, according to the trade publication Asset-Backed Alert. . . . .
>
> After credit markets slumped at the end of 2007 and losses had to be recognized on RBS's balance sheet, CDOs accounted for the largest portion of the 1.5 billion pounds of writedowns announced by the company in December of that year. Twenty CDOs originated by RBS totaling almost $16.5 billion were in events of default as of May 13 of this year [2009], according to data compiled by Bloomberg.[18]

137. According to three former Greenwich executives, the pressure to plunge deeper into growth areas such as CDOs "came from Edinburgh and London," _i.e._, Goodwin and his team. "'They believed you had to be one of the top three in all the markets you're in,' said Glen Capelo, a former Treasuries trader at the firm who's now a managing director at Broadpoint Capital Inc. in New York, 'That leads to over-expansion.'" _Id._

---

[18] Simon, Clark, "Decline of West Where Matthewson Rues What RBS Wrought," _Bloomberg_ (June 19, 2009).

138.    However, by no later than August 2007, RBS recognized that the market for CDOs was becoming illiquid, that CDO underwriting was likely to retract substantially and began downsizing its CDO operations.  By mutual agreement, the co-head of the CDO team that was hired to drive Greenwich's repackaging business left the firm.  Six other CDO team members were let go at the same time.  Just three months later, the other co-head of the CDO team, Fred Matera, also left the firm.

139.    Although RBS was quick to reduce its workforce in response to the growing illiquidity of the CDO market, the same could not be said for its speed in writing down assets exposed to the same illiquidity on its balance sheet.

140.    Despite RBS's massive buildup of billions of pounds in subprime exposure, which largely originated between 2005 and 2007 (the period of the greatest home price appreciation and subsequent decline in U.S. real estate),[19] RBS largely concealed from investors until at least April 22, 2008 that the majority of its CDOs were based on MBSs, including securities backed by subprime mortgages.  It was not until RBS issued its annual report on Form 20-F for 2007 on May 14, 2008 that RBS revealed the percentages of subprime loans included in the CDOs it held.  Moreover, not until it filed its annual report on Form 20-F for 2008 did RBS belatedly disclose to investors that RBS had to retain an interest in the high-grade and mezzanine tranches of the CDOs because the market had become so illiquid that RBS could not sell them, something RBS knew or was reckless in not knowing as early as fall 2007.

### 1.    Defendants Repeatedly Deny the Extent to Which RBS Had Exposure to Subprime Assets

141.    Despite the fact that they had known for years prior to the Class Period that RBS had been accumulating billions of pounds of exposure to subprime assets, those assets were

---

[19] Home prices in the U.S. peaked in mid to late 2006 and began declining in early 2007.  On average, home prices in the U.S. grew by more than 30% during the two years ended December 31, 2005.

significantly overvalued and their peers were reporting billions of dollars of writedowns, the

Exchange Act Defendants quelled investor fears about RBS's potential exposure by continually

assuring investors that RBS did not "do subprime" and that it "has no subprime exposure."

142.     As set forth more fully in Section IX below, the Exchange Act Defendants

repeated these and similar assertions on numerous occasions throughout 2007.  For example, in

its Form 6-K reporting 2006 financial results, filed with the SEC on March 1, 2007, RBS stated:

> [*W*]*e have retained our inherently cautious stance towards*
> *higher risk activities such as unsecured consumer lending and*
> *sub-prime credit markets more generally*. . . . *Sound control of*
> *risk is fundamental to [RBS's] business*, and our results here are
> reassuring. We have grown average customer lending by 14%
> while impairment losses have increased by 10%.  *Central to this is*
> *our longstanding aversion to sub-prime lending, wherever we do*
> *business. . . .*
>
> We maintained our traditional unwillingness to engage in sub-
> prime lending . . . .

143.     During a conference call with analysts to discuss the year-end results, Defendant

Whittaker assured investors that RBS had avoided the pitfalls of the subprime market both in its

lending and its GBM businesses:

> In the U.S., where there has been some market turbulence and
> much comment over the last days and weeks, we have prime
> quality portfolios both at Citizens, where we do not do [subprime],
> nor in our Global Banking & Markets business where *our role as*
> *an intermediary between originators and investors, leaves us both*
> *well-protected and with limited risk*.

144.     On the same call, Defendant Fish emphatically reiterated, "*We have never – we*

*don't do sub-prime, we have never done sub-prime. We have no plans to do sub-prime.  Sub-*

*prime brings with it operational risks, regulatory risks and, of course, credit risks.*"

145.     Three months later, during another call with analysts and investors on June 5,

2007, Goodwin once again reiterated, "The mix of the quality of the credit within our book as

you have been seeing ad nauseam; *we don't do sub-prime so we have not perhaps been exposed to some of the more boisterous elements of that*. . . ."

146.     These representations were belied by the fact that the Exchange Act Defendants already knew that RBS had retained interests in billions of pounds of CDOs comprised of subprime and other high risk mortgages, and that it maintained a trading portfolio of subprime MBSs.  In addition, they created an affirmative duty to reveal to investors the extent of RBS's exposure to subprime U.S. assets via CDOs and MBSs.

147.     In stark contrast to their statements to investors, the Exchange Act Defendants not only knew that RBS had billions of pounds of subprime exposure in its portfolio of CDOs and other MBSs, but also knew that these assets were significantly overvalued and would have to be written down by billions of pounds, as set forth below.  As a result of the aforementioned false and materially misleading statements, RBS's shares were artificially inflated.

### 2.     Market Indicators Establish the Need to Substantially Write Down Subprime Assets

148.     The ABX indices are several credit derivative indices which reference MBSs. Each index tracks the value of credit default swaps, which are derivatives that provide insurance against default on MBSs on a group of 20 underlying subprime securitizations at different levels of the liability structure.  Underlying mortgage securitizations are selected on the basis of set criteria, including large and liquid structures with at least $500 million of deal size at issuance. The ABX index is divided into series, based upon when the underlying mortgage backed securitization deals occurred.  Each index is further broken down by credit quality, ranging from AAA to BBB-.  The index is constructed such that when it declines, a corresponding decline in MBSs is implied.

149.     Beginning in late 2006, the U.S. subprime mortgage industry was clearly in decline.  By early 2007, a steep rise in the rate of subprime mortgage defaults and foreclosures had caused some subprime mortgage lenders to fail or file for bankruptcy, including most prominently, New Century Financial Corporation ("New Century"), previously the nation's second-largest subprime lender.  The failure of New Century and other subprime lenders caused prices in the $6.5 trillion MBS market to decline, garnering considerable attention from the U.S. media from late 2006 onward.

150.     By August 3, 2007, in response to rising default rates on subprime mortgages and the collapse of several subprime mortgage originators, the ABX indices that were comprised of the very classes of securities held by RBS and which were thus key indicators of the market value of its MBS and CDOs, declined by 19% for high-grade tranches and 46% for mezzanine tranches.  As the chart below illustrates, the ABX indices continued to decline through the Class Period.  Despite these precipitous declines in relevant market indicators, which clearly indicated the need to write down the value of RBS's CDOs and MBSs, the Exchange Act Defendants failed to do so.

| Date | Decrease in ABX Index for High Grade CDOs Relative to December 29, 2006 | Decrease in ABX Index for Mezzanine CDOs Relative to December 29, 2006 |
|---|---|---|
| August 3, 2007 | 19% | 46% |
| August 15, 2007 | 19% | 50% |
| September 28, 2007 | 19% | 50% |
| November 20, 2007 | 26% | 50% |
| December 6, 2007 | 25% | 71% |
| February 28, 2007 | 37% | 73% |

151.     That RBS failed to timely write down its impaired subprime assets is further evidenced by the facts, as set forth below, that: (i) the Company was one of the last of the major

financial services companies to report writedowns on its portfolio of CDO and MBS assets, and (ii) ratings agencies had downgraded the credit ratings of similar types of assets in October 2007.

152.     In September 2007, Goldman Sachs wrote down the value of its leveraged loan commitments by $1.5 billion.

153.     That same month, write-downs in similar assets were announced by Bear Stearns ($700 million), Lehman Brothers ($700 million) and Morgan Stanley ($940 million).

154.     On October 11, 2007, Moody's downgraded more than $33 billion worth of MBSs that were backed by subprime assets.  Significantly, this downgrade was on mostly senior tranches, the least risky kind of debt in an MBS.  An additional $23.8 billion of securities was put on negative watch.

155.     Later that same month, Merrill Lynch reported that it would have to write down $8 billion in U.S. subprime assets.

156.     During the first half of November 2007, Citigroup, Morgan Stanley and Barclays announced writedowns of $8 -$11 billion, $3.7 billion, and $2.6 billion, respectively, on subprime assets.  In fact, when Citigroup announced its massive writedowns on November 5, 2007 its then CEO Gary Crittenden referenced the sharp decline in the ABX index tracking senior tranches as a significant factor, stating "the best way to get an outside perspective" on pricing for mortgage related ABSs "is tolook at the ABX indices, which have dropped dramatically…."[20]  It is apparent that the decline in the ABX index was considered critical by Citigroup, itself accused of securities fraud for failing to take timely writedowns of subprime assets, but was recklessly or knowingly ignored by the Exchange Act Defendants when they failed to take prompt writedowns on their own subprime assets.

---

[20] Grace Wong, "Behind Wall Street's subprime fear index,"

43

157. Despite the foregoing developments, throughout 2007, RBS failed to take any writedowns on its subprime assets until December 6, 2007. Instead, the Exchange Act Defendants blatantly and repeatedly lied to investors, insisting that the Company "didn't do" subprime, implying that it had no exposure to subprime.

158. Even when RBS announced that it would write down some portion of its subprime exposure, it continued to claim its exposure was far less and, therefore, required significantly lower writedowns than that of its peers. The below chart compares RBS's peer banks' net exposure to super senior ABS CDOs to their 2007 writedowns of such assets. It shows that RBS claimed to have the lowest percentage of bad assets of any bank, and half the average amount:



Bank Writedowns of Subprime Holdings as a Percentage of Total Exposure

### 3. Defendants Knew that RBS's Subprime Assets Were Materially Overvalued

159. In addition to the foregoing developments, each of which was sufficient to alert the Exchange Act Defendants to the fact that RBS's subprime assets needed to be written down by billions of pounds, internal RBS documents supplied to Lead Counsel by an anonymous source confirm that RBS management knew that valuations of the Company's subprime assets, including both its CDOs and MBSs, were grossly inflated in relation to the ABX indices, were out of line with those of RBS's competitors, and expressed great concern that the Company's assets were inappropriately marked to model. Moreover, as discussed below, these documents were created during the second half of 2007 and indicate that RBS was manipulating certain assumptions with respect to the value of its subprime securities and, in particular, its "high grade" and "mezzanine" level assets. Additionally, these documents indicate that RBS management had been ignoring internal warnings from its risk department since May 2007.

160. In the course of their investigation, Lead Plaintiffs discovered RBS internal documents, which revealed that as of fourth quarter 2007, RBS was fully aware that its internal procedures used to determine pricing on its super senior CDO positions reflected that the value of those positions needed to be written-down, which would directly affect RBS's income statement and balance sheet. In an October 1, 2007 email exchange, Victor Hong, a Managing Director of Greenwich Capital and Head of Fixed-Income Independent Price Verification, advised the GCM Market Risk Group that the price of the super senior tranches should be priced around "60:00" as opposed to 90 (the figure reported by RBS in its December 6, 2007 Trading Update). Henry Asare, a member of the Market Risk Group at GCM confirmed Hong's price estimate for the super senior tranches had been overstated for at least six months, stating ***"I have***

been telling them t[h]is for 5-6 months but they don't want to hear," and noted that "*Citi and UBS are taking a massive writedown this quarter . . . .*"

161.    In an email exchange on October 29, 2007, Gareth Brown, a member of the Corporate Markets Risk Group, Riccardo Rebonato,[21] Head of Group Market Risk and Head of the Quantitative Research Centre (QUARC) for RBS, and Bruce Jin, Managing Director and Head of Market Risk, in response to a request for an explanation by Defendant Cameron as to "why the super senior position end result is so sensitive to changes in the underlying assumptions," discussed the flaws inherent in the Company's credit loss models.  In that exchange, Jin noted that an increase in the loss assumptions, "will hit the super seniors with more sensitivity than other classes" and recommended that the Company "*mark them comfortably below our central assumption in the base case loss numbers to take into account the uncertainty premium as well as the negative convexity (gamma) inherent in any cuspy positions*."  Jin further recommended that, because of the "inherent flaw" in the mark-to-model approach, the mark-to-market approach would be a superior method of determining super senior exposure[22]:

> [O]ur loan loss default model has had to calibrate upward its final cumulative loss projections for the subprime mortgage pools in each of our last two monthly updates – resulting in larger and larger principal hit for our super seniors.  . . . *[t]here is an inherent flaw, in my opinion, thus in having our marks be so reliant (or so close in value) to the LSD model projected credit losses* . . .

---

[21] On information and belief, Defendants Goodwin and Whittaker also were aware of these flaws with RBS's credit loss models.

[22] "Mark-to-market," or "fair value" accounting, assigns the value to a portfolio or position held in a financial instrument based on the current fair market price for the instrument or similar instruments;  "mark-to-model" refers to the practice of pricing a portfolio or position at prices determined by proprietary financial models, instead of letting the market determine the price.  The accuracy of the estimated price is only as good as the model used to determine it.  Mark-to-model is also subject to manipulation by the use of improper assumptions.

Due in part to the above points, we should be looking at the underlying assets to help determine the value of the super seniors. The market value of the underlying assets is more discernable than that of the CDO bonds and reflect well the market's consensus view on the future losses of the pool.

162.     A November 9, 2007, email exchange addressing a November 7 Flash Report, evidences that RBS insiders were concerned at the significant disparity between the Company's asset valuations and movements in the ABX Index.  In his November 9 message, Ian Gaskell, Head of Structured Products at RBS, advised other senior managers in RBS's Risk Markets Group, **"*I remain concerned that the fall in the ABX is not being reflected in our valuations, and consequently we may not be accurately reflecting the "true" daily p/l (I cannot comprehend how, in a falling ABX market, our inventory has done anything other than also fall in value. . . .)*"**

**4.     Defendants Continued to Significantly Understate the Magnitude of RBS's Subprime Exposure**

163.     It was not until December 6, 2007, months after other banks and brokerage firms had taken tens of billions of pounds in writedowns on portfolios of similar securities, as well as months after RBS's risk management team warned that RBS's assets were overstated, that RBS belatedly revealed that it did, in fact, have some exposure to subprime assets, reporting in a Form 6-K that:

The Royal Bank of Scotland Group's Global Banking & Markets business (GBM) has a leading position in structuring, distributing and trading asset backed securities (ABS).  These activities include buying mortgage-backed securities, ***including securities backed by US sub-prime mortgages***, and repackaging them into collateralised debt obligations (CDOs) for subsequent sale to investors.  ***It retains exposure to some of the super senior tranches of these CDOs.  There is no exposure to these instruments in the banking book.***

At 30 November, GBM's exposure to these super senior tranches, net of hedges and write-downs, totaled £1.1 billion to high grade

[super senior] CDOs which include commercial loan collateral as well as ***prime and sub-prime mortgage collateral, and £1.3 billion to mezzanine CDOs based predominantly on residential mortgage collateral***.  The CDOs are largely based on ABS issued between 2004 and the first half of 2006.  GBM also had under £1 billion of exposure to sub-prime mortgages through a trading inventory of mortgage-backed securities and CDOs, and £0.1 billion through securitisation residuals . . . .

164.    Because the Exchange Act Defendants knowingly or recklessly suggested that the magnitude of its subprime exposure was only a small, but as yet unspecified, fraction of RBS's total exposure to ABS CDOs and MBSs, their statements provided fraudulent reassurances to investors.  The Form 6-K stated that "RBS has continued to perform well in 2007, with operating profit and earnings per share expected to be ***well ahead*** of the market consensus forecast." Moreover, in a conference call with analysts that same day, Defendant Goodwin claimed that RBS had taken "pretty conservative" writedowns, trying to be "prudent in our judgment."  In fact, neither Goodwin nor RBS revealed the Company's true exposure.  Recording just over £1 billion ($2 billion) in writedowns, investors would not learn until much later that RBS had taken only marginal and insufficient writedowns on the fair value on its portfolio.

165.    In addition to the £950 million in write-offs announced with respect to its own separate portfolio RBS announced that it would write off an additional £300 million ($600 million) of ABN AMRO assets of the same asset class, using the same internal valuation models they knew to be flawed based on the internal emails referenced above:

ABN AMRO

At 30 November, ABN AMRO had exposure of £1.7 billion [$3.5 billion] to super senior tranches of high grade [super senior] ABS CDOs, net of hedges and write-downs, and no exposure to mezzanine ABS CDOs.  ABN AMRO also held a trading inventory of junior CDO tranches and mortgage-backed securities totaling £0.05 billion [$0.1 billion], net hedges and write-downs. . . .

> Applying the same valuation methodology used by GBM, we expect to book write-downs in income on ABN AMRO's exposure to US mortgage related assets totaling approximately £300 million [$600 million] in the second half. These write-downs will be reflected in 2007 results for ABN AMRO but will not affect [RBS's] earnings as they will be dealt with as part of the acquisition accounting adjustments.

166.    In reporting the writedowns defendant Goodwin stated, "***Nothing in these numbers should come as any great surprise.  We've said all along that there's nothing in our numbers to worry about.***"  Goodwin also affirmed that RBS would report profits for the year "still comfortably ahead of consensus" forecasts of £9.78 billion ($20 billion).

167.    The reaction to the December 2007 writedown was one of relief.  As *The Daily Telegraph*, in its December 7, 2007 article entitled "***RBS shrugs off sub-prime woes***," noted, "Royal Bank of Scotland has confounded the skeptics by taking a lower-than-expected provision against 'toxic' US sub-prime mortgage debts and pledging to deliver profits this year 'well ahead of consensus.'"

168.    Most analysts, too, were convinced of RBS's position.  For example, in a research report entitled "Fewer unknowns prompts relief rally," a Deutsche Bank analyst wrote, "Though RBS confirmed a balance sheet which is more levered than management target on an ongoing basis, the confirmation of full year tier 1 forecasts, publication of ABN AMRO risk assets balances which were surprisingly low, and an impairment charge which has been more than offset by asset disposal profits, provided investor relief."

169.    Likewise, a December 6, 2007 research report issued by Charles Stanley explained that the market had expected far greater asset writedowns: "RBS's share price has risen markedly this morning as it has announced writedowns that were well below market expectations."  The report quoted Defendant Goodwin's statement that the writedowns "felt pretty conservative."  It concluded, "[W]e were happy to see that write-downs were significantly

below market expectations and the RBS performance once again highlights the benefits of [RBS's] broad diversification by product and geography."

170.    During a conference call with investors on February 28, 2008, Defendant McKillop discussed the Company's positive operating performance for the year ended December 31, 2007, and reiterated that the previously announced writedowns announced on December 6, 2007 were sufficient, and that no further writedowns were necessary.  Defendant McKillop made this statement despite the despite the fact that ABX indices had fallen a total of 37% (for senior tranches) and 73% (for mezzanine tranches) from December 29, 2006 through the end of December 2007.  In a report dated February 28, 2008, analyst Charles Stanley expressed relief at the "largely re-assuring" 2007 results, writing, "We are pleased to see that not only have market concerns regarding potential write-offs proved once again to be overdone but also that concerns that RBS would be forced to do a rights issue also look to be overblown."

171.    The following day, February 29, 2008, Credit Suisse wrote, "[T]o the bank's credit, 'risky' asset positions seem manageable, at least for now."

172.    In light of the reassuring results, RBS's announcement of an additional writedown of £5.9 billion ($11.7 billion) on these assets less than eight weeks later, on April 22, 2008, came as a surprise to the investment community.  The Company revealed that, as of December 31, 2007, RBS was holding £1.3 billion ($2.6 billion) of ABS backed by subprime U.S. residential mortgages, and £2.2 billion ($4.4 billion) backed by Alt-A loans.

173.    In an April 22, 2008 Form 6-K, RBS confirmed that it expected to report asset write-downs of ***5.9 billion*** for fiscal 2008, almost triple the amount for 2007, and further confirmed that it would conduct the £12 billion Rights Issue to raise additional capital.  This was, at the time, the largest rights issue in European history.

174.    During a conference call on April 22, 2008, Whittaker acknowledged that those ABS CDO and MBS positions that had been subject to the write-downs included "assets which were impacted or are impacted by the *US subprime market.*"

175.    In taking the write-downs on these ABS positions, RBS significantly reduced the average prices of those assets from what was disclosed as of December 31, 2007, as follows:

| Asset Category | Average Price % as of 12/31/07 | Average Price % used for 4/22 | 4/22 write-downs (millions of GBP) write-downs |
|---|---|---|---|
| High Grade CDOs | 84 | 52 | 990 |
| Mezzanine CDOs | 70 | 20 | 902 |
| Subprime MBS | 72 | 38 | 405 |
| Alt-A MBS | 83 | 50 | 666 |
| Other Non-Agency MBS | 94 | 82 | 100 |
| US Commercial MBS | 97 | 83 | 201 |

176.    Shortly thereafter, in a Form 6-K filed with the SEC on May 1, 2008, RBS disclosed for the first time that 70% of the Company's subprime CDOs had been originated prior to 2007.

### 5.    U.S. Authorities Investigate RBS's Subprime Exposure

177.    RBS's subprime underwriting spawned investigations by New York's Attorney General ("NYAG") and the SEC. As reported by RBS on April 22, 2008:

> The New York State Attorney General has issued subpoenas. . . . RBS Greenwich Capital has produced documents requested by the New York State Attorney General principally *related to sub-prime loans that were pooled into one securitisation transaction*.
>
> In addition to the above, certain of [RBS's] subsidiaries have received requests for information from various US governmental agencies and self-regulatory organisations including *in connection with sub-prime mortgages and securitisations, collateralised debt obligations and synthetic products related to sub-prime mortgages*. In particular, during March 2008 [RBS] was advised by the SEC that it had commenced a non-public, formal

51

> investigation *relating to [RBS's] US sub-prime securities exposure* and US residential mortgage exposures.

178.     Greenwich has reportedly produced documents in response to the NYAG's subpoena and both the NYAG investigation and the SEC investigation remain ongoing.

**D.     RBS's Acquisition of ABN AMRO Compounds the Company's Subprime Problems**

179.     RBS's acquisition of 38% of ABN AMRO, which was announced on April 13, 2007 and completed on or about October 17, 2007, compounded RBS's subprime problem by saddling the Company with at least two billion pounds of ABN AMRO's toxic subprime assets.

180.     RBS participated in a Consortium with Banco Santander SA of Spain and Fortis of Belgium to purchase ABN AMRO for €71 billion ($100 billion)—the world's largest bank takeover to date.

181.     As a part of the three-way takeover, RBS agreed to purchase a portion of ABN AMRO's operations, including its wholesale and investment banking unit, for approximately $38 billion in cash and securities.  Approximately £8 billion of this amount was attributable to RBS's portion of the goodwill recognized in connection with the acquisition.

182.     As part of the deal initially announced by RBS, the Company would have also acquired ABN AMRO's U.S. subsidiary LaSalle Bank Corporation ("LaSalle").  Even though ABN AMRO ultimately sold LaSalle to Bank of America for $21 billion in cash prior to RBS's acquisition of ABN AMRO, RBS did not lower its bid.

183.     Moreover, further demonstrating Goodwin's determination to complete the ABN AMRO acquisition at any cost, RBS performed only a few days worth of due diligence on ABN AMRO, from April 30 to May 5, 2007.  Beyond that, RBS simply accepted ABN AMRO management's representations regarding ABN AMRO's financial condition.

184.     Nonetheless, RBS repeatedly touted the transaction benefits and accretiveness to earnings that it would achieve via the ABN AMRO acquisition. In the Exchange Offer prospectus dated July 20, 2007, RBS stated that its primary rationale for the acquisition was the "strong strategic fit" between GBM and ABN AMRO's Global Wholesale Businesses, which would allow RBS to accelerate its plans to become the leading wholesale and fixed income bank in Europe and a "top five" corporate bank in the U.S. It further stated that the net revenue benefits to GBM would be €481 million ($664 million) and that synergies and other cost savings would amount to $1.24 billion within three years.

185.     On January 20, 2009, the *Irish Times* reported that RBS's writedown of the goodwill it had recognized in connection with the ABN AMRO acquisition was a direct result of the Company's unsustainable growth spree under Goodwin:

> The goodwill writedown is a legacy of RBS's seven-year acquisition spree embarked on by Sir Fred, who was dubbed a *'deal junkie'* by analysts for his aggressive takeover strategy. This included buying part of Dutch bank ABN AMRO at the height of the bull market in 2007 as well as a number of other deals such as buying Charter One bank in the US in 2004. *From 2003 onwards, RBS expanded quickly and relied on funding from the wholesale markets to support new lending and assets on its balance sheet. These all but dried up after the collapse of US investment bank Lehman Brothers last year.*

186.     McKillop later admitted the deal was a "mistake" and conceded that the vast majority of the goodwill attributable to ABN AMRO had to be written off. More importantly, however, McKillop's February 10, 2009 testimony before the U.K. Parliament clearly demonstrates that Defendants' statements about the ABN AMRO deal's accretiveness to RBS's earnings were fraudulent when made, and not just in hindsight, based on their failure to perform appropriate due diligence on the deal:

> **Chairman**: Sir Tom, before we move on, you say due diligence was done on ABN AMRO earlier on, but the deal was completed

in October 2007. I remember, along with my colleagues in this Committee, sitting here with the Governor of the Bank of England in September talking about Northern Rock in crisis and here, a month after the earthquake has hit the financial services industry, your organisation signed up to ABN AMRO. Can you say to us hand on heart here that the due diligence was done in October and you were still very happy with it?

*Sir Tom McKillop*: The due diligence was done in May, as Fred said, and then there were a series of meetings with the senior people of ABN AMRO to determine if there were any further developments.

187.    Defendants' numerous assurances regarding the ABN AMRO acquisition, discussed in detail in "Defendants' False and Misleading Class Period Statements," were therefore fraudulent, because Defendants either knew about ABN AMRO's exposure to subprime assets and failed to disclose it, or acted with extreme recklessness in making those statements without first investigating the magnitude of ABN AMRO's subprime exposure.

E.    **RBS Fails to Timely Impact Billions of Pounds of Goodwill Attributable to the ABN AMRO Acquisition**

188.    Despite the Exchange Act Defendants' repeated assurances that RBS's acquisition of ABN AMRO would provide "real gains" to RBS and would be accretive to shareholders, as discussed below, the Company both recklessly failed to test ABN AMRO's goodwill for impairment as early as December 2007 and failed to impair goodwill attributable to the acquisition from April 2008 until the end of the Class Period.  Ultimately, on January 19, 2009, RBS surprised the market with its announcement that it expected to impair virtually the entire amount of goodwill it had attributed to its acquisition of ABN AMRO throughout the Class Period.[23]

---

[23] This was in addition to the approximately £17 billion of goodwill attributable to the minority interest in ABN AMRO, substantially all of which was written off in 2008.

54

189.     As set forth more fully in Section XI below, IFRS require that companies test goodwill recorded in connection with a business combination for impairment on an annual basis or more frequently if events or changes in circumstances reveal that the asset may be impaired. Thus, based upon governing standards, Defendants were required to test goodwill attributable to ABN AMRO no later than December 2007 as a matter of course.  See Section XI below.

190.     Second, major economic developments in mid to late 2007 constituted changes in circumstances indicating possible impairment of goodwill, thereby creating a separate requirement for RBS to test the ABN AMRO goodwill for impairment.  In the summer of 2007 the credit markets had seized up as a direct result of investors' fears over losses in the subprime mortgage market.  Due to the market's reaction, Northern Rock was unable to obtain financing for its operation, requiring an emergency loan from the Bank of England.  In addition, declines in the ABX indices which began in early 2007 and became increasingly severe in July and September 2007, constituted additional triggering events that required RBS to test the ABN AMRO goodwill for impairment.

191.     Nevertheless, on December 6, 2007, without having allocated ABN AMRO goodwill across its various business units RBS not only failed to test for impairment the ABN AMRO goodwill, but also sought to convince investors that no impairment was necessary by reporting that the integration of ABN AMRO was progressing well with transaction benefits and earnings accretion exceeding forecasted estimates.

192.     Moreover, despite further deterioration in credit markets after year end 2007, on February 28, 2008, the Exchange Act Defendants claimed that RBS's "positive view…of the acquisition had been confirmed" and that the accretiveness of the ABN AMRO deal was

expected to be 2 pence (4 cents) per share, even greater than prior estimates, giving no indication that the ABN AMRO goodwill might be impaired.

193.     On April 22, 2008, in connection with its announcement of the £12 billion ($23.7 billion) Rights Issue to raise capital, and a £5.9 billion ($11.6 billion) writedown of assets, *one-third* of which were assets acquired through its purchase of ABN AMRO, RBS admitted that it "purchased AMRO at a point when bank valuations were way higher than they are today," and that the purchase "increased our exposure to wholesale markets at an unfortunate time . . . ."

194.     Despite this admission that RBS had purchased ABN AMRO at a time when valuations had been much higher, and therefore the estimates supporting the ABN AMRO goodwill valuation were no longer accurate, the Exchange Act Defendants intentionally or recklessly denied any need to impair goodwill on the acquisition. Indeed, when pointedly asked about the possibility of taking a goodwill impairment, Defendant Goodwin emphatically denied the need to do so, instead reiterating that ABN AMRO stood to deliver "synergies with our business and give us new opportunities and improve our franchise going forward."

195.     During an April 22 conference call with analysts, Defendant McKillop added:

> ABN Amro combined with the RBS business, is going to deliver excellent synergies, synergies that are substantially higher than the original case and are broadly on track to deliver that. It also is opening up many, many options for us, many parts of the ABN businesses are performing very well and are very robust to the economic environment we're in today. They also give us much increased presence in areas of the world where the economic outlook is nothing like so gloomy.

196.     During that same call, when specifically asked whether goodwill on RBS's balance sheet attributable to the ABN AMRO acquisition would be impaired due to the reported asset writedowns, Defendant Goodwin swiftly dismissed the discussion, saying any impairment was unnecessary.

197.    Likewise, in its Form 20-F filed on May 14, 2008, RBS maintained that all the prior assumptions and conditions remained from the time of the acquisition to year-end, and that no goodwill impairment was necessary.

198.    The Exchange Act Defendants' representations about the future value of ABN AMRO and, as a result, the strength of RBS's balance sheet, were intended to, and in fact did, induce shareholders to participate in the £12 billion ($23.7 billion) Rights Issue.

199.    Two months later, yet another development occurred which required RBS to test the ABN AMRO goodwill for impairment.  On June 16, 2008, *DutchNews* reported that Fortis was seeking to sell its acquisition of ABN AMRO's asset management unit but was unable to do so (*"Fortis ABN AMRO sell-off in trouble,"* DutchNews.nl, June 16, 2008).  Under IFRS, this news served as another indication that the goodwill reported for the ABN AMRO acquisition on RBS's consolidated balance sheet, including the portion allocable to Fortis's minority interests, might be impaired requiring RBS to test for impairment.

200.    Yet, rather than respond to the mounting evidence that the ABN AMRO goodwill may have become impaired and perform the required testing for impairment, RBS continued to ignore the issue and proclaim the benefits of the acquisition and to tout the many opportunities that the acquisition purportedly created.  During an August 8, 2008 conference call with analysts and investors, the Exchange Act Defendants reported, "[W]e're on track to deliver the original promised synergies and more… [because of ABN AMRO], RBS now has well-diversified product ranges in mature economies and exciting franchise opportunities in the fast-growing economies.  We are well-positioned to thrive in the competitive landscape the current storm will leave behind."

201.     On September 15, 2008, the investment bank Lehman Brothers filed for bankruptcy after tranches of toxic subprime MBSs that it had retained after securitizing the underlying mortgages—the same type of assets that RBS had acquired from ABN AMRO—caused Lehman Brothers billions of dollars in losses and eroded investor confidence in that bank. In 2005 and 2006, Greenwich was ranked one of the two largest domestic underwriters of subprime securities, second only to Lehman Brothers.

202.     Subsequently, on October 3, 2008, the remainder of ABN AMRO minority goodwill became impaired by £14.6 billion ($25.8 billion), when Fortis's shares in RFS Holdings were acquired by the State of the Netherlands.

203.     Yet still, in violation of IFRS, RBS failed to test its goodwill attributed to ABN AMRO in the face of all of this news.

204.     Knowing that the Rights Issue was in the works, the Exchange Act Defendants, rather than testing goodwill at that time, emphatically denied any need to test goodwill before the 2008 year-end and instead misled investors about the strength of RBS's balance sheet, insisting in an October 13, 2008 press release that "[t]he integration of the RBS-acquired ABN AMRO business is proceeding ahead of schedule."

205.     In fact, as late as November 20, 2008, when the Exchange Act Defendants acknowledged that their exposure to the credit crisis had been exacerbated by the ABN AMRO acquisition, they still assured investors that the "synergy benefits" were "fully on track" and maintained that "options for growth" had improved.

206.     It was not until January 19, 2009 that RBS made the stunning disclosure that the ABN AMRO acquisition would result not only in further asset writedowns, but also in the impairment of virtually the entire amount of goodwill recorded in connection with the

acquisition.  The combination of the asset writedowns (of approximately £8 billion ($11.8 billion)) and ABN AMRO goodwill impairment (of approximately £7.7 billion ($11.3 billion)) totaled more than £15 billion ($22 billion).

      **F.**      **RBS Raises Capital In a Desperate Attempt to**
                 **Shore Up Its Mounting Subprime Losses**

      207.    During the Company's February 28, 2008 conference call with analysts to discuss its 2007 results, Defendant Whittaker reported the following with respect to RBS's capital condition:

> We ended the year with a balance sheet of [£]609 billion worth risk weighted assets. A core Tier 1 ratio of 4.5%, the Tier 1 as I mentioned earlier of 7.3% and total capital of 11.2% consistent with previous guidance that we had given, our return on equity rose to 19.9%.

      208.    Whittaker also stated that he was "comfortable with the capital ratios that we have."  During that same call, Defendant Goodwin, too, emphatically denied having any plans to raise capital.

      209.    Notwithstanding Goodwin's assurances less than two months earlier, prior to the opening of the financial markets in London on April 22, 2008, in a press release titled "Update on Credit Market Exposures, Disposals, Capital Trading Conditions and Outlook" (the "April 22 Update"), RBS reported that it would have to conduct the £12 billion Rights Issue to raise additional capital while also reporting expected asset writedowns of ***£5.9 billion*** for fiscal 2008, related to its credit market exposures.

      210.    On June 9, 2008, RBS announced that the Rights Issue was subscribed at 95.11%, and that a total of 5,823,635,440 new RBS ordinary shares would be issued.

**G.**     **RBS's Subprime Assets Lead to the Company's Partial Nationalization**

211.     On August 8, 2008, RBS announced its financial results for the six months ended June 30, 3008, including a pre-tax loss of £691 million—the first-ever loss in the Company's 40-year history as a public company, and one of the largest losses in British banking history. As noted above, this loss was largely attributable to the previously disclosed £5.9 billion writedown of subprime-related assets.

212.     Less than two months after RBS reported the huge first half loss, on October 6, 2008, Standard & Poor's Ratings Services lowered the long-term and short-term counterparty credit ratings on RBS, explaining that the rating action reflected, in part, Standard & Poor's "expectation that RBS's financial profile may continue to weaken," due to "deteriorating credit risk." Standard & Poor's also reduced the rating on RBS equities from "strong buy" to "sell," citing the Company's need to add to capital reserves.

213.     The following day, October 7, 2008, the U.K.'s economics and finance ministry issued a press release confirming market rumors of a government bailout, reporting that the U.K. would recapitalize RBS.

214.     In a statement issued on October 8, 2008, Goodwin confirmed that the Company would receive a bailout from the U.K. Government.

215.     As observed in an October 10, 2008 article in *The Wall Street Journal,* this marked a significant reversal of the Exchange Act Defendants' position that RBS was adequately capitalized and could absorb all expected losses:

> Royal Bank of Scotland Group PLC's chief executive, Fred Goodwin, is walking a tightrope. After saying for months that his bank was in good shape, he is expected to be among the most likely to go hat in hand to the government for funding under the U.K.'s ambitious new bailout plan.

216.     On October 13, 2008, in a drastic move to boost capital, RBS announced the terms of the £20 billion capital raising plan that previously had been discussed in the press. Under the plan, RBS would offer £15 billion in additional ordinary shares.  The price for the shares was set at a fixed price per share, which represented a discount to the closing price for the Company's shares on October 10, 2008.  The new shares would be underwritten by Her Majesty's Treasury ("HM Treasury").  The government further committed to purchasing up to £5 billion of the new preference shares if investors failed to purchase shares in the offering.

217.     Shortly thereafter, Defendants Goodwin and McKillop were removed in a series of management changes that were reportedly a condition to the U.K. government bailout.

218.     These adverse developments during October decimated the price of RBS ordinary shares, which plunged to £0.57 by October 28, 2008.

219.     Investors would not even pay 65 pence per share for the Company's stock (the price at which RBS offered new shares to investors).  In fact, on November 28, 2008, RBS announced that only 0.24% (55 million shares) of the ordinary share offering for new shares had been subscribed.  As a result, the U.K. government, through HM Treasury, acquired the unsubscribed shares and, thereby, ownership of approximately 57.9% of RBS ordinary shares.

**H.     RBS Projects £28 Billion Loss Tied to Subprime Exposure
and Goodwill Impairment**

220.     Finally, on January 19, 2009, RBS made a stunning disclosure that exposed the true extent of the misrepresentations and non-disclosures made by the Exchange Act Defendants during the Class Period.  On that date, RBS announced that *it was projecting a loss of £28 billion for 2008*, the largest in U.K. history.  The loss was driven by up to *£8 billion in credit-market write-downs and £20 billion impairment of goodwill recognized in connection with ABN AMRO and other acquisitions*.

221.   RBS issued a statement in connection with the trading update before the financial

markets opened in London on January 19, 2009, that stated in relevant part:

> [A]fter credit market write-downs, integration costs, preference
> dividends and other items, RBS estimates an attributable loss,
> before ***exceptional goodwill impairments, of between £7.0bn and
> £8.0bn for the year***.  . . .   The major negatives contributing to this
> outcome are discussed below:
>
> GBM Income.  . . .   The impact of changes in fair value and write-
> downs on GBM's income . . . total approximately £2.8bn. In
> addition, reserves of approximately £0.6bn have been established
> against our Credit Derivative Product Companies ("CDPC")
> exposures.  As a result of all the above, fourth quarter income is
> estimated to be approximately ***£3bn lower*** than our expectations at
> the time of the IMS [November 4, 2008], only partially offset by a
> reduction in variable costs.
>
> Credit Impairment losses.  Economic conditions deteriorated
> sharply towards the end of the year.  ***As a result, [RBS's] credit
> impairment losses for 2008 are estimated to be between £6.5bn
> and £7.0bn.***
>
> *     *     *
>
> Credit market write-downs.  Write-downs for the full year relating
> to [RBS's] previously ***disclosed credit market exposures are
> estimated in the region of £8bn*** after hedging gains of
> approximately £1.7bn.  ***The £1.9bn increase in the fourth quarter
> is primarily driven by increased write-downs against our US ABS
> CDO exposures of £1.1bn***, increased reserves against monoline
> exposures of approximately £1.5bn, partly offset by hedging gains
> of approximately £1.1bn.
>
> *     *     *
>
> Goodwill impairment.  [RBS] is currently reviewing the carrying
> value of goodwill and other purchased intangibles on its balance
> sheet as part of the finalisation of the year end results. ***Preliminary
> findings indicate an estimated impairment charge in the region
> of approximately £15bn to £20bn.***

222.     British Prime Minister Gordon Brown reacted to RBS's massive losses by stating that RBS had taken "irresponsible risks."  These risks, of course, as discussed above, were not timely revealed to investors.

