UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ROYAL BANK OF SCOTLAND
GROUP PLC SECURITIES LITIGATION

Case No. 09 Civ. 300 (DAB)

ECF Case

Oral Argument Requested

**THE ROYAL BANK OF SCOTLAND GROUP PLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED COMPLAINT**
**FOR FAILURE TO STATE A CLAIM [CORRECTED]**

WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Telephone: 212-230-8800
Fax: 212-230-8888

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

GLOSSARY ................................................................................................................... xiii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 5

   A.   The Parties ................................................................................................. 6

   B.   RBS's Disclosures ...................................................................................... 6

      1.   RBS's Descriptions Of Its Residential Mortgage-Related Businesses
         Prior To The Credit Crisis ................................................................... 7

      2.   RBS's Disclosures About Its U.S. Mortgage Lending Portfolio As
         U.S. "Subprime" Troubles Emerge ...................................................... 14

      3.   RBS's Estimates Of Losses On Certain Mortgage-Related Securities ............ 18

      4.   RBS's Disclosures About The ABN Acquisition .................................... 24

      5.   RBS's Disclosures Of Its Capital Needs ............................................. 26

   C.   The Commencement Of This Action ........................................................... 27

ARGUMENT .................................................................................................................... 28

I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER
     SECTION 10(B) OF THE '34 ACT ............................................................... 28

   A.   The Complaint Fails To Plead A Materially Misleading Misstatement Or Omission ...... 31

      1.   RBS's Statements About Its U.S. Mortgage Portfolio Are Not Actionable ......... 31

      2.   RBS's Statements About CDO Risks And Valuation Are Not Actionable ........... 35

      3.   RBS's Statements About The ABN Acquisition Are Not Actionable ................ 45

      4.   RBS's Statements About Its Capital Needs Are Not Actionable .................... 47

   B.   The Complaint Fails To Plead Scienter ....................................................... 47

      1.   Motive ........................................................................................... 48

      2.   Conscious Misbehavior or Recklessness ............................................. 50

    C.   The Complaint Fails To Plead Loss Causation ................................................... 51

II.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER
    SECTIONS 11 AND 12 OF THE '33 ACT ........................................................ 54

    A.   The Complaint Fails To Plead Material Falsity .............................................. 54

       1.  Internal Controls And Risk Management ....................................... 57

       2.  Capital Base .................................................................................... 59

       3.  Credit Quality ................................................................................. 61

       4.  Acquisition Of ABN ....................................................................... 64

       5.  Other Alleged Omissions From Reports On Form 6-K .................. 65

    B.   The Rights Issue Claims Fail Because It Was Not A U.S. Public Offering .................... 66

    C.   The Preferred Share, Exchange Offer, And Rights Issue
    Claims Are Time Barred ................................................................................. 67

CONCLUSION ......................................................................................................... 70

# TABLE OF AUTHORITIES

## CASES

*60223 Trust v. Goldman, Sachs & Co.*,
 540 F. Supp. 2d 449 (S.D.N.Y. 2007)....................................................................52

*380544 Canada, Inc. v. Aspen Technology, Inc.*,
 544 F. Supp. 2d 199 (S.D.N.Y. 2008)...................................................................29

*Acito v. IMCERA Group, Inc.*,
 47 F.3d 47 (2d Cir. 1995) ..............................................................................42, 49

*Allen v. WestPoint-Pepperell, Inc.*,
 945 F.2d 40 (2d Cir. 1991)...................................................................................5

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009)........................................................................................56

*Basic, Inc. v. Levinson*,
 485 U.S. 224 (1988).............................................................................................42

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007).............................................................................................56

*Chill v. General Electric Co.*,
 101 F.3d 263 (2d Cir. 1996)............................................................................48, 51

*Cirisi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991) .................................................30

*City of Sterling Heights Police & Fire Retirement System v. Abbey National, PLC*,
 423 F. Supp. 2d 348 (S.D.N.Y. 2006)...................................................................44

*City of Sterling Heights Police & Fire Retirement System v. Vodafone Group Public Ltd. Co.*,
 No. 07 Civ 9921, 2009 WL 1456846 (S.D.N.Y. May 20, 2009)...........................45

*Condit v. Dunne*,
 317 F. Supp. 2d 344 (S.D.N.Y. 2004).....................................................................5

*Coronel v. Quanta Capital Holdings Ltd.*,
 No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)........................45, 65

*Decker v. Massey-Ferguson, Ltd.*,
 681 F.2d 111 (2d Cir. 1982)...........................................................................43, 44

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978)................................................................4, 30, 34

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) .........................................................................41

*Druskin v. Answerthink, Inc.*,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) .........................................................40

*Dujardin v. Liberty Media Corp.*,
    359 F. Supp. 2d 337 (S.D.N.Y. 2005) ..........................................................32

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................29, 52

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...........................................................29, 44, 49

*Edison Fund v. Cogent Investment Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) ..........................................................45

*Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*,
    No. 02 Civ 7313, 2004 WL 634171 (S.D.N.Y. Mar. 30, 2004) ...........................33

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)................................................................................6

*Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)......................................................38, 39

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007)..........................................................38

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 2009 WL 3109914
    (2d Cir. Sept. 30, 2009)................................................................................43

*Glamorgan Coal Corp. v. Ratner's Group PLC*,
    No. 93 Civ. 7581, 1995 WL 406167 (S.D.N.Y. July 10, 1995) .............................67

*Gotham Holdings, LP v. Health Grades, Inc.*,
    534 F. Supp. 2d 442 (S.D.N.Y. 2008)..........................................................66

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)......................................................................................67

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)......................................................................35, 44

*Harrison v. Rubenstein*,
   No. 02 Civ. 9356, 2007 WL 582955 (S.D.N.Y. Feb. 23, 2007) ....................32

*Hershfang v. Citicorp*,
   767 F. Supp. 1251 (S.D.N.Y. 1991)..............................................................33

*Higginbotham v. Baxter International, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ........................................................................34

*In re 2007 Novastar Finance, Inc., Securities Litigation*,
   No. 07 Civ. 0139, 2008 WL 2354367 (W.D. Mo. June 4, 2009) ...................30

*In re Allied Capital Corp. Securities Litigation*,
   No. 02 Civ. 3812, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)....................39

*In re Alstom S.A. Securities Litigation*,
   406 F. Supp. 2d 402 (S.D.N.Y. 2005).............................................................55

*In re American Express Co. Securities Litigation*,
   No. 02 Civ. 5533, 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ...................5

*In re Ashanti Goldfields Securities Litigation*,
   184 F. Supp. 2d 247 (E.D.N.Y. 2002) ............................................................42

*In re Avon Products Securities Litigation*,
   No. 05 Civ. 6803, 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) .....................32

*In re Axis Capital Holdings Ltd. Securities Litigation*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006).......................................................42, 55

*In re Bristol-Myers Squibb Securities Litigation*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004).......................................................33, 50

*In re Canandaigua Securities Litigation*,
   944 F. Supp. 1202 (S.D.N.Y. 1996)...............................................................43

*In re Citigroup, Inc. Securities Litigation*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom.*
   *Albert Fadem Trust v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006) .........43, 44

*In re Credit Suisse First Boston Corp.*,
   431 F.3d 36 (1st Cir. 2005)............................................................................37

*In re Downey Securities Litigation,*
  No. 08 Civ. 3261, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ....................................31, 40

*In re Duke Energy Corp. Securities Litigation,*
  282 F. Supp. 2d 158 (S.D.N.Y. 2003).....................................................................................63

*In re eSpeed, Inc. Securities Litigation,*
  457 F. Supp. 2d 266 (S.D.N.Y. 2006).....................................................................................49

*In re Elan Corp.,*
  No. 02 Civ. 8652004, WL 1305845 (S.D.N.Y. May 18, 2004)................................................65

*In re FBR Inc. Securities Litigation,*
  544 F. Supp. 2d 346 (S.D.N.Y. 2008).....................................................................................42

*In re Flag Telecom Holdings, Ltd. Securities Litigation,*
  352 F. Supp. 2d 429 (S.D.N.Y. 2005).....................................................................................65

*In re Initial Public Offering Securities Litigation,*
  383 F. Supp. 2d 566 (S.D.N.Y. 205).......................................................................................45

*In re International Bus. Machines Corp. Securities Litigation,*
  163 F.3d 102 (2d Cir. 1998)....................................................................................................44

*In re JP Morgan Chase Securities Litigation,*
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)...........................................................................43, 44, 49

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,*
  218 F.R.D. 76 (S.D.N.Y. 2003) ..............................................................................................50

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,*
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................................6, 62

*In re Merrill  Lynch & Co., Inc. Research Reports Securities Litigation,*
  273 F. Supp. 2d 351 (S.D.N.Y. 2003).......................................................................................5

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,*
  568 F. Supp. 2d 349 (S.D.N.Y. 2008).....................................................................................52

*In re Morgan Stanley Technology Fund Securities Litigation,*
  Nos. 02 Civ. 6153, 02 Civ. 8579, --- F. Supp. 2d ---, 2009 WL 256005
  (S.D.N.Y. Feb. 2, 2009) .........................................................................................................42

*In re NBTY, Inc. Securities Litigation,*
  224 F. Supp. 2d 482 (E.D.N.Y. 2002) ....................................................................................46

*In re N.Y. Community Bancorp, Inc. Securities Litigation,*
  448 F. Supp. 2d 466 (E.D.N.Y. 2006) .................................................................42

*In re Omnicom Group, Inc. Securities Litigation,*
  541 F. Supp. 2d 546 (S.D.N.Y. 2008).................................................................54

*In re Optionable Securities Litigation,*
  577 F. Supp. 2d 681 (S.D.N.Y. 2008)...........................................................33, 42

*In re PXRE Group, Ltd., Securities Litigation,*
  600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................................50

*In re Radian Securities Litigation,*
  612 F. Supp. 2d 594 (E.D. Pa. 2009) .................................................................31

*In re Razorfish, Inc. Securities Litigation,*
  No. 00 Civ. 9474, 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001) .........................46

*In re Refco, Inc. Securities Litigation,*
  503 F. Supp. 2d 611 (S.D.N.Y. 2007).............................................................66, 67

*In re Regeneron Pharmaceutical, Inc. Securities Litigation,*
  No. 03 Civ 3111, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ...............................49

*In re Rhodia SA Securities Litigation,*
  531 F. Supp. 2d 527 (S.D.N.Y. 2007)...............................................28, 52, 53, 54

*In re Salomon Analyst Level 3 Litigation,*
  373 F. Supp. 2d 248 (S.D.N.Y. 2005).............................................................37, 41

*In re Salomon Analyst Metromedia Litigation,*
  544 F.3d 474 (2d Cir. 2008)................................................................................45

*In re Sina Corp. Securities Litigation,*
  No. 05 Civ. 2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006) ...........................6

*In re Take-Two Interactive Securities. Litigation,*
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................54

*In re Tower Automobile Securities Litigation,*
  483 F. Supp. 2d 327 (S.D.N.Y. 2007).................................................................46

*In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation,*
  Nos. 2:08 MD 1919, C 08 387, 2009 WL 1393679 (W.D. Wash. May 15, 2009)..................29

*In re WorldCom, Inc. Securities Litigation,*
   294 F. Supp. 2d 431 (S.D.N.Y. 2003)........................................................................67

*In re Worldcom, Inc. Securities Litigation,*
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)........................................................................63

*In re Xinhua Finance Media, Ltd. Securities Litigation,*
   No. 07 Civ 3994, 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) ...........................................44

*In re Yukos Oil Co. Securities Litigation,*
   No. 04 Civ. 5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .......................................5, 32

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001).........................................................................48, 49, 50

*Kramer v. Time Warner, Inc.,*
   937 F.2d 767 (2d Cir. 1991)..................................................................................6

*Lasker v. New York State Electric & Gas Corp.,*
   85 F.3d 55 (2d Cir. 1996) .................................................................................44

*Ledford v. Rapid-American Corp.,*
   No. 86 Civ. 9116, 1988 WL 3428 (S.D.N.Y. Jan. 8, 1988)...............................................50

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005)........................................................................30, 52, 53

*Leykin v. AT&T Corp.,*
   423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd,* 216 F. App'x 14 (2d Cir. 2007).................52, 65

*Lipsky v. Commonwealth United Corp.,*
   551 F.2d 887 (2d Cir. 1976)................................................................................50

*Marsh Group v. Prime Retail, Inc.,*
   No. 01-2500, 46 F. App'x. 140 (4th Cir. 2002) .........................................................36

*Matusovsky v. Merrill Lynch,*
   186 F. Supp. 2d 397 (S.D.N.Y. 2002)....................................................................29

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
   547 U.S. 71 (2006)........................................................................................29

*Miller v. Lazard, Ltd.,*
   473 F. Supp. 2d 571 (S.D.N.Y. 2007).....................................................................33

*Milman v. Box Hill System, Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)............................................................29

*Newman v Warnaco Group, Inc.*,
   335 F.3d 187 (2d Cir. 2003)......................................................................69

*Nolte v. Capital One Finance Corp.*,
   390 F.3d 311 (4th Cir. 2004) ....................................................................42

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)......................................................................49

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
   98 F.3d 2 (2d Cir. 1996)............................................................................31

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 2009 WL 2959883
   (2d Cir. Sept. 17, 2009)..............................................................45, 58, 63

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D. Cal. 2008) ..............................................................31

*Pittleman v. Impac Mortgage Holdings, Inc.*,
   No. SACV 070970, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ............................34

*Podany v. Robertson Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004).........................................................38

*Rapoport v. Asia Electrics Holding Co.*,
   88 F. Supp. 2d 179 (S.D.N.Y. 2000)..........................................................29

*Rich v. Maidstone Finance, Inc.*,
   No. 98 Civ 2569, 2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) ............................33

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..........................................................31, 45, 55

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).................................................................28, 51

*Rubin v. MF Global, Ltd.*,
   634 F. Supp. 2d 459 (S.D.N.Y. 2009)....................................................44, 45

*Rubin v. MF Global, Ltd.*,
   No. 08 Civ. 2233, 2009 WL 2058590 (S.D.N.Y. Jul. 16, 2009) ............................56

*San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996)..................................................................................35

*Shaev v. Hampel*,
  No. 99 Civ. 10578, 2002 WL 31413805 (S.D.N.Y. Oct. 25, 2002) ........................36

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996)..................................................................................29

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)..............................................................................30, 49

*Steiner v. Shawmut National Corp.*,
  766 F. Supp. 1236 (D. Conn. 1991)........................................................................34

*Teamsters Local 445 Freight Division Pen. Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008)..............................................................................30, 51

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................................48

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*,
  348 F. Supp. 2d 255 (S.D.N.Y. 2004)....................................................................37

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)............................................................................................37

*Waxman v. Envipco Pick Up & Processing Services, Inc.*,
  No. 02 Civ. 10132, 2003 WL 22439796 (S.D.N.Y. Oct. 28, 2003) ........................44

*White v. H&R Block, Inc.*,
  No. 02 Civ. 8965, 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ...........................32

*Williams v. Citibank, N.A.*,
  565 F. Supp. 2d 523 (S.D.N.Y. 2008)....................................................................29

*Williams v. WMX Technologies, Inc.*,
  112 F.3d 175 (5th Cir. 1997) ................................................................................30

*Yung v. Lee*,
  432 F.3d 142 (2d Cir. 2005)..............................................................................66, 67

*Zirkin v. Quanta Capital Holdings, Ltd.*,
  No. 07 Civ. 851, 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009)................................56

# STATUTES AND RULES

15 U.S.C. § 77k(a) ...............................................................................................56

15 U.S.C. § 77l(a)(2) ...........................................................................................57

15 U.S.C. § 77k(b)(3)(C) ......................................................................................63

15 U.S.C. § 78u-4(b)(4) ........................................................................................52

15 U.S.C. §78u-5(c)(1)(A)(i) .................................................................................35

17 C.F.R. 240.13a-13 ............................................................................................40

17 C.F.R. 240.15d-13 ............................................................................................40

# OTHER AUTHORITIES

Doug Alexander, *Greenspan Says Worst of U.S. Housing Slowdown is Over (Update 2)*, Bloomberg,  (Feb. 14, 2007) .......................................................................15

Bear Stearns Analyst Report, *Royal Bank of Scotland—U.S. Exposur*e, Feb. 9, 2007 .................16

Bernstein Research Report, *Barclays and RBS—How Bad Can It Be? Realistic Downside Scenario Suggests Value Reductions are Excessive* (Nov. 11, 2007) .....................................40

Bernstein Research Analyst Report, *Barclays and RBS*, April 26, 2007 .......................................17

*Credit Crunch: Regulating Chaos*, St. Louis Post-Dispatch, March 28, 2008 ............................22

Expanded Guidance for Subprime Lending Programs (OCC, FRS Bd., FDIC, OTS)  (2001) .......7

Ambrose Evans-Pritchard, *Bear Stearns Speculation Sparks Storm in Credit Markets*, Daily Telegraph, March 11, 2008 ..................................................................................................22

Frank J. Fabozzi, et al., *Collateralized Mortgage Obligations: Structures and Analysis* (3d ed. 1999) ...........................................................................................................................18

FASB, Determining Fair Value When the Volume and Level of Activity for the Asset of Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly, FASB Staff Position FAS 157-4 (Apr. 9, 2009) .......................................................36

FICO, *Scoring Your Customers: How Often is Often Enough?*, Insights, No. 8, October 2008 .....7

Ingo Fender et al., *The ABX: How Do The Markets Price Subprime Mortgage Risk?* BIS Quarterly Review, September 2008 .......................................................................40

Andrew Giduci, *Why the ABX May Not Be a Good Overall Indicator of 'AAA' Credit Risk in U.S. RMBS Transactions*, Ratings Direct (May 21, 2008), www.standardandpoors.com/ratingsdirect ...........................................................40

Int'l Monetary Fund, Global Fin. Stability Report (Apr. 2007) ....................................16

Ben Logan (Managing Director of Markit Partners), *The ABX Index: A Pricing Conundrum*, Credit, (May 1, 2008)..............................................................................40

William L. Megginson & Scott B. Smart, Introduction to Corporate Finance (2009) ..................46

Merrill Lynch Analyst Report, *More Turbulence Ahead*, Oct. 29, 2007......................................19

*Moody's Downgrades Royal Bank of Scotland*, Global News Wire—Asia Africa Intelligence Wire, July 1, 2008)..............................................................................69

Moody's, *Special Comment: Default & Loss Rates of Structured Finance Securities: 1993-2006* (Apr. 2007)............................................................................14

*Paulson—Housing Woes Not Affecting U.S. Economy*, Reuters, Mar. 13, 2007 .........................15

Greg Robb, *Bernanke:  This may be worse than Great Depression*, Marketwatch, July 26, 2009, *available at* http://www.marketwatch.com/story/bernanke-explains-crisis-to-average-americans-2009-07-26 ...................................................................53

*S&P's Ratings Direct: Understanding S&P's Rating Definitions*, at 14 (June 3, 2009)...............14

David L. Scott, *Wall Street Words: An A to Z Guide To Investment Terms for Today's Investor* (2003)............................................................................14

SEC, Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008, Study on Mark-to-Market Accounting, Dec. 30, 2008.................36

Elizabeth Spiers, *Bear Run, Why the Fed had to bail out Bear Stearns*, Slate Magazine, March 18, 2008, http://www.slate.com/id/2186792/ .............................................22

Statement on Subprime Mortgage Lending (OCC, FRS Bd., FDIC, OTS, NCUA) (June 28, 2007)............................................................................7

*The Financial Crisis and the Role of Federal Regulators: Hearing Before the H. Comm. On Oversight and Govt. Reform*, 110th Cong. 15 (2008) (statement of Alan Greenspan)............53

