UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | 09 Civ. 300 (DAB) |
| ) | |
| In Re Royal Bank of Scotland Group plc ) | |
| Securities Litigation ) | ECF Case |
| ) | |
| ) | Oral Argument Requested |

THE ROYAL BANK OF SCOTLAND GROUP PLC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS TO DISMISS
FOR LACK OF SUBJECT-MATTER JURISDICTION AND
UNDER THE *FORUM NON CONVENIENS* DOCTRINE [CORRECTED]

WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Telephone: 212-230-8800
Fax: 212-230-8888

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 4

    A.   The Royal Bank of Scotland Group plc ...................................................... 4

    B.   The Consolidated Amended Complaint ........................................................ 6

I.   THIS COURT LACKS JURISDICTION OVER CLAIMS OF FOREIGN PURCHASERS
    OF RBS ORDINARY SHARES ......................................................................... 7

    A.  There Is No Subject-Matter Jurisdiction Under The Conduct Test.................................. 9

        1.   Under *Morrison* and *Rhodia*, the relevant question is where corporate responsibility
            lies for reporting to shareholders and the financial community, and for public
            filings. ....................................................................................... 9

        2.   At RBS, as in *Morrison* and *Rhodia*, the foreign parent company
            is responsible for financial reporting and public filings, and
            Plaintiffs do not allege otherwise; Plaintiffs thus fail to satisfy
            the conduct test. ........................................................................... 11

        3.   Plaintiffs cannot escape *Morrison*'s holding by emphasizing that the subject of
            some of RBS's allegedly fraudulent statements concerned the holdings of its U.S.
            subsidiaries..................................................................................... 12

        4.   Plaintiffs cannot escape *Morrison*'s holding by emphasizing that RBS made
            required filings with the SEC................................................................. 15

        5.   Plaintiffs cannot escape *Morrison*'s holding by emphasizing that RBS made
            corporate communications that reached the United States. ..................................... 17

    B.  There Is No Subject-Matter Jurisdiction Under The Effects Test................................. 19

II.  THIS COURT SHOULD DISMISS PLAINTIFFS' LAWSUIT UNDER THE DOCTRINE
    OF *FORUM NON CONVENIENS*, SO THAT THE ENTIRE
    CASE CAN BE TRIED IN THE UNITED KINGDOM ..................................................... 20

    A.  Plaintiffs' Purely Strategic Choice Of Forum Merits Little Or
        No Deference................................................................................... 21

    B.  The United Kingdom Is An Adequate Alternative Forum ............................................ 25

C.  Both Public And Private Factors Counsel In Favor Of Dismissal ................................. 27

    1.  Public factors weigh in favor of dismissal............................................ 27

    2.  Private factors weigh in favor of dismissal........................................... 32

D.  Dismissing The Entire Case Will Also Avoid Duplicative Litigation ........................... 34

III.  THE COURT SHOULD DISMISS CLAIMS RELATING TO THE RIGHTS ISSUE BECAUSE THOSE CLAIMS ARE GOVERNED BY A MANDATORY FORUM SELECTION CLAUSE........................................................................................... 35

CONCLUSION.............................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

*Aguinda v. Texaco, Inc.*,
   303 F.3d 470 (2d Cir. 2002)............................................................................. 25, 27

*Allstate Life Insurance Co. v. Linter Group Ltd.*,
   994 F.2d 996 (2d Cir. 1993)............................................................................. 26, 29

*Altvater Gessler-J.A. Baczewski International (USA) Inc. v. Sobieski Destylarnia S.A.*,
   572 F.3d 86 (2d Cir. 2009)..................................................................................... 39

*Banco De Serguros Del Estado v. J.P. Morgan Chase & Co.*,
   500 F. Supp. 2d 251 (S.D.N.Y. 2007)............................................................... *passim*

*Bersch v. Drexel Firestone, Inc.*,
   519 F.2d 974 (2d Cir. 1975).................................................................................... 20

*Blanco v. Banco Industrial de Venezuela, S.A.*,
   997 F.2d 974 (2d Cir. 1993).................................................................................... 27

*Capital Currency Exchange, N.V. v. National Westminster Bank PLC*,
   155 F.3d 603 (2d Cir. 1998).................................................................................... 25

*Capital Ventures International v. Republic of Argentina*,
   552 F.3d 289 (2d Cir. 2009).................................................................................... 38

*City of Edinburgh Council ex rel. Lothian Pension Fund v.
   Vodafone Group Public Co.*,
   No. 07 Civ. 9921, 2008 WL 5062669 (S.D.N.Y. Nov. 24, 2008) ......................... 12, 14, 16, 18

*Cornwell v. Credit Suisse Group*,
   No. 08 Civ. 3758, 2009 WL 3241404 (S.D.N.Y. Oct. 5, 2009) .................................. 12, 16, 18

*Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG*,
   535 F. Supp. 2d 403 (S.D.N.Y. 2008)...................................................................... 33

*Dabbous v. American Express Co.*,
   No. 06 Civ. 11345, 2009 WL 1403930 (S.D.N.Y. May 8, 2009)...................................... *passim*

*DiRienzo v. Philip Services Corp.*,
   232 F.3d 49 (2d Cir. 2000)................................................................................. 22, 25

*DiRienzo v. Philip Services Corp.*,
   294 F.3d 21 (2d Cir. 2002)................................................................................. 22, 31

*Do Rosario Veiga v. World Meteorological Organisation,*
486 F. Supp. 2d 297 (S.D.N.Y. 2007) ...................................................................... 33

*Dragon Capital Partners L.P. v. Merrill Lynch Capital Services Inc.,*
949 F. Supp. 1123 (S.D.N.Y. 1997) ........................................................................ 26

*Europe & Overseas Commodity Traders v. Banque Paribas London,*
147 F.3d 118 (2d Cir. 1998) .................................................................................... 19

*Fitzgerald v. Texaco, Inc.,*
521 F.2d 448 (2d Cir. 1975) .................................................................................... 23

*Froese v. Staff,*
No. 02 Civ. 5744, 2003 WL 21523979 (S.D.N.Y. July 7, 2003) ........................... 12

*Gulf Oil Corp. v. Gilbert,*
330 U.S. 501 (1947) ....................................................................................... *passim*

*IIT v. Vencap, Ltd.,*
519 F.2d 1001 (2d Cir. 1975) ............................................................................ 13, 20

*In re Alstom SA Securities Litigation,*
406 F. Supp. 2d 346 (S.D.N.Y. 2005) ................................................................. 8, 19

*In re AstraZeneca Securities Litigation,*
559 F. Supp. 2d 453 (S.D.N.Y. 2008) ........................................................ 16, 17, 20

*In re Baan Co. Securities Litigation,*
103 F. Supp. 2d 1 (D.D.C. 2000) ............................................................................ 17

*In re Bayer AG Securities Litigation,*
423 F. Supp. 2d 105 (S.D.N.Y. 2005) ....................................................... 12, 16, 20

*In re Bayer AG Securities Litigation,*
No. 03 Civ. 1546, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004) ...................... 17, 20

*In re China Life Securities Litigation,*
No. 04 Civ. 2112, 2008 WL 4066919 (S.D.N.Y. Sept. 3, 2008) ............................ 18

*In re DaimlerChrysler AG Securities Litigation,*
216 F.R.D. 395 (E.D. Mich. 2003) .......................................................................... 34

*In re NovaGold Resources Inc. Securities Litigation,*
629 F. Supp. 2d 272 (S.D.N.Y. 2009) ........................................................ 12, 16, 18, 20

*In re Rhodia S.A. Securities Litigation*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007)......................................................................*passim*

*In re SCOR Holding (Switzerland) AG Litigation*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)............................................... 12, 13, 14, 16, 18

*In re Vivendi Universal, S.A. Securities Litigation*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................................ 34

*Iragorri v. United Technologies Corp.*,
   274 F.3d 65 (2d Cir. 2001)............................................................... 21, 22, 23, 25

*Kokkonen v. Guardian Life Insurance Co. of America*,
   511 U.S. 375 (1994)............................................................................................. 7

*Koster v. (American) Lumbermens Mutual Casualty Co.*,
   330 U.S. 518 (1947)............................................................................................. 22

*Land v. Dollar*,
   330 U.S. 731 (1947)............................................................................................. 4

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000)................................................................................ 4

*Morrison v. National Australia Bank*,
   547 F.3d 167 (2d Cir. 2008),
   *petition for cert. filed*, 77 U.S.L.W. 3656 (U.S. June 1, 2009).........................*passim*

*Nathan Gordon Trust v. Northgate Exploration, Ltd.*,
   148 F.R.D. 105 (S.D.N.Y. 1993) ......................................................................... 16

*Norex Petroleum, Ltd. v. Access Industries*,
   416 F.3d 146 (2d Cir. 2005)................................................................................ 22, 23

*Phillips v. Audio Active Ltd.*,
   494 F.3d 378 (2d Cir. 2007)................................................................ 36, 37, 38, 39

*Piper Aircraft v. Reyno*,
   454 U.S. 235 (1981)............................................................................. 20, 22, 25, 26

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
   329 F.3d 64 (2d Cir. 2003)............................................................... 22, 25, 26, 30, 35

*Pozniak v. Imperial Chemical Industries PLC*,
   No. 03 Civ. 2457, 2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004)........................... 19

*PT United Can Co. v. Crown Cork & Seal Co.*,
   138 F.3d 65 (2d Cir. 1998) ......................................................................................... 26

*Roby v. Corp. of Lloyds*,
   996 F.2d 1353 (2d Cir. 1993) ..................................................................................... 39

*Scottish Air v. British Caledonian Group*,
   81 F.3d 1224 (2d Cir. 1996) ....................................................................................... 35

*Stamm v. Barclays Bank of New York*,
   153 F.3d 30 (2d Cir. 1998) .................................................................................. 26, 39

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) ...................................................................................................... 20

*Tri-Star Farms Ltd. v. Marconi, PLC*,
   225 F. Supp. 2d 567 (W.D. Pa. 2002) ........................................................................ 20

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000) ......................................................................................... 25

*Yung v. Lee*,
   No. 00 Civ. 3965, 2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002),
   *aff'd*, 432 F.3d 142 & 160 F. App'x 37 (2d Cir. 2005) ......................................... 25, 26, 27, 29

## OTHER AUTHORITIES

Banking Crisis:  Hearings Before the Treasury Committee of the House of Commons
   (Feb. 10, 2009) ............................................................................................................ 29

James C. Duff, *Judicial Business of the United States Courts:  2008 Annual Report of the
   Director* (2008) ........................................................................................................... 31

Richard M. Dunn & Raquel M. Gonzalez, *The Thing about Non-U.S. Discovery for U.S.
   Litigation:  It's Expensive and Complex*,
   67 Def. Couns. J. 342 (2000) ...................................................................................... 34

International Disclosure Standards,
   Securities Act Release No. 33-7637, 1999 WL 44076 (Feb. 2, 1999) ...................... 15

*The Pounding of the Pound:  The UK Finances are in a Parlous State, which the Currency
   Reflects*, The Times (Jan. 21, 2009) .......................................................................... 30

Rules, Registration and Annual Report Form for Foreign Private Issuers,
   Exchange Act Release No. 16371, 1979 WL 169934 (Nov. 29, 1979) ...................... 15

U.K. Office for National Statistics, News Release (Aug. 27, 2009)......................................... 5, 28

U.K. Office for National Statistics, Public Sector Employment:  Q1 2009 (June 17, 2009).......... 6

U.S. District Court—Judicial Caseload Profile:  New York Southern (2009) ............................ 31

U.S. Courts, Judicial Facts and Figures (2007) ......................................................................... 31

The Royal Bank of Scotland Group plc ("RBS") moves to dismiss for lack of subject-matter jurisdiction Plaintiffs' claims on behalf of "foreign-cubed" purchasers of RBS ordinary shares—those purchasers who (1) are not U.S. residents or citizens, (2) purchased ordinary shares of this United Kingdom company, and (3) made those purchases outside the United States. Separately, RBS moves, under the doctrine of *forum non conveniens,* to dismiss this entire case in favor of the United Kingdom.

