UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ROYAL BANK OF SCOTLAND
GROUP PLC SECURITIES LITIGATION

Case No. 09 Civ. 300 (DAB)

ECF Case

Oral Argument Requested

**THE RBS INDIVIDUALS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS THE CONSOLIDATED
AMENDED COMPLAINT [CORRECTED]**

WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Telephone: 212-230-8800
Fax: 212-230-8888

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT .......................................................................................................... 3

I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE '34
      ACT AGAINST GOODWIN, FISH, WHITTAKER, CAMERON, OR
      MCKILLOP (COUNTS I AND II) ...................................................................... 3

   A.    The Complaint Fails To State A Claim Under Section 10(b) (Count I) ............. 3

      1.   The 10(b) Claims Fail For Impermissible "Group Pleading" ...................... 3

      2.   The Complaint Also Fails To Adequately Allege Falsity Or Scienter ............. 6

   B.    The Complaint Fails To State A Claim Under Section 20(a) (Count II) ......... 18

II.   THE '33 ACT CLAIMS FAIL TO STATE A CLAIM (COUNTS III-X) ........................ 18

   A.    The Complaint Fails To Plead A Primary Violation Of The '33 Act
         (Counts III, IV, VI, VII, IX) .......................................................................... 18

   B.    The Complaint Fails To Plead A "Controlling Person" Claim Under The
         '33 Act (Counts V, VIII, X) .......................................................................... 19

III.  THE CLAIMS SHOULD BE DISMISSED UNDER 12(B)(2) FOR
      LACK OF PERSONAL JURISDICTION .............................................................. 20

CONCLUSION ..................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*380544 Canada, Inc. v. Aspen Technology, Inc.*,
  633 F. Supp. 2d 15 (S.D.N.Y. 2009) ...................................................................15

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...................................................................................9

*Bond Opportunity Fund v. Unilab Corp.*,
  No. 99 Civ. 11074, 2003 WL 21058251 (S.D.N.Y. May 9, 2003),
  *aff'd*, 87 F. App'x 772 (2d Cir. 2004) .................................................................5

*Chill v. General Electric Co.*,
  101 F.3d 263 (2d Cir. 1996) ..............................................................................13

*Dujardin v. Liberty Media Corp.*,
  359 F. Supp. 2d 337 (S.D.N.Y. 2005) .................................................................8

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ..............................................................................19

*Edison Fund v. Cogent Investment Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008) .................................................................3

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007) ...............................................................12

*Harrison v. Rubenstein*,
  No. 02 Civ. 9356, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007)......................... *passim*

*In re Alstom SA*,
  406 F. Supp. 2d 346 (S.D.N.Y. 2005) ...............................................................20

*In re AstraZeneca Securities Litigation*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008) ...............................................................20

*In re BISYS Securities Litigation*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) ...............................................................10

*In re Bristol-Myers Squibb Securities Litigation*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) .................................................................9

*In re Cross Media Marketing Corp. Securities Litigation*,
  314 F. Supp. 2d 256 (S.D.N.Y. 2004) .................................................................5

*In re Elan Corp. Securities Litigation,*
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) ...................................................................15

*In re PXRE Group, Ltd., Securities Litigation,*
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ..................................................................17

*In re Rhodia S.A. Securities Litigation,*
    531 F. Supp. 2d 527 (S.D.N.Y. 2007) ........................................................... *passim*

*In re Sotheby's Holdings, Inc.,*
    No. 00 Civ. 1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)...........................3

*In re Time Warner Inc. Securities Litigation,*
    9 F.3d 259 (2d Cir. 1993) ....................................................................................12

*In re Vivendi Universal, S.A.,*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..................................................................19

*In re Yukos Oil Co. Securities Litigation,*
    No. 04 Civ. 5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006).............................3

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001) ............................................................................9, 10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    437 F.3d 588 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007) ......................5

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,*
    84 F.3d 560 (2d Cir. 1996) ..................................................................................20

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ................................................................................10

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ................................................................................10

*SEC v. Price Waterhouse,*
    797 F. Supp. 1217 (S.D.N.Y. 1992) ....................................................................13

*Santa Fe Industries, Inc. v. Green,*
    430 U.S. 462 (1977) ..............................................................................................7

*Schwartz v. Celestial Seasonings, Inc.,*
    124 F.3d 1246 (10th Cir. 1997) .............................................................................5

*Scone Investments, LP v. American Third Market Corp.*,
   No. 97 Civ. 3802, 1998 WL 205338 (S.D.N.Y. Apr. 28, 1998) ...................................................3

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ...................................................................................................9

*South Cherry St., LLC v. Hennessee Group LLC*,
   573 F.3d 98 (2d Cir. 2009) ................................................................................................9, 10

*Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ...................................................................................................5

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) ...................................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...................................................................................................................8

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007) .....................................................................................................5

*Yung v. Lee*,
   432 F.3d 142 (2d Cir. 2005) ...................................................................................................19

The undersigned individuals[1] respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Complaint ("Complaint") pursuant to Rules 12(b)(6) and 12(b)(2).  For the sake of brevity, the undersigned join and incorporate by reference the definitions, factual recitations, and arguments for dismissal made by The Royal Bank of Scotland Group plc and the Underwriter Defendants in their separate briefs.  This brief sets forth additional grounds for dismissal applicable to the undersigned individuals.

