UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Royal Bank of Scotland Group plc Securities Litigation | 09 Civ. 300 (DAB)<br>ECF Case<br>Oral Argument Requested |

**THE ROYAL BANK OF SCOTLAND GROUP PLC'S**
**REPLY TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW**
**ADDRESSING THE IMPACT OF *MORRISON V. NATIONAL AUSTRALIA BANK LTD.***

WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Telephone: 212-230-8800
Fax: 212-230-8888

# TABLE OF CONTENTS

I. PLAINTIFFS' EXCHANGE ACT CLAIMS MUST BE DISMISSED........................... 1

A. Plaintiffs' "Listing" Theory Is Irreconcilable With *Morrison* .............................. 1

B. Plaintiffs Did Not Purchase Their Ordinary Shares In The United States ............. 7

C. Lead Plaintiffs Lack Standing To Pursue Claims Based On ADR Purchases........ 9

II. THE EXCHANGE OFFER AND RIGHTS ISSUE CLAIMS MUST ALSO BE DISMISSED ..................................................................................................... 10

## TABLE OF AUTHORITIES

### CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009) .......... 10

*Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118, 2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010).......... 6

*Blau v. Ogsbury*, 210 F.2d 426 (2d Cir. 1954).......... 9

*Copeland v. Fortis*, 685 F. Supp. 2d 498 (S.D.N.Y. 2010) .......... 3

*Cornwell v. Credit Suisse Group*, 666 F. Supp. 2d 381 (S.D.N.Y. 2009) .......... 3

*Cornwell v. Credit Suisse Group*, No. 08 Civ. 3758, 2010 WL 3069597 (S.D.N.Y. July 27, 2010).......... 6, 8

*Cornwell v. Credit Suisse Group*, No. 08 Civ. 3758, 2010 WL 3291800 (S.D.N.Y. Aug. 11, 2010).......... 6

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006).......... 10

*Getter v. R.G. Dickinson & Co.*, 366 F. Supp. 559 (S.D. Iowa 1973).......... 9

*Green v. Weis, Voisin, Cannon, Inc.*, 479 F.2d 462 (7th Cir. 1973).......... 9

*Ingenito v. Bermec Corp.*, 376 F. Supp. 1154 (S.D.N.Y. 1974) .......... 9

*In re Adelphia Communications Corp. Securities & Derivatives Litigation,* 398 F. Supp. 2d 244 (S.D.N.Y. 2005) .......... 9

*In re Alstom S.A. Securities Litigation*, 406 F. Supp. 2d 346 (S.D.N.Y. 2005) .......... 4

*In re Alstom SA Securities Litigation*, No. 03 Civ. 6595, 2010 WL 3718863 (S.D.N.Y. Sept. 14, 2010) ..........5, 6, 8

*In re Banco Santander Securities - Optimal Litigation*,
No. 09 Civ. 20215, 2010 WL 3036990 (S.D. Fla. July 30, 2010)....................................... 6, 8

*In re China Life Securities Litigation*,
No. 04 Civ. 2112, 2008 WL 4066919 (S.D.N.Y. Sept. 3, 2008) ........................................... 3

*In re Rhodia S.A. Securities Litigation*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) ......................................................................................... 3

*In re SCOR Holding (Switzerland) AG Litigation*,
537 F. Supp. 2d 556 (S.D.N.Y. 2008) ......................................................................................... 3

*In re Societe Generale Securities Litigation*,
No. 08 Civ. 2495 (S.D.N.Y. Sept. 29, 2010) ................................................................... 6, 8

*In re Yukos Oil Co. Securities Litigation*,
No. 04 Civ. 5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)........................................... 4

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
501 U.S. 350 (1991)........................................................................................................ 5

*Morrison v. National Australia Bank Ltd.*,
130 S. Ct. 2869 (2010)...................................................................................................*passim*

*North America Philips Corp. v. American Vending Sales, Inc.*,
35 F.3d 1576 (Fed. Cir. 1994)............................................................................................ 9

*Pozniak v. Imperial Chemical Industries PLC*,
No. 03 Civ. 2457, 2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004) .......................................... 4

*Quail Cruises Ship Management Ltd. v. Agencia de Viagens CVC Tur Limitada*,
No. 09 Civ. 23248, 2010 WL 3119908 (S.D. Fla. Aug. 6, 2010) ....................................... 7, 8

