UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
In Re ROYAL BANK OF SCOTLAND GROUP PLC

SECURITIES LITIGATION,                               09 Civ. 300 (DAB)

                                              MEMORANDUM AND ORDER

----------------------------------------x

DEBORAH A. BATTS, United States District Judge.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: //11/11

## I. INTRODUCTION

Massachusetts Pension Reserves Investment Management Board
("MassPRIM") and Public Employees Retirement System of
Mississippi ("MissPERS") are Co-Lead Plaintiffs on behalf of the
putative class of Plaintiffs who owned ordinary shares of RBS,
while the Freeman Group is Lead Plaintiff on behalf of the
putative class of Plaintiffs who purchased RBS preferred shares
(collectively, "Plaintiffs").  Plaintiffs filed this consolidated
securities class action against Defendants The Royal Bank of
Scotland Group plc ("RBS"), a British company whose ordinary (or
common) shares are listed on the London Stock Exchange and
Euronext Amsterdam stock exchange; Merrill Lynch, Pierce, Fenner
& Smith Inc.; Greenwich Capital Markets Inc. (n/k/a RBS
Securities Inc.); Wachovia Capital Markets, LLC (n/k/a Wells
Fargo Securities, LLC); Morgan Stanley & Co. Incorporated; UBS
Securities LLC; Banc of America Securities LLC; RBC Dain Rauscher
Inc. (n/k/a RBC Capital Markets Corporation); Citigroup Global

1

Markets Inc.; A.G. Edwards & Sons, Inc.; Goldman, Sachs & Co. (collectively, the "Underwriter Defendants"); Sir Fred Goodwin; Sir Tom McKillop; Guy Whittaker; John Cameron; Lawrence Fish; Gordon Pell; Mark Fisher; Colin Buchan; Jim Currie; Sir Steve Robson; Robert Scott; Peter Sutherland; Archie Hunter; Charles Koch; Joseph MacHale; Chris Campbell; Janis Kong; William Friedrich (collectively, the "Individual Defendants"); Goldman Sachs International; Merrill Lynch International and UBS Limited (collectively, the "International Underwriter Defendants").

Essentially, Plaintiffs allege that they, along with other investors, suffered massive losses in shareholder value as a result of a series of write-downs that occurred at RBS due to RBS's substantial holdings in subprime and other mortgage-related assets. Plaintiffs allege that certain actions (or inactions) taken by RBS, RBS management and underwriters prior to and during these writedowns, which happened during the overall global financial crisis, amounted to violations of U.S. securities laws.

On July 15, 2009, Plaintiffs filed their Consolidated Amended Complaint ("CAC"). On October 23, 2009, RBS, the RBS Individual Defendants and the Underwriter Defendants all filed their Motions to Dismiss pursuant to Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ.

2

P."), as well as for forum non conveniens.[1]  On January 15, 2010,
Plaintiffs filed their opposition to Defendants' motions.  The
motions became fully submitted on February 19, 2010.

However, on June 24, 2010 the U.S. Supreme Court decided
Morrison v. National Australia Bank Ltd, 130 S.Ct. 2869 (2010),
which addresses the extent of the extraterritorial reach of U.S.
securities laws. On July 8, 2010, the Court memo-endorsed the
parties July 7, 2010 joint letter request for supplemental
briefing on the impact of Morrison as to the ordinary share
claims.[2]  In the July 7, 2010 letter, Defendants agreed not to
address the substance of the other grounds for dismissal that
Defendants have identified in their pretrial motions, including
forum non-conveniens.  The Parties agreed to reserve arguments on
all non-Morrison issues until after the Court has resolved the
immediate impact of Morrison on this case.  Accordingly, it its
Order dated September 24, 2010, the Court stated that it will not

---

[1]     Certain defendants also filed documents related to
their motions to dismiss on October 29 and November 6, 2009.
Also, on November 17, 2009, the Court "so ordered" the parties
stipulation to stay the case as to Goldman Sachs International,
Merrill Lynch International and UBS Limited (the "International
Underwriter Defendants") until the Court rules on the pending
Motions to Dismiss.

[2]     In the same July 7, 2010 letter, Defendants and
Preferred Share Plaintiffs agreed that Morrison did not bear
directly on the Preferred Share claims and no supplemental
briefing was sought as to the Preferred Share claims.

consider any arguments on the original motions to dismiss until after any resolution of the _Morrison_ issues.

