UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————  x
                                                              :
IN RE ROYAL BANK OF SCOTLAND GROUP        :     Civil Action No.:
PLC SECURITIES LITIGATION                          :     09-CV-0300 (DAB)
                                                              :
                                                              :
                                                              :     ECF CASE
                                                              :
——————————————————————  x

### LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION BY DEFENDANT ROYAL BANK OF SCOTLAND GROUP PLC TO DISMISS UNDER THE *FORUM NON CONVENIENS* DOCTRINE

Jonathan K. Levine
**GIRARD GIBBS LLP**
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767

Daniel C. Girard
Amanda M. Steiner
Matthew A. Brinegar
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

**Lead Plaintiffs' Counsel**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ..................................................................................... 1

I. The Preferred Share Offerings Were U.S. Investments ...................................... 2

II. RBS Has a Significant Presence In the U.S. and Much of the Company's Subprime-Related Writedowns Were Attributed to the Operations of Its Business Units in the U.S. ............................................................................................................. 3

III. Other Litigation and Investigations in the U.S. .............................................. 4

ARGUMENT ..................................................................................................... 5

I. This Court Should Not Take the Extreme Step of Declining to Exercise Its Jurisdiction on *Forum Non Conveniens* Grounds In a Securities Class Action Brought by U.S. Investors on Behalf of a Class Composed of U.S. Investors ................. 5

    A. Dismissing Plaintiffs' Claims on *Forum Non Conveniens* Grounds Would Contravene Second Circuit Precedent .................................................. 5

    B. Plaintiffs' Choice of Forum Is Entitled to Great Deference ................... 6

    C. The *Gilbert* Factors Weigh Against Dismissal ................................... 8

        1. The Private Interest Factors Favor New York ............................ 8

            (a) Ease of Access to Evidence ..................................... 9

            (b) Availability of Compulsory Process ........................... 10

            (c) Cost of Willing Witnesses' Attendance ....................... 11

            (d) Other Factors Favoring United States Jurisdiction ........ 12

        2. The Public Interest Factors Favor New York ........................... 12

            (a) Administrative Difficulties ..................................... 13

            (b) Local Interest in the Litigation ................................ 13

            (c) Imposing Jury Duty on Local Citizens ....................... 15

            (d) Conflict With and Application of Foreign Law .............. 15

i

D.   RBS Is Forum Shopping by Seeking Removal to a Forum Where Few if Any Class Members Will Bring Claims ...................................................................... 16

CONCLUSION ............................................................................................................................ 18

# TABLE OF AUTHORITIES

## Cases

*Alcan Int'l Ltd. v. S.A. Day Mfg. Co., Inc.*
    176 F.R.D. 75 (W.D.N.Y. 1996)....................................................................... 10

*Banco De Seguros Del Estado v. J.P. Morgan Chase & Co.*
    500 F. Supp. 2d 251 (S.D.N.Y. 2007)........................................................ 6, 14, 15

*Bank of America Corp. v. Lemgruber*
    385 F. Supp. 2d 200 (S.D.N.Y. 2005)............................................................ 6, 8

*Bonder v. Banque Paribas*
    114 F. Supp. 2d 117 (E.D.N.Y. 2000) .............................................................. 10

*Cyberscan Tech., Inc. v. Sema Ltd.*
    2006 WL 3690651 (S.D.N.Y. Dec. 13, 2006) .............................................. 11, 12

*Dabbous v. American Express Co.*
    2009 WL 1403930 (S.D.N.Y. May 8, 2009) ...................................................... 6

*Dagen v. CFC Group Holdings, Ltd.*
    2003 WL 194208 (S.D.N.Y. 2003)................................................................ 6, 10

*DiRienzo v. Philip Services Corp.*
    294 F.3d 21 (2d Cir. 2002)...................................................................... passim

*Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.*
    949 F. Supp. 1123 (S.D.N.Y. 1997)................................................................. 6

*E.ON AG v. Acciona, S.A.*
    468 F. Supp. 2d 559 (S.D.N.Y. 2007)............................................................. 16

*Guidi v. Inter-Continental Hotels Corp.*
    224 F.3d 142 (2d Cir. 2000).................................................................... 7, 13

*Gulf Oil Corp. v. Gilbert*
    330 U.S. 501 (1947)........................................................................ 1, 6, 8, 13

*In re Alstom SA Sec. Litig.*
    253 F.R.D. 266 (S.D.N.Y. 2008) ................................................................... 12

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*
    228 F. Supp. 2d 348 (S.D.N.Y. 2002).......................................................... passim

*In re Asta Medica, S.A.*
   981 F.2d 1 (1st Cir. 1992) ................................................................. 11

*In re CINAR Corp. Sec. Litig.*
   186 F. Supp. 2d 279 (E.D.N.Y. 2002) ......................................... 7, 14, 15

*In re Edelman*
   295 F.3d 171 (2d Cir. 2002) ............................................................ 11

*In re Lernout & Hauspie Sec. Litig.*
   208 F. Supp. 2d 74 (D. Mass. 2002) ................................................. 18

*In re Letter of Request from Crown Prosecution Serv. of U.K.*
   870 F.2d 686 (D.C. Cir. 1989) ........................................................ 11

*In re Livent, Inc. Sec. Litig.*
   78 F. Supp. 2d 194 (S.D.N.Y. 1999) ................................................. 11

*In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*
   848 F.2d 1151 (11th Cir. 1988) ....................................................... 11

*In re Vivendi Universal, S.A. Sec. Litig.*
   765 F. Supp. 2d 512 (S.D.N.Y. 2011) ............................................... 11

*In re Vivendi Universal, S.A.*
   242 F.R.D. 76 (S.D.N.Y. 2007) ....................................................... 12