223.     RBS's downfall has been attributed to its acquisition of ABN AMRO and its undisclosed risky subprime investments:

> . . . RBS has been crippled by former Chief Executive Officer Fred Goodwin's 14.3 billion-euro ($19 billion) acquisition of ABN AMRO Holding NV's investment banking assets three months before the credit crisis began.  Goodwin was ousted in October after the government agreed to take control of RBS.  Chancellor of the Exchequer Alistair Darling today called the ABN AMRO takeover "disastrous" on BBC Radio 4.
>
> "I am angry at the Royal Bank of Scotland and what has happened," Prime Minister Gordon Brown told reporters in London today. ***The bank took "irresponsible risks," in investing in U.S. subprime mortgages and ABN AMRO***, he said.

*Bloomberg News* (January 19, 2009).

224.     RBS's new CEO, Stephen Hester, Defendant Goodwin's replacement, also agreed that both the extent of RBS's exposure to subprime and the ABN AMRO acquisition caused RBS's massive losses.  On a January 19, 2009 "2008 Sales and Revenue Call" with analysts and investors, Hester stated, "***When we look at GBM [Global Banking & Markets, RBS's investment banking division] losses across the piece, both as to income, credit markets and credit impairments, they are spread roughly half-and-half between the ABN acquisition and RBS's own positions.***"  Later, on April 3, 2009, during the RBS Annual General Meeting, RBS's new Chairman Philip Hampton stated, "Given the complexity of the Group and the progress of integrating the ABN AMRO business, ***it is impossible to unpick the ABN Amro and RBS results with complete accuracy***."

225.    On the January 19, 2009 conference call, Hester also admitted, in stark contrast to Exchange Act Defendants' Class Period statements, that he was surprised to discover "inappropriate risk concentrations," stating:

> With respect to risk concentrations, I would say to you that, if I've had a negative surprise in getting inside RBS, it is that the – some of the risk concentrations are inappropriate, and we have to work our way through that.

226.    RBS's shocking January 19, 2009 disclosures finally revealed to investors the Company's true state of affairs.  In response, RBS shares lost more than 65% of their value, to close at £0.12, on extraordinarily high trading volume of 743 million shares.

227.    In connection with the unprecedented losses RBS also announced that it had reached agreement with HM Treasury to raise an additional £5 billion through the sale of additional ordinary shares, underwritten by HM Treasury.  Because private investors did not purchase the additional shares, HM Treasury retained them and consequently came to own 70% of RBS.

## I.      Post-Class Period Revelations

228.    The collapse of RBS brought about by the Exchange Act Defendants' improper conduct and activities led to the ouster of seven RBS directors in early February, 2009, and the early "retirement" of Defendant McKillop.

229.    On February 11, 2009, in his testimony before Parliament's House of Commons Treasury Committee, Hester stated, "[T]he risk-management systems at Royal Bank of Scotland need a lot of change.  And frankly I cannot do that in a couple of weeks."  According to a February 12 article in *The Scotsman*, at the hearing, Hester testified that "he had found real problems in risk management systems at RBS" and that "RBS's controversial acquisition of ABN AMRO 'doubled up that risk.'"

230.    On February 26, 2009, RBS published its financial results for fiscal 2008 in a Form 6-K filed with the SEC, which confirmed the losses, impairments, and writedowns previously announced on January 19, 2009.  In total, RBS reported a loss of £40.7 billion for 2008.  That loss included charges to goodwill totaling £16.2 billion, broken down for the acquisitions of ABN AMRO (£7.7 billion), Citizens/Charter One (£4.4 billion) and NatWest (£2.7 billion).  RBS's Form 6-K further disclosed that RBS originated £4.3 billion of U.S. subprime MBS prior to 2007.

231.    As discussed below, these writedowns and impairments were not timely reported by RBS and the Exchange Act Defendants' failure to write down or impair the value of these assets in a timely fashion constituted material violations of IFRS.  The failure to timely report these losses and to "deleverage" RBS's balance sheet resulted in RBS being effectively nationalized by the British government and wiped out multiple billions of dollars in Class members' investments in RBS.

232.    On March 6, 2009, the *Daily Telegraph* reported that "RBS has approached U.K. law firm Linklaters LLP to investigate whether there are grounds for a wide-ranging – and potentially explosive – review of Sir Fred's [Goodwin] and other RBS employees' conduct before the Government averted the bank's collapse with a £20bn bail-out last autumn."

233.    On March 21, 2009, the *Daily Telegraph* reported that, according to one former RBS senior executive, Goodwin was directly responsible for RBS adopting the mantra "accumulate assets," including billions of dollars of risky subprime assets, despite Goodwin's repeated public statements that RBS had no subprime exposure:

> They were buying everything to meet Goodwin's targets and his targets were assets."

It was against this background that – ***despite Sir Fred's public statements – traders started buying into the American sub-prime mortgage market***.

In 2007, mortgage portfolios were bought from other banks and huge lines of credit offered to lenders with questionable records.

Crucially, RBS was piling into the market as others were fleeing. The plan was to package up the sub-prime debts and sell them on, but RBS was unable to offload the "toxic" mortgages. By the end of 2007, RBS was forced to begin announcing that the value of many of its assets was less than previously thought.

By last month, the bank admitted the scale of its disastrous mistakes, unveiling a £28 billion loss. The taxpayer now effectively owns the toxic debts. ***One former executive estimates that losses could total more than £100 billion before the end of the recession.***

234.    In the same article, the *Daily Telegraph* reported, based on interviews with former RBS senior insiders, that certain members of the RBS Board were not aware of the Company's decision to spend billions of pounds buying subprime mortgages from other banks, and that Citizens Bank had purchased packages of subprime mortgages without Board approval:

In 2007, it is understood to have begun buying up sub-prime mortgages from other banks. Although Citizens, headed by Larry Fish, was not offering sub-prime loans itself, it quickly amassed billions of pounds in sub-prime exposure.

It is not known why it adopted this strategy, which was not authorised by the RBS board. It went disastrously wrong and Citizens is understood to have about £14 billion in "toxic" loans.

Several senior executives at the bank were "severely reprimanded" over the move into sub-prime.

235.    The *Daily Telegraph* also reported, "It is alleged that the way in which bonuses were paid – based on the interest earned on assets – encouraged traders to take on riskier prospects which offered higher rates of return."

236.     Likewise a March 23, 2009 article in the *Daily Telegraph* revealed that, not only was crucial information about the way bonuses were paid to RBS executives (based on interest earned on assets) not disclosed to the RBS Board, not only was the Board not given information to question the business decisions that led to RBS's downfall because of the "culture at RBS . . . driven by Sir Fred Goodwin," but former non-executive RBS directors were prevented from asking questions of RBS management by intimidation.  The article reported that a former Minister of Scotland had written the U.K.'s Financial Services Authority ("FSA") to demand an investigation, citing "intimidation of non-executive directors who had been asking probing questions which lead them to believe they would not be reappointed if they continued to pursue such searching questions."

237.     On April 12, 2009, the FSA announced that it was investigating the conduct of RBS executives.

238.     On May 18, 2009, according to the *Sunday Telegraph*, the FSA retained PricewaterhouseCoopers ("PwC") to conduct an inquiry into conduct of the RBS Board. According to the article, PwC will examine RBS's risk management process and establish whether the stock market was properly informed about the Company's financial position in the buildup to the Rights Issue.

239.     In June 2009, Defendant Goodwin, who left the Company in January with a lucrative severance package that included a pension of approximately £700,000 ($1.1 million) per year for the rest of his life, agreed to reduce his severance package by 50% amid public outrage about his role in the Company's collapse.  Coincidentally, that same day, an investigation by U.K. authorities into whether Goodwin misused expense accounts and other perks was closed.

# VII. CONFIDENTIAL WITNESSES

240. In addition to the above-referenced investigation undertaken by Counsel for Lead Plaintiffs, the sources for the factual allegations set forth herein are supported by the first-hand knowledge of material Confidential Witnesses ("Confidential Witness" or "CW"). Each CW is a former-employee of the Company or a subsidiary of the Company. As detailed below, the CWs occupied positions that provided access to the information which they described concerning the Company's business, operations and the materially false and misleading statements alleged to have been made by the Defendants throughout the Class Period. In addition, the CWs communicated with those who directly reported to the Individual Defendants and in some instances with the Individual Defendants themselves, such that the CWs had a reasonable basis upon which to describe information that the Individual Defendants knew or recklessly disregarded.

241. As detailed below, CW1 and CW2 were both employed by Greenwich and on information and belief, were involved in Greenwich's provision of warehouse lines of credit to residential mortgage originators. Under this process, Greenwich would provide capital and take on loans (which RBS would either keep on its own books or pool with other mortgages for sale to investors through an offering of ABS in the form of MBS or CDOs). CW1 and CW2 both stated that they were instructed by senior executives of RBS to override risk statistics in these loans to improve the Risk Adjusted Return On Equity (RAROE).

242. **Confidential Witness No. 1 ("CW1")** was a Managing Director at Greenwich, in the Financial Institutions Group, from the date of RBS's acquisition of ABN AMRO in 2007 through December 2008. CW1 had been employed at ABN AMRO since 2002. From approximately October 2007 until December 2008, CW1 was physically located at Greenwich's principal offices in Greenwich, Connecticut. By way of CW1's position at RBS, CW1 was

knowledgeable of the Company's operations across various types of structured finance or asset-backed securities, including daily purchases and sales of MBS CDOs, structuring of CDOs and the use of RBS's quantitative CDO models which were used by structuring and market risk groups to determine what capital should be committed to any particular trade. Moreover, CW1 was also knowledgeable of activities at RBS related to Credit Default Swaps (derivatives used to either hedge a long position or short an asset, asset class or index) and the securitization of mortgage loans into MBS.

243. As a Managing Director, CW1 had significant knowledge of calculating Loss Given Default ("LGD") on mortgage loans funded and held by Greenwich, but described RBS's calculations of this as a "real black box." In this context LGD models estimate the economic loss that may be suffered by RBS in the event of default. The LGD of a facility represents the amount of debt which cannot be recovered, taking into account the type of borrower, credit facility, collateral value and any other risk mitigation. With respect to the LGD assumptions, CW1 acknowledged that Greenwich would override the LGD assumptions on loans to understate potential losses.

244. CW1 said that the LGD could be manipulated because it "can change to suit getting things done." CW1 stated that in addition to being a "black box" it was not applied in a "consistent" manner allowing loans to have a "lower capital requirement and have a higher return on the capital if it had a lower [LGD] rate." The LGD's effect on the projected return of a given loan could be significant and by lowering, and overriding the LGD from what the models predicted Greenwich could project much higher returns.

245. In discussing the effect that overriding the LGD has, CW1 noted that the Company's "return on the investment or the return on capital used" would be much higher if the

LGD was lower. Moreover, CW1 acknowledge that the LGD was used inconsistently and that "the inconsistencies are certainly an issue; no doubt" because "you can change the LGD to get the return up to what it needs to be above the hurdle . . . to get it done."

246. Information provide by CW2, corroborated by CW1, indicates that *credit personnel were instructed to alter and manipulate credit risk measures, through LGD. As CW1 stated, this override would make sure that loans "get done."*

247. **Confidential Witness No. 2 ("CW2")** was a Credit Administrator at Greenwich, in the Company's Credit Department, from July 2008 to April 2009 and reported to CW1. During this period, CW2 was physically located at Greenwich's principal offices in Greenwich, Connecticut. CW2 worked closely with credit officers on mortgage loans. CW2 indicated that these were mortgage loans funded by Greenwich and originated by, among others, GMAC, TAMMAC, Potomac, American Home Mortgage Corp. and GreenTree.

248. CW2 began her role as a Credit Administrator and became immediately aware of a significant number of reported problems relating to the Company's mortgage loan assets, specifically, substantial increases in delinquent payments and defaults by borrowers. In response to these changes, CW2 was instructed by the Credit Officer to whom she reported to modify loss default profiles on loans, which would effectively decrease the amount of expected loss on the loan assets. Specifically, CW2 was instructed by supervisors to "*override the LGD to 10%, whatever percentage they'd want me to override for*." The implication of this override was to under-state the loss expected from a given mortgage-related security.

249. **Confidential Witness No. 3 ("CW3")** was a Managing Director at RBS's Money Markets and Treasury Department in RBS's New York offices from January 2000 to July 2007.

Prior to joining RBS, CW3 had been employed by NatWest since 1993.[24]  CW3 reported directly to Jay Levine at Greenwich and Graham Niblock in London.  By way of the position CW3 held at the Company, CW3 possessed intricate knowledge of the Company's North America banking operations, specifically, RBS's purchase of Collateralized Mortgage Obligations ("CMOs") and the subsequent sale to Greenwich, RBS's role in structuring CDOs, RBS's real estate lending operations (primarily through Citizens and Charter One) and its use of the risk assessment models.

250.    CW3 stated that Citizens' CEO, Larry Fish, was pressured by RBS to offer larger credit to and extend Citizen's balance sheet in order for RBS to have a major involvement in commercial real estate in the U.S.  By 2005, RBS began pressuring Fish  to "*lax some of his conservative ideals*," increase the size of Citizen's loan book, and "*even go down a couple of notches in credit quality*."

251.    CW3 stated that management at Greenwich was extremely "secretive" with respect to revealing or talking about the underwriting standards or practices employed in securitizing mortgage-related securities.  CW3 further indicated that Greenwich profit had expanded from $0.5 billion to $1.5 billion in a matter of three or four years and that so long as money was being made, how the unit operated was not questioned.  CW3 indicated that *while some of the loans that were purchased by Greenwich were of high quality, most were "real garbage*."

252.    Furthermore, CW3 indicated that Citizens had purchased high quality CMOs, which it then sold to Greenwich.  *Greenwich would then repackage them into CDOs that were weighted disproportionately with subprime mortgages obtained from such entities as*

---

[24] CW3 indicated that Greenwich Capital had been purchased by NatWest in the late 1990's and that in 2000, NatWest was acquired by RBS, obtaining Greenwich Capital as a part of the transaction.

***Countrywide, Merrill Lynch, and Bear Stearns.*** According to CW3, Citizens had a CMO portfolio of more than $25 billion before the first half of 2007. Additionally, CW3 indicated that ***by July 2007, it was known that problems with mortgages were significantly adversely affecting Greenwich's profitability***.

253. **Confidential Witness No. 4 ("CW4")** was an Underwriter/Credit Analyst at Charter One from 1999 to January 2008. CW4 worked in the "Wholesale Lending" division (also known as the "Specialty Lending" division), which was located in Cleveland, Ohio and fell under Charter One's Consumer Lending Division. CW4 explained that ***if a potential borrower did not qualify for a prime mortgage, the borrower would be sent to Charter One's subprime unit, Equity One***, which was also located in Cleveland.

254. CW4 described Wholesale Lending's and Equity One's loans as "Portfolio Loans," which meant that Charter One kept the loans on its balance sheet and did not sell them to other banks or securitize and sell them to investors as ABS.

255. As a result, these subprime loans were assets that Citizens purchased when it acquired Charter One in September 2004.

256. CW4 explained that after Citizens acquired Charter One, the Wholesale Lending division continued originating mortgages with high "loan-to-value" ("LTV") ratios, which represent the size of a loan relative to a property's value. These mortgages had LTV ratios as high as 100%, indicating that no down payment was required.

257. The Wholesale Lending Division would also originate loans with no income or asset verification (known as "NINA" loans), and even loans with no job verification (known as "NINJA" loans).

258.     CW4 explained that, although Citizens was aware of the subprime loans on

Charter One's balance sheet, ***Citizens did not discontinue the Wholesale Lending Division's***

***subprime operations until approximately November 2007***.

**VIII.   The Company's Strong and Numerous Ties to the U.S.**

259.     This Court has subject matter jurisdiction over the claims brought on behalf of

investors who purchased or acquired RBS securities on foreign markets and/or on the NYSE

market as the focus of Defendants' misrepresentations concerning RBS's exposures to subprime

mortgages and related assets arise from actions taken and decisions made in the U.S.

**A.     The U.S. Accounted for A Substantial**
**Portion of the Worldwide Market for RBS Shares**

260.     During the Class Period, there was but a single worldwide market for RBS shares

and ADRs.  RBS's ordinary shares and ADRs representing those ordinary shares traded in

tandem, as set forth in the charts below:

## RBS ADR Price Chart



## RBS Ordinary Shares Price Chart



261.    As of December 31, 2007, 62.9 million RBS ADRs were outstanding, with The

Bank of New York serving as the depositary and paying agent.  During the Class Period, RBS's

ADRs had substantial trading volume, reaching a Class Period high of 2,148,600, with a total

volume of trading during the Class Period of more than 58 million shares. On January 20, 2009, the day after the Class Period, trading volume reached a record daily high of 6,545,680 shares.

262. At least 27 of the top 100 RBS shareholders are U.S. institutions. Indeed, the institution with the largest share holdings in RBS, AllianceBernstein L.P., is a U.S. institution. Additionally, U.S. company Dodge & Cox is in the top three.

263. Importantly, RBS is closely followed by a number of analysts who are headquartered (or that are subsidiaries of companies headquartered) in the U.S., including Goldman Sachs & Co., Morgan Stanley, Lehman and Citigroup.

**B.    Actions Taken By Defendants in the U.S. Were
    Integral to Defendants' Scheme to Defraud Investors**

264. RBS has been operating in the U.S. since 1960. On its website, as recently as March of 2009, RBS boasted that it is "One of the largest US banks" and touted its U.S. ranking by Orion Consultants as #1 in Mortgage Backed Securities Sales, #1 in Mortgage Backed Securities Trading, #1 in Asset Backed Securities Sales, and #5 in Asset Backed Securities Trading. RBS also had substantial operating subsidiaries within the United States at all relevant times hereto and files periodic financial statements with the SEC upon which the global market relies in pricing RBS shares.

265. The first international office of RBS was opened in New York in 1960. In 1988, RBS acquired Citizens Financial Group ("Citizens"), a bank that operates under the Citizens Bank retail name and is based in Rhode Island, United States. Since then, Citizens has acquired several other American banks, and in 2004 acquired Charter One Financial, the parent company of Charter One Bank, to become the eighth largest bank in the United States.

266. RBS Securities (formerly Greenwich), founded in 1981, is a U.S. investment bank/broker-dealer based in Greenwich, Connecticut, and a wholly owned subsidiary of RBS.

RBS Securities is a leading underwriter, trader, and distributor of fixed-income investment products. The company specializes in U.S. dollar derivatives, asset-based securities, corporate debt, and mortgage-backed securities. It is also active in corporate banking, commercial real estate finance, foreign exchange, futures trading, and financing of mergers and acquisitions. RBS Securities provides investment services to major corporations and to financial and governmental institutions around the world.

267. RBS's U.S. operations were integral to the misrepresentations at the heart of this case and the scheme devised to make these misrepresentations possible. RBS's massive exposure to the toxic subprime market was led by its Connecticut-based Greenwich. Greenwich has been described as having the largest trading floor in the world, with Greenwich executives earning up to $25 million a year in cash bonuses. Greenwich's website further touts that "RBS and RBS Greenwich constitute one of the largest banking and capital markets groups in North America." *See* http://www3.rbsgc.com/rbsgcconnect/home.aspx. By December 2007, RBS's daily morning meetings, presided over by Goodwin, involved updates and discussions with the U.S. operations on the subprime assets accumulated by the traders at and held on the books of Greenwich – all based in Greenwich, Connecticut.[25]

268. The importance of the Greenwich entities is highlighted by the fact that the former head of Greenwich, Jay Levine, was RBS's highest paid employee, making nearly four times as much as RBS's CEO at the time. As Greenwich piled on exposure to the subprime market, Levine's extreme compensation – Levine made approximately $55 million over three years – increased accordingly. One journalist observed, "[t]he boom in selling mortgage debt to the financial markets had begun, and RBS Greenwich . . . was at the heart of it." On February 8, 2009, Levine was quoted as stating, "We [Greenwich] were in the right place, we had a very

---

[25] Iain Dey & Kate Walsh, "How Fred Shredded RBS," *TimesOnline* (February 8, 2009).

significant mortgage business – we were among the top three or four players – and the market has just expanded unbelievably."[26]

269.    In addition to Greenwich – another U.S. based RBS subsidiary, Citizens, led by Fish, operated across 12 states in New England, the Mid-Atlantic and the Midwest.  Under the RBS umbrella, Citizens grew from the sixth-largest bank in Rhode Island to the eighth-largest bank in the United States with over $160 billion in assets.  In 2007, Fish was also appointed to the Federal Deposit Insurance Corp.'s Advisory Committee on Economic Inclusion, a committee formed to provide the FDIC with advice and recommendations on important initiatives focused on expanding access to banking services by underserved populations in the U.S., which primarily consisted of subprime loans.

270.    Importantly, it was under Fish's leadership that—like Greenwich—Citizens Bank adopted a subprime-driven strategy, resulting in exposure to more than £14 billion in toxic subprime assets.  This was despite the fact that Fish, on a conference all with analysts and investors on March 1, 2007, had emphatically stated, "*We have never – we don't do sub-prime. We have never done sub-prime.  We have no plans to do sub-prime.*"  Such statements were engineered by an employee of RBS who worked in the U.S. (indeed who led a U.S. division of RBS) and transmitted such statements to investors.

271.    The build-up of subprime exposure through RBS's U.S. subsidiaries amounted to approximately £34 billion in subprime exposure by the summer of 2007.  Moreover, while about half of RBS's exposure to subprime appears to have come through the Company's own U.S. subsidiaries, after October 2007, RBS was also exposed through ABN AMRO's accumulation of subprime assets.  As CW2 (who worked at ABN AMRO and then Greenwich as a Credit

---

[26] *Id.*.

Administrator in the Credit Department of the main office in Greenwich, Connecticut) and CW1 (who worked at ABN AMRO and then as Managing Director of the Financial Institution Group at Greenwich) explained, the scheme to acquire risky assets yet describe such assets as sound and value such assets at artificially inflated levels (as they are described in RBS's Forms 20-F during the relevant time period) was carried out in the U.S. subsidiaries of RBS.

272.    That RBS's U.S. conduct was integral to the misrepresentations and scheme complained of herein is further evidenced by the fact that the SEC has begun a formal investigation of RBS's "U.S. sub-prime securities exposures and U.S. residential mortgage exposures."  Similarly, the New York Attorney General has also begun an investigation of RBS's subprime exposure.  Indeed, without the actions taken and decisions made by RBS employees in the U.S. – including the directions given by directors of RBS living in the U.S. including Fish and leading U.S. divisions of RBS, the scheme complained of herein (and the resulting misrepresentations) could not and would not have been engineered.  Defendants' U.S. activities were both a significant part of RBS's business at the center of this action, and were a direct cause of Plaintiffs' and Class members' losses.

## IX.    EXCHANGE ACT DEFENDANTS' FALSE & MISLEADING STATEMENTS

### The March 1, 2007 Statements

273.    The Class Period begins on March 1, 2007, the date on which, RBS filed a financial report announcing the Company's results for year-end 2006 on Form 6-K, stating:

> [W]e have retained our inherently cautious stance towards higher risk activities such as unsecured consumer lending and sub-prime credit markets more generally.
>
> *        *        *
>
> [W]e have retained our inherently cautious stance towards higher risk activities such as unsecured consumer lending and sub-prime credit markets more generally.  . . .  Sound control of risk is

fundamental to [RBS's] business, and our results here are reassuring. We have grown average customer lending by 14% while impairment losses have increased by 10%. ***Central to this is our longstanding aversion to sub-prime lending, wherever we do business. . . .***

\*     \*     \*

We maintained our traditional unwillingness to engage in sub-prime lending . . . .

274. That same day, during an earnings call in which McKillop, Whittaker, Goodwin, Cameron and Fish participated, the Individual Defendants repeatedly reassured investors and analysts that the Company's credit metrics were strong and that neither RBS nor its subsidiaries had any exposure to the U.S. subprime market, either through lending or trading activities. For example, Whittaker claimed:

In the US, where there's been some market turbulence and much comment over the last days and weeks, ***we have prime quality*** portfolios ***both at Citizens, where we do not do front [sic] prime lending, nor in our Global Banking and Markets business where our role as an intermediary between originators and investors, leaves us both well-protected and with limited risk.***

275. Defendant Cameron, RBS's Chief Executive-Corporate Banking and Markets, in response to an inquiry about the Company's credit lines to subprime lenders, explained that Greenwich has "always been very risk averse." Although he acknowledged that Greenwich offered credit lines to mortgage originators, he stated that it had been highly selective, such that RBS was "***very comfortable with what we've done . . . it's highly over collateralized, the mark-to-markets are fine. We've got no concerns with our lines to the originators.***"

276. On that same conference call, Fish was equally emphatic about the Company's risk profile, stating, "***We have never – we don't do sub-prime. We have never done sub-prime. We have no plans to do sub-prime. Sub-prime brings with it operational risks, regulator risks and, of course, credit risks.***"

277. The foregoing statements regarding RBS's lack of exposure to subprime assets, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that RBS ultimately ended up with £14 billion of subprime exposure, notwithstanding the Exchange Act Defendants' assurances that the Company had no such exposure (¶¶ 8, 250, 270);

(b) They falsely represented that RBS had a "no subprime" stance, when in fact, such statements were materially false and misleading because they misled RBS shareholders and analysts about RBS's then undisclosed subprime ABS CDO and MBS exposures and also hid from investors the fact that Defendants' scheme to invest in such CDOs, in order to generate additional income, exposed RBS to billions of dollars of high-risk assets (¶¶ 134-178);

(c) They failed to disclose RBS's material control weakness regarding "risk concentrations," identified by Hester (¶¶ 225);

(d) They failed to disclose that in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258); and

(e)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich Capital to repackage into CDOs, which ultimately exposed RBS to billions of dollars of risk related to the U.S. subprime market from RBS's retained interests in the CDOs (¶¶ 134, 252).

**The May 29, 2007 Statements**

278.     Following only one week of due diligence with ABN AMRO, on May 29, 2007, the Consortium (RBS, Fortis and Santander) held a conference call with analysts and investors (in which Goodwin, Cameron and Fisher participated), during which they discussed the value of the Consortium's bid to acquire ABN AMRO.  During that conference call, defendants Goodwin and Cameron discussed RBS's rationale for the terms of its bid, explaining that the seemingly high price being offered by RBS was well-justified by what had been found as a result of the Company's due diligence.  In particular, Defendant Goodwin explained, "But for today we stick with the bid we made a month ago. *We feel better about it than we did a month ago.  We've had a chance to do more work to gain more insight into ABN AMRO and the numbers work.*"

279.     Defendant Goodwin explained unequivocally that RBS chose to get into a competitive bidding situation for ABN AMRO, because it would produce "attractive returns for RBS shareholders":

> The important point -- I haven't said the words yet but it is self-evident, we don't have to do this. The reasons we are bringing this forward is we've seen from the outset are very doable, challenging but doable transaction that offers very attractive returns for RBS shareholders. We are wearing a consortium hat today but not for long. *We've look at this -- our own shareholders we're here for as are my colleagues and it is attractive for all of us*. That's why we're here. If it ever gets to a place where we think we need to change the price to one which starts to challenge reason, I don't want to do it. My colleagues don't want to do it. The Board don't want to do it and that is very simple.

280.     The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time or were made with reckless disregard for the truth, because given the extremely limited due diligence conducted by RBS, the Exchange Act Defendants did not have a basis to believe that the integration of ABN AMRO would result in "attractive returns" to RBS, in light of the assets that RBS stood to inherit from the acquisition. (¶¶ 183-188).

**The June 5, 2007 Statements**

281.     On June 5, 2007, RBS held a conference call with analysts and investors (in which Goodwin and Whittaker participated) to discuss the Company's interim financial results. During that call, Defendant Goodwin continued to reiterate the mantra that the Company had no subprime exposure.  When asked to elaborate on the quality of RBS's assets he noted:

> **Sir Fred Goodwin** - *Royal Bank of Scotland Group Plc - Group CEO*
> **The mix or the quality of the credit within our book, as you've heard me saying ad nauseam, we don't do sub-prime so we've not, perhaps, been exposed to some of the more boisterous elements of that market that others have**.  So provisioning as a proportion of our book is coming down as well as the book coming down so, to my mind, that gets you to the remarks about quality and quantity.
>
> **Alt-A, we're not anticipating -- we don't have a huge exposure to Alt-A.  It's a very modest level of exposure, but at all very high FICO scores.  And I think that one of the things when somebody comes to write the book about all of this in the United States is that the contagion from sub-prime is into other areas of sub-prime.  I think what's happened over recent years, and perhaps it has passed people by, is just quite the depth of the sub-prime sector is a lot greater than people thought and there is a -- where there is contagion, it's up the food chain, but still within the sub-prime area rather than making it across into any of the others, so we're not seeing any stress in our book against the -- what little exposure there is to Alt-A.**

282.     The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that Citizens ultimately ended up with £14 billion of subprime exposure, notwithstanding the Exchange Act Defendants' assurances that Citizens had no such exposure (¶¶ 8, 250, 270);

(b)     They failed to disclose RBS' material control weakness regarding "risk concentrations," identified by Hester (¶ 225);

(c)     They failed to disclose that, in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258); and

(d)     They falsely represented that RBS had a "no subprime" stance, when in fact, such statements were materially false and misleading because they misled RBS shareholders and analysts about RBS's then undisclosed subprime ABS CDO and MBS exposures and also hid from investors the fact that Defendants' scheme to invest in such CDOs, in order to generate additional income, exposed RBS to billions of dollars of high-risk assets (¶¶ 134-178).

**The July 16, 2007 Statements**

283.    The following month, in a Form 6-K filed on July 16, 2007, RBS made the

following representations concerning the expected benefits of the planned ABN AMRO

acquisition:

> *On RBS's forecasts for business growth and transaction benefits,
> the internal rate of return on the acquisition of the ABN AMRO
> Businesses will be 15.5% post-tax, well above [RBS's] hurdle rate
> of 12% post-tax.  The acquisition is expected to deliver a post-tax
> return on investment of 13.2% in 2010, and to increase [RBS's]
> adjusted earnings per share by 2.0% in 2009 and by 7.0% in
> 2010.*

(Footnotes omitted).

284.    The July 16 Form 6-K also included the following statement by defendant

Goodwin touting the expected benefits of the ABN AMRO acquisition:

> The acquisition of the ABN AMRO Businesses remains
> compelling from a financial point of view, as evidenced by the fact
> that it produces essentially the same earnings enhancement for
> [RBS], despite the smaller size of the transaction. . .

(Footnotes omitted).

285.    The foregoing statements regarding the business case for the ABN AMRO

acquisition, which caused RBS securities to trade at artificially inflated prices, were each

materially false and misleading when made, and were known by the Exchange Act Defendants

to be false at that time, or were made with reckless disregard for the truth, for the following

reasons, among others:

(a)    They failed to disclose that, given RBS's extremely limited due diligence

in connection with the acquisition, the Exchange Act Defendants lacked a basis for their claim

that the transaction was "compelling from a financial point of view" and would enable RBS to

accelerate its strategic development (¶¶ 138-188); and

(b)    The Exchange Act Defendants failed to disclose, or recklessly failed to investigate, the effect that the ABN AMRO acquisition would have on the Company's balance sheet, capital position, and overall operations, which materially increased investors' risk of purchasing RBS securities (¶¶ 183-206).

**The July 20, 2007 Statements**

286.    On July 20, 2007, RBS issued a statement regarding its financial outlook for the six months ended June 30, 2007, reporting in a Form 6-K that profit was expected to be at least £5 billion, consistent with the guidance RBS provided on June 5, 2007, as follows:

> **Profit Estimate for First Six Months of 2007**
>
> RBS's interim results for the six months to 30 June 2007 are expected to reflect good organic growth in income, disciplined expense control, ***measured investment in faster growing businesses and continued strong credit metrics***. Profit before tax, intangibles amortisation and integration costs for the six months to 30 June 2007 is expected to be not less than £5,000 million. Adjusted earnings per share before intangibles amortisation and integration costs is expected to exceed 37 pence per RBS Ordinary Share based on an effective tax rate of 26%.

287.    The foregoing statements regarding RBS's investment growth and credit metrics, which caused RBS securities to trade at artificially inflated prices, were materially false and misleading when made, and were known by Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, because they:

(a)    Failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that Citizens ultimately ended up with £14 billion of subprime exposure, notwithstanding Exchange Act Defendants' assurances that Citizens had no such exposure (¶¶ 8, 250, 270);

(b)     Failed to disclose that, in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions, and instead the Company priced those assets at inflated values (¶¶ 240-258); and

(c)     Misled RBS shareholders and analysts about RBS's U.S. subprime ABS CDO exposures and also hid from the investing public that Defendants' scheme to invest in such CDOs, in order to generate additional income, exposed RBS to billions of dollars of high-risk assets (¶¶ 134-178).

288.    In a Form F-4 Registration Statement filed with the SEC on July 20, 2007, RBS made the following representations concerning its reasons for acquiring ABN AMRO, and the benefits that could be expected from the transaction:

> **RBS**
> RBS believes that the acquisition of the ABN AMRO Businesses will enhance [RBS's] prospects for growth, both by enabling it to accelerate existing strategies for growth and by providing attractive new opportunities.
>
> *        *        *
>
> **Cost Savings and Revenue Benefits**
> RBS believes that the combination of its and the ABN AMRO Businesses creates the opportunity for significant cost savings and revenue benefits. RBS believes that it will deliver cost savings amounting to €1,237 million (or €1,319 million, including its share of central cost savings), or 23% of the 2006 costs associated with the relevant ABN AMRO Businesses and ***net revenue benefits amounting to €481 million, or 8% of the 2006 income associated with the relevant ABN AMRO Businesses, in the third year after completion of the offers.*** RBS expects the total integration costs to be €2.57 billion (€2.73 billion including RBS's share of central integration costs).

The following table sets out the pre-tax benefits that RBS expects to gain within three years of completion of the offers as a result of the integration of the relevant ABN AMRO Businesses. . . .

| RBS | Estimated Cost Savings per Annum by end of 2010 | Estimated Net Revenue Benefits per Annum by end of 2010 |
|---|---|---|
| Global Wholesale Businesses | 11,237 | 4,481 |
| International Retail Businesses | -- | -- |
| Shared Assets | 882 | -- |
| Total | 11,319 | 4,481 |

**Expected Financial Impact**

Based on RBS's forecasts for business growth and transaction benefits, the acquisition of the ABN AMRO Businesses is expected to lead to 7.0% accretion in adjusted earnings (a) per RBS ordinary share and to produce a return on investment (b) of 13.2% in the third year after completion of the offers. The internal rate of return of the Transaction is expected to be 15.5% post tax.

Allowing for the acquisition of the relevant ABN AMRO Businesses, RBS's Tier 1 capital ratio is expected to be approximately 7.4% (c) at the end of 2007.

289. The foregoing statements regarding the projected revenue benefits that would be derived from the ABN AMRO acquisition, which caused RBS securities to trade at artificially inflated prices, were materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that, given RBS's extremely limited due diligence in connection with the acquisition, defendants lacked a basis for their claim that the transaction was "compelling from a financial point of view" and would enable RBS to accelerate its strategic development (¶¶ 183-188); and

(b)     They misstated the effect that the ABN AMRO acquisition would

foreseeably have on the Company's balance sheet, capital position, and overall operations, as the

dislocation in the financial markets were then having, and also foreseeably would continue to

have, an increasingly severe impact on RBS's business, which significantly increased investors'

risk of loss in purchasing RBS securities (¶¶ 183-206).

**The August 2007 Statements**

290.     On August 3, 2007, RBS filed a Form 6-K that included its financial results for

the first half of fiscal 2007.  In that filing, RBS reported that the Company's operating profit had

risen 11% to £5.106 billion and that adjusted earnings per ordinary share had risen 21% to 38.4p.

The Company also reported that impairment losses had improved to 0.40% of loans and

advances.  In his "Group Chief Executive's Review," defendant Goodwin stated, in relevant part:

> Our businesses have continued to balance volume growth against
> profitability, and *we have maintained a more cautious approach*
> *towards a number of business segments in which we have not*
> *considered that the available returns matched the costs and risks*
> *entailed.*  We have, therefore, further reduced our business
> volumes in markets such as direct loans, intermediary mortgages
> and insurance partnerships, with a consequent improvement in
> profitability.
>
> *Global Banking & Markets has produced another strong*
> *performance, as its expanding product set and broadening*
> *geographical footprint have yielded a 19% increase in operating*
> *profit,* while UK Corporate Banking has maintained its
> consistently good pace of growth.  Ulster Bank and Wealth
> Management, too, have kept up their momentum, and we are
> continuing to invest in these high-growth businesses.
>
> *             *             *
>
> *Strong credit metrics highlight our conservative risk profile*
> *across [RBS], and impairment losses fell 2% to £871 million.*
> The quality of our corporate loan portfolio remains very strong,
> and we believe that we have passed the peak of bad debts in the
> UK unsecured personal credit market.  Our early action to tighten
> lending criteria and reduce activity in the direct loan market is now

reflected in falling arrears and a 7% reduction in Retail impairment losses. ***Our trading book risk remains modest.***

\* \* \*

Retail Markets has continued to build its core current account franchise, providing the platform for strong growth in its savings and investments business. ***Lending growth has been more subdued but our cautious credit stance has produced a reduction in impairment losses, and this, together with flat underlying costs, drove a 10% increase in operating profit.***

Citizens has increased its customer numbers by 5% and made significant progress in its efforts to diversify its income streams away from its traditional deposit products, with good growth in credit cards and merchant acquiring. ***That diversification has emphatically not included the sub-prime credit markets, and we have no regrets over our decision to avoid this segment.*** Average corporate lending increased by 12%, demonstrating the momentum we are building towards our objective of developing a significant corporate and commercial banking presence in the US. Operating profit rose by 2% in US dollar terms.

291.     RBS further reported in the August 3, 2007 Form 6-K that, in its Global Banking and Markets division, ***"[p]ortfolio risk remained stable*** and the corporate credit environment remained benign," adding that, "[i]mpairment losses of £21 million were in line with the first half of 2006, a period which included significant recoveries."

292.     With respect to Citizens, RBS reported in the August 3, 2007 Form 6-K a 2% increase in income to approximately $3.1 billion and a 2% increase in operating profit growth to $1.5 billion.  RBS reiterated: "***Citizens is not active in sub-prime lending***, and consumer lending is to prime customers, with average FICO scores on our portfolios, including home equity lines of credit, in excess of 700 with 96% of lending secured."

293.     The foregoing statements regarding RBS's conservative approach to risky assets and, in particular, the subprime credit markets, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were

known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that Citizens ultimately ended up with £14 billion of subprime exposure, notwithstanding Exchange Act Defendants' assurances that Citizens had no such exposure (¶¶ 8, 250, 270);

(b)     They failed to disclose that in increasing its exposure to risky U.S. subprime and Alt-A mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(c)     They failed to disclose that RBS's increase in operating profit for GBM was achieved, in part, by exposing RBS to billions of dollars of risky subprime assets (¶¶ 159-176);

(d)     They falsely represented that RBS's trading book was "risk modest" when, in fact, the Exchange Act Defendants failed to adequately protect against the risk of these exposures (¶¶ 134-178, 240-258);

(e)     They failed to disclose RBS's material control weakness regarding "risk concentrations," identified by Hester (¶ 225);

(f)     They falsely represented that RBS had a "no subprime" stance, when in fact, such statements were materially false and misleading because they misled RBS shareholders and analysts about RBS's then undisclosed subprime ABS CDO and MBS

exposures and also hid from investors the fact that Defendants' scheme to invest in such CDOs, in order to generate additional income, exposed RBS to billions of dollars of high-risk assets (¶¶ 134-178); and

(g)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich to repackage into CDOs, which ultimately exposed RBS to billions of dollars of risk related to the U.S. subprime market (¶¶ 134, 252).