## GLOSSARY

| Term | Definition |
|------|------------|
| '34 Act | The Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| '33 Act | The Securities Act of 1933, 15 U.S.C. § 77a *et seq.* |
| ABN | ABN AMRO Holding N.V., a Dutch financial institution acquired by a consortium of banks, including RBS, in October 2007. |
| ABS | Asset-Backed Security. |
| ABX | A collection of indices offered by Markit Group Limited. The Markit ABX.HE index is composed of 20 Credit Default Swaps on U.S. home equity ABS. The TABX.HE, or the Markit ABX.HE Tranche Indices, are constructed using the underlying names of the BBB and BBB- Markit ABX.HE Indices. |
| Appendix A | Disclosures in CDO Offering Memoranda, attached to the end of this brief. |
| Appendix B | Analyst and Press Reports Concerning RBS Mortgage-Related Exposures, attached to the end of this brief. |
| Appendix C | RBS Public Statements Concerning Mortgage-Related Exposures, attached to the end of this brief. |
| Appendix D | Alleged Misstatements/Cautionary Language, attached to the end of this brief. |
| CDO | Collateralized Debt Obligation. |
| CMO | Collateralized Mortgage Obligation. |
| Citizens | Citizens Financial Group, a bank holding company subsidiary of RBS, headquartered in Providence, R.I. |
| Complaint or CAC ("CAC ¶__") | The July 15, 2009 Complaint filed in this action, cited to by paragraph number. |
| Exchange Offer | Offer effectuated October 5, 2007 by RFS Holdings B.V., an affiliate of Fortis N.V. and Fortis SA/NV, RBS, and an affiliate of Banco Santander Central Hispano, S.A., to holders of ABN ordinary shares, in exchange for RBS ordinary shares. |
| Exhibit Books ("E__") | The Exhibit Books accompanying this Motion under cover of October 23, 2009 declarations by Robert W. Trenchard. |

| Term | Definition |
| --- | --- |
| FASB | The Financial Accounting Standards Board, the designated private sector organization in the U.S. that establishes financial accounting and reporting standards. |
| FICO Score | FICO is an abbreviation for Fair Isaac Corporation and refers to a person's credit score based on credit history.  Lenders and credit card companies use the number to decide if the person is likely meet credit obligations. |
| Freeman Group | Jay Freeman, Ravi Srinivasan, Sheldon Cantor, Jeffrey Hathorn and Michael Mancini, named Plaintiffs here. |
| FSA | Financial Services Authority, a U.K. body, given statutory powers by the Financial Services and Markets Act 2000, which regulates the financial services industry in the U.K. and has a wide range of rule-making, investigatory and enforcement powers. |
| GBM | RBS Global Banking & Markets, a business division offering a broad range of financing services principally to corporations and institutions. |
| Greenwich Capital | Greenwich Capital Holdings, Inc., subsequently named RBS Securities USA Inc., a holding company with wholesale and investment banking operations including Greenwich Capital Markets, Inc., a U.S. broker dealer, subsequently renamed RBS Securities Inc. |
| IAS, IASB | International Accounting Standards, a set of accounting standards promulgated by The International Accounting Standards Board. |
| Individuals' Brief ("Ind. Br.__") | The RBS Individuals' October 23, 2009 Memorandum Of Law In Support Of Their Motion To Dismiss The Consolidated Amended Complaint. |
| IFRS | International Financial Reporting Standards. |
| IMF | International Monetary Fund. |
| LTV | Loan-to-Value Ratio. |
| MassPRIM | Massachusetts Pension Reserves Investment Management Board, a named plaintiff here. |
| MissPERS | Public Employees' Retirement System of Mississippi, a named plaintiff here. |

| Term | Definition |
|------|------------|
| MBS | Mortgage-Backed Security. |
| Monoline(s) | Monoline insurers and/or insurance—insurance provided on specific financial products, such as credit default insurance on a CDO. *See, e.g.*, http://www.afgi.org/monoline.htm. |
| Plaintiffs | MassPRIM, MissPERS and the Freeman Group. |
| Preferred Share(s) | RBS Series Q, R, S, T and/or U Non-cumulative Dollar Preference Shares traceable to the April 8, 2005 Registration Statement. |
| PSLRA | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b). |
| RBS or the Bank | The Royal Bank of Scotland Group plc. |
| RBS Merits Brief ("RBS MTD Br.___") | The Royal Bank Of Scotland Group plc's October 23, 2009 Memorandum Of Law In Support Of Its Motion To Dismiss The Consolidated Amended Complaint For Failure To State A Claim. |
| RBS Subject-Matter Jurisdiction/Forum-Non Brief ("RBS SMJ Br.___") | The Royal Bank Of Scotland Group plc's October 23, 2009 Memorandum Of Law In Support Of Its Motions To Dismiss For Lack Of Subject-Matter Jurisdiction And Under The *Forum Non-Conveniens* Doctrine. |
| RFS | RFS Holdings B.V., a company owned by RBS, an affiliate of Fortis N.V. and Fortis SA/NV, and an affiliate of Banco Santander Central Hispano, S.A., set up in connection with the acquisition of ABN. |
| Rule 9(b) | Federal Rule of Civil Procedure 9(b). |
| Underwriters' Brief ("UW Br.___") | Underwriter Defendants' October 23, 2009 Memorandum Of Law In Support Of Their Motion To Dismiss The Consolidated Complaint. |
| April 8, 2005 Registration Statement | RBS shelf registration statement for the issuance of debt securities and dollar preference shares, filed on Form F-3 dated April 8, 2005. |
| April 26, 2006 Financials | RBS audited financial statement for the period ending December 31, 2005, filed on Form 20-F dated April 26, 2006; excerpted pages of this document are at E35-87. |

| Term | Definition |
|------|-----------|
| March 1, 2007 Results | RBS annual results for the year ended December 31, 2006, filed on Form 6-K dated March 1, 2007; excerpted pages of this document are at E122-32. |
| April 24, 2007 Financials | RBS audited financial statement for the period ending December 31, 2006, filed on Form 20-F dated April 24, 2007; excerpted pages of this document are at E210-86. |
| August 15, 2007 Interim Results | RBS interim results for the period ending August 15, 2007, filed on Form 6-K dated August 15, 2007; excerpted pages of this document are at E393-405. |
| December 6, 2007 Trading Update | RBS Pre-close Trading Update for the period ending December 6, 2007, filed on Form 6-K dated December 6, 2007; a copy of this document is at E510-518. |
| February 28, 2008 Results | RBS annual results for the year ended December 31, 2007, filed on Form 6-K dated February 28, 2008; excerpted pages of this document are at E586-87. |
| April 22, 2008 Announcement | Announcement of £12 billion Rights Issue, filed on Form 6-K dated April 22, 2008; excerpted pages of this document are at E703-08. |
| April 22, 2008 Rights Issue | Proposed 11 for 18 rights issue of 6,123,010,462 new ordinary RBS shares announced on April 22, 2008, to raise proceeds of £12 billion. |
| April 30, 2008 Rights Issue Circular | Circular dated April 30, 2008 issued in connection with the Rights Issue (also referred to as Rights Issue Prospectus); excerpted pages of this document are at E717-29. |
| May 14, 2008 Financials | RBS audited financial statement for the period ending December 31, 2007, filed on Form 20-F dated May 14, 2008; excerpted pages of this document are at E730-85. |
| October 14, 2008 Announcement | Announcement of £20 billion capital raise, filed on Form 6-K dated October 14, 2008; excerpted pages of this document are at E1022-33. |
| February 26, 2009 Results | RBS annual results for the period ending December 31, 2008, filed on Form 6-K dated February 26, 2009. |

| Term | Definition |
|------|-----------|
| April 29, 2009 Financials | RBS audited financial statement for the period ending December 31, 2008, filed on Form 20-F dated April 29, 2009; excerpted pages of this document are at E1164-72. |

The Royal Bank of Scotland Group plc hereby moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint for failure to state a claim. RBS is additionally submitting separate motions to dismiss for lack of subject-matter jurisdiction and under the doctrine of *forum non conveniens*. RBS incorporates additional arguments for dismissal from the Individuals Defendants' Brief and the Underwriters' Brief.

## PRELIMINARY STATEMENT

As the most severe economic crisis since the Great Depression was developing in 2007 and 2008, RBS regularly updated its shareholders about the potential effects of the crisis on the Bank. Initially, the crisis primarily affected companies in the U.S. that had made so-called "subprime" mortgage loans, as the borrowers on those loans began to default. RBS accordingly assured shareholders that its U.S. retail banking business, principally housed in its subsidiary Citizens, had not made such loans. But as time went by, losses spread well beyond direct subprime lenders. They began to affect even far-removed triple-A rated securities, and eventually the entire global financial system. RBS reacted by writing down the value of affected securities and by raising capital to weather the crisis. Events nonetheless overtook the Bank. In late 2008, RBS became one of many financial institutions to be rescued through government intervention. It is now 70 percent owned by the U.K. Government.

Plaintiffs are disappointed shareholders who purport to assert claims under the U.S. securities laws on behalf of a putative global class of all RBS shareholders. From the vantage of hindsight, Plaintiffs opportunistically assert that RBS must have been concealing the risks facing the Bank all along. Plaintiffs, however, are wrong. The risks were well-known. RBS made no secret of them in multiple financial statements, analyst calls and other publications, and they were the subject of extensive commentary in the marketplace. Simply put, the very documents on which the grossly bloated Complaint relies, as well as other material subject to judicial notice

here, belie Plaintiffs' allegations.  On this record, the Complaint cannot withstand scrutiny as a matter of law.

For instance, perhaps the Complaint's most inflammatory allegation is that RBS supposedly assured shareholders from March to August 2007 that it faced no risk from the subprime crisis whatsoever.  That claim is false.  In this period, subprime borrowers were increasingly defaulting on their loans, which in turn inflicted losses on their direct lenders.  RBS accordingly assured investors that its U.S. lending business, principally Citizens, did not have subprime loans in its mortgage portfolio.  Plaintiffs do not dispute the truth of these statements.  But Plaintiffs nonetheless claim that these statements were misleading because they somehow "implied" that no other part of RBS faced any risk of loss from subprime defaults at all.

This claim cannot be taken seriously.  Not only does it mischaracterize what RBS actually said, but it also ignores that RBS disclosed repeatedly that it was exposed to risk of loss in other lines of business in the event of loan defaults exceeding expectations.  Most importantly, RBS was a known leader in the "securitization" business of creating securities that paid out cash based on the performance of pools of underlying loans, including subprime mortgages.  As RBS made clear in its financial statements, this business could suffer losses if default rates turned out to be greater than expected, which could impair the value of the related securities.  Market analysts commented extensively on this risk, and RBS's stock price broadly tracked the price of other financial institutions facing similar risks.  The notion that RBS somehow concealed this risk has no basis in fact.

Perhaps recognizing the weakness of their sweeping assertion of total concealment, Plaintiffs hedge their bets and additionally fault RBS for the timing and measurement of its losses on debt securities as the crisis deepened.  RBS initially announced write-downs on debt

securities—principally Collateralized Debt Obligations, or "CDOs"—and related assets on December 6, 2007, and then took further write-downs in February and April 2008 as the crisis worsened. Plaintiffs now assert in hindsight that RBS must have known that its CDO holdings were impaired before December 6, 2007, and that its initial write-downs were insufficient. Plaintiffs rest these allegations on the facts that other financial institutions began to write down the values of their own CDOs in September 2007, related indices were declining, RBS employees were debating the significance of the rapidly-evolving events on the value of RBS's CDO, and RBS in fact had to take additional write downs after December 2007.

But these allegations fundamentally misconstrue the nature of CDOs. Plaintiffs pretend as if these instruments had a definite market value, like a security traded on a liquid market with a published price. As Plaintiffs elsewhere concede, however, CDOs were customized, illiquid instruments. So their value had to be estimated in light of uncertain predictions of future events, such as expected borrower defaults. Put differently, the value of these instruments was a matter of judgment, not objective fact, as RBS repeatedly cautioned.

In this context, RBS's valuations are shielded from attack, both because they were "forward looking statements" that "bespoke caution" in light of RBS's extensive warnings, and because the Complaint comes nowhere close to meeting the requirements for pleading a putative misstatement or omission on a matter of opinion. The cases on this issue demand far more than merely showing that different judgments about valuation existed or that a defendant's valuation, in hindsight, is open to critique. Plaintiffs instead must show that RBS did not actually believe its valuations, such as by identifying instances in which RBS disclaimed its valuations in another context. The Complaint is devoid of any such facts, and it consequently fails to state a claim.

Plaintiffs next try to manufacture a separate set of allegations that are just as hindsight-driven, if not more so.  They attack RBS's participation in a consortium that acquired ABN in October 2007, largely because RBS wrote down the goodwill on the acquisition of ABN in its February 26, 2009 Results.  In light of that ultimate outcome, Plaintiffs now claim that RBS was unduly optimistic from the outset about the acquisition's prospects, and that RBS should have written down ABN's goodwill sooner.  Optimism, however, is not securities fraud, even if it turns out to have been misplaced.  And Plaintiffs' second-guessing on the timing of RBS's goodwill write-down is both unsupported, and contrary to the views of RBS's independent auditors, who gave an unqualified audit opinion on the May 14, 2008 Financials—a fact conveniently ignored throughout the Complaint.

Plaintiffs' final attack is to challenge how RBS managed its capital in 2008, again complaining in hindsight that RBS should have acted differently.  Specifically, although RBS had not previously concluded that it needed additional capital, it changed course with a £12 billion rights issue in April 2008 as a result of severe market disruptions in March.  Plaintiffs complain that RBS should have somehow disclosed its intent to raise this capital in February 2008 or earlier—*before* the events that precipitated the need for more capital had occurred.  Similarly, RBS had to raise more capital after further severe market disruptions in September 2008.  Plaintiffs again complain that RBS did not disclose its intent to raise capital earlier.

Like most of their other claims, these allegations essentially reduce to the theory that the Bank and its directors committed "fraud" when they failed to predict the future.  Labeled "fraud by hindsight," cases of this sort do no more than "seize[] upon disclosures made in later [statements] and allege[] that they should have been made in earlier ones[.]"  *Denny v. Barber*,

576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.).  That form of pleading is manifestly insufficient, and by itself is sufficient reason to dismiss the Complaint.

*          *          *

In addition to the foregoing, the Complaint is beset with numerous other fatal flaws.  One glaring defect arises from the brazen assertion that the *entire* drop in RBS's stock price from March 2007 to January 2009 is attributable to the alleged misstatements and omissions, notwithstanding the fact that this stock drop coincided exactly with the worst global economic crisis in generations.  That implausible claim has no basis in fact.  On the contrary, RBS's financial statements show that, like other financial institutions, it incurred losses as a result of the credit and liquidity crisis far beyond its "subprime" exposures.  In these circumstances, Plaintiffs must plead facts sufficient to disentangle the effects of the alleged misstatements and omissions, if any, from the market-wide price drop.  The few anemic paragraphs addressed to the issue in the Complaint come nowhere close to meeting that requirement.  This provides yet another reason why the Complaint should be dismissed, with prejudice.

## STATEMENT OF FACTS

Well-pleaded allegations of fact in the Complaint—and not conclusory assertions—are accepted as true for purposes of this motion.  *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).  This Court may also consider "'documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'"  *In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533, 2008 WL 4501928, at *5 (S.D.N.Y. Sept. 26, 2008) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).  Newspaper articles and press releases are appropriate for judicial notice, *see, e.g.*, *Condit v. Dunne*, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004) (reviewing articles "as evidence of the media frenzy"), as are speeches by government officials, *see, e.g.*, *In re Merrill*

*Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 383-88 (S.D.N.Y. 2003); stock quotes, *see, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 254 n.9 (S.D.N.Y. 2003); analyst reports, *see, e.g.*, *In re Sina Corp. Sec. Litig.*, No. 05 Civ. 2154, 2006 WL 2742048, at *7-*8 (S.D.N.Y. Sept. 26, 2006); as well as market phenomena, *see, e.g.*, *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (real estate market downturn); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (junk bond market collapse).

### A.    The Parties

Plaintiffs are two public pension funds, MassPRIM and MissPERS, as well as five individuals in the self-titled "Freeman Group."  (CAC ¶¶ 42-44.)  They purport to represent a class of RBS shareholders from March 1, 2007 to January 19, 2009, as well as the buyers of certain series of Preferred Shares in 2006 and 2007.  (*Id.* ¶ 105.)  MassPRIM and MissPERS claim to have purchased RBS ordinary shares and Preferred Shares (*id.* ¶¶ 42-43), and the Freeman Group individuals claim to have purchased the Preferred Shares (*id.* ¶ 44).

Defendant RBS is a U.K. bank based in Edinburgh, Scotland.  (*Id.* ¶ 45.)  It operated through numerous subsidiaries in the relevant period, including Citizens and Greenwich Capital in the U.S.  (*Id.* ¶¶ 50, 53.)  RBS is majority-owned by the Government of the U.K.  Plaintiffs have also sued certain current and former RBS officers and directors (*id.* ¶¶ 58-78), as well as investment banks that underwrote certain RBS share offerings (*id.* ¶¶ 79-98).

### B.    RBS's Disclosures

The Complaint attacks statements RBS made between 2006 and January 2009 in a variety of different contexts, including in annual and interim financial reports, SEC filings from various share offerings, proxy materials related to RBS's acquisition of ABN, and statements to analysts by RBS personnel.  The attacked statements cover five topics:  (1) RBS's descriptions of its U.S.

residential mortgage-related businesses prior to the credit crisis; (2) RBS's disclosures concerning its prime-quality U.S. mortgage lending portfolio; (3) RBS's estimates of potential losses related to certain mortgage-related securities; (4) RBS's disclosures concerning the ABN acquisition; and (5) RBS's disclosures concerning its capital needs. We address each in turn.

### 1. RBS's Descriptions Of Its Residential Mortgage-Related Businesses Prior To The Credit Crisis

Before the credit crisis began and the term "subprime" became part of the public lexicon,[1] RBS had provided the market detailed information about its different U.S. residential mortgage-related operations and risks, including both its direct lending and securitization businesses. Among these disclosures were financial statements for financial year 2005 and dozens of prospectuses RBS issued in connection with its securitization business. This section details these documents, as well as Plaintiffs' general attack on RBS's pre-crisis disclosures.

### a) RBS's 2005 Audited Financial Statement

In its audited April 26, 2006 Financials covering financial year 2005, RBS made crystal clear that it faced significant exposure to U.S. mortgages. It disclosed that as of December 31, 2005 its total mortgage loan portfolio was approximately £109 billion, including approximately £35 billion in U.S. mortgages. (E84-85, April 26, 2006 Financials, at 152-53.) In that

---

[1] The Complaint uses the term "subprime" indiscriminately. Generally, "subprime" is a banking term referring to an individual borrower's or loan's higher credit risk, as reflected in one or more factors such as high loan-to-value ("LTV"), history of delinquencies or bankruptcy, and/or a borrower FICO score below a given threshold. (*See, e.g.*, E1603-04, Expanded Guidance for Subprime Lending Programs (OCC, FRS Bd., FDIC, OTS) (2001), at 2-3.) However, "the term 'subprime' is not consistently defined in the marketplace or among individual institutions." (E1641, Statement on Subprime Mortgage Lending (OCC, FRS Bd., FDIC, OTS, NCUA) (June 28, 2007), at 5; *see also* E1604, Expanded Guidance for Subprime Lending Programs, at 3 (noting "institution specific" definitions of subprime).) In addition, the factors used to define "subprime"—which vary from bank to bank—are themselves mutable. Accordingly, a loan originated as a "prime" loan can become "subprime" over time if, for example, the borrower's financial situation or home value (and by extension LTV) deteriorates. (*See generally, e.g.*, E1784, FICO, *Scoring Your Customers: How Often is Often Enough?*, Insights, No. 8, October 2008.)

connection, RBS explained that its U.S. Citizens bank subsidiary "provides retail and corporate banking services [throughout New England] . . . including residential mortgages," and reported "robust growth in secured consumer lending." (*Id.* at 5, E43) These disclosures and others provided ample notice that defaults on U.S. residential mortgages could adversely affect RBS.[2]

RBS furthermore disclosed total debt securities of approximately £121 billion, including approximately £35 billion available-for-sale and £81 billion held-for-trading (*Id.* at 111), and explained that its GBM unit "securiti[zes] commercial and residential mortgage loans, commercial and residential mortgage related securities . . . and other types of financial assets" in the U.S. (*Id.* at 203, E87.) With respect to the securitization business in particular, the April 26, 2006 Financials provided four pages of detailed information and analysis that made the risks of U.S. residential mortgage defaults absolutely transparent. (*Id.* at 108-111, E69-73.) Those pages explained the securitization process in terms very similar to those used in the Complaint. That business entailed pooling loans or debt securities—"including commercial and residential mortgage loans" and "commercial and residential mortgage related securities"—and transferring them "to a special purpose entity which then issues liabilities to third party investors." (*Id.* at 108, E69; *see* CAC ¶¶ 128-29.) RBS further disclosed that it had retained certain securities issued through the securitization process. For 2005, "[t]hese retained interests comprise[d] approximately . . . £ 764 million in consumer based retained interests[,]" such as U.S. residential

---

[2] Detailed information about Citizens' mortgage portfolio was, and is, publicly available in near real time. For example, quarterly Bank Holding Company Performance Reports ("BHCPR"), generated by the Federal Reserve and available on the Fed website, provide the size of the portfolio and extent of impairments, including as compared with peer institutions. Citizens also disclosed detailed information about its mortgage portfolio in its FR Y-9C financial statements filed each quarter and also publicly available on the Fed website. Copies of both of these reports are provided at E154, 296, 433, 519, 660, 855, 952, 1076 (FR Y-9C); E336, 473, 559, 633, 898, 995, 1110, 1137 (BHCPR).

mortgage-related securities.  (April 26, 2006 Financials, at 109, E70.)  RBS emphasized that "[t]hese retained interests primarily relate to mortgage loans and securities and arose from securitisations that have taken place in current and prior years." (*Id.*)

Having separately identified these securities, RBS went on to explain how their value had been calculated, and how greater-than-expected loan defaults could adversely affect their value. RBS calculated these securities' "fair value" using "appropriate valuation techniques or management estimates." (*Id.* at 95, E69.1.)  A chart on page 110 of the April 26, 2006 Financials set forth the "[k]ey economic assumptions used in measuring the value of retained interests . . . resulting from securitisations[.]"  These included estimates of the payment speed on the underlying loans, the weighted average life of the loans, the cash flow discount rate, and, importantly here, "credit losses." (*Id.* at 110, E71.)