## PRELIMINARY STATEMENT

By any measure, the center of gravity of this litigation is in the United Kingdom. RBS is one of the U.K.'s oldest and largest financial institutions. RBS is incorporated in the U.K.; its headquarters are in the U.K.; the strategic decisions governing RBS are made in the U.K.; its stock trades principally in the U.K.; its customer base is overwhelmingly in the U.K.; and responsibility for issuing RBS's financial statements and disclosures—including those at issue in this case—at all times has rested in the U.K. Plaintiffs' Complaint itself alleges a fraud masterminded by RBS executives based in the U.K.

The events at issue in this litigation are, furthermore, a matter of intense public interest in the U.K. That is because the health of RBS is integral to the U.K. economy, and because the U.K. Government, and through it the people of the U.K., are the majority owners of RBS. Much as the U.S. Government acted last fall to stabilize the U.S. financial system when banks were in grave jeopardy, the U.K. has invested billions of pounds to fortify British financial institutions, including RBS. The U.K. Government today holds an ownership stake of approximately 70 percent in RBS.

In spite of these facts, Plaintiffs have filed this securities fraud lawsuit—on behalf of a putative worldwide class of RBS shareholders—not in the U.K., but in the United States. This

class is overwhelmingly composed of foreign (principally U.K.) purchasers of the ordinary shares of RBS. Those shares are listed only on U.K. and other foreign stock exchanges—they are not listed in the U.S.—and at all relevant times, less than 3% of the holders of RBS ordinary shares resided in the U.S. And, although U.S.-listed American Depositary Receipts ("ADRs") for RBS trade on the New York Stock Exchange, these ADRs equated to less than 1% of RBS's outstanding ordinary shares. Plaintiffs thus seek to do what the Second Circuit has repeatedly held improper: to make a U.S. court bear the burdens of a global class action involving a company and conduct centered abroad, where only a small minority of those allegedly harmed reside in this country.

As we demonstrate in this brief, two forms of relief are in order, in light of the above facts and other factors evidencing the overwhelmingly extraterritorial nature of this dispute.

*Subject-matter jurisdiction*: The claims of all foreign purchasers of RBS stock on foreign exchanges must be dismissed for lack of subject-matter jurisdiction. As the Second Circuit has long held in cases involving the extraterritorial application of the U.S. securities laws, U.S. courts lack jurisdiction to hear such claims unless the wrongful conduct at issue either occurred in the U.S., or had substantial effects in the U.S. Neither test is satisfied here.

As to the "conduct" test, the Second Circuit has held, in *Morrison v. National Australia Bank*, 547 F.3d 167 (2d Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3656 (U.S. June 1, 2009) (No. 08-1191), that, where plaintiffs allege fraudulent statements by a foreign issuer, the wrongful conduct does not occur in the United States unless corporate responsibility for issuance of the allegedly fraudulent statements rested in the United States. This Court had previously held the same, in *In re Rhodia S.A. Securities Litigation*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007) (Batts, J.). Plaintiffs here do not even allege that responsibility for RBS's financial statements rested in

the U.S.; and, in fact, such responsibility demonstrably rested in the U.K.  The "effects" test is also not met as to foreign purchasers:  As numerous cases, including *Rhodia*, hold, that test is intended only to shield *domestic* investors and markets from the effects of securities frauds perpetrated elsewhere.  It does not permit foreign investors to obtain a U.S. forum for their claims by piggybacking on the effects upon domestic investors.

*Forum non conveniens*:  The entire case (or the fraction that remains after the appropriate dismissals for lack of subject-matter jurisdiction) should be dismissed under the *forum non conveniens* doctrine, so that any trial may be held where it belongs:  in the U.K.  The English courts[1] unquestionably provide an adequate forum for adjudicating these fraud-based claims.  The traditional private factors relevant to *forum non conveniens* motions (including the location of events, parties, witnesses, and documents) lopsidedly favor the U.K.  So do the public factors:  RBS's financial struggles, near collapse, and ensuing government recapitalization constitute a paradigmatic "localized controversy" based in the U.K.  In addition, the U.K. Government is now RBS's majority shareholder.  The impact of any adverse judgment in this litigation would thus fall, overwhelmingly, upon the U.K. Government.  Indeed, as Her Majesty's Treasury itself attests in an accompanying Declaration, a substantial damages award against RBS would undermine the actions the U.K. Treasury has taken to fortify RBS, and may require additional U.K. taxpayer support for RBS.

If further confirmation were needed that the U.K. is the proper forum for this litigation, it has been supplied by Plaintiffs themselves, and their counsel.  A major set of Plaintiffs' claims in this case, those relating to RBS's April 2008 Rights Issue, are governed by a mandatory forum

---

[1] The U.K. consists of three civil jurisdictions, one of which includes both England and Wales.  Any reference herein to the English courts refers to the courts of England and Wales, and any reference to a U.K forum similarly refers to these same courts.

selection clause in the Rights Issue Prospectus.  This clause gives the English courts "exclusive jurisdiction" over those claims; under any circumstances, they must be litigated in the U.K.  And Plaintiffs' U.S. counsel are expressly coordinating this action with U.K. counsel, who, in solicitations to U.K. investors to join their "Action Group," have stated that they are readying a parallel lawsuit "through the UK courts."  U.K. counsel have stated that they are doing so because this Court may dismiss Plaintiffs' claims, and because "cover[ing] both jurisdictions" will maximize Plaintiffs' recovery.  This Court should dismiss in favor of the U.K., so that all claims may proceed in a single forum.

## STATEMENT OF FACTS

### A.     The Royal Bank of Scotland Group plc

RBS is a financial services company that is incorporated in the U.K.  It is registered in Scotland and headquartered in London and Edinburgh.  (Declaration of George Graham ("Graham Declaration" or "Graham Decl.") ¶¶ 6, 8; Consolidated Amended Complaint ("CAC" or "Complaint") ¶ 45.)[2]  At all relevant times, RBS had two principal subsidiaries based in the U.S.:  Citizens Financial Group, Inc. ("Citizens"), a bank holding company with U.S. commercial and retail banking operations; and Greenwich Capital Holdings, Inc. ("Greenwich"), later named RBS Securities USA Inc., a holding company with wholesale and investment banking operations.  (Graham Decl. ¶ 31.)  At all relevant times, the overwhelming majority of

---

[2] Along with the other declarations cited herein, the Graham Declaration is contained within the Appendix of Declarations and Associated Exhibits filed along with this Memorandum.  When the question of "jurisdiction is raised," the Court "may inquire by affidavits or otherwise, into the facts" not as they are pleaded, but "as they exist."  *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) (citations omitted); *see, e.g.*, *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *In re Rhodia*, 531 F. Supp. 2d at 537 (Batts, J.) (same).  The Court may also consider declarations and other evidence outside of the pleadings in determining whether dismissal under the *forum non conveniens* doctrine is warranted.  *See, e.g.*, *Dabbous v. American Express Co.*, No. 06 Civ. 11345, 2009 WL 1403930, at *3 n.1 (S.D.N.Y. May 8, 2009) (Batts, J.) ("A *forum non conveniens* inquiry goes to the court's subject matter jurisdiction, and, as such, in resolving the jurisdictional dispute, the district court must review the pleadings and all evidence before it, such as affidavits." (internal quotation marks omitted; alterations incorporated)).

RBS's senior executives and directors worked in the U.K.; decisions regarding RBS's strategic direction were made in the U.K.; and responsibility for preparing and issuing RBS's financial statements and public disclosures rested squarely in the U.K.  (*Id.* ¶¶ 19-22, 27-28, 32, 34, 44-46, 53, 60.)  RBS's customer base is also dominantly based in the U.K., where its 24 million individual customers represent more than one-third of the population.  (*Id.* ¶ 9); U.K. Office for National Statistics, News Release (Aug. 27, 2009).

RBS's ordinary (or common) shares are listed on the London Stock Exchange and Euronext Amsterdam.  Those shares are not listed, and have never been listed, on any U.S. exchange.  (Graham Decl. ¶ 14.)[3]  At all relevant times, less than 3% of the holders of RBS ordinary shares resided in the U.S.  (Declaration of Kenneth M. Lehn ("Lehn Decl.") ¶ 14.) Starting in October 2007, ADRs representing ordinary shares of RBS were first listed on the New York Stock Exchange ("NYSE").  (Graham Decl. ¶ 15.)  Over the relevant period, less than 1% of RBS's ordinary shares were traded in ADR form.  (Lehn Decl. ¶ 17 & Ex. 2.)[4]

In the fall of 2008, in the midst of the economic crisis, the U.K. Government undertook "the largest U.K. government intervention in financial markets since the outbreak of the First World War."  (Declaration of Christopher J. Meade ("Meade Decl.") Ex. 11, Bank of England, Financial Stability Report, 31-32 Box 5 (Oct. 24, 2008); *see also* Declaration of Tom Scholar, Her Majesty's Treasury ("U.K. Treasury Decl.") ¶ 4 (Treasury "intervened in unprecedented ways" to, *inter alia*, "restore financial stability").)  As to RBS, these actions included a £20 billion investment in RBS.  (U.K. Treasury Decl. ¶ 6; *see also* Meade Decl. Ex. 12, UK Financial

---

[3] RBS's registrar of shareholders is based in Bristol, England and Edinburgh, Scotland.  (Graham Decl. ¶ 17.)  RBS's annual meeting of ordinary shareholders is held in Edinburgh, Scotland.  (*Id.* ¶ 18.)

[4] "ADRs are issued by U.S. depository banks and represent 'one or more shares of foreign stock or a fraction of a share.'"  *Morrison*, 547 F.3d at 168 n.1.  The shares represented by RBS's ADRs are deposited with the principal London office of The Bank of New York Mellon.  (Graham Decl. ¶ 15.)

Investments Ltd, UKFI Strategy:  Market Investments and Annual Report and Accounts 2008/09 ("UKFI Strategy"), at 15, 31 (June 30, 2009).)  According to the U.K. Treasury:  "The public interest actions taken by the Treasury in respect of RBS have averted a collapse of RBS, with incalculable consequences for the UK, and potentially the world, economy."  (U.K. Treasury Decl. ¶ 10.)  The U.K. Government today owns 70% of RBS, and its ownership stake may increase again.  (*Id.* ¶ 6; Meade Decl. Ex. 12, UKFI Strategy, at 15, 31.)  The U.K. Office of National Statistics has classified RBS, for certain purposes, as a public corporation.[5]

### B.    The Consolidated Amended Complaint

The 256-page Consolidated Amended Complaint alleges misstatements and/or material omissions in RBS's disclosures as to five subjects:  (1) RBS's U.S. residential mortgage-related business prior to the subprime crisis; (2) Citizens' conservative approach to mortgage lending; (3) RBS's estimates of potential losses relating to certain mortgage-related securities; (4) RBS's 2007 participation in a consortium of banks that acquired the Dutch company ABN AMRO Holding N.V. ("ABN"); and (5) the adequacy of RBS's capitalization.  Plaintiffs allege that actionable statements were made in RBS's financial disclosures, public filings, analyst calls, press releases, and offering materials.  (CAC ¶¶ 22, 24; *see generally* RBS's Memorandum of Law in Support of its Motion to Dismiss for Failure to State a Claim ("RBS Merits Brief").)  For purposes of these motions, two aspects of the Complaint are noteworthy.

First, although no Lead Plaintiff is foreign, and although Lead Plaintiffs have acknowledged that foreign purchasers are "vulnerable to unique defenses relating to subject

---

[5] *See* U.K. Office for National Statistics, Public Sector Employment:  Q1 2009, Background Note 24 (June 17, 2009), *available at* http://www.statistics.gov.uk/pdfdir/pse0609.pdf.

matter jurisdiction at the motion to dismiss stage,"[6] Plaintiffs purport to file this Complaint on behalf of a global class including all foreign purchasers of RBS stock.  (*See, e.g.*, CAC ¶¶ 1, 31, 105; *see id.* ¶ 25 (purporting to represent all persons "who purchased or otherwise acquired RBS securities" anywhere in the world between March 2007 and January 2009).)  By adding foreign purchasers to the putative class, Plaintiffs dramatically increased its size:  Foreign purchasers constituted more than 97% of the holders of RBS ordinary shares.  (Lehn Decl. ¶ 14.)