## PRELIMINARY STATEMENT

The Complaint in this case is a classic "fraud-by-hindsight" pleading, a failing especially evident in the paltry allegations against the individually named defendants.  As explained in detail in RBS's Motion to Dismiss ("MTD") Brief, the Complaint fails to identify a single materially false statement of fact.  On the contrary, RBS, its management, and its directors sought to provide timely and accurate information to the market in the face of a rapidly deteriorating financial crisis.  This was true of RBS's good-faith disclosures concerning matters of judgment, such as the valuation of complex illiquid assets, which Plaintiffs attack without foundation.  It was also true of the statements to the effect that "we don't do subprime"—statements attributed to Goodwin, Fish, and Whittaker that the overwrought Complaint repeats *ad nauseum*, but which did no more than accurately inform the market that RBS had a "prime" quality U.S. mortgage lending portfolio, at a point in time when that was the concern at hand.  And the information that the individuals supposedly misstated or concealed—such as RBS's exposure to CDO positions, the scope of due diligence performed in connection with the ABN transaction, and RBS's level of capitalization—were all matters of widespread market knowledge.

---

[1] This brief is submitted on behalf of all named individual defendants except for Chris Campbell, upon whom Plaintiffs have not effected service as of October 23, 2009.

*First*, the '34 Act claims against Goodwin, Fish, Whittaker, Cameron, and McKillop identify no factual misstatement and do not come close to creating the requisite "strong inference" of scienter.  As exemplified by the attached Appendix I of alleged misstatements by these individuals, the Complaint relies almost entirely on impermissible "group pleading," lodging allegations based on what the "Defendants" and other clusters of individuals supposedly must have known.  The Complaint lacks any particularized evidence of contemporaneous knowledge of falsity, recklessness, or anything else that could support a fraud claim against any individual.  This Court has twice rejected this "shotgun" pleading tactic, as have many other courts.  Moreover, even if Plaintiffs were permitted to substitute group pleading for actual allegations against each individual, the scienter allegations themselves do not come close to satisfying the particularity requirements of Rule 9(b) and the PSLRA.  Plaintiffs incant conclusory allegations of supposed knowledge of falsity, but fail completely to allege that Goodwin, Fish, Whittaker, Cameron, or McKillop had any motive to commit any alleged fraud; were privy to any document or conversation that would have provided knowledge of the falsity of any of public statement; or acted in any manner inconsistent with any public statement.

*Second*, the '33 Act claims are similarly deficient.  Plaintiffs name as defendants, in different groupings, Goodwin, McKillop, Whittaker, Cameron, Fish, Pell, Fisher, Buchan, Currie, Robson, Scott, Sutherland, Hunter, Koch, MacHale, Kong, Friedrich, and Campbell.  (*See* CAC Exhibit A.)  As explained in the RBS MTD Br., the claims fail for a variety of reasons.  Foremost, the Complaint fails to identify any actionable misstatement or omission of any material fact in a registration statement or prospectus.  Moreover, although the Complaint formulaically disavows that any of the '33 Act claims sound in fraud, they are fraud claims as

pleaded and by their nature, and are therefore deficient as to the individuals because they fail to allege scienter. Additional reasons for dismissal of the '33 Act claims are set forth below.

   **Third**, the Court should dismiss the claims for lack of personal jurisdiction.

## ARGUMENT

**I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE '34 ACT AGAINST GOODWIN, FISH, WHITTAKER, CAMERON, OR MCKILLOP (COUNTS I AND II)**

### A.    The Complaint Fails To State A Claim Under Section 10(b) (Count I)

   Under Rule 9(b) and the PSLRA, "[w]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by *each defendant*." *Harrison v. Rubenstein*, No. 02 Civ. 9356, 2007 WL 582955, at *12 (S.D.N.Y. Feb 26, 2007) (Batts, J.) (emphasis added) (internal quotation marks and citation omitted). Courts should be "especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants," *id.*, and to ensure that "[e]ach defendant is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged," *Scone Invs., LP v. American Third Mkt. Corp.*, No. 97 Civ. 3802, 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998) (internal quotation marks and citations omitted). A complaint "must 'state with particularity facts giving rise to a strong inference' that *each defendant* acted with scienter." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008) (emphasis added) (citation omitted).[2] The claims against the undersigned individuals fail under these standards.

### 1.    The 10(b) Claims Fail For Impermissible "Group Pleading"

   Rather than state any facts that could give rise to a fraud claim against *each defendant* named in the '34 Act claims, as required, the Complaint instead attempts to substitute

---

[2] *See also, e.g.*, *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024, at *20 (S.D.N.Y. Oct. 25, 2006).

impermissible "group pleading."  Indeed, aside from the legally insufficient "motive" allegations against Goodwin, Cameron, and Whittaker, as Appendix I shows, the Complaint has only a few "scienter" allegations that even *mention* any individual by name.  The first is the conclusory allegation, accompanied by no facts whatsoever, that "Goodwin . . . fully understood" that the April 22, 2008 rights issue "could not have been achieved" if he revealed "subprime related problems" and "the need to write down" goodwill related to ABN.  (CAC ¶ 380.)  The second is the pure hindsight allegation that "McKillop's and Goodwin's statements about RBS's ability to achieve its target capital ratios" in August 2008 must have been knowingly false "as indicated by the fact that within less than two months" RBS had to raise additional capital.  (*Id.* ¶ 351(f).) The last is the non-sequitur allegation that Fish's comments about the absence of subprime exposure at Citizens "failed to disclose that RBS was pressuring Fish to offer larger credit lines and expand Citizens' balance sheet to riskier assets so that Citizens could grow to become a major bank in the U.S."  (*Id.* ¶ 277(a).)  As explained below, none of these borderline "individualized" allegations comes close to creating a strong inference of scienter through particularized factual allegations.