*Sgalambo v. McKenzie*,
No. 09 Civ. 10087, 2010 WL 3119349 (S.D.N.Y. Aug, 6, 2010)........................................... 6

*Shaw v. Drefus*,
172 F.2d 140 (2d Cir. 1949)................................................................................................ 9

*Stackhouse v. Toyota Motor Co.*,
No. 10 Civ. 0922, 2010 WL 3377409 (S.D. Cal. July 16, 2010) ....................................... 7, 8

*Superintendent of Insurance v. Bankers Life & Casualty Co.*,
404 U.S. 6 (1971) .............................................................................................................. 5

*Terra Securities ASA Konkursbo v. Citigroup, Inc.*,
No. 09 Civ. 7058, 2010 WL 3291579 (S.D.N.Y Aug. 16, 2010)........................................... 6

**STATUTES & CODES**

15 U.S.C. § 78c(a)(13)............................................................................................................ 9

15 U.S.C. § 78c(a)(14)............................................................................................................ 9

17 C.F.R. § 230.902(h)............................................................................................................ 9

The Royal Bank of Scotland Group plc ("RBS") respectfully submits this reply to Plaintiffs' memorandum of law addressing the impact of *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), on RBS's pending motions to dismiss.[1]

## I. PLAINTIFFS' EXCHANGE ACT CLAIMS MUST BE DISMISSED

As RBS has demonstrated, *Morrison* adopted a bright-line, location-of-the-transaction test, under which purchases and sales on foreign securities exchanges fall, categorically, outside the scope of § 10(b) of the Exchange Act. (RBS Br. 3-5.) Because Plaintiffs undisputedly bought the RBS ordinary shares on which they base their Exchange Act claims on foreign securities exchanges, *Morrison* requires that these claims (Counts One and Two) be dismissed.

To try to salvage these claims—which represent the vast majority of claims in this case—Plaintiffs contrive two theories as to why these purchases on foreign exchanges, purportedly, fall within the scope of § 10(b). First, seizing on the word "listed" in the *Morrison* decision, Plaintiffs argue that the fact that certain RBS ordinary shares were listed on the NYSE, even though such listing was solely to enable RBS's ADRs to trade there, brings the purchase and sale of RBS securities traded everywhere in the world within the scope of § 10(b). Second, Plaintiffs argue that because they are U.S. residents who, assertedly, were in the United States when they decided to purchase RBS shares, their purchases of such shares, even though on a foreign exchange, fall within § 10(b). Both arguments misconstrue—indeed, they are irreconcilable with—*Morrison*. Plaintiffs' efforts to end-run that decision must be rejected.

### A. Plaintiffs' "Listing" Theory Is Irreconcilable With *Morrison*

*Morrison* held that § 10(b) has no extraterritorial reach, and that it applies only to "the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of

[1] RBS's opening brief addressing the impact of *Morrison* will be referred to as "RBS Br." and Plaintiffs' brief addressing the same topic will be referred to as "Opp." All other abbreviations are consistent with those used in RBS's prior briefing on its motions to dismiss.

any other security in the United States." 130 S. Ct. at 2888. The Supreme Court "reject[e]d the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad." *Id.* at 2885. Indeed, the Court observed that "no one … thought the Act was intended to regulate foreign securities exchanges," and that there is no "national public interest" in "transactions conducted upon foreign exchanges and markets." *Id.* at 2882, 2884-85. Thus, as RBS earlier demonstrated (RBS Br. 4-6), because Plaintiffs' Exchange Act claims involve purchases of RBS ordinary shares that occurred exclusively on foreign securities exchanges, *Morrison*'s location-of-the-transaction test requires their dismissal.

Nonetheless, in their opposition brief, Plaintiffs ignore *Morrison*'s focus on the location of the transaction, instead seizing on part of a sentence in *Morrison* using the word "listed" to describe when § 10(b) might apply. Based on this language, they contend that, so long as a foreign company lists securities in the United States, then *all* of the trading in its securities *anywhere* in the world becomes subject to the American securities laws. (Opp. 2-6.)