On September 29, 2010, the parties fully supplemented their previous submissions in light of _Morrison_, in which the Supreme Court "reject[ed] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad" and adopted the so-called "transactional test" pursuant to which "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 130 S.Ct. at 2885, 2888.

Defendants argue, _inter alia_, that: (1) _Morrison_ requires dismissal of the Exchange Act claims; (2) the Exchange Offer and Rights Issue claims must also be dismissed as the Securities Act does not apply extraterritorially, the Exchange Offer claims do not involve domestic securities transactions, and the Rights Issue claims do not involve domestic securities transactions; and (3) dismissal of RBS ordinary share claims would leave Lead Plaintiffs MassPRIM and MissPERS without standing to proceed and they should be dismissed.

4

Plaintiffs argue, _inter alia_, that: (1) <u>Morrison</u> does not bar claims relating to the purchase of securities listed on an American stock exchange; (2) MassPRIM and MissPERS purchased their RBS ordinary shares in the United States; (3) <u>Morrison</u> does not bar claims based on purchases of ADRs; and (4) <u>Morrison</u> does not apply to Securities Act claims.

For the reasons set forth below, Counts One, Two, Six, Seven, Eight, Nine and Ten are HEREBY DISMISSED, with prejudice. In addition, Co-Lead Plaintiffs MassPRIM and Public Employees Retirement System of Mississippi, along with their counsel, Cohen Milstein Sellers & Toll PLLC, Labaton Sucharow LLP, and Wolf Popper LLP, are HEREBY DISMISSED from this action, with prejudice.

## II. FACTUAL BACKGROUND[3]

A. Rise and Near Collapse of RBS

This is a class action on behalf of those who purchased RBS securities through several public offerings and on the open market between March 1, 2007 and January 19, 2009 ("Exchange Act

---

[3]     For purposes of this motion, the allegations contained in the 256 page Consolidated Amended Complaint, or CAC, are taken as true. <u>See</u> <u>State Employees Bargaining Agent Coal. v. Rowland</u>, 494 F.3d 71, 77 (2d Cir. 2007).

Class Period") and investors who purchased RBS Series Q, R, S, T and U preferred share offerings. (CAC ¶ 1.) According to the CAC, RBS is one of the oldest and, prior to former CEO Sir Frederick Goodwin's tenure, was one of the most conservative banks in the United Kingdom (the "U.K."). (CAC ¶ 2.)

Under Goodwin's leadership, from 2001 to 2008, RBS's assets increased over 650%, from £368 billion ($558 billion) to £2.4 trillion ($4.5 trillion). (CAC ¶ 3.) For the year ended December 31, 2008, RBS reported a loss of £32.6 billion ($47.2 billion). Goodwin was dismissed following the collapse and virtual nationalization of RBS by the British government.[4] (CAC ¶ 3.)

Throughout this period of rapid expansion, RBS's SEC filings described elaborate risk management procedures purportedly followed by the Company. (CAC ¶ 5.) RBS consistently represented that it had strong financial and risk management controls in place. (CAC ¶ 5.) In 2006 and 2007, as concerns over banks' so-called "subprime" exposure grew, analysts asked if RBS was exposed to such risky assets. (CAC ¶ 5.) In response, Goodwin and other senior officers at RBS dismissed the analysts' concerns and assured the investment community that RBS and its subsidiaries

---

[4]     As of approximately July 2009, the U.K. government had acquired a 70% ownership stake in RBS to prevent its total collapse as RBS lost £47 billion ($87 billion) of market value from its peak in December 2007. (CAC ¶ 4.)

6

"don't do sub-prime," and emphasized both the soundness of its risk management controls and the conservative nature of its business practices. (CAC ¶¶ 5, 276, 281.)

Plaintiffs allege that these statements were false and misleading as RBS had in fact accumulated billions of pounds of risky subprime assets. (CAC ¶ 6.) Beginning in 2003, and throughout the housing boom, RBS's Connecticut-based bond house, Greenwich Capital Markets generated vast profits by selling mortgage debt to the financial markets as asset-backed securities ("ABS") and packaging them together into collateralized debt obligations ("CDO"). (CAC ¶ 6.) These investment vehicles, created by buying various kinds of debt, pooling them together and using them to back the issuance of bonds, were in large part based on mortgage-backed securities ("MBS"), including securities backed by subprime, Alt-A and other high-risk residential mortgages. (CAC ¶ 6.)