*Iragorri v. United Technologies Corp.*
   274 F.3d 65 (2d Cir. 2001) ..................................................... 5, 7, 8, 17

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*
   2002 WL 432390 (S.D.N.Y. Mar. 20, 2002) ...................................... 16

*Lowry v. Aldar Properties PJSC*
   2009 WL 3672754 (C.D. Cal. 2009) ................................................. 14

*Maersk, Inc. v. Neewra, Inc.*
   554 F. Supp. 2d 424 (S.D.N.Y. 2008) ............................................ 8, 15

*Miller v. Calotychos*
   303 F. Supp. 2d 420 (S.D.N.Y. 2004) ............................................... 11

*Murray v. BBC*
   81 F.3d 287 (2d Cir. 1996) ............................................................... 7

*Nationsbank of Florida v. Banco Exterior de Espana*
    867 F. Supp. 167 (S.D.N.Y. 1994) ............................................................................... 14

*Olympic Corp. v. Societe Generale*
    462 F.2d 376 (2d Cir. 1972) ......................................................................................... 6

*Societe Nationale Industrielle Aerospatiale v. U.S. District Court*
    482 U.S. 522 (1987) ...................................................................................................... 9

*Terris-Feldmam v. Dan Hotels of Israel*
    1997 WL 109441 (S.D.N.Y. 1997) ............................................................................... 6

*U.S. Fidelity and Guaranty Co. v. Braspetro Oil Services Co.*
    1999 WL 307666 (SD.N.Y. May 17, 1999) ............................................................... 14

*Wiwa v. Royal Dutch Petroleum Co.*
    226 F.3d 88 (2d Cir. 2000) ................................................................................. 6, 7, 10

*Yung v. Lee*
    2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002) ............................................................ 6

**Rules**

Fed. R. Civ. P. 12 ................................................................................................................ 2

The Royal Bank of Scotland Group plc ("RBS") asks this Court to do what no United States court has ever done: dismiss a securities class action under the doctrine of *forum non conveniens* where the court-appointed lead plaintiff and other named plaintiffs (as well as most, if not all, of the proposed class members) are United States residents; the securities were registered in the United States, sold in the United States by United States underwriters, and traded on a United States stock exchange and in the United States; the claims arise under the United States securities laws; and much of the alleged wrongdoing occurred in the United States.

*Forum non conveniens* is a rare exception to the general rule that a court is obligated to hear cases over which it has jurisdiction. The doctrine permits courts to take the extreme step of declining to hear cases that fall within their jurisdiction only when it would be so extraordinarily inconvenient for a case to proceed in that court that it appears the plaintiff must have brought suit there to "vex, harass or oppress" the defendant, and there is an adequate alternative forum where the case could be conveniently heard. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09 (1947) (citation omitted). Although RBS has inundated this Court with declarations from various scholars, an employee and its attorneys, and even Her Majesty's Treasury, it has not met its high burden of proving that litigating in this Court is "genuinely inconvenient" and that it is "significantly preferable" to require preferred share investors to pursue an unprecedented, costly and risky action in the U.K. *DiRienzo v. Philip Services Corp.,* 294 F.3d 21, 33 (2d Cir. 2002).

Lead Plaintiff requests that the Court deny the motion.

## FACTUAL BACKGROUND

Plaintiffs allege that RBS and the other defendants violated the Securities Act by representing in the preferred share offering documents that RBS followed elaborate risk management procedures, had effective internal financial controls in place, maintained a strong capital base and a prudent relationship between the capital base and the underlying risks of the business, and that its financial statements fairly presented the company's financial condition.

¶¶ 93-174.[1]   Lead Plaintiff's opposition to the Rule 12(b)(1) and 12(b)(6) motions to dismiss has a more detailed overview of the facts and allegations, which is incorporated by reference.

## I.   The Preferred Share Offerings Were U.S. Investments

Between May 16, 2006 and September 25, 2007, RBS raised more than $5.3 billion through five preferred share offerings: Series Q, R, S, T and U.  ¶¶ 93, 115, 124, 151, 165.  RBS filed the offering documents with the SEC, including the April 8, 2005 shelf registration statement that permitted RBS to sell securities in one or more offerings up to a total of $10 billion.  ¶ 90.  The underwriters of the offerings are U.S. companies and are all headquartered or have offices within the Southern District of New York, except for RBS's wholly-owned subsidiary Greenwich Capital Markets, Inc. (recently renamed RBS Securities)—a part of RBS's Global Banking and Markets business unit—which is based in Connecticut.  ¶¶ 35-44.

The offerings were marketed to, and purchased by, individual U.S. investors like the members of the Freeman Group and institutional U.S. investors like plaintiff Mississippi Public Employees Retirement System (MissPERS).  The shares are traded on the NYSE and in the U.S. ¶ 7.  RBS appears to concede that all or at least the vast majority of preferred share investors are U.S. residents, since its expert witness calculates the percentage of common shareholders in the U.S. and U.K. but does not suggest that any of the preferred shareholders are U.K. residents.  *See* Lehn Decl. ¶ 6 (Dkt. No. 199).

The Series Q, R, S and T preferred shares, purchased by members of the Freeman Group, were offered and initially traded at $25 per share.  By January 19, 2009, they had lost approximately 80% of their value.  The Series U preferred shares, purchased by MissPERS, were offered and initially traded at $100,000 per share.  By January 19, 2009, they had lost approximately 61% of their value.  ¶ 89.

---

[1] "¶" refers to paragraphs of the Amended Class Action Complaint filed as Docket No. 182.

## II.   RBS Has a Significant Presence In the U.S. and Much of the Company's Subprime-Related Writedowns Were Attributed to the Operations of Its Business Units in the U.S.