294.     In its August 3, 2007 Form 6-K, RBS also represented that its financial statements for the period ended June 30, 2007, had been prepared in accordance with IAS 34 "Interim Financial Reporting" and made the following representations concerning impairment losses for that period:

> Operating profit is stated after charging loan impairment losses of £851 million (2006—£889 million).  The balance sheet loan impairment provisions increased in the half year ended 30 June 2007 from £3,935 million to £4,062 million . . .

295.     The foregoing statement in RBS's August 3, 2007 financial report, which caused RBS securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by the Exchange Act Defendants to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)     It failed to disclose that in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs  (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(b)     It falsely represented that RBS's financial statements conformed to IFRS because, subsequent to the June 30, 2007 financial statement date there had been a significant deterioration in the value of RBS's ABS CDOs (¶¶ 148-176, 397-443);

(c)     They failed to disclose that the Exchange Act Defendants violated IFRS by inflating the fair value of RBS's senior and mezzanine U.S. subprime ABS CDO and MBS exposures by failing to properly mark-to-market those securities based on the corresponding declines in the ABX indices, which had declined by at least 19% (senior tranches) and 46% (mezzanine tranches) since December 29, 2006[27] (¶¶ 150, 397-443).

296.    On August 3, 2007, during a conference call with analysts and investors (in which McKillop, Whittaker, Goodwin, Cameron and Fish participated), Defendant Whittaker stated that Citizens had no subprime loans in its lending book:

> The credit environment was positive. Our credit metrics reflected that and duly improved, loans and advances grew by 10% to [£]424 billion, but our impairment losses fell by 2% to [£]871 million. Our risk elements in lending and potential problem loans declined as a proportion of the portfolio from 1.64% this time a year ago to 1.51% as at June 30. ***It remains a very high quality portfolio, well diversified by industry and by geography***. It was pleasing to see that our UK unsecured credit losses declined in the first half of the year and arrears are falling. ***The corporate environment remains benign and our US portfolios, a subject of much discussion at the moment, are of a prime or super prime nature***.
>
> \*     \*     \*
>
> Our commercial lending volumes grew by 12% with good growth in the ancillary fees and products that are sold with them. ***Credit metrics overall remains strong***. The rise in impairments is very much in line with our expectations and reflects really the growth in the commercial book as that size of the business expands. Our risk elements in lending are very low at 35 basis points. ***We have just***

[27] Utilizing an arithmetic weighted average of AAA, AA and A-rated indices for high-grade CDOs and an average of the BBB and -BBB indices for the mezzanine CDOs based on the company-reported vintages as reported in RBS's May 14, 2008 Form 20-F.

> *as a reminder no sub-prime exposure in the lending book at*
> *Citizens* . . . .

297.     During the same call, Defendant Goodwin also stated that, in addition to the lack

of exposure to subprime through its lending business, the Company's overall exposure through

ABSs was minimal, noting that:

> Looking beyond the deposits and lending, I think another
> interesting figure *is all of our activity in US asset-backed and*
> *related to US asset-backed activity comes to about 1.6% of our*
> *total income.*

298.     In response to a question from Credit Suisse analyst Jonathan Pierce concerning

RBS's exposure on CDOs, defendant Cameron replied:  "*We've cut back a lot since the year*

*end of '06 in our exposure to these sorts of markets and I told you then that they were very*

*modest.  We've taken no credit losses anywhere in the portfolio.*"

299.     The foregoing statements made on the August 3, 2007 conference call, which

caused RBS securities to trade at artificially inflated prices, were materially false and misleading

when made, and were known by the Exchange Act Defendants to be false at that time, or were

made with reckless disregard for the truth, for the following reasons:

        (a)     They failed to disclose that RBS was pressuring Fish to offer larger credit

lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a

major bank in the U.S., such that Citizens ultimately ended up with £14 billion of subprime

exposure, notwithstanding Exchange Act Defendants' assurances that Citizens had no such

exposure (¶¶ 8, 250, 270);

        (b)     They failed to disclose that in increasing its exposure to risky U.S.

subprime mortgages, largely through an accumulation of ABS CDOs and MBSs  (which were

collateralized in significant part by subprime mortgages), RBS overrode its own internal risk

management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(c)     They failed to disclose that increases in RBS's reported net revenues and earnings for RBS's Global Banking & Markets division were achieved, in part, by exposing RBS to billions of dollars of risky subprime assets with a corresponding 1.6% increase in total income stemming from those investments (¶¶ 159-176);

(d)     They falsely represented that, because of RBS's "no subprime" stance RBS would not be materially impacted by the subprime crisis, unlike many of its competitors (¶¶ 134-178);

(e)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich to repackage into CDOs, which ultimately exposed RBS to billions of dollars of risk related to the U.S. subprime market (¶¶ 134, 252);

(f)     They falsely represented that RBS's financial statements conformed to IFRS and failed to disclose RBS's substantial exposure to risky U.S. subprime ABS CDOs. (¶¶ 134-178, 397-443);

(g)     They failed to disclose that the Exchange Act Defendants violated IFRS by inflating the fair value of RBS's senior and mezzanine U.S. subprime ABS CDO and MBS exposures by failing to properly mark-to-market those securities based on the corresponding declines in the ABX indices, which had declined by at least 19% (senior tranches) and 46% (mezzanine tranches) since December 29, 2006 (¶¶ 150, 397-443); and

(h)     Goodwin's statement regarding RBS's US asset-backed "activity" is not defined and ignores the potential impact of RBS's risk concentrations in this area upon RBS's

reported earnings. For example, a relatively small decline in the value of RBS's exposures in this area could have a material impact on RBS's earnings.

300. In its Form 6-K filed with the SEC on August 15, 2007, RBS reported that its impairment losses had actually declined year-over-year:

> **Impairment losses**
> **Impairment losses fell 2% to £871 million, compared with £887 million in 2006.**
>
> *Risk elements in lending and potential problem loans represented 1.51% of gross loans and advances to customers excluding reverse repos at 30 June 2007 (31 December 2006 - 1.57%).*
>
> *Provision* coverage *of risk elements in lending and potential problem loans was 63% (31 December 2006 - 62%).*
>
>         \*      \*      \*
>
> **CORPORATE MARKETS – GLOBAL BANKING AND MARKETS**
> . . . **Portfolio risk remained** stable and the corporate credit environment remained benign. Impairment losses of £21 million were in line with the first half of 2006, a period which included significant recoveries . . . .
>
> **CITIZENS**
> The increasing proportion of commercial lending in our portfolio has contributed to an increase in impairment losses to £83 million ($163 million). This reflects the growth in the portfolio over the recent past and still represents just 0.29% of loans and advances to customers, on an annualized basis, illustrating the quality of our portfolio. Risk elements in lending and problem loans represent 0.35% of loans and advances, up slightly from 0.32% in 2006. **Citizens is not active in sub-prime lending, and consumer lending is to prime customers**, with average FICO scores on our portfolios, including home equity lines of credit, in excess of 700 with 96% of lending secured.
>
>         \*      \*      \*
>
> **Loan impairment** provisions
> Operating profit is stated after charging loan impairment losses of £851 million (2006 - £889 million). The balance sheet loan impairment provisions increased in the half year ended 30 June

2007 from £3,935 million to £4,062 million, and the movements thereon were:

| | First half 2007 £m | First half 2006 £m |
|---|---|---|
| At 1 January | 3,935 | 3,887 |
| Currency translation and other adjustments | (6) | (34) |
| Acquisitions | 7 | - |
| Amounts written-off | (768) | (737) |
| Recoveries of amounts previously written-off | 126 | 96 |
| Charge to the income statement | 851 | 889 |
| Unwind of discount | (83) | (63) |
| At 30 June | 4,062 | 4,038 |

The provision at 30 June 2007 includes £2 million (31 December 2006 - £2 million; 30 June 2006 - £3 million) in respect of loans and advances to banks.

The provision at 30 June 2007 includes £2 million (31 December 2006 - £2 million; 30 June 2006 - £3 million) in respect of loans and advances to banks.

301.     With respect to its Global Banking & Markets unit, RBS also reported that:

*Portfolio risk remained stable and the corporate credit environment remained benign. Impairment losses of £21 million were in line with the first half of 2006, a period which included significant recoveries.*

Average risk-weighted assets grew by 12% and the annualized ratio of operating profit to average risk-weighted assets improved from 2.8% to 3.0%.

302.     The foregoing statements contained in the August 15, 2007 Form 6-K, which caused RBS securities to trade at artificially inflated prices, were materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons:

(a)     They failed to disclose that RBS and its subsidiaries were increasingly unable to sell ABS CDOs, which resulted in RBS having billions of dollars of U.S. subprime exposures by the beginning of the Class Period (¶¶ 134-178);

(b)    They failed to disclose that in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime and Alt-A mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(c)    They falsely represented that RBS's financial statements conformed to IFRS and failed to disclose RBS's substantial exposure to risky U.S. subprime and Alt-A backed ABS CDOs and MBSs, and the significant decline in the value of these assets since the June 30, 2007 date of the financial statements (¶¶ 148-176, 397-443);

(d)    They failed to disclose that the Exchange Act Defendants violated IFRS by inflating the fair value of RBS's senior and mezzanine U.S. subprime ABS CDO and MBS exposures by failing to properly mark-to-market those securities based on the corresponding declines in the ABX indices, which had declined by at least 19% (senior tranches) and 50% (mezzanine tranches) since December 29, 2006 (¶¶ 150, 397-443); and

(e)    They falsely represented that because of RBS's "no subprime" stance, RBS would not be materially impacted by the subprime crisis, unlike many of its competitors (¶¶ 134-178).

**The September 28, 2007 Statements**

303.    In a Form 6-K filed on September 28, 2007, RBS reported that it had achieved "strong growth," stating, in relevant part:

> **Total income**
>
> [RBS] achieved strong growth in income during the first half of 2007. Total income was £11,421 million compared with £10,457 million, an increase of £964 million, 9%. . .
>
> *      *      *

Impairment losses fell 1% to £871 million, compared with £880 million in 2006.

*     *     *

**Loan Impairment Provisions**

Operating profit is stated after charging loan impairment losses of £851 million (first half 2006 - £882 million). The balance sheet loan impairment provisions increased in the half year ended 30 June 2007 from £3,929 million to £4,062 million, and the movements thereon were:

|  | **First half 2007 £m** | First half 2006 £m |
|---|---|---|
| At 1 January | **3,929** | 3,886 |
| Currency translation and other adjustments | **(6)** | (34) |
| Acquisitions | **7** | - |
| Amounts written-off | **(762)** | (736) |
| Recoveries of amounts previously written-off | **126** | 96 |
| Charge to the income statement | **851** | 882 |
| Unwind of discount | **(83)** | (63) |
| At 30 June | **4,062** | 4,031 |

304. The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) They failed to disclose that increases in RBS's reported net income were achieved, in part, by exposing RBS to billions of dollars of risky subprime and Alt-A mortgage exposures (¶¶ 159-176);

(b) They failed to disclose that, in increasing its exposure to risky U.S. subprime and Alt-A mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime and Alt-A mortgages), RBS overrode

its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(c)     They falsely represented that RBS's financial statements conformed to IFRS and failed to disclose RBS's substantial exposure to risky U.S. subprime and Alt-A backed ABS CDOs and MBSs, and the significant decline in the value of these assets that had occurred since the date of the June 30, 2007 financial statements (¶¶ 148-176, 397-443); and

(d)     They failed to disclose that the Exchange Act Defendants violated IFRS by inflating the fair value of RBS's senior and mezzanine U.S. subprime ABS CDO and MBS exposures by failing to properly mark-to-market those securities based on the corresponding declines in the ABX indices, which had declined by at least 19% (senior tranches) and 50% (mezzanine tranches) since December 29, 2006 (¶¶ 150, 397-443).

**The October 10, 2007 Statements**

305.    On October 10, 2007, during a conference call with analysts and investors to discuss the Consortium's declaration that its offer for ABN AMRO was unconditional, Goodwin reassured investors that, RBS's outlook for ABN AMRO and its contribution to RBS was unchanged.  For example, Goodwin engaged in the following exchange with financial journalists participating in the call:

> **Peter Larson** - *Financial* Times - *Media*
>
> And you are confident that the targets you have – I guess this is more applicable to the businesses that RBS is requiring than, perhaps, the others.  But you are confident that the targets you had in place at the start of this – you can still meet your expectations from this acquisition or from these businesses, even given the way in which conditions have changed?
>
> **Fred Goodwin** - *Royal Bank of* Scotland - *CEO*
>
> No; none of us are fortunetellers, but **certainly based on what we've seen so far we would remain very confident in the**

*projections.* Again, bear in mind that when you're making financial projections in a situation like this you sensitize them and stress test them, and you don't pitch with the most extreme set of projections.

306.     The foregoing statement related to RBS's confidence in the financial projections for the ABN AMRO acquisition, which caused RBS securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by the Exchange Act Defendants to be false at that time or were made with reckless disregard for the truth, because given the extremely limited due diligence conducted by RBS, the Exchange Act Defendants did not have a basis to believe that the integration of ABN AMRO would achieve the projected revenue in light of the assets that RBS had inherited from the acquisition.  (¶¶ 183-206);

**The December 6, 2007 Statements**

307.     On December 6, 2007, RBS issued the following statement concerning its expected 2007 results, which was included in a Form 6-K filed with the SEC on that date. Significantly, defendants reported that RBS would take a very modest writedown of subprime assets, knowingly or recklessly misleading the market to believe that RBS had fully and properly accounted for those assets, which remained massively inflated and continued to be mispriced:

> RBS (excluding ABN AMRO) operating profit and earnings per share in 2007 expected to be well ahead of market consensus*
>
> - [RBS's] capital ratios at end 2007 expected to be comfortably within our target ranges of 7% to 8% for Tier 1 capital and 11% to 12% for total capital
>
> - Credit market deterioration in the second half is expected to result in *write-downs of £950 million*
>
> - Gains on planned operating disposals have benefited from strong investor demand
>
> - Excluding the net positive impact of these write-downs and gains, results are still expected to be comfortably ahead of consensus

- ***ABN AMRO Group adjusted earnings consistent with previous guidance***

- ***Integration of ABN AMRO progressing well. Transaction benefits, return on investment and earnings accretion slightly higher than forecast***

308.    In the December 6, 2007 statement, Goodwin continued to tout the benefits of the ABN AMRO transaction, stating in relevant part:

> The integration of ABN AMRO is off to a promising start, and we now anticipate better financial returns than we envisaged at the time of the bid. More importantly, the increased exposure to many high growth economies that ABN AMRO brings us seems more attractive and relevant than ever."
>
> *\* **The market consensus forecast, excluding ABN AMRO, is for 2007 profit before tax, purchased intangibles** amortisation **and integration costs of £9,775 million, and for adjusted earnings per share of 70.5***

*    *    *

> **RBS excluding ABN AMRO**
> RBS has continued to perform well in 2007, with operating profit and earnings per share expected to be well ahead of the market consensus forecast.  Results have been restrained by credit market deterioration in the second half, which is expected to result in write-downs in income of approximately £950 million. ***These include write-downs of approximately £950 million on our exposures to US sub-prime mortgage markets*** (see Appendix) and £250 million on our leveraged finance portfolio, partially offset by a reduction of approximately £250 million in the carrying value of our own debt carried at fair value.

*    *    *

> ***Overall credit metrics*** remain ***strong***, with improvements in both UK personal and corporate impairments.

309.    The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that Citizens ultimately ended up with £14 billion of subprime exposure, notwithstanding Exchange Act Defendants' assurances that Citizens had no such exposure (¶¶ 8, 250, 270);

(b)     They failed to disclose the magnitude of materially overvalued "toxic" assets that RBS had acquired from ABN AMRO and that, as a result of their magnitude, Exchange Act Defendants did not have a basis to believe that the integration of ABN AMRO would achieve the projected synergies (¶¶ 179-230);

(c)     They failed to disclose that in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(d)     They failed to disclose that RBS was increasingly unable to sell ABS CDOs, which resulted in RBS having net exposures to US subprime and Alt-A MBS of over £2.95 billion and £2.8 billion, respectively, and £3.8 billion of ABS CDO exposures by December 31, 2007 and that, as a result, the £950 million impairment was wholly inadequate relative to RBS's subprime exposure. (¶¶ 228-239); and

(e)     They failed to disclose that the Exchange Act Defendants violated IFRS by inflating the fair value of RBS's senior and mezzanine U.S. subprime ABS CDO and MBS exposures by failing to properly mark-to-market those securities based on the corresponding

declines in the ABX indices, which had declined by at least 26% (senior tranches) and 71% (mezzanine tranches) since December 29, 2006 (¶¶ 150, 397-443).

310. RBS also expressly reassured investors in the December 6, 2007 Form 6-K that its financial guidance for ABN AMRO in 2007 was unchanged:

> **ABN AMRO**
> ***ABN AMRO's adjusted earnings for 2007 are expected to be consistent with the guidance it issued on 17 September 2007. These results include write-downs on US sub-prime mortgage exposures (see Appendix) which have now been valued using the same approach as RBS.***
>
> The integration of ABN AMRO is progressing well. Since completion of the acquisition, RBS has validated its plan and now expects to deliver transaction benefits somewhat greater than anticipated in the offer for ABN AMRO announced on 16 July 2007.
>
> ***Based on RBS's revised forecasts for business growth and transaction benefits, the acquisition of the ABN AMRO Businesses is now expected to lead to slightly higher earnings accretion and return on investment than previously indicated.***
>
> *Capital ratios remain in line with previous guidance, and ABN AMRO's funding and liquidity position remains strong.* ***Investor demand for commercial paper issued by ABN AMRO's long-established conduits, less than 0.5% of whose assets relate to US sub-prime residential mortgages, remains strong.***

311. The foregoing statements regarding the return on investment from the ABN AMRO acquisition, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) They failed to disclose the magnitude of materially overvalued "toxic" assets that RBS had acquired from ABN AMRO (¶¶ 179-230);

(b)　　　The Exchange Act Defendants did not have a basis to believe that the integration of ABN AMRO would achieve the projected synergies, much less higher-than-projected earnings accretion and return on investment, in light of the assets that RBS had inherited from the acquisition (¶¶ 179-230); and

(c)　　　They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230).

312.　　　The Company also gave the following assurances in the December 6, 2007 Form 6-K concerning its purported limited exposure to subprime through ABSs and CDOs:

> The Royal Bank of Scotland Group's Global Banking & Markets business (GBM) has a leading position in structuring, distributing and trading asset-backed securities (ABS). These activities include buying mortgage-backed securities, including securities backed by US sub-prime mortgages, and repackaging them into collateralized debt obligations (CDOs) for subsequent sale to investors. It retains exposure to some of the super senior tranches of these CDOs. ***There is no exposure to these instruments in the banking book.***
>
> At 30 November, GBM's exposure to these super senior tranches, net of hedges and write-downs, totaled £1.1 billion to high grade [super senior] CDOs which include commercial loan collateral as well as prime and sub-prime mortgage collateral, and £1.3 billion to mezzanine CDOs based predominantly on residential mortgage collateral. ***The CDOs are largely based on ABS issued between 2004 and the first half of 2006. GBM also had under £1 billion of exposure to sub-prime mortgages through a trading inventory of mortgage-backed securities and CDOs, and £0.1 billion through securitization residuals.*** GBM has no exposure to Structured Investment Vehicles (SIVs) or to SIV-Lites.

313.　　　RBS also stated in the December 6, 2007 Form 6-K that it expected to report credit market writedowns on ABS CDOs on a mark-to-market basis and represented that those

writedowns took into account market data, observable market benchmarks and "prudent

valuation adjustments," stating in part:

> In the second half of 2007, rising mortgage delinquencies and
> expectations of declining house prices in the US have led to a
> deterioration of the estimated fair value of these exposures. ***Our
> valuations of the ABS CDO super senior exposures take into
> consideration outputs from our proprietary model, market data
> and prudent valuation adjustments. Our trading book exposures
> and residuals are marked to market on the basis of direct prices,
> where available, or observable market benchmarks, as detailed in
> the table below***.

| | Exposure net of hedges and write-downs at 30 November £m | Average price post write-down % |
|---|---|---|
| Super senior tranches of ABS CDOs | | |
| High grade CDOs | 1,100 | 90 |
| Mezzanine CDOs | 1,256 | 70 |
| CDO squared | 0 | n/a |
| Sub-prime trading inventory | | |
| Investment grade | 717 | 89 |
| Non-investment grade | 218 | 46 |
| Residuals | 86 | 47 |

> ***The resulting write-downs in income are expected to total
> approximately £950 million in the second half.***

314. RBS also disclosed in the December 6, 2007 Form 6-K that, as of November 30,

2007, ABN AMRO had £1.7 billion of exposure to "super senior tranches of high grade ABS

CDOs" and "no exposure to mezzanine ABS CDOs." RBS reported that it expected to book

writedowns in income on ABN AMRO's exposure to US-mortgage related assets in the second

half of 2007.

> At 30 November, ABN AMRO had exposure of £1.7 billion to
> super senior tranches of high grade [super senior] ABS CDOs, net
> of hedges and write-downs, and no exposure to mezzanine ABS
> CDOs. ABN AMRO also held a trading inventory of junior CDO
> tranches and mortgage-backed securities totaling £0.05 billion, net

of hedges and write-downs. ABN AMRO has no exposure to SIVs or SIV Lites.

| | Exposure net of hedges and write- downs at 30 November £m | Average price post write- down % |
|---|---|---|
| Super senior tranches of ABS CDOs | | |
|     Super senior CDOs | 1,667 | 90 |
|     Mezzanine CDOs | 0 | n/a |
|     CDO squared | 0 | n/a |
| Sub-prime trading inventory | 51 | 26 |
| Residuals | 0 | n/a |

> ***Applying the same valuation methodology used by GBM, we expect to book write-downs in income on ABN AMRO's exposure to US-mortgage related assets totaling approximately £300 million in the second half.***

> These write-downs will be reflected in 2007 results for ABN AMRO but will not affect [RBS's] earnings as they will be dealt with as part of the acquisition accounting adjustments.

315.     The foregoing statements regarding RBS's ABS CDOs and the U.S. subprime market, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that, in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(b)     They failed to disclose that Greenwich had become the second largest domestic underwriter for subprime MBSs in 2006, increasing its underwriting by 134% relative

to 2005, while at the same time ramping up its own exposure to subprime CDOs, which were equally risky (¶¶ 135-137);

        (c)      They failed to disclose that the valuation of RBS's assets, including the Company's MBSs and senior and mezzanine U.S. subprime ABS CDOs, among others, had materially declined in tandem with the ABX indices, which had declined by 26% (senior tranches) and 71% (mezzanine tranches) since December 29, 2006 (¶¶ 150, 397-443);

        (d)      They failed to disclose the magnitude of materially overvalued "toxic" assets that RBS had acquired from ABN AMRO (¶¶ 179-230); and

        (e)      They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230).

        316.      During a December 6, 2007 conference call with analysts and investors (in which Goodwin and Whittaker participated), Defendant Goodwin reported reassuringly:

> ***We are expecting to deliver results well ahead of market consensus for the old RBS, and even stripping out the credit write-downs and the gains we still expect to be comfortably ahead of consensus. ABN AMRO earnings after provisioning on an RBS basis consistent with the previous guidance and the integration of ABN itself progressing well.***

        317.      Even when pressed by JP Morgan analyst Carla Antijnes Da Silva, defendant Goodwin continued to insist that the positive outlook and expectations for ABN AMRO's contribution to RBS remained unchanged:

> ***But in short, we're seeing the synergies, both revenue and cost we've already surpassed in terms of things we've got banked as it were in terms of our confidence about the delivery, greater numbers than we had published at the time of the bid.*** We're also seeing good growth in the business, at the underlying business, especially in Asia. ***So that's really the premise for the***

*comments that we've made that we think the return on the*
*investment will be higher than we posted and the EPS also, the*
*accretion will also be higher.*

318. The foregoing statements, which caused RBS securities to trade at artificially

inflated prices, were each materially false and misleading when made, and were known by the

Exchange Act Defendants to be false at that time or were made with reckless disregard for the

truth, for the following reasons, among others:

(a) They failed to disclose the magnitude of materially overvalued "toxic"

assets that RBS had acquired from ABN AMRO (¶¶ 179-230); and

(b) They failed to disclose that the goodwill associated with the ABN AMRO

purchase had not been tested for impairment in spite of the events and changes in conditions that

had occurred since the date of purchase indicating that the goodwill might have become impaired

(¶¶ 179-230).

319. Notably, certain analysts quizzed the Exchange Act Defendants as to whether the

Company had taken sufficient credit market writedowns, noting that RBS's peers had recognized

larger writedowns. Nevertheless, defendants Goodwin and Whittaker continued to insist that the

reported writedowns were not only adequate, but in fact conservative, as illustrated in the

following exchanges:

> **Tom Rayner** - *Citigroup – Analyst*
> Sure. Okay. Thanks for that. Could I just have just a quick one on
> the write-downs because I think it's an issue that's been blown up
> out of all proportion in any case. But just on what you have
> written down, on the mezzanine CDO for instance, ***the size of your***
> ***write-down seems a bit lower than some of the other banks out***
> ***there***. I just wondered how conservative you think you've been or
> are you limited by auditors etc. in exactly how much you can write
> down these exposures?
>
> **Sir Fred Goodwin** - *Royal Bank of Scotland Group plc - Group*
> *Chief Executive*
> I think Tom, I think -- I have some sympathy with the comment,

Tom, but firstly it wouldn't be our suggestion, my sense that we are lower than others. There are quite a range of these. And as you know yourself, the vintage is important, so when they were written, what age they are, as to how much of a write-down you would take. Also there's quite a bit of difference as to which state you're exposed to. So there's quite a complicated model here that's gone loan by loan, state by state and gone through to calculate where we're at.

*So we feel these are pretty conservative. That's not to say it's impossible that they could go up. But we've tried to be prudent in our judgment. We've used all the data available at this point in time. We've made what we consider to be prudential adjustments to the calculations and projections we've used to project. Because as you will well appreciate, we're trying to project what we think the total delinquencies over the life of these instruments will be and as ever there could be vagaries in all of that. But we've tried to be prudent with this.* It does make it difficult to compare between organization A and organization B.

*     *     *

**Mamoun Tazi** - *MF Global Securities - Analyst*
Yes, good morning gentlemen. A follow-on question on the write-downs. I just wanted to understand if your write-downs were based on mark to market or mark to model? And also when you look at some of the values after the write-downs, 90% for higher grade and 70% for mezzanine. *Some of your competitors have pushed their write-downs a bit lower and I wanted to know what your thoughts were on that?*

**Guy Whittaker** - *Royal Bank of Scotland Group plc - Group Finance Director*
The model piece relates to the super senior CDO tranches. The inventory referred to in the appendix is related to market observable prices. The same would be true for the leveraged loans to the extent there are market comparables and benchmarks that have been used. And I think one of Fred's earlier comments on the approach to the modeling and the valuations that have applied is --- I'm not sure there's anything more to add to that.

**Mamoun Tazi** - *MF Global Securities - Analyst*
And in terms of the ---

**Sir Fred Goodwin** - *Royal Bank of Scotland Group plc - Group Chief Executive*

I think we do sit quite well in the range of numbers used again, just to be clear.

\* \* \*

**Sandy Chen** - *Panmure Gordon - Analyst*
I've got two questions. Just a follow-up again on the write-downs. Just to be clear, the write-downs that you've announced today, are they all that you expect through to the end of '07 or the end of '08? Is there a timetable on that?

**Sir Fred Goodwin** - *Royal Bank of Scotland Group plc - Group Chief Executive*
Well the way the write-down works, Sandy, is the model attempts to predict what it thinks delinquency will be across the life of the instrument. Because it's important that if delinquency stopped at its current level we wouldn't lose any money. ***The question here is that there's a belief that delinquency will carry on and reach levels which would cause us to lose money. And so in our models we've used the delinquency data to date, and we've modeled, going forward, what the rate of delinquency looks like and what the total level of delinquency might reach. And based on that have come up with a calculation of what the losses would be. So if delinquency from here unfolds in line with those models, then these are all the provisions we would need.***

\* \* \*

**Simon Samuels** - *Citigroup - Analyst*
Okay, thank you. Secondly, other than the already identified [£300 million] write down are there any other fair value adjustments for the ABN acquisition that we are likely to see? I guess realistically they are at the trading update -- the full year results or the report and accounts stage?

**Sir Fred Goodwin** - *Royal Bank of Scotland Group plc - Group Chief Executive*
***Nothing too drastic at this point Simon.*** There is here's and there's but there is nothing that has caught the eye at this point.

\* \* \*

**Sir Fred Goodwin** - *Royal Bank of Scotland Group plc - Group Chief Executive*
***The acquisition of ABN AMRO has rarely seemed more attractive and relevant than it does at this point, and it enhances that diversity and gets us into some rapidly expanding markets.***

320.     The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that, in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS ignored its internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(b)     They failed to disclose that RBS falsely represented that the Company was "prudent" and "pretty conservative" in mitigating risk on trading assets and liabilities when, in fact, the Exchange Act Defendants had knowingly or recklessly materially overstated these assets above their present values.  (¶¶ 134-178, 240-258);

(c)     They failed to disclose that the valuation of RBS's assets, including the Company's senior and mezzanine U.S. subprime ABS CDOs, among others, had materially declined in tandem with the ABX indices which had declined by 26% (senior tranches) and 71% (mezzanine tranches) since December 29, 2006 (¶¶ 150, 397-443); and

(d)     They failed to disclose the magnitude of materially overvalued "toxic" assets that RBS had acquired from ABN AMRO (¶¶ 179-230).

**The February 28, 2008 Statements**

321.     On February 28, 2008, RBS reported its financial results for the year ended December 31, 2007, including the following highlights:

2007 Highlights

RBS GROUP – including ABN AMRO

- Group operating profit up 9% to £10,282 million

- Profit after tax up 19% to £7,712 million

- Adjusted earnings per ordinary share up 18% to 78.7 p

- Total dividend up 10% to 33.2p

- Tier 1 capital ratio 7.3%

- Total capital ratio 11.2%

- ***Underlying performance of retained ABN AMRO businesses in line with expectations***

- ***Synergies increased by 33% to €2.3 billion***

- Improved financial returns and earnings accretion

322.    The filing also included the "Group Chief Executive's Review" by Goodwin,

which stated:

> The diversity and quality of our business platform enabled us to
> deliver good financial results, with operating profit for the enlarged
> RBS Group rising by 9% to £10,282 million.  Adjusted earnings
> per share increased by 18% to 78.7p. Our earnings momentum
> remained powerful, notwithstanding the impact of challenging
> credit market conditions in the second half of the year.
>
> *      *      *
>
> RBS excluding ABN AMRO
> Our operating performance in 2007 is best seen in the results of
> RBS excluding the 76 days of ownership of ABN AMRO. We
> continued our strong momentum, with total income increasing by
> 3% to £28,864 million and operating profit by 9% to £10,298
> million. Adjusted earnings per share rose by 22% to 81.7p,
> benefiting from a lower than usual tax rate of 21%.
>
> These results have been held back by the second half credit market
> deterioration, which led our Global Banking & Markets division to
> incur write-downs on its US mortgage-related and leveraged
> finance exposures. ***The valuations of our credit market positions
> have been stable*** since ***our trading update in December.***
>
> *      *      *

Total RBS income rose by 3% to £28,864 million, while costs were reduced by 1% to £12,173 million, resulting in a further improvement in the cost:income ratio to 40.7%.

*       *       *

***Overall credit metrics remained very strong, and impairment losses declined by 1% to £1,865 million.*** As a result of our cautious approach to the UK personal credit market, in particular to the direct loans market, we achieved a further reduction in UK personal impairments, and the credit quality of our UK corporate customers remained stable in 2007. ***We have taken active steps to manage our risk profile and ensure that our lending portfolio remains appropriately positioned, nowhere more so than in the US, where the overall quality of our book remains high but we have experienced a reversion from the low levels of impairment seen in recent years.***

Our Businesses

*       *       *

Citizens has continued to develop its franchise, increasing its consumer banking customer base by 2% and achieving good results in its growing corporate and commercial banking operations. Market conditions remain difficult, however, and we continued to respond to challenging income prospects with tight cost control. ***The credit quality of the Citizens portfolio is high***, although we have seen impairment losses reverting from the very low levels seen in recent years, resulting in a 9% decrease in operating profit to $2,647 million. With the dollar weaker over the year, this decline was more marked in sterling terms. . .

***ABN AMRO***

*       *       *

***The integration has made a strong start, and we have identified additional cost savings and revenue benefits over and above those we originally anticipated.*** We now expect to achieve cost savings totaling €1,596 million in three years, 21% more than we originally indicated. We have identified another €100m of net revenue benefits in Global Banking & Markets and €200m in the International Retail businesses, bringing the total for net revenue benefits we expect to achieve in three years to €688 million. ***All told, integration benefits are now expected to total €2.3 billion, compared with our original estimate of €1.7 billion.***

*Applying these increased synergies to the financial targets originally announced in our offer would have yielded increased accretion in adjusted earnings per share of 9%, a return on investment in 2010 of 16% and an internal rate of return of 18%.*

\*     \*     \*

For 2007 as a whole, the ABN AMRO businesses that will be retained by RBS made an underlying operating profit of £439 million. *We have concluded our initial review of the ABN AMRO balance sheet and applying RBS valuation methodologies have recorded a reduction of £978 million in the carrying value of financial instruments we acquired.* While credit market activities reflected the prevailing market conditions, equities, currencies and rates all achieved good growth. . . .

323.     During a February 28, 2008 conference call with analysts and investors (in which McKillop, Whittaker, Goodwin, Cameron and Fisher participated), RBS and many of the Individual Defendants discussed RBS's positive operating performance for the year ended December 31, 2007, and reiterated that the previously announced writedowns announced on December 6, 2007 were sufficient:

> **Guy Whittaker** - *Royal Bank of Scotland Group Plc - Group FD*
> *. . . As we highlighted at the trading statement we took a number of marks related to credit markets principally in the second half of the year. We remain comfortable with the marks that we took at the trading statement and we remain so*. . . . *So if you take the [£]950 million number that we talked about at the trading statement, we add about [£]150 million or so for the first half write-downs that were incorporated in the results that we shared with you back in August and the [£]456 million as of today, you see total write-downs to the credit markets netted out at [£]1.6 billion*. You take the costs associated with these deals out of the profit line, it impacted our profits by about [£]1.1 billion.

\*     \*     \*

> *In the year end review we looked at the ABN high grade super senior CDO and we've took an additional 10 percentage points write-down to that, marking it down from 90 to 80* and that's incorporated in the weighted average price that you see in the top right-hand corner of this page.

*　　*　　*

For the ABN AMRO businesses that we required [sic], **_an operating profit of around [£]640 million for the year off income of just under [£]7 billion. It's kind of in line with where we thought they would be, probably slightly ahead of the equivalent number last year._** We saw some year-on-year improvements in equities, in rates, in currencies in some of the local markets activities. We saw 7% rise in transaction banking, our International Retail customer base grew by about 12 percentage points, but as you've seen from the very earlier slides, an 86% cost income ratio something with which we are not familiar at RBS and not surprisingly **in the time of ownership we've identified some additional synergies which Fred will talk about later**.

324.　During the February 28 call, defendants Cameron and McKillop also maintained

that the credit market writedowns reported by the Company to that point were adequate, and that

no further writedowns were necessary, despite the apparent deterioration in relevant indices

during December 2007, as illustrated in the following exchanges:

> **Derek Chambers** - *Standard & Poor's Equity Research - Analyst*
> Derek Chambers from Standard & Poor's Equity Research. A similar theme, some questions about the credit market exposures. I think you've made it plain that everything is fair value to where you can and you seem to be making a distinction between your trading book to the ABS CDOs which are proprietary models and other things. You've noted that the overall marks for most of this is much the same at end December as at end November, whereas to the extent that one can observe things like some of the indices, there was a deterioration in some areas in December. So I'm wondering if, is this because your particular portfolio and detachment points didn't deteriorate in line with the market or because your methodology means that you didn't experience any movement relative to November?
>
> And then on a slightly different area, or two slightly related questions. One is I think you've indicated an extra 10% on some of the ABN exposures which looks like about [£]100 million, did that go through the consolidated income statement or was it part of the fair value adjustments?
>
> And then finally on this area, you've disposed some Alt-A net exposures of [£]2.2 billion, I'm not sure if that's quite on the same

115

basis as you discussed in the conference call. Could you just say what your view on the integrity of that is or at least on the --how that's performing?

**Tom McKillop** - *Royal Bank of Scotland Group Plc - Chairman*
I'll just remind you that we issued - yes I'll come to you in moment, *we issued our trading statement based on later data than most other organizations and indeed on a very prudent basis*, so that's the background to the trading statement. But Guy can you pick up on --?

**Guy Whittaker** - *Royal Bank of Scotland Group Plc - Group FD*
I think what we tried to do at the trading statement was clearly take not just the output from our model but to the extent the accounting allowed to put in some sort of prudent buffer in place. I think it's fair to say there was actually no movement in the ABN -- ABX index between November and December. In fact if anything, it moves slightly higher. You rightly say that these instruments are specific rather than generic in their characters. *We took a -- characteristics, we took another look at the ABN portfolio and we felt it prudent to take an additional 10% mark that was around the number that you've indicated and that was reflected as a pre-acquisition adjustment taken as -- through the balance sheet*.

\*     \*     \*

**Tom Rayner** - *Citigroup Smith Barney - Analyst*
Okay, thanks a lot. The second question is very deep in the release as well, on page 59. Could you just talk a little bit about the [£]33 billion of assets? And there is an offsetting liability as well, which is smaller, of assets where there's no observable input,

so I guess the valuation and -- there's been no losses taken against those to date, if I'm right. And what your thoughts are about the potential losses, where we can't actually see a market valuation?

**Johnny Cameron** - *Royal Bank of Scotland plc - CEO Corporate Banking & Financial Markets*
Shall I take that one as well? There's some narrative underneath, we've tried to describe them and I would say there have been some losses taken against it because included in those are the high grades [super senior] and mezzanine CDO exposures that I outlined earlier, as well as some of the other inventory that is in there. *You can see there's certain structured debt securities, certain over-the-counter derivatives, certain syndicated loans that have been part of that group. As I say, in total terms it represents around 3%, slightly less than 3%, of assets. And, you can*

*imagine, these are subject to scrutiny and review from all interested parties. So the numbers you see today fully reflect all that we know about them.*

325. The foregoing statements about RBS's 2007 year-end financial results, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) They failed to disclose that in increasing its exposure to risky U.S. subprime mortgages, largely through an accumulation of ABS CDOs and MBSs (which were collateralized in significant part by subprime mortgages), RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 240-258);

(b) They falsely represented that RBS's writedowns were "prudent" and mitigated risk on trading assets and liabilities when, in fact, the Exchange Act Defendants failed to adequately protect against the risk of these exposures (¶¶ 134-178, 240-258);

(c) They failed to disclose that the valuation of RBS's assets, including the Company's senior and mezzanine U.S. subprime ABS CDOs, among others, had materially declined in tandem with the ABX indices, which had declined by 37% (senior tranches) and 73% (mezzanine tranches) since December 29, 2006 (¶¶ 150, 397-443);

(d) They failed to disclose that RBS knew that, as a result of adverse conditions in the secondary market for mortgage loans that existed since the end of 2006, ABN AMRO's assets were materially overvalued at time of the acquisition in October 2007 (¶¶ 179-230);

(e) They failed to disclose the magnitude of materially overvalued "toxic" assets that RBS had acquired from ABN AMRO (¶¶ 179-230); and

(f)     They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230).