RBS provided another chart that dramatized how variations in its valuation assumptions could affect retained securities' values. (*Id.*)  Among other variations, the analysis showed how a higher-than-expected default rate could reduce value; an adverse change in default rates of just 10% could cause tens of millions of British Pounds Sterling in losses.  RBS also emphasized that losses "may not be linear," and could exceed those in its sensitivity analysis for a variety of reasons. (*Id.*)  Indeed, RBS emphasized elsewhere in the April 26, 2006 Financials the highly uncertain nature of forward-looking statements like these generally. (*Id.*)

### b)    RBS's Published CDO Prospectuses

Individual CDO prospectuses issued by RBS's U.S. Greenwich Capital subsidiary provided further detail about RBS's mortgage-related exposures.  Available from Thomson and Bloomberg, these prospectuses detail the nature of the securities being offered, their connection to underlying residential mortgages, the fact that many of those mortgages were "subprime," and Greenwich Capital's role in underwriting the offerings and RBS retaining some of the offered

securities.  By way of background, the following depicts the cash flow of a hypothetical CDO

based on the allegations in the Complaint:



① Cash from consumer, commercial and home-owner loans paid to asset-backed securities (ABS) holders.

② Cash from different types of ABS paid to Special Purpose Entity.

③ Cash from SPE to CDO note holders in order of priority by credit rating (i.e., AAA paid first, A paid next, etc.).

As the illustration shows, defaults on the debt underlying the securities held by the Issuer

CDO could affect the note holders by reducing the cash flow to the Issuer, and thus the cash

available for distribution to note holders.  Importantly, however, the extent of the risk would vary

depending on the type of note held.  As the Complaint points out, "[s]ince the senior tranche is

*first* to receive payments, it is also the *last* tranche to absorb any losses[.]"  (CAC ¶ 130.)  That is

why the senior-most tranches could receive triple-A credit ratings from Standard & Poors and

other credit rating agencies (*id.*)—defaults would have to be exceptionally severe to affect these

notes.  (*Id.* ("[T]he senior tranches of most CDOs were rated AAA by the credit rating

agencies[.]").)

Excerpted pages from one of RBS's CDO prospectuses are at E94-105, and a chart of key

language from 42 other published prospectuses is attached as Appendix A.  The sample offering

described at E94 is for a CDO entitled "TABS 2006-6," which became effective on November 15, 2006.  Like CDOs generally (*see* CAC ¶¶ 128-32), TABS 2006-6 employed a special purpose entity (the "Issuer") that in turn acquired different types of debt securities, such as those backed by residential mortgages, corporate bonds and the like.  (E102-03, TABS 2006-6 Prospectus, at 142, 160; *see* CAC ¶¶ 128, 130.)  TABS 2006-6 then issued different slices (or "tranches") of new debt securities to investors, each of which was assigned a priority in the cash flow from the underlying investments.  (E99, TABS 2006-6 Prospectus, at 81; *see* CAC ¶ 130.)  As the Complaint explains, "[t]he highest tranche (also referred to as the senior tranche) is first to receive its share of the cash flow from the . . . pool." (*Id.* ¶ 130; *see also* E99-100, TABS 2006-6 Prospectus, at 81-82.)

Highlighting the risks involved, RBS provided detailed descriptions of the type of debt that would be included in its CDOs.  For instance, the TABS 2006-6 prospectus describes the various types of debt securities that would be purchased, including that these would include Residential Mortgage Backed Securities (RMBS).  (E95-97, 104, TABS 2006-6 Prospectus, at 38, 42, 43, 164.)  Going even further, page 43 of the TABS 2006-6 prospectus discloses that "[a] large percentage of the [Residential Mortgage Backed Securities] [a]cquired by the Issuer are expected to be . . . secured primarily by subprime mortgages."  (E97, TABS 2006-6 Prospectus, at 43.)  Similar disclosures were contained in many of RBS's other prospectuses.  (*See* Appendix A.)

The CDO prospectuses also described Greenwich Capital's role in underwriting and as a potential participant in the CDO offerings, and thus its potential risk as a CDO note holder.  The TABS 2006-6 example identifies Greenwich Capital as the "Initial Purchaser" of the offered notes, with the intent that most of the securities would be subsequently sold.  (E105, TABS

2006-6 Prospectus, at 236; *see also* Appendix A.)  That role necessarily subjected RBS to the risk that Greenwich Capital would be unable to sell the CDO notes.  In addition, the TABS 2006-6 prospectus stated that RBS (specifically, Greenwich Capital Markets, Inc. or its affiliates) "may [a]cquire" certain of the notes issued from the CDO—the super-senior tranche denominated "Class A1S" in the prospectus.  (E98, TABS 2006-6 Prospectus, at 71.)  RBS's other prospectuses likewise disclosed that it might retain similar interests.  (*See* Appendix A.) Securities like these were the "retained interests" disclosed in RBS's April 26, 2006 Financials. *See supra* pp. 8-9.

Finally, Thomson Financial, using prospectuses and other information, compiled quarterly "League Tables" that ranked participants in the U.S. residential mortgage CDO market by deal volume.  These summary tables consistently identified RBS as one of the leading underwriters of MBS and CDOs.  (*See, e.g.*, E1387-1428, League Tables (relevant pages underlined).)  RBS routinely cited to its position in League Tables during conferences with market analysts and in the presentations that accompanied these conferences.[3]  So, even if a particular market observer did not review RBS's prospectuses, RBS's major role in the business was widely known, and analysts indeed referred to these League Tables in meetings with RBS personnel cited in the Complaint.

### c)  Plaintiffs' Allegations

Notwithstanding the volume of information available to the market about RBS's exposure to U.S. residential mortgages, Plaintiffs contend that RBS concealed these exposures. Plaintiffs principally attack RBS's audited April 26, 2006 Financials, which was incorporated by

---

[3] (*See* E1181-82, October 3, 2005 Presentation at Conference on Corporate Banking and Financial Markets, at 36, 40; E1230, August 4, 2006 RBS Conference Call Tr., at 43; E1245, March 1, 2007 Analyst Conference Call Tr., at 6; E1337-38, December 6, 2007 Conference Call Tr., at 12-13.)

reference into the offering documents for certain series of Preferred Shares (CAC ¶¶ 532-33, 534-52, 556-57, 561-62), and into an interim financial report published in 2006 (*id.* ¶¶ 558-60).[4] Plaintiffs isolate broadly reassuring statements in the April 26, 2006 Financials about the credit and risk exposures of the Bank (*id.* ¶¶ 535-36), and contend that these were inaccurate because they did not specifically disaggregate RBS's exposure to subprime-related assets. Plaintiffs also contend that the April 26, 2006 Financials should have specifically shown RBS's exposure to subprime-related assets under governing accounting principles (*id.* ¶¶ 538-39), and that RBS's assurances regarding its risk management systems were inaccurate because they were somehow inconsistent with RBS's acquisition of subprime-linked securities (*id.* ¶¶ 542-43).

The Complaint relies heavily on the contention that IFRS required the disclosure of so-called "concentrations of risk." (*Id.* ¶¶ 422-26; 574-75.) According to Plaintiffs, the fact that subprime loans fed into the securities owned by RBS transformed those securities into high-risk "subprime assets," which rendered them "concentrations of risk" subject to separate treatment in RBS's financial statements and elsewhere. (*Id.* ¶¶ 422-30.) Plaintiffs appear to base this claim on their definition of what constitutes a "subprime" loan, which they contend are loans "considered riskier than prime loans, because borrowers typically have less than full documentation, lower credit credit scores, higher loan-to-value [ratios] or multiple investment properties." (*Id.* ¶ 132.)

However, Plaintiffs do not try to reconcile their "concentration of risk" claim with their acknowledgment throughout the Complaint that the supposed "subprime assets" held by RBS

---

[4] (*See* E93, RBS's Series Q prospectus, at 32 (incorporating the April 26, 2006 Financials ); E111, RBS's Series R prospectus, at 32 (incorporating the April 26, 2006 Financials).)

were mainly super-senior CDO notes rated triple-A.[5]   As the Complaint concedes, the tiered manner in which CDO note holders were paid meant that even a large number of defaults in the underlying collateral would not necessarily affect senior note holders.  (*See id.* ¶ 130.)  There is thus a critical distinction between risks associated with individual high-risk loans and triple-A-rated tranches of securitized pools of loans.  In that regard, RBS's independent auditors gave an unqualified audit opinion that the financial statements conformed with IFRS as issued by the ISB without a separate analysis of "subprime" connected assets.  (*See* E66-67, April 26, 2006 Financials 86-87 (unqualified approval of independent auditors for RBS's accounting).)  Although these securities were ultimately  unable to withstand the recent massive decline in the U.S. housing markets, at the time they were anything but "subprime" in nature, notwithstanding the nature of the underlying loans.

### 2.   RBS's Disclosures About Its U.S. Mortgage Lending Portfolio As U.S. "Subprime" Troubles Emerge

In late 2006, delinquencies on subprime mortgages began to rise, and "[b]y early 2007, a steep rise in the rate of subprime mortgage defaults and foreclosures had caused some subprime mortgage lenders to fail or file for bankruptcy."  (CAC ¶ 149.)  The Complaint notes the bankruptcy of lender New Century.  (*Id.*)  Another example is HSBC (a U.K. bank like RBS), which announced on February 7, 2007 that a U.S. subsidiary had lost $10.5 billion through

---

[5] Triple-A is the highest possible credit rating, "indicat[ing] an unusually strong capacity to pay interest and repay principal."  David L. Scott, *Wall Street Words:  An A to Z Guide To Investment Terms for Today's Investor* 1 (2003) (definition of "AAA").  Standard & Poor's, a rating agency that rated CDOs, says that "[a]n issuer or obligation rated 'AAA' should be able to withstand an extreme level of stress and still meet its financial obligations.  A historical example of such a scenario is the Great Depression in the U.S."  (E1763, *S&P's Ratings Direct:  Understanding S&P's Rating Definitions*, at 14 (June 3, 2009).)  The cumulative impairment rates for triple-A-rated CDO tranches between 1993 and 2006 was **0%**.  (E1596-97, Moody's, *Special Comment: Default & Loss Rates of Structured Finance Securities: 1993-2006* (Apr. 2007), 47-48.)  RBS itself ranked assets using credit ratings, and it described triple-A rated assets as "investment grade."  (*See, e.g.*, E224, RBS's April 24, 2007 Financials, at 43).

defaults on direct subprime loans.  (E1626, *HSBC Reports Rise in Troubled Loans*, N.Y. Times, Feb. 8, 2007, at C3.)

a)        <b>RBS's Statements About Its U.S. Mortgage Lending Portfolio</b>

On March 1, 2007, just a week after HSBC's announcement of losses on direct subprime loans, RBS published its annual results for financial year 2006.  It was in this context that RBS confirmed that its U.S. mortgage lending business did not make such loans, emphasizing a "longstanding aversion to sub-prime lending."  (E127-28, March 1, 2007 Results, at 4-5; CAC ¶ 273.)  At Citizens in particular, "credit quality remains strong, underpinned by our focus on prime customers."  (E129, March 1, 2007 Results, at 6.)  Likewise, in a discussion with analysts the same day, RBS made clear that its Citizens loan portfolio was "prime quality" because Citizens did not "do subprime lending[.]"  (E1244, March 1, 2007 Analyst Tr. at 5; *see also* CAC ¶ 274.)  And when an analyst asked how RBS's situation compared to HSBC's, Larry Fish, the CEO of Citizens, emphasized that RBS was not in the same position because "we"—meaning Citizens—"don't do subprime."  (E1262, March 1 2007, Analyst Tr. at 23; *see also* CAC ¶ 276.)

These statements were limited to describing RBS's mortgage portfolio in the U.S.  The statements said nothing about RBS's separate securitization business.  As the Complaint acknowledges, it was not until September 2007 at the earliest that some banks began to reflect the growing credit crisis in their valuations of their triple-A securities.  (*See* CAC ¶¶ 152-53.)  Before then, it was widely believed that these securities were insulated.  Indeed, both the Chairman of the Federal Reserve and the U.S. Treasury Secretary stated their belief that, as of February or March 2007, "the worst [wa]s behind us" and that subprime-related problems were "largely contained."  (E1627, Doug Alexander, *Greenspan Says Worst of U.S. Housing Slowdown is Over (Update 2)* Bloomberg, (Feb. 14, 2007), at 1 (quoting former Fed Chairman Greenspan); E1629, *Paulson—Housing Woes Not Affecting U.S. Economy*, Reuters, Mar. 13,

2007, at 1 (quoting U.S. Treasury Secretary Paulson).)  And the IMF advised in April 2007 that "even under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures will not face losses."  (E1776, Int'l Monetary Fund, Global Fin. Stability Report (Apr. 2007), at 7.)

In their discussions with RBS, analysts showed they understood that RBS's comments were only about U.S. mortgage loan portfolio, and not about securitization.  For instance, in the March 1, 2007 analyst call, the same analyst who had asked how RBS compared to HSBC asked a follow-up question that showed a clear understanding of the differences between Citizens' retail banking and RBS's securitization business.  After Larry Fish said that Citizens did not "do subprime," the analyst turned to Johnny Cameron, the head of RBS's GBM group, and asked about the potential effect of subprime defaults on GBM *as distinct from Citizens*:  "MARK THOMAS:  Okay perhaps *on Johnny's side then*, can you actually in terms of the revenues say how many dollars, millions of pounds . . . . Was made in trading subprime mortgage-backed?"  (E1262, March 1, 2007 Analyst Tr. at 23 (emphasis added).)  Cameron declined to provide the "commercially sensitive" detail being requested, but confirmed that there had not been any "significant trading losses" at that point in time.  (*Id.*)  Cameron also confirmed that GBM had some credit exposure to entities that had originated the subprime loans that RBS would later securitize.  (*See id.*)

Analyst reports published before and after the March 1, 2007 analyst call confirm that analysts understood that RBS's securitization business presented a distinct risk.  For example, even before RBS's March 1, 2007 statements, a Bear Stearns analyst report stated that "RBS's loan exposure in the US is prime and super prime[,]" but that "RBS is exposed to mortgage-backed security markets through its Corporate Markets divisions and is currently the biggest

participant in these markets."  (E1460, Bear Stearns Analyst Report, *Royal Bank of Scotland—U.S. Exposur*e, Feb. 9, 2007, at 1.)  After the March 1, 2007 statement, an April 26, 2007 analyst report stated:  "Despite having a relatively low volume of sub-prime lending in the US, . . . RBS ha[s] possible credit exposure to the US . . . sub-prime mortgage market through [its] MBS underwriting activities."  (E1506, Bernstein Research Analyst Report, *Barclays and RBS*, April 26, 2007, at 11.)  Other reports make the same or similar observations, as reflected in Appendix B to this brief.

From March 1, 2007 until August 15, 2007, RBS issued several more statements describing its U.S. direct lending profile, but also confirming RBS's involvement in securitizing U.S. mortgage debt.  These statements are collected in Appendix C hereto.  Most significant in this regard was RBS's April 24, 2007 Financials (covering FY 2006).  That document contained essentially the same disclosures as the April 26, 2006 Financials about RBS's securitization business, including its retention of securitization interests and the attendant risks.  (E263-70, April 24, 2007 Financials at 111-15.)  Public regulatory information about Citizens for this period also provided detailed information about its mortgage portfolio, including impairments.  *See supra* n.2.

### b)    Plaintiffs' Allegations

Plaintiffs claim that despite the limited nature of RBS's actual statements, RBS told the world it lacked exposure to the effects of the subprime mortgage crisis.  They assert that RBS had "assured the investment community that RBS and its subsidiaries '***don't do subprime***.'"  (CAC ¶ 5 (emphasis in original).)  The Complaint carries forward the same theme throughout, asserting that RBS "blatantly and repeatedly lied to investors, insisting that the Company 'didn't do' subprime, implying that it had no exposure to subprime."  (*Id.* ¶ 157; *see also* ¶¶ 134, 141, 146, 277(b), 282(d), 293(f), 299(d).)

Plaintiffs also include a handful of allegations asserting that RBS's statements were misleading with respect to Citizens standing alone. Specifically, the Complaint alleges that RBS should have also disclosed that it "was pressuring [Citizens CEO Larry] Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S., such that RBS ultimately ended up with £14 billion of subprime exposure." (*Id.* ¶¶ 277(a), 282(a), 287(a), 293(a), 299(a), 309(a); *see also* ¶¶ 8, 250, 270.)[6] Plaintiffs' only source for the allegation that RBS "ultimately ended up"—at an unspecified time—"with £14 billion in subprime exposure" is a March 21, 2009 *Daily Telegraph* article. (*Id.* ¶¶ 8 n.6, 234.) The article does not specify any source for the information or explain what it means by "subprime exposure."

### 3. RBS's Estimates Of Losses On Certain Mortgage-Related Securities

The next stage in the crisis began in the third and fourth quarters of 2007. Heading into this period, on April 24, 2007, RBS had issued its 2006 year-end audited Financial Statement. Like the April 26, 2006 Financials, this one contained four pages of information and analysis providing details on how loan defaults could adversely impact the value of RBS's retained debt securities. (E263-70, April 24, 2007 Financials at 111-15.)

---

[6] Plaintiffs also allege, based on information provided by a putative "confidential witness," that Citizens purchased "Collateralized Mortgage Obligations" ("CMOs"), and then transferred those instruments to Greenwich Capital for packaging with other securities into CDOs. (CAC ¶¶ 249, 252.) Plaintiffs claim that RBS should have disclosed this fact, but they fail to explain why, given their own witness's view that the CMOs were "high quality." (*Id.* ¶ 252.) In any event, RBS did disclose that it purchased CMOs in its Financial Statements, which also explained precisely what CMOs were. (*See* E69, April 26, 2006 Financials at 108 ("The Group engages in securitisation transactions of its financial assets including . . . US Government agency collateralised mortgage obligations").) U.S. Government agency CMOs are generally considered risk free since the government (or government sponsored agencies) guarantee the payment of principal and interest on the underlying collateral. (*See* E1601, Frank J. Fabozzi, et al., *Collateralized Mortgage Obligations: Structures and Analysis* (3d Ed. 1999), at 5.)

In September 2007, large financial institutions like Goldman Sachs, Bear Stearns, Lehman Brothers and Morgan Stanley began to write down the value of holdings of CDOs and other debt securities in connection with those banks' quarterly reporting cycles. (CAC ¶¶ 152-53.) Thereafter, Merrill Lynch announced write downs in October 2007 (*id.* ¶ 155), and Citigroup, Morgan Stanley and Barclays, among others, announced further write downs in November 2007 (*id.* ¶ 156).