Second, a major set of Plaintiffs' claims relates to RBS's April 2008 Rights Issue, in which RBS raised capital by issuing ordinary shares.  Plaintiffs allege, among other things, that RBS failed to disclose in the Rights Issue Prospectus that it no longer expected to realize the benefits anticipated from its 2007 acquisition of part of ABN.  (*See, e.g.*, CAC ¶¶ 332-36.)  But that very Prospectus contains a *mandatory forum selection clause*.  (Graham Decl. Ex. 2, Part III, § 2.9.)  That clause grants "exclusive jurisdiction" to "[t]he courts of England and Wales . . . to settle any dispute which may arise out of or in connection with the Rights Issue."  (*Id.*) Purchasers of shares in the Rights Issue—including Lead Plaintiffs MassPRIM and MissPERS, the representatives of the purchasers of ordinary shares—are each bound by that clause, such that Plaintiffs' claims relating to the Rights Issue (Counts IX and X) must be dismissed.  *See* Part III, *infra*.

## I.    THIS COURT LACKS JURISDICTION OVER CLAIMS OF FOREIGN PURCHASERS OF RBS ORDINARY SHARES

Like all federal courts, this Court is one of "limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  "Determining the existence of subject matter

---

[6] Lead Plaintiffs MassPRIM and MissPERS, who represent purchasers of ordinary shares, made this statement in vying to serve as Lead Plaintiffs.  *See* Reply Mem. in Further Support of Mot. of the State Funds for Consolidation (Dkt. #48) 14; *see also* Mem. of the State Funds in Opp. to Mot. for Reconsideration of the Order Appointing Lead Plaintiff (Dkt. #64) 5.

jurisdiction is a threshold inquiry:  the plaintiff "has the burden of proving by a preponderance of evidence that it exists."  *Morrison*, 547 F.3d at 170 (internal quotation marks omitted).  Subject-matter jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Id.* (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)).

With respect to the reach of the federal securities laws, "[w]hen Congress wrote the Securities Exchange Act, . . . it omitted any discussion of its application to transactions taking place outside of the United States."  *Id.*  As a result, "when faced with securities law claims with an international component," courts "turn to the underlying purpose of the anti-fraud provisions as a guide to discern whether Congress would have wished the precious resources of the United States courts . . . to be devoted to such transactions."  *Id.* (internal quotation marks omitted).  In the Second Circuit, this analysis involves a "binary inquiry."  *Id.* at 171.[7]

First, under the "conduct test," the court asks "whether the wrongful conduct" at issue "occurred in the United States."  *Id.*  Second, under the "'effects test,'" the court asks "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens."  *Id.*

Plaintiffs' Complaint includes a preemptive discussion of why the "conduct" and "effects" tests are, purportedly, satisfied, as to "the claims of foreign Class members who acquired RBS securities on foreign markets."  (CAC ¶ 31; *see generally id.* ¶¶ 29-37.)  But Plaintiffs have not met, and cannot meet, their burden of establishing jurisdiction with respect to

---

[7] This same analysis applies to claims brought under the Securities Act.  *See, e.g.*, *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 368 & n.12 (S.D.N.Y. 2005).

either of these tests, and therefore this Court lacks jurisdiction over the claims of such "foreign-cubed" purchasers.[8]

### A.    There Is No Subject-Matter Jurisdiction Under The Conduct Test

#### 1.    Under *Morrison* and *Rhodia*, the relevant question is where corporate responsibility lies for reporting to shareholders and the financial community, and for public filings.

*Morrison* sets out the framework for applying the conduct test to securities fraud claims on behalf of "foreign-cubed" purchasers.  Plaintiffs in *Morrison* alleged fraudulent filings and public statements by an Australian bank (National Australia Bank, or NAB) relating to its Florida subsidiary, HomeSide.  They further alleged that HomeSide had "manipulated its internal books and records and sent the falsely inflated numbers from Florida to NAB's headquarters in Australia"; and that NAB, the parent company, had "created and distributed its public filings and related public statements," which "included HomeSide's falsified numbers."  547 F.3d at 171.

The Second Circuit affirmed the dismissal of foreign purchasers' claims.  It held that the relevant issue is where within the corporation *responsibility* rested for issuing the allegedly fraudulent filings and statements.  The Court explained that that requirement flows from the nature of a 10b-5 claim itself:  "Liability under Rule 10b-5(b) requires a false or misleading statement," and "anything short of such conduct is merely aiding and abetting . . . [and] not enough to trigger liability under 10b-5."  *Id.* at 176 (internal quotation marks omitted); *see also id.* at 171 (actions "merely preparatory to a fraud" do not create jurisdiction under conduct test).  It thus was not decisive that NAB's U.S. subsidiary was the subject of NAB's filings and statements; or that personnel at HomeSide had, allegedly, manipulated its internal books and

---

[8] RBS's motion to dismiss based on the lack of subject-matter jurisdiction applies to the claims of all foreign purchasers of ordinary RBS shares, regardless whether those shares were acquired through open-market trading, the October 2007 Exchange Offer, or the April 2008 Rights Issue.  RBS does not move to dismiss for lack of subject-matter jurisdiction the claims of purchasers of ADRs on U.S. markets, U.S. purchasers of ordinary shares on foreign markets, or purchasers of preferred shares.

triggered the chain of events that caused NAB's filings to be misleading.  Rather, the Court held,

NAB's filings themselves were "more directly responsible for the harm to investors than the

manipulation of the numbers in Florida." *Id.* at 176.

In its analysis of the issue of where within NAB responsibility for the allegedly

fraudulent filings and statements lay, the Second Circuit explained:

> The [American subsidiary's] mandate was to run its business well
> and make money.  *The responsibilities of NAB's Australian
> corporate headquarters, on the other hand,* included overseeing
> operations, including those of the subsidiaries, and *reporting to
> shareholders and the financial community.  NAB*, not HomeSide,
> [the subsidiary,] *is the publicly traded company, and its
> executives*—assisted by lawyers, accountants, and bankers—*take
> primary responsibility for the corporation's public filings, for its
> relations with investors, and for its statements to the outside world*.

*Id.* (emphasis added).  "[E]xecutives" of the parent company "possess the responsibility to

present accurate information to the investing public and to the holders of its ordinary shares in

accordance with a host of accounting, legal and regulatory standards."  *Id.*  Thus, the Court

stated, "[w]hen a statement or public filing fails to meet these standards, the responsibility, as a

practical matter, lies in Australia, not Florida."  *Id.*

The analysis in *Morrison* closely tracked this Court's analysis in *Rhodia*.  There, the

Court dismissed the claims of foreign purchasers who had bought shares of a foreign company

on foreign exchanges.  "At all times" under the conduct test, the Court stated, it "is concerned

with the alleged fraud" itself, which consists of the "engineer[ing]" and issuance of the allegedly

fraudulent statements themselves, and responsibility for those functions within Rhodia had rested

abroad.  531 F. Supp. 2d at 539-40.  This Court rejected plaintiffs' claim that the subject-matter

jurisdiction might exist even if the "acts that took place in the United States" had themselves

been fraudulent.  *Id.* at 540.  Such acts could not "be said to have been a direct cause of [their]

- 10 -

losses"; rather, they were "merely preparatory acts of a securities fraud conducted elsewhere" and "were merely a link in the chain of the overall scheme, which was perpetrated abroad." *Id.* at 539-40; *see id.* at 539 (citing similar analysis in district court decision in *Morrison*).

> ### 2.    At RBS, as in *Morrison* and *Rhodia*, the foreign parent company is responsible for financial reporting and public filings, and Plaintiffs do not allege otherwise; Plaintiffs thus fail to satisfy the conduct test.

Despite bearing the burden of establishing subject-matter jurisdiction, Plaintiffs fail to allege that responsibility within RBS "to present accurate information to the investing public," *Morrison*, 547 F.3d at 176, rested in the United States.  Under *Morrison* and *Rhodia*, Plaintiffs' conspicuous failure to make any such allegation disposes of any claim that subject-matter jurisdiction exists under the conduct test.  Indeed, to the extent the Complaint touches at all on this subject, it implicitly *acknowledges* that RBS's corporate leadership was based abroad.  (*See* CAC ¶ 45 (describing RBS as "a British banking and insurance holding company . . . based in Edinburgh, Scotland"); *see also, e.g., id.* ¶ 267 ("RBS's daily morning meetings, presided over by Goodwin" the U.K.-based CEO, "involved updates and discussions with the U.S. operations on the subprime assets [they] accumulated.").)

It is unsurprising that the Complaint lacks allegations that RBS's U.S. subsidiaries bore such responsibility, as it is demonstrably clear that responsibility for RBS's public filings and disclosures to shareholders and the financial community rests in the U.K., both now and during the period covered by the Complaint.  At all relevant times:  (1) RBS, the U.K.-based parent company, has been responsible for RBS's public filings and disclosures, with responsibility for the particular disclosure belonging either to RBS's board or senior U.K. executives (Graham Decl. ¶¶ 32-41, 44, 47, 50-51, 58); (2) RBS's subsidiaries, including Citizens and Greenwich, have not had responsibility for such disclosures and filings (*id.* ¶ 32); (3) the executives of the

department of RBS responsible for compiling financial information and preparing it for public disclosure (Group Finance) were located in the U.K. (*id.* ¶ 36); and (4) the executives of the department of RBS responsible for regularly communicating with public investors (Investor Relations) were also located in the U.K. (*id.* ¶¶ 53, 58-59). This case thus parallels *Morrison,* both in that the foreign parent was responsible for public disclosures, and in that, prior to issuance, such disclosures first went through "a number of checkpoints manned by [the foreign parent company's personnel]." 547 F.3d at 176-77.

Under *Morrison* and *Rhodia*, it is clear that Plaintiffs have not satisfied the conduct test with respect to the claims of foreign-cubed purchasers. Numerous courts in this District have similarly refused to exercise subject-matter jurisdiction over foreign-cubed claims where, as here, responsibility for public statements and disclosures resided at the issuer's foreign headquarters. *E.g.*, *Cornwell v. Credit Suisse Group*, No. 08 Civ. 3758, 2009 WL 3241404 (S.D.N.Y. Oct. 5, 2009) (Switzerland); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009) (Canada); *City of Edinburgh Council ex rel. Lothian Pension Fund v. Vodafone Group Public Co.*, No. 07 Civ. 9921, 2008 WL 5062669 (S.D.N.Y. Nov. 24, 2008) (United Kingdom); *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556 (S.D.N.Y. 2008) (Switzerland); *In re Bayer AG Sec. Litig.*, 423 F. Supp. 2d 105 (S.D.N.Y. 2005) (Germany); *Froese v. Staff*, No. 02 Civ. 5744, 2003 WL 21523979 (S.D.N.Y. July 7, 2003) (Germany).

### 3. Plaintiffs cannot escape *Morrison*'s holding by emphasizing that the subject of some of RBS's allegedly fraudulent statements concerned the holdings of its U.S. subsidiaries.

Unable to allege the doctrinally decisive fact that corporate responsibility for issuing its financial statements and filings rested in the U.S., Plaintiffs emphasize that they allege "fraud-*related* conduct in the United States." (CAC ¶ 32 (emphasis added).) They state that "activities

central to the wrongdoing alleged"—in particular, that U.S. subsidiaries of RBS had exposure to subprime assets—occurred "in the United States" (*id.* ¶ 36) and were the subject of some of RBS's allegedly false statements. (*See id.* at 75 (Heading: "Activities Taken By Defendants in the U.S. Were Integral to Defendants' Scheme to Defraud Investors"); *id.* ¶¶ 264-72.)

A long line of decisions forecloses this argument. *Morrison* recognized that the pertinent issue is where "responsibility" lay for the ultimate dissemination of false information to investors, not the location of the underlying business activity, 547 F.3d at 176, and *Rhodia* recognized that the conduct test is not concerned with the "object of the misrepresentations allegedly made by [the defendant]," 531 F. Supp. 2d at 539. *See also, e.g.*, *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1018 (2d Cir. 1975) (Friendly, J.) (conduct test is "limited to the perpetration of fraudulent acts themselves" and does not extend to "mere preparatory activities"); *In re SCOR Holding*, 537 F. Supp. 2d at 568 ("The fact that the subject of the alleged fraud was [a] North American business unit is not 'conduct' in the United States"). Put differently, much as the job of the HomeSide subsidiary in *Morrison* was "to run its business well and make money," 547 F.3d at 176, the same is true of RBS's U.S. subsidiaries, whose jobs included acquiring mortgages or mortgage-backed (and allegedly "subprime") assets (CAC ¶¶ 267, 270). But, in both cases, it was the foreign parent, working out of "corporate headquarters," that was responsible for what to "report[] to shareholders and the financial community" about its subsidiaries and their impact on the parent company's financials. *Morrison*, 547 F.3d at 176.