The Complaint otherwise attributes both alleged misstatements statements and vague scienter allegations indiscriminately to "board members" (*e.g.*, *id.* ¶ 371), "Defendants" (*e.g.*, *id.* ¶ 381), "Exchange Act Defendants" (*e.g.*, *id.* ¶ 357), "senior members of RBS management" (*e.g.*, *id.* ¶ 362), and other such groupings of individuals.  (*See* Appendix I.)  Plaintiffs acknowledge this strategy, contending that "[i]t is appropriate to treat the individual Exchange Act Defendants as a group for pleading purposes."  (CAC ¶ 100.)  Yet as many courts have held,

that is plainly insufficient under the strict pleading requirements of Rule 9(b) and the PSLRA.[3] This pleading failure alone should result in dismissal of the claims against the individuals named in the '34 Act claims.

Indeed, this Court has emphatically rejected Plaintiffs' pleading tactic twice before.  In *Harrison*, the Court held that "[t]he requirements of Rule 9[(b)] are not 'satisfied by a complaint in which defendants are clumped together in vague allegations.'"  2007 WL 582955, at *12 (citation omitted).  The plaintiffs there alleged that "'the Cornerstone Defendants, through press releases, interviews, and email, made many public statements with the purpose of artificially inflating the price of Cornerstone' and that such statements were 'always positive and never mentioned the significant losses which Cornerstone was incurring at the time such statements were made.'"  *Id.* at *8.  The Court faulted the "generalized allegations," observing that the complaint "provide[d] only a blanket allegation that all of the Cornerstone Defendants are liable for any of Cornerstone's alleged fraudulent misrepresentations or omission by virtue of their high level positions in the company."  *Id.* at *7; *see also id.* at *13.  Rather than accept the indiscriminate group allegations, the Court conducted a "careful reading of the Amended Complaint," finding that only two defendants were "specifically alleged to have engaged in any fraudulent conduct."  *Id.* at *7.  Then, examining those scant specific allegations, this Court found them lacking and dismissed the claims against the two individuals.  *Id.* at *19-*20.

---

[3] The PSLRA "has eliminated" the group pleading doctrine.  *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074, 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004); *see also In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 262 (S.D.N.Y. 2004) (PSLRA's "use of the singular 'defendant' counsels against group pleading").  The Second Circuit has not expressly ruled on the topic, but all three circuit courts that have directly addressed this issue have so held.  *See Winer Family Trust v. Queen*, 503 F.3d 319, 335-37 (3d Cir. 2007); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-65 (5th Cir. 2004); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006) (same), *vacated on other grounds*, 551 U.S. 308 (2007); *but cf. Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997) (applying the Group Pleading Doctrine without analysis or citation of the PSLRA).

This Court adopted the same approach in *In re Rhodia S.A. Securities Litigation*, 531 F. Supp. 2d 527, 550 (S.D.N.Y. 2007) (Batts, J.). There too, plaintiffs attempted to sue numerous individuals, including the company's Chairman/CEO and CFO, based on "general allegations . . . that 'Defendants' were aware of the financially detrimental investments." *Id.* This Court again rejected the attempted pleading shortcut, stating that "[t]hese kinds of allegations are not sufficient." *Id.* The Court dismissed claims against both individuals, finding that the complaint failed to plead specific knowledge and holding that "officers cannot be imputed with knowledge about all transactions which occur at a corporation for purposes of pleading scienter." *Id.* The Court further rejected the complaint's impermissible reliance on "general allegations" directed at "Defendants" rather than any "specific allegations." *Id.*

Here, as in *Harrison* and *Rhodia*, the allegations against the individuals are based on deficient "general allegations" about what "defendants" generally or clusters of them supposedly said and knew. *See* Appendix I. The scienter allegations in particular, almost without exception, are mere "boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions" that courts have routinely rejected as insufficient to state a claim. *In re Rhodia*, 531 F. Supp. 2d at 550. That falls far short of the strictures of Rule 9(b) and the PSLRA, and the claims should be dismissed.

## 2.    The Complaint Also Fails To Adequately Allege Falsity Or Scienter

Even if the Court overlooked the impermissible group pleading, the claims against Goodwin, Fish, Whittaker, Cameron, or McKillop would still be subject to dismissal because the Complaint fails to allege either material falsity or scienter against any of these individuals. Instead, a "careful reading" of the Complaint shows that neither the "shotgun" allegations, even if deemed to be directed at each individual separately, nor the few examples of allegations that are even arguably directed at a specific individual, are sufficiently particularized to survive

dismissal.  In sum, "those few specific allegedly fraudulent statements that Plaintiffs attribute to [each individual] are either clearly immaterial statements of opinion or are statements accompanied by appropriate cautions to investors regarding forward looking statements." *Harrison*, 2007 WL 582955, at *12.