This interpretation—never articulated by any court or commentator—is simply irreconcilable with *Morrison*'s repeatedly articulated location-of-the-transaction test and the overall logic of that decision. *Morrison* was emphatic that, because § 10(b) does not apply extraterritorially, the decisive issue is where the purchase or sale of the security in question occurred. If the transaction occurred on a securities exchange, the determinant is whether the exchange was an American exchange (in which case § 10(b) applies) or a foreign exchange (in which case it quite clearly does not). *See, e.g.*, 130 S. Ct. at 2882 ("Nothing suggests that the *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets." (emphasis in original)); *id.* at 2885 ("[W]e reject the notion that the Exchange Act reaches

conduct in this country affecting exchanges or transactions abroad.").[2]

These and other statements in *Morrison* cannot be squared with Plaintiffs' self-serving construction. Under Plaintiffs' construction, transactions on foreign exchanges in securities listed on those exchanges *would* be covered by § 10(b), due solely to the fact that securities of the same company were listed in the United States in order to facilitate the sale of ADRs. This would be so even if, as is the case here, no ordinary shares of the company trade in the United States. Indeed, transactions that were *entirely* foreign in nature—for example, a transaction between a foreign buyer and a foreign seller, carried out on a foreign exchange, and involving shares of a foreign issuer—could be covered by § 10(b) solely by virtue of a domestic listing. Plaintiffs' reading is thus flatly inconsistent with the Supreme Court's foundational conclusion that § 10(b) does not apply extraterritorially. *Morrison*, 130 S. Ct. at 2885. And it flies in the face of the Supreme Court's pointed admonition that Congress did not intend for the Exchange Act to interfere with foreign countries' regulation of "securities transactions occurring within their territorial jurisdiction" based on securities regulations that "often differ[] from ours." *Id.*

The absurdity of Plaintiffs' construction is manifest. If it were correct, the Court would have *expanded*, *sub silentio*, the extraterritorial application of § 10(b) in "foreign-cubed" cases—exactly the opposite of what the Court obviously intended.[3] *Morrison* expressly rejected the use

---

[2] *See also Morrison*, 130 S. Ct. at 2884 ("[T]he focus of the Exchange Act is … upon purchases and sales of securities in the United States."); *id.* ("We know of no one who thought that the Act was intended to 'regulat[e] foreign securities exchanges—or indeed who even believed that under established principles of international law Congress had the power to do so."); *id.* at 2883 (noting that the explicit provision in § 30(a) of the Exchange Act "for a specific extraterritorial application would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges").

[3] Prior to *Morrison*, courts in this district had frequently dismissed foreign-cubed claims under its "conduct" and "effect" tests, even where the defendant had listed and registered ADRs in the United States. *See, e.g.*, *Copeland v. Fortis*, 685 F. Supp. 2d 498, 506 (S.D.N.Y. 2010); *Cornwell v. Credit Suisse Grp.*, 666 F. Supp. 2d 381, 385 (S.D.N.Y. 2009); *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 559 (S.D.N.Y. 2008); *In re China Life Sec. Litig.*, No. 04 Civ. 2112, 2008 WL 4066919, at *1 n.1 (S.D.N.Y. Sept. 3, 2008); *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 537 (S.D.N.Y. 2007);

of § 10(b) by "foreign cubed" plaintiffs—*i.e.*, foreign plaintiffs suing foreign defendants based on purchases in foreign markets. Yet, under Plaintiffs' construction of *Morrison*, exactly such claims would be permissible so long as the foreign issuer merely listed *some* of its securities in the United States in connection with ADRs. That result is patently ridiculous.[4]

Plaintiffs are wrong to assert (Opp. 5) that their construction would somehow narrow the number of foreign companies that could potentially be sued under § 10(b). Under their construction, foreign (and domestic) investors who purchased shares listed on foreign exchanges could "piggyback" on the mere fact that securities of the company were also listed on a U.S. exchange. *Cf. In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 346, 369 (S.D.N.Y. 2005) (holding, under then-controlling "effects" test, that foreign investors could *not* "piggyback" on injury to domestic investors and markets). By this means, the more than 850 foreign issuers that list shares on a U.S. exchange, *see* Companies Listed, http://www.nasdaq.com/screening/company-list.aspx, would be exposed to suit under § 10(b) by investors who purchased shares of their stock on a foreign exchange. This would turn the United States into precisely what Congress did *not* intend: "the Shangri-La of class-action litigation for lawyers representing those allegedly cheated *in foreign securities markets*." *Morrison*, 130 S. Ct. at 2886 (emphasis added).