Unbeknownst to investors, however, as the market for these securities became increasingly illiquid beginning in late 2006, RBS was forced to retain interests in many of these ABS CDOs. (CAC ¶ 7.) Retaining interest in these ABS CDOs meant that RBS also retained the investment risk associated with these securities. (CAC ¶ 7.) Another U.S. subsidiary of RBS, Citizens Financial Group, Inc. ("Citizens"), also took on significant

exposure to subprime and non-conforming loans during a period of rapid growth. (CAC ¶ 7.)

As the U.S. mortgage industry began to decline, there was a sharp increase in default rates on subprime mortgages. (CAC ¶ 8.) By the summer of 2007, as the market for its CDOs dried up, RBS's subprime exposure had reached at least £34 billion ($68 billion)—£20 billion ($40 billion) in its investment banking division and £14 billion ($28 billion) in Citizens. (CAC ¶ 8.) Throughout this period, however, RBS maintained in public statements and securities filings that it had no significant exposure to the subprime loan market and that its risk management practices and financial controls were sound. (CAC ¶ 8.)

Despite this environment, in October 2007, as part of a three member consortium, RBS purchased 38% of Dutch banking giant ABN AMRO Group ("ABN AMRO") for approximately $38 billion in cash and securities. (CAC ¶ 9.) Goodwin and other RBS senior executives pronounced the deal "compelling from a financial point of view" and touted the "synergies" and "accretions" that would result from merging the two companies. (CAC ¶ 9.)

Shortly thereafter, in December 2007, RBS acknowledged that the Company held portfolios of subprime loans through both Greenwich and ABN AMRO, but downplayed the extent of RBS's

exposure, reporting just over £1 billion ($2 billion) in losses. (CAC ¶ 10.) RBS assured investors that the Company was well capitalized and still on target to report profits for the year "comfortably ahead of consensus" forecasts of £9.78 billion ($20 billion). The securities markets accepted RBS's assurances. (CAC ¶ 10.)

However, on April 22, 2008, RBS announced a £5.9 billion ($11.6 billion) asset write-down, nearly one-third of which was attributable to subprime assets carried over from ABN AMRO. (CAC ¶ 11.) The other two-thirds were tied primarily to ABSs and other similar assets held by Greenwich and Citizens. (CAC ¶ 11.) On that same date, RBS announced a £12 billion ($23.7 billion) rights issue (the "Rights Issue") to increase the Company's capital base.[5] (CAC ¶ 12.) The Rights Issue, the largest in European history, was needed in large part because of the £5.9 billion ($11.6 billion) writedown. (CAC ¶ 12.)

In explaining the need for the Rights Issue, RBS admitted that it "purchased ABN AMRO at a point when bank valuations were way higher than they are today," and that the purchase "also increased our exposure to wholesale markets at an unfortunate

---

[5]     Plaintiffs allege that Goodwin and other RBS officers had previously assured analysts and investors a number of times that RBS did not have any plans, or need, to raise capital.

time . . . ." (CAC ¶ 13.)  Plaintiffs allege that this admission,

coupled with other materially adverse developments, clearly

indicated that the billions of pounds of goodwill RBS had

recorded on its balance sheet in connection with the ABN AMRO

acquisition (and others) might be impaired. (CAC ¶ 14.) However,

rather than test the ABN AMRO goodwill, as required by applicable

accounting standards, RBS instead assured investors that no

impairment was necessary. (CAC ¶ 14.)  RBS's failure to account

accurately for goodwill induced investors to participate in the

£12 billion ($23.7 billion) Rights Issue by overstating the

strength of RBS's balance sheet.[6] (CAC ¶ 14.)

The Rights Issue was successful, resulting in the issuance

of more than 5.8 billion new RBS ordinary shares. (CAC ¶ 16.)

After raising £12 billion ($23.7 billion) through the Rights

Issue, Defendants assured investors that they had achieved their

target capital ratios and continued to tout the purported

benefits of the ABN AMRO acquisition. (CAC ¶¶ 17, 18.)