While based in Scotland, RBS is a global bank and has been operating in the U.S. for over fifty years.  Steiner Decl. Ex. 1.  RBS states on its website that "[it] is one of the Top 10 banking groups in the US and a principal supplier of corporate finance and debt capital markets services."   Steiner Decl. Ex. 3.  It also claims that "RBS Business Capital is one of the largest providers of asset-based financing in the United States."  Steiner Decl. Ex. 2.

Citizens Financial Group, located in Rhode Island, has been an RBS business unit since the late 1980s and is consolidated into the company's financial statements.  Citizens boasts on its website that it is "one of the 15 largest commercial banking companies in the country."  Steiner Decl. Ex. 4.  Citizens provides these financial services to U.S. customers through the Citizens and Charter One brands and through Kroger Personal Finance, its credit card joint venture with the second largest U.S. supermarket group.  ¶ 20.  These entities have at least 4.6 million "personal" customers and 460,000 business customers, who are served through more than 2,139 bank branches.  Steiner Decl. Ex. 5.

Citizens accumulated significant exposure to U.S. subprime and non-conforming loans by purchasing collateralized mortgage obligations (CMOs) and selling them to Greenwich.  ¶ 68.  By mid 2007, Citizens had a CMO portfolio of more than $25 billion, with $28.1 billion[2] of subprime exposure.  ¶¶ 68, 72.  This portfolio constituted a substantial portion of RBS's $68.3 billion total subprime exposure.  Citizens retained these subprime assets despite RBS's repeated insistence that Citizens does not "do sub-prime," has never "done sub-prime," and has "no plans to do sub-prime."  ¶¶ 71, 156; Steiner Decl. Ex. 6 at 11.  RBS's financial results for fiscal 2008, reported in a February 26, 2009 6-K, identify a charge to goodwill of $31.6 billion—$8.6 billion of which was attributed to Citizens/Charter One. ¶ 81.

---

[2]   For the Court's convenience, all foreign currencies have been converted into U.S. dollars at the then-existing exchange rate.

Greenwich, which was also consolidated into RBS's financial statements and conducted the principal activity in the U.S. of the company's Global Banking and Markets business unit, was one of the biggest players in the subprime market during the recent housing boom. ¶ 66. Beginning in 2003, Greenwich generated massive profits by pooling risky U.S. subprime mortgages and securitizing them into collateralized debt obligations (CDOs). ¶ 65. Greenwich invested so heavily in U.S. based subprime mortgages (to the tune of $188 billion) that by 2005 and 2006 it was the second largest subprime underwriter in the United States. Only Lehman Brothers originated more subprime securities during that time. ¶ 66. Two-thirds of the $11.6 billion writedown that RBS announced on April 22, 2008 was attributable to assets (including subprime and Alt-A U.S. residential mortgages) held by Greenwich and Citizens. Steiner Decl. Ex. 7 at 5.

## III.   Other Litigation and Investigations in the U.S.

The conduct of former RBS executives and the adequacy of the company's disclosures of its exposure to subprime assets are the subject of ongoing investigations by the SEC and the New York Attorney General. ¶ 86. The SEC recently "upgraded its investigation into RBS's underwriting of mortgage backed securities instruments, which played a key part in its near collapse." Steiner Decl. Ex. 8. On May 23, 2011, it was reported that the New York Attorney General expanded its probe into mortgage practices at large banks, including RBS. Steiner Decl. Ex. 9.

On June 20, 2011, it was reported that U.S. regulators filed suit against RBS/Greenwich in Kansas, seeking to recover hundreds of millions of dollars that the bank generated by selling risky mortgage-backed securities to now-failed credit unions. Steiner Decl. Ex. 10. The National Credit Union Administration, a U.S. federal agency, has also filed a lawsuit against RBS Securities Inc., accusing it of misrepresenting their residential mortgage-backed securities as safe, when in fact they were dicey investments dependent on loans that "were all but certain to become delinquent or default shortly after origination." Steiner Decl. Ex. 11.

<u>**ARGUMENT**</u>

I.     **This Court Should Not Take the Extreme Step of Declining to Exercise Its Jurisdiction on *Forum Non Conveniens* Grounds In a Securities Class Action Brought by U.S. Investors on Behalf of a Class Composed of U.S. Investors**

      A.     **Dismissing Plaintiffs' Claims on *Forum Non Conveniens* Grounds Would Contravene Second Circuit Precedent**

RBS has not cited a single case in which a court has dismissed, on *forum non conveniens* grounds, claims filed by U.S. residents for violations of U.S. securities laws based on securities registered, underwritten and issued in the U.S., and traded exclusively on a U.S. exchange.[3]  In the most analogous case RBS cites, *DiRienzo v. Philip Services Corp.,* 294 F.3d 21, the Second Circuit *reversed* the district court's dismissal on *forum non conveniens* grounds.  In *DiRienzo,* the plaintiffs were U.S. residents who alleged violations of U.S. securities laws by a Canadian corporation and U.S. underwriters.  Less than 80% of the shares were traded on U.S. exchanges—unlike the RBS preferred shares, which were sold exclusively in the United States and traded on the NYSE.  *Id.* at 25.  The Second Circuit held that "although defendants may have shown Canada to be an appropriate forum, they have not met their burden of proving that litigation in the United States is unnecessarily inconvenient for them to a degree much greater than the convenience that would be afforded plaintiffs by trial in the Southern District of New York." *Id.* at 33.