326.     During the February 28, 2008 conference call, Defendant Goodwin also reassured investors that RBS's positive view of the ABN AMRO acquisition remained unchanged, stressing that, "*. . . I think the main news is that with a view of all of the businesses, a positive view we had of the ABN businesses has been confirmed.*"

327.     The foregoing statement, which caused RBS securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by the Exchange Act Defendants to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that RBS knew that, as a result of adverse conditions in the secondary market for mortgage loans that existed since the end of 2006, ABN AMRO's assets were materially overvalued at time of the acquisition in October 2007 (¶¶ 179-230);

(b)     They failed to disclose the magnitude of materially overvalued "toxic" assets that RBS had acquired from ABN AMRO; (¶¶ 179-230);

(c)     They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230);

(d)     They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230); and

(e)     They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the tens of billions of dollars of goodwill associated with these assets (¶¶ 179-230).

328.     RBS and certain Individual Defendants also addressed the Company's capital condition during the February 28 call and Defendant Goodwin emphatically denied having any plans to raise capital, as set forth below:

> **Robert Law** - *Lehman Brothers - Analyst*
> What I'm checking there is how we read into that, is -- whether that's an aspiration or whether you've actually got plans as you currently stand, with [RBS] as it is, without making additional disposals or raisings, other than you've already announced, to get to that target? That's why I'm asking the question.
>
> **Tom McKillop** - *Royal Bank of Scotland Group Plc - Chairman*
> Fred, yes.
>
> **Fred Goodwin** - *Royal Bank of Scotland - Group CEO*
> The short answer is, we do Robert, that's -- we don't tend to throw numbers out unless we've got some idea how we're going to do them, but anything relating to the future, ultimately is an aspiration. But you'll see from the results we're delivering today for the incremental synergies we expect from ABN AMRO and from our historic track record in generating profit and driving these ratios up are the basis for the comments where Guy very accurately described what we're planning to do. ***There are no plans for inorganic capital raisings or anything of the sort***.

329.     The foregoing statement that RBS had no plan to engage in a rights issue, which caused RBS securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by the Exchange Act Defendants to be false at that time, or was

made with reckless disregard for the truth, because fewer than eight weeks later, the Exchange

Act Defendants announced the £12 billion Rights Issue—the largest in history— to shore up

RBS's capital (¶¶ 207-210).

330.    Finally, Defendants confirmed their comfort with the impairment values assigned

to Citizens, as set forth in the following dialogue:

> **Simon Samuels** - *Citigroup - Analyst*
> Okay. Alright, thank you. And second question if I can, just
> operationally actually, is just on the credit trends in the United
> States, I guess for [Ellen], but I'm not sure. Second half of the
> year, looked like Citizens credit [costs] went from $160 million in
> the first half of the year, to over $500 million charge in the second
> half, so clearly a huge increase half-on-half. Clearly, there's some
> reserve build in Q4. The question really is really, what should we
> be expecting for '08? Does the second half of '07 form a good run
> rate in terms of the likely shape of the credit charges for '08, does
> the environment deteriorate from here, or does the reserve build in
> Q4 just mean we should ignore the second half '07 as an
> aberration?
>
> **Unidentified Company Representative**
> Sure, in the second half of last year we did increase the impairment
> at Citizens, but you have to realise it was coming from a very, very
> low base. Part of that impairment was actual charge-offs in
> commercial, commercial real estate and in home equity.  The other
> large part of it was we increased our reserves against the portfolio.
> ***All said though, our impairment is only about 60 basis points on
> the entire portfolio, which is very low. It reflects the conservative
> credit policies that Citizens has had in the past.***   And as I believe
> Guy and Fred mentioned earlier, over 70 FICO scores average over
> 700 on the portfolio, 97% of our facilities are secured.
>
> **Simon Samuels** - *Citigroup - Analyst*
> And what would your expectations be for the year ahead?
>
> **Unidentified Company Representative**
> It would just be -- there's going to be continued pressure in the
> housing market, but ***we feel we're comfortable with our reserve
> levels at Citizens***.

331.    The foregoing statements, which caused RBS securities to trade at artificially

inflated prices, were materially false and misleading when made, and were known by the

Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons:

(a)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich to repackage into CDOs, which ultimately exposed RBS to billions of dollars of risk related to RBS's retained exposures to the U.S. subprime market (¶¶ 134, 252);

(b)     They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S. such that ultimately Citizens ended up with £14 billion of subprime exposure notwithstanding all of the Exchange Act Defendants' assurances that Citizens did not do "subprime" (¶¶ 8, 250, 270).

**The April 22, 2008 Statements**

332.     On April 22, 2008, following the announcement of the Rights Issue, RBS held another conference call with analysts and investors (in which McKillop, Goodwin, Whittaker and Cameron participated), during which defendants were questioned about the ABN AMRO acquisition and its effect on GBM.  Although the Exchange Act Defendants revealed that one-third of the nearly £6 billion pre-announced asset impairment was attributable to ABN AMRO's assets, Defendant Goodwin continued to conceal the true nature of the extent of the negative impact the ABN AMRO acquisition had had on the Company, reporting that "ABN AMRO synergies remain broadly on plan."

333.     During the call, although Defendant McKillop acknowledged that the RBS Board "accept[ed] responsibility" for the ABN AMRO situation and that RBS had "increased our exposure to wholesale markets at an unfortunate time," defendant Goodwin denied that any

goodwill impairment was necessary and led investors to believe that the synergies between the

two companies would compensate for the fact that RBS had clearly overpaid for ABN AMRO:

> **Unidentified Audience Member**
> Hi, it's (inaudible) from Societe Generale. I was just wondering, ***given the inflated price that you paid for ABN and the way the world has changed and the challenges facing GBM, what the likelihood is of a material impairment against the goodwill you paid that you have in your books for ABN?***
>
> **Tom McKillop** – *Royal Bank of Scotland plc – Chairman*
> Fred, do you want to comment?
>
> **Fred Goodwin** – *Royal Bank of Scotland plc – Group Chief Executive*
> I think you covered it earlier, Tom, in terms of your view of the business. We're six months into the ownership of ABN AMRO; we're in the depths of a global financial crisis. I don't think that's the point at which to start making too precise judgments about these things. ***We'll see that we believe, as the Chairman described earlier, that the underlying business case remains robust, these are good businesses, they're businesses that have synergies with our business and give us new opportunities and improve our franchise going forward***.

334. The foregoing statements, which caused RBS securities to trade at artificially

inflated prices, were materially false and misleading when made, and were known by those

Individual Defendants who spoke and RBS to be false at that time, or were made with reckless

disregard for the truth, for the following reasons, among others:

(a)      They failed to disclose the magnitude of materially overvalued "toxic"

assets that RBS had acquired from ABN AMRO (¶¶ 179-230);

(b)      They failed to disclose that the Exchange Act Defendants did not have a

basis to believe that the integration of ABN AMRO would proceed smoothly or was "broadly on

plan," in light of the assets that RBS had inherited from the acquisition (¶¶ 179-230);

(c)      They failed to disclose that the goodwill associated with the ABN AMRO

purchase had not been tested for impairment in spite of the events and changes in conditions that

had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230);

(d)     They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the tens of billions of dollars of goodwill associated with these assets (¶¶ 179-230); and

(e)     They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230).

335.     In its Form 6-K filed with the SEC on April 24, 2008, RBS published an excerpt of defendant McKillop's remarks at the Company's annual meeting, in which McKillop spoke of "dislocation in the financial markets" and the Company's need to raise capital through the Rights Issue.  Nevertheless, McKillop noted, the Board had approved a dividend of 23.1 pence for a total of 33.2 pence for the year, representing a 10% increase over 2006, reflecting to investors the Board's confidence in the financial health of RBS.  McKillop summarized the Company's overall performance and reiterated the benefits purportedly realized by RBS as a result of the ABN AMRO acquisition in relevant part, as follows:

> . . . RBS was already one of the world's leading corporate banks but as result of the acquisition we can now lay claim to real pre-eminence in this field.
>
> *         *         *
>
> **The Board remains convinced that in the long term ABN AMRO will prove to add value for shareholders**
>
> **Over the last six months we have been able to confirm our positive view of the ABN AMRO businesses we have secured. Our teams have also had the opportunity to confirm their view of**

*the financial benefits we can derive from combining our businesses.*

*Indeed, we now expect these benefits* **to** *be even greater than those we originally anticipated.  By 2010, when we have completed the integration process, we expect to achieve synergies totaling almost 2.3 billion euros a year.*

*As a result, the financial returns are now expected to be even more attractive than we had thought when we were first considering this transaction.*

336.	The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)	They failed to disclose that the Exchange Act Defendants did not have a basis to believe that the integration of ABN AMRO would proceed smoothly or was "on track," in light of the assets that RBS had inherited from the acquisition (¶¶ 179-230);

(b)	They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230);

(c)	They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230);

(d)	They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the tens of billions of dollars of goodwill associated with these assets (¶¶ 179-230); and

(e)     They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 Form 6-K) yield increased accretion in adjusted earnings per share of 9% (¶¶ 179-230).

**The May 14, 2008 Statements in RBS's Form 20-F**

337.     On May 14, 2008, RBS filed its 2007 annual report on Form 20-F (which was signed by Whittaker) with the SEC ("2007 Form 20-F") for the fiscal year ended December 31, 2007.  In that filing, RBS again represented that no goodwill impairment was necessary as of December 31, 2007, reporting that:

> [RBS] recognized goodwill of £23.3 billion following the preliminary allocation of fair values since acquiring ABN AMRO on 17 October 2007 (Note 35). ***Subsequent events have not significantly affected the assumptions and estimates supporting the consortium's investment decision and [RBS] has therefore concluded that there is no impairment of the goodwill recognized at 31 December 2007.***

338.     The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose that RBS knew that, as a result of adverse conditions in the secondary market for mortgage loans that existed since the end of 2006, ABN AMRO's assets were materially overvalued at the time of the acquisition in October 2007 (¶¶ 179-230);

(b)     They failed to disclose that the goodwill associated with the purchase of ABN AMRO had not been tested for impairment in spite of the events and changes in circumstances that had occurred since its purchase indicating that the goodwill might be impaired (¶¶ 179-230);

(c)     They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230);

(d)     They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the tens of billions of dollars of goodwill associated with these assets (¶¶ 179-230); and

(e)     They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 Form 6-K) yield increased accretion in adjusted earnings per share of 9% (¶¶ 179-230).

339.     In addition to the foregoing, the 2007 Form 20-F contained signed certifications of Defendants Goodwin and Whittaker, which attested to the purported accuracy and truth of the statements contained therein or attached thereto, in part, as follows:

> 2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, *fairly present in all material respects the financial condition, results of operations and cash flows of the company as of and for, the periods presented in this report*;
>
> 4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(o) for the company and we have:
>
> (a)     *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,* to ensure that material information relating

to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)     ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision,*** to provide assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     ***Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures,*** as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)     ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information;*** and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

340.    The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were materially false and misleading and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, because they failed to disclose that the tens of billions of dollars in goodwill attributed to the ABN

AMRO acquisition was being reported on RBS's balance sheet in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 406-418), and that RBS's controls were not effective as defined by the COSO Framework (¶¶ 433-443).

341.    The 2007 Form 20-F also included the following representations regarding the amount of goodwill on the Company's balance sheet, and RBS's method of determining when a goodwill write-off was necessary:

> **Goodwill**
> [RBS] capitalizes goodwill arising on the acquisition of businesses, as discussed in accounting policy 5. The carrying value of goodwill as at 31 December 2007 was £42,369 million (2006 – £17,889 million).
>
> Goodwill is the excess of the cost of an acquired business over the fair value of its net assets. The determination of the fair value of assets and liabilities of businesses acquired requires the exercise of management judgment; for example those financial assets and liabilities for which there are no quoted prices, and those non-financial assets where valuations reflect estimates of market conditions such as property. Different fair values would result in changes to the goodwill arising and to the post-acquisition performance of the acquisition. ***Goodwill is not amortised but is tested for impairment annually or more frequently if events or changes in circumstances indicate that it might be impaired.***
>
> For the purposes of impairment testing, goodwill acquired in a business combination is allocated to each of [RBS's] cash-generating units or groups of cash-generating units expected to benefit from the combination. ***Goodwill impairment testing involves the comparison of the carrying*** value of a cash-generating unit or group of cash generating units with its recoverable amount. The recoverable amount is the higher of the unit's fair value and its value in use. Value in use is the present value of expected future cash flows from the cash-generating unit or group of cash-generating units. ***Fair value is the amount obtainable for the sale of the cash-generating unit in an arm's length transaction between knowledgeable, willing parties.***
>
> Impairment testing inherently involves a number of judgmental areas: the preparation of cash flow forecasts for periods that are beyond the normal requirements of management reporting; the assessment of the discount rate appropriate to the business;

estimation of the fair value of cash-generating units; and the valuation of the separable assets of each business whose goodwill is being reviewed.

\* \* \*

**Impairment review**
[RBS's] goodwill acquired in business combinations is reviewed annually at 30 September for impairment by comparing the recoverable amount of each cash generating unit (CGU) to which goodwill has been allocated with its carrying value.

[RBS] recognized goodwill of £23.3 billion following the preliminary allocation of fair values since acquiring ABN AMRO on 17 October 2007 (Note 35). ***Subsequent events have not significantly affected the assumptions and estimates supporting the consortium's investment decision and [RBS] has therefore concluded that there is no impairment of the goodwill recognized at 31 December 2007.***

342.    The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO, causing the goodwill attributed to ABN AMRO to be materially overstated throughout the Class Period, in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 179-230, 406-418);

(b)    They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230);

(c)    They falsely represented that "subsequent events have not significantly affected" conclusions regarding the goodwill from the ABN AMRO acquisition and also failed

to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230);

(d)     They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the tens of billions of dollars of goodwill associated with these assets (¶¶ 179-230); and

(e)     They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 Form 6-K) yield increased accretion in adjusted earnings per share of 9% (¶¶ 179-230).

**The May 20, 2008 Statements**

343.     In a Form 6-K filed with the SEC on May 20, 2008, RBS published the following excerpt of defendant McKillop's speech at the Company's general meeting on May 20, 2008:

> *"And of course, we must deliver the benefits from the ABN*
> *AMRO integration - benefits that we now expect to total almost*
> *€2.3 billion a year, a third greater than our original expectation.*
> *Our management remains firmly focused on this task."*

344.     The same SEC filing provided additional comments indicating that once the Rights Issue was completed that additional capital to achieve the Company's target capital ratios would be raised through "asset disposals" and that there would no need for additional offerings to achieve those targets:

> Our capital plans assume that whole or partial disposals of this
> kind will contribute approximately £4 billion to our capital this
> year, almost offsetting the write-downs. Rest assured that we are
> determined to achieve full and fair value for any disposals we may
> make. Taking all of these elements together, we expect to generate
> £11.7 billion of net new capital and to have achieved our new
> target capital ratios by the end of 2008.

345.	Unbeknownst to investors, however, the statements made by the Individual Defendants and RBS in this Form 6-K filed on May 20, 2008, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time or were made with reckless disregard for the truth, for the following reasons, among others:

(a)	They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO, causing the goodwill attributed to ABN AMRO to be materially overstated throughout the Class Period, in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 179-230, 406-418);

(b)	They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230);

(c)	They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230);

(d)	They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the goodwill associated with these assets (¶¶ 179-230);

(e)	They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 Form 6-K) yield increased accretion in adjusted earnings per share of 9% (¶¶ 179-230); and

(f)	McKillop's statements about RBS's ability to achieve its target capital ratios through asset disposals alone were materially false and misleading in light of the fact that

additional asset writedowns would require an additional rights issue and preferred share sale totaling £20 billion in October 2008 (¶ 216).

**The August 8, 2008 Statements**

346.    Despite the poor first half results, RBS continued touting the ABN AMRO acquisition.  The Exchange Act Defendants reported in the August 8, 2008 Form 6-K that the "ABN AMRO integration [is] ahead of plan" and "proceeding smoothly," further reporting in part:

> . . . *As announced in February, we have identified additional cost savings and revenue benefits from the integration of ABN AMRO over and above those we originally anticipated.* Our forecast is now for integration benefits totaling €2.3 billion annually (£1.6 billion) in 2010, almost four times the underlying profit before tax achieved in 2007 by the businesses we have acquired.
>
> *We are currently ahead of schedule in realizing those benefits, with the amounts delivered so far running at almost twice what we anticipated at this early stage of the integration process.* In the six months to June we have made cost savings ranging from headcount reductions to economies as mundane as cutting the price paid for printer cartridges. Together, these savings have contributed £135 million pre-tax profit to our first half results. In addition, we achieved £57 million of revenue synergies within our enlarged business in the first half, *and now have concrete evidence from a stream of new business that we are achieving real gains from our broader footprint and product range.*

347.    That same day, during a conference call with analysts and investors (in which McKillop, Whittaker, Goodwin, Cameron and Alemany participated), RBS and many of the Individual Defendants continued to assure investors that the ABN AMRO acquisition was a success, and that the Company was "on track to deliver the original promised synergies and more."  McKillop added, "[b]ut there's more to ABN than synergies . . . .  We are well-positioned to thrive in the competitive landscape the current storm will leave behind."  Defendant Goodwin added:

132

So integration -- separation and integration both going well. I know it's a subject we'll return to again, but off to a good start and the start is always the most difficult part, just to go from a piece of paper with synergies on to actual delivered momentum.

Looking to -- as the Chairman mentioned earlier, we didn't buy the business for the synergies. ***We got the business for the underlying businesses and again as we've taken ownership, brought these under control and started to move forward with the combined management teams in the new business structure, we've been running through and validating the business rationale, the strategic rationale that was in our mind at the time we took the businesses over.***

***And so far so good. What we thought was possible in these businesses still looks possible. And we believe it will happen.*** It does move us forward in the way in which we anticipated. Clearly what's different though, are the current trading prospects for some of the businesses. Some, but not all, a very crude assessment on the chart, that I grant you, but just to give a sense that the real areas, and they're not small areas, but the areas where current market conditions fall short of what we might have expected at the time we set off on the transaction. And equities, difficult equity market. Not the end of the world, but more difficult than would have been ideal for the business. And in credit markets where -- I need hardly tell you what the markets have been like. That's impacted on the RBS business and the pieces we've acquired from ABN AMRO.

We're by no means despondent about the prospects for credit markets going forward, but just as to how things currently trade against where we thought, those are really the areas where it's pinching at this point. ***But the strategic rationale for the businesses and their acquisition remains intact.***

348.    In the Form 6-K filed with the SEC on August 8, 2008, Goodwin made the

following statements concerning RBS's capital condition, indicating that the Company had

already surpassed its target Core Tier I capital ratio of 5.0%:

> From our review of market conditions, we concluded in April that we needed to materially strengthen our capital base, and that ***to accomplish this we needed to conduct the rights issue which was completed in June***.
>
> Our capital plan set a target for our capital ratios to exceed 5.0% for core Tier 1 and 7.5% for Tier 1 by mid-year, on a proportional

consolidated basis. In fact, our Core Tier 1 ratio at 30 June stood at 5.7% and we are on course to achieve our target level, in excess of 6%, by the end of the year. Our Tier 1 ratio at 30 June was 8.6%, already in excess of our target minimum.

349.     In addition to the statements made by defendants in the August 8, 2008 Form 6-K,

during the conference call with investors McKillop made the following statements regarding the

Company's capital plan, indicating that no further share sales or rights issues would be required

to shore up RBS's capital:

> [I]n April the Board acted quickly and prudently to set out a new capital plan for the business, including significantly raised target capital ratios.
>
> To us, the balance of risks had changed for the worse in the early months of 2008 and it was the Board's view that they were likely to remain so. Against that backdrop, we signaled that these conditions would lead us to take [£]5.9 billion of write-downs in our credit market exposures.
>
> The next step in the new capital plan was the completion of a [£]12 billion rights issue and we are grateful that over 95% of our shareholders supported the issue.
>
> ***I'm pleased to say we are also making good progress with the other elements of the plan and I've asked Fred to update you on the disposal program and the steps already taken to improve the efficiency of our balance sheet. We are now in a position where we will only dispose of other assets if the valuation is attractive to us.***

350.     Defendant Goodwin continued to insist that the ABN AMRO acquisition was a

success, explaining in his "Group Chief Executive's Review" that "[RBS's] income totaled

£16,835 million, down 1%, and underlying profit declined by 3% to £5,144 million."

> ***As announced in February, we have identified additional cost savings and revenue benefits from the integration of ABN AMRO over and above those we originally anticipated. Our forecast is now for integration benefits totaling €2.3 billion annually (£1.6 billion) in 2010, almost four times the underlying profit before tax achieved in 2007 by the businesses we have acquired.***

We are currently ahead of schedule in realizing those benefits, with the amounts delivered so far running at almost twice what we anticipated at this early stage of the integration process. In the six months to June we have made cost savings ranging from headcount reductions to economies as mundane as cutting the price paid for printer cartridges. ***Together, these savings have contributed £135 million pre-tax profit to our first half results. In addition, we achieved £57 million of revenue synergies within our enlarged business in the first half, and now have concrete evidence from a stream of new business that we are achieving real gains from our broader footprint and product range.***

***The trading environment for credit markets and equities is currently dislocated, but the strategic rationale for the acquisition remains intact.*** Our global client franchises and complementary product strengths have materially enhanced Global Banking & Markets, while our Global Transaction Services platform has given us the capability to cross-sell a much greater range of cash management and trade finance services to our UK and global clients. We are also pleased with the international retail and commercial businesses we have acquired, while the implementation of our manufacturing model on a global basis presents us with the opportunity to reduce costs significantly.

351.     The foregoing statements made by the Individual Defendants and RBS and contained in RBS's August 8, 2008 Form 6-K, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO, causing the goodwill attributed to ABN AMRO to be materially overstated throughout the Class Period, in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 179-230, 406-418);

(b)     They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that

had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230);

(c)     They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230);

(d)     They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid by RBS and the carrying value of the goodwill associated with these assets (¶¶ 179-230);

(e)     They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 Form 6-K) yield increased accretion in adjusted earnings per share of 9% (¶¶ 179-230);

(f)     McKillop's and Goodwin's statements about RBS's ability to achieve its target capital ratios, and its achievement of certain of those targets, were materially false and misleading and made without a sufficient basis, as indicated by the fact that within less than two months of these statements, the Company would require an additional rights issue and preferred share sale totaling **£20 billion** in October 2008 (¶ 216); and

(g)     Defendants omitted from their disclosures and statements concerning the Company's capital adequacy and achievement or progress towards achieving its target capital ratios, information indicating the continued insufficiency of RBS's capital, particularly in light of the Company's imminent need to raise £20 billion (¶ 216).

**The October 13, 2008 Statements**

352.     *On October 13, 2008, RBS issued a press release announcing a capital raising of £20 billion to be underwritten by the British government.* This release stated, in part, the

reasons for this major step and, importantly, also announced the departure of certain high-level executives, including its long-time Chief Executive, Goodwin, and his Executive Team. Despite this dramatic development, RBS continued to insist that "*[t]he integration of the RBS-acquired ABN AMRO businesses is proceeding ahead of schedule.*"

353. Furthermore, in an October 13, 2008 conference call with analysts and investors (in which McKillop, Whittaker, Hester and Goodwin participated), Defendant Whittaker also stated:

> Yes, and I think, again, making heroic statements at this point certainly would be rather -- I think it is worth going back to the basic building blocks of the franchise we grew, even in this environment of pre-impairment profits by 6 percentage points in the first half of the year.
>
> ***Predicting the extent and the depth of the economic cycle, I think you have to put your own assumptions into that and make your own assumptions about what that would mean for the post-impairment line.*** But I think all of our businesses and all of our franchises are expected to generate significant profits on the pre-impairment line. These capital resources certainly give us the capacity to continue to develop those franchises which offer attractive risk-adjusted returns over the course of the medium term, are continuing to work on the process of de-levering and de-risking some of those activities which we no longer expect to continue either at the same level or at all.

354. The foregoing statements, made by RBS and many of the Individual Defendants in the October 13, 2008 release and on the conference call of that same day, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO, causing the goodwill attributed to ABN AMRO

to be materially overstated throughout the Class Period, in violation of IFRS (¶¶ 179-230, 406-418);

(b)     They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired (¶¶ 179-230);

(c)     They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated (¶¶ 179-230); and

(d)     The realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the goodwill associated with these assets (¶¶ 179-230).

**The November 20, 2008 Statements**

355.     On November 20, 2008, RBS and the Exchange Act Defendants disclosed that, in fact, its capital position was insufficient, explaining, "In effect, the action the Board took in April [referring to the £5.9 billion asset impairment and £12 billion Rights Issue], while viewed as radical at the time, had been overtaken by events over the subsequent six months." For the first time, the Exchange Act Defendants were forced to acknowledge the "toxic assets" that were purchased in connection with the ABN AMRO acquisition. Nevertheless, McKillop still touted the acquisition, promoting it as a deal that made strategic and business sense:

> However, the [ABN AMRO] acquisition increased our exposure to those wholesale markets within which many of the problems have emerged during the course of this financial crisis.
>
> In retrospect, the higher exposure to assets, which later became very difficult to trade, and the need to fund an enlarged balance sheet as access to liquidity became increasingly difficult, increased

the short-term vulnerability of [RBS] to the financial crisis as it intensified this year.

But let me be clear, the acquisition of ABN AMRO may now be seen with hindsight as having increased our exposure to the emerging crisis, but it did not cause it. We would have needed to strengthen our capital position in any event as is also evident from the capital raisings being undertaken by the majority of our UK competitors and other banks around the world.

*Nor is this to say that the synergy benefits from the ABN AMRO deal will not be delivered – they are fully on track – or that the options for growth did not improve – they have. However, with the benefit of the knowledge we now have, it is clear that the timing of this acquisition has added to our difficulties.*

356.    The foregoing statements, which caused RBS securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by the Exchange Act Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons:

(a)    They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO, causing the goodwill attributed to ABN AMRO to be materially overstated throughout the Class Period, in violation of IFRS;

(b)    They failed to disclose that the goodwill associated with the ABN AMRO purchase had not been tested for impairment in spite of the events and changes in conditions that had occurred since the date of purchase indicating that the goodwill might have become impaired;

(c)    They failed to disclose that ABN AMRO's future cash flows were materially diminishing as the economy and the financial markets were deteriorating, and thus ABN AMRO's "value-in-use" had deteriorated, which the Exchange Act Defendants recklessly or knowingly failed to disclose to investors; and

(d)     They failed to disclose that the realizable value of the acquired ABN AMRO businesses, if a sale to a non-interested party were to occur, had declined well below the price paid and the carrying value of the goodwill associated with these assets which the Exchange Act Defendants recklessly or knowingly failed to disclose to investors.

## X.     SCIENTER ALLEGATIONS

### A.     The Exchange Act Defendants Knew that RBS Had Significant Exposure to the Subprime Market

357.    As set forth in ¶¶ 141-147 above, throughout 2007, the Exchange Act Defendants repeatedly assured investors that, unlike many of its peers, the Company was insulated from the U.S. subprime crisis because it did not "do subprime," that it measured risk in its portfolio conservatively, and that its exposure to the subprime and Alt-A markets was modest.

358.    For example, during a March 1, 2007 earnings conference call, Defendant Whittaker falsely assured investors that "*our role as an intermediary between originators and investors, leaves us both well-protected and with limited risk*." ¶ 274.  Defendant Fish, who spoke at a later point in the call likewise assuaged any concerns investors might have had about RBS's exposure to the subprime market, emphatically reiterating that, "[w]*e have never – we don't do sub-prime.  We have never done sub-prime.  We have no plans to do sub-prime.  Sub-prime brings with it operational risks, regulator risks and, of course, credit risks.*" ¶ 276.

359.    Likewise, during the Company's June 5, 2007 conference call, Goodwin reminded analysts that "[t]he mix or the quality of the credit within our book, as you've heard me saying ad nauseam*, we don't do sub-prime* so we've not, perhaps, been exposed to some of the more boisterous elements of that market that others have." ¶ 281.

360.    These statements were knowingly false when made in that, as RBS belatedly admitted on April 22, 2008 in connection with its announcement of the £5.9 billion writedown of

its ABS CDOs, 70% of the subprime MBS underlying those assets were originated prior to 2007. Ultimately, it was revealed that the greatest concentrations of the Company's exposure to subprime and Alt-A loans were to mortgages originated in 2005 and 2006, which were the periods of greatest home price appreciation in the U.S., creating an enormous exposure to the risk of a subsequent price decline in U.S. real estate, an eventuality which began to occur in late 2006. ¶¶ 149, 176.

361.     Moreover, by no later than the second half of 2007, defendants knew that the CDO market was becoming illiquid, as evidenced by the fact that, in August 2007 RBS began layoffs in Greenwich's CDO team, cutting a quarter of its staff as well as encouraging the departure of the team's co-head.  Just three months later, in November 2007, the other co-head of the CDO team left the firm.  In sum, while RBS began making corrections in its business as early as August 2007, it waited eight months, and at investors' expense, to acknowledge this illiquidity on its balance sheet.

**B.     The Exchange Act Defendants Knew that RBS's Assets Were Materially Overstated**

362.     As set forth in the ¶¶ 160-162 above, senior members of RBS management, including officers responsible for evaluating and monitoring risk, were aware that (i) the Company's valuation models were "inherent[ly] flaw[ed]" in that, among other things, they did not reflect then-prevailing market prices and they substantially overestimated the true value of RBS's ABS CDOs and (ii) the Company's valuations were inconsistent with the massive writedowns taken by its peers during that quarter.

363.     For example, on October 1, 2007, Victor Hong, a Managing Director and Head of Fixed-Income Independent Price Verification at Greenwich advised members of Greenwich's Market Risk Group that RBS's super senior tranches should be priced approximately 30%

lower." As reflected in an October 1, 2007 email exchange between the two, Hong's assessment of the true value of those assets were shared by Market Risk Group member Henry Asare, who complained to Hong that, "*I have been telling them t[h]is for 5-6 months but they don't want to hear*," further noting that "*Citi and UBS are taking a massive writedown this quarter . . .* "

364.    Despite these internal concerns about the accuracy of the valuations of RBS's ABS CDOs during the months prior to Asare's observations, the Exchange Act Defendants falsely and misleadingly claimed that RBS's financial statements were accurate because RBS's portfolio was conservatively and prudently marked. For example, as described more fully above in ¶¶ 290-302, the Exchange Act Defendants made the following statements in the summer of 2007:

(a)    **August 3, 2007 6-K.**  Defendants stated:

> *Strong credit metrics highlight our conservative risk profile across the Group*, and impairment losses fell 2% to £871 million. . . . Lending growth has been more subdued but our cautious credit stance has produced a reduction in impairment losses, and this, together with flat underlying costs, drove a 10% increase in operating profit. . . . . *Portfolio risk remained stable* and the corporate credit environment remained benign . . . Citizens is not active in sub-prime lending.

> The corporate environment remains benign and our US portfolios . . . Credit metrics overall remains strong.  ¶ 290.

> Portfolio risk remained stable and the corporate credit environment remained benign. Impairment losses of £21 million were in line with the first half of 2006, a period which included significant recoveries.  ¶ 300.

365.    Later in October 2007, Riccardo Rebonato, the Head of Group Market Risk, was warned by Bruce Jin, a Managing Director and Head of Market Risk, that, due to various flaws in the Company's mark-to-model approach, "*we should also be looking at the market value of the underlying assets to help determine the value of the super seniors*" because "*[t]he market*

*value of the underlying assets is more discernable than that of the CDO bonds and reflect well the market's consensus view on the future losses of the pool.*"

366. On November 9, 2007, Ian Gaskell, the Head of Structured Products at RBS, reiterated to senior managers in RBS's Risk Markets Group, that "***I remain concerned that the fall in the ABX is not being reflected in our valuations, and consequently we may not be accurately reflecting the "true" daily p/l (I cannot comprehend how, in a falling ABX market, our inventory has done anything other than also fall in value)*** . . . ."

367. Nevertheless, despite the Exchange Act Defendants' awareness or reckless disregard that the Company's valuation models were flawed and that the Company's ABS CDO valuations were inconsistent with the massive writedowns taken by its peers, the Exchange Act Defendants continued to falsely and misleadingly claim that RBS's financial statements were accurate because RBS was not significantly exposed to the subprime crisis and its portfolio was conservatively and prudently marked. For example, as described more fully above in ¶¶ 316-320, in a December 6, 2007 conference call, Goodwin stated:

> we feel these [writedowns] are pretty conservative. That's not to say it's impossible that they could go up. But we've tried to be prudent in our judgment. We've used all the data available at this point in time. We've made what we consider to be prudential adjustments to the calculations and projections we've used to project. . . . [I]n our models we've used the delinquency data to date, and we've modeled, going forward, what the rate of delinquency looks like and what the total level of delinquency might reach. And based on that have come up with a calculation of what the losses would be. ¶ 319.

368. The "top down" manipulation of risk assessments and asset valuations is further corroborated by the interviews provided by the Confidential Witnesses. Section VII, *supra.*

### C. RBS's Board Learned of the Company's Undisclosed Subprime Exposure No Later Than Summer 2007

369.    As described above, throughout 2007 the Individual Defendants made repeated misrepresentations to analysts and investors about the Company's purported lack of exposure to risky subprime investments.

370.    It has now been revealed that, no later than the summer of 2007, members of the RBS's Board learned that the Company had tens of billions of pounds of subprime exposure. As reported by the *Telegraph* on March 20, 2009, RBS directors and other senior Company insiders have confirmed that, in Summer 2007 Goodwin apprised RBS board members that: (i) the Company had spent billions of pounds purchasing subprime mortgages from other banks; and (ii) Citizens had in fact, contrary to Defendants' repeated assurances that Citizens did not "do subprime," amassed £14 billion of subprime exposure.

371.    Despite having learned of this information, which they knew was patently inconsistent with the Company's prior statements regarding its subprime exposure, these board members failed to cause RBS to correct its prior misstatements or otherwise disclose this material information to investors prior to December 2007.

### D. Defendants' Fraudulent Scheme Triggers Government Investigations

372.    RBS's subprime activities have also spawned numerous investigations by regulators and government officials both in the U.K. and the U.S., including: (i) a formal investigation by the SEC investigating "the Group's US sub-prime securities exposures and US residential mortgage exposures," (ii) an investigation by New York's Attorney General "focusing on the information underwriters obtained as part of the due diligence process from the independent due diligence firms and whether that information is adequately disclosed to

investors"; and (iii) the above-described FSA investigation into the conduct of RBS's board in connection with the June 2008 £12 billion Rights Issue.

373. It was not until the NYAG and SEC launched investigations into RBS's subprime exposure that the Exchange Act Defendants were forced to disclose its magnitude.

374. In addition, the U.K.'s Serious Fraud Office ("SFO") is reportedly considering whether to open a criminal investigation of RBS. On March 24, 2009, the *Guardian* reported that the SFO has been in contact with the FSA "to determine whether events (at RBS) were criminal or regulatory matters," stating that, "[w]e are monitoring developments to ascertain whether or not there are circumstances warranting an intervention by the SFO." The paper further reported that the basis for the potential investigation would be reports that, "RBS ha[d] been strengthened by claims that its traders invested billions in so-called toxic debt, or sub-prime loans, as part of a tax avoidance operation." Indeed, RBS has 238 off-shore subsidiaries that were created for the purpose of establishing tax havens. According to a March 13, 2009 article in *Accountancy Age*, the investment of nearly £25 billion in these off-shore tax havens would have resulted in a tax savings of nearly £500 million. As reported by the *Guardian*, Defendant Goodwin sanctioned these structured trade deals.

E. **RBS Fails to Take Required Goodwill Impairments in Order to Induce Participation in the Rights Issue**

375. As discussed above, by the Spring of 2008 there were numerous circumstances that required RBS, pursuant to International Accounting Standard ("IAS") 36.90, to examine whether the billions of pounds in goodwill it recorded in connection with the ABN AMRO acquisition (and other acquisitions) had become impaired. These circumstances included the September 2007 £27 billion U.K. government bailout and nationalization of Northern Rock Bank; the continuing deterioration of the credit markets in the second half of 2007 and the first

half of 2008, RBS's £5.9 billion subprime related writedown announced on April 22, 2008; RBS's need for £12 billion in new capital announced on the same day; and Fortis's failed attempt to sell certain assets from ABN AMRO acquisition as reported on or about June 16, 2008.

376.    Yet throughout this period, RBS failed to test the ABN goodwill for impairment as required by IFRS and as described in the *Accounting Policies* Note to its 2007 and 2008 financial statements.

377.    The motivation for RBS's refusal to consider whether all of these key events and changes in circumstance required a goodwill impairment was clear:  after depleting its capital to acquire ABN AMRO and then belatedly taking a £5.9 billion writedown (and with more subprime related  writedowns on the horizon), RBS was desperate to raise billions of pounds in new capital.  In fact, the £12 billion Rights Issue was the largest in European history.  Its success depended on investors believing that all of the bad news about RBS had already come out.

378.    Further, when asked by analysts on April 22  about the possibility of RBS taking goodwill impairments related to ABN AMRO, Goodwin stonewalled, reiterating that ABN AMRO stood to deliver "synergies with our business and give us new opportunities and improve our franchise going forward."

379.    When the Rights Issue closed on June 6, 2008, it was more than 95% subscribed. More than 5.8 billion new shares of RBS were issued, and investors provided RBS with £12 billion of new capital.

380.    Goodwin and other RBS insiders fully understood that this capital raise – critical to the possible survival of the under-capitalized Company caught in the midst of a severe credit crunch – could not have been achieved if RBS had fully informed investors of the extent of its

subprime related problems and its need to write down billions of pounds in goodwill related to the ABN AMRO and other acquisitions.

<strong>F.     Virtually All of RBS's Directors Are Removed<br/>as Defendants' Fraudulent Scheme Unravels</strong>

381.    That Defendants acted with knowledge and/or deliberate recklessness is further evidenced by the Company's abrupt removal of all of its senior executives in late 2008 as Defendants' fraudulent scheme began to unravel.  As noted above, on October 13, 2008, Defendant Goodwin was forced to leave RBS, reportedly as a condition of the U.K. government's agreement to provide capital to rescue the Company.  Just a week later, RBS announced the departure of Defendant McKillop, RBS's Chairman of the Board, which was to occur at the Annual Meeting in April 2009.  After RBS announced the extent of its 2008 losses, Defendant McKillop's departure was accelerated by two months and effective immediately.

382.    In addition, on August 27, 2008, RBS announced that it was removing Defendant Fish as a non-executive Director of the RBS Board.

383.    On May 5, 2009, on the eve of an announced investigation by the FSA into the conduct of RBS's board, the Company announced the resignation of its Finance Director, defendant Whittaker.  The focus of the FSA investigation is purportedly to determine whether the RBS Board provided truthful information to the market about RBS's financial position as well as the Board's appetite for taking on risk, something that RBS consistently said it did not do, as set forth above.  Following Whittaker's departure, only one member of Goodwin's original "regime" remained, reflecting the complete failure of these directors to discharge their obligations to RBS investors.