Not surprisingly in light of its disclosed risks, RBS's stock price began to decline as subprime loan defaults increased, along with the stock prices of the banks identified as benchmarks in the Complaint and other similarly-situated firms.[7] Indeed, in October 2007, Merrill Lynch published an analyst report titled "More Turbulence Ahead," which estimated the "subprime" exposure of the major European financial institutions. The report estimated, based on public information about RBS's underwriting activities, that RBS had retained approximately $8.6 billion in total super-senior holdings, not accounting for "hedging" such as monoline insurance that would reduce the actual total exposure. (*See* E1522-23, Merrill Lynch Analyst Report, *More Turbulence Ahead*, Oct. 29, 2007, at 6-7.)

### a)  RBS's Initial CDO Write-Downs

On December 6, 2007, RBS issued its year-end Trading Statement, in which it too disclosed write-downs on CDOs and related assets, against the backdrop of an otherwise very successful year. Excluding CDO interests held by ABN (which had been acquired in October 2007, as discussed below), RBS announced write-downs of £950 million "on our exposure to

---

[7] For example, between September 1, 2007 and December 31, 2007 RBS's stock price dropped 23% (from an adjusted price of 481.08 to 371.80). During the same timeframe, Citigroup's stock price dropped 37% (from $46.88 to $29.44); Merrill Lynch's price dropped 27% (from $73.70 to $53.68); Wachovia's price dropped 22% (from $48.98 to $38.03); Fortis's stock price dropped 20% (from €22.53 to €18.01); Barclays' price dropped 18% (from 597.47 GBp to 490.83 GBp); and Morgan Stanley's dropped 15% (from $62.37 to $53.11). (Source of Data: Bloomberg.)

U.S. sub-prime mortgage markets," the details of which were set out in an appendix.  (E1355, December 6, 2007 Presentation.)  RBS also announced write-downs in ABN's CDO holdings. (*Id.*)  The total write-down was £1.25 billion, a relatively small part of the £9.9 billion pre-tax 2007 operating profit.  (*Id.*)

The Trading Statement appendix set out further details about the write-downs.  First, RBS reconfirmed the nature of its securitization business, consistent with its prior Financial Statements.  RBS explained that it "ha[d] a leading position in structuring, distributing and trading asset-backed securities (ABS).  These activities included buying mortgage-backed securities, including securities backed by U.S. sub-prime mortgages, and repackaging them into [CDOs] for subsequent sale to investors."  RBS further confirmed that it had "retain[ed] exposure to some of the super senior tranches of these CDOs[,]" but that "[t]here [was] no exposure to these instruments in the banking book."  (*Id.* at E1358.)

RBS then explained why its CDO-related assets were being written down:  "In the second half of 2007, rising mortgage delinquencies and expectations of declining house prices in the U.S. have led to a deterioration of the estimated fair value of these exposures." (*Id.*)  RBS also emphasized the judgment-driven nature of its valuations, stating that its "valuations of the ABS CDO super senior exposures take into consideration outputs from our proprietary model, market data and prudent valuation adjustments."  (*Id.*)  Elsewhere, the Trading Statement emphasized the forward-looking and uncertain nature of its estimates.  (*See id.* at E1360.)

In a follow-up meeting with analysts the same day, RBS provided additional detail about its CDO loss estimates, in which it further emphasized the uncertain, judgment-driven nature of its write-downs.  An analyst asked why RBS's estimates were "a bit lower than some of the other banks out there."  (E1332-33, Dec. 6, 2007 Analyst Tr. at 7-8.)  RBS explained that "there's

quite a range" of CDOs, and that a variety of factors can affect valuation estimates, including "when they were written[,]" "what age they are[,]" and "which state you're exposed to[.]" (*Id.* at 8)  That information was used to "project what we think the total delinquencies over the life of these instruments w[ould] be[.]"  (*Id.*)  To account for these variables, RBS explained that "there's a complicated model here that's gone loan-by-loan, state-by-state and gone through to calculate where we're at."  While the losses "could go up," RBS said it had "tried to be prudent in [its] judgment[.]"  (*Id.*)

Analysts' reactions reflect relief that RBS's loss estimates were lower than has been expected.  (CAC ¶¶ 167-69; *see* Appendix B for a list of analyst comments.)  One analyst noted in the December 6, 2007 meeting that RBS's losses were less than would be predicted based on RBS's position in Thomson's League Tables.  (E1337-38, Dec. 6, 2007 Analyst Tr. at 12-13.) When RBS's estimates were announced, its stock price increased from $9.65 to $9.99, which analysts directly attributed to its lower-than-expected loss estimates.  (*See* Appendix C).

### b)  RBS's Subsequent Write-Downs

Like the other banks the Complaint cites as comparable benchmarks, RBS was forced to take further write-downs as the financial crisis worsened.[8]  RBS first did so in its year-end 2007 annual results, published on February 28, 2008.  RBS took "an additional mark-down of 10% on the valuation of high grade CDOS in ABN['s] . . . portfolio."  (E594, February 28, 2008 Results at 6.)  But the majority of the additional losses at this point arose from "the weakening credit

---

[8] Plaintiffs cite other banks' earlier write-offs as evidence that RBS's came too late, but the Complaint tellingly fails to say what happened to those other banks after their initial write-offs.  Those banks ended up having multiple write-offs as the crisis progressed:  as of January 2009, Merrill Lynch. had written down approximately $60.2 billion; as of March 2009, Citigroup Inc. approximately $40.6 billion; as of December 2008, Morgan Stanley approximately $14.8 billion; as of November 2008, Barclays approximately £2.7 billion; and as of January 2008, Bear Stearns approximately $3.4 billion.  (*See* E1801-2055 (excerpted pages from relevant SEC filings and press releases).)

profile of some financial guarantors[,]" which had "caused [RBS] to mark down the value of our positions with these counterparties." *Id.* at 3. As RBS explained in an analyst meeting the same day, these "guarantors" were the so-called "monoline" insurers who provided credit default insurance on RBS's CDOs; if the insurers became insolvent, the insurance would become worthless. (E1363, February 28, 2008 Analyst Tr. at 3.)[9] As it had before, RBS reiterated that its valuations were merely estimates. (E590, February 28, 2008 Results.)

RBS was next forced to take additional write-downs in April 2008, in the wake of the unprecedented market upheaval in March 2008. That month, Bear Stearns averted bankruptcy only through a hastily-arranged takeover by JPMorgan Chase. That a major financial institution like Bear Stearns could nearly go bankrupt caused severe disruption in the credit markets.[10] Thus, as RBS explained in its April 22, 2008 announcement, March had witnessed a "severe and increasing deterioration in credit market conditions," as well as a "worsening economic outlook" and an "increased likelihood that credit markets would be difficult for some time[.]" (E706, April 22, 2008 Announcement, at 3.) RBS "estimated that the effect on capital of write-downs in respect of credit market exposures could be £4.3 billion net of tax (£5.9 billion before tax) in 2008." RBS emphasized that "[t]hese estimates," like its prior estimates, "are based on prudent

---

[9] Credit default insurance is supposed to guarantee timely payment of principal and interest on asset backed securities. (E740, May 14, 2008 Financials at 8 n.4 ("Monoline exposures relate to credit protection purchased on credit assets, including CDOs.").) "Monoline" insurers are so called because they only provide insurance on financial products. (*See* E1797, http://www.afgi.org/ monoline.htm.) As with any insurance, credit default insurance is useful only if the insurer is financially able to make the payment required by the insurance policy. (E740, 748, May 14, 2008 Financials at 8, 14.)

[10] (*See, e.g.*, E1654, Ambrose Evans-Pritchard, *Bear Stearns Speculation Sparks Storm in credit markets*, Daily Telegraph, March 11, 2008, at 1 ("Panic swept the credit markets on rumours of cash crisis at . . . the US investment bank Bear Stearns . . . ."); E1655-57, Elizabeth Spiers, *Bear Run, Why the Fed had to bail out Bear Stearns*, Slate Magazine, March 18, 2008, http://www.slate.com/id/2186792/ ("When rumors began to circulate that Bear Stearns was having liquidity problems . . . . [a] full-fledged panic ensued."); E1658-59, *Credit Crunch: Regulating Chaos*, St. Louis Post-Dispatch, March 28, 2008, at 1 ("when rumors spread that Bear Stearns might fail, investors and trading partners rushed to pull their money out and cut off business with the firm").)

assumptions" that, in this instance, reflected "the further sharp deterioration in market conditions and outlook in credit markets at this point." (*Id.*)  RBS provided a chart that detailed the estimated losses on its CDOs and monoline exposures, as well as on other assets (such as U.S. commercial mortgages) that had not been the subject of prior write-downs at all (and which Plaintiffs do not attack here).  (*Id.* at 5, E708.)[11]

### c)    Plaintiffs' Allegations

Plaintiffs assert that RBS somehow "knew" that its CDOs and related security assets were "overvalued" before the initial December 6, 2007 write-down.  As evidence, the Complaint points to (a) an alleged decline in the "ABX" index beginning in August 2007, which Plaintiffs claim was a relevant benchmark in valuing RBS's CDOs (CAC ¶¶ 148-50); (b) write-downs by other financial institutions on their CDO holdings beginning in September 2007 (*id.* ¶¶ 152-56); (c) internal RBS emails acquired from a putative "confidential witness" that reflect debates about CDO valuation in October and early November 2007, before RBS's write-downs were published (*id.* ¶¶ 159-62); and (d) statements in hindsight by RBS personnel in 2009 about the need to improve RBS's risk-management systems (*id.* ¶¶ 225; 229; 526; 528-29; 546).

Plaintiffs contend that these alleged facts show that "RBS management knew that valuations of the Company's subprime assets, including both its CDOs and MBSs, were grossly inflated" prior to December 6, 2007.  (*Id.* ¶ 159.)  On this basis, Plaintiffs purport to identify a number of pre-December 6, 2007 statements that supposedly should have contained disclosures

---

[11] Although Plaintiffs concede that RBS's April 22, 2008 document provided complete disclosure about CDO losses (CAC ¶¶ 172-73; 453), it is worth noting that RBS made further detailed disclosures in its audited 2007 Financial Statement dated May 14, 2008.  That Statement separately devoted 8 pages to discussing RBS's exposure to subprime-related assets.  (E739-44, E751-52, May 14, 2008 Financials at 7-11, 23-24, 30.)  Put differently, now that these assets had become "concentrations of risk," RBS gave them focused accounting treatment in accordance with the accounting rules cited in the Complaint.  (CAC ¶¶ 422-24.)

about the value of RBS's CDOs and related assets, and the risk management systems related to those valuations.[12]   Plaintiffs do not allege that RBS provided any inconsistent valuation estimates to anyone else or that RBS took any actions that were inconsistent with a good faith belief in the valuations it provided.

Plaintiffs additionally attack the extent of the initial December 6, 2007 write-down. Plaintiffs claim that it was "misleading" because it was accompanied by a (concededly true) report that "operating profits and earnings per share [were] expected to be well ahead of market consensus forecast." (E512, Dec. 6, 2007 Trading Statement; CAC ¶ 164.)  Plaintiffs also attack RBS's stated belief that its initial write-downs were "pretty conservative" and based on "prudent . . . judgment." (E1333, Dec. 6, 2007 Analyst Tr. at 8; CAC ¶ 164.)  The only facts Plaintiffs point to in support of their attack on these statements are the added write-downs that RBS took in April 2008.  (CAC ¶¶ 172-76.)  Plaintiffs omit any reference to the events of March 2008 that had caused RBS to increase its loss estimates, as explained in RBS's April 22, 2008 disclosure (*see supra* p. 22).

### 4.   RBS's Disclosures About The ABN Acquisition

Plaintiffs also attack RBS's statements about its participation in the consortium that acquired ABN in October 2007.  Plaintiffs first complain about certain pre-acquisition statements and projections by RBS personnel concerning the hoped-for benefits of the acquisition.[13]

---

[12] These include the April 26, 2006 Financials (CAC ¶¶ 542, 543); May 24, 2006 Form 6-K (*id.* ¶ 553-54); November 9, 2006 6-K (*id.* ¶ 561); December 21, 2006 6-K (*id.* ¶¶ 562-63); March 1, 2007 Results (*id.* ¶¶ 273, 277(c)-(e)); April 24, 2007 Financials (*id.* ¶¶ 579-580); a June 5, 2007 Analyst Meeting (*id.* ¶ 282(b)-(c)); June 27, 2007 6-K (*id.* ¶ 590); a July 20, 2007 6-K (*id.* ¶ 287(b)); an August 3, 2007 6-K (*id.* ¶¶ 293(b)-(e), 294(a)-(c)); an August 3, 2007 Analyst Meeting (*id.* ¶ 299(b)-(c), (f)-(h)); the August 15, 2007 Interim Results (*id.* ¶ 302(a)-(d)); September 25, 2007 6-K (*id.* ¶ 609); September 27, 2007 6-K (*id.* ¶ 604); September 28, 2007 6-K (*id.* ¶ 304(b)-(d)); and an October 4, 2007 6-K (*id.* ¶ 611).

[13] These include statements in a May 29, 2007 analyst meeting (CAC ¶¶ 278-80); a June 16, 2007 6-K (*id.* ¶¶ 283-85); a July 20, 2007 F-4 (*id.* ¶¶ 288-89); and an October 10, 2007 analyst meeting (*id.* ¶¶ 305-06).

Plaintiffs claim that RBS had not performed enough due diligence on ABN's books to support those statements.  (CAC ¶¶ 183-84, 280, 289, 306.)

Plaintiffs fail to acknowledge, however, that RBS made clear early-on that "ABN . . . has provided the Banks only with limited access to ABN['s] . . . accounting records," so "RBS [consequently] did not have the information necessary to independently verify certain adjustments and assumptions."  (E368, July 20, 2007 Form F-4, at 46.)  In all-bold letters, RBS separately warned that, as is typical in a hostile takeover of a public company, "*[t]he Banks have conducted only limited due diligence . . . and, therefore, we may become subject to unknown liabilities[.]*"  (*Id*. at 47, E369 (emphasis in original).)  To emphasize the point, RBS said that its offer was based primarily on "publicly available information relating to ABN[.]"  (*Id.*)  The Complaint identifies nothing in the public data on which RBS had relied that is inconsistent with RBS's public optimism about the acquisition.  Nor do Plaintiffs take account of ABN's strong earnings announcements in summer and fall of 2007 just prior to the acquisition.  (*See* E380-81, ABN Form 6-K, filed with the SEC on July 30, 2007, at E408; ABN Form 6-K, filed with the SEC on Sept. 17, 2007.)

Plaintiffs next complain about how RBS accounted for the goodwill associated with its ABN acquisition, and about post-acquisition statements concerning the acquisition's expected benefits.  "'Goodwill'" is an asset that is "'the excess of the cost of an acquired business over the fair value of its net assets.'"  (CAC ¶ 341 (quoting E776, May 14, 2008 Financials at 120).)  Plaintiffs contend that the goodwill value of the ABN combination was overstated, and that the projected synergies were too optimistic.  They argue that economic events should have caused RBS to "test" its goodwill under relevant accounting rules sooner than it did, and then to have written down the goodwill earlier than January 19, 2009, when it actually was written down.

(CAC ¶¶ 311(b)-(c); 318(b); 325(f); 327(a), (c)-(e); 334(b)-(e); 336; 338; 342; 345; 351(b)-(e); 354(b)-(d); 356(b)-(d).)

Yet Plaintiffs concede that goodwill need only have been tested and written down after it was "allocated" to RBS's existing business units. (*Id.* ¶¶ 402-04.)  Although Plaintiffs make the assertion that RBS "had sufficient information to allocate ABN . . . goodwill at least on a provisional basis" by May 14, 2008 (*id.* ¶ 404), they do not provide a basis for that allegation, and otherwise do not allege that the allocation was completed before RBS issued any of the statements that the Plaintiffs attack.  On the contrary, Plaintiffs concede that the April 29, 2009 Financials was "the first indication that RBS finalized the allocation of ABN goodwill[.]"  (*Id.* ¶ 402.)  The Complaint pleads no specific facts concerning the viability of perceived synergies from the ABN acquisition prior to January 2009.  Instead, Plaintiffs point to general economic conditions (*id.* ¶ 409), the failure of a different bank (*id.* ¶ 410), and declines in the values of RBS's and ABN's CDOs and other credit-exposed assets (*id.* ¶ 420).

### 5.    RBS's Disclosures Of Its Capital Needs

Plaintiffs' last series of allegations focus on RBS's statements about its capital needs. Plaintiffs allege that before March 2008 RBS had fraudulently assured the market that it did not need additional capital (*id.* ¶¶ 207-08), but later conducted the April 2008 Rights Issue to raise £12 billion in new capital (*id.* ¶ 209).  Plaintiffs make similar allegations with respect to RBS's capital raising efforts in the fall of 2008.  (*Id.* ¶¶ 213-16.)

The Complaint ignores the intervening watershed events of March and September 2008. As discussed above, credit markets suffered significant deterioration in the wake of Bear Stearns' near collapse in March.  *See supra* p. 22.  RBS specifically referred to these momentous events as the reason for its change of direction with respect to capital, and further explained that the large scale of the £12 billion capital raise was meant not simply to cover losses (as Plaintiffs

would have it), but moreover to increase the capital base well *above* pre-crisis levels, and thereby provide a larger buffer against *future* disruptions.  (E723, 727, April 30, 2008 Rights Issue Circular at 7, 24.)  Even this anticipatory effort failed.  The markets were even more disrupted in September 2008, as the public record amply shows.  Lehman Brothers collapsed, triggering a severe liquidity crisis in the financial industry.  Fannie Mae and Freddie Mac went into receivership. The U.S. government bailed out banks, insurance giant AIG, and others.  And the economy moved to the brink of depression.  (*See* E1693-1701, E1707-14 (collecting articles).)  RBS again needed to raise additional capital in October, and cited the events of September as the principal cause.  (E1027-28, October 14, 2008 Announcement, at 2-3.)

### C.    The Commencement Of This Action

The Complaint asserts two categories of claims against RBS.  *First*, it asserts a claim under Section 10(b) of the '34 Act and Rule 10b-5 thereunder, on behalf of RBS common stockholders from March 1, 2007 to January 19, 2009.  (CAC ¶¶ 484-94.)  *Second*, it asserts claims under Sections 11 and 12 of the '33 Act, on behalf of acquirers of RBS shares in (i) five Preferred Share offerings in 2006 and 2007 *(id.* ¶¶ 500-613, 674-87); (ii) RBS's acquisition of ABN (the Exchange Offer) (*id.* ¶¶ 642-61); and (iii) RBS's Rights Issue in April 2008 (the Rights Issue) (*id.* ¶¶ 698-723).

In addition to the claims against RBS, the Complaint asserts direct and supervisory liability claims under the '33 and '34 Acts against various individuals affiliated with RBS (*id.* ¶¶ 484-99, 636-97, 724-32), as well as '33 Act claims against underwriters allegedly involved in the Preferred Share offerings in 2006 and 2007 (*id.* ¶¶ 614-41), and in the Rights Issue in April 2008 (*id.* ¶¶ 698-723).  Exhibit A to the Complaint is a chart of which defendant is subject to which claim.

Amazingly, Plaintiffs purport to attribute *all* of the decline in RBS's stock price from March 1, 2007 until January 19, 2009 to the alleged fraud.  (*Id.* ¶ 22.)  While the Complaint discusses six instances in this period in which the "truth" supposedly came out and affected prices (*id.* ¶¶ 444-77), the Complaint glaringly does not limit its claims to the stock price drop attributed to these disclosures.  On the contrary, Plaintiffs claim the entire 98% drop in RBS's shares in this period as damages, notwithstanding the fact that the decline coincided exactly with the evolution of the credit crisis and the resulting U.K. government bailout.  (*Id.* ¶¶ 444-48.)[14]

## ARGUMENT

Part I of this section shows why Plaintiffs fail to state a claim under Section 10(b) of the '34 Act.  Part II shows the same under Sections 11 and 12 of the '33 Act.