Indeed, the U.S.-based conduct alleged here is *more* attenuated from the alleged misrepresentation than the U.S.-based conduct in *Morrison*. In *Morrison*, HomeSide allegedly "manipulated its internal books and records and sent the falsely inflated numbers from Florida to NAB's headquarters in Australia," 547 F.3d at 171; in other words, it manufactured the "false

numbers" that were passed on to investors by the parent, NAB.  The Second Circuit nonetheless held that the activity at HomeSide was at most "merely aiding and abetting," and therefore "not enough to trigger liability under Section 10(b)."  *Id.* at 176 (internal quotation marks omitted).  Plaintiffs here nowhere allege even that much—that RBS's U.S.-based conduct itself was fraudulent.  They merely claim that RBS's U.S.-purchased assets were the *subject* of *some* of the alleged misstatements and omissions.[9]

Finally, even if the business activities of RBS's U.S. subsidiaries were relevant under the conduct test, which they are not, Plaintiffs repeatedly allege that these actions were controlled and directed by their U.K. parent, RBS.[10]  By their own account, Plaintiffs thus allege a fraud masterminded in the U.K., not the U.S.  *Cf. In re SCOR Holding*, 537 F. Supp. 2d at 565 ("[T]he complaint places remarkable emphasis on the extensive control exerted by European management over key decisions related to . . . North America" (internal quotation marks omitted)).  Thus, even the U.S.-based conduct that Plaintiffs seek, improperly, to import into the "conduct" test was, according to Plaintiffs, engineered by—and the responsibility of—RBS, the U.K. parent.

---

[9] Indeed, beyond the non-specific allegation that all activities were of a "single fraudulent scheme" (CAC ¶ 32), Plaintiffs nowhere allege that *any* U.S.-based activities were fraudulent in and of themselves.  *Cf. City of Edinburgh Council*, 2008 WL 5062669, at *5.

[10] With respect to RBS subsidiary Greenwich, the Complaint alleges that RBS CEO Fred Goodwin, who was based in the U.K., "designed the plan for Greenwich's growth" (CAC ¶ 136); that the "pressure to plunge deeper into growth areas such as CDOs came from Edinburgh and London" (*id.* ¶ 137 (internal quotation marks omitted)); and that Goodwin was "directly responsible for RBS adopting the mantra 'accumulate assets,' including billions of dollars of risky subprime assets" (*id.* ¶ 233); *see also id.* ¶ 267 ("RBS's daily morning meetings, presided over by Goodwin, involved updates and discussions with the U.S. operations on the subprime assets [they] accumulated").  With respect to RBS subsidiary Citizens, the Complaint repeatedly states that RBS "pressur[ed] Fish," the CEO of Citizens, to expand the subsidiary's "balance sheet to riskier assets" (*id.* ¶¶ 277(a), 282(a), 287(a), 293(a), 299(a), 309(a), 331(b), 654(d), 656(c), 658(c), 661(d)).

### 4. Plaintiffs cannot escape *Morrison*'s holding by emphasizing that RBS made required filings with the SEC.

Nor may Plaintiffs avoid *Morrison* by littering the Complaint with references to RBS's filings with the SEC. Plaintiffs claim that those filings support subject-matter jurisdiction over foreign purchasers. (*See, e.g.*, CAC ¶ 34.) But, like the plaintiffs in *Rhodia*, who tried the same ploy, *see* 531 F. Supp. 2d at 540-41, Plaintiffs fail to allege that those filings were the responsibility of the parent company's U.S. operations. And they were not: responsibility for preparing and approving RBS's SEC filings demonstrably rested with executives in the U.K. (Graham Decl. ¶¶ 46-52.)

Moreover, due to the very nature of U.S. disclosure requirements, RBS's disclosures to the SEC were substantively duplicative of disclosures made in the U.K. The SEC's rules governing filings required for ADRs (or other U.S. securities listed by foreign issuers) are designed to simplify the filing obligations of foreign issuers; they generally allow foreign issuers to fulfill their SEC disclosure obligations by using materials prepared for disclosure *in their home country*. For example, SEC Form 20-F (Annual Report for Foreign Private Issuer), on which RBS filed its annual report (*see, e.g.*, CAC ¶ 337), is designed to be "an 'international passport'" so that foreign issuers may "access more than one securities market using essentially the same basic disclosure document."[11] Like other foreign issuers, RBS's regular SEC filings are based on its disclosures in the U.K., for which personnel in the U.K. were responsible. (*See*

---

[11] International Disclosure Standards, Securities Act Release No. 33-7637, 1999 WL 44076, at *2, *14 (Feb. 2, 1999). Similarly, SEC Form 6-K (Report of Foreign Issuer), on which RBS filed most of the documents about which Plaintiffs complain (*see, e.g.*, CAC ¶¶ 273, 283, 286, 290, 300, 303, 307, 335, 343, 346), "requires the furnishing of information and material to investors made public pursuant to foreign law, stock exchange regulations or distributed to security holders." Rules, Registration and Annual Report Form for Foreign Private Issuers, Exchange Act Release No. 16371, 1979 WL 169934, at *8 (Nov. 29, 1979).

Graham Decl. ¶ 46.)[12]  Thus, when Plaintiffs complain about misrepresentations in SEC forms,

they are complaining ultimately about disclosure decisions made earlier in the U.K.[13]

Not surprisingly, it is well-settled that, where "the authorship, preparation and

dissemination of the allegedly false information was done . . . abroad," SEC filings "cannot

support an extension of jurisdiction over an overwhelmingly foreign putative class."  *In re Bayer

AG Sec. Litig.*, 423 F. Supp. 2d 105, 112 (S.D.N.Y. 2005) (collecting cases).  Indeed, faced with

the same argument, this Court in *Rhodia* held that the filing of documents with the SEC in

connection with U.S. securities is *not* sufficient conduct to establish jurisdiction over non-U.S.

purchasers of non-U.S. securities, where responsibility for the content of those filings rested

abroad.  531 F. Supp. 2d at 541 ("Rhodia's filing of SEC reports were conceived, engineered,

and published on foreign soil.").[14]

Finally, Plaintiffs do not allege that any non-U.S. purchaser even saw, much less "relied

upon these United States filings."  *Id.*  The SEC filings are thus insufficient to trigger this

Court's subject matter jurisdiction.  *Id.*; *see also In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d

---

[12] Indeed, many SEC filings of which Plaintiffs complain acknowledge this fact, and acknowledge that disclosure decisions were made under U.K. law.  (*See, e.g.*, Meade Decl. Ex. 4, August 8, 2008 Form 6-K (cited at CAC ¶¶ 346, 348, 351), at 2 ("The half-yearly financial report is the responsibility of, and has been approved by, the directors.  The directors are responsible for preparing the half-yearly financial report in accordance with the Disclosure and Transparency Rules of the United Kingdom['s] Financial Services Authority.").)

[13] To use just one example, Plaintiffs allege that a series of statements in RBS's financial results for the year ended December 31, 2007, reported on Form 6-K filed on February 28, 2008 (*see* CAC ¶¶ 321-22), were "each materially false and misleading" (*id.* ¶ 325; *see id.* ¶ 325(a)-(f)).  Every allegedly false or misleading statement taken from the 6-K was published, in *verbatim form*, in the U.K.  (*Compare* Meade Decl. Ex. 5 *with id.* Ex. 6.)

[14] *See also, e.g.*, *In re NovaGold Res.*, 629 F. Supp. 2d at 306 ("While SEC filings constitute U.S. conduct, filing documents with the SEC alone is insufficient to confer subject-matter jurisdiction." (citations omitted)); *In re SCOR Holding*, 537 F. Supp. 2d at 568 ("Foreign investors may not bring private claims for damages in United States courts simply by alleging that false statements were made in SEC filings."); *Cornwell*, 2009 WL 3241404, at *10; *City of Edinburgh Council*, 2008 WL 5062669, at *6; *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y. 1993).  Similarly, in *Morrison*, NAB, the Australian parent, had issued ADRs (547 F.3d at 168 & n.1) which traded on the NYSE (*id.* at 168) and necessarily had the attendant U.S. filing obligations.

453, 466 (S.D.N.Y. 2008) ("[T]o demonstrate that the fraud 'directly caused' plaintiffs' losses, plaintiffs must . . . have sufficiently alleged that the foreign purchasers relied on the United States-based conduct when deciding to acquire the stock.").[15]

> **5.      Plaintiffs cannot escape *Morrison*'s holding by emphasizing that RBS made corporate communications that reached the United States.**

Finally, Plaintiffs' allegation that RBS made misstatements on "conference calls aired in the United States" is simply beside the point.  (CAC ¶ 34.)  As with any other allegedly actionable statement, the pertinent question is whether corporate responsibility for the statement rested in the U.S.  *See Morrison*, 547 F.3d at 176.  Plaintiffs do not allege that this was so with respect to any conference call.  Indeed, Plaintiffs do not identify *any* U.S. nexus to these calls other than that those calls "aired" in the U.S.  (CAC ¶ 34.)

In fact, as the Graham Declaration demonstrates:  (1) Each of the conference calls cited by Plaintiffs was organized by and arranged by RBS officials in the U.K.; (2) the content of the presentations on those calls was arranged by RBS officials in the U.K.; and (3) all of the RBS participants on each of those calls participated from the U.K.  (Graham Decl. ¶¶ 53-59.)

Under the case law, that a corporate communication reaches a U.S. audience is insufficient conduct to create subject-matter jurisdiction.  In *Rhodia*, for example, press releases issued by the defendant companies "were picked up by American press venues like Bloomberg"; and some statements "were incorporated into guidance given at Goldman Sachs conferences in

---

[15] Instead of alleging reliance by non-U.S. purchasers, Plaintiffs allege that the "fraud-on-the-market" presumption applies.  (CAC ¶ 478.)  But whatever role that presumption might otherwise have at this stage, it "cannot be used to satisfy the conduct test."  *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357, at *18 (S.D.N.Y. Sept. 30, 2004); *see also In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d at 466 (similar).  Were the rule otherwise, the conduct test would be meaningless, for it "would allow a foreign plaintiff to sue a foreign defendant based on an extraterritorial transaction whenever that foreign defendant had filed a fraudulently misleading document with the SEC," *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 10 (D.D.C. 2000), irrespective of how much—or little—fraudulent conduct occurred in the U.S., or of the relative sizes of the domestic and foreign putative classes.

West Palm Beach, Florida." 531 F. Supp. 2d at 534. But the plaintiffs in *Rhodia*, like those here, had "not allege[d] that any of these statements . . . were created or planned in the United States." *Id.* This Court rejected that these U.S. contacts created subject-matter jurisdiction: "While some of the allegedly fraudulent statements issued by [defendants] trickled over" to the United States, such conduct was insufficient absent allegations that such statements were engineered in the United States. *Id.* at 540.[16]

Also ineffectual is Plaintiffs' misleading implication that one such call was made by an RBS executive speaking from inside the U.S. Under the caption "Actions Taken by Defendants in U.S." (CAC at 75), Plaintiffs state that, "on a conference [c]all with analysts and investors on March 1, 2007," defendant Lawrence Fish, chief executive of RBS's Citizens subsidiary, stated: "[W]e don't do subprime. We have never done subprime. We have no plans to do subprime" (CAC ¶ 270). Revealingly, Plaintiffs do not repeat—in the actual body of the Complaint—that Fish was in the United States at the time. That is because he was not.