### a)      Sir Fred Goodwin

The Complaint singles out Sir Fred Goodwin—CEO and a Director of RBS until October 2008—for special criticism.  Plaintiffs place the blame for RBS's losses squarely on Goodwin, and recite that he had a "central role" in the supposed fraud.  (CAC ¶ 111.)  Describing him as a "bully" who "ran roughshod" over RBS's internal controls, the Complaint alleges that he caused RBS to "engage in risky investments in order to fuel his desire for growth."  (*Id.* ¶ 395.)  The Complaint also attributes "personal financial motives"—based on incentive compensation—to Goodwin.  (*Id.* ¶¶ 385-94.)  As explained more fully in the RBS MTD Brief, however, Plaintiffs' ire directed at Goodwin at best concerns supposed mismanagement or errors in business judgment.  But as this Court and others have consistently held, "[a]llegations of mismanagement do not state a claim for securities fraud."  *Harrison*, 2007 WL 582955, at *13 (internal quotation marks and citation omitted); *see also, e.g.*, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").  The Complaint's rhetorical barrage notwithstanding, the fraud allegations against Goodwin are fatally deficient.

### (i)      Material Falsity

The handful of statements actually attributed to Goodwin are all inactionable.  Most are statements of judgment, opinion, and forward-looking statements accompanied by detailed "bespeaks caution" warnings.  (*See* Appendix I; RBS MTD Br. Parts I.A, II.A & Appendix D.) For example, discussing the company's method for valuing super-senior CDO positions on

December 6, 2007, Goodwin, far from presenting RBS's valuations as a matter of fact, explained the inherent complications, stating: "***we're trying to project what we think the total delinquencies over the life of these instruments will be and as ever there could be vagaries in all of that.***" (CAC ¶ 319 (emphasis in original)).  As also explained in detail in the RBS MTD Brief, Goodwin's few "we don't do subprime" comments (*id.* ¶¶ 281, 290, 297, 322) on their face and in context clearly pertained to the credit quality of RBS's U.S. mortgage portfolio, and not its securitization business.  The Complaint alleges no facts showing that these comments were untrue or inaccurate.  (*See* RBS MTD Br. Part I.A.1.)[4]  Otherwise, the information Goodwin supposedly concealed from the market—such as RBS's exposure to CDOs with underlying subprime collateral, the scope of due diligence for the ABN acquisition, and the company's capital position—were all *disclosed* to the market.  (*See id.* Parts I.A.2-4.)[5]

### (ii)     Scienter

Even if any of Goodwin's statements could be somehow deemed materially false, the Complaint still fails entirely to plead facts giving rise to a "powerful" or "cogent" inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).

---

[4] In addition, the Complaint fails to plead loss causation with respect to the alleged Citizens "subprime" exposure because the only alleged "disclosure" of this fact is a *Daily Telegraph* article dated after the class period.  (CAC ¶¶ 233-34); *see Harrison*, 2007 WL 582955, at *15 (dismissing claim where plaintiffs failed to allege that "any of the alleged misrepresentations attributed to" the defendants, "once their falsity became known to the market, caused a decline in [the company's] stock price"); *In re Rhodia*, 531 F. Supp. 2d at 546 (finding no loss causation pleaded where there was no disclosure of "the precise facts allegedly concealed").

[5] *See also, e.g.*, *Harrison*, 2007 WL 582955, at *15 (rejecting "generalized allegations that" the company "concealed its financial condition" where, *inter alia*, the company's public filings disclosed the information allegedly concealed); *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 348 (S.D.N.Y. 2005) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.") (citation omitted).

*__Motive.__*  By far the most detailed scienter allegations against Goodwin allege a supposed personal "financial motive."  (CAC ¶¶ 111, 385-94.)  But as this Court and many others have held, neither ambition nor "[a] general wish by corporate officers to preserve their executive positions or to increase their compensation is . . . sufficiently concrete to allege motive."  *In re Rhodia*, 531 F. Supp. 2d at 549.[6]  Moreover, the Complaint neglects to mention public documents show that Goodwin's RBS shareholding *increased by approximately 2.5 million shares* during the class period, which entirely undermines any inference that he sought to defraud investors.  (*See* E197-98, 1062-63 (RBS Director/PDMR Shareholder Notifications.); *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ("[T]he Individual Defendants, in almost every instance, increased their . . . holdings during the Class Period—a fact wholly inconsistent with fraudulent intent.").  Finally, the Complaint also alleges, based on a March 20, 2009 *Daily Telegraph* article, that Goodwin had a motive to conceal RBS's subprime exposure because in 2006 he supposedly "had assured RBS's Board that the Company would not move into the subprime arena."  (CAC ¶ 395.)  But the article provides no source for this conclusory and vague allegation, nor any specifics about what Goodwin supposedly said to the Board in either 2006 or 2007, nor any facts showing that Goodwin *knew* about any "subprime" exposure he supposedly concealed from the RBS Board in 2006.  That is plainly insufficient.

---

[6] *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009) (the desire to maintain a high credit rating, sustain the appearance of corporate profitability or the success of an investment, or maintain a high stock price to increase executive compensation are insufficient to show fraudulent intent); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter"); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("[A] plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold" to plead scienter); *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated."  (citation omitted)).

**_Conscious Misbehavior or Recklessness._**  Lacking sufficient motive allegations against Goodwin, Plaintiffs must—but fail to—meet the far more onerous task of pleading "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004).  (*See* RBS MTD Br. Part I.B.2.)  To show conscious misbehavior, Plaintiffs "must allege facts supporting an inference that defendant[] deliberately or recklessly engaged in illegal conduct."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005).  And Courts have required "conscious recklessness"—"a state of mind approximating actual intent, and not merely a heightened form of negligence."  *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted).  Plaintiffs must plead "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (citations and internal quotations omitted).  Absent any plausible motive, the circumstantial evidence "must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (citation omitted).