The sentence in *Morrison* that Plaintiffs twist to arrive at their untenable construction is, in fact, readily understood. The Supreme Court used the phrase "security listed on an American

*In re Yukos Oil Co Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024, at *2 (S.D.N.Y. Oct. 25, 2006); *Pozniak* v. *Imperial Chem. Indus. PLC*, No. 03 Civ. 2457, 2004 WL 2186546, at *8 (S.D.N.Y. Sept. 28, 2004). Ironically, under Plaintiffs' "listing" theory, the claims in these cases would now be cognizable.

[4] Indeed, if Plaintiffs' "listing" theory were correct, *Morrison* itself was wrongly decided. Like RBS, National Australia Bank ("NAB"), the issuer defendant in *Morrison*, listed and traded its ADRs on the NYSE. *See Morrison*, 130 S. Ct. at 2875 (noting that NAB "*listed* on the [NYSE] … ADRs, which represent the right to receive a specified number of … Ordinary Shares"). To be sure, the *Morrison* Court had no occasion to decide whether claims based on purchases of NAB's ADRs were cognizable under § 10(b), because such claims had been dismissed below and not appealed. *Id.* at 2876 n.1. But it is not true that the *Morrison* Court "did not consider those ADRs in its analysis." (Opp. 4.) The Court noted the fact of the listing attendant to the ADRs and nevertheless dismissed all of plaintiffs' claims.

stock exchange" as a natural way to describe the first of the two categories of securities that can be bought in the United States, and as to which § 10(b) claims, therefore, may validly rest: (1) *listed* securities that trade on a U.S. exchange; or (2) unlisted securities that trade in the United States on a "face-to-face" or "over-the-counter" basis.[5]

And the fact that RBS had ordinary shares listed in the United States is also unremarkable. Such a listing—actually of only a small and discrete subset of RBS's ordinary shares—was required to enable ADRs based on those specific RBS ordinary shares to be listed and sell in the United States.[6]

It is, thus, unsurprising that no court to consider *Morrison* has adopted Plaintiffs' "listing" theory. Judge Marrero, in fact, expressly considered and rejected an identical claim. In *In re Alstom SA Securities Litigation*, No. 03 Civ. 6595, 2010 WL 3718863, at *2 (S.D.N.Y. Sept. 14, 2010), plaintiffs argued that *Morrison*'s transactional test was met "because [] common shares were registered and listed on the NYSE, though not actually purchased there." Judge

[5] *See Morrison*, 130 S. Ct. at 2882 (citing 15 U.S.C. § 78b, which distinguishes between "transactions in securities as commonly conducted upon securities exchanges and [those conducted on] over-the-counter markets"); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 360-61 (1991) (The central goal of § 10(b) is "to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets.") (quotation omitted); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971) (Section 10(b) applies to "the purchase or sale of securities whether conducted in the organized markets or face to face.").

[6] Plaintiffs presumably understand as much. In their brief they cite to RBS's Form 8-A, which clearly states that "Application [to register RBS's ordinary shares under the Exchange Act] is made for listing, not trading, but *only* in connection with the registration of American Depositary Shares." (*See* Declaration of Steven J. Toll ("Toll Decl.") Ex. C (emphasis added).) As part of the process of registering and listing its ADRs for trading on the NYSE, RBS was required to register and list only a *discrete set* of its ordinary shares. (*See id.* Ex. A, at 2-19 ("ADRs … evidence an interest in segregated securities of a foreign issuer. ADRs are usually issued by a U.S. commercial bank (the 'Depositary') with whose foreign correspondent (the 'Custodian') the underlying shares have been deposited.").) As part of its ADR offering, RBS registered approximately 130.5 million ordinary shares (*see id.* Ex. B (RBS Form F-4)) out of a total float of approximately 9.5 billion shares (*see* Second Supplemental Declaration of David S. Lesser Ex. 1, RBS Form 424B3, at 111 (filed herewith)), meaning that RBS registered only approximately 1.4 percent of its ordinary shares in the United States. Moreover, RBS first registered such ordinary shares effective on October 1, 2007, and applied to list ordinary shares on October 4, 2007 (Toll Decl. Ex. C), *after* many of RBS's alleged misstatements occurred. (*See* CAC ¶¶ 273-304.)