Finally, on January 19, 2009, RBS admitted that due to the

volume of subprime exposure the Company had taken on between 2005

---

[6]    The Exchange Act Plaintiffs allege that Defendants knew
that if they followed proper accounting procedures and wrote down
billions of pounds in goodwill, they would not have been able to
raise the £12 billion ($23.7 billion) in capital that was needed.
(CAC ¶ 15.)

and 2008 and the failure of the ABN AMRO acquisition, it would report a loss of £28 billion ($41.3 billion) for 2008. (CAC ¶ 19.) Following this disclosure, RBS ordinary shares lost more than 65% of their value, closing at £0.12 ($0.17) per share. (CAC ¶ 19.)

Plaintiffs allege that investors in RBS securities have suffered devastating losses as a direct consequence of RBS's undisclosed speculation in subprime assets, failure to value properly those assets and failure to take timely writedowns of goodwill related to the ABN AMRO acquisition. (CAC ¶ 22.) Defendants' false statements and failure to disclose material facts caused RBS securities to trade at inflated prices during the Class Period. (CAC ¶ 22.) The tens of billions of ordinary RBS shares outstanding have declined 98% in value, from a high of £6.02 ($11.60) per share on March 6, 2007 to £0.12 ($0.17) per share upon RBS's January 19, 2009 announcement that it would post a record-breaking £28 billion ($41.3 billion) loss for 2008.[7] (CAC ¶ 22.)

---

[7] Although not the subject of the <u>Morrison</u> supplemental briefing, RBS also relied on a series of preferred stock issuances to fund its asset growth, expansion into the risky subprime loan market, and acquisition of ABN AMRO. (CAC ¶ 23.) RBS raised more than $5.3 billion through the sale of preferred shares in 2006 and 2007. (CAC ¶ 23.) These securities have declined in value by as much as 83% and continue to sell for less than 50% of their original issue price. (CAC ¶ 23.)

B. Overview of the Separate Claims

### 1. Ordinary Share Exchange Act Claims

In Counts One and Two, Plaintiffs allege claims for violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder, against RBS and certain Individual Defendants. Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS securities during the Class Period - from March 1, 2007 through January 19, 2009.

### 2. Preferred Share Securities Act Claims

In Counts Three, Four and Five, Plaintiffs allege claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. § 77l(a)(2), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against certain Defendants. Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS Series Q, R, S, T and/or U Non-cumulative Dollar Preference Shares issued by RBS pursuant or traceable to the

April 8, 2005 Registration Statement (the "Preferred Share Offerings").

### 3. Exchange Offer Securities Act Claims

In Counts Six, Seven and Eight, Plaintiffs assert claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. § 77l(a)(2), against certain Defendants. Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who tendered ABN AMRO ordinary shares in exchange for RBS ordinary shares issued by RBS pursuant or traceable to the prospectus filed with the SEC on July 20, 2007 (the "Exchange Offer Prospectus").

### 4. Rights Issue Securities Act Claims

Finally, in Counts Nine and Ten, Plaintiffs assert claims for violations of Section 12(a)(2) and 15 of the Securities Act, 15 U.S.C. § 77l(a)(2), against certain Defendants. Plaintiffs bring these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired RBS ordinary shares issued by RBS pursuant

or traceable to the Rights Issue prospectus, filed with the SEC on April 30, 2008 (the "Rights Issue Prospectus").

In total, Defendants argue that Counts One, Two, Six, Seven, Eight, Nine and Ten of the Consolidated Amended Complaint should be dismissed pursuant to the Supreme Court's decision in Morrison.

### III. DISCUSSION

A. Motion to Dismiss Standard

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," the Supreme Court has explained:

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009) (quoting Twombly, 550 U.S. at 556-57). "A complaint asserting securities fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires fraud to be

14

alleged with particularity." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001).

## B. Application of <u>Morrison</u>

Defendants argue, <u>inter alia</u>, that: (1) <u>Morrison</u> requires dismissal of the Exchange Act claims (Counts One and Two); (2) the Exchange Offer claims (Counts Six through Eight) and Rights Issue claims (Counts Nine and Ten) must also be dismissed as the Securities Act does not apply extraterritorially, the Exchange Offer claims do not involve domestic securities transactions, and the rights issue claims do not involve domestic securities transactions; and (3) dismissal of RBS ordinary share claims would leave Lead Plaintiffs MassPRIM and MissPERS without standing to proceed and they should be dismissed.