Like the defendants in *DiRienzo*, RBS has failed to meet its burden of proving that litigating in this district is "genuinely inconvenient" and that the U.K. is "significantly preferable."  *Id.* (quoting *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 74-75 (2d Cir. 2001)).  In its analysis, the Court must "balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at

---

[3] RBS is joined in its motion by the Individual Defendants, and for convenience they will be referred to collectively as "RBS."  The Underwriter Defendants have not agreed to submit to personal jurisdiction in the U.K., however, apparently wanting to see how the Court rules on their motion to dismiss on the merits while reserving their right to move on *forum non conveniens grounds* at some later time.

stake." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 100 (2d Cir. 2000). "'[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *DiRienzo*, 294 F.3d at 28 (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947)).  Moreover, "the balance must be even stronger when the plaintiff is an American citizen and the alternative forum is a foreign one." *Olympic Corp. v. Societe Generale,* 462 F.2d 376, 379 (2d Cir. 1972).

RBS cites several of this Court's cases in which the Court granted *forum non conveniens* motions, but RBS fails to mention that the plaintiffs in those cases were not U.S. residents.  *See Dabbous v. American Express Co.*, No. 06 Civ. 11345, 2009 WL 1403930, at *1(S.D.N.Y. May 8, 2009) (Egyptian plaintiff); *Banco De Seguros Del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 260 (S.D.N.Y. 2007) (Uruguayan plaintiff); *Yung v. Lee*, No. 00 Civ. 3965, 2002 WL 31008970, at *1 (S.D.N.Y. Sept. 5, 2002) (Chinese and other non-U.S. plaintiffs); *Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.*, 949 F. Supp. 1123, 1124 (S.D.N.Y. 1997) (Cayman Islands plaintiff).  Defendants do *not* cite the cases in which this Court has denied a *forum non conveniens* motion where, as here, there was a U.S. plaintiff.  *See e.g., Bank of America Corp. v. Lemgruber*, 385 F.Supp.2d 200, 235 (S.D.N.Y. 2005) (denying motion urging a forum in Brazil, the Bahamas or the Cayman Islands); *Dagen v. CFC Group Holdings, Ltd.*, No. 00 Civ. 5682, 2003 WL 194208, at *3 (S.D.N.Y. 2003) ("Most materially, the plaintiff in *Dragon Capital* was a limited partnership investment fund incorporated in the Cayman islands; in the instant case, Plaintiff is an American citizen."); *Terris-Feldmam v. Dan Hotels of Israel*, No. 95 CIV. 9666 (DAB), 1997 WL 109441, *1 (S.D.N.Y. 1997) (denying motion urging an Israeli forum, where the plaintiff was an American citizen).

### B.    Plaintiffs' Choice of Forum Is Entitled to Great Deference

A court's first step in deciding *a forum non conveniens* motion is to determine the deference to be given to the plaintiffs' choice of forum.  *DiRienzo*, 294 F.3d at 28.  "Ordinarily a strong favorable presumption is applied to that choice."  *Id.*  "The more it appears that a

domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice." *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001).

The members of the Freeman Group and the other named plaintiffs are all U.S. residents, and it is not surprising or questionable that they prefer to litigate their claims in a U.S. court.  *See In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 351-52 (S.D.N.Y. 2002) ("There appears to be no reason to doubt the bona fides of the … plaintiffs' choice of a U.S. forum: every single named plaintiff is a U.S. resident, and litigation abroad would likely raise costs and necessitate the retention of foreign counsel.").  RBS argues that Lead Plaintiff's choice of forum should not be accorded great deference because the members of the Freeman Group are not from New York.  But the "home forum" of a U.S. resident for *forum non conveniens* purposes is any U.S. court.  *See, e.g., Guidi v. Inter-Continental Hotels Corp.,* 224 F.3d 142, 147 n.4 (2d Cir. 2000); *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 103 (2d Cir. 2000); *Assicurazioni Generali*, 228 F. Supp. 2d at 350-351  ("In *DiRienzo I, Wiwa*, and *Guidi,* the [Second] Circuit suggested that whenever a U.S. plaintiff files suit in a U.S. forum, that choice is to be considered the plaintiff's 'home forum' and therefore entitled to great weight– even if that forum is a district other than the district in which the plaintiff resides.").

RBS also argues that the Court should give no deference to Lead Plaintiff's choice of forum because it is suing in a representative capacity.  But "deference is due notwithstanding the fact that plaintiffs are acting in a representative capacity." *Id.* at 352; *see also In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 296-297 (E.D.N.Y. 2002).  The Second Circuit has stated that even though the degree of deference might vary, plaintiff's forum choice is entitled to deference in all cases, and should never be lightly overturned.  *See DiRienzo*, 294 F.3d at 28-29; *Murray v. BBC*, 81 F.3d 287, 290 (2d Cir. 1996) (even reduced deference "is not an invitation to accord … no deference since dismissal for *forum non conveniens* is the exception rather than the rule").

The Second Circuit has also accorded deference to plaintiffs' choice of forum where the "defendants sought out business opportunities in this country by registering stock on American

exchanges, filing statements with the SEC, and conducting the bulk of its business in the United States." *DiRienzo*, 294 F.3d at 28.  Like the Canadian defendant in *DiRienzo*, RBS "sought out business opportunities in this country" by selling more than $5.3 billion of preferred shares through U.S. Underwriters overwhelmingly based in this district, listing RBS preferred shares on the NYSE, filing statements with the SEC and conducting significant business in the U.S.  294 F.3d at 28.  As in *DiRienzo*, "plaintiffs offered a quite valid reason for litigating in federal court: this country's interest in having United States courts enforce United States securities laws." *Id.*

Finally, RBS appears to argue that Lead Plaintiff's choice of forum should be accorded less deference because most investors in RBS common stock are U.K. residents.  The common stock investors are not part of the proposed class so their residency is irrelevant.