384.    In addition to the foregoing high-level departures, there also was a notable addition.  On March 23, 2009, Goodwin's replacement, Stephen Hester appointed Nathan

Bostock as the Company's head of restructuring and risk, charged with ridding RBS of the £385 billion in "toxic and other non-core assets." Hester explained that, "[f]rankly, the risk-management systems at Royal Bank of Scotland need a lot of change. And frankly I cannot do that in a couple of weeks."[28] Bostock's appointment further reflects the complete failure of RBS's internal controls and risk management systems under Goodwin's leadership.

### G. The Individual Defendants' Personal Financial Motives

385. Defendants Goodwin, Cameron and Whittaker (the "Executive Defendants") had a powerful financial motive to overstate the Company's financial condition and performance during the Class Period owing to the fact that, as executive directors of RBS, the bulk of their earnings came not from their annual salaries, but instead from bonuses pursuant to the various incentive plans, including the Company's Short Term Incentive Plan and Medium Term Incentive Plan. As illustrated in the following graphic included in RBS's 2007 Form 20-F, only 21% of defendant Goodwin's compensation package was fixed; the remaining 79% was performance-based. Approximately 73% of defendant Cameron's and defendant Whittaker's compensation package was performance-based:

---

[28] Martin Flanagan, "RBS Chief: It Could Take Five Years to Reverse the Serious Failings," *The Scotsman* (Feb. 12, 2009).

**UK-based executive directors' remuneration balance**



386.     As reported in the Company's 2007 Form 20-F, defendants Goodwin and

Cameron were eligible to receive incentive payments totaling as much as 250% of their annual

salary, while defendant Whittaker was entitled to incentive payments totaling as much as 200%

of his annual salary.

387.     According to RBS's SEC filings, defendant Goodwin's annual incentive "was

primarily based on specific [RBS] financial performance measures such as operating profit,

earnings per share growth and return on equity," while defendant Cameron's was based in part

on RBS's financial performance and in part on divisional financial performance.  Additionally,

Cameron's incentive pay was "dependent on achievement of a range of non-financial measures,

specific objectives and key result areas."  According to the 2007 Form 20-F, "[d]ivisional

performance" includes such metrics as operating income, costs, loan impairments and operating

profit," while "non-financial measures" include customer measures (e.g. customer numbers,

customer satisfaction), staff measures (e.g. employee engagement) and "efficiency and change

objectives."  As reported in the 2007 Form 20-F, these performance targets were established in

the beginning of 2007 – before the Company decided to purchase ABN AMRO, and before the

dramatic deterioration in the U.S. subprime and world credit markets.

388.     RBS reported that, in 2007, because "[RBS's] operating profit targets were met in full notwithstanding the impact of challenging credit market conditions in the second half of the year" and because "customer and employee satisfaction scores showed improvement in line with or above expectations" and "[f]inancial performance in most divisions exceeded target," the Company's Board approved annual incentive payments of "up to 112.5% of normal maximum levels."

389.     Thus, for the year ended December 31, 2007, defendant Goodwin received performance bonuses totaling £2.86mm - - more than double his annual salary of £1.29mm, defendant Cameron received performance bonuses totaling £1.9mm, approximately double his annual salary of £988,000, and defendant Whittaker received performance bonuses totaling £1.425mm, almost twice his annual salary of £760,000.

390.     Because the Individual Defendants' compensation was so heavily weighted in favor of incentive payments that were based on achievement of both financial and non-financial objectives, they had a strong financial incentive to insure that the Company's reported results for the year 2007 met those objectives established at the beginning of that year, despite the subsequent dramatic deterioration in market conditions.  In particular, the Individual Defendants each had a strong personal financial motive to conceal RBS's subprime exposure and to delay reporting the impairments of ABS CDO assets that were belatedly reported on April 22, 2008, in order to ensure that RBS met its earnings and other incentive targets for that year, thereby entitling them to the performance-based component of their 2007 compensation.

391.     It was not until after certain of the Individual Defendants pocketed their multi-million-pound performance bonuses at year-end 2007 that they acknowledged that the Company's ABS CDO and MBS positions were impaired by almost £6 billion.

392.     In addition to the foregoing, RBS's bonus scheme incentivized the Individual Defendants to (a) make increasingly large bets on risky U.S. subprime assets and (b) hide from investors any material losses the Company incurred as a result.

393.     RBS's Board encouraged this risky practice by sharply increasing bonuses in 2006, concurrent with the Company's increased investment in those toxic assets.

394.     The relationship between the Company's bonus scheme and the increase in RBS exposure to risky subprime assets is evidenced, in part, by the fact that RBS's top subprime mortgage trader, Levine, who served as co-head of Greenwich, reportedly earned a staggering £40 million between 2005 and 2007—more than five times the amount earned by his immediate superior, defendant Cameron, and more than four times the amount earned by defendant Goodwin during that period.[29]

### H.     Goodwin's Additional Motive

395.     Besides all of Goodwin's other reasons to conceal RBS's subprime exposure from investors, he had an additional motive to conceal this information:  he had assured RBS's Board that the Company would not move into the subprime arena.  As reported by the *Daily Telegraph* in a March 20, 2009 article, rather than follow the conservative approach that RBS had followed for  decades, in the years prior to the Class Period, Goodwin caused RBS to engage in risky investments in order to fuel his desire for growth.  Despite these activities, the *Daily Telegraph* reported, during a board meeting in the summer of 2006, when RBS directors asked Goodwin whether the Company had any plans to enter the subprime market, Goodwin "told the board that the bank would not move into sub-prime and that, as a result, 'RBS is better placed than our competitors."

---

[29] Iain Dey & Kate Walsh, "How Fred Shredded RBS," *TimesOnline* (February 8, 2009).]

396. Because he concealed this information from his own Board until Summer 2007, Goodwin had no choice but to also conceal RBS's exposure to these investments from investors.

## XI.    IFRS VIOLATIONS

### A.    RBS Was Required to Follow International Accounting Standards

397. IAS 1 provides that "*Material* Omissions or misstatement of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. Materiality depends upon the size and nature of the omission or misstatement judged in the surrounding circumstances. The size or nature of the item, or a combination of both, could be the determining factor." (IAS 1 ¶ 7)

398. As set forth in International Accounting Standards Board ("IASB") Preface, a fundamental objective of financial reporting is "to develop, in the public interest, a single set of high quality, understandable and enforceable global accounting standards that require high quality, transparent and comparable information in financial statements and other financial reporting to help participants in the various capital markets of the world and other users of the information to make economic decisions."

399. In failing to file financial statements with the SEC that conformed to the requirements of IFRS, RBS disseminated financial statements that were presumptively misleading and inaccurate. The Company's Class Period Forms 20-F filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, as required by Item 303 of Regulation S-K.

### B.    RBS Fails to Properly Report Goodwill

400. IFRS 3 governs the reporting of Business Combinations. The stated objective of IFRS 3 "is to specify the financial reporting by an entity when it undertakes a business

combination …" IFRS 3 goes on to say that in a business combination, "the acquirer … recognizes goodwill, which is subsequently tested for impairment rather than amortized."  (IFRS 3, ¶ 1).

401.    IFRS requires that acquirers (such as RBS) recognize as goodwill the excess of the purchase price over the fair value of the assets acquired:

> The acquirer shall at the acquisition date:
>
> a)  Recognize goodwill acquired in a business combination as an asset; and
>
>> (i) Initially measure that goodwill at its cost, being the excess of the cost of the business combination over the acquirer's interest in the net fair value of the identifiable assets, liabilities and contingent liabilities. . . .

IFRS 3 ¶ 51.

402.    IFRS standard IAS 36 requires goodwill to be tested for impairment annually or more frequently if events or changes in circumstances indicate that the asset might be impaired. (IAS 36.90)  In addition, IAS 36 requires that any newly acquired goodwill must be tested for impairment before the end of the fiscal year in which it was acquired (IAS 36.96).  In order for this impairment testing to be completed, goodwill must be allocated at acquisition date to each of the acquirer's units that are expected to benefit from the synergies of the business combination, and each of those units must be tested for impairment by comparing their carrying values to their recoverable amounts (IAS 36.59, 80, 96). The disclosures in Notes 17 and 38 to RBS's 2008 financial statements are the first indication that RBS finalized the allocation of ABN AMRO goodwill between its GBM, Global Transaction Services, Asia Retail & Commercial Banking, RFS Holdings minority interests, and other units, and tested the ABN AMRO goodwill for

impairment. These disclosures indicate that the "reappraisal" was first performed as of December 31, 2008, based on events occurring during the second half of 2008.

403. IAS 36 acknowledges that it may not be possible to complete the initial allocation of goodwill before the end of the fiscal year of acquisition, if sufficient information is not available to do so (IAS 36.84, 85). In such cases, IAS 36 requires additional disclosures, such as the amount of goodwill that remained unallocated and the reasons why it was not possible to allocate it. IAS 36.133.

404. Based on the segment information included in the Notes to RBS's 2007 financial statements, it is clear that the goodwill associated with the purchase of ABN AMRO had not been allocated to specific business units as of December 31, 2007. However, here it is also clear that, at the time it filed its 2007 Form 20-F, RBS had sufficient information to allocate ABN AMRO goodwill at least on a provisional basis. RBS's 2007 Form 20-F disclosed that ABN AMRO units retained by RBS consisted "principally of the global wholesale businesses and international retail businesses in Asia and the Middle East" and that those units "have been restructured to mirror the new RBS Group structure." Based on this information, as of December 31, 2007, RBS should have been able to allocate at least a portion of ABN AMRO goodwill to its GBM and Asia Retail units – the very units in which £7 billion[30] of ABN AMRO goodwill impairments were recorded in 2008.

405. Nevertheless, contrary to the requirements of IAS 36, RBS failed to allocate the ABN AMRO goodwill among its various business units at December 31, 2007, and failed to disclose the reasons for not having made the allocation.

---

[30] This amount relates to RBS's share of the ABN AMRO goodwill and does not include the £14.6 billion impairment of ABN AMRO goodwill related to Fortis's minority interest recognized in 2008.

### C.     RBS Fails to Timely Test and Impair Goodwill

406.    Once a company has recognized goodwill in connection with a business combination, IAS 36 requires that the cash-generating units to which the goodwill has been assigned "be tested for impairment before the end of the current annual period" in which the business combination occurred (see IAS 36, ¶ 96) and thereafter be tested for impairment annually or more frequently if events or changes in circumstances indicate that the asset might be impaired.  (IAS 36.90).

407.    If the recoverable amount is determined to be less than the carrying amount impairment loss must be recognized.  See IAS 36 ¶ 59.

> If, and only if, the recoverable amount of an asset is less than its carrying amount, the carrying amount of the asset shall be reduced to its recoverable amount.  That reduction is an impairment loss.

IAS 36 ¶ 59.

408.    IAS 36 explicitly requires that cash-generating units to which goodwill is allocated must be tested before the end of the year of acquisition.  It was RBS's policy to perform its annual testing for goodwill impairment as of September 30 which preceded the purchase date of ABN AMRO.  As discussed above, however, as of December 31, 2007, RBS failed to allocate ABN AMRO goodwill to relevant business units, let alone test those units for impairment.

409.    Irrespective of IAS 36 requirements to always test newly acquired goodwill for impairment on or before the end of the year of acquisition, prior to the end of 2007 there were also specific events and changes in circumstances requiring RBS to test the goodwill attributable to ABN AMRO for impairment.  Perhaps the most notable of these, an event characterized by a member of the U.K. Treasury Panel as an "*earthquake . . . [hit]ting the financial services*

*industry*," was the failure of Northern Rock Bank, which received a government bailout in mid-September 2007.

410.    The failure of Northern Rock and further deterioration in the credit markets and banking industry during the second half of 2007—occurring several months after RBS had negotiated the purchase of ABN AMRO constituted "events and changes in circumstances indicat[ing] that the asset might be impaired" within the meaning of IAS 36.90, and therefore required RBS to test the goodwill for impairment.

411.    Notwithstanding the foregoing, RBS not only failed to perform the required impairment testing, but in fact affirmatively, and falsely represented in the May 14, 2008 filing of its 2007 Form 20-F that:

> Subsequent events have not significantly affected the assumption and estimates supporting the Consortium's investment decision and the Group has therefore concluded that there is no impairment of the goodwill recognized at 31 December 2007.

412.    Throughout 2008, there were further events and changes in circumstances indicating that RBS's goodwill might be impaired, and which therefore necessitated testing the ABN AMRO goodwill for impairment pursuant to IAS 36.90.  Among other things, on April 22, 2008, RBS announced the need to raise an additional £12 billion in capital through the Rights Issue and reported that it would take a £5.9 billion writedown related to its credit market exposures, approximately one-third of which related to assets acquired in its purchase of ABN AMRO.

413.    At that time, RBS conceded that it "bought AMRO at a point when bank valuations were way higher than they are today," and that the purchase "also increased our exposure to wholesale markets an unfortunate time …"  RBS's admission that it had purchased ABN AMRO at a time when valuations had been much higher shows that, not later than April

22, 2008, RBS was fully aware that valuations had declined and that the estimates supporting the

ABN AMRO purchase price and the related goodwill were no longer reliable.

414.     In June 2008, it was reported that Fortis, RBS's partner in the Consortium that

purchased ABN AMRO, was seeking to sell ABN AMRO's asset management unit but was

unable to do so.[31]  Fortis's ownership interest represented over 60% of the goodwill associated

with the ABN AMRO acquisition.  The inability of Fortis to sell ABN AMRO's asset

management unit was yet another indicator that a significant portion of the total ABN AMRO

goodwill included in RBS's consolidated financial statements may have become impaired by

June 30, 2008.  Indeed, an impairment loss of £14.6 billion was recognized in RBS's

consolidated financial statements when Fortis's shares in RFS Holdings were acquired by the

State of the Netherlands on October 3, 2008.

415.     On September 15, 2008, the investment bank Lehman Brothers filed for

bankruptcy after toxic subprime MBSs that it had retained after securitizing the underlying

mortgages—the same type of assets that RBS had acquired from ABN AMRO—caused Lehman

Brothers billions of dollars in losses.

416.     On or about September 29, 2008 the governments of Belgium, the Netherlands

and Luxembourg agreed to invest £9 billion to attempt to rescue Fortis from collapse in a move

that forced Fortis to divest its share of the ABN AMRO acquisition.  This development was a

further indication that at least a portion of the ABN AMRO goodwill included in RBS's

consolidated financial statements might be impaired.

417.     These developments were further indication that the ABN AMRO goodwill

included in RBS's consolidated financial statements was impaired.

---

[31] "Fortis ABN AMRO sell-off in trouble," *DutchNews.nl* (June 16, 2008).

418. As reported in its Form 20-F issued on April 29, 2009 for the year ended December 31, 2008 (the "2008 Form 20-F"), RBS disclosed that, when it performed the impairment testing required by IAS 36, it determined that the carrying value of the goodwill recognized in its acquisition of ABN AMRO was far less than its recoverable value and an impairment loss was necessary. *Substantially all of the £23.3 billion of goodwill originally recognized in connection with the ABN AMRO purchase was written off in 2008.*

D. **RBS Fails to Properly Value Asset Backed Securities and Related Credit Market Exposures**

419. IAS 39 provides that, in determining the fair value of financial instruments:

> The best evidence of fair value is quoted prices in an active market. If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations…The chosen valuation technique *makes maximum use of market inputs* and relies as little as possible on entity-specific inputs. It incorporates *all factors that market participants would consider* in setting a price and is consistent with accepted economic methodologies for pricing financial instruments. Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument…or based on any available observable market data."

As set forth in the Company's 2007 Form 20-F, RBS determined the fair value of its ABS CDOs using proprietary valuation models.

420. RBS violated IAS 39 by failing to consider all available observable market data in determining the value of its ABS CDOs as of December 31, 2007. Among other things, as discussed in ¶¶ 160-162, RBS knew that its valuation models failed to adequately reflect the dramatic decline in relevant ABX indices at December 31, 2007. RBS valued its high grade and mezzanine ABS CDOs at December 31, 2007 at average prices of 84% and 70%, respectively,

compared with ABX indices for similar securties of 63% and 27%, respectively. The ABX indices represented the best available evidence of fair value of these CDOs ased upon quoted price in an active market.

421.     In its 2007 20-F, filed on May 14, 2008, RBS confirmed what it had previously disclosed on April 22, 2008, that it was planning to recognize a pre-tax write-down in respect to credit market exposures of approximately £5.9 billion during 2008. Approximately 50% of these estimated write-downs were comprised of CDOs and US residential subprime and Alt-A MBS trading inventories. RBS based its write-downs on average prices for its high grade and mezzanine CDOs of 52% and 20%, respectively, and average prices for its subprime and Alt-A MBS trading inventory of 38% and 50%, respectively. A composite of ABX indices for subprime loans at May 14, 2008 reflected prices (as a percentage of face value) of high grade and mezzanine CDOs of approximately 46% (e.g., 46 cents on the dollar – a decline of 54% from face value) and 11%, respectively. These prices were significantly lower than those used by RBS in estimating the additional write-downs to be taken in 2008 as disclosed on April 22, 2008. As a result, RBS violated IAS 39 for failing to consider all available observable market data in determining the write downs recognized in its financial statements during the first six months of 2008.

### E.     RBS Fails to Disclose Risks Associated with Financial Instruments

422.     IFRS 7, which was effective for annual periods beginning after January 1, 2007, requires entities to "disclose information that enables users of its financial statements to evaluate the nature and extent of risks arising from financial instruments to which the entity is exposed at the end of the reporting period." IFRS 7 (¶B8) specifically requires disclosures about concentrations of risk arising from financial instruments that have similar characteristics and are affected similarly by changes in economic or other conditions, including the entity's maximum

exposure to loss from the concentrations. Prior to January 1, 2007, IAS 32 similarly required disclosures of information that would "assist users of financial statements in assessing the extent of risk related to financial instruments," including the requirement to disclose information about exposure to "significant concentrations of credit risk." (IAS ¶ 42-43; 66-76) Paragraph 75 specifies that, "[c]haracteristics that may give rise to a concentration of risk include … the level of creditworthiness of a group of borrowers."

423. The requirement to disclose information with respect to an entity's concentrations of credit risks is based upon the existence of the risk and irrespective of the likelihood of loss or occurrence of events that would lead to losses.

424. IAS 1 provides that omissions or misstatements of items "are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statement. The size or nature of the item, or a combination of both, could be the determining factor." (IAS 1 ¶ 7)

425. Based upon information contained in its 2008 financial statements, as of December 31, 2007, RBS's net exposure to CDOs and US-based subprime and Alt-A trading inventory totaled approximately £9.6 billion, comprised of net exposures to CDOs, US subprime and Alt-A securities of £3.8 billion, £2.95 billion and £2.8 billion, respectively.[32] Based on these net exposures as of December 31, 2007, it would have taken only a 10% decline in the value of these ABS to trigger approximately a 10% decline in RBS's £9.9 billion in reported operating profits before tax for 2007. This shows the materiality of these credit concentrations to RBS's financial statements and the extent to which changes in their values would influence the economic decisions of users of RBS's financial statements. Although RBS did not disclose the

---

[32] The amounts of net exposure to US subprime and Alt-A RMBS disclosed in the 2007 20-F were £1.3 billion and £2.2 billion, repectively. The reason for the different amounts is not apparent.

extent of its concentration in these ABS existing at December 31, 2006 and 2005, based on information contained in its 2008 Form 20-F, RBS had been accumulating its interests in CDOs since 2003 and, based on information contained in the 2007 20-F, at least 70% of the underlying MBS were originated prior to 2007 and approximately 25% were originated prior to 2006. Based on available information, it appears that these risk concentrations were material to both RBS's 2006 and 2005 financial statements as well as the 2007 financial statements.

426.    In its financial statements included in the Company's Form 20-F for the year ended December 31, 2006, RBS failed to disclose RBS's exposure to high-risk, low credit quality ABSs, including specifically RBS's exposure to mortgage-related ABSs. Indeed, although RBS reported in its 2008 Form 20-F, filed with the SEC on April 29, 2009, that, "[t]he Group's CDO exposures comprise CDOs structured by the Group from 2003 to 2007 that were unable to be sold to third parties due to prevailing illiquid markets with net exposures of £1.4 billion (2007 - £3.8 billion)," the Company's financial statements for the year ended December 31, 2006 failed to disclose the risks associated with these financial instruments at that time. Indeed, the term CDO does not even appear in RBS's 2006 Form 20-F. RBS's 2006 Form 20-F also fails to disclose RBS's exposure to subprime, Alt-A, and adjustable rate mortgage ("ARM") loans, including interest only and negative amortization ("Option ARM") loans. RBS's exposure to CDOs and subprime and Alt-A MBS trading inventories represented significant concentrations of credit risk with similar characteristics. The weaker credit quality, unverified borrower income and sensitivity to increases in interest rates of the loans underlying these ABS created a specific risk with respect to a potential decline in residential real estate prices and increases in mortgage interest rates, particularly in the US where the growth in housing prices had been so dramatic up to mid-2006 after which it began to decline.

427.    In its financial statements included in the Company's Form 20-F for the year

ended December 31, 2006, note 10 to RBS's 2007 financial statements on *Financial instruments*

does not disclose any investments in CDOs subprime or Alt-A residential mortgage backed

securities.  Note 11 to RBS's 2007 financial statements on *Asset Quality* includes a disclosure of

*Industry risk—geographical analysis* indicates that RBS had no investment in debt securities

comprised of residential mortgages in the US in either 2006 or 2007.  Note 14 to RBS's 2007

financial statements on *Debt securities* indicates that as of December 31, 2007 and 2006, RBS

held mortgage backed securities totaling £68.3 billion and £32.2 billion, respectively, but there is

no disclosure as to the composition of these mortgage backed securities and the extent to which

they are comprised of CDOs or residential or subprime mortgage assets.  The financial statement

disclosures in RBS's 2007 financial statements are inconsistent with the disclosures contained in

the *Business Review* section of the 2007 Form 20-F which discuss RBS's net exposures to CDOs,

including prime and subprime mortgage collateral, and subprime and Alt-A residential mortgage

backed securities (RMBS).  These inconsistencies and the failure of RBS to disclose information

in the Notes to its 2007 and prior year financial statements concerning its investments in and

exposure to CDOs and other mortgage backed securities, caused those financial statements to fail

to comply with the IFRS Framework requiring financial statements to be understandable,

reliable, and to faithfully represent the transactions and other events it either purports to

represent or could reasonably be expected to represent.[33]

428.    In its financial statements included in the Company's 2007 Form 20-F, RBS

failed to disclose the percentage of ABSs that was comprised of higher risk ARM loans,

---

[33] Unlike RBS's 2007 financial statements, Note 11 to RBS's 2008 financial statements on *Financial Instruments* makes numerous disclosures related to RBS's investments in CDOs and RMBS.

including interest only and negative amortization loans or Option ARMs, which subjected borrowers to the risk of increases in interest rates, and a correspondingly higher risk of default.

429. In its financial statements included in the Company's 2007 Form 20-F, RBS failed to disclose that its retained interests in CDOs, which it had been structuring since 2003, were held because RBS was unable to sell these interests to third parties due to illiquid market conditions.

430. In both its 2007 and 2006 financial statements, included in its Form 20-F filings for those periods, RBS groups its geographic concentrations of risk at the very highest levels, providing information for the U.K., the U.S. and Europe separately, and lumping the rest of the world together in a fourth category. RBS did not provide information with respect to its concentration of risk in specific U.S. residential mortgage markets including its exposure to the markets presenting the greatest risk of default such as California, Florida, Nevada, Arizona and the upper Midwest. These risks were the direct result of either unprecedented growth in home prices upon which the loans had been underwritten or deteriorating economic conditions.

**F.** **RBS Fails to Disclose Changes in Financial Position and Performance.**

431. IAS 34, *Interim Financial Reporting*, requires interim financial reports to disclose "events and transactions that are significant to an understanding of the changes in financial position and performance of the entity since the end of the last annual reporting period. . . ." (IAS 34 ¶15). IAS 34 also requires the disclosure of material events subsequent to the balance sheet date and material events subsequent to the end of the interim period that have not been reflected in the financial statements for the interim period. (IAS 34 ¶ 16(h)).

432. In violation of IAS 34, RBS's interim financial statements for the six months ended June 30, 2007 failed to disclose material events and circumstances that had occurred between the June 30, 2007 financial statement date and the August 3, 2007 filing of the 6-K for

that reporting period in violation of IAS 34. These events included, among other things, a significant decline in the ABX indices for similar securities of approximately 15% for certain high grade CDOs and more than a 30% decline in the value of certain mezzanine level CDOs since June 30, 2007. This decline in value indicated that the Company's ABSs would have to be significantly written down from the levels reported as of June 30, 2007, and was required to be disclosed in order to keep the June 30, 2007 financial statements from being materially misleading. *See* ¶ 150.

### G. RBS Failed to Maintain Effective Internal Controls

433. Defendants were required to present RBS's business activities in accordance with Section 13 of the Exchange Act of 1934, which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall --
>
> (A)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (B)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -
>
> > (i)     transactions are executed in accordance with management's general or specific authorization;
> >
> > (ii)     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
> >
> > (iii)     access to assets is permitted only in accordance with management's general or specific authorization; and
> >
> > iv.     the recorded accountability for assets is compared with the existing assets at reasonable

intervals and appropriate action is taken with
respect to any differences. . . .

434.    In its 2006 and 2007 Form 20-F filings, RBS management asserted that it had

assessed the effectiveness of the Company's internal control over financial reporting based on

the criteria set forth by the Committee of Sponsoring Organizations of the Treadway

Commission ("COSO") and that, based on its assessment, management believed that the

Company's internal control over financial reporting was effective.

435.    The COSO framework on internal control consists of five interrelated

components:

(a)    Control environment

(b)    Risk assessment

(c)    Control activities

(d)    Information and communication

(e)    Monitoring

436.    With respect to *Control Environment*, the COSO framework provides that:

The control environment sets the tone of an organization,
influencing the control consciousness of its people. It is the
foundation for all other components of internal control, providing
discipline and structure . . . . The chief executive officer is
ultimately responsible and should assume "ownership" of the
system. More than any other individual, the chief executive sets the
"tone at the top" that affects integrity and ethics and other factors
of a positive control environment.

437.    Rather than setting an appropriate "tone at the top" creating an environment

fostering integrity, ethics and a positive control environment, Goodwin used fear and

intimidation to dominate management, discouraging debate and the free flow of ideas.

438.    With respect to *Risk Assessment,* the COSO framework provides that:

> Risk assessment is the identification and analysis of relevant risks to achievement of the objectives, forming a basis for determining how the risks should be managed. Because economic, industry, regulatory and operating conditions will continue to change, mechanisms are needed to identify and deal with the special risks associated with change.

439.    Stephen Hester, Goodwin's replacement at CEO, admitted in early 2009 that "the risk-management systems at Royal Bank of Scotland need a lot of change," suggesting the areas that needed addressing were in both the timing and concentration of risk exposure.  Goodwin's unchecked "quest to make RBS a titan of world banking" led to an unprecedented level of acquisitions without adequate consideration of how those acquisitions impacted the Company's risk concentrations.

440.    With respect to *Information and Communication*, the COSO framework provides that:

> Pertinent information must be identified, captured and communicated in a form and timeframe that enable people to carry out their responsibilities [including] information about external events, activities and conditions necessary to informed business decision-making and external reporting. [Members of an organization] must have a means of communicating significant information upstream.

441.    During the period of rapid change in the credit markets, RBS's controls did not permit the free flow of information concerning the deterioration of values of subprime ABS CDOs and MBSs to be communicated and properly incorporated in the financial reporting process of RBS.  To the extent that this information was communicated, it was ignored and/or concealed.

442.    With respect to *Roles and Responsibilities* of persons within an organization, the COSO framework provides that the members of the board of directors must have the knowledge and the commitment to fulfill their duties:

Effective board members are objective, capable and inquisitive. They also have knowledge of the entity's activities and environment, and commit the time necessary to fulfill their board responsibilities.

To the extent that management may have overridden controls and ignored or stifled communications from subordinates . . . [a] strong, active board, particularly when coupled with effective upward communications channels and capable financial, legal and internal audit functions, is often best able to identify and correct such a problem.

443.    Here, certain RBS Board members claim not to have been aware that the Company had been exposed to significant risks related to CDO and related subprime mortgage exposures beginning as early as 2003, establishing a lack of knowledge of the Company's activities, and a failure to fulfill their responsibilities as board members.

## XII.    LOSS CAUSATION ALLEGATIONS

444.    These allegations establish loss causation for purposes of the claims pursuant to the Exchange Act.

445.    Due to the Exchange Act Defendants' scheme to deceive investors and the market through the fraudulent course of conduct alleged herein, RBS shares were inflated at all times during the Exchange Act Class Period.  This inflation was the result of the Exchange Act Defendants' false and misleading statements and omissions concerning, among other things, the Company's exposure to subprime assets, the value of certain asset-backed securities (including ABS CDOs and MBSs), the value of goodwill associated with the acquisition of various businesses (including ABN AMRO), the Company's financial results, asset valuations, capital adequacy and compliance with IFRS.  However, this inflation was dissipated as the truth concerning RBS's subprime exposures, asset-backed securities losses, goodwill, financial results, and accounting compliance, was revealed to investors and the market.

446.     The decline in the value of RBS securities upon the revelation of true facts was precipitous.  Plaintiffs and the Class made purchases of RBS securities at artificially inflated prices during the Exchange Act Class Period and suffered damages and economic loss, for purposes of the federal securities laws, when subsequent disclosures revealed the true facts to the market, resulting in the reduction of the artificial inflation in the prices of RBS securities.

447.     Exchange Act Defendants were successful in causing the prices of RBS securities to trade at artificially inflated prices during the course of the Exchange Act Class Period.  However, like their fraud, this inflation was not sustainable, and when the true facts were revealed, the prices of RBS securities declined significantly.  For example, RBS ordinary shares trading on the London Exchange closed as high as £6.03 per share during the Exchange Act Class Period (on March 6, 2007) and did not trade significantly below £3.00 per share until after April 2008.  As a direct and proximate result of the disclosures set forth below, which, over time, revealed the truth about either Defendants' false and misleading statements, or material facts that they failed to disclose, RBS ordinary shares fell to £0.12 – a *massive 98% decline* from their Class Period high.

448.     Plaintiffs' loss causation allegations relate primarily to the decline in the prices of RBS securities on April 21, 2008, April 22, 2008, October 6, 2008, October 7, 2008, October 13, 2008 and January 19, 2009.

**April 21, 2008**

449.     News reports beginning on Saturday, April 19, 2008, and continuing on Sunday, April 20, 2008 and Monday, April 21, 2008, revealed for the first time that RBS would announce material asset writedowns.  An article in the April 19, 2008 *Financial Times* indicated that RBS would be required to take writedowns of an estimated £2.6 billion.  An article in the April 20, 2008 *Sunday Telegraph* indicated that RBS would report a loss of up to £6 billion in the next

168

week, mostly due to asset writedowns totaling between £6 billion and £7 billion.  On Monday, April 21, 2008, prior to the opening of the financial markets in London,[34] *Reuters* reported that RBS had taken, and would announce later in the week, asset writedowns of £5 billion to £7 billion on tarnished CDOs and similar assets, including those acquired from ABN AMRO.

450.    The writedowns identified by these news reports related to assets that had been carried on RBS's balance sheet at inflated values, causing RBS's Class Period financial results and financial statements to be materially overstated in violation of IFRS.  In addition, the reports indicating that RBS would seek to raise capital through a capital markets transaction contradicted the Exchange Act Defendants' prior statements, made as recently as February 28, 2008, that they would not need to raise additional capital.

451.    These announcements, all of which were issued or published between the closing of the financial markets on Friday, April 18, 2008, and the closing of those markets on Monday, April 21, 2008, caused RBS securities to decline materially on Monday, April 21, 2008.  RBS shares trading on the London Exchange declined by £0.10 (or 3%), to close at £3.12, on high trading volume of 206 million shares.  This decline was statistically significant when compared to the movement of comparable stock indexes on April 21, 2008.

452.    Notwithstanding the disclosures described above, the prices of RBS securities continued to be inflated because Exchange Act Defendants had not yet confirmed that belated asset writedowns were in fact required, nor had they revealed to the market, among other things, that RBS continued to report goodwill that was inflated by £20 billion, that RBS acquired

---

[34]  RBS Ordinary Shares trade on the London Stock Exchange which opens at 8:00 a.m. Greenwich Mean Time (GMT).  RBS ADRs trade on the New York Stock Exchange, which opens for trading at 9:30 a.m. local time, which is at least five hours behind GMT.  Thus for all purposes herein, if a statement is said to have been issued before trading began in London, it would also have been issued before trading opened on the NYSE.  All pricing and volume information referenced is based on data published by Bloomberg reflecting the closing prices and daily volume of RBS ordinary shares in trading on the London Exchange.

materially overvalued "toxic" assets from ABN AMRO (causing the goodwill specifically

attributed to ABN AMRO to be materially overstated in violation of IFRS) and further that ABN

AMRO's "value-in-use" had declined along with the expected cash flows from its businesses.

**April 22, 2008**

453.     As detailed above in Section VI.C.4, on Tuesday, April 22, 2008, prior to the

opening of the financial markets in London, RBS issued a press release titled "Update on Credit

Market Exposures, Disposals, Capital Trading Conditions and Outlook," which disclosed asset

writedowns totaling £5.9 billion on various credit market exposures, primarily RBS's position in

CDO's, U.S. residential (including subprime) and commercial mortgages and leveraged loans.

454.     During an April 22, 2008 conference call with analysts and investors on the

subject of the writedowns, Defendant Whittaker admitted that "US subprime market and other

real estate related exposures" accounted for £3.3 billion of the total and that CDO positions

would be re-priced by a huge amount—with the valuation of "high-grade CDOs" being reduced

"down from $0.84 to $0.52 . . . and the mezzanine [CDOs] down from $0.70 to $0.20."

455.     The writedowns disclosed in the "April 22 Update" and accompanying

disclosures in the conference call of that same date, confirmed the reports from April 19 through

April 21, 2008, and revealed that the written-down assets had been carried on RBS's balance

sheet at inflated values, causing RBS's Class Period financial results and financial statements to

be materially overstated in violation of IFRS.  In addition, RBS's admission that it would seek to

raise £12 billion in the Rights Issue contradicted the Exchange Act Defendants' prior statements,

made as recently as February 28, 2008, that they would not need to raise additional capital.

456.     These announcements, all of which were issued or published between the closing

of the financial markets on Monday, April 21, 2008, and the closing of those markets on

Tuesday, April 22, 2008, caused RBS securities to decline materially on April 22, 2008.  RBS

shares trading on the London Exchange declined by £0.12 (or 3.9%), to close at £3.00, on high trading volume of 204 million shares. This decline was statistically significant when compared to the movement of comparable stock indexes on April 22, 2008.

457. The prices of RBS securities continued to be inflated because the Exchange Act Defendants had not yet revealed that belated asset writedowns were in fact required, because among other things, that RBS continued to report goodwill that was inflated by £20 billion, that RBS acquired materially overvalued "toxic" assets from ABN AMRO (causing the goodwill specifically attributed to ABN AMRO to be materially overstated in violation of IFRS) and further that ABN AMRO's "value-in-use" had declined along with the expected cash flows from its businesses.

**October 6, 2008**

458. Prior to the opening of the financial markets in London on Monday, October 6, 2008, Standard & Poor's Ratings Services issued a release lowering the credit ratings on RBS, and attributing that rating cut to reflect their "***expectation that RBSG's financial profile may continue to weaken***," noting losses in the first half that "***were principally driven by large net write-downs in GBM totaling [£]5.9 billion***." That morning, Standard & Poor's Equity Research Analyst Derek Chambers also reduced the rating on RBS equities from "strong buy" to "sell," citing a need to add to capital reserves.

459. Additional media reports indicated that these two downgrades were interpreted as a revelation that RBS would imminently be required to raise additional capital because its existing capital had been depleted due to writedowns on toxic assets. It was assumed that such capital could not be raised in a rights issue, and that it would need to be obtained in significant part in a highly dilutive investment by the U.K. government. A *Bloomberg News* article published during the afternoon of October 6, 2009 quoted Sandy Chen, a London securities

analyst with Panmure Gordon & Co., as stating that such a capital infusion from the U.K. government to RBS was no longer "a matter of choice."  MF Global Securities Ltd analyst Simon Maughan was quoted by Bloomberg as stating that such a government action would be "massively dilut[iv]e."

460.    These downgrades and news reports indicated that RBS would need to engage in another massively dilutive capital raising process.  This information continued to reveal the inadequacy of the Rights Issue, the full impact of those writedowns identified on April 22, 2008, and the falsity of the Exchange Act Defendants' statements made since April 22, 2008, concerning RBS's capital ratios, adequacy and targets, as well as their omissions regarding the Company's materially inadequate capitalization.  Moreover, the indication that additional capital was required, despite RBS's management's statements to the contrary, revealed for the first time an undisclosed crisis of confidence in the Company's senior executives and prompted reports of a management shake-up.

461.    These announcements, all of which were issued or published between the closing of the financial markets on Friday, October 3, 2008, and the closing of those markets on Monday, October 6, 2008, caused RBS securities to decline materially on Monday, October 6, 2008.  RBS shares trading on the London Exchange declined by £0.38 (or 20.5%), to close at £1.48, on high trading volume of 197.5 million shares.  This decline was statistically significant when compared to the movement of comparable stock indexes on October 6, 2008.

462.    Notwithstanding the disclosures described above, the prices of RBS securities continued to be inflated because Exchange Act Defendants had not yet confirmed that such a capital raise was necessary or that members of the Company's senior management would be replaced, nor had they revealed to the market, among other things, that RBS continued to report

goodwill that was inflated by £7.7 billion, that RBS acquired materially overvalued "toxic" assets from ABN AMRO (causing the goodwill specifically attributed to ABN AMRO to be materially overstated in violation of IFRS) and further that ABN AMRO's "value-in-use" had declined along with the expected cash flows from its businesses.

**October 7, 2008**

463. Market commentators and analysts were quoted in an October 7, 2008 *Bloomberg News* story indicating that RBS would need a massive new inflow of capital due to losses and impairments on mortgage-related assets, tied to the U.S. housing market, including subprime, and that the previously undisclosed need for additional capital could result in RBS being nationalized or becoming insolvent:

> "**They [RBS] are perceived as one of the banks that is having more trouble funding**," said Bruno Paulson, a London-based analyst at Sanford C. Bernstein & Co. "Like most banks, **they are currently dependent on government funding**, and the issue is the price that the government will ultimately extract for its support."

> **RBS Chief Executive Officer Fred Goodwin was among bankers who met late yesterday with Chancellor of the Exchequer Alistair Darling and Bank of England Governor Mervyn King to discuss the industry's capital needs, three people with knowledge of the situation said**. Standard & Poor's cut the bank's credit rating for the first time in 10 years, saying RBS is "less well positioned than some of its major global peers" as it seeks capital.

> **RBS faces rising defaults and a slumping housing market in the U.K. and the U.S.**, where it makes about 10 percent of its pretax earnings. The bank may have **$1 billion of bad loans** at the U.S. consumer and commercial banking unit in the second half, according to Sanford C. Bernstein & Co.

> *                *                *

> "They are in the eye of the storm," said Robert Talbut, who manages 31 billion pounds at Royal London Asset management, including RBS.