## I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(B) OF THE '34 ACT

To plead a claim under Section 10(b) of the '34 Act, Plaintiffs must show "'that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff's reliance on defendant's action caused [plaintiff] injury.'"  *In re Rhodia SA Sec. Litig.*, 531 F. Supp. 2d 527, 543 (S.D.N.Y. 2007) (Batts, J.) (quoting *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000)).  Conclusory assertions will not suffice.  "Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by

---

[14] Indeed, Plaintiffs completely ignore the massive impact of the economic crisis on virtually every aspect of the Bank's business.  For example, by close of 2008, RBS's losses relating directly to super-senior CDOs were less than £3 billion (with a potential £3.6 billion more relating to monolines).  But RBS suffered total direct credit-related losses of approximately *£16 billion*, including, e.g., losses from counterparty exposures (such as Lehman), leveraged finance losses, and impairments.  And this does not begin to take account of the enormous effects of higher funding costs and sharply lower fees and revenues, all of which caused severe deterioration of capital far beyond the impact of the CDOs. (*See* E1170-72, April 29, 2009 Financials, at 22, 29.)

stating with particularity the circumstances constituting fraud." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Among other things, these rules require that the Complaint "'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U. S. 71, 81-82 (2006) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

The Court should separately examine each of the alleged misstatements and omissions in the Complaint to evaluate whether they meet the applicable pleading standards.[15] The Court should make that assessment in light of not only the allegations in the Complaint, but also other documents and information cognizable on a motion to dismiss. Significantly here, if the cognizable documents "contradict the allegations of the . . . complaint, the documents control and th[e] Court need not accept" the allegations as true. *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).[16]

The number of words, paragraphs or pages in a Complaint must not be mistaken for particularity, an important principle here in light of the dense, repetitive 256-page Complaint here. "A complaint can be long-winded, even prolix, without pleading with particularity.

---

[15] *See, e.g., 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 235 (S.D.N.Y. 2008) (examining each alleged misstatement separately); *Milman v. Box Hill Sys., Corp.*, 72 F. Supp. 2d 220, 235 (S.D.N.Y. 1999) (same); *In re Washington Mutual, Inc. Sec., Derivative & Erisa Litig.*, Nos. 2:08 MD 1919, C 08 387, 2009 WL 1393679, at *10 (W.D. Wash. May 15, 2009) (same).

[16] "Were the rule otherwise, a plaintiff could maintain a claim of fraud by excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement[.]" *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996). *See also, e.g., Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." (internal quotation marks, citation omitted)); *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ("If a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss.").

Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).  As one court recently emphasized in dismissing a securities fraud case, like this one, about mortgage-related securities, "[o]ne might be tempted to think that a complaint spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific.  The temptation is dangerous and must be resisted." *In re 2007 Novastar Fin., Inc., Sec. Litig.*, No. 07 Civ. 0139, 2008 WL 2354367, at *2 (W.D. Mo. June 4, 2009); *see also In re Downey Sec. Litig.*, No. 08 Civ. 3261, 2008 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009) (dismissing 944-page securities fraud complaint concerning mortgage-related securities).

A final overarching principle—especially important here—is that courts are highly skeptical of fraud allegations that follow upon the heels of a market-wide downturn.  In *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978), Judge Friendly pejoratively characterized these cases as alleging mere "fraud by hindsight[.]"  As a court in this District has described, these cases "in essence try to penalize [defendants] 'for failing to show "greater clairvoyance.'"  *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991).  Because it is obviously unjust to subject defendants to the burdens of litigating claims based on no more than second-guessing, courts have repeatedly thrown out hindsight-driven complaints for failure to allege the essential elements of a material misstatement or omission, scienter and/or loss causation.  *See, e.g.*, *Teamsters Local 445 Freight Div. Pen. Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (material misstatement); *Shield v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (scienter); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (loss causation).  Here, not one of these elements is satisfied, as shown in the following sections.  This

case accordingly should be dismissed just as have been other similar hindsight-driven cases challenging losses on mortgage-backed securities.[17]

## A.    The Complaint Fails To Plead A Materially Misleading Misstatement Or Omission

The alleged misstatements or omissions Plaintiffs attack under Section 10(b) of the '34 Act do not withstand the close scrutiny required by Rule 9(b) and the PSLRA.  Simply put, the Complaint lacks the facts necessary to back up its claims that any of RBS's conduct was materially deceptive, much less deliberately so.

### 1.    RBS's Statements About Its U.S. Mortgage Portfolio Are Not Actionable

To begin with, Plaintiffs' claim that RBS misled the market by confirming that it did not originate subprime loans violates the most elementary rules against taking statements out of context.  The law requires that "the allegedly fraudulent materials [be read] in their entirety to determine whether a reasonable investor would have been misled.  The touchstone of the inquiry is . . . whether defendants' representations or omissions, *considered together and in context*, would affect the total mix of information and thereby mislead a reasonable investor."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (emphasis added); *see also Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).  Plaintiffs ignore this rule.

RBS plainly did not state that RBS as a whole faced no risk from a large-scale credit crisis in the housing markets, as Plaintiffs now contend.  On their face, those statements said

---

[17] *See, e.g.*, *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 614 (E.D. Pa. 2009) (dismissing complaint, like this one, challenging the timing of subprime-related write-downs); *Patel v. Parnes*, 253 F.R.D. 531, 560 (C.D. Cal. 2008) (dismissing securities fraud claims based on decline in mortgage market, where "[i]n effect, by arguing that defendants' predictions and forecasts were not low enough, plaintiffs improperly attempt to allege 'fraud by hindsight.'"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *1 (dismissing securities claims attempting to attribute losses in mortgage-related positions to "misrepresentations" rather than the "current economic climate").

only that RBS (through its U.S. bank operations) did not originate "subprime" loans.  *See supra* pp. 15-17.  RBS made these statements at a time when losses from direct subprime loans were the subject of intense media and analyst scrutiny (*id.*), and RBS's statements were obviously a response to those reports.  Analysts understood them in exactly this way.  (*See* Appendix A.)  While Plaintiffs now in hindsight would like to pretend that they "implied" more (CAC ¶ 157), there is no basis for that claim.

But even if, contrary to fact, the statements had been unclear in isolation, Plaintiffs would still have no claim because RBS had provided ample disclosure elsewhere about its securitization business and attendant mortgage-related risks.  Allegedly misleading statements are not actionable when the purported "truth" that was concealed was available in the marketplace.  *See Harrison v. Rubenstein*, No. 02 Civ. 9356, 2007 WL 582955, at *15-*16 (S.D.N.Y. Feb. 23, 2007) (Batts, J.) (rejecting "generalized allegations that" the company "concealed its financial condition" where, *inter alia*, the company's public filings disclosed the information allegedly concealed).[18]  The April 26, 2006 Financials and April 24, 2007 Financials each contained four pages of data and analysis making RBS's risks absolutely clear, and RBS issued dozens of CDO prospectuses in the relevant period that provided even more detail, including information about RBS's potential exposure to securities linked to subprime loans.  *See supra* pp. 7-9.  Again, analysts repeatedly commented on RBS's potential exposure to losses in its securitization business during 2007.  (*See, e.g.*, E1506, April 26, 2007 Bernstein Research Analyst Report, at 11; *see generally* Appendix A.)  No investor would have viewed RBS's statement that it "did not

---

[18] *See also, e.g.*, *In re Avon Products Sec. Litig.*, No. 05 Civ. 6803, 2009 WL 848017, at *29 (S.D.N.Y. Feb. 23, 2009); *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024, at *21 (S.D.N.Y. Oct. 25, 2006); *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 348 (S.D.N.Y. 2005); *White v. H&R Block, Inc.*, No. 02 Civ. 8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004).

do subprime" as a "material" misstatement in light of the other information RBS had provided to the market.

As to Citizens, Plaintiffs cite a March 2009 *Daily Telegraph* article for the proposition that Citizens at some unspecified time had "exposure" to £14 billion of "subprime" assets of an unspecified form.  (CAC ¶ 234.)  But "[c]onclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (citations omitted).[19]  The *Daily Telegraph* article does not say what it means by the term "subprime"—which is not a term of art.  *See supra* n.1.[20]  Nor does it even specify *when* the alleged "subprime" exposure accrued.  *See Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569, 2001 WL 286757, at *9 (S.D.N.Y. Mar. 23, 2001) (Batts, J.) (dismissing claim where plaintiff failed to allege time and place misleading statements were made); *see also Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*, No. 02 Civ 7313, 2004 WL

---

[19] *See also, e.g., Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (reliance on media reports does not relieve plaintiffs of their burden under 9(b) "to 'adequately identify and link the sources . . . with the allegations of misconduct...derived from those sources.'"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004) ("These conclusory allegations and opinions [from newspaper and magazine articles] cannot satisfy the strictures of Rule 9(b) or the PSLRA and cannot be a predicate for fraud under § 10(b) and Rule 10b-5."); *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1259 (S.D.N.Y. 1991) ("Plaintiffs have stitched together a patchwork of newspaper clippings and proclaimed the result a tale of securities fraud. But by even the modest standards of Rules 9(b) and 12(b)(6), it isn't.").

[20] For example, the RBS repeatedly referred to FICO scores in characterizing its U.S. mortgage portfolio as "prime."  The Complaint does not dispute these statements.  (*See* E1199, August 4, 2006 Conference Call Tr., at 12 ("The credit portfolio remains good . . . It is a prime portfolio, FICO scores average 700 plus, 650 typically being the cusp point."); E1295, August 3, 2007 Analysts Conference Call Tr., at 3 ("We have just as a reminder no subprime exposure in the lending book at Citizens. Our FICO scores are over 700 and 96% of our lending to consumers is fully secured."); E1364, February 28, 2008 Analysts Conference Call Tr., at 5 ("Overall the portfolio remains very high quality, our retail customer FICO scores on average are above 700"); E754.1, May 14, 2008 Financials, at 40 ("Our consumer lending is to prime customers with average FICO scores on our portfolios, including home equity lines of credit, remain in excess of 700."); E1386, August 8, 2008 Analyst Conference Call Tr., at 4 ("Our retail books, mostly the Citizens-originated high quality credits, continue to perform well . . . The Core Home Equity and Mortgage books with a FICO score of 748 average and loan to value of 64 . . . continues to experience I think industry leading credit performance at this point.").)

634171, at *10 (S.D.N.Y. Mar. 30, 2004) (dismissing claim where plaintiff specified an "amorphous time period" of when alleged misstatements occurred). The *Daily Telegraph* article's *post hoc* reference to supposed "subprime" exposures does not come close to establishing material falsity, especially in light of ample disclosures about Citizens' sizable mortgage portfolio. *See supra* pp. 7-8.

Finally, based on information from a putative confidential witness, Plaintiffs assert that Citizens' CEO Larry Fish was being "pressured" to take additional "risks," and that this fact should have been disclosed. (CAC ¶¶ 250, 277(a), 282(a), 287(a), 293(a), 299(a), 309(a), 331(a), 654(d), 656(c), 658(c), 661(d).) Such allegations merit little weight. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (Easterbrook, C.J.) ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). But in any event, there is no allegation that Mr. Fish succumbed to this alleged "pressure," and nothing links the supposed "pressure" to supposed "*subprime*" lending.[21] Likewise, the confidential witness allegations about Citizens' purchase of CMOs and Charter One are vague and unconnected to the alleged statements about subprime lending. Such allegations state no claim.

---

[21] *See, e.g.*, *Denny*, 576 F.2d at 469 ("[T]he simple use of the epithet 'risky' is no better than a 'mere conclusory allegation to the effect that defendant's conduct was fraudulent,' which we have held to be insufficient" to state a claim for fraud) (internal citations omitted); *Steiner v. Shawmut Nat'l Corp.*, 766 F. Supp. 1236, 1247 (D. Conn. 1991) (citing *Denny* and finding that allegation that bank's real estate loans were "risky" lacked the specificity required under Fed. R. Civ. P. 9(b)); *see also Pittleman v. Impac Mortg. Holdings, Inc.*, No. SACV 070970, 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009) (allegation that former employee was under "significant pressure" to approve a loan pool that did not meet underwriting guidelines was "too vague" to state a claim).

### 2.    RBS's Statements About CDO Risks And Valuation Are Not Actionable

Plaintiffs next attack RBS's disclosures about the amount of risk it faced in securitizing and holding securities linked to subprime loans.  Plaintiffs contend that RBS reported inflated values for these securities; failed to accord them separate accounting treatment as "concentrations of risk" under IFRS; and failed to disclose weaknesses in RBS's risk management systems related to these securities.  None of these allegations has merit.

### a)    The Valuation Allegations

Plaintiffs' claim that RBS deliberately mis-valued CDOs and other mortgage-related securities fails under the "bespeaks caution" doctrine and the statutory safe harbor for forward-looking statements, and because the Complaint contains no facts to suggest that RBS lacked a good-faith belief in its valuation estimates.

*First*, under the bespeaks caution doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).  *See also, e.g.*, *San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) ("forward-looking statements" that "reflect hope, adequately tinged with caution," when considered in the context of "the total mix of information available to the market," are not misleading under the "bespeak[s] caution" doctrine).  Similarly, under the statutory safe harbor for forward-looking statements, issuers like RBS are exempt from liability for statements accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).

Here, these doctrines separately and together bar Plaintiffs' claims based on RBS's alleged mis-valuation of CDOs. RBS made it crystal clear in its April 26, 2006 Financials and April 24, 2007 Financials that its valuations of debt securities like CDOs were based on uncertain projections of future events, such as loan defaults. RBS even went so far as to provide a sensitivity analysis to educate investors of the possible extent of the risk. (*See, e.g.*, E75, April 26, 2006 Financials 144; E272, April 24, 2007 Financials at 150). In these circumstances, valuations that depend on such forward-looking factors fall squarely under the doctrines to bar Plaintiff's claims. *See, e.g.*, *Shaev v. Hampel*, No. 99 Civ. 10578, 2002 WL 31413805, at *7 (S.D.N.Y. Oct. 25, 2002) (safe harbor applies to valuation model calculations accompanied by warning that calculations "are estimates" and "dependent upon certain (enumerated) assumptions"); *cf. Marsh Group v. Prime Retail, Inc.*, No. 01-2500, 46 F. App'x. 140, 146 (4th Cir. 2002) ("All projections can be characterized as presently held beliefs. The statements are forward-looking because they relate to 'future economic performance.'").

*Second*, and in any event, even if there had been no such warnings, Plaintiffs fail to plead that RBS's valuations were "false." As Plaintiffs concede in the Complaint, the CDOs at issue were highly illiquid instruments. (*See, e.g.*, CAC ¶ 7.) They could not be valued with reference to an objective market price. There was none. In fact, U.S. and international accounting standard boards (the FASB and IASB) and the U.S. SEC have since noted the difficulty that financial firms faced in valuing mortgage-related securities as the markets became increasingly illiquid.[22] RBS consequently used judgments about likely future default rates and other factors

---

[22] (E1718, SEC, Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008, Study on Mark-to-Market Accounting, Dec. 30, 2008 (specifically noting that that issuers and auditors had faced significant "challenges" in trying to apply fair value accounting in the current global economic crisis); E1728, 1737, FASB, Determining Fair Value When the Volume and Level of Activity for the Asset of Liability Have Significantly Decreased and Identifying Transactions

to value these assets, as RBS fully disclosed at the time.  *See supra* pp. 20-21.  In other words, the valuations being attacked were statements of opinion, not of objective fact.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) ("Like other opinions, some valuation models may be more or less reliable than other models, have more or less predictive power, or hew more or less closely to the conventional wisdom on a subject, but they are nonetheless opinions and not objective facts[.]").

In this context, Plaintiffs fail to meet the pleading standards of Rule 9(b) and the PSLRA.  To plead a misstatement of opinion under these rules, the Complaint must contain facts sufficient to show that the statements were not honestly believed when made.[23]  "The sufficiency of a subjective falsity allegation must be determined through a statement-by-statement analysis based on the state of affairs extant at the time the opinion was rendered.  The fact that a speaker changes his or her mind and decides after the fact that an earlier opinion was ill-advised is insufficient to support an averment of subjective falsity."  *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 49 (1st Cir. 2005).  Nor can Plaintiffs "succeed in pleading subjective falsity merely by identifying an overarching fraudulent scheme or corrupt environment."  *Id.*  Instead, "the plaintiff must, *for each allegedly false opinion*, plead provable facts strongly suggesting that the speaker did not believe that particular opinion to be true when uttered."  *Id.* (emphasis added);

_____

That Are Not Orderly, FASB Staff Position FAS 157-4 (Apr. 9, 2009) ¶¶ 15, 29D (reemphasizing that, when markets are illiquid or inactive, "significant judgment" must be used to develop alternative valuation methodologies.).)

[23] *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991) (plaintiffs must allege with particularity that defendants did not honestly believe the opinion they purported to hold); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 271 (S.D.N.Y. 2004) (dismissing plaintiff's "conclusory allegation" in support of its fraud claim for failure to allege that "defendant made the statement [of opinion] knowing it was false"); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 155 (S.D.N.Y. 2004) (Lynch, J.) (dismissing plaintiff's allegations of fraudulent opinion for failure to point to any "inconsistent statements or actions by defendants from which a factfinder could infer that the published opinions were not truly held").

*see also Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 155 (S.D.N.Y. 2004) (Lynch, J.) (rejecting allegations that defendants did not sincerely believe opinions at the time they were shared, noting that, unlike in a related case in which the court denied a motion to dismiss, plaintiffs "point to no inconsistent statements or actions by defendants from which a factfinder could infer that the published opinions were not truly held").[24]

The Complaint here lacks the necessary factual support. Judge Kaplan's opinion in *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005), is especially useful in illustrating the failures of the Complaint. Plaintiffs in *Beacon Hill* had invested in an entity that in turn invested in structured credit products similar to CDOs. They alleged that, for a period of over two years, the fund's own broker had provided *contemporaneous* valuations of the fund's assets that were substantially lower than the investment manager's valuations, by as much as almost 40%. According to the plaintiffs, that fact was enough to show that the investment manager's valuations were fraudulent. *Id.* at 395.

Judge Kaplan disagreed. He held that the mere existence of divergent valuations by different people was insufficient under Rule 9(b) to support an inference that the investment manager's valuations were false. The fund's assets were "non-exchange listed securities, the valuation of which may differ depending on the model used in the calculations. In other words, valuation of such securities was not a matter of looking up closing prices in the *Wall Street Journal*, but involved the exercise of judgment." *Id.* at 396 (internal quotation marks omitted); *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.*, LLC, 479 F. Supp. 2d 349, 362

---

[24] As the *Podany* court noted, the test for falsity and *scienter* merge in opinion cases because proving the falsity of a statement of opinion "is the same as proving scienter, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion. As with all inquiries into someone's state of mind, plaintiffs must typically rely on circumstantial evidence for the defendants' words and actions." 318 F. Supp. 2d at 154. Accordingly, allegations of falsity with respect to statements of opinion must meet the rigorous tests for pleading scienter.

(S.D.N.Y. 2007) (valuation in this context is "considerably more a statement of opinion than a report of an objectively determinable fact").   So, the mere fact that the fund's investment manager and its broker disagreed about the value of the fund's assets was insufficient to support an inference that the investment manager's estimates of fund value were not honestly held. *Beacon Hill*, 376 F. Supp. 2d at  395-96; *see also In re Allied Capital Corp. Sec. Litig*., No. 02 Civ. 3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) (Lynch, J.) ("[G]iven the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account, alleging disagreement with . . . valuations does not equate to alleging fraud.").