As the Graham Declaration demonstrates: (1) This statement was not made on a conference call, but was actually at a *conference with analysts in the U.K.* which Mr. Fish attended in person; (2) there were no telephonic presenters, and questions were only taken in-

---

[16] *See also, e.g.*, *In re SCOR Holding*, 537 F. Supp. 2d at 568 & n.17 (dismissing claims of foreign investors who purchased shares abroad; focus must be on "the locus of decisionmaking" and it is thus insufficient merely to allege that "conference calls took place with unnamed 'Wall Street analysts' in the United States"); *Cornwell*, 2009 WL 3241404, at *10 (same; not sufficient that some executives of foreign defendant who participated in conference calls allegedly "resided in the United States at the time [the] calls were made"); *In re NovaGold Res.*, 629 F. Supp. 2d at 305 (same; not sufficient that the foreign defendant held a presentation in New Orleans and "conference calls with participants from the United States"); *City of Edinburgh Council*, 2008 WL 5062669, at *5, *6 (same; not sufficient that there were "a pair of presentations . . . in New York" and that the defendant "briefed U.S. institutional shareholders"); *In re China Life Sec. Litig.*, No. 04 Civ. 2112, 2008 WL 4066919, at *9 (S.D.N.Y. Sept. 3, 2008) (same; not sufficient that there was "a 'roadshow' conducted in the United States, and communications with American media"); *see generally Europe & Overseas Traders v. Banque Paribas London*, 147 F.3d 118, 129 (2d Cir. 1998) ("[A] series of calls to a transient foreign national in the United States is not enough to establish jurisdiction.").

person; (3) the conference began at 4:30 am Eastern Standard Time; and (4) what is legally decisive under *Morrison*, the conference was arranged, and the presentation used was authorized, by RBS officials in the U.K.   (Graham Decl. ¶¶ 53, 56, 58; *see also* Meade Decl. Ex. 9, Proceedings of Analyst Conference, at 1.)  Mr. Fish's statement at the U.K. conference thus does not constitute conduct which provides a basis for finding subject-matter jurisdiction.[17]

### B.    There Is No Subject-Matter Jurisdiction Under The Effects Test

In a single sentence, Plaintiffs claim (CAC ¶ 30) that the "effects" test is satisfied, because U.S. ADRs trade on U.S. markets, and because some investors on foreign markets are U.S. persons.  But, as a matter of law, those facts fail to satisfy the effects test with respect to the "foreign-cubed" purchasers.  As this Court has noted, "[t]he 'effects test' is only meant to shield *domestic* investors and domestic markets from the effects of securities fraud perpetrated elsewhere," and cannot be invoked or satisfied by foreign-cubed purchasers.  *Rhodia*, 531 F. Supp. 2d at 538 (emphasis added); *see also Europe & Overseas Commodity Traders v. Banque Paribas London*, 147 F.3d 118, 128 & n.12 (2d Cir. 1998) (The "effects test concerns the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges"; its focus is on "sales to [those] resident in the United States.").

For this reason, courts uniformly hold that foreign-cubed purchasers may not "piggyback on the harm caused by the alleged fraud to investors and markets in the United States and thus bring their claims in United States courts."  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 369 (S.D.N.Y. 2005); *Pozniak v. Imperial Chem. Indus. PLC*, No. 03 Civ. 2457, 2004 WL 2186546,

---

[17] As the conference transcript further demonstrates, Mr. Fish's statement there was all but identical to a statement made earlier in the conference by RBS's U.K.-based CFO.  (Meade Decl. Ex. 9, Proceedings of Analyst Conference, at 5, 23.)  In any event, the statement attributed to Mr. Fish is not actionable because it was not false or misleading.  Read in context, Mr. Fish's statement simply conveyed that RBS's retail subsidiary Citizens, which he headed, had a prime-quality mortgage loan portfolio.  (*See* RBS Merits Brief 15.)

at *8 (S.D.N.Y. Sept. 28, 2004) ("The effects test, which extends jurisdiction to foreign transactions that generate effects in the United States, is designed to protect United States citizens who purchase securities abroad. . . . [T]here is no basis for our assuming jurisdiction over claims by foreigners . . . who purchased their shares outside the United States."); *see also, e.g.*, *Tri-Star Farms Ltd. v. Marconi*, PLC, 225 F. Supp. 2d 567, 573 n.7 (W.D. Pa. 2002) (foreign purchasers may not "bootstrap their losses . . . to independent American losses."). Otherwise, particularly where, as here, the bulk of the class are foreign purchasers who purchased on foreign exchanges, there would be not just the "likelihood," but a certainty, that "a very small tail [is] wagging an elephant," *Vencap*, 519 F.2d at 1018 n.31 (Friendly, J.), thereby "impos[ing]" the "tremendous burdens" of a massive, global class action on this Court, *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975) (Friendly, J.).[18]

## II.    THIS COURT SHOULD DISMISS PLAINTIFFS' LAWSUIT UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*, SO THAT THE ENTIRE CASE CAN BE TRIED IN THE UNITED KINGDOM

This Court should exercise its discretion under the *forum non conveniens* doctrine to dismiss this case, because this litigation is more appropriately conducted in an alternative forum. *See Piper Aircraft v. Reyno*, 454 U.S. 235, 249 (1981) ("[D]ismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant

---

[18] This Court can and should address these jurisdictional questions now. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (The "requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." (internal quotation marks omitted)); *Rhodia*, 531 F. Supp. 2d at 537 ("[I]t is axiomatic that subject matter jurisdiction remains an unwaivable *sine qua non* for the exercise of federal judicial power."). Accordingly, in cases like this involving domestic plaintiffs who have sought to sue on behalf of foreign-cubed purchasers as to whom subject-matter jurisdiction was lacking, courts have consistently dismissed claims on behalf of foreign purchasers at the motion to dismiss stage. *See, e.g., In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009) (dismissing claims on behalf of putative class members who reside abroad and who purchased shares abroad where named lead plaintiff was domestic); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008) (same); *In re Bayer AG Sec. Litig.*, 423 F. Supp. 2d 105 (S.D.N.Y. 2005) (same); *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004) (same).

or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice."); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947) (same); *Dabbous v. American Express Co.*, No. 06 Civ. 11345, 2009 WL 1403930, at *3-*5 (S.D.N.Y. May 8, 2009) (Batts, J.) (court "may resist imposition upon its jurisdiction" where *forum non conveniens* factors favor alternative forum). Courts apply a three-step test to determine whether to dismiss a lawsuit in favor of the alternative forum: a court (1) determines the degree of deference properly accorded the plaintiff's choice of forum; (2) considers whether an alternative foreign forum exists that is adequate to adjudicate the dispute; and (3) balances the private and public interests implicated by plaintiff's choice of forum, and, with whatever deference is due the plaintiff's choice of forum, decides if the case would be better adjudicated in the alternative forum. *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73-74 (2d Cir. 2001) (en banc); *see also Banco De Serguros Del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 258-59 (S.D.N.Y. 2007) (Batts, J.).

Applied here, these factors decisively favor dismissal in favor of the U.K. Further, because much of this litigation unavoidably will be conducted in the English courts—both because of the required dismissals for lack of subject-matter jurisdiction, *see* Part I, *supra*, and because a mandatory forum selection clause requires that Plaintiffs' claims relating to RBS's Rights Issue be heard in those courts, *see* Part III, *infra*—dismissal in favor of those courts would avoid needless duplicative litigation on both sides of the Atlantic.

### A.    Plaintiffs' Purely Strategic Choice Of Forum Merits Little Or No Deference

Here, Plaintiffs' selection of a U.S. forum is not entitled to the deference usually accorded to a plaintiff's chosen forum. *See Iragori*, 274 F.3d at 71. "The Second Circuit has adopted a 'sliding scale' concept of deference, giving 'greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons' like convenience, and

'diminishing deference' to the extent that it was by motivated by tactical advantage." *Dabbous*, 2009 WL 1403930, at *3 (quoting *Iragorri*, 274 F.3d at 73); *see Norex Petroleum, Ltd. v. Access Indus.*, 416 F.3d 146, 154-55 (2d Cir. 2005); *Iragorri*, 274 F.3d at 73. Where convenience does not favor the U.S. forum and there are indications that a plaintiff's choice of forum was motivated instead by "forum-shopping for a . . . litigation advantage," *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003), the presumption in favor of a plaintiff's choice of forum "may not apply . . . at all or with full force," *Norex*, 416 F.3d at 154. Here, the presumption in favor of Plaintiffs' chosen forum merits little or no deference.

As an initial matter, courts commonly apply diminished deference to the choice of a U.S. forum "when the plaintiff or *real parties in interest* are foreign." *Piper*, 454 U.S. at 255 (emphasis added).[19] Although the named Plaintiffs are U.S.-based, they explicitly purport to represent a class including "foreign Class members who acquired securities on foreign markets." (CAC ¶ 31.) As noted, 97% of ordinary shareholders were foreign, and U.S.-issued ADRs equated to less than 1% of RBS's ordinary shares. (Lehn Decl. ¶¶ 14, 17 & Ex. 2.) *Cf. DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 33 (2d Cir. 2002) ("*DiRienzo II*") (deference due to plaintiff's choice of forum where "the significant majority of the putative class . . . bought their securities on American markets" while foreigners who bought shares on a foreign exchange were "a small minority of the proposed class"), *vacating in part DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49 (2d Cir. 2000) ("*DiRienzo I*"). Because the real parties in interest are predominantly foreign, Plaintiffs' choice of forum is entitled to less deference.[20]

---

[19] *See also Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 525-26 (1947) (when a plaintiff "assumes to represent" a "whole class," consideration of what "forum is appropriate . . . may require consideration of [the lead plaintiff's] relation to the whole group of members and stockholders whom [he] volunteers to represent as well as to the nominal plaintiff himself.").

[20] *See Koster*, 330 U.S. at 524 ("[W]here there are hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the . . . cause of action and all of whom could with equal show of

Nor can Plaintiffs credibly claim that their choice of forum was motivated by convenience. Here, the decisive majority of witnesses at any potential trial (including 15 of the 18 individual defendants, who have a right to attend a trial in which Plaintiffs seek damages of over $100 billion) reside in the U.K. Relevant documents also are overwhelmingly located abroad. These facts are hardly surprising in a case in which virtually all relevant events occurred in the U.K. Trial in the U.S. may also present difficulties compelling documentary and testimonial evidence from abroad, among other inconveniences. *See* Part II.C.2, *infra* (discussing these issues as part of analysis of "private factors"). Tellingly, the Complaint reveals virtually no connection between this controversy and the Southern District of New York.

Where it is not apparent that convenience motivated a plaintiff's choice of forum, the court must analyze whether that choice instead reflects an attempt to gain a tactical advantage. As the Second Circuit has recognized, such advantage may arise "from local laws that favor the plaintiff's case," such as the fact that reliance is presumed in 10b-5 claims (due to the fraud-on-the-market presumption), or the higher damages awards (and attorneys' fees) that result from the "habitual generosity of juries in the United States." *Iragorri*, 274 F.3d at 73; *cf. Norex*, 416 F.3d at 155 ("[W]e recognize that the possibility of [a] RICO treble damages award might have made the choice of a U.S. forum attractive [to the plaintiff] regardless of convenience.").

Here, there is not only reason to infer that Plaintiffs filed suit in the U.S. to gain a tactical advantage—there is documentary proof. In August 2009, in a letter soliciting U.K. residents to

---

right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened."); *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 452 (2d Cir. 1975) (the "balance of convenience . . . clearly tip[ped] in favor of dismissal" to England where "the real parties in interest [we]re either German citizens and residents or foreign corporations, [and] it appear[ed] that a trial in England, where several [we]re already parties to related suits, would be considerably less burdensome than a trial in New York"). Importantly, this factor counsels against deference to Plaintiffs' choice of forum even if the Court dismisses the claims of foreign purchasers. This first step of the *forum non conveniens* analysis examines the motivation behind plaintiffs' choice of forum and, therefore, is analyzed at the time of filing, not dismissal. *Cf. Norex*, 416 F.3d at 156.

join their "Action Group," the U.K. law firm of Leon Kaye told RBS shareholders that it had

"linked up" with Plaintiffs' counsel *in this case* so as to "cover both jurisdictions." (*See* Meade

Decl. Ex. 13, Letter of Leon Kaye Solicitors, at 2 ("*We have also linked up with a leading*

*American Law Firm, Cohen, Milstein, Sellers and Toll . . . . We are hoping that the synergy*

*between our Action Group and the action in the United States will offer our members the best*

*chances of success* . . . [W]e feel that it is essential to continue with our claim through the UK

courts and cover both jurisdictions to give our members the best exposure to a possible

compensation Claim." (emphasis in original)).) Further, the Action Group's website reported on

a "recent[] . . . meeting in London with both our Solicitors, Leon Kaye Solicitors, our barrister

and Steve Toll[,] the Managing Partner of Cohen Mils[]tein . . . . [W]e feel that we are in an ideal

position in that we have a twin track approach . . . .").  (*Id.* Ex. 14, Reproduction of Webpage of

RBS Action Group, at 1.)  This "twin track" approach entails filing in the U.S., but also readying

a suit in the U.K.  (*See id.*)

Significantly, counsel has evidently acknowledged to the Action Group that this case has

a tenuous connection to the U.S.:  "Cohen Milstein will be seeking permission for European

investors to be included in the U.S. Class Action. . . . To do this CM will have to show that

whatever actions taken in the U.S. by RBS directly affected shareholders in Europe.  *This will be*

*difficult because the RBS Board obvio[usly] sits in the U.K. and that is where the decisions were*

*taken by RBS*."  (*Id.* (emphasis added).)