Yet the scienter allegations here lack ***any*** specificity about what Goodwin supposedly knew when he made alleged misstatements.  As to Goodwin's public statements about "subprime," Plaintiffs vaguely allege that "Exchange Act Defendants knew that RBS had significant exposure to the subprime market."  (CAC ¶ 360.)  Leaving aside the improper group pleading, that type of hindsight conclusion and imprecision does come not close to creating a strong inference that Goodwin knew his "we don't do subprime" statements in spring and summer 2007 to be false.  (*See* Appendix I.)  The Complaint supplies no basis to infer that Goodwin intended these statements to apply to CDO exposures, nor that Goodwin had any

reason to think—much less *know*—that AAA rated CDO exposures should in any way be considered "subprime." The Complaint identifies no documents, conversations, or actions by Goodwin to suggest fraudulent intent.[7] Nor does the Complaint even explain what Plaintiffs believe Goodwin meant by the term "subprime," which was not and is not a uniform industry term of art. The Complaint does allege, based on conclusory assertions in a March 2009 *Daily Telegraph* article, that Goodwin "in Summer 2007 apprised RBS board members" that Citizens had amassed exposure to "subprime," but it does not provide any basis for that assertion, explain what is meant by "subprime," allege *when* that supposed "subprime" exposure was taken on at Citizens, or allege that *Goodwin* knew about such exposure *prior* to his allegedly contrary public statements. (*See* RBS MTD Br. 18, 33-34.)

The Complaint also fails to plead scienter with respect to any of Goodwin's alleged misstatements concerning the valuation of impaired assets and the sufficiency of write-downs. (CAC ¶¶ 308, 319.) First, there are no allegations demonstrating that Goodwin believed there to be any flaw in the valuation methodology, which—it bears noting—was examined and blessed by RBS's external auditors. (*See* May 14, 2008 Financials, Ex. 15.1. (Deloitte & Touche Audit Letter).) Allegations that unidentified "senior members of RBS management" (CAC ¶ 362; *see also id.* ¶¶ 160-62) were aware of supposed flaws in RBS's valuation models do not support an inference that *Goodwin* was aware of any supposed flaws or acted out of anything other than good faith. The Complaint cites three internal emails that purport to show that a few employees debated about how to value certain securities. (*Id.* ¶¶ 360, 363, 365-66.) But there are no

---

[7] *See In re Rhodia*, 531 F. Supp. 2d at 549 (holding that to plead conscious misbehavior or recklessness plaintiffs must allege "that defendants had knowledge of specific facts or documents that they disregarded," and declining to presume knowledge on the part of CEO based on executive position); *see also, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (where alleging that defendant had access to contrary facts, plaintiffs must specifically identify the reports or statements containing this information).

allegations that *Goodwin* ever received these emails or was aware of the opinions expressed in them. *See, e.g.*, *In re Rhodia*, 531 F. Supp. 2d at 550 (individual not specifically alleged to have participated in negotiations "cannot be presumed to have had knowledge" of them). And, even if Goodwin *had* seen the three emails cited in the Complaint, the fact that others at the Company may have expressed disagreement with RBS's valuation methodology does not establish anything more than an internal debate, much less that Goodwin was engaged in fraud when he discussed RBS's valuations. (*See* RBS MTD Br. 36-41); *see also, e.g.*, *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 362 (S.D.N.Y. 2007) (rejecting difference of opinion about valuation as evidence of fraud, and noting that valuation of illiquid securities is "not a precise science" and requires "exercise in judgment").

Finally, as to Goodwin's alleged misstatements about the capital needs of the company (CAC ¶¶ 328-29) and the anticipated benefits of the ABN transaction (*id.* ¶¶ 375-80), the Complaint again lacks any allegation plausibly suggesting that Goodwin had any reason to think—much less know—that they were false. *See also, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993) ("[T]he complaint contains no allegations to support the inference that the defendants either did not have these favorable opinions on future prospects when they made the statements or that the favorable opinions were without a basis of fact.") (citation omitted). At best the Complaint alleges that Goodwin failed to predict the future; that does not suffice to plead fraud.[8]

---

[8] The Complaint also alleges that "Goodwin and other RBS insiders" failed to write down the goodwill from the ABN transaction at the time of the Rights Issue because they supposedly "fully understood that this capital raise—critical to the possible survival of the under-capitalized Company caught in the midst of a severe credit crunch—could not have been achieved if RBS had fully informed investors of the extent of its subprime related problems and its need to write down billions of pounds in goodwill related to the ABN AMRO and other acquisitions." (CAC ¶ 380.) There are no facts to support this claim, but in any event, as explained in the RBS MTD Brief, plaintiffs simply misconstrue the relevant accounting principles. (RBS MTD Br. 25-26, 46-47.) In any event, even if required by accounting rules, the fact that