Marrero rejected that claim, noting that "[alt]hough isolated clauses of the [*Morrison*] opinion may be read as requiring only that a security be 'listed' on a domestic exchange for its purchase anywhere in the world to be cognizable under the federal securities laws, those excerpts, read in total context, compel the opposite result." *Id.* He noted that a holistic reading of *Morrison* shows that "the Court was concerned with *the territorial location where the purchase or sale was executed and the securities exchange laws that governed the transaction.*" *Id.* at 3 (emphasis added). *See also id.* (The "most natural and elementary reading of *Morrison*" is "[t]hat the transactions themselves must occur on a domestic exchange to trigger application of § 10(b).").

Similarly, in *Sgalambo v. McKenzie*, No. 09 Civ. 10087, 2010 WL 3119349 (S.D.N.Y. Aug. 6, 2010), plaintiff investors purchased securities of a Canadian issuer on the Toronto Stock Exchange ("TSX") while those securities were also listed on a U.S. exchange. *Id.* at *1. Defendants moved, based on *Morrison*, to dismiss the claims of investors who purchased shares on the TSX. Refreshingly refusing to press a contrived interpretation of *Morrison*, plaintiffs "concede[d] that … *Morrison* … foreclose[d] any potential class members who purchased Canadian Superior common stock on a foreign exchange … from recovering in th[e] action." *Id.* at *17. Judge Scheindlin agreed, finding that "[t]he parties [we]re correct that *Morrison* prevent[ed] such plaintiffs from recovering" and dismissing "the claims of any potential class members who purchased Canadian Superior common stock on a foreign exchange." *Id.* There was no suggestion that the fact of the issuer's U.S. listing gave plaintiffs any lifeline.[7]

[7] The other decisions to apply *Morrison* have, similarly, held that it categorically precludes § 10(b) suits based on purchases of shares on a foreign exchange. *See Cornwell v. Credit Suisse Grp.*, No. 08 Civ. 3758, 2010 WL 3069597 (S.D.N.Y. July 27, 2010), *reconsideration denied*, 2010 WL 3291800 (S.D.N.Y. Aug. 11, 2010); *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, No. 09 Civ. 7058, 2010 WL 3291579 (S.D.N.Y Aug. 16, 2010); *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118, 2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010); *In re Societe Generale Sec. Litig.*, No. 08 Civ. 2495, slip op. (S.D.N.Y. Sept.

**B. Plaintiffs Did Not Purchase Their Ordinary Shares In The United States**

Plaintiffs, alternatively, argue that their purchases of RBS ordinary shares on foreign exchanges in London, Frankfurt, or Amsterdam were actually made "in the United States" and thus survive *Morrison*. (Opp. 6.) This argument may be swiftly interred.

As discussed above, *Morrison* makes clear that, under its location-of-the-transaction test, the Exchange Act categorically does not reach a purchase of a security on a foreign exchange. Thus, the Supreme Court "reject[e]d the notion that that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad," noted that "no one … thought the Act was intended to 'regulat[e]' foreign securities exchanges," and emphasized that there is no "national public interest" in "transactions conducted upon foreign exchanges and markets." 130 S. Ct. 2882, 2884-85. The Court also emphasized that "foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction" and stated that it was—at the request of amici including foreign governments—adopting a transactional test that would avoid interfering with foreign securities regulation. *Id.* at 2885-86.

Plaintiffs seek to distinguish *Morrison* factually, alleging that they are U.S. residents who were in the country when they decided to buy RBS shares, "on the direction of their [U.S.]-based asset managers." (*See* Opp. 6 (noting that *Morrison* plaintiffs were "all Australians" and that "all aspects of [their] purchases … took place outside the United States").) But the Supreme Court anticipated—and rejected—arguments that § 10(b) applies to foreign transactions if there is some U.S. factual nexus, observing that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with [U.S.] territory" and that "the presumption against extraterritorial

---

29, 2010); *In re Banco Santander Sec. - Optimal Litig.*, No. 09 Civ. 20215, 2010 WL 3036990 (S.D. Fla. July 30, 2010); *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, No. 09 Civ. 23248, 2010 WL 3119908 (S.D. Fla. Aug. 6, 2010); *Stackhouse v. Toyota Motor Co.*, No. 10 Civ. 0922, 2010 WL 3377409 (S.D. Cal. July 16, 2010).

application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 130 S. Ct. at 2884 (emphasis in original).