Under <u>Morrison</u>, "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 130 S.Ct. at 2888. "[I]t is the foreign location of the transaction that establishes (or reflects the presumption of) the [Exchange] Act's inapplicability.... [W]e reject the notion that the Exchange Act reaches conduct in this

country affecting exchanges or transactions abroad...." Id. (emphasis in original). "Trade in ADRs is considered to be a 'predominantly foreign securities transaction.'" In re Societe Generale Securities Litigation, 2010 WL 3910286, *4 (S.D.N.Y. 2010)(quoting In re SCOR Holding (Switzerland) AG Litis., 537 F.Supp. 2d 556, 562 (S.D.N.Y. 2008)); see also Copeland v. Fortis, 685 F.Supp. 2d 498, 506 (S.D.N.Y. 2010).


1. The Exchange Act Claims

(a) Ordinary Shares

Defendants argue that in light of Morrison, Plaintiffs' Exchange Act claims (Counts One and Two), which are based on the purchase and sale of RBS ordinary shares, must be dismissed. (Defs.' Mot. at 5.) Defendants argue that the Consolidated Amended Complaint does not allege that RBS ordinary shares were purchased or sold on an American stock exchange, see CAC ¶ 33, or otherwise in the United States. Morrison, 130 S.Ct. at 2888 ("Section 10(b) [of the Exchange Act] reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States.").

16

Conversely, Plaintiffs argue that the plain reading of

_Morrison_ requires that when a security is "listed" on an American

stock exchange, Section 10(b) applies, regardless of whether the

security is purchased in the U.S. or through the American

exchange.[8] (Pls.' Opp. at 2.) Plaintiffs seize on the following

language from _Morrison_: Section 10(b) covers both "the purchase

or sale of a _security listed_ on an American stock exchange, and

the purchase or sale of any other security in the United States."

130 S. Ct. at 2888 (emphasis added). Plaintiffs' reading of

_Morrison_ suggests that the listing itself provides the

U.S.-nexus, thus requiring the application of Section 10(b) any

time there is such a listing. Plaintiffs would argue that RBS's

ordinary shares were clearly "listed" (and registered) on the

NYSE in October 2007, for _Morrison_ purposes, as RBS listed and

registered American Depository Shares (and as evidenced by

American Depository Receipts or "ADRs"). (_Id._ at 2-3.)

Plaintiff's arguments fail under _Morrison_. The idea that a

foreign company is subject to U.S. Securities laws everywhere it

conducts foreign transactions merely because it has "listed" some

---

[8]     Plaintiffs argue the text of Section 10(b) supports
their reading of _Morrison_.  Section 10(b) prohibits, inter alia,
deceptive conduct "in connection with the purchase or sale of any
security registered on a national securities exchange[.]" 15
U.S.C. § 78j(b).

securities in the United States is simply contrary to the spirit of _Morrison_. (Pls.' Opp. at 2-6.) Plaintiffs seize on specific language without at all considering, or properly presenting, the context. The _Morrison_ Court did conclude that it was their "view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies." 130 S.Ct. at 2884. However, the Court's language merely tracks the language of the statute, which is less specific and reads, "any security registered on a national securities exchange." _See_ 15 U.S.C. § 78j(b). In the next paragraph, the Court makes clear its concern is on the true territorial location where the purchase or sale was executed and the particular securities exchange laws that governed the transaction: "[w]e know of no one who thought that the Act was intended to 'regulat[e]' foreign securities exchanges-or indeed who even believed that under established principles of international law Congress had the power to do so. The Act's registration requirements apply only to securities listed on national securities exchanges." _Morrison_, 130 S.Ct. at 2884-85.

Plaintiffs interpretation would be utterly inconsistent with the notion of avoiding the regulation of foreign exchanges.