### C.    The *Gilbert* Factors Weigh Against Dismissal

After determining the level of deference to be given to the plaintiffs' choice of forum—which is substantial in this case given the bona fide connections to the U.S.—courts must balance the public and private interest factors outlined by the Supreme Court in *Gilbert*.  "[A] defendant's burden with respect to these factors is always high; '[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 234 (S.D.N.Y. 2005) (quoting *Gilbert*, 330 U.S. at 508).  "As is implicit in the meaning of 'deference,' the greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74. "Where, as here, Plaintiffs' choice is entitled to substantial deference, Defendants' task is that much harder." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 453 (S.D.N.Y. 2008).

### 1.    The Private Interest Factors Favor New York

The private interest factors focus on the convenience to the parties: "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive." *DiRienzo*, 294 F.3d

at 29-30.

(a)      **Ease of Access to Evidence**

RBS asserts that this Court cannot compel testimony or documentary evidence from non-party witnesses who reside in the United Kingdom, and argues that this factor militates in favor of litigation in England.  RBS ignores that most of the witnesses will be representatives of parties, who are subject to discovery in the U.S., and most of the documents will be in the custody or control of the parties.  *See Societe Nationale Industrielle Aerospatiale v. U.S. District Court*, 482 U.S. 522, 540-541 (1987) (upholding the application of the Federal Rules of Civil Procedure to collect evidence from foreign parties for use in U.S. litigation).  If the litigation takes place in England, both party and non-party discovery would be very limited.  *See* RBS FNC Br. at 19 & n.24 (English law "places extensive restrictions on the collection of evidence," including the prohibition of pretrial discovery).  But since English courts cooperate with U.S. courts in obtaining discovery from non-parties, if the case proceeds here the parties will have at least as much discovery as parties in an English case.  *See* Harris Decl. ¶¶ 21, 181;[4] Supp. Harris Decl. ¶ 48.

As even RBS concedes, little more than a bare majority – RBS calls it a "decisive majority," but 13 out of 21 is only 62% – of the individuals referenced in the complaint are located in the U.K.  *See* RBS FNC Br. at 18; Lesser Decl. Ex. 1 (Dkt. 204-1) (showing that 18 of the 21 individuals referenced in the complaint are parties to this action, including 11 of the 13 individuals located in the U.K.).  All of the underwriters are in the U.S., due diligence was conducted in the U.S., and RBS and the underwriters used U.S. law firms for the offerings. ¶¶ 35-45.[5]  Moreover, two-thirds of the £5.9 billion writedown that RBS announced on April 22, 2008 was attributable to assets held by Greenwich and Citizens.  Steiner Decl. Ex. 7 at 5.

---

[4] Attached as Exhibit 12 to the Steiner declaration.

[5] *See also* Steiner Decl., Ex. 13 at pages 19, 24, 65(Series Q prospectus); Ex. 14 at pages 2, 19, 25, 67 (Series R prospectus); Ex. 15 at pages 2, 22, 23, 27, 66, 70 (Series S prospectus); Ex. 16 at pages 1, 53-53, 55, 86, 89(Series T prospectus); Ex. 17 at pages 2, 67, 69, 121, 125 (Series U prospectus).

As a result, much of the discovery will focus on documents and testimony be centered in New York, where all of the Underwriter Defendants are either headquartered or have offices. ¶¶ 35-45.  All of the plaintiffs are located in the U.S. and many witnesses not referenced in the complaint may reside in or near New York, especially those related to the New York-based underwriters and RBS's U.S. business units, Greenwich and Citizens.  Since much of the underlying conduct giving rise to RBS's accumulation of subprime assets occurred in RBS's U.S. operations, the documents and testimony related to those allegations are also likely to be centered in the U.S.  *See* ¶¶ 65-69.

RBS has not shown that costs related to travel or transporting evidence are "excessively burdensome, especially in view of the defendants' vast resources."  *Wiwa*, 226 F.3d at 107. "The defendants have failed to explain how transporting the documents or copies of them would be 'oppressive' or 'vexatious.'"  *DiRienzo*, 294 F.3d at 30.  Now that electronic discovery is the norm, there is little or no burden to producing documents in another country.  *See Dagen v. CFC Group Holdings, Ltd.*, No. 00 Civ. 5682 (DAB), 2003 WL 194208, at *4 (S.D.N.Y. Jan. 28, 2003); *see also Assicurazioni Generali*, 228 F. Supp. 2d at 361 ("[I]t is not uncommon in international litigation for documents or witnesses to be located abroad. … [T]he advances of modern technology and the development of a global economy with instant access to information worldwide severely undercut defendants' claim of forum non conveniens.") (quoting *Bonder v. Banque Paribas*, 114 F. Supp. 2d 117, 133 (E.D.N.Y. 2000).

**(b)    Availability of Compulsory Process**

If this case proceeds here rather than in England, there will be much greater access to witnesses located in the U.S. (like current and former employees of Citizens and Greenwich), as well as witnesses located outside the U.S.  *See, e.g.*, *Alcan Int'l Ltd. v. S.A. Day Mfg. Co., Inc.*, 176 F.R.D. 75, 78 (W.D.N.Y. 1996) ("The ordinary discovery provisions of the Federal Rules of Civil Procedure, rather than the more complicated procedures of the Hague Convention, generally apply to the discovery of information in the custody or control of a party's foreign

affiliate."). By contrast, if the case were to proceed in England, courts in the Second Circuit may take into consideration limitations on discovery in the foreign jurisdiction. *See In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002). And courts in other circuits may not require parties to turn over evidence that would not otherwise be discoverable under the relevant foreign law. *See In re Asta Medica, S.A.*, 981 F.2d 1, 7 (1st Cir. 1992); *In re Letter of Request from Crown Prosecution Serv. of U.K.*, 870 F.2d 686, 692-693 & n.7 (D.C. Cir. 1989); *In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151, 1156 (11th Cir. 1988).