*      *      *

U.S. Defaults

RBS gets about 10 percent of its profit in the U.S., where loan
defaults are surging on the steepest housing slump since the Great
Depression.

*      *      *

"**The market is implying that RBS will be the next to go**," said
Mamoun Tazi, a London-based analyst at MF Global Securities,
who has a "buy" rating on the stock. "There is a loss of confidence
by investors."

464.     The information contained in the above news reports indicated that RBS would

need to engage in another massively dilutive capital raising process. This information continued

to reveal the inadequacy of the Rights Issue and the full impact of those writedowns identified on

April 22, 2008, and to reveal the falsity of the Exchange Act Defendants' statements made since

April 22, 2008 concerning RBS's capital ratios, adequacy and targets and their omissions

regarding the Company's inadequate capitalization. Moreover, the indication that additional

capital was required, despite RBS's management's statements to the contrary, revealed an

undisclosed crisis of confidence in the Company's senior executives and prompted reports of a

management shake-up.

465.     These announcements, all of which were issued or published between the closing

of the financial markets on Monday, October 6, 2008, and the closing of those markets on

Tuesday, October 7, 2008, caused RBS securities to decline materially on Monday, October 7,

2008. RBS shares trading on the London Exchange declined by £0.58 (or 39%), to close at

£0.90, on extremely high trading volume of 504 million shares. This decline was statistically

significant when compared to the movement of comparable stock indexes on October 7, 2008.

466.     Notwithstanding the disclosures described above, the prices of RBS securities continued to be inflated because the Exchange Act Defendants had not yet confirmed that such a capital raise was necessary nor had they revealed to the market, among other things, that RBS continued to report goodwill that was inflated by £7.7 billion, that RBS acquired materially overvalued "toxic" assets from ABN AMRO (causing the goodwill specifically attributed to ABN AMRO to be materially overstated in violation of IFRS) and further that ABN AMRO's "value-in-use" had declined along with the expected cash flows from its businesses.

**October 13, 2008**

467.     Between October 8, 2008 and Monday, October 13, 2008 there were additional reports that RBS would receive "rescue capital" from the U.K. government and that Goodwin and McKillop would be replaced in a management shake-up at RBS in connection with capital to be provided by HM Treasury.  Some reports indicated that Stephen Hester, CEO of British Land, would become CEO and Philip Hampton, chairman of food retailer J. Sainsbury, would become chairman.

468.     However, in an attempt to confound these rumors and to apparently restore confidence in RBS's senior executives, on October 8, 2008, RBS issued a statement denying these rumors: "We have been uniquely focused on working with government and the other banks to bring stability to the system.  Management changes have not been a feature of these discussions."

469.     An October 10, 2008 article in *The Wall Street Journal* reported that if RBS agreed to accept capital from HM Treasury it would be a significant reversal of Goodwin's prior statements:

> Royal Bank of Scotland Group PLC's chief executive, Fred Goodwin, is walking a tightrope. **After saying for months that his bank was in good shape, he is expected to be among the**

**most likely to go hat in hand to the government for funding under the U.K.'s ambitious new bailout plan.**

470.     Confirming investors' worst fears and the most severe rumors, before the financial markets opened in London on Monday, October 13, 2008, RBS issued a statement confirming that it would raise a total of £20 billion pounds, with £15 billion in ordinary shares to be sold, underwritten by the U.K. government (HM Treasury), at 65.5 pence each, and £5 billion to be raised through the sale of Preference Shares to HM Treasury. RBS also confirmed that Defendants Goodwin and Cameron would resign and that Defendant McKillop would retire as of April 2009. In the statement, McKillop admitted stated that "**We regret having to raise new capital but believe that decisive action is necessary.**"

471.     The information contained in the above disclosure confirmed that RBS would raise £20 billion through the massively dilutive Rights Issue and preference share offering. This information continued to reveal the inadequacy of the Rights Issue and the full impact of those writedowns identified on April 22, 2008, and to reveal the falsity of the Exchange Act Defendants' statements made since April 22, 2008, concerning RBS's capital ratios, adequacy and targets and their omissions regarding the Company's inadequate capitalization. Moreover, the admission that additional capital was required and that Goodwin, Cameron and McKillop would all leave RBS, despite RBS's prior statements about the Company's capital adequacy, confirmed that RBS's senior executives were determined to be responsible for the Company's lack of capital and misleading and incomplete disclosures concerning that issue.

472.     The effect of RBS's disclosure that it would raise an additional £20 billion in capital which was published between the closing of the London financial markets on Friday, October 10, 2008, and the opening of those markets on Monday, October 13, 2008, caused RBS shares to decline materially on October 13, 2008. RBS shares trading on the London Exchange

declined by £0.06 (or 8.4%), to close at £0.66, on extremely high trading volume of 459 million shares.

473.     Notwithstanding the disclosures described above, the prices of RBS securities continued to be inflated because the Exchange Act Defendants had not yet confirmed that such a capital raise was necessary nor had they revealed to the market, among other things, that RBS continued to report goodwill that was inflated by £7.7 billion, that RBS acquired materially overvalued "toxic" assets from ABN AMRO (causing the goodwill specifically attributed to ABN AMRO to be materially overstated in violation of IFRS) and further that ABN AMRO's "value-in-use" had declined along with the expected cash flows from its businesses.

**January 19, 2009**

474.     As detailed above in Section VI.H, on Monday, January 19, 2009, prior to the opening of the financial markets in London, RBS announced that it was predicting a loss of £28 billion for 2008, the largest in U.K. history.  The January 19, 2009 disclosures announced belated asset writedowns and impairments, including the impairment of billions of pounds in goodwill related to acquisitions.  These disclosures revealed that Defendants' prior statements had been materially false and misleading and omitted to disclose certain material information, specifically, statements regarding the Company's financial disclosures and financial statements, and statements regarding the stability of the Company's business and assets (made as recently as November 4, 2008).  The writedowns and impairments first disclosed on January 19, 2009, related to assets that had been carried on RBS's balance sheet at inflated values, causing RBS's class period financial results and financial statements to be materially overstated in violation of IFRS.

475.     The disclosures occurring on January 19, 2009, all of which were issued or published between the closing of the financial markets on Friday, January 16, 2009 and the

closing of those markets on Monday, January 19, 2009, caused RBS securities to decline materially on January 19, 2009, and for the remaining artificial inflation in those securities to be dissipated. RBS shares trading on the London Exchange declined by £0.23 (or 65%), to close at £0.12, on extraordinarily high trading volume of 743 million shares. This decline was statistically significant when compared to the movement of comparable stock indexes on January 19, 2009.

476.    At all times relevant hereto, RBS ADRs, which were listed and traded on an efficient market in the NYSE, moved in proportion to those Ordinary Shares trading on the London Exchange. Loss causation on the ADRs is thus proportionate to and consistent with those allegations contained in the foregoing.

477.    These price declines were directly and proximately caused by the disclosures discussed above and were not caused by industry news, randomness, or by RBS-related information unrelated to the alleged fraud. Each of the above-referenced disclosures partially corrected the false and misleading information, or revealed material information that was required to be disclosed but was not.

## XIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

478.    With respect to Plaintiffs' claims brought under the Exchange Act and Rule 10b-5, Plaintiffs are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Exchange Act Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in efficient markets;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     without knowledge of the misrepresented or omitted material facts, Plaintiffs and the other members of the Class purchased or otherwise acquired RBS securities between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which time the price of RBS securities was inflated by Defendants' misrepresentations and omissions.

479.     At all relevant times, the global markets for RBS publicly traded securities were efficient for the following reasons, among others:

(a)     RBS's securities were actively traded on several exchanges worldwide, including the London Stock Exchange and in the United States in the form of ADSs;

(b)     As a registered and regulated issuer of securities, RBS filed periodic public reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;

(c)     RBS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)     RBS was followed by numerous securities analysts employed by major brokerage firms, including Citigroup, Deutsche Bank, Merrill Lynch, and Morgan Stanley.

480.     As a result of the foregoing, the market for RBS's securities promptly digested current information regarding RBS from all publicly available sources and reflected such

information in RBS's securities prices.  Under these circumstances, all purchasers and acquirers of RBS's securities during the Exchange Act Class Period suffered similar injury through their purchase or acquisition of RBS's securities at artificially inflated prices and a presumption of reliance applies.

## XIV.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

481.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the statements pleaded herein were statements of historical fact and/or representations about the Company's present status to which the statutory safe harbor does not apply.

482.    To the extent any of the statements pleaded herein may properly be classified as forward-looking statements to which the statutory safe harbor applies: (a) those statements were not accompanied by meaningful cautionary statements identifying the important then present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (b) the particular speakers of such statements knew in each case that their statements were false or misleading, and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

483.    Any purported warnings contained in or accompanying any of the press releases, periodic financial reports and financial statements, offering materials and other statements described herein were generic and unparticularized boilerplate statements which lacked the meaningful cautionary language necessary to insulate any purportedly forward-looking statements.

# COUNT I

## AGAINST THE EXCHANGE ACT DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER

484.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations.

485.     During the Exchange Act Class Period, RBS and the Individual Defendants, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud upon plaintiffs and other members of the Class, and made various untrue and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and other Class members as set forth above.  The purpose and effect of this scheme was to induce plaintiffs and the Class to purchase RBS securities at artificially inflated prices.

486.     During the Exchange Act Class Period, RBS and the Individual Defendants, pursuant to their plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or caused to be issued statements to the investing public as described above.

487.     RBS and the Individual Defendants knew and/or recklessly disregarded the falsity of the foregoing statements.  As senior officers and/or directors of the Company, involved in its operations, the Individual Defendants had access to the non-public information detailed above.

488.     Throughout the Exchange Act Class Period, RBS acted through the Individual Defendants, whom it portrayed and represented to the press and public as its valid representatives.  The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to RBS, which is primarily responsible for the securities law violations of the Individual Defendants while acting in their official capacities as Company

representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of respondeat superior.

489.     Each of RBS and the Individual Defendants each knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in RBS securities.  Had the adverse facts RBS and the Individual Defendants concealed been properly disclosed, RBS's securities would not have sold at the artificially inflated prices at which they sold during the Exchange Act Class Period.

490.     As a result of the foregoing, the market price of RBS securities was artificially inflated during the Exchange Act Class Period.  In ignorance of the false and misleading nature of the representations, plaintiffs and other members of the Class relied, to their detriment, on the integrity of the market as to the price of RBS securities.

491.     Had plaintiffs and the other members of the Class and the marketplace known of the true operating and financial results of RBS, which, due to the actions of defendants were not disclosed, plaintiffs and the Class would not have purchased or otherwise acquired their RBS securities during the Exchange Act Class Period or, if they had acquired RBS securities during the Exchange Act Class Period, they would not have done so at the artificially inflated prices at which they purchased their stock during the Exchange Act Class Period.  Hence, plaintiffs and the Class were damaged by said defendants' violations of Section 10(b) and Rule 10b-5.

492.     Plaintiffs and the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions and other fraudulent conduct alleged herein.  The decline in the price of RBS's securities was caused by the public dissemination of the true facts, which were previously concealed or hidden.  Absent

182

RBS and the Individual Defendants' wrongful conduct, plaintiffs and the Class would not have been injured.

493.     The price of RBS securities declined materially upon public disclosure of the true facts that had been misrepresented or concealed, as alleged in this complaint.  Plaintiffs and other members of the Class have suffered substantial damages as a result of the wrongs alleged herein.

494.     By reason of the foregoing, RBS and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

495.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations.

496.     By reason of their status as officers, members of senior management and/or directors of RBS, the Individual Defendants were "controlling persons" of RBS within the meaning of Section 20 of the Exchange Act and had the power and influence to cause RBS to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of RBS's business, the information contained in its filings with the SEC and public statements about its business.  The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, and press releases and public filings alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  RBS was controlled by the Individual Defendants and all of its employees.

497.     In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore are presumed to have had the power to control or

influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

498.     As set forth above in Count I, RBS violated Section 10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of RBS, the Individual Defendants are liable for the Company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged in Count I, pursuant to Section 20(a) of the Exchange Act.

499.     As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Exchange Act Class Period.

## XV.     SECURITIES ACT CLAIMS RELATING TO THE PREFERRED SHARE OFFERINGS

500.     Preferred Share Lead Plaintiffs Jay Freeman, Ravi Srinivasan, Sheldon Cantor, Jeff Hathorn and Michael Mancini assert claims under Sections 11, 12(a)(2) and 15 of the Securities Act against the Preferred Share Offerings Defendants (as defined in ¶ 101) on behalf of all persons who purchased or otherwise acquired RBS Non-cumulative Dollar Preference Shares pursuant or traceable to the April 8, 2005 Registration Statement for any of the following preferred share offerings: Series Q, effective May 22, 2006; Series R, effective December 18, 2006; Series S, effective June 26, 2007; Series T, effective September 24, 2007; and Series U, effective September 28, 2007 (collectively, the "Preferred Share Offerings").

501.     The Securities Act claims arising from the Preferred Share Offerings are strict liability and/or negligence claims against the Preferred Share Offerings Defendants.  For the purposes of the Securities Act claims, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these claims

are based solely on claims of strict liability and/or negligence under the Securities Act. Plaintiffs incorporate Sections I through IVand XX through XXI into, and exclude Sections VI-XIV from their allegations.

502. The offering materials for the Preferred Share Offerings were materially false and misleading because they contained untrue statements of material fact and omitted to state other material facts required to be stated therein or necessary to make the statements contained therein not misleading. These include, without limitation, the following materially false and misleading statements and omissions of material fact:

(a) RBS claimed its business philosophy was to maintain a strong capital base, to expand it as appropriate and to utilize it efficiently throughout its activities to optimize the return to shareholders while maintaining a prudent relationship between the capital base and the underlying risks of the business. In fact, at all times material to the Preferred Share Offerings, RBS was accumulating billions of dollars of exposure to subprime loans and retained interests in collateralized debt obligations and other asset-backed securities comprised of U.S., U.K. and European residential real estate loans classified as subprime, non-conforming and Alt-A loans (collectively "subprime assets"). In light of the risks presented by its subprime activities, RBS's representations concerning its business philosophy of maintaining a strong capital base and a prudent relationship between its capital base and the risks underlying its business were false and misleading.

(b) RBS's accumulation of subprime assets created undisclosed material concentrations of risk. RBS was required to disclose these concentrations of risk in the offering documents for the Preferred Shares under U.S. securities law and applicable accounting standards.

(c) RBS claimed in the offering documents for the Preferred Shares to have extensive internal control procedures to review, monitor and manage the Company's credit risk. These representations were false. RBS's internal risk control procedures were incapable of accurately reviewing, monitoring or managing RBS's exposure to credit risk. RBS should have, but failed to disclose that its procedures could not be relied on to limit credit risk because the procedures did not actually exist, were not being followed or were otherwise ineffective in preventing RBS from developing material concentrations of undisclosed risk.

(d) RBS's financial statements were not fairly presented under applicable accounting standards. RBS did not present the financial statements that formed part of the offering materials for the Preferred Share Offerings in accordance with International Financial Reporting Standards (IFRS), including International Accounting Standards (IAS) and the International Accounting Standards Board Framework (IASB Framework), and RBS's internal controls did not ensure that the financial statements were fairly presented.

(e) ABN AMRO had billions of dollars of undisclosed subprime assets on its books. RBS announced the takeover of ABN AMRO, but did not disclose that RBS would take on billions of dollars of additional subprime assets when it acquired ABN AMRO, and that these additional subprime assets would materially increase RBS's existing undisclosed concentration of risky subprime assets. RBS also failed to disclose that it lacked the internal controls to detect, monitor and manage the increased concentration of credit risk resulting from the acquisition of ABN AMRO's subprime assets.

(f) RBS's representations concerning the economic and strategic benefits of the ABN AMRO acquisition were false and misleading because RBS's risk management systems were incapable of detecting, monitoring and managing the concentration of existing subprime

assets on RBS's books or the additional subprime assets RBS would acquire through the ABN
AMRO acquisition.

503.     Preferred Share Lead Plaintiffs and all other purchasers of the Preferred Shares in
the proposed Class suffered significant losses as a result of the Preferred Share Offering
Defendants' materially false and misleading statements and omissions of material fact.

**XVI.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS
RELATING TO THE PREFERRED SHARE OFFERINGS**

**A.      RBS Accumulated Billions of Dollars of Subprime Assets
While Assuring Investors That the Company Maintained
A Strong Capital Base and Controlled for Risk**

504.     RBS was a conservative regional Scottish bank before Sir Fred Goodwin became
CEO in 2001.  Under Goodwin's leadership, RBS completed twenty-six acquisitions by the end
of 2007.  By purchasing rival banks and expanding its investment banking division, RBS grew to
become the tenth largest company in the world with operations throughout Europe, the U.S. and
Asia.

505.     Throughout its period of rapid growth, RBS represented in public filings that its
business philosophy was to maintain a strong capital base that balanced the underlying risks of
the business and optimized return to shareholders.  RBS claimed to have extensive internal
control procedures in place at the Board and senior executive levels to authorize, manage,
oversee, assess and report on RBS's exposure to credit risk (the risk of loss due to non-payment
on a loan).  These procedures supposedly included the approval, monitoring and review of all
credit exposures and more frequent review of lower-quality exposures.  Portfolio analysis and
reporting were purportedly used to identify and manage credit risk concentrations and changes in
credit risk quality, and an executive-level committee was tasked with undertaking a regular
assessment of each of the Company's divisions to ensure that its credit risk management

framework complied with RBS's standards and was appropriate for the business being undertaken. RBS represented that its Board was ultimately responsible for RBS's internal controls, which were established to ensure that any significant risks faced by RBS were properly identified, evaluated and managed.

506. A significant part of RBS's expansion occurred in the United States. One of RBS's U.S. affiliates, Greenwich Capital Markets (recently renamed RBS Securities), is an investment bank / broker-dealer based in Connecticut. Beginning in 2003, Greenwich generated vast profits by pooling mortgages and securitizing them into collateralized debt obligations ("CDOs"). The market for mortgage-backed CDOs grew quickly during the U.S. housing boom. Unlike the traditional home loan model in which the loan originator (typically a bank) holds the note until it matures, the risk of borrower default transfers to investors when mortgages are pooled together into CDOs. CDOs that are backed by subprime assets present a high risk because they are based on loans made to borrowers who are more likely than others to default on repayment.

507. Much of the debt that Greenwich repackaged into CDOs was backed by subprime loan portfolios. In the peak years of underwriting mortgage-backed securities (2005 and 2006), Greenwich was ranked the second largest domestic underwriter. Only Lehman Brothers originated more subprime securities during that time. By 2007, Greenwich had underwritten $188 billion of subprime mortgage-backed securities.

508. RBS's system of annual cash bonuses encouraged bankers to buy up assets with insufficient regard to the risks involved. The manner in which bonuses were paid – on interest earned on assets – encouraged traders to take on riskier prospects that offered higher rates of return. During the time period relevant to the Preferred Share claims, Greenwich executives

earned up to $25 million a year in cash bonuses.  The head of Greenwich at the time, Jay Levine, was RBS's highest paid employee, making nearly four times as much as RBS's CEO at the time.

509.    Another U.S. subsidiary, Citizens Financial Group, purchased collateralized mortgage obligations ("CMOs") and sold them to Greenwich.  Citizens had a CMO portfolio of more than $25 billion before the first half of 2007.

510.    Citizens also acquired Charter One Financial Inc. in 2004.  Before the acquisition, Charter One operated an Ohio subsidiary known as Equity One that specialized in the origination of subprime home loans.  Charter One kept the loans on its balance sheet and did not sell them to other banks.  As a result, these subprime loans were assets that Citizens purchased when it acquired Charter One in September 2004.

511.    Between 2003 and 2007, RBS acquired a material concentration of risk in subprime assets.  RBS told investors the opposite:  that the Company maintained a cautious approach to its retail lending markets and centered its growth on high quality residential mortgages and small business loans, that a fundamental aspect of the Company's business was controlling risk exposure, and that the Company's overall credit profile remained conservative. The extensive internal risk management procedures that were supposed to protect the Company and investors from material concentrations of risky assets did not exist, were not being followed or were otherwise ineffective in allowing RBS to identify and manage concentrations of risk.

512.    RBS senior executives were regularly questioned by securities analysts about RBS's exposure to subprime loans and related trading activity.  RBS executives consistently responded that investors had no reason to be concerned about RBS's exposure to subprime.  In fact, RBS told investors that the Company had a "longstanding aversion to subprime lending,

wherever we do business," that Greenwich has "always been very risk averse," and that Citizens does not "do sub-prime."

513.    As the market for mortgage-backed securities became increasingly illiquid, RBS was forced to retain interests in many of the CDOs and assume the risks associated with them. By summer 2007, as the market for its CDOs dried up, RBS's subprime exposure had reached at least £34 billion—£20 billion from its investment banking division and £14 billion from Citizens.

514.    Despite deteriorating market conditions, RBS announced in April 2007 that it had joined with two other companies, Fortis SA/NV and Santander Central Hispano S.A., to submit a joint proposal for the acquisition of Dutch bank ABN AMRO.  The three companies ultimately made a €71 billion ($100 billion) offer under which RBS would acquire 38% of ABN AMRO, including its wholesale and investment banking units, for approximately $38 billion in cash and securities.

515.    RBS did not tell investors that ABN AMRO had billions of dollars of undisclosed subprime assets on its balance sheet, that the addition of these assets to RBS's own portfolio would materially increase RBS's existing undisclosed concentration of subprime assets, or that RBS's existing capital base could not withstand the additional risk the Company would take on when it acquired ABN AMRO.  Instead, with no reasonable basis for doing so, RBS told investors that the acquisition would result in profitable "synergies" between the companies.

516.    RBS conducted minimal due diligence on the ABN AMRO acquisition over a few days in late April and early May 2007.  In the months that followed, the U.S. subprime crisis worsened and the credit crisis spread to Europe.

517. RBS nonetheless proceeded to complete the ABN AMRO acquisition on October 17, 2007. Instead of performing additional due diligence following the changes in the market, RBS simply accepted ABN AMRO management's representations regarding ABN AMRO's financial condition, and continued to represent that the acquisition would prove beneficial for RBS and its shareholders.

**B.      RBS Announces Massive Losses Due to Its
Accumulation of Subprime Assets and Acquisition of
<u>ABN AMRO and Is Bailed Out by the British Government</u>**

518. The acquisition of ABN AMRO, with its subprime portfolio, in combination with RBS's own growing portfolio of subprime assets and inadequate internal risk controls, ultimately led to the collapse of RBS, with the Company suffering the largest losses in British corporate history and requiring partial nationalization by the British government.

519. On January 19, 2009, RBS disclosed that it expected to report a 2008 full-year loss as high as £28 billion, in large part due to a write-off of goodwill associated with the ABN AMRO acquisition, as well as an £8 billion writedown associated with subprime loans in the U.S. and elsewhere. When RBS published its financial results for fiscal year 2008 in February 2009, it provided a detailed breakdown of the Company's subprime assets. The Company's losses totaled £26.9 billion, which included charges to goodwill totaling £16.2 billion, broken down for the acquisitions of ABN AMRO (£7.7 billion), Citizens/Charter One (£4.4 billion) and NatWest/Greenwich (£2.7 billion).

520. Until RBS announced these losses in January 2009, it had continued to downplay the combined impact of the Company's exposure to subprime, lack of adequate internal risk controls, and the ABN AMRO acquisition on the Company's bottom line and future business prospects.

521. In December 2007, RBS announced that RBS and ABN AMRO would be taking writedowns of £950 million and £300 million, respectively, attributable to exposure to the U.S. subprime mortgage markets. RBS reported that the CDOs that were the subject of the writedown were largely based on asset-backed securities issued between 2004 and June 2006. At the same time, RBS minimized the associated credit risks and RBS's exposure. RBS represented that the integration of ABN AMRO was progressing well and that transaction benefits were higher than forecast. On an investor call the same day, RBS senior executives reassured investors and analysts that despite the "conservative and prudent" writedowns, RBS expected to be comfortably ahead of forecasts of £9.78 billion for the year and that the acquisition of ABN AMRO appeared to be even more attractive and relevant than it was before. Securities analysts and the media viewed the writedown announcement and the accompanying statements of executives as consistent with prior statements of RBS management downplaying RBS's exposure to risky subprime lending and investment activity.

522. When RBS announced additional writedowns of £5.9 billion (nearly $12 billion) due to the Company's exposure to subprime assets in April 2008, the Company also announced the £12 billion (some $23.9 billion) Rights Issue to increase RBS's capital base. (A rights issue allows existing shareholders to buy a proportional number of additional securities at a specified price within a fixed time period.) The Rights Issue, which was, at the time, the largest rights issue in European history, succeeded in infusing RBS with additional capital to offset the writedowns. Notwithstanding the writedowns, RBS's management told investors and analysts that the businesses the Company acquired in the ABN AMRO acquisition were good, synergized well with RBS's existing business and improved RBS's opportunities going forward.

523.    In October 2008, RBS confirmed that it would receive a bailout from the British

government.  The U.K.'s economics and finance ministry, known as HM Treasury, confirmed

that the government would recapitalize RBS in order to prevent a possible collapse of the British

banking system.  RBS nonetheless continued to report that integration of the ABN AMRO

businesses within RBS was "proceeding ahead of schedule."

524.    As part of the government's £20 billion bailout, Goodwin was replaced as CEO

and the retirement of Chairman of the Board, Defendant Sir Thomas Fulton McKillop, also a

defendant, was announced.  Nearly all of RBS's board members and senior executives were also

ousted from the Company.

525.    Former Chairman McKillop has identified two factors that contributed to the

Company's downfall.  The first was a capital base that was "low relative to the size of our

balance sheet."  The second was the acquisition of ABN AMRO.

526.    New RBS CEO Stephen Hester confirmed that the Company's record losses were

due, in equal part, to RBS's significant exposure to subprime loans and the ABN AMRO

acquisition.  Hester also acknowledged RBS's insufficient internal controls: "With respect to risk

concentrations, I would say to you that, if I've had a negative surprise in getting inside RBS, it is

that the – some of the risk concentrations are inappropriate, and we have to work our way

through that.  That obviously was in part a result of putting two big wholesale banks together at a

time when it was then not possible to take the exposures down, given market dislocations post

the ABN AMRO acquisition."

527.    The conduct of former RBS executives and the adequacy of the Company's

disclosures about its exposure to subprime assets are the subject of ongoing formal investigations

by the SEC, the New York State Attorney General and the U.K. Financial Services Authority, as well as the subject of testimony before the U.K. House of Commons Treasury Committee.

528.    On February 10, 2009, Goodwin testified before the Treasury Committee.  He admitted that RBS had a risk calibration issue.

529.    RBS CEO Hester testified before the Treasury Committee the next day.  Hester stated:  "I think, frankly, that the risk-management systems at RBS need a lot of change, and I cannot do it all in a couple of weeks."  He testified that one of the Company's weaknesses had been "some very big elements of control," including "[c]ontrol of risk and rules on size and concentration, types of risk and amounts of risk…."

### C.    Preferred Share Purchasers Suffer the Consequences of RBS's Materially False and Misleading Statements and Material Omissions

530.    RBS raised more than $5.3 billion from the series of preferred stock issuances it sold to Plaintiffs and class members in 2006 and 2007.  The Preferred Shares were marketed to and largely purchased by individuals like Plaintiffs, who were looking for conservative fixed income investments.  The Series Q, R, S and T Preferred Shares were offered at $25 per share and initially traded at that amount after the offerings.  By January 19, 2009, the Series Q, R, S and T Preferred Shares had lost approximately 80% of their value.  The Series U Preferred Shares were offered at $100,000 per share and initially traded at that amount after the Series U offering.  By January 19, 2009, the Series U preferred shares had lost 61% of their value.

## XVII.  THE MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE PREFERRED SHARE OFFERING MATERIALS

### A.    The April 8, 2005 Registration Statement

531.    The Registration Statement that RBS filed with the SEC on April 8, 2005 was a "shelf" registration, which permitted RBS to sell securities in one or more offerings up to a total dollar amount of $10 billion.  A shelf registration permits the registrant to register offerings of

securities in advance of offering those securities to the public on a continuous or delayed basis, amending the registration statement as required to ensure that accurate information is disseminated to purchasers. The issuer is then permitted to offer the securities over time with different pricing and terms, up to the total amount of the original registration. Only "seasoned" issuers with a history of reporting to the SEC and with more than $700 million in worldwide market value are allowed to use the shelf registration procedure. Shelf registrations require continuing disclosure to ensure that investors receive current information as to each offering despite the gap between registration and selling dates. Issuers may satisfy this requirement by incorporating certain of the company's other filings with the SEC into the registration statement.

532. The April 8, 2005 Registration Statement incorporated RBS's comprehensive annual reports on Form 20-F and certain of its periodic Form 6-K updates into each preferred share offering:

- **Series Q**: Annual Report on Form 20-F for 2005, filed with the SEC on April 26, 2006; and Report on Form 6-K, filed with the SEC on May 24, 2006.

- **Series R**: Annual Report on Form 20-F for 2005, filed with the SEC on April 26, 2006; Annual Report on Form 20-F/A for 2005 (as restated), filed with the SEC on September 27, 2006; Report on Form 6-K, filed with the SEC on November 9, 2006; Interim Report on Form 6-K for the first six months of 2006, filed with the SEC on November 9, 2006; and Report on Form 6-K, filed with the SEC on December 21, 2006.

- **Series S**: Annual Report on Form 20-F for 2006, filed with the SEC on April 24, 2007; and Report on Form 6-K, filed with the SEC on June 27, 2007.

- **Series T**: Annual Report on Form 20-F for 2006, filed with the SEC on April 24, 2007; Interim Report on Form 6-K for the first six months of 2007, filed with the SEC on August 15, 2007; and Report on Form 6-K, filed with the SEC on September 27, 2007.

- **Series U**: Annual Report on Form 20-F for 2006, filed with the SEC on April 24, 2007; Interim Report on Form 6-K for the first six months of 2007, filed with the SEC on August 15, 2007; Report on Form 6-K, filed with the SEC on September

25, 2007; Report on Form 6-K, filed with the SEC on October 4, 2007; and Report on Form 6-K, filed with the SEC on February 28, 2008.

**B.**      **May 22, 2006: The Series Q Offering**

533.      On May 16 and 22, 2006, respectively, RBS filed with the SEC the Prospectus and Prospectus Supplement for the Series Q Preferred Share offering.  The Series Q Prospectus and Prospectus Supplement form a part of the Registration Statement.  The Series Q Prospectus and Prospectus Supplement contained untrue statements of material fact and omitted to state material facts required to be stated therein, or necessary to make the statements contained therein not misleading, for the reasons set forth below.

534.      2005 Form 20-F.  The Series Q Prospectus incorporated the 2005 Annual Report on Form 20-F that RBS filed with the SEC on April 26, 2006.

535.      With respect to credit quality, the 2005 Form 20-F represented that RBS's "[o]verall credit quality remained strong in 2005" (p. 9), and that "[r]isk elements in lending and potential problem loans represented just 1.6% of gross loans and advances to customers (excluding reverse repos)" (p. 10).  The 2005 Form 20-F also purported to set out and quantify RBS's exposure to credit risk by asset quality, industry sector, geography, product and customer type (pp. 42-44).

536.      The foregoing statements were materially false and misleading because they failed to disclose the extent to which RBS had subprime assets in its portfolio.  During 2005 and early 2006, RBS acquired billions of dollars of subprime assets through the activities of RBS's Greenwich and Citizens subsidiaries, among others.  The 2005 Form 20-F failed to disclose the extent of subprime assets on RBS's books and the Company's potential exposure to subprime assets.  Under IFRS, "omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the

financial statements." (IAS 1, paragraph 7.)  The amount of subprime assets that RBS was acquiring during 2005 and early 2006 was material to RBS's financial statements and business prospects and should have been disclosed to investors, as the amount of RBS's subprime assets could have influenced the economic decisions investors made on the basis of RBS's financial statements.

537.    RBS's management was questioned by securities analysts and the press about the Company's exposure to subprime loans and related trading activity, and consistently represented that investors had no reason to be concerned about RBS's exposure to subprime.  The questions of financial analysts concerning RBS's exposure to subprime in periodic conference calls throughout 2006 and 2007 evidences the materiality to the securities markets of information concerning RBS's exposure to subprime.

538.    The foregoing statements were also materially false and misleading because the 2005 Form 20-F failed to disclose any concentration of credit risk arising from the billions of dollars of subprime assets in RBS'S portfolio.  IAS 32 required RBS to disclose certain information that would "assist users of financial statements in assessing the extent of risk related to both recognized and unrecognized financial instruments."  Paragraph 66 of IAS 32 stated that "for each class of financial asset, both recognized and unrecognized, an enterprise should disclose information about its exposure to credit risk, including…significant concentrations of credit risk."  Paragraph 75 of IAS 32 specified that "[c]haracteristics that may give rise to a concentration of risk include…the level of creditworthiness of group of borrowers."  Paragraph 76 of IAS 326 stated that "[d]isclosure of concentrations of credit risk includes a description of the shared characteristic that identifies each concentration and the amount of the maximum credit

risk exposure associated with all recognized and unrecognized financial assets sharing that characteristic."

539.    RBS's exposure to CDOs and subprime and Alt-A MBS trading inventories represented significant concentrations of credit risk with similar characteristics.  The weaker credit quality, unverified borrower income and sensitivity to increases in interest rates of the loans underlying these ABS created a specific risk with respect to a potential decline in residential real estate prices and increases in mortgage interest rates, particularly in the U.S. where the growth in housing prices had been so dramatic up to mid-2006 after which it began to decline.

540.    With respect to RBS's capital base, the 2005 Form 20-F represented that it was RBS's policy to "maintain a strong capital base, to expand it as appropriate and to utilize it efficiently throughout its activities to optimize the return to shareholders while maintaining a prudent relationship between the capital base and the underlying risks of the business" (p. 37).

541.    The foregoing statement was materially false and misleading because RBS failed to disclose that the Company either lacked any such policy or lacked the means to implement the policy, as RBS had and would continue to acquire billions of dollars of subprime assets from at least 2005 through 2007.  The use of RBS's capital base to acquire material amounts of high-risk subprime assets significantly increased RBS's credit exposure and concentration of credit risk. RBS's ongoing acquisition of subprime assets was inconsistent with RBS's stated policy of maintaining a strong capital base, expanding it as appropriate and utilizing it efficiently throughout its activities to optimize the return to shareholders while maintaining a prudent relationship between the capital base and the underlying risks of the business.

542.    With respect to RBS's internal controls and risk management practices, the 2005 Form 20-F represented that all credit exposures, once approved, were effectively monitored, managed and reviewed periodically against approved limits, with lower quality exposures being subject to a greater frequency of analysis and assessment (p. 40); that portfolio analysis and reporting were used to identify and manage credit risk concentrations and credit risk quality migration (p. 40); that RBS had an extensive governance framework at the Board and senior executive levels to manage RBS's exposure to credit and market risks (pp. 38-41); that RBS had established standards for credit risk management (p. 40); that an executive level committee of RBS would undertake a regular assessment of each RBS division's credit risk management framework to ensure that it complied with RBS's standards and was appropriate for the business being undertaken (p. 40); and that the Board was responsible for RBS's internal controls and had established such controls to ensure that significant risks faced by RBS were identified, evaluated and managed (p. 38).

543.    The foregoing statements were materially false and misleading because the internal controls described above either did not exist at RBS or were not being followed. Defendants repeatedly denied or minimized RBS's exposure to subprime and other lower-quality assets or failed to disclose the extent of the Company's exposure to such assets in the Company's financials.  It subsequently has been revealed that in 2005 and early 2006, RBS already had billions of dollars of subprime and other lower-quality assets on its books and was continuing to accumulate more of such assets.

544.    In connection with its announcement of £5.9 billion in writedown on April 22, 20008, RBS said that 70% of the loans backing RBS's super-senior CDOs were originated prior

to 2007.  Ultimately, it was revealed that the highest percentage of the Company's exposure to subprime and Alt-A loans were originated in 2005 and 2006.

545.    RBS's internal control failures have been confirmed by a number of senior RBS insiders.  On a January 19, 2009 conference call, CEO Hester said that he was "negatively surprised" when he joined RBS because some of the risk concentrations were inappropriate.

546.    On February 10, 2009, in his testimony before the Treasury Committee, Defendant Goodwin admitted that RBS had a risk calibration issue and that RBS's risk system was wrong when it quantified RBS's exposure to subprime assets as being very small.

547.    During his testimony before the Treasury Committee on February 11, 2009, CEO Hester testified that one of the Company's weaknesses had been "some very big elements of control," including "[c]ontrol of risk and rules on size and concentration, types of risk and amounts of risk…."

548.    An article in *The Daily Telegraph* on March 23, 2009 revealed that the manner in which bonuses were paid – on interest earned on assets – encouraged traders to take on riskier prospects which offered higher rates of return.  One former senior RBS executive stated: "The place was totally dysfunctional.  Everywhere you looked they were taking on assets – billions of dollars worth of planes, billions of dollars of ships, commercial real estate across America and Britain.  They were buying everything to meet Goodwin's targets and his targets were assets."

549.    In the 2005 Form 20-F, RBS represented that the 2005 financial statements set forth therein were fairly presented in accordance with IFRS in all material respects and that RBS had sufficient internal controls to ensure that these financial statements were in fact fairly presented.

550. The foregoing statements were materially false and misleading because RBS's 2005 financial statements included within the 2005 Form 20-F failed to comply with IFRS. Specifically, RBS's 2005 financial statements failed to provide information about the financial position, performance and changes in financial position useful to users (IASB Framework at paragraph 12), failed to provide information that was readily understandable by users (IASB Framework at paragraph 25), failed to provide reliable information that was free from material error and that could be depended upon by users to faithfully represent the financial condition of RBS (IASB Framework at paragraph 31), failed to faithfully present the transactions and other events described in the financial statements (IASB Framework at paragraph 33), and failed to present information neutrally and free from bias (IASB Framework at paragraph 36). RBS's 2005 financial statements also failed to comply with IAS 32, for the reasons discussed above (*see* ¶ 538).

551. The 2005 Form 20-F contained certifications signed by Defendants Goodwin and Whittaker, as required by the Sarbanes-Oxley Act of 2002. In those certifications, Defendants Goodwin and Whittaker certified that (1) they reviewed the filing; (2) the filing did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;" (3) the financial information and statements contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company; (4) they designed or caused to be designed appropriate internal disclosure controls over financial reporting; (5) they evaluated the effectiveness of such controls; and (6) they disclosed any material change in such controls, and

any fraud or material weakness or deficiency in such controls, to the Company's Board and to its

independent auditors.

552.     The foregoing statements were materially false and misleading at the time they

were made because, among other things: (1) RBS's 2005 Form 20-F did contain untrue

statements of material fact and omitted to state material facts as alleged herein; (2) the 2005

Form 20-F failed to disclose the extent to which RBS had subprime assets in its portfolio or the

concentration of credit risk arising from the subprime assets in its portfolio; and (3) RBS lacked

adequate internal controls over financial reporting to prevent the 2005 Form 20-F from being

false and misleading.

553.     May 24, 2006 Form 6-K.  The Series Q Prospectus incorporated the Report on

Form 6-K that RBS filed with the SEC on May 24, 2006.  The Form 6-K contained the

memoranda and articles of association of RBS, samples of the share warrants and ADRs

(American depositary receipts, which allow U.S. investors to buy shares in foreign companies)

for the Series Q preferred shares, and a resolution of the RBS Board regarding the Series Q

preferred share offering.