The facts pleaded here are even weaker than those pleaded in *Beacon Hill*.   Unlike plaintiffs in that case, Plaintiffs here largely point to facts about how *others* valued securities *different* from RBS's.   For example, Plaintiffs note that other companies wrote down the values of their own CDOs a few months earlier, or that an index allegedly related to mortgage-backed securities had declined.   (CAC ¶¶ 148-58.)   These facts cannot be used to impugn RBS's valuation estimates of its own CDOs.   As RBS explained in the December 6, 2007 analyst meeting, CDOs vary widely in structure and in composition of loans.   Their valuation depends on the particular makeup of the loans underlying the CDO, including "when they were written[,]" "what age they are[,]" and "which state you're exposed to[.]"  *See supra* pp. 19-21. In addition, a single CDO can derive cash flow from debt securities classified as prime as well as subprime (*see supra* pp. 10-12), so the proportion each type of security in the CDO pool is highly relevant to valuation.   Because of these complex factors, multiple commentators have rejected efforts to use the ABX index or the valuation decisions of other companies as

meaningful benchmarks when valuing particular CDOs.[25]    Nonetheless, that is exactly what Plaintiffs purport to do in the Complaint here.    Those efforts are unavailing and cannot state a claim.[26]

Nor do the handful of internal RBS emails Plaintiffs cite dictate a different result.    On the contrary, those emails show just how judgment-driven valuation was in this context.    One email notes that valuation is highly "sensitive to changes in the underlying assumptions," and subject to an "uncertainty premium."  (CAC ¶ 161.)    That same email notes that the "market value" of the CDO bonds was not "discernable."    (*Id.*)    While the employees involved in these emails expressed various opinions about valuation, those opinions at most suggest that they "had different business judgments" than RBS's management about valuation.  *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004).    But "the second-guessing of management decisions by [employees] does not provide a basis for securities fraud."  *In re Downey*, 2009 WL

---

[25] "[The ABX index] was not designed to be uncritically extrapolated to the broader ABS market, and it was certainly not designed as a valuation tool for individual securities."  (E1666, Ben Logan (Managing Director of Markit Partners), *The ABX Index: A Pricing Conundrum*, Credit, (May 1, 2008); "[Standard & Poor's] believes that [the ABX indices] provide only limited insight into . . . 'AAA' rated class-level credit risk within U.S. residential mortgage-backed securities."  E1668, Andrew Giduci, *Why the ABX May Not Be a Good Overall Indicator of 'AAA' Credit Risk in U.S. RMBS Transactions*, Ratings Direct (May 21, 2008), www.standardandpoors.com/ratingsdirect.)  Plaintiffs average together multiple different indexes of different securities issued at different times, and then assert that the "ABX" index "declined" by a certain percentage. (CAC ¶¶ 148-50.)  But in fact, the ABX index measures multiple tranches of ABS securities issued at different points in time.  (E1680, Ingo Fender et al., *The ABX: How Do The Markets Price Subprime Mortgage Risk?*, BIS Quarterly Review, September 2008, at 69-70.)  As shown in the chart at E1680, those tranches moved at substantially different rates, with earlier and higher credit-quality tranches declining far less than the averages cited in the Complaint.  This variability illustrates the highly divergent values of ABS's within a CDO, much less the CDO itself.  In addition, commentators have noted the futility of using write-downs by one company as a means of evaluating another company's CDOs.  (*See* E1528, Bernstein Research Report, *Barclays and RBS—How Bad Can It Be? Realistic Downside Scenario Suggests Value Reductions are Excessive* (Nov. 11, 2007), at 5.)

[26] In noting that some other banks began announcing CDO write-downs a few months earlier than did RBS, Plaintiffs neglect to mention that the timing of those announcements was connected to those firms' quarterly reporting cycles.  *See* 17 C.F.R. 240.13a-13; 17 C.F.R. 240.15d-13.  RBS, however, is a U.K. company.  It does not issue quarterly financial reports.  It follows a 6-month reporting cycle, and its initial write-down in its pre-closing trading update, issued on 6 December 2007, provided information on CDO values.

2767670, at *11; *see also In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d at 252 ("[T]he fact that other individuals within SSB may have had views different from [research analyst] Grubman's does not provide any basis for an inference that Grubman did not believe his own professed opinions on [the company's] value, or that other valuation models, rather than Grubman's, constituted SSB's true institutional opinion (if such a concept is even meaningful).").

In sum, Plaintiffs' complaint that RBS should have written down its CDOs sooner, or to a greater extent, is the height of hindsight pleading. As the Seventh Circuit has explained in analogous circumstances, "[f]or any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). So "[i]f all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence." *Id.* These allegations fail to state a claim.[27]

### b)    The IFRS Allegations

Plaintiffs also contend that, under applicable accounting rules, RBS should have separately disclosed the proportion of its securities that were linked to subprime mortgages earlier than it did. (CAC ¶¶ 422-30.) Plaintiffs contend that these securities were a

---

[27] The Complaint also alleges that RBS's use of a proprietary discounted cash-flow valuation model violated IAS 39, which concerns the fair value of financial instruments. But the Complaint's quotation of IAS 39 misleadingly crops out the key language with an ellipsis. (*See* CAC ¶ 419.) The omitted material expressly states that market participants can use "recent arm's length market transactions between knowledgable, willing parties, *if available*, reference to the current fair value of another instrument *that is substantially the same*, **discounted cash flow analysis and option pricing models**." (*See* E1796, IAS 39 (emphasis added).) IAS 39 further states that market participants should use such reliable valuation techniques that are "commonly used" to estimate prices. (*Id.*) IAS 39 thus specifically recognizes that reliable market transactions and proxies may be unavailable for pricing and expressly endorses use of a discounted cash flow model.

"concentration of risk" before RBS published its 2007 Financial Statement, when RBS's subprime exposure was in fact afforded separate treatment. (E739-44 2007 May 14, 2008 Financials at 7-11, 23-24, 30.) But "it is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material." *In re Morgan Stanley Tech. Fund SEC Litig.*, Nos. 02 Civ. 6153, 02 Civ. 8579, --- F. Supp. 2d ----, 2009 WL 256005, at *7 (S.D.N.Y. Feb. 2, 2009).[28] And "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).

Moreover, the securities laws do not require corporations to "disaggregate" particular assets, line items of revenue or costs, or other financial details simply because those items become problematic due to subsequent events, as courts have held specifically with regard to "subprime" exposure.[29] Indeed, when an analyst pressed RBS to disclose what proportion of its securities were backed by underlying subprime loans as early as March 1, 2007, RBS refused to provide that information for appropriate competitive reasons. *See supra* p. 16. Courts

---

[28] *See also, e.g.*, *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5[.]"); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts[.]" (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993))); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008) ("When an allegation of fraud is based on nondisclosure, there can be no fraud absent a duty to speak[.]" (citations omitted)).

[29] *See Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 316-17 (4th Cir. 2004) (company has no duty to specify the size of subprime portfolio when the company had met its regulatory obligations by disclosing its capital and loan loss reserves); *In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 479 (E.D.N.Y. 2006) (additional disclosure not required where "it is apparent from the quarterly reports disclosed to the public that the company was heavily involved in investing in mortgage-backed securities"); *see also In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (no duty to break out costs for broker contracts in disclosure of acquisition costs); *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 266 (E.D.N.Y. 2002) (no actionable omission when defendants disclosed overall structure of hedge book, but did not disclose details of hedge book).

accordingly "have been sensitive about forcing a company to damage its own interests as well as those if its shareholders by revealing competitive information." *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996). RBS had no obligation to separately disclose this information. That result is especially sensible here, where the IFRS accounting rules regarding "concentrations of risk" are so judgment-driven, and where the securities that ultimately caused RBS's losses were so highly-rated.[30]

### c)    The Risk Management Allegations

The balance of the Complaint's "subprime" allegations attack the adequacy of RBS's statements about its risk management procedures and controls more generally. (CAC ¶¶ 134-78; 225; 240-58; 277(c); 282(b); 293(d), (e); 299(d), (h); 302(e); 320(b).) Such statements are "too general to cause a reasonable investor to rely upon them," and cannot "amount to a guarantee that [a company's] choices would prevent failures in its risk management practices." *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements regarding "highly disciplined" risk management are not actionable).[31] Nor do

---

[30] The Complaint's separate allegations of supposed accounting violations (CAC ¶¶ 397-443) cannot plead fraud. *See Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir. 1982) ("allegations concerning the violation of generalized accounting principles requiring adequacy and fairness of disclosure, a conservative approach, complete financial information, and understandable methods of reporting" do not satisfy Rule 9(b)); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (dismissing 10(b) claim premised on noncompliance with GAAP); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) (holding that plaintiff cannot state a claim merely by citing GAAP), *aff'd*, 2009 WL 3109914 (2d Cir. Sept. 30, 2009). In any event, Plaintiffs are simply wrong that "[t]he requirement to disclose information with respect to an entity's concentrations of credit risks is based upon the existence of the risk and irrespective of the likelihood of loss or occurrence of events that would lead to losses." (CAC ¶ 423.) Plaintiffs cite no IAS or IFRS standard for this contention, nor any other reason as to why RBS's detailed disclosures supposedly failed to comply. Under IFRS 7, disclosures are expressly through the eyes of management as to risk concentrations deemed **material** at the time, and Plaintiffs' hindsight contention that RBS management should have foreseen losses in triple-A-rated CDO holdings earlier is their invention, not an accounting principle.

[31] *See also, e.g.*, *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) ("[G]eneralizations regarding integrity, fiscal discipline and risk management" and statement that "[p]rocesses in place are intended to ensure credit risk instruments are accurately assessed, properly

hindsight assertions that risk management techniques failed to prevent the losses alleged suffice

to establish factual inaccuracy.[32]

In addition, these statements are shielded from attack by the bespeaks caution doctrine,

described above (at pp. 35-36). RBS provided ample warning that its risk management systems

were no guarantee against losses, as set forth in Appendix D. A recent case in this District is on

point. In *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459 (S.D.N.Y. 2009), the court applied the

bespeaks caution doctrine to reject allegations that the defendant's "risk management system was

not as robust as described in the language quoted from the Prospectus," which touted a

"centralized, hands-on approach" . . . and a "robust, globally integrated risk-management

infrastructure." *Id.* at 472. In the face of "sufficient warnings regarding the potential for the risk

management system to fail, . . . misrepresentations and omissions Plaintiffs cite are immaterial as

a matter of law, pursuant to the 'bespeaks caution' doctrine." *Id.* (citing *Halperin*, 295 F.3d at

---

approved and continuously monitored" are non-actionable "puffery" (*citing Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996))); *Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 02 Civ. 10132, 2003 WL 22439796, at *9 (S.D.N.Y. Oct. 28, 2003) ("No reasonable investor relies on a corporation's representation that . . . it is operated on a sound and proper basis."); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 Civ. 3994, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("allegation focus[ing] on the adjectives used to describe the management team, such as 'strong,' 'experienced,' and 'capable,' . . . [are] soft adjectives [and] are nothing more than puffery, which is not actionable under the securities laws."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005) (statement that bank had "sound risk-management procedures" inactionable puffery); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57 (2d Cir. 1996) (statement that "business strategies [would] lead to continued prosperity," not actionable); *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998) (statement that "we think that we can ride right through this [difficult period] with no problem [whatsoever] as far as [the] dividend is concerned" is "plainly an expression of optimism that is too indefinite to be actionable under the securities laws"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 358 (S.D.N.Y. 2006) (same for statements that company "is in very good shape as it moves into the next stage of its development" and "well placed to take advantage of future opportunities").

[32] *See Decker*, 681 F.2d at 116; *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004) (instances of loans to an unsuitable borrower do not demonstrate that statements about risk management were false), *aff'd sub nom. Albert Fadem Trust v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006).

357).[33]  The court concluded that the plaintiffs in *Rubin*, like Plaintiffs here, were "'engaging in retrospective pleading'" and failed to state a claim.  *Id.* at 474 (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008)).[34]

### 3.    RBS's Statements About The ABN Acquisition Are Not Actionable

Plaintiffs' attack on RBS's disclosures concerning the ABN acquisition fare no better.  Plaintiffs first criticize a number of optimistic statements about the anticipated business synergies from the acquisition before it was closed.  (CAC ¶¶ 278-80.)  These forward-looking statements are not actionable.  (*See* Appendix A.)  They are mere "puffery" and also barred by the PSLRA safe-harbor for forward-looking statements and the "bespeaks caution" doctrine.  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  *See, e.g.*, *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 484 (2d Cir. 2008) ("[S]tatements that are predictions or opinions, and which concern uncertain future events . . . are generally not actionable." (internal

---

[33]  *See also, e.g.*, *Rombach*, 355 F.3d at 172-74 (alleged failure to disclose integration and liquidity problems protected by the "bespeaks caution" doctrine); *Coronel v. Quanta Capital Holdings, Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *17-*18 (S.D.N.Y. Jan. 26, 2009) (applying the "bespeaks caution" doctrine to loss estimates in a prospectus and registration statement); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 223-24 (S.D.N.Y. 2008) (applying the "bespeaks caution" doctrine to an alleged failure to disclose defendant's "inability to achieve yields and meet redemption demands because of the absence of the historic secondary market"); *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 582 (S.D.N.Y. 205) (applying the "bespeaks caution" doctrine to a list of factors in prospectus used to set offering price of IPO).

[34]  The Complaint also alleges that RBS failed to disclose on two occasions—in its August 15, 2007 Interim Results and December 6, 2007 Trading Update—that it was "increasingly unable to sell ABS CDOs."  (CAC ¶¶ 302(a), 309(d); *see also id.* ¶ 140 (alleging that RBS "belatedly disclose[d] to investors [it] had to retain an interest in . . . CDOs because the market had become so illiquid that RBS could not sell them")).  This is far too nebulous to state a claim.  *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co.*, No. 07 Civ. 9921, 2009 WL 1456846, at *7 (S.D.N.Y. May 20, 2009) (allegation that defendants were "increasingly aware that the impairment indicators existed" was "too broad to be objectively assessed" and was not pleaded with particularity).  Moreover, by the summer of 2007 the market was well aware that the CDO market was drying up—including because RBS disclosed it.  (*See, e.g.*, E1294-95, E1301 August 3, 2007 Analyst Tr. at 2-3, 9 (describing "declining activities in our mortgage and CDO businesses" and stating that income in "US asset backed activity . . . has reduced in the course of this year"); *see also* E1642-43 (collecting articles).)

quotation marks omitted; alteration incorporated)).[35]    RBS never gave a profit forecast, for example, and repeatedly warned that its assessment of the ABN acquisition was based entirely on public data, and that RBS had not been able to review ABN's books and records.  *See supra* p. 25.  These are exactly the sort of statements that are not actionable.

Plaintiffs also attack RBS's accounting for the goodwill associated with the ABN acquisition, and certain post-acquisition statements of optimism concerning the potential synergies from the acquisition.  The claims about expected synergies fail for the same reasons as the pre-acquisition claims about statements of optimism:  these were forward looking statements accompanied by meaningful cautionary language, and are consequently non-actionable under the PSLRA safe harbor and bespeaks caution doctrine.  (*See* Appendix D.)  Nothing pleaded in the Complaint undermines the notion that RBS thought it could achieve synergies from the ABN acquisition, such as those derived from cost-cutting measures like combining computer systems and the like.  (*See* E1618-19, William L. Megginson & Scott B. Smart, Introduction to Corporate Finance (2009), at 865-66 (operational synergies occur when "relative operating costs are reduced because of an increase in size that allows for the reduction or elimination of overlapping resources").)  Indeed, the reference to declines in RBS's CDOs and other assets is a *non-sequitur*; as Plaintiffs concede, goodwill measures the *excess* of a company's value over its assets, not its asset values.  (CAC ¶ 401.)  As for the claims about goodwill accounting, even

---

[35] *See also, e.g.*, *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007) ("Vague and non-specific pronouncements on the success of integrating acquisitions are inactionable puffery."); *In re Razorfish, Inc. Sec. Litig.*, No. 00 Civ. 9474, 2001 WL 1111502, at *2 (S.D.N.Y. Sept. 21, 2001) (statements regarding success of acquisition dismissed as puffery—"'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud in this context"); *In re NBTY, Inc. Sec. Litig.*, 224 F. Supp. 2d 482, 494 (E.D.N.Y. 2002) (statements that acquisition should have a positive impact on profitability were "optimistic future projections that do not purport to guarantee future outcomes; are not misleading; and cannot support a securities fraud cause of action").

were they correct—which they are not—they fail under the cases, discussed above at n.30, which refuse to permit complaints to rest on the alleged failure to comply with accounting rules.[36]

### 4.    RBS's Statements About Its Capital Needs Are Not Actionable

Plaintiffs' last category of complaints concern RBS's statements about its capital needs. Plaintiffs complain that RBS sought to raise capital in April and October 2008 despite prior statements that it did not believe it needed more capital.    (CAC ¶¶ 328-29; 349.)    These statements of belief were forward-looking and thus also subject to the bespeaks caution rule. Moreover, Plaintiffs fail to plead any facts giving rise to an inference that RBS did not believe these statements of opinion at the time they were made, as required by Rule 9(b) and the PSLRA (*see supra* p. 29).    The only fact Plaintiffs cite is RBS's ultimate decision to raise capital, but these backward-looking facts are exactly the sort of hindsight allegations that cannot state a claim.

### B.    The Complaint Fails To Plead Scienter

The Complaint additionally fails to state a claim for the independent reason that it does not adequately plead scienter, "a mental state embracing intent to deceive, manipulate or

---

[36] Under controlling accounting guidelines, goodwill could be measured either with reference to the "recoverable amount"—i.e., the amount for which the asset could be sold—or the "value in use," which is "the present value of expected future cash flows from the cash-generating unit" to which the goodwill had been "allocated."    (*See* CAC ¶ 341 (quoting E271.1, April 24, 2007 Financials at 120).)    RBS had the discretion to choose which measure to use.    *See* IAS 36 (leaving to the subject entity to determine whether cost is higher than recoverable amount).    The Complaint also alleges that RBS failed to timely test goodwill (CAC ¶¶ 406-18), but provides no basis for this assertion.    As the Complaint recognizes, IAS 36.96 requires testing of goodwill "for a cash-generating unit *to which goodwill has been allocated* . . . at any time during the annual period."    (E1799, IAS 36 (emphasis added).)    Under IAS 36.84, RBS was required to allocate the ABN goodwill within 12 months of acquisition (*id.*), and the Complaint does not allege any failure to do so.    As to the allegation that RBS should have written down goodwill because of the write-down of impaired CDO assets in 2008 (CAC ¶ 412), Plaintiffs completely misunderstand the concept of goodwill and the accounting rules.    Goodwill is defined as "[f]uture economic benefits arising from assets that are *not capable of being individually identified and separately recognized*."    IFRS 3, App'x A.    IAS 36 does not even apply to financial assets such as credit market exposures, which are covered by IAS 39.

defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  Rule 9(b) and

the PSLRA require that Plaintiffs plead facts sufficient to give rise to a "strong" inference of

scienter.  *Id.* at 314.  The inference "must be more than merely plausible or reasonable—it must

be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.*

This requires a "comparative evaluation," under which courts consider "not only inferences

urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."

*Id.*  "A complaint will survive . . . only if a reasonable person *would*"—not just "could"—"deem

the inference of scienter cogent and at least as compelling as any opposing inference [of non-

fraudulent intent] one could draw from the facts alleged."  *Id.* at 324 (emphasis added); *see also*

*id.* at 314.  A plaintiff can plead scienter only with sufficient facts showing either: (1) "that

defendants had both motive and opportunity to commit fraud" or (2) "strong circumstantial

evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d

Cir. 2001).  Plaintiffs try to meet both tests here, and fail.[37]

### 1.    Motive

Plaintiffs devote a substantial part of their scienter allegations to showing a supposed

motive and opportunity to commit fraud.  (CAC ¶¶ 375-96)  The law in this Circuit, however,

requires very particular allegations to establish motive and opportunity.  "[A] generalized

motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not

sufficiently concrete for purposes of inferring scienter."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263,

268 (2d Cir. 1996).  "If scienter could be pleaded on [such bases] alone, virtually every company

---

[37] RBS adopts the additional points set forth in the Individuals' Brief addressing the Complaint's scienter
allegations.

in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Kalnit*, 264 F.3d at 139-40.

Despite this settled law, Plaintiffs premise their motive on exactly the sort of run-of-the-mill business motivations that the Second Circuit and this District have repeatedly held insufficient. Plaintiffs largely focus on the interest of RBS executives in improving their compensation as the motive for fraud. (CAC ¶¶ 385-94.) But personal financial incentives alone do not establish motive. "Motives . . . such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation . . . do not constitute 'motive' for purposes [of pleading a strong inference of scienter under the PSLRA]." *ECA*, 553 F.3d at 198 (citing *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).[38]

That is especially true here, where RBS provided voluminous disclosure about the compensation and shareholdings of the RBS executives named as defendants. RBS's 2005, 2006 and 2007 Financials each contained detailed descriptions of the key executives' compensation packages and share holdings. This extensive disclosure defeats any notion that these executives were secretly seeking to benefit at the shareholders' expense. *See Acito*, 47 F.3d at 54 (plaintiffs failed to establish that defendant's stock sales were "unusual" where defendant disclosed all of his holdings).[39] Indeed, there is more: These disclosures and other documents show that RBS's

---

[38] *See also Acito*, 47 F.3d at 54 (motive of "increas[ing] executive compensation" insufficient); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (motive of "protect[ing] their executive positions and the compensation and prestige they enjoy thereby" insufficient (internal quotation marks omitted)); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) ("Generalized allegations of intent to maintain lucrative business relationships and to establish new ones do not set forth a motive for scienter purposes.").