It is therefore not only reasonable to infer, but readily apparent, that Plaintiffs' choice of

this forum was motivated by "forum-shopping for a higher damage award or for some other

litigation advantage."[21]  *Pollux*, 329 F.3d at 71.  In light of Plaintiffs' "tactical" selection of a

U.S. forum, their choice of forum merits little, if any, deference.  *Iragorri*, 274 F.3d at 73.[22]

### B.    The United Kingdom Is An Adequate Alternative Forum

The courts of England provide an adequate alternative forum for adjudicating Plaintiffs'

claims, as consistently reflected in the decisions of this Circuit.  *E.g.*, *Pollux*, 329 F.3d at 75

(expressing "high regard for [English] courts' fairness and commitment to the rule of law"

(citation omitted)); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir. 2000) ("We

regard the British courts as exemplary in their fairness and commitment to the rule of law.").

"Ordinarily, the requirement of an adequate alternative forum 'will be satisfied when the

defendant is amenable to process in the other jurisdiction.'"  *Aguinda v. Texaco, Inc.*, 303 F.3d

470, 476-77 (2d Cir. 2002) (quoting *Piper*, 454 U.S. at 225 n.22).  "An agreement by the

defendants to submit to the jurisdiction of the foreign forum can generally satisfy th[e]

[amenability to an alternative forum] requirement."  *DiRienzo I*, 232 F.3d at 57; *Dabbous*, 2009

WL 1403930, at *5; *Banco De Serguros Del Estado*, 500 F. Supp. 2d at 260; *Yung v. Lee*, No. 00

Civ. 3965, 2002 WL 31008970, at *2 (S.D.N.Y. Sept. 5, 2002) (Batts, J.), *aff'd*, 432 F.3d 142 &

---

[21] Plaintiffs' choice of forum also merits less deference for the separate reason that it repudiates the mandatory forum selection clause governing claims relating to the Rights Issue.  *See* Part III, *infra*.

[22] *See also Capital Currency Exchange, N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 612 (2d Cir. 1998) (rejecting as a "red herring" plaintiffs' "attempt[] to morphose th[e] case into a dispute that concerns the United States" and affirming dismissal of case on *forum non conveniens* grounds when it was "clear that, at bottom, [it was] a suit about two English banks' refusal to do business in England with [the foreign plaintiffs]); *Dabbous*, 2009 WL 1403930, at *3-*5 (plaintiff "entitled to only limited deference in its [U.S.] choice of forum" where, *inter alia*, "likely witnesses referenced in the Complaint [were] located in Egypt"; various Egyptian witnesses were outside court's subpoena power;  documents in Egypt "likely do not have any analog in New York;" and "record supports the inference that Plaintiff's selection of a New York forum was based at least partially upon considerations of forum shopping"); *Banco De Serguros Del Estado*, 500 F. Supp. 2d at 261 (plaintiff's choice of U.S. forum entitled to limited deference where, *inter alia*, "nearly every event alleged in the Complaint either occurred in Uruguay, or involved a decision finalized in Uruguay" and "Defendants' papers strongly suggest that most of the internal corporate documents, and most of the related documents that have been generated by regulators and auditors, are located in Uruguay and Argentina").

160 F. App'x 37 (2d Cir. 2005). RBS and the individual defendants consent to such jurisdiction provided that this Court grants the *forum non conveniens* motion.[23]

Once it is established that defendants are either amenable to process in or have consented to an alternative forum, that forum is adequate except in "rare circumstances . . . where the remedy offered by the other forum is clearly unsatisfactory," such as when it "does not permit litigation of the subject matter of the dispute." *Piper*, 454 U.S. at 255 n.22; *Pollux*, 329 F.3d at 75. No such claim is available to Plaintiffs here. English law provides various statutory and common law causes of action that would cover the alleged misconduct in the Complaint (*see* Declaration of Edwin Peel ("Peel Decl.") ¶¶ 15-38), and these causes of action are available not only to U.K. residents, but to U.S. plaintiffs as well, for example, U.S. purchasers of RBS shares overseas, or of ADRs (*id.* ¶¶ 39-40; Declaration of Neil Andrews ("Andrews Decl.") ¶¶ 3(6), 6, 8, 13(6)). And, to the extent that there are differences between U.S. and U.K. law, such differences are immaterial to this court's analysis; the question is whether the alternative forum is "adequate," not whether it is "equivalent." *Dabbous*, 2009 WL 1403930, at *6; *see also PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998) ("The availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum."); *Piper*, 454 U.S. at 247 ("The possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry.") The Second Circuit has, in fact, held that "English law [is] adequate to discourage fraud and misrepresentation, and to provide Plaintiff with a remedy should a fraud be proven."[24]

---

[23] (Meade Decl. ¶ 3.) As to other defendants, as this Court has recognized, a defendant may appropriately ask the Court to resolve its motions to dismiss before it is asked to provide consent to jurisdiction in an alternative forum. *See Yung*, 2002 WL 31008970, at *2.

[24] *Stamm v. Barclays Bank of N.Y.*, 153 F.3d 30, 33 (2d Cir. 1998); *see also Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993) (securities actions not immune from *forum non conveniens* dismissal); *Dragon Capital Partners L.P. v. Merrill Lynch Cap. Servs. Inc.*, 949 F. Supp. 1123, 1126

Finally, the fact that an alternative forum lacks a U.S.-style class action device does not render that forum inadequate. *See Aguinda*, 303 F.3d at 478. The U.K. does have procedural mechanisms for collective actions which permit the aggregation of plaintiffs into a single action.[25] Indeed, there are already at least two organized groups of RBS shareholders in the U.K. One reportedly has over 4,000 investor members; the other reportedly has contacted more than 70,000 investors, of which over 5,000 have responded, and recently held a public meeting in London for those interested in pursuing claims against RBS.[26] *See Aguinda*, 303 F.3d at 478; *cf. Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) ("[T]he unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." (citation omitted)).

Accordingly, there is no question that the courts of England are an adequate forum for resolution of the instant dispute.

### C.    Both Public And Private Factors Counsel In Favor Of Dismissal

In conducting a *forum non conveniens* analysis, a court must weigh various public and private factors. Those factors—individually and together—favor dismissal in favor of the U.K.

### 1.    Public factors weigh in favor of dismissal.

Public factors include (i) the "local interest in having localized controversies decided at home," (ii) the interest, "[i]n cases which touch the affairs of many persons, . . .[in] holding the

---

(S.D.N.Y. 1997) (Batts, J.) (dismissing case in favor of Hong Kong on *forum non conveniens* grounds where, *inter alia*, plaintiffs alleged violations of § 10(b) of the Exchange Act of 1934 and Rule 10b-5); *Yung*, 2002 WL 31008970, at *2 (dismissing securities fraud action on *forum non conveniens* grounds where plaintiff alleged material misrepresentations and omissions).

[25] (*See generally* Andrews Decl. ¶¶ 3-12) (discussing Group Litigation Orders, joinder, and representative actions).) U.S. residents would also be able to participate in these collective actions. (*Id.* ¶¶ 3(6), 6, 8, 13(6); *see also* U.K. Treasury Decl. ¶ 14 (features of U.K. legal system "represent[] the legitimate policy choice of a national government" as it balances different interests).)

[26] (Meade Decl. Ex. 13, Letter of Leon Kaye Solicitors, at 1; *id.* Ex. 15, Newsletter of RBoS Shareholders Action Group, at 2; *id.* Ex. 16, Presentation of RBoS Shareholders Action Group, at 7.)

trial in their view and reach rather than in remote parts of the country [or world] where they can learn of it by report only," and (iii) the need to avoid imposing "[j]ury duty . . . upon the people of a community which has no relation to the litigation."  *Gulf Oil Corp.*, 330 U.S. at 508-09. For many reasons, those factors emphatically point towards the U.K., and away from this District, as the proper place to litigate this dispute.

First, RBS, founded in 1727, is one of the oldest and largest corporations in the U.K. RBS serves over 24 million individual customers in the U.K.  (Graham Decl. ¶ 9)—more than one-third of the U.K.'s citizenry.  U.K. Office for National Statistics, News Release (Aug. 27, 2009).  The U.K. has an interest in adjudicating a dispute involving an established and influential British corporation.  *See Banco De Serguros Del Estado*, 500 F. Supp. 2d at 265 (The public interest "is served best by the adjudication of this suit in Uruguay.  Uruguay has a far more significant interest in a case that allegedly imperiled its oldest bank as well as hundreds or more of that country's investors." ).

Second, the events at issue in this case are at the center of one of the largest and most publicly scrutinized financial crises in U.K. history.  This case arises from—indeed, Plaintiffs expressly blame defendants for—RBS's economic struggles, record losses, and near-collapse during the credit crisis that began in 2007 and peaked in the fall of 2008.  Those events, as well as RBS's attempts to survive, which culminated in its bailout by the U.K. Government, have been chronicled by the U.K. media, often on a daily basis, from 2007 to present.  *See, e.g.*, *Whole Country Angry at RBS Chiefs, Says Brown*, The Daily Telegraph (Mar. 24, 2009) (reproduced in Meade Decl. Ex. 17; *id.* Ex. 17 (reproducing representative U.K. newspaper articles relating to RBS's struggles and bailout).)   RBS's near-collapse was also a subject of a high-profile investigation conducted in early 2009 by the Treasury Committee of the U.K. House of

Commons. (Graham Decl. ¶ 77.) As part of the inquiry, former RBS Chief Executive Sir Fred Goodwin and former Chairman Sir Tom McKillop—both of whom are defendants in this case (CAC ¶¶ 58-59)—testified, with such testimony broadcast on the BBC Parliamentary Channel and reported on national television.[27] (Graham Decl. ¶ 77.)

This case is thus a paradigmatic "localized controvers[y]" that is appropriately "decided at home." *Gulf Oil Corp.*, 330 U.S. at 509. Indeed, RBS's near-collapse was quintessentially a U.K. event every bit as much as the 2008 collapses of Bear Stearns, AIG, Lehman Brothers, and Washington Mutual, and the attendant lawsuits, were quintessentially American events.[28]

Third, as noted, RBS is today majority-owned by the U.K. Government and, derivatively, its citizens and taxpayers. (*See* U.K. Treasury Decl. ¶ 6; *see also id.* ¶ 10 (Treasury actions "averted a collapse of RBS, with incalculable consequences for the UK . . . economy")); Meade Decl. Ex. 10, Statement by the Chancellor on Financial Markets (Oct. 13, 2008) ("put[ting] RBS on a stronger footing" was essential to "stabili[zing] and rebuild[ing]" the U.K. economy and a motivating factor behind the government's bank recapitalization scheme); *id.* Ex. 12, UKFI Strategy, at 15, 31).) In light of the Government's massive investment and ownership, commentators have stated that RBS "liabilities must effectively be regarded as state liabilities,"

---

[27] *See Banking Crisis: Hearings Before the Treasury Committee of the House of Commons* (Feb. 10, 2009) (testimony of, among others, Messrs. Goodwin and McKillop), *available at* http://www.publications.parliament.uk/pa/cm200809/cmselect/cmtreasy/uc144_vii/uc14402.htm.