### b)    Lawrence Fish

As to Lawrence Fish—former Chairman and CEO of Citizens and Director of RBS (CAC ¶ 62), the Complaint alleges only one misstatement.  On the March 1, 2007 Earnings Call, Fish is alleged to have told analysts:  "We have never—we don't do sub-prime.  We have never done sub-prime.  We have no plans to do sub-prime.  Sub-prime brings with it operational risks, regulator risks and, of course, credit risks."  (*id.* ¶ 276.)   Fish's statement plainly concerned the loan portfolio at Citizens, the company of which he was the CEO, and not exposure to CDOs through RBS's Greenwich Capital business.  (*See* RBS MTD Br. 15-16, 34.)  The market was fully aware of that distinction.  (*Id*).  Plaintiffs' allegation, which is based entirely on a March 21, 2009 *Daily Telegraph* article, that Citizens accumulated massive "subprime" exposure at some unspecified time (CAC ¶¶ 233-34) is entirely conclusory, as well as unsubstantiated.  (RBS MTD Br. 33-34); *supra* p. 9.  And the Complaint's only other supposed basis for attributing "subprime" exposure to Citizens—the vague statements of a "confidential witness" (CAC ¶ 53)—does not come close to establishing that Citizens in fact engaged in any "subprime" lending during the relevant period, or more importantly, that *Fish* was aware of any supposed "subprime" loans on Citizens' lending books.  *See, e.g.*, *Dynex*, 531 F.3d at 196.  The motive allegations against Fish fail as well—like Goodwin, his shareholding *increased* during the class period.  (*See* E630-32, 1038-39.)  Finally, the Complaint fails to plead loss causation with respect to supposed "subprime" exposure at Citizens.  *See supra* n.4.

---

a goodwill write-down might have affected the success of the Rights Issue does not come close to providing a basis for the conclusion that Goodwin or anyone else decided not to write down the goodwill at that time for fraudulent reasons.  *See Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (stating that the recklessness standard in a securities fraud action "requires more than a misapplication of accounting principles").

c)      **Guy Whittaker**

The allegations against defendant Guy Whittaker also fail to state a claim under Rule 10(b).  Whittaker was Chief Financial Officer and a Director of RBS beginning in February 2006.  (CAC ¶ 60.)  The Complaint alleges two misstatements by Whittaker concerning exposure to "subprime":   First, the Complaint alleges that on March 1, 2007, he stated that Citizens did not "do subprime lending," and that in the Greenwich Capital CDO business, "our role as an intermediary between originators and investors, leaves us both well-protected and with limited risk."  (*Id.* ¶ 274.)  Second, the Complaint alleges that on August 3, 2007, Whittaker stated that "[w]e have just as a reminder no sub-prime exposure in the lending book at Citizens."  (*Id.* ¶ 296.)

As explained in detail in the RBS MTD Brief and above with respect to Goodwin's and Fish's statements, these comments were truthful, but had they been inaccurate, the scienter allegations still utterly fail.  The general allegation that Whittaker had a motive to commit fraud because he stood to gain financially from doing so (*id.* ¶¶ 385-86) is not sufficient to plead scienter.  *See supra* p. 9.  In any event, Whittaker too *added* shares to his RBS holdings during the class period.  (*See* E119-21, 1060-61.)  Nor does the Complaint allege that Whittaker knew at the time that his statements regarding subprime exposure were false.   The Complaint impermissibly seeks to attribute scienter to Whittaker with generalized allegations that "Exchange Act Defendants knew that RBS had significant exposure to the subprime market" (CAC ¶¶ 357-61) and that "no later than the summer of 2007, members of the RBS's Board learned that the Company had tens of billions of pounds of subprime exposure" (*id.* ¶ 370).  But

allegations about what directors or senior executives supposedly knew are insufficient to plead scienter against Whittaker. *See In re Rhodia*, 531 F. Supp. 2d. at 550.[9]

The Complaint otherwise faults Whittaker for (1) December 2007 and February 2008 comments explaining the company's valuation of CDO positions (CAC ¶¶ 323-24)[10]; (2) the May 14, 2008 Form 20-F, of which he was a signatory, for having determined not to write-down goodwill associated with the ABN acquisition (*id.* ¶¶ 337, 339); and (3) his statements in an October 2008 conference call regarding the company's capital adequacy (*id.* ¶ 353). *See also* Appendix I. These allegations also fail. These were not otherwise actionable statements of present fact, and, in any event, the scienter allegations on these topics do not even mention Whittaker. The Complaint's allegation about unidentified "senior members of RBS management" says nothing about what *Whittaker* knew or believed. The Complaint's reliance on three e-mails suggesting that certain employees of RBS had differences of opinion about valuation issues (CAC ¶¶ 363, 365-66) would not support scienter even if Whittaker had been privy to them, which is not alleged. The Complaint lacks any scienter allegation plausibly

---

[9] *See also, e.g.*, *380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 31 (S.D.N.Y. 2009) ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook."); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (allegations "far too vague with respect to what information was actually communicated and what conclusions any defendant actually reached"). Notably, the Complaint, citing a *Daily Telegraph* article dated March 21, 2009, states that "certain members of the RBS Board were **not** aware of the Company's decision to spend billions of pounds buying subprime mortgages from other banks, and that Citizens Bank had purchased packages of subprime mortgages without Board approval." (CAC ¶ 234 (emphasis added).) The Complaint fails to say which members knew and which did not. And, even if knowledge of exposure to subprime by "Board" members could be properly imputed to Whittaker, the allegations would still fail, among other reasons, because the two statements attributed to Whittaker denying "subprime" exposure were made before (March 1, 2007) and during (August 3, 2007) the "summer of 2007" (when Board members allegedly first became aware of RBS's subprime exposure.

[10] Paragraph 324 of the Complaint attributes a quotation to Cameron, but the transcript shows that the speaker is Whittaker. (*See* E1367-68.)

suggesting that Whittaker had any contrary contemporaneous information or otherwise acted inconsistently with any of his stated views.