Not surprisingly, courts applying *Morrison* have uniformly held that "§ 10(b) [does] not extend to foreign securities trades executed on foreign exchanges even if purchased or sold by American investors, and even if some aspects of the transaction occurred in the United States." *Cornwell*, 2010 WL 3069597, at *5.[8] As these cases recognize, a proposal like Plaintiffs', under which a purchase or sale on a foreign exchange could be deemed "domestic," would effectively rehabilitate the malleable and fact-specific tests that *Morrison* interred, and revive the "vagueness, inconsistency and unpredictability" in the application of § 10(b) that the Supreme Court sought to eliminate. *Id.* at *3.[9] As Judge Marrero put it, such a proposal:

> would invite [the] extensive analysis required to parse foreign securities trades so as to assess quantitatively how many and which parts or events of the transactions occurred within United States territory, and then to apply value judgments to determine whether the cluster of those activities sufficed to cross over the threshold of enough domestic contacts to justify extraterritorial application of § 10(b). The complexity inherent in such far-reaching inquiries and fine-line judgments … formed a central element of the *Morrison* Court's "damning indictment" of the conduct and effect tests.

*Id.* at *4 (citing *Morrison*, 130 S. Ct. at 2879); *see also In re Alstom*, 2010 WL 3718863, at *2.

---

[8] *See also In re Alstom*, 2010 WL 3718863, at *2 (rejecting argument that "purchases of Alstom securities recorded on Euronext are domestic transactions under *Morrison* because such purchases were initiated in the United States"); *In re Societe Generale*, No. 08 Civ. 2495, slip op. at 8-10 (holding categorically that "[w]here … domestic plaintiffs purchased shares … on a foreign exchange, the Exchange Act is inapplicable"); *Quail Cruises*, 2010 WL 3119908, at *3 (rejecting argument that stock purchases were domestic transactions merely because the parties intended to close in Miami and documents associated with the transaction were sent there); *Stackhouse*, 2010 WL 3377409, at *1 (rejecting argument that "if the purchaser or seller resides in the United States and completes a transaction on a foreign exchange from the United States, the purchase or sale has taken place in the United States").

[9] *See also In re Banco Santander*, 2010 WL 3036990, at *6 ("looking to the subjective intent" of investors to "determine whether the securities act applies … would eliminate the doctrinal clarity … provided in *Morrison*"); *Quail Cruises*, 2010 WL 3119908, at *3 ("The principal takeaway from *Morrison* is that Congressional intent, not the intent of the parties, is dispositive of the application of federal securities law to foreign securities transactions. Adopting a rule that permits the intent of parties … to [dictate the] appl[ication of] United States securities law is inconsistent with *Morrison*.").

Plaintiffs' proposal is, finally, belied by the text of the Exchange Act itself.[10] The Act defines a "purchase" as "any contract to buy, purchase, or otherwise acquire," and a "sale" as "any contract to sell or otherwise dispose of." 15 U.S.C. §§ 78c(a)(13), (14). Such a contract "creates enforceable rights and obligations between the parties." *Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1176 (S.D.N.Y. 1974); *see also Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954) (citing § 78c(a)(13) definition of "purchase" for finding that purchase occurred when buyer's obligation to pay for stock was finalized). By definition, Plaintiffs did not hold any rights or incur any obligations with respect to the RBS ordinary shares purchased until after their orders were entered and executed on a foreign exchange.[11]

### C. Lead Plaintiffs Lack Standing To Pursue Claims Based On ADR Purchases

Lead Plaintiffs MassPRIM and MissPERS do not allege that they purchased ADRs. They argue instead that, if any Exchange Act claims based on purchases of RBS ordinary shares survive RBS's motion to dismiss, they should be permitted to represent purchasers of RBS

---

[10] Contrary to Plaintiffs' claim (Opp. 7), *Morrison* does not suggest that the definition of an "offshore transaction" for purposes of Regulation S of the Securities Act, 17 C.F.R. § 230.902(h), defines a "domestic transaction" under the transactional test laid out therein. *Morrison*, 130 S. Ct. at 2885.