This Court is not the first to read <u>Morrison</u> in this way.[9] <u>See</u>
<u>In re Alstom SA Securities Litigation</u>, 2010 WL 3718863, at *2-3
(S.D.N.Y. Sept. 14, 2010)(holding that the "most natural and
elementary reading of Morrison" is "[t]hat the transactions
themselves must occur on a domestic exchange to trigger
application of §10(b)."); <u>Sgalambo v. McKenzie</u>, 2010 WL 3119349
(S.D.N.Y. Aug. 6, 2010) (dismissing claims after the plaintiffs
conceded that <u>Morrison</u> foreclosed any potential class members who
purchased Canadian Superior common stock on a foreign exchange);
<u>see also</u> <u>Anwar v. Fairfield Greenwich Ltd.</u>, 2010 WL 3341636
(S.D.N.Y. Aug. 18, 2010); <u>Terra Sec. ASA Konkursbo v. Citigroup,</u>
<u>Inc.</u>, 2010 WL 3291579 (S.D.N.Y. Aug. 16, 2010); <u>Cornwell v.</u>
<u>Credit Suisse Grp.</u>, 2010 WL 3069597 (S.D.N.Y. July 27, 2010).

Plaintiffs also argue that unlike the situation in <u>Morrison</u>
where the plaintiffs were "all Australians" and "all aspects of
the purchases . . . took place outside the United States,"
<u>Morrison</u>, 130 S.Ct. at 2876, 2888, here their purchases occurred
within the United States because: (1) MassPRIM and MissPERS are
indisputably residents in the United States evidencing their
purchases occurred here; and (2) MassPRIM and MissPERS can

_____

[9]     Plaintiffs arguments are also badly undercut by the
fact that the issuer in <u>Morrison</u> - National Australia Bank - had
ADRs traded on the NYSE.

demonstrate that their decisions to purchase many of their RBS ordinary shares were made in the United States, based on the direction of their United States-based asset managers. As Plaintiffs would have it - these purchases and sales are sufficient to establish "domestic transactions...in securities." Id. at 2884.

However, the Supreme Court "reject[e]d the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad, the Court noted that "no one … thought the Act was intended to 'regulat[e]' foreign securities exchanges," and emphasized that there is no "national public interest" in "transactions conducted upon foreign exchanges and markets." Morrison, 130 S.Ct. at 2882, 2884-85. The Court also emphasized that "foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction" and stated that it was adopting a transactional test that would avoid interfering with foreign securities regulation. Id. at 2885-86.

Plaintiffs approach - that it is enough to allege that Plaintiffs are U.S. residents who were in the country when they decided to buy RBS shares - is exactly the type of analysis that Morrison seeks to prevent. The Morrison Court did not reject the conduct and effects tests formerly employed by the various

Circuits to replace it with another difficult-to-employ, fact intensive test. <u>Cornwell</u>, 2010 WL 3069597, at *5 ("§ 10(b) [does] not extend to foreign securities trades executed on foreign exchanges even if purchased or sold by American investors, and even if some aspects of the transaction occurred in the United States." ).

### (b) ADRs

Plaintiffs Consolidated Amended Complaint also asserts Exchange Act claims encompassing purchasers of American Depository Receipts ("ADRs"), which trade on the New York Stock Exchange ("NYSE").[10] (<u>See</u> CAC ¶ 33.) Defendants admit that under <u>Morrison</u>, trades on the NYSE fall within the territorial ambit of the Exchange Act. (Defs.' Mot. at 6.) However, Defendants argue that Plaintiffs nevertheless cannot bring claims as to ADRs in this case because none of the Lead Plaintiffs, including MassPRIM and MissPERS, claim to have ever purchased ADRs representing ordinary shares on the NYSE, and as such, Plaintiffs have failed to allege any injury "in connection with the purchase or sale" of ADR shares, as required under Section 10(b). 17 C.F.R. § 240.10b-5.

---

[10]    ADRs representing ordinary shares of RBS have been listed on the NYSE since October 2007.

Plaintiffs argue that if the Court permits MassPRIM and MissPERS to pursue claims based on their purchases of ordinary shares, MassPRIM and MissPERS may also represent purchasers of ADRs; and, unlike shares purchased in different offerings pursuant to different prospectuses and/or public statements (as in the cases cited by RBS in its brief), ADRs are directly tied to the underlying ordinary share, providing the holder of such instrument the right to exchange ADRs for the underlying ordinary shares at any time.