### (c)    Cost of Willing Witnesses' Attendance

Willing witnesses can travel to the U.S. for trial; "[s]uch travel today is not burdensome in terms of cost or time, and defendants have not shown otherwise." *DiRienzo*, 294 F.3d at 30. In addition, testimony of foreign deponents can be preserved on videotape for use at trial in a cost-effective manner. As the Second Circuit has noted, "[w]hile demeanor evidence is important when trying a fraud case … videotaped depositions, obtained through letters rogatory, could afford the jury an opportunity to assess []credibility …." *Id.* (internal citation omitted); *see also In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194 (S.D.N.Y 1999). Trials frequently include videotaped testimony. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 523 (S.D.N.Y. 2011) ("During plaintiff's direct case, the jury saw videotaped deposition testimony from over twenty fact witnesses, including employees and senior executives at Vivendi and its subsidiaries, former members of Vivendi's Board, and employees of the rating agencies whose responsibility it was to cover Vivendi.").

RBS has not identified any potential witnesses who are unable or unwilling to travel or presented evidence of "what material role they played in this litigation that would make their appearance at a trial here essential." *Miller v. Calotychos*, 303 F. Supp. 2d 420, 429 (S.D.N.Y. 2004). "This is significant, as 'such identification is generally required for a *forum non conveniens* dismissal.'" *Cyberscan Tech., Inc. v. Sema Ltd.*, 2006 WL 3690651, at *10 (S.D.N.Y. Dec. 13, 2006) (citation omitted). The Second Circuit has "recognized the availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is inconvenient."

*DiRienzo*, 294 F.3d at 30; *see also Assicurazioni Generali*, 228 F. Supp. 2d at 362 (citing cases). And English courts support requests for evidence in foreign proceedings whenever possible. *See* Harris Decl., ¶¶ 145-64, 173-77, 181.

(d)        <strong>Other Factors Favoring United States Jurisdiction</strong>

As one court in this district has recognized, factors based on convenience of trial, as opposed to pre-trial proceedings, have become largely irrelevant given the realities of modern civil litigation. *Cyberscan Tech*, 2006 WL 3690651, at *11 ("[M]odern civil litigation rarely results in a trial. The vast majority of cases are resolved by settlement, by summary judgment, or by other legal devices.").

RBS also argues for dismissal because "it is unclear" whether a resolution in the U.S. would have res judicata effect in England. But this remote possibility does not favor dismissal:

> It is neither remarkable nor significant that a class action judgment by a U.S. court will not be enforced in Europe against unnamed members of an exclusively U.S. plaintiff class. Because most European courts do not recognize the class action as binding against unnamed plaintiffs, there will always be the remote possibility, in an American class action against a European company, that some unnamed American class members who lose in the United States will travel to Europe to relitigate their claims.

*Assicurazioni Generali*, 228 F. Supp. 2d at 363-364. Moreover, it is likely that English courts would give preclusive effect to a judgment in a U.S. class action. *See* Harris Decl., ¶¶ 13-17, 29-123, 180; Supp. Harris Decl. ¶¶ 34-47. In the *Vivendi* case, Judge Holwell reviewed expert declarations, including a declaration from Professor Harris, and concluded that "English courts, when ultimately presented with the issue, are more likely than not to find that U.S. courts competent to adjudicate with finality the claims of absent class members and, therefore, would recognize a judgment or settlement in this action." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 103 (S.D.N.Y. 2007); *see also In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 288-289 (S.D.N.Y. 2008) (Marrero, J.).

<strong>2.  The Public Interest Factors Favor New York</strong>

The public interest factors focus on the impact of the litigation on the courts and

12

community: "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law." *DiRienzo*, 294 F.3d at 31 (quoting *Gilbert*, 330 U.S. at 508-09). These factors weigh decisively in favor of New York and against dismissal.

### (a)   Administrative Difficulties

As in *DiRienzo*, this factor is neutral. The fact that courts may be very busy does not mean that they are any less capable of handling securities actions. *See DiRienzo*, 294 F.3d at 31; *see also Guidi*, 224 F.3d at146 n.5.

### (b)   Local Interest in the Litigation

Also like *DiRienzo*, the "local interest" factor favors litigation in New York. *See DiRienzo*, 224 F.3d at 31-33. While events leading to the near collapse of RBS may, in a general sense, be of great interest in the U.K., it is not clear that issues specifically related to the large losses by U.S. resident preferred shareholders are of great interest there. But it is indisputable that U.S. purchasers of RBS's preferred shares, who have suffered billions of dollars in damages, have a very strong interest in having their day in court, which likely would never happen if this case were dismissed on forum non conveniens grounds. *See id.* at 32 ("*DiRienzo* does not involve Americans who sought out involvement with a foreign forum. … Plaintiffs are involved in this lawsuit precisely because of aggressive selling techniques … within the United States that targeted United States investors as potential purchasers of its stock."). The ongoing SEC and NYAG investigations of RBS's role in the securitization of subprime mortgages, and the National Credit Union Administration lawsuit against RBS Securities Inc. based on alleged misrepresentations regarding its residential mortgage-backed securities, are further evidence of U.S. interest in the subject matter of this case.