554.     The Form 6-K was materially false and misleading because it failed to disclose

the extent to which RBS had subprime assets in its portfolio (*see* ¶ 536-37 above), the

concentration of credit risk arising from the subprime assets in its portfolio (see ¶¶ 538-39, 545-

47 above), and RBS's lack of internal controls to mitigate or properly disclose this exposure in

the Company's financial reporting (see ¶¶ 543-48, 550 above).

**C.      December 18, 2006: The Series R Offering**

555.     On December 13 and 18, 2006, respectively, RBS filed with the SEC the

Prospectus and Prospectus Supplement for the Series R preferred share offering.  The Series R

Prospectus and Prospectus Supplement form a part of the Registration Statement.  The Series R

Prospectus and Prospectus Supplement contained untrue statements of material fact and omitted to state material facts required to be stated therein, or necessary to make the statements contained therein not misleading, for the reasons set forth below.

556.     2005 Form 20-F.  The Series R Prospectus incorporated the 2005 Annual Report on Form 20-F that RBS filed with the SEC on April 26, 2006.  The 2005 Form 20-F was materially false and misleading for the reasons set forth in ¶¶ 535-52 above.

557.     2005 Form 20-F/A.  The Series R Prospectus also incorporated the amended Form 20-F/A that RBS filed with the SEC on September 27, 2006.  The 2005 amended Form 20-F/A was materially false and misleading for the reasons set forth in ¶¶ 535-52 above.

558.     November 6, 2006 Form 6-K Interim Report.  The Series R Prospectus also incorporated the Interim Report on Form 6-K for the first six months of 2006, ended June 30, 2006, that RBS filed with the SEC on November 9, 2006.  The Form 6-K disclosed RBS's results of operations and financial results for the first six months of 2006.  In discussing these results, the Form 6-K was materially false and misleading and omitted material facts because it failed to disclose the extent to which RBS had subprime assets in its portfolio (*see* ¶ 536-37 above), or the concentration of credit risk arising from the subprime assets in its portfolio (*see* ¶ 538-39, 545-46 above).

559.     The financial statements included within the Form 6-K were materially false and misleading and failed to comply with IAS 34, which required disclosure of events and transactions that were significant to an understanding of the changes in financial position and performance of RBS since the last annual reporting period.  During the interim financial period encompassed with the Form 6-K, RBS's portfolio of subprime assets materially increased, resulting in a corresponding increase in credit risk and concentration of risk that was significant

to an understanding of the interim financial statements and that was not disclosed in the interim financial statements for the first six months of 2006.

560.     The financial statements included within the Form 6-K also failed to comply with certain provisions of the IASB Framework which requires that financial statements provide information about the financial position, performance and changes in financial position that is useful to users.  (IASB Framework at paragraph 12).  The interim report further failed to provide reliable information that was free from material error and that could be depended upon by users to faithfully represent what it could reasonably be expected to represent.  (IASB Framework at paragraphs 31, 33).  Additionally, the interim report failed to present information neutrally and free from bias.  (IASB Framework at paragraph 36).

561.     November 9, 2006 Form 6-K.  The Series R Prospectus also incorporated by reference the Form 6-K filed with the SEC on November 9, 2006 that restated certain segment disclosures contained in RBS's 2005 Form 20-F and 2005 Form 20-F/A.  The Form 6-K was materially false and misleading for the reasons set forth in ¶¶ 535-52 above.

562.     December 21, 2006 Form 6-K.  The Series R Prospectus incorporated the Report on Form 6-K that RBS filed with the SEC on December 21, 2006.  The Form 6-K contained the memoranda and articles of association of RBS, samples of the share warrants and ADRs for the Series R preferred shares, and a resolution of the RBS Board of Directors regarding the Series R preferred share offering.

563.     The Form 6-K was materially false and misleading because it failed to disclose the extent to which RBS had subprime assets in its portfolio (*see* ¶ 536-37 above), the concentration of credit risk arising from the subprime assets in its portfolio (*see* ¶¶ 538-39, 545-

46 above), and RBS's lack of internal controls to mitigate or properly disclose this exposure in the Company's financial reporting (*see* ¶¶ 543-48, 550 above).

### D.     <u>June 26, 2007: The Series S Offering</u>

564.    On June 20 and 26, 2007, respectively, RBS filed with the SEC the Prospectus and Prospectus Supplement for the Series S preferred share offering. The Series S Prospectus and Prospectus Supplement form a part of the Registration Statement. The Series S Prospectus and Prospectus Supplement contained untrue statements of material fact and omitted to state material facts required to be stated therein, or necessary to make the statements contained therein not misleading, for the reasons set forth below.

565.    With respect to the ABN AMRO acquisition, the Series S Prospectus Supplement stated that based on RBS's due diligence and the publicly available information about ABN AMRO, the combination of RBS's Global Banking & Markets group with ABN AMRO's Global Wholesale business would create a "leading corporate and institutional business with both scale and global reach." (p. 9).

566.    The foregoing statement was materially false and misleading because RBS failed to disclose that ABN AMRO had billions of dollars of undisclosed subprime assets on its balance sheet prior to the acquisition and that the addition of the ABN AMRO subprime assets to RBS's own portfolio of subprime assets would materially increase RBS's existing undisclosed concentration of subprime assets and RBS lacked sufficient internal controls to effectively manage this increased risk concentration.

567.    The foregoing statement was also materially false and misleading when made because RBS lacked an adequate basis to make representations about the benefits to RBS from the proposed acquisition. RBS's executives failed to appreciate the risk those assets presented

and RBS lacked sufficient internal controls to monitor and manage the increased concentration of credit risk resulting from the acquisition of ABN AMRO's subprime assets.

568.     On April 22, 2008, Defendant Whittaker admitted that one-third of the £5.9 billion of subprime assets written down at the end of 2007 (just a few months after the acquisition closed) were on ABN AMRO's balance sheet at the time of the acquisition.

569.     On November 20, 2008, Defendant McKillop admitted that "the acquisition increased our exposure to those wholesale markets within which many of the problems have emerged during the course of this financial crisis.  In retrospect, the higher exposure to assets, which later became very difficult to trade, and the need to fund an enlarged balance sheet as access to liquidity became increasingly difficult, increased the short-term vulnerability of the Group to the financial crisis as it intensified this year."

570.     2006 Form 20-F.  The Series S Prospectus incorporated the Annual Report on Form 20-F for the fiscal year ended December 31, 2006, filed with the SEC on April 24, 2007.

571.     The 2006 Form 20-F represented that risk elements in lending and potential problem loans represented just 1.57% of gross loans and advances to customers (excluding reverse repos) (p. 9); that portfolio risk remained stable and the corporate credit environment remained benign (p. 21); that lending growth was centered on high quality residential mortgages and small business loans (p. 23); and that low impairment losses reflected the prime quality of Citizens' portfolio (p. 28).  The 2006 Form 20-F also purported to set out and quantify RBS's exposure to credit risk by asset quality, industry sector, geography, product and customer type (pp. 43-45).

572.     The foregoing statements were materially false and misleading because they failed to disclose the extent to which RBS had subprime assets in its portfolio.  During 2006 and

early 2007, RBS acquired billions of dollars of subprime assets through the activities of RBS's Greenwich and Citizens subsidiaries, among others. The 2006 Form 20-F failed to disclose the extent of RBS's subprime assets and potential exposure to any subprime assets. Under IFRS, "omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements." The amount of subprime assets that RBS was acquiring during 2006 and early 2007 was material to RBS's financial statements and business prospects and should have been disclosed to investors, as the amount of RBS's subprime assets could have influenced the economic decisions investors made on the basis of RBS's financial statements.

573. RBS's management was questioned by securities analysts about RBS's exposure to subprime loans and related trading activity. The questions of financial analysts concerning RBS's exposure to subprime in periodic conference calls throughout 2006 and 2007 evidences the materiality to the securities markets of information concerning RBS's exposure to subprime.

574. The foregoing statements were also materially false and misleading because the 2006 Form 20-F failed to disclose any concentration of credit risk arising from the billions of dollars of subprime assets in RBS's portfolio. IAS 32 required RBS to disclose certain information that would "assist users of financial statements in assessing the extent of risk related to both recognized and unrecognized financial instruments." Paragraph 66 of IAS 32 stated that "for each class of financial asset, both recognized and unrecognized, an enterprise should disclose information about its exposure to credit risk, including…significant concentrations of credit risk." Paragraph 75 of IAS 32 specified that "[c]haracteristics that may give rise to a concentration of risk include…the level of creditworthiness of group of borrowers." Paragraph 76 of IAS 32 stated that "[d]isclosure of concentrations of credit risk includes a description of the

shared characteristic that identifies each concentration and the amount of the maximum credit risk exposure associated with all recognized and unrecognized financial assets sharing that characteristic."

575. RBS's exposure to CDOs and subprime and Alt-A MBS trading inventories represented significant concentrations of credit risk with similar characteristics. The weaker credit quality, unverified borrower income and sensitivity to increases in interest rates of the loans underlying these ABS created a specific risk with respect to a potential decline in residential real estate prices and increases in mortgage interest rates, particularly in the U.S. where the growth in housing prices had been so dramatic up to mid-2006 after which it began to decline.

576. With respect to RBS's capital base, the 2006 Form 20-F represented that it was RBS's policy to "maintain a strong capital base, to expand it as appropriate and to utilize it efficiently throughout is activities to optimize the return to shareholders while maintaining a prudent relationship between the capital base and the underlying risks of the business" (p. 38).

577. The foregoing statement was materially false and misleading because RBS failed to disclose that RBS either lacked any such policy or lacked the means to implement the policy, as RBS had and would continue to acquire billions of dollars of subprime assets from at least 2005 through 2007. The use of RBS's capital base to acquire material amounts of high-risk subprime assets significantly increased RBS's credit exposure and concentration of credit risk. RBS's ongoing acquisition of subprime assets was inconsistent with RBS's stated policy of maintaining a strong capital base, expanding it as appropriate and utilizing it efficiently throughout its activities to optimize the return to shareholders while maintaining a prudent relationship between the capital base and the underlying risks of the business.

578.     The foregoing statement was materially false and misleading because RBS failed to disclose that the ABN AMRO acquisition would further undermine RBS's stated policy of maintaining a strong capital base, utilizing it efficiently to optimize shareholder value, and maintaining a prudent relationship between the capital base and the underlying risks of the business, because RBS would be taking on the subprime assets already held by ABN AMRO presented for RBS in a deteriorating credit environment.

579.     With respect to RBS's internal controls and risk management practices, the 2006 Form 20-F represented that all credit exposures, once approved, were effectively monitored, managed and reviewed periodically against approved limits, with lower quality exposures being subject to a greater frequency of analysis and assessment (p. 41); that portfolio analysis and reporting were used to identify and manage credit risk concentrations and credit risk quality migration (p. 41); that RBS had an extensive governance framework at the Board and senior executive levels to manage RBS's exposure to credit and market risks (pp. 39-41); that RBS had established standards for credit risk management (p. 41); that an executive level committee of RBS would undertake a regular assessment of each RBS division's credit risk management framework to ensure that it complied with  RBS's standards and was appropriate for the business being undertaken (p. 41); and that the Board was responsible for RBS's internal controls and had established such controls to ensure that significant risks faced by RBS were identified, evaluated and managed (p. 39).

580.     The foregoing statements were materially false and misleading because the internal controls described above either did not exist at RBS or were not being followed.  RBS's management repeatedly denied or minimized RBS's exposure to subprime and other lower-quality assets or failed to disclose the extent of RBS's exposure to such assets in the Company's

financials. It has been revealed that in 2006 and early 2007, RBS already had billions of dollars of subprime and other lower-quality assets on its books and was continuing to accumulate more of such assets.

581. In connection with its announcement of £5.9 billion in writedown on April 22, 2008, RBS said that 70% of the loans backing RBS's super-senior CDOs were originated prior to 2007. Ultimately, it was revealed that the highest percentage of the Company's exposure to subprime and Alt-A loans were originated in 2005 and 2006.

582. RBS's internal control failures have been confirmed by a number of senior RBS insiders. On a January 19, 2009 conference call, CEO Hester acknowledged that he was "negatively surprised" when he joined RBS because some of the risk concentrations were inappropriate. On February 10, 2009, Defendant Goodwin admitted that RBS had a risk calibration issue and that RBS's risk system was wrong when it quantified RBS's exposure to subprime assets as being very small.

583. During his testimony on February 11, 2009 before Parliament, CEO Hester testified that one of the Company's weaknesses had been "some very big elements of control," including "[c]ontrol of risk and rules on size and concentration, types of risk and amounts of risk…."

584. An article in *The Daily Telegraph* on March 23, 2009 revealed that the manner in which bonuses were paid – on interest earned on assets – encouraged traders to take on riskier prospects which offered higher rates of return. One former senior RBS executive stated: "The place was totally dysfunctional. Everywhere you looked they were taking on assets – billions of dollars worth of planes, billions of dollars of ships, commercial real estate across America and Britain. They were buying everything to meet Goodwin's targets and his targets were assets."

585.     In the 2006 Form 20-F, RBS represented that the 2006 financial statements set forth therein were fairly presented in accordance with IFRS in all material respects and that RBS had sufficient internal controls to ensure that these financial statements were in fact fairly presented.

586.     The foregoing statements were materially false and misleading because RBS's 2006 financial statements included within the 2006 Form 20-F failed to comply with IFRS. Specifically, RBS's 2006 financial statements failed to provide information about the financial position, performance and changes in financial position useful to users (IASB Framework at paragraph 12), failed to provide information that was readily understandable by users (IASB Framework at paragraph 25), failed to provide reliable information that was free from material error and that could be depended upon by users to faithfully represent the financial condition of RBS (IASB Framework at paragraph 31), failed to faithfully present the transactions and other events described in the financial statements (IASB Framework at paragraph 33), and failed to present information neutrally and free from bias (IASB Framework at paragraph 36). RBS's 2006 financial statements also failed to comply with IAS 32, for the reasons discussed above (*see* ¶ 538 above).

587.     The 2006 Form 20-F contained certifications signed by Defendants Goodwin and Whittaker, as required by the Sarbanes-Oxley Act of 2002. In those certifications, Defendants Goodwin and Whittaker certified that (1) they reviewed the filing; (2) the filing did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;" (3) the financial information and statements contained in the report fairly presented, in all material respects, the financial

condition and results of operations of the Company; (4) they designed or caused to be designed appropriate internal disclosure controls over financial reporting; (5) they evaluated the effectiveness of such controls; and (6) they disclosed any material change in such controls, and any fraud or material weakness or deficiency in such controls, to the Company's Board and to its independent auditors.

588.    The foregoing statements were materially false and misleading at the time they were made because, among other things: (1) RBS's 2006 Form 20-F did contain untrue statements of material fact and omitted to state material facts; (2) the 2006 Form 20-F failed to disclose the extent to which RBS had subprime assets in its portfolio or the concentration of credit risk arising from the subprime assets in its portfolio; and (3) RBS lacked adequate internal controls over financial reporting to prevent the 2006 Form 20-F from being false and misleading.

589.    <u>June 27, 2007 Form 6-K</u>.  The Series S Prospectus incorporated the Report on Form 6-K that RBS filed with the SEC on June 27, 2006.  The Form 6-K contained the memoranda and articles of association of RBS, samples of the share warrants and ADRs for the Series S preferred shares, and a resolution of the RBS Board regarding the Series S preferred share offering.

590.    The Form 6-K was materially false and misleading because it failed to disclose the extent to which RBS had subprime assets in its portfolio (*see* ¶ 572-73 above), the concentration of credit risk arising from the subprime assets in its portfolio (*see* ¶¶ 574, 582-83 above), and RBS's lack of internal controls to mitigate or properly disclose this exposure in the Company's financial reporting (*see* ¶¶ 580-84, 586, 588 above).

E.    <u>September 24, 2007: The Series T Offering</u>

591.    On September 18 and 24, 2007, respectively, RBS filed with the SEC the Prospectus and Prospectus Supplement for the Series T preferred share offering.  The Series T

Prospectus and Prospectus Supplement form a part of the Registration Statement. The Series T Prospectus and Prospectus Supplement contained untrue statements of material fact and omitted to state material facts required to be stated therein, or necessary to make the statements contained therein not misleading, for the reasons set forth below.

592. With respect to the ABN AMRO acquisition, the Series T Prospectus Supplement stated that based on RBS's due diligence and the publicly available information about ABN AMRO, the combination of RBS's Global Banking & Markets group with ABN AMRO's Global Wholesale business would be a strong strategic fit and would enable RBS to accelerate its expansion relative to its then current strategy. RBS also represented that it had developed a clear and detailed roadmap for the integration of ABN AMRO's business into RBS and that RBS expected to generate significantly higher revenues from ABN AMRO's business. The foregoing statements were materially false and misleading for the reasons set forth in ¶¶ 566-69 above.

593. The Series T Prospectus Supplement set forth, for RBS and ABN AMRO, unaudited condensed combined balance sheets and income statements as of June 30, 2007, prepared in accordance with IFRS, that assumed the acquisition was completed on its terms. In discussing these combined results, the Series T Prospectus Supplement was materially false and misleading because it failed to disclose the extent to which RBS and ABN AMRO had subprime assets in their portfolios (*see* ¶¶ 566, 572-73 above), or the concentration of credit risk arising from the subprime assets in their portfolios (*see* ¶¶ 566, 574, 582-83 above).

594. 2006 Form 20-F. The Series T Prospectus incorporated the 2006 Annual Report on Form 20-F that RBS filed with the SEC on April 24, 2007. The 2006 Form 20-F was materially false and misleading for the reasons set forth in ¶¶ 570-88 above.

595.	<u>August 15, 2007 Interim Report on Form 6-K</u>.  The Series T Prospectus also incorporated the Interim Report on Form 6-K for the six months of 2007, which RBS filed with the SEC on August 15, 2007.

596.	The Form 6-K represented that RBS's impairment losses actually fell 2% when compared to the same period in 2006 (p. 3); that the risk elements in lending and potential problem loans represented just 1.51% of gross loans and advances to customers (excluding reverse repos), a decline from the prior year (p. 3); that portfolio risk remained stable and the corporate credit environment remained benign (p. 14); and that Citizens was not active in subprime lending and its consumer lending was to prime customers (p. 22).

597.	The foregoing statements were materially false and misleading and omitted material facts because they failed to disclose the extent to which RBS had subprime assets in its portfolio (*see* ¶ 572-73 above), or the concentration of credit risk arising from the subprime assets in its portfolio (*see* ¶ 574, 582-83 above).

598.	In discussing the interim results for the first six months of 2007, the Form 6-K discussed RBS's asset quality and credit risks.  This discussion was materially false and misleading and omitted material facts because it did not disclose or attempt to quantify the extent to which RBS had subprime assets in its portfolio (*see* ¶ 572-73 above), the concentration of credit risk arising from the subprime assets in its portfolio (see ¶ 574, 582-83 above), or that as a result of the impending acquisition of ABN AMRO, RBS's exposure to and concentration of credit risk from subprime assets in its portfolio would increase dramatically (*see* ¶ 566 above).

599.	The financial statements included within the Form 6-K were materially false and misleading and failed to comply with IFRS.  Specifically, RBS's interim 2007 financial statements failed to provide information about the financial position, performance and changes in

financial position useful to users (IASB Framework at paragraph 12), failed to provide information that was readily understandable by users (IASB Framework at paragraph 25), failed to provide reliable information that was free from material error and that could be depended upon by users to faithfully represent the financial condition of RBS (IASB Framework at paragraph 31), failed to faithfully present the transactions and other events described in the financial statements (IASB Framework at paragraph 33), and failed to present information neutrally and free from bias (IASB Framework at paragraph 36).

600.    The interim 2006 financial statements included within the Form 6-K also failed to comply with IAS 34, which required disclosure of events and transactions that were significant to an understanding of the changes in financial position and performance of RBS since the last annual reporting period (IAS 34 at paragraph 15), and material events subsequent to the end of the interim period that have not been reflected in the financial statements for the interim period (IAS 34 at paragraph 16).  During the interim financial period encompassed with the Form 6-K, RBS's portfolio of subprime assets materially increased, resulting in a corresponding increase in credit risk and concentration of risk that was not disclosed in the interim financial statements for the first six months of 2007.  In addition, RBS failed to disclose the significant decline in the value of its holdings of subprime assets that had occurred since June 30, 2007.  Because of these failures to disclose certain information required by IAS 34, the financial statements included within the Form 6-K also failed to comply with provisions of the IASB Framework.  RBS's financial statements failed to provide required information about the financial position, performance and changes in financial position that is useful to users (IAS Framework at paragraph 12), reliable information that was free from material error and that could be depended upon by users to faithfully represent what it could reasonably be expected to represent (IAS

215

Framework at paragraphs 31, 33), and present information neutrally and free from bias (IASB Framework at paragraph 36).

601. In connection with its announcement of £5.9 billion in writedown on April 22, 2008, RBS said that 70% of the loans backing RBS's super-senior CDOs were originated prior to 2007. Ultimately, it was revealed that the highest percentage of the Company's exposure to subprime and Alt-A loans were originated in 2005 and 2006.

602. The financial statements included within the Form 6-K also violated IAS 39 because they failed to properly mark-to-market the true value of RBS's portfolio of subprime assets, particularly the U.S. subprime assets. This was a violation of IAS 39's requirement that RBS consider all available observable market data in determining the value of its CDOs, including declines in the ABX indices. During the first six months of 2007, the key indices in the U.S. tracking the market value of mortgage-backed securities and CDOs, particularly the indices tracking subprime assets, has declined dramatically due to the reported rise in default rates on subprime loans and the announced bankruptcy of several subprime mortgage originators. By June 2007, the indices for subprime loans showed that these assets were being discounted by as much as 65%. However, in the Form 6-K for the first six months of 2007, RBS continued to value its subprime portfolio at full value, and failed to properly account for the significant reduction in the value of its subprime asset portfolio consistent with what was known in the market.

603. September 27, 2007 Form 6-K. The Series T Prospectus incorporated the Report on Form 6-K that RBS filed with the SEC on September 27, 2006. The Form 6-K contained the memoranda and articles of association of RBS, samples of the share warrants and ADRs for the

Series T preferred shares, and a resolution of the RBS Board regarding the Series T preferred share offering.

604.    The Form 6-K was materially false and misleading because it failed to disclose the extent to which RBS and ABN AMRO had subprime assets in their portfolios (*see* ¶¶ 566, 572-73 above), the concentration of credit risk arising from the subprime assets in their portfolios (*see* ¶¶ 566, 574, 582-83 above), and RBS's lack of internal controls to mitigate or properly disclose this exposure in the Company's financial reporting (*see* ¶¶ 580-84, 586, 588 above).

### F.    September 28, 2007: The Series U Offering

605.    On September 25 and 28, 2007, respectively, RBS filed with the SEC the Prospectus and Prospectus Supplement for the Series U Preferred Share offering. The Series U Prospectus and Prospectus Supplement form a part of the Registration Statement. The Series U Prospectus and Prospectus Supplement contained untrue statements of material fact and omitted to state material facts required to be stated therein, or necessary to make the statements contained therein not misleading, for the reasons set forth below.

606.    The Series U Prospectus Supplement is substantially similar to the Series T Prospectus Supplement and contained the same untrue statements of material fact and omissions of material fact concerning the ABN AMRO acquisition as set forth in the Series T Prospectus Supplement, which are incorporated by reference. The Series U Prospectus Supplement is materially false and misleading for the same reasons set forth above with respect to the Series T Prospectus Supplement.

607.    2006 Form 20-F.  The Series U Prospectus incorporated the 2006 Annual Report on Form 20-F that RBS filed with the SEC on April 24, 2007. The 2006 Form 20-F was materially false and misleading for the reasons set forth in ¶¶ 570-88 above.

608.     August 15, 2007 Interim Report on Form 6-K.  The Series U Prospectus also incorporated an Interim Report on Form 6-K that RBS filed with the SEC on August 15, 2007. The Interim Report on Form 6-K was materially false and misleading for the reasons set forth in ¶¶ 103-108 above.

609.     <u>September 25, 2007 6-K</u>.  The Series U Prospectus also incorporated a Form 6-K that RBS filed with the SEC on September 25, 2007 containing pro forma unaudited condensed combined financial information related to the proposed acquisition of ABN AMRO.  In discussing these combined results, the Form 6-K was materially false and misleading because it failed to disclose the extent to which RBS and ABN AMRO had subprime assets in their portfolios (*see* ¶¶ 566, 572-73 above), the concentration of credit risk arising from the subprime assets in their portfolios (*see* ¶¶ 566, 574, 582-83 above), and RBS's lack of internal controls to mitigate or properly disclose this exposure in the Company's financial reporting (*see* ¶¶ 580-84 above).

610.     <u>October 4, 2007 Form 6-K</u>.  The Series U Prospectus incorporated the Report on Form 6-K that RBS filed with the SEC on October 4, 2007.  The Form 6-K contained the memoranda and articles of association of RBS, samples of the share warrants and ADRs for the Series U preferred shares, and a resolution of the RBS Board regarding the Series U preferred share offering.

611.     The Form 6-K was materially false and misleading because it failed to disclose the extent to which RBS and ABN AMRO had subprime assets in their portfolios (*see* ¶¶ 572-73 above), the concentration of credit risk arising from the subprime assets in their portfolios (*see* ¶¶ 566, 574, 582-83 above), and RBS's lack of internal controls to mitigate or properly disclose this exposure in the Company's financial reporting (*see* ¶¶ 580-84, 586, 588 above).

612.     <u>February 28, 2008 Form 6-K</u>.  The Series U Prospectus also incorporated "any subsequent 6-K furnished to the SEC containing updated or revised pro forma financial information."  On February 28, 2008, RBS filed with the SEC a Report on Form 6-K containing pro forma financial information for RBS and ABN AMRO for 2006 and 2007.

613.     The Form 6-K was materially false and misleading because it failed to disclose the extent to which RBS and ABN AMRO had subprime assets in their portfolios (*see* ¶¶ 566, 572-73 above), the concentration of credit risk arising from the subprime assets in their portfolios (see ¶¶ 566, 574, 582-83 above), and RBS's lack of internal controls to mitigate or properly disclose this exposure in the Company's financial reporting (*see* ¶¶ 580-884, 586, 588 above).

## COUNT III

### AGAINST EACH OF THE PREFERRED SHARE OFFERINGS DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

614.     Preferred Share Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 500 to 613 above, including all Sections and Paragraphs incorporated therein, and further allege as follows.

615.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, by the Preferred Share Plaintiffs on behalf of themselves and all persons who purchased or otherwise acquired RBS Series Q, R, S, T or U Non-cumulative Dollar Preference Shares pursuant to traceable to the April 8, 2005 Registration Statement against each of the Preferred Share Offerings Defendants.

616.     This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Preferred Share Plaintiffs do not allege that the

Preferred Share Offerings Defendants acted with scienter or fraudulent intent. Preferred Share Plaintiffs expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

617. The Registration Statement for the Preferred Share Offerings, including the Preferred Share Offering Materials incorporated by reference therein at the time of each Preferred Share Offering, contained untrue statements of material facts and omitted to state other material facts necessary to make the statements made therein not misleading.

618. RBS was the registrant for each of the Preferred Share Offerings. As issuer of the shares, RBS is strictly liable to Preferred Share Plaintiffs and all other persons who purchased or otherwise acquired RBS preferred shares pursuant or traceable to the Preferred Share Offerings for the misstatements and omissions in the Registration Statement for the Preferred Share Offerings.

619. The Individual Defendants and Preferred Share Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement for the Preferred Share Offerings. Each of the Individual Defendants and Preferred Share Individual Defendants signed or authorized the signing of the Registration Statement or were identified in the Registration Statement as directors. As such, the Individual Defendants and Preferred Share Individual Defendants caused to be issued, and participated in the issuance of the Registration Statement. By reasons of the conduct alleged herein, each of the Individual Defendants and Preferred Share Individual Defendants violated Section 11 of the Securities Act.

620. The Preferred Share Offerings Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statement for the Preferred

Share Offerings. The Preferred Share Offerings Underwriter Defendants acted negligently and are liable to Preferred Share Plaintiffs and to all other persons who purchased or otherwise acquired RBS preferred shares pursuant or traceable to the Preferred Share Offerings in which each Underwriter Defendant participated.

621. The Preferred Share Offerings Defendants owed to purchasers of the preferred shares issued in the Offerings the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement for the Preferred Share Offerings, and any incorporated documents, at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading. The Preferred Share Offerings Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true, without omissions of any material facts, and were not misleading. Accordingly, the Preferred Share Offerings Defendants acted negligently and are therefore liable to Preferred Share Plaintiffs and all other persons who purchased or otherwise acquired preferred shares sold on the Offerings.

622. Preferred Share Plaintiffs and all members of the Class who purchased or otherwise acquired preferred shares sold on the Preferred Share Offerings did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by reasonable exercise of care could not have reasonably discovered such facts or conduct.

623. None of the untrue statements or omissions alleged herein was a forward-looking statement, but rather, concerned existing facts. Moreover, the Defendants named in this Count

did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

624.    Less than one year elapsed from the time that Preferred Share Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time that this action was commenced asserting claims arising out of the falsity of the Registration Statement.  Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that this action was commenced.

625.    Preferred Share Plaintiffs and all members of the Class have sustained damages. The value of the securities sold pursuant to the Preferred Share Offerings has declined substantially subsequent to and due to the Preferred Share Offerings Defendants' violations of Section 11 of the Securities Act.

626.    By reasons of the foregoing, the Preferred Share Offerings Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Preferred Share Plaintiffs and all members of the Class who purchased or otherwise acquired preferred shares pursuant or traceable to the Registration Statement.

## COUNT IV

### AGAINST EACH OF THE PREFERRED SHARE OFFERINGS DEFENDANTS FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

627.    Preferred Share Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 500 to 626 above, including all Sections and Paragraphs incorporated therein, and further allege as follows.

628.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), by the Preferred Share Plaintiffs on behalf of themselves and all persons who purchased or otherwise acquired RBS Series Q, R, S, T or U Non-cumulative Dollar Preference

Shares pursuant or traceable to the April 8, 2005 Registration Statement against each of the Preferred Share Offerings Defendants as defined in ¶ 101 above.

629.     This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Preferred Share Plaintiffs do not allege that the Preferred Share Offerings Defendants acted with scienter or fraudulent intent.  Preferred Share Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

630.     The Preferred Share Offerings Defendants were sellers, offerors, and/or solicitors of sales of RBS preferred shares offered pursuant to the Prospectus and Prospectus Supplement issued in connection with each Preferred Share Offering.

631.     The Prospectuses and Prospectus Supplements for the Preferred Share Offerings contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading.

632.     The Preferred Share Offerings Defendants owed to Preferred Share Plaintiffs and the other members of the Class who purchased RBS preferred shares in the Preferred Share Offerings, pursuant to the Prospectuses and Prospectus Supplements, the duty to make a reasonable and diligent investigation of the statements contained in those Prospectuses and Prospectus Supplements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Preferred Share Offerings Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained and incorporated by

reference in the Preferred Share Offering Prospectuses and Prospectus Supplements at the time of each offering in which they participated were true and without omissions of any material facts and were not misleading. Accordingly, the Preferred Share Offerings Defendants are liable to Preferred Share Plaintiffs and the other members of the Class who purchased RBS preferred shares in the Preferred Share Offerings in which each Preferred Share Offerings Defendant participated.

633. Preferred Share Plaintiffs and other members of the Class purchased or otherwise acquired preferred shares in the Preferred Share Offerings pursuant to materially untrue and misleading Prospectuses and Prospectus Supplements and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses and Prospectus Supplements for the Preferred Share Offerings.

634. Less than one year elapsed from the time that Preferred Share Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time that this action was commenced asserting claims arising out of the falsity of each of the Preferred Share Prospectuses and Prospectus Supplements. Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that this action was commenced.

635. By virtue of the conduct alleged herein, the Preferred Share Offerings Defendants violated §12(a)(2) of the Securities Act. Accordingly, Preferred Share Plaintiffs and the other members of the Class who purchased RBS preferred shares in the Preferred Share Offerings have the right to rescind and recover the consideration paid for their preferred shares, and hereby elect to rescind and tender their shares to the Preferred Share Offerings Defendants who participated in the respective offerings in which those preferred shares were purchased. Preferred Share

Plaintiffs and members of the Class who have sold the preferred shares that they purchased in the Preferred Share Offerings are entitled to rescissory damages.

## COUNT V

### AGAINST EACH OF THE INDIVIDUAL DEFENDANTS
### AND THE PREFERRED SHARE INDIVIDUAL DEFENDANTS
### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

636.     Preferred Share Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 500 to 635, including all Sections and Paragraphs incoporated therein, and further allege as follows.

637.     This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, by the Preferred Share Plaintiffs on behalf of themselves and all persons who purchased or otherwise acquired RBS Series Q, R, S, T or U Non-cumulative Dollar Preference Shares pursuant or traceable to the April 8, 2005 Registration Statement against the Individual Defendants and the Preferred Share Individual Defendants as defined in ¶ 63 and ¶ 102 above.

638.     This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Preferred Share Plaintiffs do not allege that the Individual Defendants or the Preferred Share Individual Defendants acted with scienter or fraudulent intent.  Preferred Share Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

639.     At all relevant times, the Individual Defendants and Preferred Share Individual Defendants were controlling persons of RBS within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants and Preferred Share Individual Defendants served as an

executive officer and/or director of RBS prior to and/or at the time of the Preferred Share Offerings.

640.     The Individual Defendants and Preferred Share Individual Defendants at all relevant times participated in the operation and management of RBS, and conducted and participated, directly and indirectly, in the conduct of RBS's business affairs.  As officers and directors of a publicly owned company, the Individual Defendants and Preferred Share Individual Defendants had a duty to disseminate accurate and truthful information with respect to RBS's financial condition and results of operations.  Because of their positions of control and authority as officers and directors of RBS, the Individual Defendants and Preferred Share Individual Defendants were able to, and did, control the contents of the Preferred Share Offering Materials, which contained materially untrue financial information, among other things.

641.     By reason of the aforementioned conduct, each of the Individual Defendants and Preferred Share Individual Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Preferred Share Plaintiffs and the other members of the Class who purchased or acquired preferred shares pursuant to the Preferred Share Offerings.  As a direct and proximate result of the conduct of RBS and the Individual Defendants and Preferred Share Individual Defendants, Preferred Share Plaintiffs and the other members of the Class suffered damages in connection their purchase or acquisition of preferred shares pursuant to the Preferred Share Offerings.

## XVIII.   SECURITIES ACT CLAIMS RELATING TO THE EXCHANGE OFFER

642.     In the allegations and claims set forth in this Section XVIII of the Complaint, Lead Plaintiffs assert strict liability and negligence claims against the Exchange Offer Defendants , pursuant to the Securities Act on behalf of the Class (as defined in Section V above).

643.     Lead Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of any of the Exchange Offer Defendants.  Lead Plaintiffs' Securities Act claims do not allege, and do not sound in, fraud, and Lead Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.

644.     The Securities Act allegations set forth below arise from the Exchange Offer, which was accomplished in the U.S. pursuant to a registration statement on Form F-4 filed with the SEC on July 20, 2007, which the SEC declared effective on October 2, 2007 (the "Exchange Offer Registration Statement"), together with the prospectus contained therein and filed with the SEC on October 4, 2007 (the "Exchange Offer Prospectus"), and the documents incorporated by reference (collectively, the "Exchange Offer Documents").  The Exchange Offer Defendants also participated in the Exchange Offer by soliciting ABN AMRO shareholders outside the U.S. to exchange their shares by use of the same false and misleading statements and omissions of material fact described below.

645.     The Exchange Offer Registration Statement provided that the Consortium would offer to exchange each ABN AMRO ordinary share and each ABN AMRO ADS "validly tendered and not properly withdrawn" for €35.60 in cash and "0.296 newly issued ordinary shares, nominal value £0.25 per share, of RBS."

646.     As of the date the Exchange Offer was effectuated, October 5, 2007, RBS ordinary shares closed at £4.77 per share in trading on the London Exchange.  The value of those RBS shares has declined significantly since that date, causing damages to those investors, including Lead Plaintiffs, whose ABN AMRO shares were converted to RBS ordinary shares pursuant to the Exchange Offer Documents.

647.     As detailed herein, the Exchange Offer Documents in their entirety, and specifically the sections set forth below, were materially false and misleading and omitted to state material facts, including those necessary to make them not misleading.

648.     The Exchange Offer Registration Statement made the following untrue representations concerning the benefits to be achieved from the acquisition of ABN AMRO:

**RBS**

RBS believes that the acquisition of the ABN AMRO Businesses will enhance [RBS's] prospects for growth, both by enabling it to accelerate existing strategies for growth and by providing attractive new opportunities**.**

\*          \*          \*

**Cost Savings and Revenue Benefits**

RBS believes that the combination of its and the ABN AMRO Businesses creates the opportunity for significant cost savings and revenue benefits. RBS believes that it will deliver cost savings amounting to €1,237 million (or €1,319 million, including its share of central cost savings), or 23% of the 2006 costs associated with the relevant ABN AMRO Businesses and *net revenue benefits amounting to €481 million, or 8% of the 2006 income associated with the relevant ABN AMRO Businesses, in the third year after completion of the offers.* RBS expects the total integration costs to be €2.57 billion (€2.73 billion including RBS's share of central integration costs).

The following table sets out the pre-tax benefits that RBS expects to gain within three years of completion of the offers as a result of the integration of the relevant ABN AMRO Businesses. . . .

| RBS | Estimated Cost Savings per Annum by end of 2010 | Estimated Net Revenue Benefits per Annum by end of 2010 |
|---|---|---|
| Global Wholesale Businesses | 11,237 | 4481 |
| International Retail Businesses | -- | -- |
| Shared Assets | 882 | -- |
| Total | 11,319 | 4481 |

**Expected Financial Impact**

Based on RBS's forecasts for business growth and transaction benefits, the acquisition of the ABN AMRO Businesses is expected to lead to 7.0% accretion in adjusted earnings (a) per RBS ordinary share and to produce a return on investment (b) of 13.2% in the third year after completion of the offers. The internal rate of return of the Transaction is expected to be 15.5% post tax.

Allowing for the acquisition of the relevant ABN AMRO Businesses, RBS's Tier 1 capital ratio is expected to be approximately 7.4% (c) at the end of 2007.

649.    In addition, the Exchange Offer Prospectus stated that part of RBS's strategic rationale for the acquisition of ABN AMRO was to create a global banking franchise that would be number one in global securitizations – the transactions that create ABS (CDOs, MBSs, etc.) and which create business for the Company through the underwriting of the ABS products created:

Strategic Rationale

RBS believes that there is a strong strategic fit between GBM and ABN AMRO's Global Wholesale Businesses.

\*       \*       \*

RBS expects that the combined business will have product leadership across a broad range of corporate banking products, benefiting from the complementary and overlapping product strengths of GBM and ABN AMRO. ***The combined business will rank*** third in all bonds and loans globally, ***first in global securitisations***, global project finance and all international bonds, second in emerging markets syndicated credits, third in foreign exchange and fifth in international cash management.

(first emphasis in original.)