[39] *See also, e.g., In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) (dismissing claim where defendant alleged to have committed insider trading did not complete any sales of stock); *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ 3111, 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005) ("[T]he mere allegation of insider sales . . . does not, without more, properly allege motive.").

executives' shareholding *increased* throughout the class period, and that they held onto these shares as RBS's stock price declined.  (*See* Ind. Br. 9.)  These facts strongly refute any inference of scienter.  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ("[T]he Individual Defendants, in almost every instance, increased their . . . holdings during the Class Period – a fact wholly inconsistent with fraudulent intent.")

Viewed against the backdrop of the extreme uncertainty created by the credit crisis, the only "cogent" or "compelling" inference that arises has nothing to do with fraud.  RBS's executives, like the rest of the financial world, were struggling with an historic and uncertain set of circumstances.  They had no motive to deceive, and were not in fact deceiving anybody. "[T]he most compelling inference is that Defendants, in an unprecedented and uncertain situation, simply lacked the [tools] . . . to calculate accurately the full extent of losses incurred by the three hurricanes. . . . Defendants issued the challenged statements in good faith, but based upon ultimately erroneous loss estimations."  *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009).[40]

### 2.    Conscious Misbehavior or Recklessness

Plaintiffs also try to meet the even more rigorous test for scienter, which requires facts evidencing "conscious misbehavior or recklessness."  But where "a plaintiff has failed to demonstrate that defendants had a motive to defraud . . . he must produce a *stronger* inference of recklessness."  *Kalnit*, 264 F.3d at 143 (emphasis added).  Plaintiffs must plead conduct that is

---

[40] Plaintiffs' conclusory "motive" assertions about the "hubris" of RBS's CEO Sir Fred Goodwin and his interest in expanding RBS through acquisition (CAC ¶ 111) cannot support a fraud claim.  (*See* Ind. Br. 9.)  Plaintiffs also point to U.K. and U.S. regulatory investigations of RBS business.  (CAC ¶¶ 372-74.) These allegations of uncharged, untried, government investigations should be struck from the Complaint. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976); *Ledford v. Rapid-Am. Corp.*, No. 86 Civ. 9116, 1988 WL 3428, at *2 (S.D.N.Y. Jan. 8, 1988).  They obviously cannot be used to support an inference of scienter.

"highly unreasonable and . . . represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill*, 101 F.3d at 269 (citation omitted).  In that regard, "poor business judgment is not actionable under [S]ection 10(b) and Rule 10b-5." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

As shown above, Plaintiffs do not even allege enough facts to support their claims of misstatements or omissions.  But even if the facts alleged were deemed to support the existence of factual inaccuracy, they fall far short of what is necessary to show conscious misbehavior or recklessness.  For instance, even if the Court were to conclude that RBS's statements about its U.S. retail mortgage lending were misleading—i.e., the "we don't do subprime" statements—the facts would not support a "compelling" conclusion that they were deliberately so.  Similarly, even if the Court were to conclude that RBS's valuations of CDOs were inaccurate, the facts cannot support the claim that they were deliberately so in light of the difficulty of valuing illiquid securities.  The same analysis defeats Plaintiffs' claims of conscious misbehavior or recklessness as to the ABN acquisition and RBS's statements about its capital needs.  Simply put, the Complaint utterly lacks the facts required under *Tellabs* to support a "compelling" inference of deliberate deception, especially in light of the extreme uncertainty created by the credit crisis.  These failings are further elaborated in the Individuals' Brief and, under these circumstances, the failure to plead scienter against any individual defeats the claims against RBS.  *See Teamsters Local 445 Freight Div. Pen. Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196-97 (2d Cir. 2008).

### C.    The Complaint Fails To Plead Loss Causation

Plaintiffs' '34 Act claims fail for a final independent reason:  the Complaint does not adequately plead loss causation.  The loss causation element of a Section 10(b) claim requires "that the subject of the fraudulent statement or omission was the cause of the actual loss

suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (citation omitted); *see Dura*, 544 U.S. at 341-42; 15 U.S.C. § 78u-4(b)(4).  "Establishing loss causation is critical because Section 10(b) is not meant to 'provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *Rhodia*, 531 F. Supp. 2d at 544 (quoting *Dura*, 544 U.S. at 345).

Even if a misstatement or omission is properly alleged to have inflated a stock price, it does not follow that buyers are necessarily injured by the alleged fraud.  "[L]ower [stock] price[s] may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 342-43.  Thus, where, as here, "the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases[.]'" *Lentell*, 396 F.3d at 174.  As a court in this District has put it, plaintiffs at the pleading stage "must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (quoting *Dura*, 544 U.S. at 343).[41]

The Complaint fails to untangle these factors.  Instead, Plaintiffs implausibly claim that *all* of RBS's 98% decline in stock value from March 2007 to January 2009 was caused by the

---

[41] *See also 60223 Trust v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) ("The complaint does not even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation.  The court concludes that the complaint does not adequately plead loss causation"); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) ("The [proposed third amended complaint] does not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse, nor any way to separate the effect of the misstatements (if there was any) from the general collapse or other causes"), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).

alleged fraud, even though that decline coincided exactly with what former Federal Reserve Chairman Alan Greenspan has called a "credit tsunami," and what current Federal Reserve Chairman Ben Bernanke has called the worst economic crisis since the Great Depression. *See The Financial Crisis and the Role of Federal Regulators: Hearing Before the H. Comm. on Oversight and Govt. Reform*, 110th Cong. 15 (2008) (statement of Alan Greenspan); Greg Robb, *Bernanke: This may be worse than Great Depression*, Marketwatch, July 26, 2009, *available at* http://www.marketwatch.com/story/bernanke-explains-crisis-to-average-americans-2009-07-26. Like the complaint in *Lentell*, Plaintiffs fail to explain how this entire stock drop could possibly be attributable to the alleged misstatements or omissions. *Lentell*, 396 F.3d at 173.

Plaintiffs must know that this grandiose claim is untenable. So they plead alternatively that a handful of specific disclosures related to the alleged misstatements and omissions caused specific drops in price that were "significant" in comparison to an undisclosed index. (CAC ¶¶ 451, 456, 461, 465, 475.) But these allegations only highlight the inadequacy of the Complaint because the identified "disclosures" fail to connect the "public disclosure causing injury" to "the specific fact allegedly concealed." *Rhodia*, 531 F. Supp. 2d at 545.

For instance, Plaintiffs allege that RBS mis-valued CDOs; but, as shown above, CDO valuation was a matter of judgment and opinion, and the Complaint identifies no disclosure stating that RBS did not honestly hold any prior valuation opinion. RBS's disclosures that events had caused additional CDO write-downs is not a disclosure of any allegedly concealed fraud. Likewise, RBS never disclaimed any of its statements of optimism about ABN; those expectations merely turned out to be wrong in light of subsequent events. As this Court has held, "[w]here the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—i.e. a public disclosure" that the opinion was not

honestly held.  *Rhodia*, 531 F. Supp. 2d at 548.  *See also, e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551-52 (S.D.N.Y. 2008); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284-86 (S.D.N.Y. 2008).  In these circumstances, even as to their few particular disclosures cherry-picked by Plaintiffs, the Complaint fails to plead loss causation.[42]  As to their allegation that RBS misrepresented or concealed exposure to sub-prime lending through Citizens, the only "disclosure event" Plaintiffs cite is a March 21, 2009 *Daily Telegraph* article, but that is long after the end of the purported class period.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 11 AND 12 OF THE '33 ACT

### A.    The Complaint Fails To Plead Material Falsity

Plaintiffs also pursue claims under Sections 11 and 12 of the '33 Act against RBS, various individuals, and the underwriters of the Preferred Shares and Rights Issue based on alleged misstatements and omissions in various offerings.  Plaintiffs' '33 Act claims sound in fraud, and thus should be dismissed for failure to satisfy Rule 9 and the PSLRA.  But even if construed under Rule 8, the claims fail to allege any actionable misstatements or omissions.  Furthermore, for the reasons stated below, the '33 Act claims are time-barred.  Finally, the

---

[42] For example, even though they allege that RBS had repeatedly told the market that it lacked any "subprime" exposure, Plaintiffs revealingly do not identify as a disclosure event the December 6, 2007 Trading Update, which specifically broke out RBS's "subprime" exposures.  This is presumably because RBS stock traded *up*, completely contradicting Plaintiffs' core allegation that RBS had deceived the market that it lacked any "subprime" exposure.  Otherwise, Plaintiffs' six supposed "loss causation events" should be rejected for lack of particularity.  The Complaint describes disclosures on these dates, and then submits that RBS suffered a "decline [that] was statistically significant when compared to the movement of comparable stock indexes."  (CAC ¶¶ 451, 456, 461, 465, 475.)  But Plaintiffs do not identify or even describe these "indexes," or provide any information suggesting that they are meaningful.  Nor do Plaintiffs bother to attempt to disaggregate the effect of supposedly disclosed fraud from other company-specific news.

Rights Issue offering is simply not subject to the '33 Act, because it was not a U.S. public offering.  For all of these reasons, the '33 Act claims should be dismissed.

Plaintiffs' '33 Act allegations cover essentially the same topics as their fraud claims under the '34 Act, and like their '34 Act claims, "sound in fraud," and are therefore subject to Rule 9(b).  *See, e.g.*, *Rombach*, 355 F.3d at 171 (applying Rule 9(b) to '33 Act claim that "sounds in fraud").[43]  Although Plaintiffs strain to disclaim any connection to fraud in making these claims (*see, e.g.*, CAC ¶¶ 26-28), most of the alleged misstatements and omissions they attack under the '33 Act are either identical to those attacked under the '34 Act,[44] or at least occurred after March 1, 2007, the start of the period in which Plaintiffs contend that RBS was deliberately deceiving investors.[45]  Only two of the offerings Plaintiffs attack under the '33 Act occurred before March 1, 2007.  (*Id.* ¶ 533 (May 22, 2006 Series Q Offering); *id.* ¶ 555 (December 18, 2006 Series R Offering).)  In these circumstances, the overwhelming majority of Plaintiffs' '33 Act claims, if not all of them, sound in fraud, and thus must meet the requirements of Rule 9(b).  For many of the same reasons Plaintiffs fail to sufficiently plead their '34 Act claims, those '33 Act claims also fail under Rule 9(b).

---

[43] It is well established that Section 11 and Section 12(a)(2) claims "that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Rombach*, 355 F.3d at 171.  *See, e.g.*, *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient" to avoid Rule 9(b) standards when Securities Act claims sound in fraud); *In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005) ("Having made these broad averments portraying a pervasive and overarching scheme of fraud . . . Plaintiffs cannot so facilely put the fraud genie back in the bottle.").

[44] The following paragraphs of the Complaint allege the same misstatements for both their '33 and '34 Act claims:  ¶ 273/¶ 653;  ¶ 355/¶ 569;  ¶ 288/¶ 648;  ¶ 273/¶ 653;  ¶ 300/¶¶ 659-60;  ¶¶ 337,  341;  ¶ 411/¶¶ 703 and ¶ 707.  Additional portions of the '33 Act claims refer to the '34 Act allegations, but attempt to do so without being explicit:  ¶¶ 5, 144-45, 270, 273, 275-76, 281, 359-60/¶ 512.

[45] The following paragraphs of the Complaint allege misstatements that occurred after March 1, 2007:  ¶¶ 564-90; ¶¶ 591-604; ¶¶ 605-13; ¶¶ 642-61; ¶¶ 698-708.

Plaintiffs' '33 Act claims separately fail to satisfy Rule 8 as construed in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Under those cases, a court must consider whether the factual allegations of a complaint are sufficiently particular to state a "plausible" claim for relief.  *Iqbal*, 129 S. Ct. at 1949-50.  This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"; rather, the factual allegations must be sufficient to push the claims "'across the line from conceivable to plausible.'"  *Id.* at 1951 (quoting *Twombly*, 550 U.S. at 570).  Under *Iqbal*, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (emphasis added).[46]

Plaintiffs' '33 Act claims fail to sufficiently allege any actionable misstatement or omission.  Under Section 11 of the '33 Act, Plaintiffs must sufficiently allege, among other things, that "part of [a] registration statement for [an] offering" in which Plaintiffs purchased shares "contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements not misleading."  *Zirkin v. Quanta Capital Holdings, LTD*, No. 07 Civ. 851, 2009 WL 185940, at *8 (S.D.N.Y. Jan. 23, 2009) (citing 15 U.S.C. § 77k(a)).  Likewise, under Section 12(a)(2), Plaintiffs must sufficiently allege that they purchased a security pursuant to a prospectus "that included an untrue statement of material fact or omitted a

---

[46] *See Zirkin v. Quanta Capital Holdings, Ltd.*, No. 07 Civ. 851, 2009 WL 185940, at *8 (S.D.N.Y. Jan. 23, 2009) (applying the *Iqbal* pleading standard to a complaint alleging only Securities Act claims and dismissing the complaint in its entirety); *Rubin v. MF Global, Ltd.*, No. 08 Civ. 2233, 2009 WL 2058590, at *3-*4 (S.D.N.Y. Jul. 16, 2009) (holding that plaintiffs' Securities Act claims fail to meet the standards of Rule 8 as construed in *Iqbal*).

material fact necessary to make such statements not misleading." *Id.* (citing 15 U.S.C. § 77l(a)(2)).

Plaintiffs claim that the following RBS offering documents contained misstatements and omissions: (1) for the *Preferred Share* offerings, an April 8, 2005 shelf registration statement; the prospectuses and prospectus supplements for each of the Series Q, R, S, T, and U offerings; and certain Exchange Act filings incorporated by reference; (2) for the *Exchange Offer*, the October 2, 2007 Registration Statement, the offering prospectus, and documents incorporated by reference;[47] and (3) for the *Rights Issue*, the April 30, 2008 Rights Issue Circular. With respect to each of these documents, the CAC fails to adequately plead any Securities Act violation for at least the following reasons:

### 1.    Internal Controls And Risk Management

Plaintiffs allege false and misleading statements regarding the effectiveness of RBS's internal controls for monitoring risk. (*See* CAC ¶ 502(c); *see also*, *e.g.*, *id.* ¶¶ 542-48, 554, 563.)[48] This is sheer bootstrapping. Plaintiffs allege that because RBS owned subprime assets, its internal controls must have been non-existent, defective or not followed. (*See id.* ¶¶ 543, 561, 563, 580, 590, 609, 613.) These allegations fail to state a viable claim.

---

[47] RBS is not listed as a defendant in Count VI or Exhibit A to the Complaint for violations of Section 11 in connection with the Exchange Offer; however, in the section addressing Section 15 liability, the Complaint alleges that "RBS violated Section 11 of the Securities Act by issuing the Exchange Offer Documents." (CAC ¶ 690.) To the extent that the Complaint is construed to assert a Section 11 claim against RBS, it fails because RFS, not RBS, issued the Exchange Offer registration statement. In any event, the Exchange Offer claims also fail for the reasons explained herein.

[48] The CAC points to statements made in RBS's April 26, 2006 and April 24, 2007 Financials (CAC ¶¶ 542-43, 579-80); a November 9, 2006 Interim Report (*id.* ¶ 558); and several other reports on Form 6-K (*id.* ¶¶ 553-54 (May 24, 2006 Form 6-K), ¶ 561 (Nov. 9, 2006 Form 6-K), ¶¶ 562-63 (Dec. 21, 2006 Form 6-K), ¶¶ 589-90 (June 27, 2007 Form 6-K), ¶¶ 603-04 (Sept. 27, 2007 Form 6-K), ¶ 609 (Sept. 25, 2007 Form 6-K), ¶¶ 610-11 (Oct. 4, 2007 Form 6-K), ¶¶ 612-13 (Feb. 28, 2008 Form 6-K). All of these filings were incorporated by reference into the Preferred Share offering documents).

**First**, Plaintiffs do not plead any contemporaneous *facts* showing that RBS's internal controls either did not exist or were not followed at the time. Nor do they allege any facts whatsoever showing that acquiring subprime or other lower-quality assets in 2005, 2006 or 2007 was inconsistent at the time with RBS's disclosed internal controls or that RBS's financial statements failed to comply with IFRS.[49] As with Plaintiffs' other allegations, conclusions alone do not plead a claim under Rule 8. *Iqbal*, 129 S. Ct. at 1949. As explained above (*supra* pp. 43-44), Plaintiffs' reliance on statements by RBS executives in *2009* (CAC ¶¶ 545-47), and on a *2009* newspaper article (*id.* ¶ 548), regarding issues with RBS's internal controls does not correct this deficiency. *See, e.g.*, *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) ("[T]he allegations have been craftily drafted to imply that what only became clear due to subsequent events was somehow known to [defendant] far earlier in time, well before the confirming event occurred or other evidence came to light. This is pleading with 20/20 hindsight."), *aff'd*, 2009 WL 2959883 (2d Cir. Sept. 17, 2009). Moreover, *none* of the quoted statements links any supposed general "control" issues to RBS's subprime exposure or to any of the challenges to the offering documents that Plaintiffs make. (*See, e.g.*, CAC ¶¶ 545, 547.)

**Second**, as shown with the '34 Act claims, RBS's statements of belief about its risk management are inactionable puffery. Further, in light of RBS's ample warning that its risk

---

[49] With respect to the claims regarding the alleged failure of RBS's financial statements to comply with IFRS, the CAC merely restates the IASB without alleging any facts whatsoever. (CAC ¶ 550.) Plaintiffs also allege that the August 15, 2007 Interim Results, incorporated into the Series T Preferred Share offering documents, failed to comply with IFRS. (*Id.* ¶¶ 596-602.) As with Plaintiffs' other similar allegations, those allegations are merely conclusory and do not plead any facts showing how the financial statements actually failed to comply with IFRS. Further, Plaintiffs allege here not only that RBS did not disclose its subprime exposure but also failed to disclose the significant decline in value of its subprime holdings. (*Id.* ¶¶ 600, 602.) Those allegations do not state a claim for the same reasons Plaintiffs' other valuation arguments with respect to the '34 Act fail.

management systems were no guarantee against losses, RBS's statements are also protected under the bespeaks caution doctrine.

### 2.    Capital Base

Plaintiffs also allege false and misleading statements about the strength of RBS's capital base (*see id.* ¶¶ 540-41, 576-78), but once again fail to identify anything in RBS's disclosures that is inaccurate or factually untrue.[50]   Instead, they allege that these statements are "false" because RBS omitted other information about the "use of RBS's capital base to acquire material amounts of high-risk subprime assets" in its portfolio.  (*Id.* ¶¶ 541, 577, *see also* ¶¶ 502(a), 561.) Plaintiffs claim that RBS from 2005 through 2007 RBS acquired billions of dollars of subprime assets, which, they allege, was "inconsistent with RBS's stated policy of maintaining a strong capital base . . . [and] a prudent relationship between its capital base and the underlying risks of the business." (*Id.* ¶¶ 541, 577.)  Plaintiffs thus claim that RBS's SEC filings "failed to disclose that the Company either lacked any [ ] policy [to maintain a strong capital base] or lacked the means to implement the policy." (*Id.* ¶¶ 541, 577; *see also id.* ¶ 561 (Nov. 9, 2006 6-K).)  As discussed above with respect to essentially the same allegations under the '34 Act, this fails to state a viable claim.

***First***, RBS's capitalization was public knowledge, and RBS made all required disclosures concerning its capitalization.[51]  Plaintiffs make no allegation there was anything inaccurate about

---

[50] Plaintiffs again make these allegations in connection with the Preferred Share offerings.  The CAC points to statements made in RBS's April 26, 2006 and April 24, 2007 Financials (CAC ¶¶ 540-41, 576-77), and its November 9, 2006 Form 6-K (*id.* ¶ 561).   All of these documents were incorporated into RBS's Preferred Share offering documents

[51] Specifically, RBS's Financials show that RBS was within the approved Risk Asset Ratio ("RAR") in accordance with the requirements of the FSA.  (*See* E45-46, (April 26, 2006 Financials, at 37); *see also* E223, (April 24, 2007 Financials, at 38).)  The FSA uses RARs as a measure of capital adequacy in the UK banking sector.  By international agreement, the total RAR should not be less than 8% with a tier 1 component or not less than 4%.  As of December 31, 2005, RBS's total RAR was 11.7% and the tier 1

them.  Further, RBS's disclosures put investors on notice of the market risks to which RBS was exposed and that could affect its underlying capital base.  These warnings were accompanied by charts detailing RBS's capital base and weighted risk assets from earlier years through 2005 and 2006.  (E45-46, April 26, 2006 Financials, at 37; E223, April 24, 2007 Financials, at 38.)