[28] *Cf. Allstate Life Ins. Co.*, 994 F.2d at 1002 (where pending liquidation was "one of the largest in Australian history and the actions undertaken by the Banks in furtherance of the alleged fraud were carried out in Australia by Australian corporations, there [wa]s a strong local interest" in litigating in Australia); *Dabbous*, 2009 WL 1403930, at *7 ("[W]hatever minimal interest New York has in resolving Plaintiff's claims due to the fact that . . . part of the alleged scheme was hatched in New York, it is substantially outweighed by Egypt's interest in deciphering the alleged fraud perpetrated against its regulatory apparatus and judicial system as well as resolving events whose effects were felt almost entirely within Egypt."); *Banco De Serguros Del Estado*, 500 F. Supp. 2d at 265 ("Uruguay has a far more significant interest in a case that allegedly imperiled its oldest bank."); *Yung*, 2002 WL 31008970, at *2 (dismissing claims on the basis of *forum non conveniens* where an "allegedly fraudulent SEC filing by [a foreign defendant] ha[d] potential domestic impact, [but] that impact [wa]s dwarfed by the vast majority of conduct in and impact upon China.").

and therefore liabilities of U.K. taxpayers.  *The Pounding of the Pound:  The UK Finances are in a Parlous State, which the Currency Reflects*, The Times (Jan. 21, 2009).  An adverse verdict in this case could therefore potentially have severe implications for the U.K. Government and its taxpayers, in their capacity as majority shareholders.  Such a verdict would effectively drain capital that the U.K. Government injected in order to stabilize RBS, and might require additional taxpayer support for RBS.  (U.K. Treasury Decl. ¶ 11.)[29]  The anomaly—and inappropriateness—of a U.S. jury verdict effecting such consequences on a foreign state in a case centrally involving foreign persons and events is a compelling reason to dismiss in favor of a U.K. forum.

Fourth, as the Complaint itself reflects, the vast majority of the conduct at issue in this case took place in the U.K.  Plaintiffs allege no U.S. nexus whatsoever for their claims based on ABN AMRO, the Rights Issue, or RBS's capitalization.  And while Plaintiffs' claims relating to subprime exposure involve assets held by (among others) two U.S. subsidiaries of RBS, the central disclosure decisions relating to those assets were made in the U.K.  (*See* Graham Decl. ¶ 32); Part I, *supra*, at pp. 11-12.  Indeed, the alleged fraud was ostensibly masterminded by executives there.  (*See, e.g.*, CAC ¶¶ 32, 136-37, 233, 267.)  *See also* note 10, *supra*; *Pollux*, 329 F.3d at 76 ("England has a greater interest [than the U.S.] in regulating investment activity that occurs there," and therefore "ha[d] a stronger local interest" in adjudicating dispute in which "the alleged fraud and misrepresentations [at issue] primarily occurred [in England] . . . .").

Fifth, as noted, the overwhelming majority of plaintiffs purchased their securities in the U.K.  The Second Circuit has held that a country's interest in adjudicating securities disputes is

---

[29] As the U.K. Treasury states:  "Any substantial award of damages in this action would deplete the capital base of RBS, potentially rendering the actions of the Treasury less effective or requiring further UK taxpayer support, and result in loss in value of the shares in RBS held by the UK taxpayer."  (U.K. Treasury Decl. ¶ 11.)

directly proportional to the percentage of the class who purchased securities on that country's markets. *See DiRienzo II*, 294 F.3d at 33 (Canada's interest in adjudicating a securities dispute was "less" than that of the U.S. when "the significant majority of the putative class . . . bought their securities on American markets" and only "a small minority" bought their stock in Canada).

 Sixth, adjudicating this massive, complex, global, and overwhelmingly extraterritorial class action would drain resources from, and pose needless "administrative difficulties" for, the already congested courts of the Southern District. *See Gulf Oil Corp.*, 330 U.S. at 508. The caseload of each judge in this District has jumped roughly 50% over the last five years:  in 2003, the number of pending cases per judge in this District was 617; by 2008 that number was 929.[30] This District now has the second largest civil docket of any district court in the nation.[31]  By contrast, there are no such backlogs in the English courts.  (Andrews Decl. ¶¶ 12, 13(7).)

Seventh, and finally, adjudicating this case in this District would needlessly impose the burden of jury service on the people of New York, even though the claims at issue have little relevance to those citizens.  There is no good reason to so burden New York citizens.  It would be correspondingly inappropriate to deprive the people of the U.K. of the right to have this local controversy resolved "in their view and reach" rather than across an ocean "where they can learn of it by report only." *See Gulf Oil Corp.*, 330 U.S. at 509.

The public factors thus conclusively favor the United Kingdom as the preferable forum.

---

[30] *See* U.S. District Court—Judicial Caseload Profile:  New York Southern (2009), http://www.uscourts. gov/cgi-bin/cmsd2008.pl; *see also* U.S. Courts, Judicial Facts and Figures, Table 4.2: U.S. District Courts Civil Cases Filed, by District (2007), http://www.uscourts.gov/judicialfactsfigures/2007/Table402.pdf (while 8,746 civil cases were filed in the SDNY in 1990, 16,125 civil case were filed in 2007).

[31] James C. Duff, *Judicial Business of the United States Courts:  2008 Annual Report of the Director* (2008), at 155, Table C-3A, *available at* http://www.uscourts.gov/judbus2008/JudicialBusiness pdfversion.pdf (as of September 30, 2008, there were 22,796 civil cases pending in the S.D.N.Y.).

## 2.     Private factors weigh in favor of dismissal.

Relevant private factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . all other practical problems that make trial of a case easy, expeditious and inexpensive; . . . [and] the enforceability of a judgment if one is obtained." *Id.* at 508. Those factors also lopsidedly favor trial in the U.K.

First, a U.S. trial would complicate "access to sources of proof." *See id.* The decisive majority of witnesses whose testimony is likely to be pertinent are resident in the U.K. Thirty-eight of the 60 individuals referenced in the Complaint reside in the U.K. (Meade Decl. Ex. 1), including 15 of the 18 individual defendants (*id.*; Graham Decl. ¶ 29 & Ex. 1). *See Dabbous*, 2009 WL 1403930, at *8 (analyzing residence of witnesses named in Complaint, dismissing case in favor of Egypt, and noting "strong private interests of the parties in utilizing a forum that [wa]s conveniently located for obtaining the testimony of witnesses"). Moreover, this Complaint-based tally seriously *understates* the extent to which the case is likely to turn on the testimony of U.K-based witnesses. In the event of a trial, officials from RBS's U.K.-based Group Finance, Group Strategy, Group Communications, and Investor Relations Departments (Graham Decl. ¶ 75)—as the persons involved in the preparation and approval of RBS's public filings and financial statements (*e.g.*, *id.* ¶ 36)—would potentially have relevant testimony, as would RBS's external auditors (*id.* ¶ 43). So would RBS's directors during the class period, 18 of 21 of whom were based in the U.K. (*id.* ¶ 21).

Not surprisingly, the documentary evidence in this case is also overwhelmingly located in the U.K (Graham Decl. ¶¶ 32, 34-36, 41-45, 52-62, 75), as a result of the fact that the groups within RBS responsible for its public filings and disclosures were located in the U.K., and that, as noted, entire categories of Plaintiffs' allegations (e.g., the ABN acquisition, and the adequacy

of RBS's capitalization) relate to the U.K. exclusively.  *See Cortec Corp. v. Erste Bank Ber Oesterrichischen Sparkassen AG*, 535 F. Supp. 2d 403, 412 (S.D.N.Y. 2008) (gaining access to foreign documents can entail a "cumbersome and time consuming" process).  The difficulties presented by overseas document discovery have been a factor in the dismissals of other cases in favor of more convenient fora.  *E.g.*, *Dabbous*, 2009  WL 1403930, at *7 (dismissing case in favor of Egypt); *Banco De Serguros Del Estado*, 500 F. Supp. 2d at 262 (dismissing case in favor of Uruguay).

Indeed, this Court does not have the power to compel testimonial and documentary evidence from the numerous non-party witnesses who reside in the U.K.  (*See* Meade Decl. Ex. 1 (18 of the 38 U.K. residents referenced in the Complaint would be non-party witnesses).) Rather, such evidence only can be compelled through letters of request made pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Convention"), as implemented, and restricted by, English law.  (Declaration of Justyna Beckwith Burr ("Burr Decl.") ¶¶ 4(i), 5-8.)  This process is time-consuming, expensive, and not guaranteed to yield the requested discovery results.  (*Id.* ¶¶ 5-8, 31.)  English law places extensive restrictions on the collection of evidence, which require or give discretion to the English courts to refuse letters of request.[32]  (*Id.* ¶¶ 9-30.)  The potential roadblocks to acquiring U.S. testimony from U.K.-based non-party witnesses further support a U.K. forum.  *See, e.g.*, *Do Rosario Veiga v. World Meteorological Org.*, 486 F. Supp. 2d 297, 306 (S.D.N.Y. 2007)

---

[32] These restrictions include:  the prohibition of pretrial discovery (Burr Decl. ¶¶ 14-15); the requirement that evidence sought be relevant and admissible (*id.* ¶ 16) and that requests not be oppressive or overly burdensome (*id.* ¶ 17); privilege (*id.* ¶ 19), confidentiality (*id.* ¶¶ 20-21), privacy (*id.*), and personal data (*id.* ¶¶ 22-24) protections; and the right of the English courts to refuse requests if they are grounded in the extra-territorial application of foreign law (*id.* ¶¶ 25-26) or threaten the U.K.'s sovereignty or security (*id.* ¶¶ 27-30).

(discussing "greater financial hardships" and "significant delays" in trial preparation involving foreign discovery under the Hague Convention).[33]

Finally, it is unclear whether a judgment or settlement reached in a U.S. action would be given *res judicata* effect in the U.K.  (*See generally* Peel Decl. ¶¶ 60-104.)  It is doubtful that an English court would give preclusive effect to a judgment or settlement in a U.S. class action against absent class members, because of the "opt-out" nature of the U.S. class action mechanism.  (*Id.* ¶¶ 13, 70-89, 97-100.)  At a minimum, because there is no case squarely on point under U.K. law, this is a question subject to uncertainty.  (*Id.* ¶¶ 14, 72.)  *Cf. In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 103 (S.D.N.Y. 2007) (concluding, based on expert affidavit, that it is more likely than not that an English court would recognize a judgment in a U.S. class action, but that "the issue is hardly free from doubt").[34]  Thus, RBS would have no protection against an attempt by absent class members who are dissatisfied with any U.S. judgment (or the terms of a settlement) to seek a second bite of the apple in the English courts.  And, as noted, Plaintiffs' U.K. co-counsel "feel that it is essential" to pursue a two-forum strategy.  (Meade Decl. Ex. 13, Letter of Leon Kaye Solicitors, at 2.)

### D.    Dismissing The Entire Case Will Also Avoid Duplicative Litigation

Because the relevant factors heavily favor a U.K. forum, this is a compelling case for dismissal on *forum non conveniens* grounds.  Dismissal is all the more appropriate because there will likely be litigation in the U.K. arising out of the events described in the Complaint.  First, for

---

[33] *See also Banco De Serguros Del Estado*, 500 F. Supp. 2d at 262 (dismissing case on *forum non conveniens* grounds where "overwhelming majority of relevant non-party witnesses [we]re in Uruguay"); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 395, 404 (E.D. Mich. 2003) (expressing "[n]o doubt [that] obtaining evidence under the Hague Convention is more difficult and more expensive than obtaining discovery within the United States"); Richard M. Dunn & Raquel M. Gonzalez, *The Thing about Non-U.S. Discovery for U.S. Litigation:  It's Expensive and Complex*, 67 Def. Couns. J. 342 (2000).

[34] The *Vivendi* court relied heavily on the analysis of Jonathan Harris.  *In re Vivendi*, 242 F.R.D. at 102-03.  Peel is of the view that Harris's analysis is fundamentally mistaken.  (Peel Decl. ¶ 80 & nn.110-11.)

the reasons described earlier, the claims of "foreign-cubed" purchasers—the vast bulk of the putative class—must be dismissed for lack of subject matter jurisdiction. *See* Part I, *supra*. Second, a major subset of claims—those pertaining to the Rights Issue—are subject to a mandatory forum selection clause, which grants the courts of England and Wales "exclusive jurisdiction" over those claims. *See* Part III, *infra*. Third, as noted above, counsel representing one of the U.K. Action Groups appear intent on pursuing parallel claims in U.S. *and* U.K. courts. (Meade Decl. Ex. 13, Letter of Leon Kaye Solicitors.)