### d)    John Cameron

The allegations against John Cameron are even more sparse.  Cameron was a Director of RBS beginning in 2006, and the Chief Executive of Corporate Banking & Financial Markets, (subsequently renamed Corporate Markets in January 2009).  (*Id.* ¶ 61.)  The Complaint alleges that during the March 1, 2007 analyst conference, Cameron "acknowledged that Greenwich offered credit lines to mortgage originators" but stated that RBS was "'very comfortable with what we've done . . . it's highly over collateralized, the mark-to-markets are fine.  We've got no concerns with our lines to the originators.'"  (*Id.* ¶ 275.)  The Complaint further alleges that during the August 3, 2007 analyst conference, in response to a question from a Credit Suisse analyst concerning RBS's exposure on CDOs, Cameron replied: "We've cut back a lot since the year end of '06 in our exposure to these sorts of markets and I told you then that they were very modest. We've taken no credit losses anywhere in the portfolio."  (*Id.* ¶ 296.)

The Complaint alleges no facts to controvert the truth of Cameron's statements.  On the contrary, the Complaint shows that Cameron discussed Greenwich Capital's exposures in both March and August 2007, and the Complaint's gripes about his comments solely concern plainly inactionable matters of judgment and opinion.  The Complaint alleges no facts even to suggest that Cameron had any reason to be concerned about credit lines to originators in March 2007 or AAA-rated super senior exposures in August 2007, much less any facts showing that Cameron actually disbelieved his expressed views.  Additionally, the Complaint fails to allege that RBS *ever* took any credit losses on its CDOs—including up to today.  RBS had to write down the *market* value of its super-senior CDO assets, but there is no suggestion that any underlying borrower defaults caused *credit* losses—i.e., any failure of the notes to pay the anticipated

income stream.  The Complaint likewise fails to plead any motive for fraud against Cameron given that his shareholding also increased during the class period.  (*See* E112-14, 145-46, 799-800.)

###### e)    Sir Tom McKillop

Finally, the Complaint alleges that Sir Thomas McKillop—an outside director and Chairman of the Board from September 2005 until February 2009—stated on a February 28, 2007 conference that RBS had "issued our [December 6, 2007] trading statement based on later data than most other organizations and indeed on a very prudent basis."  (CAC ¶ 324.)  The Complaint also alleges that McKillop made misstatements about the benefits to RBS of the ABN acquisition and integration (*id.* ¶¶ 335, 343, 347) and about RBS's ability to achieve its target capital ratios (*see id.* ¶ 216).  Even if these statements were otherwise actionable, which they are not, the Complaint offers no plausible theory as to why McKillop would seek to mislead investors.  The Complaint does not even allege any personal financial motive for McKillop (*see id.* ¶¶ 385-94), and he too added RBS shares to his holdings during the period (*see* E500-01, 1051-52).  Nor does the Complaint allege that McKillop acted with knowledge or recklessness.  The Complaint cites no contrary facts that McKillop supposedly knew at the time, let alone when or how he learned them.  Indeed, other than impermissibly attributing knowledge of "subprime" exposure to unspecified "members of the RBS Board," the only "scienter" allegation against McKillop is that he *left* the Board in 2009.  (CAC ¶ 381.)  Courts have consistently held that departure from a company does not create a strong inference of scienter.  *See, e.g.*, *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 544-45 (S.D.N.Y. 2009).[11]

---

[11] The Complaint similarly fails to establish any inference of scienter based on the departures of Goodwin, Whittaker, Cameron, and Fish.  (*See* CAC ¶¶ 381-94.)

**B.      The Complaint Fails To State A Claim Under Section 20(a) (Count II)**

The Complaint's Section 20(a) claim against Goodwin, Fish, Whittaker, Cameron, and McKillop (CAC ¶ 496) fails because the Complaint pleads no "primary violation by a controlled person" or culpable participation.  *In re Rhodia*, 531 F. Supp. 2d at 550; *Harrison*, 2007 WL 582955, at \*19.

**II.     THE '33 ACT CLAIMS FAIL TO STATE A CLAIM (COUNTS III-X)**

**A.      The Complaint Fails To Plead A Primary Violation Of The '33 Act (Counts III, IV, VI, VII, IX)**

The '33 Act claims under Sections 11 and 12(a)(2) (Counts III, IV, VI, VII, IX; *see* CAC Exhibit A) should likewise all be dismissed for failure to plead any materially false statement in any registration statement or prospectus and for the additional reasons explained in the RBS MTD Brief and the brief of the Underwriter Defendants—including that claims are barred by the applicable statute of limitations and that the Rights Issue was not a public offering.  (*See* RBS MTD Br. Parts II.B-C.)

In addition, the claims against certain of the individuals named in the '33 Act claims are subject to dismissal for other reasons.  **First**, the claims all sound in fraud notwithstanding Plaintiff's bare disavowal.  (RBS MTD Br. 55-56.)  The Complaint fails to allege scienter against *any* individual in connection with the '33 Act claims, but it does not even *attempt* to plead scienter for any claim against Pell, Fisher, Buchan, Currie, Robson, Scott, Sutherland, Hunter, Koch, MacHale, Campbell, Kong, or Freidrich.  **Second**, the Section 12(a)(2) claims against all defendants are subject to dismissal because the Complaint fails to allege adequately that any of the named individuals sufficiently participated in a sale of the relevant securities.  As to the Preferred Share claims, the Complaint merely recites the statutory language, saying that the 15 named individuals "were sellers, offerors, and/or solicitors of sales."  (CAC ¶ 630; *see also id.*