[11] The cases cited by Plaintiffs, which long predate *Morrison*, are inapposite. In *Shaw v. Dreyfus*, the receipt of rights to purchase stock was held not to involve an investment decision and therefore was not a "purchase." 172 F.2d 140, 142 (2d Cir. 1949). The court did *not* hold that the Exchange Act's definition of "purchase" was affected by its observation that a "purchase," as "generally understood," is "to acquire something by one's own act or agreement." *Id.* In *In re Adelphia Communications Corporation Securities and Derivatives Litigation*, the court addressed the entirely separate issue whether the receipt of a dividend is a "purchase" under § 10(b) and held that one relevant factor was whether plaintiff had made "an informed investment decision." 398 F. Supp. 2d 244, 259 (S.D.N.Y. 2005). The cases Plaintiffs cite addressing the location of a sale under the securities laws of Iowa and Illinois (Opp. 8) are inapposite because those laws define "sale" much more broadly than the Exchange Act. *See Getter v. R.G. Dickinson & Co.*, 366 F. Supp. 559, 573 (S.D. Iowa 1973) (Iowa securities law defined "sale" to include "every … disposition of, or attempt to dispose of, a security."); *Green v. Weis, Voisin, Cannon, Inc.*, 479 F.2d 462, 465 (7th Cir. 1973) (Illinois securities law defined "sale" to "have the full meaning of that term as applied by or accepted in courts of law or equity, and shall include every disposition, or attempt to dispose, of a security."). Finally, Plaintiffs' claim that courts have "interpreted the definition of 'sale' broadly to include the location of the buyer" (Opp. 7) is wrong. The Federal Circuit case on which Plaintiffs rely for that proposition is grossly inapposite to the securities context, as reflected in the case's reference to "points along the shipment route" between the buyer and seller. *North Am. Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994).

ADRs, which trade domestically. (Opp. 9.) This argument is wholly academic. As discussed, *Morrison* compels the dismissal of all Exchange Act claims based on purchases of ordinary shares. Lead Plaintiffs thus will have no stake in the outcome of the Exchange Act claims.[12]

## II. THE EXCHANGE OFFER AND RIGHTS ISSUE CLAIMS MUST ALSO BE DISMISSED

Plaintiffs declare that, because *Morrison* involved solely an Exchange Act claim, it has no bearing on their Securities Act claims relating to the Rights Issue and the Exchange Offer. (Opp. 10-11.) But, as previously noted, the Supreme Court in *Morrison* expressly equated the territorial reach of the Exchange Act to that of the Securities Act, much as the Second Circuit has historically treated the territorial reach of the two statutes as commensurate. (*See* RBS Br. 8.) Thus, for the reasons previously stated (*id.* 9-12), the Rights Issue and Exchange Offer claims, both of which involve securities transactions executed outside the United States, fall outside the reach of the Securities Act. It is no answer to state that such analysis is "mechanical." (Opp. 11.) That is the nature of a bright-line rule, which the Supreme Court deliberately adopted. *See Morrison*, 130 S. Ct. at 2879-80 (rejecting prior conduct and effects tests because they "were not easy to administer" and privy to "unpredictable and inconsistent application").[13]

[12] Assuming *arguendo* that Plaintiffs' ordinary claims survived the motions to dismiss, Lead Plaintiffs would lack standing to raise claims based on securities purchases they did not make. *See*, *e.g.*, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 174-75 (S.D.N.Y. 2009) (rejecting argument that "holders of one type of security have standing to represent holders of other types of securities so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security" and dismissing for lack of standing all claims based on purchases of securities that no named plaintiff purchased (citation omitted)). Indeed, the Supreme Court has refused to "allow standing as to one claim to suffice for all claims arising from the 'same nucleus of operative fact,'" emphasizing that "standing is not dispensed in gross." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006) (citations omitted). Plaintiffs cite no contrary authority.

[13] In any event, as RBS has explained, the Securities Act claims relating to both the Rights Issue and the Exchange Offer must clearly be dismissed for reasons independent of *Morrison*. (*See* RBS MTD Br. 65-67; RBS SMJ Br. 35-39; RBS Br. 9-12.) This, no doubt, explains Plaintiffs' lackluster defense of these claims in its opposition brief.

## CONCLUSION

For the reasons set forth above, RBS respectfully requests that this Court: (1) dismiss the Exchange Act Claims (Counts One and Two); (2) dismiss the Securities Act Claims based on the Rights Issue and Exchange Offer (Counts Six through Ten); and (3) remove Lead Plaintiffs MassPRIM and MissPERS.

Dated: September 29, 2010

Respectfully submitted,

/s/ Paul A. Engelmayer
Paul A. Engelmayer
Robert W. Trenchard
David S. Lesser
WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Telephone: 212-230-8800
Fax: 212-230-8888
paul.engelmayer@wilmerhale.com

Counsel for The Royal Bank of Scotland Group plc