The Court is not convinced by Plaintiffs' arguments. As shown above, the Court is dismissing MassPRIM and MissPERS claims based on their purchases of ordinary shares, so this cannot be used as a basis to pursue claims regarding ADRs. In addition, case law supports dismissal on these ADR claims where Plaintiffs are not purchasers. See, e.g., In re European Aeronautic Def. & Space Co. Sec. Litig., 2010 WL 1191888, at *2, 7 (S.D.N.Y. Mar. 26, 2010) (dismissing securities fraud claims under the formerly employed "effects test" while noting that "the Complaint is bereft of any allegations that putative class members purchased . . . common stock or ADRs in the United States"); N.J. Carpenters Health Fund v. Residential Capital, LLC, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010) ("[C]ourts in the Second Circuit and elsewhere have . . . concluded that a plaintiff must have

22

purchased in the particular offering in order to have standing to challenge related material misstatements and omissions."); N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, plc, 2010 WL 1172694, at *8 (S.D.N.Y. Mar. 26, 2010) (same); Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co., 2010 WL 2175875, at *3 (S.D.N.Y. June 1, 2010) (holding that "because the named plaintiffs only purchased securities in nineteen offerings, any claim based on the other sixty-five offerings must be dismissed with prejudice" and there is no standing if there are "funds in which [plaintiffs] did not personally invest"); In re Lehman Bros. Sec. & ERISA Litig., 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010) (dismissing claims relating to 85 of 94 securities offerings because "no named plaintiff has alleged that he or she purchased Certificates in any of the other eighty-five offerings").

As Plaintiffs bought RBS ordinary shares on foreign securities exchanges, Lead Plaintiffs MassPRIM and MissPERS do not have standing to bring domestic ADR claims and Morrison requires dismissal of Counts One and Two.

2. The Exchange Offer and Rights Issue Claims

   (a)  Exchange Offer Claim

Plaintiffs Exchange Offer Claims (Six through Eight) and the Rights Issue Claims (Nine and Ten) are brought under the Securities Act of 1933. (See CAC ¶¶ 27-28.) Under Morrison, the Securities Act, like the Exchange Act, does not have extraterritorial reach. Morrison, 130 S.Ct. at 2885.[11]

As to the Exchange Offer claims, Defendants argue that given the applicability of Morrison to the Securities Act, the Exchange Offer claims (Counts Six through Eight) must also be dismissed. Defendants argue that Plaintiffs purport to represent a global putative class for the Exchange Offer of "all persons and entities . . . who tendered ABN AMRO ordinary shares in exchange for RBS ordinary shares," including "shareholders outside the U.S." Defendants assert Plaintiffs fail to allege facts that establish that, as to any participating shareholder, the Exchange Offer was a domestic securities transaction and hence within the scope of the Securities Act. More specifically, Defendants argue: (1) the RBS ordinary shares issued in the Exchange Offer

---

[11]     Plaintiffs argue that because Morrison involved solely an Exchange Act claim, it has no bearing on their Securities Act claims. (Pls.' Opp. at 10-11.) However, the Morrison Court clearly expressed that the territorial reach of the Exchange Act and  Securities Act involves the "same focus on domestic transactions." Morrison, 130 S.Ct. at 2885 (emphasis added).

24

were not "listed on an American stock exchange," but instead listed on foreign exchanges, Id. at 2888; and (2) Plaintiffs do not allege that the purchase of RBS ordinary shares pursuant to the Exchange Offer took place in the United States. Id. at 2885 (Securities Act does not include "sales that occur outside the United States").[12] Plaintiffs argue that even if the Court determines that the Morrison decision changed the application of the Securities Act, Plaintiffs claims would still be cognizable for the reasons expressed above with regard to the Exchange Act claims. Plaintiffs maintain the Securities Act claims are valid because RBS's ordinary shares are traded on a domestic exchange and because the shares at issue were purchased in the U.S.

As described, supra, the Court has found that RBS's ordinary shares are not traded on a domestic exchange. It is clear that the RBS ordinary shares issued in the Exchange Offer were not "listed on an American stock exchange," but were instead listed on foreign exchanges. Morrison, 130 S.Ct. at 2888. In addition, the Complaint is void of any allegations that the purchase of RBS ordinary shares pursuant to the Exchange Offer actually took

---

[12] Defendants argue that even if such an allegation were made, Morrison would foreclose it as a basis for invoking the securities laws here, because the shares at issue (RBS ordinary shares) are undisputedly listed and regulated abroad.

place in the United States. Id. at 2885 (Securities Act does not include "sales that occur outside the United States.").