RBS argues that an adverse verdict in this case could potentially hurt the U.K. and its taxpayers, who agreed to bail out RBS after its near collapse—and after the events at issue in this lawsuit took place. *See* RBS FNC Br. at 16 & n.20. But as another court remarked, "this Court

fails to see how it is in the Canadian public interest to prevent American investors from seeking remedies in American courts for wrongs at least in part perpetrated on American soil." *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 301 (E.D.N.Y. 2002). Moreover, courts often deny motions to dismiss on *forum non conveniens* grounds even when the defendants are entities owned in whole or in part by foreign governments. *See, e.g.*, *Nationsbank of Florida v. Banco Exterior de Espana*, 867 F. Supp. 167, 174-175 (S.D.N.Y. 1994) (denying motion to dismiss by Spanish bank that was 60% owned by Spanish Government); *U.S. Fidelity and Guaranty Co. v. Braspetro Oil Services Co*., 1999 WL 307666, at *18 (SD.N.Y. May 17, 1999) (denying motion to dismiss by a subsidiary of Petroleo Brasileiro, which was principally owned by the Brazilian Government, and noting that "[g]iven the fact that the plaintiffs are United States corporations, their choice to bring this litigation in a domestic forum rather than a distance foreign forum is entitled to great weight, particularly when New York was a foreseeable and likely forum under one of the major instruments at issue in this litigation."); *Lowry v. Aldar Properties PJSC*, 2009 WL 3672754, at *5-6 (C.D. Cal. 2009) (denying motion to dismiss brought by company partially owned by government of Abu Dhabi).

Aside from the fact that this case involves the U.K.'s oldest bank, it is nothing like *Banco De Seguros Del Estado*, a case RBS repeatedly cites in support of its arguments. *See, e.g.,* RBS FNC Br. at 14, 15 n.19, 19, 20 n.25. In *Banco De Seguros Del Estado*, neither the plaintiff nor any witnesses were located in New York (the plaintiff's chosen forum) and none of the allegations in the complaint evidenced any connection to New York. 500 F. Supp. 2d at 260-262. The court found that "nearly every event alleged in the Complaint either occurred in Uruguay, or involved a decision finalized in Uruguay" and that "the only alleged connections to New York are averred in vague, uncorroborated terms, e.g., an allegation that Defendants are 'pillars' of the New York financial community." *Id*. at 261. Also, "[v]arious other civil and criminal matters pertaining to the same alleged events and losses … ha[d] been proceeding in Uruguayan venues [for years]." *Id*. Based on these facts, the court concluded that "Uruguay has a far more significant interest in a case that allegedly imperiled its oldest bank as well as

14

hundreds or more of that country's investors." *Id*. at 265.  The court acknowledged that its

holding served important public policy interests that are not at issue in this case (and that have

nothing to do with the fact that the case involved Uruguay's oldest bank): "Permitting this suit to

proceed here would countenance a flood of litigation brought by parties the world over who

allege that they have been wronged by corporate greed and graft, merely because New York is

considered by those parties to be, as [plaintiff] puts it, the 'commercial nerve center of the

Western business world.'" *Id*.

### (c)     Imposing Jury Duty on Local Citizens

Because there is a substantial local interest, it is fair to impose jury duty on New York

residents.  *See DiRienzo*, 294 F.3d at 31 ("[T]he Southern District of New York, home to the

American stock exchanges through which [the Canadian defendant] sold shares, has a local

interest in this lawsuit.  Where American investors have allegedly suffered harm from purchases

made in New York, that community has an interest in considering such claims."); *CINAR*, 186 F.

Supp. 2d at 300 ("The United States has a great interest in adjudicating this case because it

involves fraud on American investors, whom [the corporate defendant] specifically targeted with

stock offerings on the NASDAQ and stock purchase agreements with American companies.").

RBS argues that England should not be deprived of its right to adjudicate this dispute, but "the

relevant question is not which community has the greater interest … but whether a juror in New

York would be forced to decide a case with no impact on his community.  That is clearly not the

case here." *Maersk*, 554 F. Supp. 2d at 456.

### (d)     Conflict With and Application of Foreign Law

Unlike *DiRienzo*, the interest in avoiding the application of foreign law is not neutral—it

favors New York.  The preferred shares were registered and sold in the U.S. pursuant to a U.S.

registration and listed on a U.S. exchange located in this district or otherwise traded in the U.S.

The claims concern only the truth and completeness of those offering documents, so there is no

basis for applying U.K. law to any of the class members' claims or any question of what

disclosures would be required under U.K. law.  And the Second Circuit has recognized "the

interest of the United States in enforcing its securities laws." *DiRienzo*, 294 F.3d at 33; *see also E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 587-588 (S.D.N.Y. 2007).

RBS also consented to the application of New York law in the U.S in numerous securities disclosures.  For example, the prospectuses for all of the preferred shares specifically state as follows:  "Governing Law: The debt securities and the indentures will be governed by and construed in accordance with the laws of the State of New York, except that, as the indentures specify, the subordination provisions of each series of debt securities and the indentures will be governed by and construed in accordance with the laws of England."  *See, e.g.,* Steiner Decl. Ex. 13 at 44.  In addition, the prospectuses state that the Bank of New York is the depository and paying agent, and that "[t]he ADR deposit agreement and the ADRs are governed by and construed in accordance with New York law."[6] *See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 2002 WL 432390, at *7 (S.D.N.Y. Mar. 20, 2002) (denying dismissal where the plaintiff invested in a Norwegian company by purchasing ADRs issued by a New York bank and traded on the NYSE, the misrepresentations were in a SEC filing, and the deposit agreement specified New York law).

### D.   RBS Is Forum Shopping by Seeking Removal to a Forum Where Few if Any Class Members Will Bring Claims

Lead Plaintiff's choice of forum is entitled to substantial deference and the *Gilbert* factors weigh in favor of keeping the litigation in this Court.  Nonetheless, RBS has accused the Freeman Group of "forum shopping," as if there is something nefarious about U.S. plaintiffs who purchased RBS preferred shares—which were registered under the U.S. securities laws and listed on the NYSE and sold in the U.S.—selecting a U.S. forum located less than one mile from the NYSE rather than bringing suit 3,500 miles away in London.  But it is RBS that is forum

---

[6] *See* Steiner Decl. Ex. 13 at 44, 55 (Series Q prospectus); Ex. 14 at 45, 55(Series R prospectus); Ex. 15 at 47, 58 (Series S prospectus); Ex. 16 at 70, 80(Series T prospectus); Ex. 17 at 93, 110 (Series U prospectus).

shopping.  The Second Circuit has cautioned that defendants may use a *forum non conveniens* motion to gain tactical advantage:

> Courts should be mindful that, just as plaintiffs sometimes choose a forum for forum-shopping reasons, defendants also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine concern with convenience but because of similar forum-shopping reasons.