650.    The Exchange Offer Defendants were responsible for the foregoing statements in the Exchange Offer Documents regarding the earnings accretion, revenue benefits and synergies that would be derived from the ABN AMRO acquisition, which were untrue or omitted to disclose material facts, for the following reasons, among others:

(a)     Given the leverage required to complete the Exchange Offer, they misstated the effect that the ABN AMRO acquisition would have on the Company's balance sheet, capital position, and overall operations, as the dislocation in the financial markets were then having, and also foreseeably would continue to have, an increasingly severe impact on RBS's business, which significantly increased investors' risk of loss in purchasing RBS securities and mitigated any real or potential benefit associated with the acquisition of ABN AMRO; and

(b)     At the time of the Exchange Offer, the ABX index had already begun to suffer material declines, other investment banks had taken huge asset writedowns on structured-products (ABS, CDOs, MBSs) and internal RBS documents reflected that the Company's own employees believed that its CDO holdings were marked at inflated prices – facts that contradicted RBS's statements that there were strategic income synergies to be gained based on the fact that a combined RBS/ABN AMRO would be the number one bank in "global securitisations."

651.     In addition to those statements quoted above, the Exchange Offer Documents incorporated by reference additional RBS SEC filings, specifically:

(a)     RBS's Form 6-K, dated March 1, 2007, reporting its annual results for the year ended  December 31, 2006;

(b)     RBS's Annual Report on Form 20-F for the year ended December 31, 2006, filed with the SEC on April 24, 2007;

(c)     RBS's Form 6-K, dated  June 5, 2007, announcing its trading update for the first half of 2007; and

(d)     RBS's Form 6-K, for the six months ended June 30, 2007, filed with the

SEC on August 15, 2007.

652.    These documents incorporated by reference into the Exchange Offer Documents

contained material untrue statements and omitted to state material facts, including such facts

necessary to make the disclosures contained therein not misleading.

653.    RBS's Form 6-K, dated March 1, 2007, reporting its annual results for the year

ended December 31, 2006 stated:

> *[W]e have retained our inherently cautious stance towards higher risk activities such as unsecured consumer lending and sub-prime credit markets more generally*. . . .   Sound control of risk is fundamental to [RBS's] business, and our results here are reassuring. We have grown average customer lending by 14% while impairment losses have increased by 10%.  *Central to this is our longstanding aversion to sub-prime lending, wherever we do business.*
>
> *     *     *
>
> *We maintained our traditional unwillingness to engage in sub-prime lending* . . . .

654.    The foregoing statements made by the Exchange Offer Defendants regarding

RBS's lack of exposure to subprime assets were untrue and omitted to disclose material facts,

including such facts necessary to make the disclosures contained therein not misleading, for the

following reasons, among others:

(a)     They falsely represented that RBS was conservative, and was not exposed

to subprime lending, when in fact, RBS had accumulated multiple billion pound exposures to

subprime loans through its inventory of ABS, including both CDO and MBS positions that were

backed primarily or significantly by subprime loans.  They also failed to disclose that this

accumulation of subprime exposures was a significant byproduct of the Company's much touted

"securitizations" franchise within GBM;

(b)     They failed to disclose that in increasing its exposure to risky U.S. subprime mortgages, RBS overrode its own internal risk management models and ignored its risk management employees' opinions to price those assets at inflated values (¶¶ 160-162);

(c)     They failed to disclose RBS's material control weakness regarding "risk concentrations," identified by Hester (¶ 225);

(d)     They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that RBS ultimately ended up with £14 billion of subprime exposure, notwithstanding the assurances that the Company had no such exposure; and

(e)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich to repackage into ABS, which ultimately exposed RBS to billions of dollars of risk related to the U.S. subprime market (¶¶ 250-252).

655.    RBS's Annual Report on Form 20-F for the year ended  December 31, 2006, filed with the SEC on April 24, 2007, included the following untrue statements regarding the Company's subprime exposures, conservative approach and risk exposures:

**Global Banking & Markets**

\*       \*       \*

Global Banking & Markets performed strongly in 2006, delivering excellent growth in income while continuing to build our strong international franchise. Total income rose by 22% to £6,826 million, contribution by 24% to £3,933 million and operating profit by 25% to £3,790 million.

GBM is a leading provider of debt financing and risk management solutions covering the origination, structuring and distribution of a wide range of assets. In 2006 we arranged over $450 billion in financing for our corporate and institutional customers, up 17% from 2005. ***We ranked first among managers of global asset-backed and mortgage-backed***

*securitizations* and fourth among managers of global syndicated loans, while among managers of international bonds we moved from thirteenth place to eighth.

\* \* \*

***Portfolio risk remained stable and the corporate credit environment remained benign.*** Impairment losses fell to £85 million, with the distribution of impairments over the course of the year reflecting recoveries in the first half.

Average risk-weighted assets grew by 11% and the ratio of operating profit to average risk-weighted assets improved from 2.6% to 2.9%.

\* \* \*

**Citizens**

\* \* \*

Impairment losses totaled £181 million ($333 million), representing just 0.31 % of loans and advances to customers and illustrating the prime quality of our portfolio. ***Underlying strong credit quality remained unchanged as our portfolio grew, with risk elements in lending and problem loans representing 0.32% of loans and advances, the same level as in 2005. Our consumer lending is to prime customers with average FICO scores on our portfolios, including home equity lines of credit, in excess of 700, and 95% of lending is secured.***

656.    The Exchange Offer Defendants were responsible for the foregoing statements regarding RBS's subprime exposures, conservative approach and risk exposures, which were untrue or omitted to disclose material facts, for the following reasons, among others:

(a)    They made untrue representations that RBS was conservative, and was not exposed to subprime lending, when in fact, RBS had accumulated multiple billion pound exposures to subprime loans through its inventory of ABS, including both CDO and MBS positions that were backed primarily or significantly by subprime loans.  They also failed to disclose that this accumulation of subprime exposures was a significant byproduct of the Company's much touted "securitizations" franchise within GBM;

(b)     They failed to disclose RBS's material control weakness regarding "risk concentrations," identified by Hester (¶ 225);

(c)     They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that RBS ultimately ended up with £14 billion of subprime exposure, notwithstanding the assurances that the Company had no such exposure; and

(d)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich to repackage into ABS, which ultimately exposed RBS to billions of dollars of risk related to the U.S. subprime market (¶¶ 250-252).

657.    RBS's Form 6-K, dated June 5, 2007, announcing its trading update for the first half of 2007, included additional untrue, positive statements regarding RBS's risk tolerances, subprime exposures and business environment:

> **Overall credit metrics remain strong**, with a benign corporate credit environment and a modest reduction in UK retail impairment losses. Total impairment losses are expected to represent a slightly lower proportion of total loans and advances.
>
> *       *       *
>
> Corporate Markets continues to perform well across its activities, with continuing strength in Global Banking and Markets and sustained good growth in UK Corporate Banking. We are continuing to invest in expanding our geographical footprint, product range and customer relationships. **Our risk profile remains conservative and the corporate credit environment is stable.**
>
> *       *       *
>
> Citizens continues to diversify its sources of income and has achieved good growth in its corporate and commercial activities, as well as in home equity lending. US retail deposit and lending volumes remain subdued but margins have stabilised. **Costs are**

> **under tight control and underlying credit metrics remain strong, reflecting the high quality of our portfolio.**

658.     The foregoing statements regarding RBS's low credit risk, conservative approach and lack of exposure to subprime assets were untrue or omitted to disclose material facts, for the following reasons, among others:

(a)     They made untrue representations that RBS was conservative, when in fact, RBS had accumulated multiple billion pound exposures to subprime loans through its inventory of ABS, including both CDO and MBS positions that were backed primarily or significantly by subprime loans.  They also failed to disclose that this accumulation of subprime exposures was a significant byproduct of the Company's much touted "securitizations" franchise within GBM;

(b)     They failed to disclose RBS's material control weakness regarding "risk concentrations," identified by Hester (¶ 225);

(c)     They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that RBS ultimately ended up with £14 billion of subprime exposure, notwithstanding the assurances that the Company had no such exposure; and

(d)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich to repackage into ABS, which ultimately exposed RBS to billions of dollars of risk related to the U.S. subprime market (¶¶ 250-252).

659.     In its Form 6-K filed with the SEC on August 15, 2007, RBS reported that its impairment losses had actually declined year-over-year:

> **Impairment losses**
> **Impairment losses fell 2% to £871 million, compared with £887 million in 2006.**

*Risk elements in lending and potential problem loans represented 1.51% of gross loans and advances to customers excluding reverse repos at 30 June 2007 (31 December 2006 - 1.57%).*

*Provision* coverage *of risk elements in lending and potential problem loans was 63% (31 December 2006 - 62%).*

\* \* \*

## CORPORATE MARKETS – GLOBAL BANKING AND MARKETS
 . . . *Portfolio risk remained stable* and the corporate credit environment remained benign. Impairment losses of £21 million were in line with the first half of 2006, a period which included significant recoveries . . .

## CITIZENS
The increasing proportion of commercial lending in our portfolio has contributed to an increase in impairment losses to £83 million ($163 million). This reflects the growth in the portfolio over the recent past and still represents just 0.29% of loans and advances to customers, on an annualized basis, illustrating the quality of our portfolio. Risk elements in lending and problem loans represent 0.35% of loans and advances, up slightly from 0.32% in 2006. *Citizens is not active in sub-prime lending, and consumer lending is to prime customers*, with average FICO scores on our portfolios, including home equity lines of credit, in excess of 700 with 96% of lending secured.

\* \* \*

### Loan impairment provisions
Operating profit is stated after charging loan impairment losses of £851 million (2006 - £889 million). The balance sheet loan impairment provisions increased in the half year ended 30 June 2007 from £3,935 million to £4,062 million, and the movements thereon were:

|  | First half 2007 £m | First half 2006 £m |
|---|---|---|
| At 1 January | 3,935 | 3,887 |
| Currency translation and other adjustments | (6) | (34) |
| Acquisitions | 7 | - |
| Amounts written-off | (768) | (737) |
| Recoveries of amounts previously written-off | 126 | 96 |
| Charge to the income statement | 851 | 889 |
| Unwind of discount | (83) | (63) |
| At 30 June | 4,062 | 4,038 |

The provision at 30 June 2007 includes £2 million (31 December 2006 - £2 million; 30 June 2006 - £3 million) in respect of loans and advances to banks.

660.    With respect to its Global Banking & Markets unit, RBS also reported in the August 15, 2007 Form 6-K, that:

> ***Portfolio risk remained stable and the corporate credit environment remained benign. Impairment losses of £21 million were in line with the first half of 2006, a period which included significant recoveries.***
>
> Average risk-weighted assets grew by 12% and the annualized ratio of operating profit to average risk-weighted assets improved from 2.8% to 3.0%.

661.    The foregoing statements contained in the August 15, 2007 Form 6-K were untrue or omitted to disclose material facts, for the following reasons, among others:

(a)    They made untrue representations that RBS was conservative, and was not exposed to subprime lending, when in fact, RBS had accumulated multiple billion pound exposures to subprime loans through its inventory of ABS, including both CDO and MBS positions that were backed primarily or significantly by subprime loans.  They also failed to disclose that this accumulation of subprime exposures was a significant byproduct of the Company's much touted "securitizations" franchise within GBM;

(b)    They failed to disclose that RBS's reported mark-to-market pricing of its senior and mezzanine U.S. subprime ABS CDO exposures were inflated, in violation of IFRS, and did not correspond with the declines in the ABX index, which had declined by at least 19% (for senior tranches) and 46% for mezzanine tranches since December 29, 2006 (¶¶ 150, 160-162);

(c)    They failed to disclose RBS's material control weakness regarding "risk concentrations," identified by Hester (¶ 225);

(d)    They failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a

major bank in the U.S., such that RBS ultimately ended up with £14 billion of subprime exposure, notwithstanding the assurances that the Company had no such exposure; and

(e)     They failed to disclose that Citizens, from late 2006, was increasingly purchasing collateralized mortgage obligations, which it would then sell to Greenwich to repackage into ABS, which ultimately exposed RBS to billions of dollars of risk related to the U.S. subprime market (¶¶ 250-252).

**COUNT VI**

**AGAINST MCKILLOP, GOODWIN, WHITTAKER, CAMERON, FISH, FISHER, PELL, BUCHAN, CURRIE, FRIEDRICH, HUNTER, KOCH, KONG, MACHALE, ROBSON, SCOTT, SUTHERLAND AND CAMPBELL FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT**

662.     Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

663.     This Count is brought pursuant to Section 11 of the Securities Act against the Exchange Offer Defendants.

664.     This claim is brought on behalf of Lead Plaintiffs and other members of the Class who, during the Class Period, acquired RBS ordinary shares issued pursuant or traceable to the Exchange Offer Documents.

665.     Defendants Fisher, Pell, Buchan, Currie, Friedrich, Hunter, Koch, Kong, MacHale, Robson, Scott, Sutherland and Campbell each signed the Exchange Offer Registration Statement.

666.     At the time the Exchange Offer Registration Statement became effective, the Individual Defendants and Defendants Fisher, Pell, Buchan, Currie, Friedrich, Hunter, Koch, Kong, MacHale, Robson, Scott and Sutherland were each directors of RBS.

667.     As set forth above, the Exchange Offer Documents contained untrue statements of material fact.  In addition, the Exchange Offer Documents omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading.

668.     Defendants named in this Count owed to Lead Plaintiffs and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Exchange Offer Registration Statement, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

669.     These defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Exchange Offer Registration Statement, and did not possess reasonable grounds for believing that the Exchange Offer Registration Statement did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

670.     The individuals named above, each of whom signed the Exchange Offer Registration Statement, were negligent in failing to conduct a reasonable investigation of the statements contained in the Exchange Offer Registration Statement and did not possess reasonable grounds for believing that the Exchange Offer Documents were free of untrue statements of material fact or omitted to state material facts required to be stated therein to make the statements in the Exchange Offer Documents not misleading.  In particular, they did not conduct a reasonable investigation into the accuracy of the statements regarding RBS's low credit risk and lack of subprime mortgage exposure.

671.     Lead Plaintiffs and members of the Class acquired RBS ordinary shares issued pursuant to the Exchange Offer Documents and were damaged thereby.

672. Lead Plaintiffs and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Exchange Offer Documents when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were *bona fide* offered to the public and the time this action was commenced.

673. By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiffs and members of the Class for violations of Section 11 of the Securities Act.

## COUNT VII

### AGAINST RBS AND THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

674. Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. For purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

675. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against RBS and defendants McKillop, Goodwin, Whittaker, Cameron and Fish.

676. This claim is brought on behalf of Lead Plaintiffs and other members of the Class who, during the Class Period, purchased or otherwise acquired RBS ordinary shares issued pursuant to the Exchange Offer Prospectus and similar documents.

677. RBS and McKillop, Goodwin, Whittaker, Cameron and Fish solicited the purchase of RBS ordinary shares by the use of means or instruments of transportation or communication in interstate commerce or of the mails and by means of the Exchange Offer Prospectus. RBS and McKillop, Goodwin, Whittaker, Cameron and Fish solicited the purchase

of RBS ordinary shares pursuant to the Exchange Offer Prospectus for their own financial interests.

678.     As alleged herein, the Exchange Offer Prospectus contained untrue statements of material fact.  In addition, the Exchange Offer Prospectus omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

679.     The misstated and omitted facts would have been material to a reasonable person reviewing the Exchange Offer Prospectus.

680.     Defendants RBS, McKillop, Goodwin, Whittaker, Cameron and Fish owed to Lead Plaintiffs and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Exchange Offer Prospectus, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

681.     Defendants RBS, McKillop, Goodwin, Whittaker, Cameron and Fish did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Exchange Offer Prospectus and did not possess reasonable grounds for believing that the Exchange Offer Prospectus did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

682.     RBS, Goodwin and the other Individual Defendants touted the ABN AMRO acquisition in Company announcements and at presentations leading up to the Exchange Offer, such presentations being often simulcast on the internet.

683.     Lead Plaintiffs and members of the Class tendered ABN AMRO ordinary shares in exchange for RBS ordinary shares pursuant to the Exchange Offer Prospectus and were damaged thereby.

684.     Lead Plaintiffs and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Exchange Offer Prospectus when they purchased or acquired the securities.

685.     Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

686.     By reason of the foregoing, Defendants RBS, McKillop, Goodwin, Whittaker, Cameron and Fish are liable to Lead Plaintiffs and members of the Class for violations of Section 12(a)(2) of the Securities Act.

687.     Lead Plaintiffs and Class members hereby tender their securities to their respective sellers and seek rescission of their exchanges to the extent that they continue to own such securities.  Class members who have sold their RBS ordinary shares seek damages to the extent permitted by law.

## COUNT VIII

### AGAINST INDIVIDUAL DEFENDANTS MCKILLOP, GOODWIN, WHITTAKER, CAMERON AND FISH FOR VIOLATIONS OF <u>SECTION 15 OF THE SECURITIES ACT</u>

688.     Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

689.     This Count is brought pursuant to Section 15 of the Securities Act against Individual Defendants McKillop, Goodwin, Whittaker, Cameron and Fish.

690.     RBS violated Section 11 of the Securities Act by issuing the Exchange Offer Documents, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Exchange Offer Documents.

691.     RBS violated Section 12(a)(2) of the Securities Act by soliciting the tender of ABN AMRO shares in exchange for RBS ordinary shares by means of the Exchange Offer Prospectus, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Exchange Offer Documents.

692.     McKillop, Goodwin, Whittaker, Cameron and Fish were each controlling persons of RBS when the Exchange Offer Registration Statement became effective because of their senior executive positions with RBS and their direct involvement in RBS's day-to-day operations.

693.     By virtue of the foregoing, McKillop, Goodwin, Whittaker, Cameron and Fish each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of RBS, including the content of the Exchange Offer Documents.

694.     McKillop, Goodwin, Whittaker, Cameron and Fish negligently, and without reasonable care regarding the accuracy of the information contained and incorporated by

reference in the Exchange Offer Documents, lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

695.    Lead Plaintiffs and members of the Class exchanged ABN AMRO ordinary shares for RBS ordinary shares pursuant or traceable to the Exchange Offer Registration Statement and/or pursuant to the Exchange Offer Prospectus, and were damaged thereby.

696.    Lead Plaintiffs and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Exchange Offer Registration Statement and/or the Exchange Offer Prospectus when they purchased or acquired the securities.

697.    By reason of the foregoing, the Defendants McKillop, Goodwin, Whittaker, Cameron and Fish are liable to Lead Plaintiffs and members of the Class for violations of Section 15 of the Securities Act.

**XIX.    SECURITIES ACT CLAIMS RELATED TO THE RIGHTS ISSUE**

698.    On April 22, 2008, RBS announced that it would commence the Rights Issue "made on the basis of 11 new shares for every 18 existing shares at an issue price of 200 pence per RBS share."  The Rights Issue was designed to raise an addition £12 billion in capital to offset the writedowns the Company was in the process of making and to shore up RBS's Tier 1 capital ratio.  Unbeknownst to the existing shareholders whose participation was sought in the Rights Issue, the Rights Issue Prospectus, which was published on April 30, 2008, omitted material facts regarding goodwill impairments attributable to ABN AMRO.  These false and misleading statements were designed to and did create the untrue impression that the Rights Issue would raise sufficient capital to make RBS a strong, growing company.

699.    The Rights Issue Prospectus reported historical financial data for RBS for the three-year period ending December 2007, and incorporated by reference portions of RBS's

Annual Report and Accounts for 2005, 2006 and 2007 and the Annual Report for 2007 filed on Form 20-F for ABN AMRO. The Rights Issue Prospectus and documents incorporated by reference contained the following untrue statements of material fact:

700.     As part of the Rights Issue Prospectus, Defendant Tom McKillop provided a letter to shareholders, which stated in relevant part:

> **ABN AMRO integration**
>
> Integration benefits and headcount reductions achieved during the first quarter are slightly ahead of RBS's initial expectations. Cost benefits are slightly ahead of schedule, while revenue benefits are slightly behind. ***As indicated in its announcement on 28 February 2008, RBS expects to achieve integration benefits totaling €2.3 billion by 2010, compared with its original estimate of €1.7 billion.***

701.     The foregoing statements were materially untrue when made, or omitted to state a material fact necessary in order to make the statement not misleading, in the light of the circumstances under which they were made, for the following reasons, among others:

(a)     They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO;

(b)     They failed to disclose that ABN AMRO's assets were materially overvalued at time of the acquisition in October 2007. The average price on subprime assets on ABN AMRO's books was only 26%, whereas the average price on RBS's non-investment grade subprime inventory was 46% and investment grade inventory was 89%. (¶¶ 313-314);

(c)     They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 6-K) yield increased accretion in adjusted earnings per share of 9%; and

(d)    They failed to disclose that the goodwill attributed to the ABN AMRO acquisition was being reported in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 202, 406-418).

702.    The Rights Issue Prospectus also includes a statement that "The consolidated financial statements of RBS and its subsidiaries included in the Annual Report and Accounts of RBS for each of the years ended 31 December 2007, 2006 and 2005, together with the audit reports thereon are incorporated by reference into this document."  The Annual Report and Account of RBS for the year ended 31 December 2007 (the "2007 Annual Report"), contains the same or similar materially untrue statements as those contained in RBS's 2007 Form 20-F, as described in ¶¶ 337, 339, 341.

703.    Specifically, the 2007 Annual Report reported that:

> [RBS] recognised goodwill of £23.3 billion following the preliminary allocation of fair values since acquiring ABN AMRO on 17 October 2007. ***Subsequent events have not significantly affected the assumptions and estimates supporting the consortium's investment decision and [RBS] has therefore concluded that there is no impairment of the goodwill recognized at 31 December 2007.***

704.    The foregoing statements were materially untrue when made, or omitted to state a material fact necessary in order to make the statement not misleading, in the light of the circumstances under which they were made, for the following reasons, among others:

(a)    They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO;

(b)    They did not have a basis to believe that the integration of ABN AMRO would achieve the projected synergies in light of the assets that RBS had inherited from the acquisition;

(c)     They failed to disclose that RBS knew that ABN AMRO's assets were materially overvalued at time of the acquisition in October 2007. The average price on subprime assets on ABN AMRO's books was only 26%, whereas the average price on RBS's non-investment grade subprime inventory was 46% and investment grade inventory was 89%. (¶¶ 313-314);

(d)     They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 Form 6-K) yield increased accretion in adjusted earnings per share of 9%; and

(e)     They failed to disclose that the goodwill attributed to the ABN AMRO acquisition was being reported in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 202, 406-408).

705.    As part of its discussion regarding comparison of impairment losses between 2005, 2006 and 2007, RBS reported in its 2007 Annual Report that:

**2007 compared with 2006**

*Impairment losses were £2,128 million compared with £1,878 million. Impairment losses in ABN AMRO in the period since acquisition were £263 million. Adjusting for this, impairment losses fell by £13 million, 1%.*

*       *       *

*Total balance sheet provisions for impairment, including ABN AMRO, amounted to £6,441 million compared with £3,935 million in 2006.*

Total provision coverage (the ratio of total balance sheet provisions for impairment to total risk elements in lending) decreased from 62% to 60%. The ratio of total balance sheet provisions for impairment to total risk elements in lending and potential problem loans also decreased to 56% compared with 62% in 2006. This reflects amounts written-off and the slightly lower risk profile of the portfolio.  (emphasis added)

706.     The foregoing statements were materially untrue when made, or omitted to state a material fact necessary in order to make the statement not misleading, in the light of the circumstances under which they were made, for the following reasons, among others:

(a)     They failed to disclose the magnitude of the materially overvalued "toxic" assets that RBS had acquired from ABN AMRO;

(b)     They did not have a basis to believe that the integration of ABN AMRO would achieve the projected synergies in light of the assets that RBS had inherited from the acquisition;

(c)     They failed to disclose that RBS knew that ABN AMRO's assets were materially overvalued at time of the acquisition in October 2007.  The average prices on subprime assets on ABN AMRO's books was only 26%, whereas the average price on RBS's non-investment grade subprime inventory was 46% and investment grade inventory was 89%. (¶¶ 313-314); and

(d)     They failed to disclose that the goodwill attributed to the ABN AMRO acquisition was being reported in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 202, 406-418).

707.     As in the 2007 Form 20-F, the Company reported the following regarding goodwill in the 2007 Annual Report:

**Goodwill**

[RBS] capitalises goodwill arising on the acquisition of businesses, as discussed in accounting policy 5. The carrying value of goodwill as at 31 December 2007 was £42,369 million (2006 – £17,889 million).

*       *       *

**Impairment review**

[RBS's] goodwill acquired in business combinations is reviewed annually at 30 September for impairment by comparing the recoverable amount of each cash generating unit (CGU) to which goodwill has been allocated with its carrying value.

[RBS] recognised goodwill of £23.3 billion following the preliminary allocation of fair values since acquiring ABN AMRO on 17 October 2007. ***Subsequent events have not significantly affected the assumptions and estimates supporting the consortium's investment decision and [RBS] has therefore concluded that there is no impairment of the goodwill recognized at 31 December 2007.***

708.     The foregoing statements were materially untrue when made, or omitted to state a material fact necessary in order to make the statement not misleading, in the light of the circumstances under which they were made, for the following reasons, among others:

(a)     They failed to disclose that ABN AMRO's assets were materially overvalued at time of the acquisition in October 2007.  The average prices on subprime assets on ABN AMRO's books was only 26%, whereas the average price on RBS's non-investment grade subprime inventory was 46% and investment grade inventory was 89%. (¶¶ 313-314);

(b)     They failed to disclose, correct and/or update that the acquisition of ABN AMRO would not (as previously touted by the Company in the February 28, 2008 6-K) yield increased accretion in adjusted earnings per share of 9%; and

(c)     They failed to disclose that the goodwill attributed to the ABN AMRO acquisition was being reported in violation of IFRS, because RBS failed to test or timely impair goodwill (¶¶ 202, 406-418).

## COUNT IX

## AGAINST RBS, MCKILLOP, GOODWIN, WHITTAKER AND
## THE RIGHTS ISSUE UNDERWRITER DEFENDANTS FOR
## VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

709.     Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  For purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

710.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act against RBS, McKillop, Goodwin, Whittaker and the Rights Issue Underwriter Defendants.

711.     This claim is brought on behalf of Lead Plaintiffs and other members of the Class who, during the Class Period, purchased or otherwise acquired RBS ordinary shares issued pursuant to the Rights Issue Prospectus and similar documents.

712.     RBS, McKillop, Goodwin, Whittaker and the Rights Issue Underwriter Defendants solicited the purchase of RBS ordinary shares by the use of means or instruments of transportation or communication in interstate commerce or of the mails and by means of the Rights Issue Prospectus for their own financial interest.

713.     As alleged herein, the Rights Issue Prospectus contained untrue statements of material fact.  In addition, the Rights Issue Prospectus omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

714.     The misstated and omitted facts would have been material to a reasonable person reviewing the Rights Issue Prospectus.

715.     RBS, McKillop, Goodwin, Whittaker and the Rights Issue Underwriter Defendants owed to Lead Plaintiffs and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Rights Issue Prospectus, to ensure that the statements contained or incorporated by reference therein were true and that there was no

omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

716. RBS, McKillop, Goodwin, Whittaker and the Rights Issue Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Rights Issue Prospectus and did not possess reasonable grounds for believing that the Rights Issue Prospectus did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

717. RBS issued the Rights Issue Prospectus and was an offeror and/or solicitor of sales of securities offered pursuant to the Rights Issue Prospectus. The Rights Issue Underwriter Defendants, Goodwin and McKillop were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the Prospectus. The Prospectus contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above in ¶¶ 700-08. RBS's, Goodwin's, McKillop's, Whittaker's and the Rights Issue Underwriter Defendants' actions and solicitations included participating in the preparation of the Prospectus.

718. The Underwriter Defendants are sellers within the meaning of the Securities Act because they: (a) transferred title of RBS shares to Plaintiffs and other members of the Class who purchased RBS shares; (b) transferred title of RBS shares to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants; and (c) solicited the purchase of RBS shares by Plaintiffs and other members of the Class, motivated at least in part by the desire to serve the Rights Issue Underwriter Defendants' own financial interest and the interests of RBS including, but not limited to, commissions on their own sales

of RBS securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.

719. RBS and the Rights Issue Underwriter Defendants participated in road shows to solicit the purchase of shares pursuant to the Rights Issue. Defendants McKillop, Whittaker and Goodwin also touted the Rights Issue at the general meetings leading up to the Rights Issue, including a presentation simulcast on the internet on April 22, 2008 during which McKillop detailed personal meetings with investors to solicit their participation in the Rights Issue. Defendant McKillop also touted the Rights Issue in the introductory letter to the Rights Issue Prospectus.

720. Plaintiffs and other members of the Class purchased or otherwise acquired securities pursuant to the materially false and misleading Rights Issue Prospectus and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions contained in the Rights Issue Prospectus. Had Plaintiffs known the material adverse information not disclosed by Defendants named herein, or been aware of the truth behind these Defendants' misstatements, they would not have purchased RBS securities, or would not have purchased it at artificially inflated prices.

721. Plaintiffs and other members of the Class offer to tender, and hereby do tender, to RBS and the Rights Issue Underwriter Defendants those RBS securities that the members of the Class continue to own in return for the consideration paid for those securities, together with interest thereon.

722. By virtue of the conduct alleged herein, each of RBS, Goodwin, McKillop and the Rights Issue Underwriter Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and other members of the Class who purchased RBS shares pursuant to

the Rights Issue Prospectus have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to RBS and the Rights Issue Underwriter Defendants. Plaintiffs and the members of the Class who have sold their securities purchased in the Rights Issue are entitled to rescissory damages.

723. This action is brought within one year after the discovery of the untrue statements and omissions contained in the Rights Issue Prospectus and within three years of when the shares were sold to the public. Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Rights Issue Prospectus at an earlier time.

## COUNT X

### AGAINST MCKILLOP, GOODWIN, WHITTAKER, CAMERON AND FISH FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

724. Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. For purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

725. This Count is brought pursuant to Section 15 of the Securities Act against Individual Defendants McKillop, Goodwin, Whittaker, Cameron and Fish.

726. RBS violated Section 12(a)(2) of the Securities Act by soliciting the sale of RBS securities and selling such securities through the Rights Issue pursuant to the Rights Issue Prospectus, which contained untrue statements and omissions of material fact. The facts misstated and omitted would have been material to a reasonable person reviewing the Rights Issue Prospectus.

727. McKillop, Goodwin, Whittaker, Cameron and Fish were each controlling persons of RBS when the Rights Issue Prospectus was issued because of their senior executive positions with RBS and their direct involvement in RBS's day-to-day operations.

728. By virtue of the foregoing, McKillop, Goodwin, Whittaker, Cameron and Fish each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of RBS, including the content of the Rights Issue Prospectus.

729. McKillop, Goodwin, Whittaker, Cameron and Fish negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Rights Issue Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

730. Lead Plaintiffs and members of the Class purchased ordinary shares of RBS pursuant or traceable to the Rights Issue Prospectus, and were damaged thereby.

731. Lead Plaintiffs and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Rights Issue Prospectus when they purchased or acquired the securities.

732. By reason of the foregoing, Defendants McKillop, Goodwin, Whittaker, Cameron and Fish are liable to Lead Plaintiffs and members of the Class for violations of Section 15 of the Securities Act.

## XX.  PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs on their own behalf and on behalf of the Class pray for judgment as follows:

A.  Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiffs to be proper class representatives;

B.      Awarding plaintiffs and the Class compensatory damages, together with appropriate prejudgment interest at the maximum rate allowable by law;

C.      Awarding rescission or a rescissory measure of damages on all claims were such remedy or damages are applicable; and

D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.      Granting such other and further relief as this Court deems to be just and proper.

## XXI. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: July 15, 2009

Respectfully submitted,

**COHEN MILSTEIN SELLERS &**
**TOLL PLLC**
Catherine A. Torell (CT-0905)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
- and -
Steven J. Toll
Julie G. Reiser
Matthew K. Handley
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Attorneys for Massachusetts Pension*
*Reserves Investment Management Board*
*and Co-Lead Counsel for the Class*

**LABATON SUCHAROW LLP**

Thomas A. Dubbs (TD-9868)
Louis Gottlieb (LG-9169)
Thomas G. Hoffman, Jr. (TG-0330)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**WOLF POPPER LLP**

Lester L. Levy (LL-9956)
James A. Harrod (JH-4400)
James Kelly-Kowlowitz (JK-9616)
845 Third Avenue
New York, New York 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

*Attorneys for Mississippi Public*
*Employees' Retirement System and*
*Co-Lead Counsel for the Class*

**GIRARD GIBBS LLP**
Jonathan K. Levine (JL-8390)
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767
        - and -
Daniel C. Girard
Amanda M. Steiner
Regina A. Sandler
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Attorneys for the Freeman Group and Co-Lead
Counsel for the Class*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
850 Third Avenue
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
One North La Salle Street, Suite 2225
Chicago, IL 60602
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

**MURRAY, FRANK & SAILER LLP**
Marvin L. Frank
Gregory B. Linkh
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone:  (212) 682-1818
Facsimile:  (212) 682-1892

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Antonio Vozzolo
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Facsimile:  (212) 983-9331

*Additional Plaintiffs' Counsel*

*Additional Plaintiffs' Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                                :
IN RE ROYAL BANK OF SCOTLAND GROUP   :    Civil Action No.:
PLC SECURITIES LITIGATION            :    09-CV-0300 (DAB)
                                                :
                                                :
                                                :    ECF CASE
                                                :
———————————————————————— x


## CERTIFICATE OF SERVICE


I hereby certify that on July 15, 2009, I caused the following to be filed with the
Clerk of the Court by hand and by electronic mail:


- Consolidated Complaint


I also certify that the foregoing document will be served via electronic mail, this day, on
the following all counsel of record:


srudman@csgrr.com, drosenfeld@csgrr.com, randib@csgrr.com, patc@csgrr.com,
bruckner@whafh.com, jfruchter@aftlaw.com, avozzolo@faruqilaw.com,
jkl@girardgibbs.com, ctorell@cohenmilstein.com, and ckeller@labaton.com.
restituyo@whafh.com, dsheils@kohnswift.com, paul.engelmayer@wilmerhale.com,
david.lesser@wilmerhale.com, jcampisi@kaplanfox.com, rkaplan@kaplanfox.com,
ofort@murrayfrank.com, mfrank@murrayfrank.com, glinkh@murrayfrank.com,
kimmiller225@yahoo.com, migross@pomlaw.com, rjhodgson@pomlaw.com, and
flqian@pomlaw.com, stoll@cohenmilstein.com,mlowenthal@cgsh.com,
lliman@cgsh.com.


I also certify that I will send a courtesy copy via U.S. mail to the following recipients:

Paul A. Englemayer
David S. Lesser
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022

Mitchell A. Lowenthal
Lewis J. Liman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

LABATON SUCHAROW LLP

Louis Gottlieb (LG 9168)
140 Broadway
New York, NY 10005
Tel. 212.907.0700
Fax. 212.883.7544

# Exhibit A

**EXHIBIT A – TABLE OF DEFENDANTS**

| DEFENDANTS | COUNTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Exchange Act Claims** | | **Preferred Share Securities Act Claims** | | | **Exchange Offer Securities Act Claims** | | | **Rights Issue Securities Act Claims** | |
| | Count I §10(b) and Rule 10B-5 | Count II §20(a) | Count III §11 | Count IV §12(a)(2) | Count V §15 | Count VI §11 | Count VII §12(a)(2) | Count VIII §15 | Count IX §12(a)(2) | Count X §15 |
| RBS | X | | X | X | | | X | | X | |
| Goodwin | X | X | X | X | X | X | X | X | X | X |
| McKillop | X | X | X | X | X | X | X | X | X | X |
| Whittaker | X | X | X | X | X | X | X | X | X | X |
| Cameron | X | X | X | X | X | X | X | X | | X |
| Fish | X | X | X | X | X | X | X | X | | X |
| Pell | | | X | X | X | X | | | | |
| Fisher | | | X | X | X | X | | | | |
| Buchan | | | X | X | X | X | | | | |
| Currie | | | X | X | X | X | | | | |
| Robson | | | X | X | X | X | | | | |
| Scott | | | X | X | X | X | | | | |
| Sutherland | | | X | X | X | X | | | | |
| Hunter | | | X | X | X | X | | | | |
| Koch | | | X | X | X | X | | | | |
| MacHale | | | X | X | X | X | | | | |
| Campbell | | | | | | X | | | | |
| Kong | | | | | | X | | | | |
| Freidrich | | | | | | X | | | | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated (Merrill Lynch) | | | X | X | | | | | | |
| Greenwich Capital Markets, Inc. | | | X | X | | | | | | |
| Wachovia Capital Markets, LLC | | | X | X | | | | | | |
| Morgan Stanley & Co. Incorporated | | | X | X | | | | | | |
| UBS Securities LLC | | | X | X | | | | | | |

| DEFENDANTS | COUNTS | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **Exchange Act Claims** | | **Preferred Share Securities Act Claims** | | | **Exchange Offer Securities Act Claims** | | | **Rights Issue Securities Act Claims** | |
| | Count I §10(b) and Rule 10B-5 | Count II §20(a) | Count III §11 | Count IV §12(a)(2) | Count V §15 | Count VI §11 | Count VII §12(a)(2) | Count VIII §15 | Count IX §12(a)(2) | Count X §15 |
| Banc of America Securities LLC | | | X | X | | | | | | |
| RBC Dain Rauscher Inc. | | | X | X | | | | | | |
| Citigroup Global Markets Inc. | | | X | X | | | | | | |
| A.G. Edwards & Sons Inc. | | | X | X | | | | | | |
| Goldman Sachs & Co. | | | X | X | | | | | | |
| Goldman Sachs International | | | | | | | | | X | |
| Merrill Lynch International | | | | | | | | | X | |
| UBS Limited | | | | | | | | | X | |

Exhibit B



## Securitization

At the heart of the cheap credit binge was a process known as securitization, where Wall Street began to buy up subprime mortgages and package them as mortgage-backed securities to sell to investors.

**Borrowers**

Mortgage broker

Subprime mortgage lender

**1**
**Borrowers,** many first-time homebuyers or individuals wanting to refinance, turned to subprime loans.

**2**
More **mortgage brokers** jumped into the subprime business, many of them earning six-figure incomes on high fees paid for by homeowners' subprime loans.

### New mortgage loans by year

All mortgages
Subprime mortgages
In trillions of dollars **$5**

4

3

2

1

0

2001   2001   2002   2003   2004   2005   2006

**3**
**Big companies** offering subprime mortgages solicited loans nationwide using Wall Street money. After making a home loan, they quickly sold it to packagers, such as investment banks, for more profits.

**4**
**Wall Street investment banks** began pooling risky, subprime loans that did not meet the standards of government-sponsored agencies such as Fannie Mae and sold them as "private label" securities.

## Structured finance

A financial innovation called structured finance provided Wall Street a way to divide subprime mortgage-backed securities into tranches (French for slices.) The tranches allowed the risk of a loan pool to be parceled out to various investors. Investors who purchased bonds in the securities received a portion of the mortgage payments in the pool.

Pool of subprime loans

Rating agency

**5**
**Rating agencies** such as Standard & Poor's helped investment banks structure the mortgage-backed securities to get the best possible bond ratings, earning healthy fees in the process, and making them attractive to investors, including mutual and pension funds.

Loan pool

**Top-level tranches** contain the highest-quality, but lowest-paying, bonds. Even though a mortgage-backed security may be funded from a pool containing subprime loans, the top tranches can have investment-grade status of triple-A rated bonds because they are paid first from the pool.

AAA

Low-risk tranches

Mortgage-backed security

Investor

**6**
Investors worldwide gobbled up the securities.

**The lowest-level tranches** contain the riskiest, highest-paying bonds. They get a low rating and are paid off after the double- and triple-A rated bonds are paid.

AA

A

BBB

BB

High-risk tranches

*Sources: Mortgage Bankers Association; HSH Associates; Federal Housing Finance Board; LoanPerformance, a First American Co.*

*The Denver Post*