*Second*, Plaintiffs' specific claims regarding RBS's capital base are impermissibly conclusory.  The Complaint is devoid of any facts showing that the criticized statements were false at the time they were made, or that there was any inconsistency between RBS's holding of subprime assets and its stated business philosophy and/or policy of maintaining a strong capital base, or that anyone would consider the acquisition of subprime assets in 2005 or 2006 to be imprudent or inconsistent with a policy of maintaining a strong capital base.  Indeed, as Plaintiffs concede, the assets that RBS held were mainly super-senior CDO notes that were rated triple-A, the highest possible rating, which indicated that the assets were believed to be anything but risky.

*Third*, the complained-of statements (*see* CAC ¶¶ 540-41, 576-77) are classic puffery and forward-looking commentary that is not actionable under the securities laws, as no reasonable investor would rely on them.  For example, statements about RBS's business model and expectations of capital adequacy were accompanied by cautionary disclosures made throughout the Financials that put any reasonable investor on notice of potential risks, thus shielding them under the bespeaks caution doctrine.

*Finally*, the Complaint alleges that RBS's statements with regard to its capital base were materially false because RBS failed to disclose that the ABN acquisition would further undermine RBS's stated policies.  (*Id.* ¶ 578.)  These allegations are also conclusory and

---

RAR was 7.6%.  (*See* E 45-46, (April 26, 2006 Financials at 37).)  As of December 31, 2006, RBS's total RAR was 11.7% and the tier 1 RAR was 7.5%.  (*See* E223, (April 24, 2007 Financials at 38).)  *All of these ratios far exceeded the FSA requirements*.

insufficient.  Among other things, Plaintiffs plead no facts showing that anyone at RBS knew or could have known *at the time* that the ABN acquisition would undermine RBS's policy regarding its strong capital base; to the extent Plaintiffs' allegations are based on RBS's subsequent disclosures about ABN in December 2007 and afterward, Plaintiffs are improperly attempting to plead fraud by hindsight.

### 3.    Credit Quality

Plaintiffs allege that RBS made false and misleading statements regarding the strength of RBS's credit quality and its exposure to credit risk.  (*See id.* ¶¶ 535, 571.)[52]  Plaintiffs allege that the statements were false because, from 2005 through early 2007, RBS acquired billions of dollars of subprime assets but omitted to disclose "the extent to which RBS had subprime assets in its portfolio."  (*Id.* ¶¶ 536, 572.)[53]  Further, relying on IFRS, Plaintiffs claim that the amount of subprime assets RBS acquired was material and should have been disclosed.  (*Id.* ¶¶ 536-37, 572-73.)  These allegations also fail to state a claim.

*First*, as explained above in detail, RBS made substantial disclosures in its Financials that put investors on notice of the credit risks RBS was exposed to that could affect its credit quality, and also disclosed the amount of its subprime assets as part of the overall disclosure of its current assets.  The Complaint conveniently ignores all of these disclosures.  The only thing RBS did not do, until December 6, 2007, was disaggregate those assets into a separate category.  There is no

---

[52] The Complaint makes these allegations in connection with all five Preferred Share Offerings.  It points to statements made in RBS's April 26, 2006 and April 24, 2007 Financials (CAC ¶¶ 535-39, 571-75); Nov. 9, 2006 6-K (*id.* ¶ 558); and several other reports on Form 6-K (*id.* ¶¶ 553-54 (May 24, 2006 6-K), ¶ 561 (Nov. 9, 2006 6-K), ¶¶ 562-63 (Dec. 21, 2006 6-K), ¶¶ 589-90 (June 27, 2007 6-K), ¶¶ 595-97 (Aug. 15, 2007 6-K), ¶¶ 603-04 (Sept. 27, 2007 6-K), ¶ 609 (Sept. 25, 2007 6-K), ¶¶ 610-11 (Oct. 4, 2007 6-K), ¶¶ 612-13 (Feb. 28, 2008 6-K)).

[53] (*See also* CAC ¶ 558 (Nov. 9, 2006 6-K), ¶ 561 (Nov. 9, 2006 6-K), ¶ 596, ¶ 597 (Aug. 15, 2007 Interim Results), ¶ 609 (Sept. 25, 2007 6-K), ¶ 613 (February 28, 2008 Results).)

allegation, however, that RBS had any duty to separately disclose its subprime exposure, particularly as early as 2005 and 2006—nor did it have one.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003) ("To state a claim under Sections 11 and 12(a)(2), a plaintiff must allege that the defendants had a legal obligation to disclose the allegedly omitted information.").

*Second*, Plaintiffs' attempt to allege that RBS was required to separately disclose its subprime assets because the information was material (*see, e.g.*, CAC ¶¶ 536-37) also fails.  The citations to IFRS are conclusory and based on the wrong standard; the CAC does not allege—as it must—any contemporaneous facts about RBS's subprime assets showing how not disclosing them separately was *material* under the Securities Act *at the time*.  *See Panther Partners*, 538 F. Supp. 2d at 669-70 (dismissing claim where plaintiffs failed to allege specific facts evincing that, *at the time of the offering*, defendants knew of omissions *and that omissions were material*). Specifically, Plaintiffs make no allegation that RBS's subprime assets were overvalued at the time of any Preferred Share offering, or that RBS believed that any subprime assets would cause RBS' credit quality to weaken materially.  Nor is there any factual allegation explaining why as far back as 2005 or 2006 an investor would have considered the amount of RBS's subprime assets material or why those holdings would have influenced an investor's economic decisions. Further, questions that analysts asked in *2006 and 2007* are not evidence of the materiality of RBS's exposure *in 2005*, the time-period covered by RBS's April 26, 2006 Financials.  Indeed, there is no factual allegation showing that subprime exposure was an issue at all in 2005.

*Third*, the Complaint also contends that RBS's disclosures were false for "fail[ure] to disclose any concentration of credit risk" arising from RBS's subprime assets, that these assets constituted "*significant concentrations* of credit risk," and that prior to January 1, 2007 IAS 32

required this to be disclosed.  (CAC ¶¶ 538-39, 574-75 (emphasis added).)  Like Plaintiffs' other allegations, these allegations are wholly conclusory and fail to plead any facts showing that the characteristics of the loans underlying the ABSs and CDOs that RBS was carrying were factors creating any material risks—much less "*significant*" concentrations of risk *in 2005 or 2006*—the periods covered by RBS's 2005 and 2006 Financials.  The determination of what constitutes a "significant" risk of credit concentration, like any valuation, is a matter of management judgment.  RBS made substantial disclosures about the risks and sensitivities in connection with its assets, and Plaintiffs do not allege anything inaccurate about those disclosures or anything to establish that RBS's mortgage-related positions constituted "*significant*" concentrations of credit risk under IAS 32.  Nor in any event is an allegation that RBS violated accounting standards enough to plead a securities violation, without also alleging specific facts showing the basis for the alleged violations.  *See In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (dismissing conclusory '33 Act allegations of improper accounting practices when complaint failed to allege "in any cognizable respect [whatsoever] how the mark-to-market accounting practices were improper").  Indeed, here RBS's auditors (Deloitte & Touche) gave "an unqualified opinion" on RBS's financial disclosures.[54]

---

[54] (*See* E67, E87.1, April 26, 2006 Financials at Ex. 15.1 & 87; E256-57, E285.1, April 24, 2007 Financials at Ex. 15.1 & 90-91.)  Notably, those financial statements were never restated, and there is no allegation that the auditors withdrew their opinions or were negligent in giving them.  The individual defendants (and the underwriters) were thus entitled to rely on Deloitte & Touche's unqualified audit opinions and on RBS's financial disclosures as expertised.  *See* 15 U.S.C. § 77k(b)(3)(C) (defendants not liable for any part of a registration statement "made on the authority of an expert" if they demonstrate that they "had no reasonable ground to believe and did not believe . . . that the statements therein were untrue" or misleading).  *See Dannenberg v. PaineWebber Inc.*, 50 F.3d 615, 623 (9th Cir. 1994); *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 664 (S.D.N.Y. 2004).

### 4.    Acquisition Of ABN

The Complaint also alleges that RBS's predictions about the benefits of its acquisition with ABN were false and misleading (CAC ¶¶ 565-66, 592, 606) because RBS failed to inform investors of the subprime assets on ABN's balance sheet and that those assets would "materially increase RBS's existing undisclosed concentration of subprime assets" (*id.* ¶ 515).  Plaintiffs further allege that RBS lacked an adequate basis to make representations about the benefits of the acquisition and failed to appreciate the risk ABN's subprime assets presented.  (*Id.* ¶ 567.)[55]

None of these allegations are sufficient to state a claim under the '33 Act.  As discussed above in detail, RBS cautioned investors about the basis for its representations regarding the ABN acquisition, might not be reliable, and might lead to errors in its assessment of the acquisition's benefits, which could adversely affect RBS's balance sheet.  Thus, RBS *precisely warned* investors of the scope of its due diligence—which was also publicly known from other sources—and that its entire assessment of the ABN acquisition may therefore be wrong.  RBS's statements about the acquisition are also classic puffery and not actionable.  *See Leykin*, 423 F. Supp. 2d at 247.  Those statements expressing RBS's aspirations about the benefits of the ABN acquisition are nothing more than optimistic accounts about RBS's future prospects, which are protected because no investor could reasonably rely on them, and also protected under the "bespeaks caution" doctrine.  Finally, even if the disclosures were not protected, Plaintiffs' reliance on statements former RBS directors made in April and November of 2008 (CAC ¶¶ 568-69) does not salvage the claim.  Those statements, made months after the relevant prospectuses

---

[55] These allegations are made with respect to the Preferred Share Offerings.  For the Series T Preferred Share offering, the Complaint further alleges that "RBS also represented that it had developed a clear and detailed roadmap for the integration of ABN[]'s business into RBS and that RBS expected to generate significantly higher revenues from ABN[]'s business."  (CAC ¶ 592.)  Plaintiffs' only basis for this is the other allegations in the CAC, which, it has been shown, are all inadequate.

were filed with the SEC and long after the offerings were completed, do not plead any contemporaneous facts showing any false or misleading statement at the time or that anyone at RBS even possessed the allegedly omitted information at the time.  The "truth of a statement made in the prospectus is adjudged by the facts as they existed" at the time of the offering.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005).  Plaintiffs' reliance on purportedly-made *hindsight* statements is thus inadequate.  *See Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 23, 2009) (dismissing Securities Act claims where "the Complaint puts forth no factual allegations contradicting the veracity of . . . [a] loss estimate at the time that estimate was released" but instead relies exclusively on subsequent disclosures).

### 5.    Other Alleged Omissions From Reports On Form 6-K

Finally, Plaintiffs also argue repeatedly that, for each series of Preferred Share offerings, RBS filed false and misleading "Report[s] on Form 6-K," which the offering documents incorporated by reference.  These Reports "contained the memoranda and articles of association of RBS, samples of the share warrants and ADRs . . . for [each] Series . . . [of] preferred shares [offered], and a resolution of the RBS Board regarding the [particular] Series . . . preferred share offering."  (CAC ¶¶ 553, 562, 589, 603, 610.)  Plaintiffs allege they were false and misleading for the same reason RBS's other disclosures were false.  (*Id.* ¶¶ 554, 563, 590, 604, 611.)  For the reasons already discussed above, those allegations are completely deficient.  In particular, RBS had no duty to disclose in these Reports any of the purportedly missing information.  A foreign issuer's duty on Form 6-K is to disclose to U.S. investors "information which is made available to stockholders pursuant to foreign law or stock exchange regulations, or otherwise distributed to stockholders" outside the United States.  *In re Elan Corp.*, No. 02 Civ. 865, 2004 WL 1305845, at *9 n.4 (S.D.N.Y. May 18, 2004).  Here, there is no allegation that the

purportedly omitted information was earlier disclosed in the U.K.—and it was not.  RBS thus had no obligation to disclose it here.

*       *       *

In sum, Plaintiffs' '33 Act allegations fall far short of the mark whether construed under Rule 9(b) or the Supreme Court's strict pleading standard in *Iqbal* and *Twombly*.  For these reasons, all of the '33 Act claims should be dismissed.

### B.       The Rights Issue Claims Fail Because It Was Not A U.S. Public Offering

The Rights Issue claims fall entirely outside the scope of the '33 Act.  Section 12(a)(2) of the '33 Act applies to those who offer or sell securities by means of a "prospectus," which is a term of art under the '33 Act "referring to a document that describes a public offering of securities by an issuer or controlling shareholder."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995).  Section 12(a)(2) liability is thus limited to U.S. public offerings in which there is an obligation to distribute a prospectus.  *See Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005) ("*Gustafson*'s definition of a prospectus as 'a document that describes a public offering of securities' compels the conclusion that a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary").  *See also Gotham Holdings, LP v. Health Grades, Inc.*, 534 F. Supp. 2d 442, 445 (S.D.N.Y. 2008); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 624-28 (S.D.N.Y. 2007) (Lynch, J.).

The Rights Issue was not a U.S. public offering, and the Rights Issue Circular was not a prospectus advertising securities in a U.S. public offering.  The Rights Issue was made only to "Qualifying Shareholders," the definition of which explicitly excluded shareholders with a registered address in the United States.  No U.S. registration statement or prospectus was filed for the Rights Issue, and, contrary to Plaintiffs' allegations (CAC ¶ 28), it is a matter of public record that the Rights Issue Circular itself was never filed with the SEC.  The Rights Issue

Circular expressly states that it is not to be distributed to or within the United States, that the securities offered are not registered under U.S. securities law, and that "[t]here will be no public offer in the United States"—among other warnings.[56]  Such "explicit restrictions" in an offering memorandum "indicate that it was not issued in connection with a public offering and is instead a private placement," to which Section 12(a)(2) liability does not apply.  *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 455 (S.D.N.Y. 2003).  Indeed, Plaintiffs' own allegations about the Rights Issue confirm that it was not a U.S. public offering.  (*See* CAC ¶¶ 698, 712.)  Rights Issue participation by U.S. residents pursuant to private contracts of sale, or "subscription letters," are not covered by Section 12(a)(2).  *Yung*, 432 F.3d at 149-50; *see also Gustafson*, 513 U.S. 561.  "'[N]o matter how the plaintiff might word the claim,'" the Rights Issue Circular "cannot be 'silkenized' into a § 12 [(a)](2) 'prospectus'."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 626-27 (quoting *Glamorgan Coal Corp. v. Ratner's Group PLC*, No. 93 Civ. 7581, 1995 WL 406167, at *3 (S.D.N.Y. July 10, 1995)).

### C.    The Preferred Share, Exchange Offer, And Rights Issue Claims Are Time Barred

All of Plaintiffs' claims under the '33 Act are also barred by the applicable 1-year limitations period.  Plaintiffs assert '33 Act claims with respect to the five *Preferred Share*

---

[56] The Circular further states that "this document and/or the Provisional Allotment Letters . . . should not be distributed, forwarded to or transmitted in or into the United States or the Excluded Territories." (E719.1, April 30, 2008 Rights Issue Circular at 4; *see* E728, April 30, 2008 Rights Issue Circular at 59 (Rights issue shares "have not been and will not be registered under the US Securities Act or under any securities laws of any state or other jurisdiction of the United States and may not be offered, sold, taken up, exercised, resold, renounced, transferred or delivered, directly or indirectly, within the United States except pursuant to an applicable exemption[,]" so "the Company is not extending the Rights Issue into the United States unless an exemption from the registration requirements of the US Securities Act is available."  As a result, "[s]ubject to certain exceptions, Provisional Allotment Letters or renunciations thereof sent from or post-marked in the United States will be deemed to be invalid and all persons acquiring New Shares and wishing to hold such Shares in registered form must provide an address for registration of the New Shares issued upon exercise thereof outside the United States."); *see also id.* at 2.)

offerings, the last of which was made in September 2007.  Plaintiffs' core complaint with respect to these offerings is that RBS should have disclosed its exposure to the risk of CDO losses and the subprime market more generally.  While Plaintiffs' claims in this regard are bogus for the reasons shown above, even if they were to be indulged for the sake of argument, they would be barred by RBS's disclosure of CDO write-downs on December 6, 2007.  At that point, even on Plaintiffs' view of RBS's prior disclosures, shareholders were on notice of potential claims.  But no complaint was filed within the one year limitations period.  The first complaint in this action was dated January 12, 2009.  *Zemprelli v. The Royal Bank of Scotland Group plc*, No. 09 Civ. 300 (S.D.N.Y. filed Jan. 12, 2009).

As to the October 2007 *Exchange Offer*, the same reasoning that bars the Preferred Share claims also applies.  The Exchange Offer claim concerns an offering prior to RBS's December 6, 2007 CDO write-downs, and the subjects of the alleged misstatements and omissions are identical to those alleged in connection with time-barred Preferred Share claims.[57]  Accordingly, the Exchange Offer claim is time-barred as well.

Finally, the *Rights Issue* claim is similarly time-barred because Plaintiffs first asserted this claim in the July 15, 2009 Complaint.  The  allegations center on RBS's purported failure to disclose the extent of ABN's subprime exposure, which RBS acquired in the ABN acquisition. (CAC ¶ 701(a); *see also id.* ¶¶ 701(b)-(d), 702-08.)  But Plaintiffs were on notice of their claims well before July 15, 2008, one year earlier, based on the December 6, 2007 announcement disclosing ABN's subprime exposure, and subsequent disclosures in the February 28, 2008

---

[57] (*Compare*, *e.g.*, CAC ¶¶ 648-49, *with id.* ¶ 502(f) (alleged misstatements regarding the benefits from the ABN transaction); ¶ 654, *with id.* ¶ 512 (alleged misstatements and omissions regarding exposure to subprime assets); ¶¶ 656, 658, *with id.* ¶ 511 (misstatements regarding RBS's conservative approach to lending).)

Financials, April 22, 2008 Announcement, and ABN's 2007 Annual Report, incorporated by reference into the Rights Issue Circular. The Annual Report provided ABN's exposure by asset type, the extent of fair value adjustments with a line item for "Sub-Prime RMBS," and a specific tally of €1.98 billion of unsold trances of U.S. ABS CDOs. (E195, ABN March 31, 2008 20-F, at 24.) The Report also warned of the challenges in valuing these assets. (*Id.*) Furthermore, the Rights Issue Circular itself contains warnings that "[p]roposals for the restructuring of ABN are complex and may not realise the anticipated benefits for RBS." (E724, April 30, 2008 Rights Issue Circular, at 10.) The mainstream press carried numerous stories describing criticism of RBS and detailing concerns with the acquisition. (E1653, 1661, 1665-77 (collecting articles).) Indeed, RBS's stock price dropped severely in early July 2008 on the heels of a Moody's downgrade. (*See* E1673, *Moody's Downgrades Royal Bank of Scotland*, Global News Wire— Asia Africa Intelligence Wire, July 1, 2008).) These substantial disclosures, made repeatedly over a seven-month period, put Plaintiffs on inquiry notice of the key portions of their Rights Issue claim and imposed a duty to inquire further. *See, e.g.*, *Newman v Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003). Plaintiffs do not allege they did anything to satisfy that duty of inquiry here. (*See* CAC ¶ 723.) The Rights Issue claim is thus time-barred.

**CONCLUSION**

For the foregoing reasons and those set forth in the RBS Subject-Matter Jurisdiction/Forum-Non Brief, the Individuals' Brief, and the Underwriters' Brief, this Court should dismiss the Complaint, with prejudice.

Dated:  October 23, 2009

Respectfully submitted,

/s/Paul A. Engelmayer
Paul A. Engelmayer
Christopher J. Meade
Robert W. Trenchard
David S. Lesser
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Telephone: 212-230-8800
Fax: 212-230-8888

*Counsel for The Royal Bank of
Scotland Group plc*