Dismissal in favor of the U.K. would eliminate this duplicative litigation. And it is clear that the claims of all Plaintiffs, including those of U.S. ADR holders, could be adjudicated in the English courts (Peel Decl. ¶¶ 15-40) and that U.S. residents could participate in a collective action in the U.K. (Andrews Decl. ¶¶ 3(6), 6, 8, 13(6)).[35] *See also Pollux*, 329 F.3d at 73 ("[T]here is no inflexible rule that protects U.S. citizen or resident plaintiffs from having their causes dismissed for *forum non conveniens*.").[36]

## III. THE COURT SHOULD DISMISS CLAIMS RELATING TO THE RIGHTS ISSUE BECAUSE THOSE CLAIMS ARE GOVERNED BY A MANDATORY FORUM SELECTION CLAUSE

Entirely apart from any dismissals on grounds of lack of subject-matter jurisdiction or *forum non conveniens*, Plaintiffs' claims relating to the Rights Issue must be dismissed, because those claims are governed by a forum selection clause granting "exclusive jurisdiction" to "[t]he courts of England and Wales . . . to settle any dispute which may arise out of or in connection

---

[35] In any event, Plaintiffs—none of whom claims to have purchased U.S. ADRs—lack standing to assert the rights or interests of U.S. ADR holders.

[36] At a minimum, however, the claims on behalf of foreign-cubed purchasers—those with the least interest in resolution by a U.S. forum—should be dismissed. *See Scottish Air v. British Caledonian Group*, 81 F.3d 1224, 1234 (2d Cir. 1996) ("*Forum non conveniens* is a doctrine that necessarily requires great flexibility. Depending upon the facts of the particular case, a district court may dismiss part of a lawsuit while deciding the merits of other issues." (citations omitted)).

with the Rights Issue." (Graham Decl. Ex. 2, Rights Issues Prospectus ("Prospectus"), Part III,

§ 2.9.)  In addition, "[b]y accepting rights under the Rights Issue in accordance with the

instruction set out in [the Prospectus] . . . *Qualifying Shareholders irrevocably submit[ted] to the*

*jurisdiction of the courts of England and Wales and waive[d] any objection to proceedings in*

*any such court on the ground of venue or on the ground that proceedings ha[d] been brought in*

*an inconvenient forum.*"[37]  (*Id.* (emphasis added).)  This Court should give effect to this

mandatory forum selection clause, and dismiss all of Plaintiffs' Rights Issue claims. (*See* CAC

Claims IX and X (alleging that defendants made untrue statements of material fact and material

omissions in the April 30, 2008 Rights Issue Prospectus).)

As an initial matter, the Prospectus also contains a choice of law clause,[38] which raises

the question of whether the enforceability of the forum selection clause would be governed by

federal or foreign (here, English) law.[39]  But, regardless whether federal or English law applies to

this question, the forum selection clause must be given effect.  It is clear that the forum selection

clause is enforceable under English law.  (Peel Decl. ¶¶ 10-12, 44-59.)  Under English law, "any

---

[37] The Prospectus defines "Qualifying Shareholders" as "holders of Ordinary Shares on the register of members of the Company at the Record Date with the exclusion (subject to certain exceptions) of Shareholders with a registered address in the United States or Australia."  (Graham Decl. Ex. 2, Part XIV.)  One such exception was made for shareholders in the United States who were Qualified Institutional Buyers ("QIBs") under Rule 144A of the Securities Act.  (*Id.* ¶ 68; *see also id.* Ex. 2, Prospectus, Part III, § 2.6.7.)  These shareholders attested to their QIB status and thereby became Qualifying Shareholders by executing an Investor Letter.  (*Id.* ¶ 68; *see also id.* Ex. 3, QIB Instruction Letter; *id.* Ex. 3, Investor Letter.)  Lead Plaintiffs MissPERS and MassPRIM became Qualifying Shareholders in this manner.  (*See* Meade Decl. Ex. 7, MissPERS Investor Letter; *id.* Ex. 8, MassPRIM Investor Letter.)

[38] (*See* Graham Decl. Ex. 2, Part III, § 2.8 ("The terms and conditions of the Rights Issue … shall be governed by, and construed in accordance with, English law.").)

[39] The Second Circuit has indicated that the question of whether a forum selection clause is enforceable is governed by federal law, so long as the clause is otherwise mandatory and applicable (i.e., encompasses claims and parties involved in the suit).  *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007).  It remains an open question in this Circuit, however, whether forum law or the foreign law selected in a choice of law clause should be used to determine whether a forum selection clause is mandatory and applicable.  *See id.* at 384-86 (discussing conflicting cases).

participant in the Rights Issue would be bound by clause 2.9" (*id.* ¶ 10), the clause "would be interpreted to cover all claims related to the Rights Issue" (*id.* ¶ 11), and the clause "would confer exclusive jurisdiction on the English courts" (*id.* ¶ 12).

The forum selection clause is also enforceable under the Second Circuit's four-part test for determining enforceability. *See Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007). First, the clause, which was contained in the Prospectus, was indisputably "reasonably communicated" to Plaintiffs. *See id.* at 383. A copy of the Prospectus was provided to all shareholders who participated in the Rights Issue.[40] Participants in the Rights Issue acceded to its terms.[41] Plaintiffs, in fact, base their Rights Issue claims in the Prospectus, stating that Counts IX and X are brought "individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS ordinary shares issued by RBS

---

[40] Initially, "[a] copy of the Prospectus . . . [was] sent to all Shareholders except those with registered addresses in the United States and the Excluded Territories." (Graham Decl. Ex. 4, Provisional Allotment Letter ("PAL"), at 1.) Shareholders with registered addresses in the United States, who were permitted to participate in the Rights Issue on account of their status as QIBs, were provided with a copy of the Prospectus after returning an Investor Letter verifying their QIB status. (*See id.* Ex. 3, QIB Instruction Letter; *id.* Ex. 3, Investor Letter ¶ 3 (attesting that a QIB "will base [its] investment decision on a copy of the Company's prospectus"); *see also* Meade Decl. Ex. 7, MissPERS Investor Letter ¶ 3; *id.* Ex. 8, MassPRIM Investor Letter ¶ 3.) Moreover, a copy of the Prospectus was made available to the public in accordance with Rule 3.2 of the Prospectus Rules of the UK Listing Authority. (Graham Decl. Ex. 2, Prospectus, at 1.)

[41] For example, persons holding shares in RBS in certificated form participated in the Rights Issue by means of returning a Provisional Allotment Letter ("PAL") along with payment for the new shares. (*See* Graham Decl. Ex. 2, Prospectus, Part III, § 2.1.) "[R]emittance [of funds for the new shares], when received together with this Provisional Allotment Letter, . . . constitute[d] acceptance of this provisional allotment in accordance with the terms and conditions in this Provisional Allotment Letter *and those set out in the Prospectus.*" (*Id.* Ex. 4, PAL, at 3, ¶ 2 (emphasis added).) Persons holding shares in RBS in uncertificated form participated in the Rights Issue by "mak[ing] a valid acceptance [of their new shares] in accordance with the procedures set out in . . . paragraph 2.2.2 [of the Prospectus]," that is, by "request[ing] that the . . . New Shares . . . be issued to [the]m *on the terms set out in this document.*" (*Id.* Ex. 2, Prospectus, Part III, § 2.2.2(iii)(a)(vi) (emphasis added).) QIBs participated in the Rights Issue through both of these mechanisms. (*See id.* Ex. 3, QIB Instruction Letter.)

*pursuant or traceable to the Rights Issue prospectus*."  (CAC ¶ 28 (emphasis added).)  *See also id.* ¶¶ 711, 726.)  Plaintiffs clearly were on notice of the forum selection clause.[42]

Second, the forum selection clause is mandatory on account of the fact that it grants "*exclusive jurisdiction*" to "[t]he courts of England and Wales."  (Graham Decl. Ex. 2, Prospectus, Part III, § 2.9 (emphasis added).)  *See Phillips*, 494 F.3d at 386 ("A forum selection clause is viewed as mandatory when it confers *exclusive jurisdiction* on the designated forum." (emphasis added)).

Third, the claims and parties to this lawsuit are subject to the forum selection clause.  *See id.* at 387-93.  As to claims, the forum selection clause applies, to "any dispute which may *arise out of or in connection with the Rights Issue*, th[e] [Rights Issue Prospectus] or the Provisional Allotment Letter."  (Graham Decl. Ex. 2, Prospectus, Part III, § 2.9 (emphasis added).)  Counts IX and X make allegations on behalf of "all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS ordinary shares issued by RBS *pursuant or traceable to the Rights Issue prospectus*" (CAC ¶ 28 (emphasis added)), based on statements and omissions in the Rights Issue prospectus (*id.* ¶ 713).  A claim "pursuant or traceable to the Rights Issue prospectus" (*id.*) necessarily "arise[s] out of or in connection with the Rights Issue" or the Rights Issue Prospectus (Graham Decl. Ex. 2, Prospectus, Part III, § 2.9).  *See Phillips*, 494 F.3d at 389 (concluding that "to 'arise out of' means 'to originate from'" the document containing the forum selection clause, while to "arise in connection with" means merely that the "claims that have some possible relationship" with that document); *Altvater Gessler-J.A. Baczewski Int'l*

---

[42] A forum selection clause need not be found in a contract in order to be reasonably communicated to the parties that it purports to bind.  *See Capital Ventures Int'l v. Republic of Arg.*, 552 F.3d 289, 291 (2d Cir. 2009) (using a forum selection clause in an offering circular for state-issued bonds to help interpret a wavier provision in that same circular and concluding that the wavier provision barred Argentina from raising a jurisdictional defense based on sovereign immunity).

*(USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 90 (2d Cir. 2009) (recognizing *Phillips*'

broad definition of "in connection with").  *Cf. Roby v. Corp. of Lloyds*, 996 F.2d 1353, 1361 (2d

Cir. 1993) (declining to differentiate between the phrases and holding that broadly worded forum

selection clauses encompassed plaintiffs' Securities Act and Exchange Act claims and were not

limited to claims related to the substance of the contracts containing the clauses).  As to parties,

the forum selection clause, by its terms, applies to those who "accept[ed] rights under the Rights

Issue."  (Graham Decl. Ex. 2, Prospectus, Part III, § 2.9.)

Finally, enforcement of the forum selection clause would not be unreasonable or unjust.

*See Phillips*, 494 F.3d at 392.  As discussed above, U.S. courts have long recognized that the

laws and courts of England are indisputably fair, and have held that "English law [is] adequate to

discourage fraud and misrepresentation, and to provide Plaintiff[s] with a remedy should a fraud

be proven."  *Stamm v. Barclays Bank of N.Y.*, 153 F.3d 30, 33 (2d Cir. 1998); s*ee also Roby*, 996

F.2d at 1360-61 (An "agreement to submit to . . . the jurisdiction of the English courts must be

enforced even if that agreement tacitly includes the forfeiture of some claims that could have

been brought in a different forum.").  Nor would enforcement of this clause contravene public

policy (*see Roby*, 996 F.2d at 1361-62), and there is no allegation that the clause was

fraudulently incorporated into the Prospectus (*see Phillips*, 494 F.3d at 392).  Lastly, a trial in the

selected forum is not inconvenient:  indeed, the Rights Issue generally *excluded* U.S. investors

(Graham Decl. Ex. 2, Prospectus, Part III, § 2.6.2), such that the vast majority of Rights Issue

participants are, presumably, non-U.S. investors, for whom the courts of England are,

presumably, a more convenient forum.

Accordingly, the Rights Issue claims should be dismissed in their entirety on the basis of

the forum selection clause.

## CONCLUSION

For the foregoing reasons, this Court should (1) dismiss the claims of all foreign-cubed purchasers for lack of subject matter jurisdiction; (2) dismiss Counts IX and X because they are governed by a mandatory forum selection clause mandating an English forum; and (3) dismiss the case (or whatever portion remains after dismissals on these other grounds) under the doctrine of *forum non conveniens*.

Dated:  October 23, 2009

<div style="margin-left:50%">

Respectfully submitted,

/s/ Paul A. Engelmayer
Paul A. Engelmayer
Christopher J. Meade
Robert W. Trenchard
David S. Lesser
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Telephone: 212-230-8800
Fax: 212-230-8888

*Counsel for The Royal Bank of Scotland Group plc*

</div>