- 18 -

Exhibit A.)  But there is no allegation as to what any individual actually *did*.  Signing of the shelf registration statement in 2005—over a year prior to the first of the Preferred Share offerings and prospectuses at issue—is insufficient.  *See, e.g.*, *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (dismissing 12(a)(2) claim against company CFO who had signed a registration statement and solicited sale of securities but where plaintiffs failed "to show how [he] stood to financially gain from his actions").  And in any event McKillop, Whittaker, Cameron, Fish, Fisher, Currie, Koch, Freidrich, and Kong did not sign the 2005 registration statement.  As to the Exchange Offer, the claims against Goodwin, McKillop, Whittaker, Cameron, and Fish appear to rest on their having signed the registration statement for the RBS shares offered in exchange and a conclusory allegation that they solicited the sale of shares for their financial benefit.  These bare allegations are insufficient to plead a claim under 12(a)(2). *See Vivendi*, 381 F. Supp. 2d at 187.[12]  Finally, as to the Rights Issue, there is no allegation that McKillop, Goodwin, or Whittaker did anything to sell shares in *to Plaintiffs*, who bought in private transactions in which the individuals are not alleged to have participated.  (*See* RBS MTD Br. Part II.B); *Yung v. Lee*, 432 F.3d 142, 149-50 (2d Cir. 2005) (Section 12(a)(2) inapplicable to private transactions pursuant to subscription letters).

**B.    The Complaint Fails To Plead A "Controlling Person" Claim Under The '33 Act (Counts V, VIII, X)**

The controlling person claims under Section 15 of the '33 Act (Counts V, VIII, and X; *see* CAC Exhibit A) are likewise subject to dismissal for failure to allege a primary violation by a controlled person or culpable participation.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir. 2009).

---

[12] Moreover, here it was RFS—a company jointly owned by the consortium—not RBS, that sold the Exchange Offer shares.

## III.    THE CLAIMS SHOULD BE DISMISSED UNDER 12(B)(2) FOR LACK OF PERSONAL JURISDICTION

Finally, the circumstances here fail to satisfy the related "minimum contacts" and "reasonableness" inquiries under the due process test for personal jurisdiction over any of the individual defendants. *See, e.g.*, *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). In particular, as to the **'34 Act** claims against Goodwin, McKillop, Whittaker, and Cameron, Plaintiffs do not adequately allege that these individuals lived in, worked in, or traveled extensively to the United States; made any material misstatement in or directed to the United States; or traveled to the United States in connection with the alleged fraud. *See In re Rhodia*, 531 F. Supp. 2d at 542. Being a corporation's control person or a director does not suffice to establish personal jurisdiction. *Id.* Plaintiffs do allege that Goodwin, McKillop, and Cameron signed certain allegedly fraudulent documents filed with the SEC (*see id.*), but under the circumstances the exercise of jurisdiction would be unreasonable for many reasons, including that the interests in this matter clearly lie overwhelmingly in the U.K. (*See* RBS SMJ Br.); *Metropolitan Life*, 84 F.3d at 568.

As to the **'33 Act** Preferred Share claims, Currie, Koch, Kong, and Friedrich did not sign the allegedly defective Registration Statement (and Complaint does not allege McKillop, Whittaker, Cameron, or Fisher to have signed).[13] (*See* E500-01, 1051-52, April 8, 2005 Registration Statement, at II-6.) *See also, e.g.*, *In re Alstom SA*, 406 F. Supp. 2d 346, 400-01 (S.D.N.Y. 2005) (being listed on a document without an actual signature insufficient to confer jurisdiction). As to the Exchange Offer claims, the Complaint does not allege that Goodwin,

---

[13] The Complaint alleges that the "Individual Defendants" and "Preferred Share Individual Defendants" were "responsible for the contents and dissemination of the Registration Statement for the Preferred Share Offerings" and that each "signed or authorized the signing of the Registration Statement or were identified in the Registration Statement as directors." (CAC ¶ 619.) Such conclusory group allegations are insufficient. *See, e.g.*, *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 466 (S.D.N.Y. 2008).

McKillop, Whittaker, or Cameron signed the Registration Statement, and no other facts are alleged that could establish jurisdiction.  Finally, as to the Rights Issue claims, the Complaint alleges that Goodwin, McKillop, and Whittaker, "participated in road shows" and "touted the Rights Issue at general meetings" including "a presentation simulcast on the internet on April 22, 2008" (CAC ¶ 719), but there is no allegation that any of this conduct occurred in the United States—and indeed there was no public offering in the United States.  (*See* RBS MTD Br. Part II.B.)

**CONCLUSION**

For the foregoing reasons and those contained in the other briefs of RBS and the Underwriters, the claims against the undersigned individuals should be dismissed with prejudice.

Dated:  October 23, 2009

Respectfully submitted,


/s/Paul A. Engelmayer
Paul A. Engelmayer
Christopher J. Meade
Robert W. Trenchard
David S. Lesser
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Telephone: 212-230-8800
Fax: 212-230-8888

*Counsel for defendants  Sir Fred
Goodwin, Sir Tom McKillop, Guy
Whittaker, John Cameron, Lawrence
Fish, Gordon Pell, Mark Fisher,
Colin Buchan, Jim Currie, Sir Steve
Robson, Robert Scott, Peter
Sutherland, Archie Hunter, Charles
Koch, Joseph MacHale, Janis Kong,
and William Friedrich*