(b)   Rights Issue Claim

Finally, Defendants argue Plaintiffs' Rights Issue claims (Counts Nine and Ten) must also be dismissed. Those claims are asserted on behalf of a putative global class, composed of "all persons and entities . . .who purchased or otherwise acquired RBS ordinary shares issued by RBS pursuant to the Rights Issue prospectus." (CAC ¶ 28.)   Defendants assert that the Rights Issue was not a U.S. public offering, and under settled precedent, it falls entirely outside the scope of the Securities Act.[13] [14]

---

[13]   Defendants assert that U.S. shareholders were generally excluded from participation in the Rights Issue and to the extent they did, it was not through a public offering, but through narrow exceptions, such as that for Qualified Institutional Buyers ("QIBs") under Rule 144A of the Securities Act.   Lead Plaintiffs MissPERS and MassPRIM had QIB status, but did not participate in a U.S. public offering.

[14]   Defendants also argue that even if Rights Issue participants otherwise had a cognizable Securities Act claim, it would be subject to mandatory dismissal pursuant to a binding forum selection clause, which grants "exclusive jurisdiction" to "[t]he courts of England and Wales . . . to settle any dispute which may arise out of or in connection with the Rights Issue." While the Court agrees that Morrison controls as to the Rights Issue claims, this is an additional basis for proper dismissal of these claims.

Morrison is dispositive as to the Rights Issue claims as no U.S. public offering is present and the Rights Issue did not involve a domestic securities transaction. Like the shares issued pursuant to the Exchange Offer, the shares issued pursuant to the Rights Issue were RBS ordinary shares, which the Court has already found to be deficient because of Morrison.[15]

## C. MassPRIM and MissPERS Standing to Proceed

Lead Plaintiffs MassPRIM and MissPERS and their counsel, Cohen Milstein Sellers & Toll PLLC, Labaton Sucharow LLP, and Wolf Popper LLP were appointed by this Court to represent a putative class of purchasers of RBS ordinary shares. For the reasons stated above, all claims based upon purchases of RBS ordinary shares are dismissed. As Lead Plaintiffs MassPRIM and MissPERS are without standing to assert any of the remaining claims, which are based on the purchase of preferred shares, the appointment of Lead Plaintiffs MassPRIM and MissPERS and their counsel is withdrawn and they must be dismissed from this action for lack of standing to sue. See N.J. Carpenters Health Fund,

---

[15]    Defendants Chris Campbell, Janis C. Kong, William M. Freidrich, Goldman Sachs International, Merrill Lynch International, and UBS Limited must be dismissed as they are not defendants as to Plaintiff's Preferred Share Securities Act claims, which are the only remaining claims in the action.

27

2010 WL 1257528, at *4 (plaintiff must have purchased in offering in question to have standing to challenge "related material misstatements and omissions"); see also Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp. 2d 387, 396, n.67 (S.D.N.Y. 2010) (dismissing claims of named plaintiff who lacked standing); In re Merrill Lynch & Co. Research Reports Sec. Litig., 375 B.R. 719, 724-26 (S.D.N.Y. 2007)(same).


## IV. CONCLUSION

For the reasons stated above:

Counts One, Two, Six, Seven, Eight, Nine and Ten are HEREBY DISMISSED, with prejudice;

Defendants Chris Campbell, Janis C. Kong, William M. Freidrich, Goldman Sachs International, Merrill Lynch International, and UBS Limited are HEREBY DISMISSED as Defendants, with prejudice;

Co-Lead Plaintiffs Massachusetts Pension Reserves Investment Management Board and Public Employees Retirement System of Mississippi, and their counsel, Cohen Milstein Sellers & Toll PLLC, Labaton Sucharow LLP, and Wolf Popper LLP, are HEREBY DISMISSED from this action, with prejudice;

Girard Gibbs LLP is now sole Lead Counsel on behalf of the only remaining Lead Plaintiff, The Freeman Group;

Within 45 days of the date of this Order the remaining Defendants shall re-file their motions to dismiss addressing Counts Three, Four and Five;

45 days after Defendants re-file their motions to dismiss, the remaining Plaintiffs shall file their opposition;

14 days after Plaintiffs file their opposition, Defendants shall file their reply, at which time the motion to dismiss will be fully submitted.

SO ORDERED.

Dated:     New York, New York
           January _11_, 2011

_Deborah A. Batts_
Deborah A. Batts
United States District Judge