*Iragorri*, 274 F.3d at 75; *see also DiRienzo*, 294 F.3d at 29 (in some cases, "defendants' current claims of inconvenience raise questions as to their underlying motives"); *Assicurazioni Generali*, 228 F. Supp. 2d at 365 ("Defendants' motions to dismiss may not be based so much on the increased convenience dismissal would offer to them, but rather based on the severe inconvenience that it would work upon plaintiffs in this case.").

RBS urges this Court to dismiss this case in favor of litigation in England, a forum that (i) does not permit class actions (recognizing only opt-in group actions); (ii) does not permit contingent litigation; and (iii) has a "loser pays" system that makes litigating complex cases extremely risky and generally cost prohibitive for plaintiffs.  *See* Harris Decl. ¶¶ 132, 133, 135-138, 148-49, 183-85; Supp. Harris Decl. ¶¶ 19-32.  RBS offers no examples of group actions in the U.K. brought by investors for damages in securities fraud litigation.  *See* Harris Decl. ¶ 134; Supp. Harris Decl. ¶¶ 19, 22, 25.  And although RBS now says "there is no jurisdictional impediment to an English Court's adjudicating claims brought under the 1933 Act," the preferred share prospectuses all warned that, according to RBS's own Scottish and English solicitors, there is "doubt" that investors could bring any U.S. securities law claims against the company in the U.K.  *See, e.g.,* Steiner Decl. Ex. 13 at 63 ("We have been advised by our Scottish solicitors, Dundas & Wilson CS LLP (as to Scots law), and our English solicitors, Linklaters LLP (as to English law), that, both in original actions and in actions for the enforcement of judgments of U.S. courts, there is doubt as to whether civil liabilities predicated solely upon the U.S. federal securities laws are enforceable in Scotland and England.").

RBS argues that dismissal will avoid duplicative litigation but has submitted no evidence of pending or contemplated litigation in the U.K. by or on behalf of purchasers of the preferred

shares.  RBS notes that two groups of RBS shareholders in the U.K. have been discussing the possibility of group litigation against the company since August 2009, and speculates that one or both of these groups may soon file claims.  But even if any claims are someday filed in the U.K., they likely will relate solely or principally to allegedly false statements made by the company in its prospectus for an April 2008 rights offering that is not at issue in this case.  RBS does not contend that any group (or even any person) in the U.K. has ever suggested filing any suit against the company on behalf of investors who purchased RBS preferred shares.  That is not surprising, as the preferred shares were marketed, registered and sold in the U.S. and purchased by U.S. investors.  RBS also concedes that—more than two and a half years after the company's near collapse—no RBS securities cases have been filed in the U.K.  RBS FNC Br. at 21-22

Even if litigation on behalf of purchasers of the common shares is brought in the U.K., it will be very different from the preferred share litigation in its facts, legal claims and theories, and the identity and location of the parties and witnesses (and their degree of connections to the U.S.).  RBS does not explain how a hypothetical (or even an actual) U.K. group action involving completely different RBS securities (purchased, for the most part, on a U.K. stock exchange by U.K. residents), would support forcing U.S. investors who purchased RBS preferred shares to litigate their distinct and different claims in the U.K.  *See In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 92 (D. Mass. 2002) ("The Court has found no cases, and counsel has cited none, where a court has dismissed a securities fraud class action on *forum non conveniens* grounds where the plaintiff class has purchased stock on the American exchange and no class action remedy was available in the alternative forum.").

The choice between the United States and the U.K. as a forum for preferred share investors to bring their claims is, in reality, a false choice.  For the vast majority of investors, it is a choice between a class action in the United States or no case at all.

## CONCLUSION

Lead Plaintiff requests that the Court deny Defendants' motion to dismiss on *forum non conveniens* grounds.

18

DATED: July 29, 2011

Respectfully submitted,

By: _____/s/ Jonathan K. Levine_____
        Jonathan K. Levine

711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767

Daniel C. Girard
Amanda M. Steiner
Matthew A. Brinegar
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Lead Plaintiffs' Counsel*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
Thomas G. Hoffman, Jr.
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Plaintiffs' Counsel and Counsel for the Mississippi
Public Employees Retirement System*

**WOLF POPPER LLP**
Lester L. Levy
James A. Harrod
James Kelly-Kowlowitz
845 Third Avenue
New York, New York 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

*Plaintiffs' Counsel and Counsel for the Mississippi
Public Employees Retirement System*

**MURRAY, FRANK & SAILER LLP**
Marvin L. Frank
Gregory B. Linkh
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

*Plaintiffs' Counsel*

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
One North La Salle Street, Suite 2225
Chicago, IL 60602
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

*Plaintiffs' Counsel*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Jeffrey P. Campisi
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Plaintiffs' Counsel*

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Shane Rowley
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

*Plaintiffs' Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan K. Levine, hereby certify that on July 29, 2011, I caused the following

document(s) to be filed electronically with the United States District Court for the Southern

District of New York through the Court's mandated ECF service:

**1**.       **LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION BY DEFENDANT ROYAL BANK OF SCOTLAND GROUP PLC TO DISMISS UNDER THE *FORUM NON CONVENIENS* DOCTRINE**

Counsel of record are required by the Court to be registered e-filers, and as such are

automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July, 2011 at San Francisco, California.


                                    */s/ Jonathan K. Levine*
                                    Jonathan K. Levine