UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ) | 09 Civ. 300 (DAB) |
| ) | |
| In Re Royal Bank of Scotland Group plc ) | |
| Securities Litigation ) | ECF Case |
| ) | |
| ) | Oral Argument Requested |

**THE ROYAL BANK OF SCOTLAND GROUP PLC'S**
**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO**
**DISMISS UNDER THE *FORUM NON CONVENIENS* DOCTRINE**

WILMER CUTLER PICKERING
 HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Telephone: 212-230-8800
Fax: 212-230-8888

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

    I.       DISMISSING THIS CASE UNDER THE *FORUM NON CONVENIENS* DOCTRINE WOULD PROMOTE JUDICIAL ECONOMY AND AVOID DUPLICATIVE LITIGATION ....................................................................... 2

    II.      DISMISSAL OF THIS CASE IS FULLY CONSISTENT WITH THE FACT-DEPENDENT *FORUM NON CONVENIENS* BALANCING INQUIRY ............. 9

          A.     The Deference Due To Plaintiffs' Choice of Forum ................................. 10

          B.     The Public And Private Factors Weigh In Favor Of Dismissal ................ 13

          C.     The U.K. Is An Adequate And Appropriate Alternative Forum ............... 16

CONCLUSION ..................................................................................................... 17

# TABLE OF AUTHORITIES

## CASES

*Aguinda v. Texaco, Inc.*,
    303 F.3d 470 (2d Cir. 2002)..................................................16

*Alcoa S.S. Co. v. M/V Nordic Regent*,
    654 F.2d 147 (2d Cir. 1980)..................................................10

*Banco de Seguros Del Estado v. J.P. Morgan Chase & Co.*,
    500 F. Supp. 2d 251 (S.D.N.Y. 2007)..........................................9, 12, 13

*Bank of America Corp. v. Lemgruber*,
    385 F. Supp. 2d 200 (S.D.N.Y. 2005)..........................................10

*Curtis v. Citibank, N.A.*,
    226 F.3d 133 (2d Cir. 2000)..................................................3

*Cyberscan Technology, Inc. v. Sema Ltd.*,
    No. 06 Civ. 526, 2006 WL 3690651 (S.D.N.Y. Dec. 13, 2006).....................15

*Dabbous v. American Express Co.*,
    No. 06 Civ. 11345, 2009 WL 1403930 (S.D.N.Y. May 8, 2009).................... *passim*

*Dagen v. CFC Group Holdings, Ltd.*,
    No. 00 Civ. 5682, 2003 WL 194208 (S.D.N.Y. Jan. 28, 2003)....................10

*DirecTV Latin America, LLC v. Park 610, LLC*,
    691 F. Supp. 2d 405 (S.D.N.Y. 2010)..........................................2

*Dragon Capital Partners L.P. v. Merrill Lynch Capital Services Inc.*,
    949 F. Supp. 1123 (S.D.N.Y. 1997)............................................9

*Guidi v. Inter-Continental Hotels Corp.*,
    224 F.3d 142 (2d Cir. 2000)..................................................11

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947)..........................................................13, 15

*Howe v. Goldcorp Investment, Ltd.*,
    946 F.2d 944 (1st Cir. 1991).................................................17

*In re Air Crash Near Athens, Greece on Aug. 14, 2005*,
    479 F. Supp. 2d 792 (N.D. Ill. 2007).........................................2

*In re Assicurazioni Generali S.p.A. Holocaust Insurance Litigation*,
  228 F. Supp. 2d 348 (S.D.N.Y. 2002)........................................................................11

*In re Banco Santander Securities-Optimal Litigation*,
  Nos. 09-MD-2073, 09-CV-20215, 2010 WL 3036990 (S.D. Fla. July 30, 2010),
  *aff'd*, No. 10-14012, 2011 WL 3823284 (11th Cir. Aug. 30, 2011) .........................2

*In re Lernout & Hauspie Securities Litigation*,
  208 F. Supp. 2d 74 (D. Mass. 2002) ........................................................................16

*In re: Merrill Lynch & Co., Auction Rate Sec. (ARS) Marketing Litigation*,
  626 F. Supp. 2d 1331 (J.P.M.L. 2009).......................................................................3

*In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984*,
  809 F.2d 195 (2d Cir. 1987).....................................................................................16

*In re Zyprexa Products Liability Litigation*,
  594 F.3d 113 (2d Cir. 2010)........................................................................................3

*Intel Corp. v. Advanced Micro Devices, Inc.*
  542 U.S. 241 (2004)..................................................................................................15

*Iragorri v. United Technologies Corp.*,
  274 F.3d 65 (2d Cir. 2001)...............................................................................9, 11, 12

*LaSala v. UBS, AG*,
  510 F. Supp. 2d 213 (S.D.N.Y. 2007)......................................................................11

*Lowry v. Aldar Properties PJSC*,
  No. Civ. 09-3215, 2009 WL 3672754 (C.D. Cal. Oct. 30, 2009).............................13

*Mendes Junior International Co. v. Banco do Brasil, S.A.*,
  15 F. Supp. 2d 332 (S.D.N.Y. 1998).................................................................2, 4, 11

*Murray v. British Broadcasting Corp.*,
  81 F.3d 287 (2d Cir. 1996).......................................................................................17

*Nationsbank of Florida v. Banco Exterior de Espana*,
  867 F. Supp. 167 (S.D.N.Y. 1994)...........................................................................13

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981)........................................................................................2, 4, 9, 15

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
  329 F.3d 64 (2d Cir. 2003)........................................................................................10

*Sussman v. Bank of Israel*,
   801 F. Supp. 1068 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993) .................................11

*Terris-Feldmam v. Dan Hotels of Israel*,
   No. 95 Civ. 9666, 1997 WL 109441 (S.D.N.Y. Mar. 11, 1997) .............................................10

*U.S. Fidelity Co. v. Braspetro Oil Services Co.*,
   No. 97 Civ. 6124, 1999 WL 307666 (S.D.N.Y. May 17, 1999),
   *aff'd*, 199 F.3d 94 (2d Cir. 1999) .........................................................................................13

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000).............................................................................................10, 11

*Yung v. Lee*,
   No. 00 Civ. 3965, 2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002),
   *aff'd*, 432 F.3d 142 & 160 F. App'x 37 (2d Cir. 2005) .............................................................9

## STATUTES & RULES

28 U.S.C. § 1407.......................................................................................................................3

Fed. R. Civ. P. 12(b)(2)...........................................................................................................17

Fed. R. Civ. P. 12(b)(6)...........................................................................................................17

The Royal Bank of Scotland Group plc ("RBS") respectfully submits this brief in further support of its motion under the *forum non conveniens* doctrine to dismiss this case in favor of the United Kingdom.

## INTRODUCTION

The Complaint should be dismissed under the *forum non conveniens* doctrine so that these preferred-share claims—which represent a small fraction of the claims made in Plaintiffs' original worldwide class action—can be litigated in the U.K., alongside the parallel claims relating to ordinary shares already dismissed in favor of the U.K. The preferred and ordinary share plaintiffs assert common allegations as to why the value of RBS shareholders' stock dropped sharply (and why RBS nearly collapsed) during the financial crisis: that RBS failed to disclose the extent of its exposure to subprime-backed assets; that RBS should have more aggressively written down the value of those assets; that RBS overstated the robustness of its internal controls and risk management practices; and that RBS conveyed undue optimism to the market about its acquisition of part of Dutch bank ABN AMRO. It would be the height of inefficiency and inconvenience for these kindred cases to be tried separately.

Plaintiffs' opposition brief all but ignores this vitally important context, which decisively supports dismissal in favor of the U.K. Only a U.K. forum would avoid the extraordinary waste of resources that would flow from subjecting parties, witnesses, and the Anglo and American judicial systems to duplicative complex securities litigations. Similarly, even within the narrow context of the preferred share litigation, Plaintiffs misleadingly downplay (if not ignore) the U.K. dimensions of their claims, which arise out of (and challenge) disclosure decisions by U.K.-based RBS personnel made in the U.K. Plaintiffs also, revealingly, all but disregard the fact that, as a result of the U.K. government's rescue and its present 83% ownership of RBS, the effects of

an adverse verdict in this litigation would overwhelmingly fall on the U.K. government and its people.

Once Plaintiffs' unduly narrow vision is corrected for, it is clear both that the pending motion falls well within the district court's broad discretion to transfer cases under the doctrine of *forum non conveniens*, *see Dabbous v. American Express Co.*, No. 06 Civ. 11345, 2009 WL 1403930, at *3 (S.D.N.Y. May 8, 2009) (Batts, J.), and that dismissal of this paradigmatically U.K. controversy is amply merited.

## ARGUMENT

I.   **DISMISSING THIS CASE UNDER THE *FORUM NON CONVENIENS* DOCTRINE WOULD PROMOTE JUDICIAL ECONOMY AND AVOID DUPLICATIVE LITIGATION**

Avoiding duplicative litigation is a central concern of the *forum non conveniens* doctrine. As the Supreme Court has observed, it is inefficient to try substantially similar claims in two separate countries, and "far more convenient . . . to resolve all claims in one trial."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 259 (1981).  The *forum non conveniens* doctrine thus aims to avoid piecemeal litigation and the related possibility of inconsistent outcomes.[1]

These goals are, of course, not confined to the *forum non conveniens* doctrine.  In various contexts, the federal courts encourage consolidation of factually related cases in order to achieve

---

[1] *See, e.g.*, *Mendes Junior Int'l Co. v. Banco do Brasil, S.A.*, 15 F. Supp. 2d 332, 341 (S.D.N.Y. 1998) (granting *forum non conveniens* dismissal where some claims would be litigated in Brazil); *In re Banco Santander Sec.-Optimal Litig.*, Nos. 09-MD-2073, 09-Civ.-20215, 2010 WL 3036990, at *25 (S.D. Fla. July 30, 2010) ("The Court considers the ability to try this case in a single location to be an extremely important factor . . . ."), *aff'd*, No. 10-14012, 2011 WL 3823284 (11th Cir. Aug. 30, 2011); *In re Air Crash Near Athens, Greece on Aug. 14, 2005*, 479 F. Supp. 2d 792, 802–03 (N.D. Ill. 2007) (identifying pendency of parallel litigation in Greece, with risk of "inefficient and duplicative fact-finding" and "inconsistent results," as a factor favoring transfer); *see also DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 426 n.6 (S.D.N.Y. 2010) (identifying *forum non conveniens* as alternative ground for dismissal and noting that if motion were not dismissed, defendant would "be forced to litigate the related issues in two different forums, and face potentially inconsistent results").

efficiency for the parties, witnesses, and courts.[2]   The doctrine of *forum non conveniens* serves similar objectives by empowering district courts to foster economy by dismissing claims that may be brought domestically when a foreign venue is the more convenient.

This lawsuit presents a textbook example of a case that, if allowed to proceed in the U.S., will needlessly disserve the interests of judicial economy.  Although Plaintiffs' brief elides the history of this matter, the telltale fact is that this litigation was brought more than two years ago as a single consolidated class action, on behalf of various categories of worldwide shareholders who made allegations about the same events and claimed injuries allegedly attributable to the same alleged false statements and material omissions by RBS and its officers.   These shareholders included purchasers of ordinary RBS shares (approximately 95% of the class), purchasers of preferred RBS shares (approximately 4% of the class), and purchasers of ADRs keyed to RBS ordinary shares (approximately 1% of the class).  In pressing for certification of such a class, Plaintiffs represented that the claims brought on behalf of these shareholders raised fundamentally common factual and legal questions, declaring:

> ***Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.***

(Consolidated Amended Complaint (CAC) ¶ 110 [Dkt. No. 75] (listing various common questions).)

---

[2]  For example, the MDL process—in which factually overlapping multi-district litigations are consolidated in a single courtroom—serves "to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary."  *In re: Merrill Lynch & Co., Auction Rate Sec. (ARS) Mktg. Litig.*, 626 F. Supp. 2d 1331, 1332 (J.P.M.L. 2009); *see also In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (purpose of MDLs is "to promote just and efficient conduct of actions involving common questions of fact" (quoting 28 U.S.C. § 1407)).  For similar reasons, the Second Circuit encourages district judges to stay or dismiss a suit that is duplicative of another federal court suit.  *See, e.g., Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) ("The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the comprehensive disposition of litigation.") (internal citation omitted).

As a result of this Court's dismissal of all ordinary-share claims based on the decision in *Morrison v. National Australia Bank*, any claims regarding RBS's ordinary shares will necessarily be pursued in the U.K. Parallel complex securities litigation over the same issues proceeding against RBS in the U.K. and the U.S. would present all of the risks and burdens of piecemeal litigation the case law deplores, including subjecting the parties, witnesses, and the courts to duplicative discovery, duplicative deposition and courtroom testimony; burdening two judicial systems with the rigors of supervising and presiding over complex litigation concerning the near-collapse of RBS; and creating the needless and destabilizing risk of inconsistent outcomes.

Under these circumstances, it is manifestly "far more convenient to resolve all claims in one trial."[3] The proper location for that litigation is, inexorably, the U.K for the many reasons we have stated in our initial and currently pending motions for dismissal based on *forum non conveniens*.[4] First, the U.K. is the center of gravity of this controversy relating to the U.K.'s largest bank. Second, as a practical matter, the ordinary-share claims cannot under *Morrison* be pursued in the U.S. Dismissal of the preferred-share claims in anticipation of consolidation of all claims in the U.K. is, therefore, merited, in the interests of economy.[5]

---

[3] *Piper Aircraft*, 454 U.S. at 259; *see also Mendes Junior Int'l Co.*, 15 F. Supp. 2d at 341 (granting *forum non conveniens* dismissal in favor of Brazil to maintain suit as "one complete package").

[4] *See* RBS's Mem. of Law in Supp. of Mot. to Dismiss for Lack of SMJ and Under *Forum Non Conveniens* Doctrine ("SMJ/FNC Br.") [Dkt. No. 118] 12–13; RBS's Mem. of Law in Supp. of Mot. to Dismiss Under the *Forum Non Conveniens* Doctrine ("RBS FNC Br.") [Dkt. No. 197] 13–17.

[5] As the Court is aware, there are presently pending two lawsuits in this district, arising out of the same events and making parallel claims, but brought on behalf of purchasers of RBS's ADRs, which track the company's foreign-issued ordinary shares. *See Lighthouse Financial Group LLC v. Royal Bank of Scotland Group PLC et al.*, No. 11 Civ. 398 and *Gold v. Royal Bank of Scotland Group PLC et al.*, No. 11 Civ. 1162. On August 19, 2011, Judge Daniels consolidated those two cases, and directed that a consolidated amended complaint be filed. Following the filing of such a complaint, Defendants intend to move for dismissal based on *forum non conveniens* against those claims as well, for the same reasons as here, so that litigation on behalf of ADR holders can also be litigated in the U.K.

Unable to justify largely overlapping parallel complex litigations, Plaintiffs' principal response is to avoid that subject.  Plaintiffs relegate any discussion of potential duplicative litigation to the final two conclusory paragraphs of their brief, instead focusing (misleadingly) on the U.S. dimensions of their claims.  *See infra* at 12.  To the extent Plaintiffs address the subject at all, they make two half-hearted arguments.  Both are meritless.

First, noting that litigation over ordinary shares has not yet been initiated in the U.K., Plaintiffs self-servingly imply that perhaps such litigation will never be brought.  (Opp. 18.)  Although RBS would welcome that result and believes such claims would lack merit, all indications are, regrettably, that such litigation will be brought soon in the U.K.  Importantly, it was not until earlier this year that this Court dismissed the ordinary-share claims from the putative global class action.  Until then, putative claimants had a judicial forum in which their grievances were being pursued.  Since then, as RBS chronicled in its opening brief, numerous communiqués from "Action Groups" proposing to bring "mass actions" against RBS have stated that litigation on behalf of ordinary share purchasers is imminent.  For example, in its June 2011 solicitation for membership, the RBoS Shareholders Action Group gave shareholders a July 1, 2011 cut-off date to join.  This "triggered off hyper activity," with many shareholders asking for an extension of time.  In response, RBoS Shareholders Action Group stated (on August 24, 2011) that it has not decided whether to permit an extension of time for others to join, but regardless it plans to serve its claim against RBS by the end of November, affirming that the "Bank will sooner or later have to address [the claims] both commercially and legally."[6]

Moreover, there are unique aspects of the U.K. legal system that, as Plaintiffs know, often generate a longer timetable for initiating litigation.  The relevant U.K. statute of limitations

---

[6] *See* Supplemental Declaration of David S. Lesser ("9/9/11 Lesser Decl.") Ex. 1, August 24, 2011 Letter by RBoS Shareholders Action Group; *see also* RBS FNC Br. 21–22 (summarizing communications from various shareholder litigation "action groups") and 6/1/11 Lesser Decl. [Dkt. No. 204] Exs. 6–25.

is six years, diminishing any urgency to commence litigation.  *See* Limitation Act, 1980, c. 58, §§ 2, 5.  And, pivotally, the U.K. legal system requires putative plaintiffs to comply with certain pre-action protocols before filing suit, including submitting a detailed "Letter Before Action," to which a detailed response must be made.  (*See* 9/9/11 Lesser Decl. Ex. 2, U.K. Civil Procedure Rules, Practice Direction on Pre-Action Conduct, April 2010.)  At least one Action Group has already taken this step on behalf of ordinary-share purchasers.[7]  Plaintiffs' new notion that the ordinary-share claims, having been dismissed from the U.S., may evaporate altogether, thus cannot be taken seriously.  Nor can it be reconciled with Plaintiffs' earlier insistence that RBS's ordinary shareholders had been the victims of a historic fraud demanding redress.  (*See, e.g.*, CAC ¶¶ 21–22.)

Plaintiffs' second argument is even more risible.  In direct repudiation of their earlier representation to this Court in the CAC, Plaintiffs declare that any litigation in the U.K. relating to ordinary shares will be "very different" from the litigation over preferred shares.  (Opp. 18.) In fact, the ordinary-share claims as presented in Plaintiffs' own earlier CAC illustrate that this is wrong.  Whenever U.K. litigation commences, the issues will overlap substantially, if not virtually entirely, with the claims before the Court in this case.

Plaintiffs premise their contrary argument on the notion that if ordinary-share litigation is brought in the U.K., it will relate solely to "allegedly false statements made by the company in its prospectus for an April 2008 rights offering that is not at issue in this case."  (Opp. 18.)  But purchasers of ordinary shares pursuant to the April 2008 offering ("Rights Issue") represent only a subset of the ordinary-share purchasers dismissed pursuant to *Morrison*.  That the Action Group communications to date have largely dealt with Rights Issue claims plainly reflects only

---

[7] Solicitors for RBS Action Group stated in a June 6, 2011 posting that the group's "timescale is likely to be a slow one" but that the group was committed to litigation.  *See* 9/9/11 Lesser Decl. Ex. 3.

that—as those Groups recognized in their earliest communications—the Rights Issue claims were likely to be dismissed from the U.S. litigation on the basis of a forum-selection clause specific to the Rights Issue.[8]  There is no reason to assume that, when litigation is brought, it will not also include claims for persons who purchased ordinary shares on the market.[9]

In any event, a suit by Rights Issue purchasers in the U.K., although involving different offering documents from the preferred-share claims, would turn on many of the same alleged false statements and omissions, and the same financial statements and other public statements that both sets of offering documents incorporated by reference.  Notably, the original CAC (to which the current Plaintiffs subscribed) brought claims related to *both* the Rights Issue and the preferred-share offerings, and represented that "[c]ommon questions of law and fact exist[ed] as to all members of the Class," including:

> . . . (g) Whether the offering documents issued in connection with the Rights Issue contained untrue statements of material fact or omitted to disclose material facts in violation of the Securities Act; (h) Whether the offering documents issued in connection with the Series Q, R, S, T and U Preferred Share Offerings contained untrue statements of material fact or omitted to disclose material facts in violation of the Securities Act; and (i) Whether the members of the Class have sustained damages and the proper measure of damages."

(CAC ¶ 110.)  The CAC also illustrates that both the preferred and Rights Issue claimants allege the same falsehoods.  For example, the Rights Issue claim prominently includes allegations that RBS's statements about its acquisition of part of ABN AMRO Holding N.V. and its subsidiary banking operations ("ABN") were materially misleading because, among other things, RBS "failed to disclose the magnitude of the materially overvalued 'toxic' assets that RBS had

---

[8]  In fact, the Court's January 11, 2011 order identified the forum-selection clause as an alternative grounds for dismissal of the Rights Issue claims.  (*See* 1/11/11 Mem. and Order 26 n.14.)

[9]  As we have noted, the U.K. has procedural mechanisms for collective actions which permit the aggregation of ordinary and preferred share holders into a single action.  (*See generally* 5/24/11 Andrews Decl. ¶¶ 4–11 [Dkt. No. 200] (discussing Group Litigation Orders, joinder, and representative actions).)  U.S. residents would be able to participate in these collective actions.  (*Id.* ¶¶ 3(6), 6, 23(3).)

acquired from ABN AMRO . . . ."  (CAC ¶ 706.)  Significantly, Plaintiffs' now-operative Amended Complaint makes the *identical* claim.  It alleges that in the Series S Preferred Share Offering materials "RBS failed to disclose that ABN AMRO had billions of dollars of undisclosed subprime assets on its balance sheet prior to the acquisition . . . ."  (Am. Compl. ¶ 126 [Dkt. No. 182]; *see also id.* ¶¶ 152 (similar allegations for Series T prospectus), 166 (similar allegations for Series U prospectus).)  As the CAC also reflects, the preferred-share and Rights Issue claims turn on alleged misstatements or omissions in many of the same underlying documents.[10]

Not surprisingly, as articulated in the CAC, there is similar, overwhelming overlap between the allegations of false or misleading statements underlying the preferred-share claims and the allegations underlying the (non-Rights Issue) ordinary-share claims.  That these claims were pursued under the 1934 Act (for ordinary shareholders) versus the 1933 Act (for preferred shareholders) must not distract from the key point—that both groups assailed largely the same statements by RBS as being false, misleading, or materially incomplete.  These included statements on the subjects of whether RBS had disclosed the extent of its exposure to subprime-backed securities, whether RBS misstated the expected synergies that would result from the ABN acquisition, whether RBS properly wrote down its goodwill on the ABN transaction after ABN's exposure to subprime became clear, whether RBS made misleading statements about its maintenance of a strong capital base, and whether RBS made misstatements about its internal

---

[10] The preferred-share claims are based primarily on alleged misstatements in RBS's 2005 and 2006 Annual Reports, which were incorporated by reference in the preferred-share offerings.  (*See* Am. Compl. ¶ 91.)  Similarly, "[t]he Rights Issue Prospectus reported historical financial data for RBS for the three-year period ending December 2007, and incorporated by reference portions of RBS's Annual Report and Accounts for 2005, 2006 and 2007 and the Annual Report for 2007 filed on Form 20-F for ABN AMRO." (CAC ¶ 699.)

controls and risk management practices.[11]   In sum, the preferred-share claims substantially overlap with potential Rights Issue or ordinary-share claims that may be brought in the U.K., and dismissal of the preferred-share claims is thus necessary to avoid highly duplicative cross-border litigation.

## II.    DISMISSAL OF THIS CASE IS FULLY CONSISTENT WITH THE FACT-DEPENDENT *FORUM NON CONVENIENS* BALANCING INQUIRY

Attempting to pretermit the traditional balancing inquiry required for such motions, Plaintiffs claim that dismissal on the basis of *forum non conveniens* is an "extreme" remedy that is categorically off-limits here.  (Opp. 1.)  In fact, dismissal on the basis of *forum non conveniens* is an "appropriate" response, *Piper Aircraft Co.*, 454 U.S. at 249, when determined to be merited under the requisite "balancing inquiry," *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc), and this Court enjoys "broad discretion" in addressing such motions,  *Dabbous*, 2009 WL 1403930, at *3 (citation omitted).[12]

It is easy to refute Plaintiffs' two closely related arguments as to why their lawsuit is, purportedly, categorically immune from *forum non conveniens* dismissal.  Plaintiffs first offer the red herring that the various dismissals by this Court on that ground involved foreign plaintiffs.  (Opp. 6.)  But even assuming *arguendo* that most purchasers of RBS preferred shares were U.S. persons, it is black-letter law that "neither the plaintiff's citizenship nor residence . . . necessarily controls the outcome" of a *forum non conveniens* motion.  *Iragorri*, 274 F.3d at 74. And cases involving dismissal of foreign plaintiffs are instructive here when the Court

---

[11] For example, the following CAC paragraphs allege the same misstatements for both the '33 Act (ordinary share) and '34 Act (preferred share) claims: ¶ 273/¶ 653;  ¶ 355/¶ 569;  ¶ 288/¶ 648; ¶ 300/¶¶ 659–60; ¶¶ 337, 341; ¶ 411/¶ 703 and ¶ 707.  Additional portions of the '33 Act claims refer implicitly to the '34 Act allegations:  ¶¶ 5, 144–45, 270, 273, 275–76, 281, 359–60/¶ 512.

[12] *See also Banco de Seguros Del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 260 (S.D.N.Y. 2007); *Yung v. Lee*, No. 00 Civ. 3965, 2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002) (Batts, J.), *aff'd*, 432 F.3d 142 & 160 F. App'x 37 (2d Cir. 2005); *Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.*, 949 F. Supp. 1123 (S.D.N.Y. 1997).

considers—as it must—the larger context of this controversy, in which the vast majority of claimants against RBS (97%) are foreign.  (RBS FNC Br. 7.)  Relatedly, Plaintiffs cite three cases involving U.S.-resident plaintiffs in which *forum non conveniens* motions were denied. (Opp. 6.)  But again, there is no "rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal" on *forum non conveniens* grounds.  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000).[13]   The law is clear that courts "do[] not assign 'talismanic significance to the citizenship or residence of the parties,'" *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003) (quoting *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 154 (2d Cir. 1980) (en banc)),[14] and, as we have explained, there are myriad factors in this case that favor dismissal.

In fact, the factors properly considered in the *forum non conveniens* analysis, taken together, compel litigating in the U.K., particularly when one views the case as originally filed— including the ordinary-share claims, now dismissed in favor of the U.K.

## A.   The Deference Due To Plaintiffs' Choice of Forum

Plaintiffs' choice of a U.S. forum to litigate an essentially U.K. controversy merits limited deference.  *See* RBS FNC Br. 7.

---

[13]  And two of the cases Plaintiffs cite are egregiously inapposite.  In *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200 (S.D.N.Y. 2005), a forum-selection clause required plaintiffs' contract claims to remain in New York.  The court found that even if the ordinary *forum non conveniens* factors pointed to a different forum on the non-contract claim, the prospect of dismissing one claim and not others dictated against dismissal.  If anything, *Lemgruber* reinforces the importance of the *forum non conveniens* goal of avoiding piecemeal litigation.  *Terris-Feldmam v. Dan Hotels of Israel*, No. 95 Civ. 9666, 1997 WL 109441 (S.D.N.Y. Mar. 11, 1997), is also inapposite.  It involved a single plaintiff suing on a personal injury claim, a context that starkly contrasts to this controversy where 97% of RBS investors on whose behalf suit is brought are foreign.  In the third case, *Dagen v. CFC Grp. Holdings, Ltd.*, No. 00 Civ. 5682, 2003 WL 194208 (S.D.N.Y. Jan. 28, 2003), the Court found plaintiffs' U.S. residency material, but did not remotely suggest that this factor was other than one part of an overall balancing analysis.

[14] *See also* RBS FNC Br. 8 n.9.

First, contrary to Plaintiffs' claim, the U.S. residency of the named plaintiffs is not decisive as to the degree of deference where overall convenience clearly favors the U.K.  Based on this principle, courts have frequently dismissed cases even where the plaintiff is an American citizen or entity.[15]  The degree of deference is further diminished here because all but one named plaintiff appears to reside outside of New York State.  (RBS FNC Br. 8 n.9; 6/1/11 Lesser Decl. ¶ 6); *see also Iragorri*, 274 F.3d at 71–72.  Plaintiffs counter that a U.S. resident's "home forum" may be "any U.S. court" (Opp. 7), but that misses the point:  In determining the degree of deference afforded plaintiff's forum choice, Courts seek to assess whether that choice was "motivated by legitimate reasons like convenience" or by other reasons such as litigation strategy.  *Dabbous*, 2009 WL 1403930, at *3 (internal citation omitted).  Plaintiffs cannot credibly claim to have filed in New York based on convenience when all but one of them reside in other states.  (RBS FNC Br. 8 n.9.)[16]

Second, contrary to Plaintiffs' claim that they filed suit in a U.S. forum to achieve convenience and not litigation advantage, overall convenience self-evidently favors the U.K. This is a case about allegedly misleading or incomplete statements.  And it is undisputed that virtually all relevant events relating to such statements occurred in the U.K., including authorship and approval (and approval responsibility) within RBS of literally every document or false

---

[15] *See, e.g., LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 225 (S.D.N.Y. 2007) (collecting cases).  *See also Mendes Junior Int'l Co.*, 15 F. Supp. 2d 332 (dismissing suit despite treaty that mandated same deference to Brazilian plaintiff as would be afforded domestic plaintiff bringing same case); *Sussman v. Bank of Isr.*, 801 F. Supp. 1068, 1074 (S.D.N.Y. 1992) (where defendant banks' alleged misconduct occurred abroad "plaintiff's American citizenship and residence do not constitute the powerful, near-decisive factors for which they contend"), *aff'd*, 990 F.2d 71 (2d Cir. 1993).

[16] The cases Plaintiffs cite in which deference is due an out-of-state plaintiff's forum choice either involved plaintiffs that had compelling emotional reasons to eschew the foreign forum, *see Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 145 (2d Cir. 2000) ("special circumstances presented by this case—specifically, the emotional burden on Plaintiffs of returning to the country where they or their loved ones were shot in an act of religious terrorism—provide additional weight for favoring Plaintiff's choice of their home forum . . . ."), or were otherwise highly idiosyncratic, *see Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) (alleged victims of torture); *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 351–52 (S.D.N.Y. 2002) (Holocaust survivors and their heirs).

statement alleged to be actionable.  (*See* 5/26/11 Graham Decl. [Dkt. No. 203]  ¶¶ 35–37, 43–45, 53–55, 76.)  Plaintiffs seek to distract from this devastating fact by noting their allegation that the subjects of some of those statements implicitly included two RBS U.S.-based subsidiaries (Citizens Bank and Greenwich Capital) that allegedly possessed subprime-backed assets.  (Opp. 3–4.)  But Plaintiffs fail to explain why this makes the center of gravity anywhere but the U.K.  Plaintiffs do not even allege that establishing their claims would require testimony from any witnesses from these U.S.-based entities; they fail to suggest that such witnesses played any role in formulating the statements in question.  (*See* 5/26/11 Graham Decl. ¶ 37); *see also Banco de Seguros Del Estado vs. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 261 (S.D.N.Y. 2007) (plaintiff's choice of U.S. forum entitled to limited deference where, *inter alia*, "nearly every event alleged in the Complaint either occurred in Uruguay, or involved a decision finalized in Uruguay" and "Defendants' papers strongly suggest that most of the internal corporate documents, and most of the related documents that have been generated by regulators and auditors, are located in Uruguay and Argentina").

Plaintiffs' final ploy is to claim that *Defendants*, in moving for transfer, are the ones forum-shopping.  Given the public anger and intense and caustic media attention directed at RBS in the U.K. since the bank's near-collapse, and given that a far higher percentage of the U.K. population owned stock in RBS and hence was adversely affected by RBS's share-price decline (*see* RBS FNC Br. 14), Plaintiffs' premise that RBS would enjoy a more favorable audience in the U.K. is dubious at best.[17]  Notably, Plaintiffs admit that the procedural rules in the U.S. relating to class actions are uniquely advantageous to them.  (Opp. 17.)  In granting motions for

---

[17] *Compare Iragorri*, 274 F.3d at 72 (plaintiff's popularity or defendant's unpopularity in the region is evidence of forum-shopping); *Dabbous*, 2009 WL 1403930, at *5 ("Plaintiff appears to be attempting to avoid, perhaps with good reason, litigating this case in a forum where the press and judicial system have developed negative impressions of him through his investigation and criminal prosecution.").

dismissal based on *forum non convenience,* the courts have identified precisely these rules as evidence of a plaintiff's forum-shopping.[18]   In sum, Plaintiffs' choice of forum warrants no more than minimal deference.

### B.   The Public And Private Factors Weigh In Favor Of Dismissal

The public and private factors favor dismissal in favor of the U.K.

#### 1.   Public Factors

Plaintiffs claim not to dispute the "local interest in having localized controversies decided at home."   *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947).   But they then dismiss in one sentence the national interest of the U.K. in this matter, claiming that *New York* has greater local interest in a worldwide class action over the collapse of the U.K.'s largest bank.  (Opp. 13.)  That claim is implausible.  As noted in our opening brief:  (1) RBS's difficulties have been the subject of intense media and public interest in the U.K., with the matter investigated by the House of Commons and frequently on the front pages of U.K. newspapers;  (2) RBS is majority-owned by the U.K. Government and thus, an adverse verdict could potentially have severe implications for the U.K. Government and, derivatively, its taxpayers (*see* 5/25/11 U.K. Treasury Decl. [Dkt. No. 198] ¶ 11; RBS FNC Br. 16);[19]  (3) as set forth above and in the Graham Declaration, the vast majority of the conduct at issue took place in the U.K.   (*See* RBS FNC Br. 16.)

With respect, the U.S. interest in this controversy does not come close to approaching the

---

[18] *See* RBS FNC Br. 9.

[19] Plaintiffs attempt to minimize the importance of the U.K. government's ownership of RBS by noting that courts have on some occasions denied *forum non conveniens* motions even where defendants are owned by foreign governments.  (Opp. 14.)  These cases are not on point.  Although they involved government-owned companies, government ownership was not a factor in the Court's *forum non conveniens* analysis.  *Nationsbank of Fla. v. Banco Exterior de Espana*, 867 F. Supp. 167 (S.D.N.Y. 1994) (government ownership arose in context of whether the court should enter a default judgment against bank); *U.S. Fidelity Co. v. Braspetro Oil Servs. Co.*, No. 97 Civ. 6124, 1999 WL 307666 (S.D.N.Y. May 17, 1999) (government ownership of co-defendants only arose in context of subject matter jurisdiction analysis), *aff'd*, 199 F.3d 94 (2d Cir. 1999); *Lowry v. Aldar Props. PJSC*, No. Civ. 09-3215, 2009 WL 3672754 (C.D. Cal. Oct. 30, 2009) (government ownership not part of *forum non conveniens* discussion).  And in a case similar to this one, *Banco de Seguros Del Estado*, the court found that foreign government ownership of the bank weighed in favor of dismissal.  *See* 500 F. Supp. 2d at 265.

U.K.'s.  Plaintiffs properly point out that the U.S. has a general interest in enforcing its securities laws where shares were registered and sold in the U.S., but in this case that interest extends only to the preferred shares—whereas all ordinary shares, the overwhelming majority (95%) of the worldwide class on behalf of whom this lawsuit was originally filed, were sold exclusively abroad.  The U.K. regulatory interest thus lopsidedly outweighs that of the U.S.  Together, the public factors overwhelmingly support dismissal.

### 2. Private Factors

Private factors also weigh heavily in favor of the U.K.  Plaintiffs do not deny that a widely accepted methodology for determining whether a U.S. or foreign venue is more convenient is the one this Court has used previously: tallying the number and location of potential witnesses, defined as persons named in the Complaint.  *See Dabbous*, 2009 WL 1403930, at *4.  Nor can Plaintiffs dispute that a clear majority of the individuals referenced in the Complaint are U.K.-based.  Plaintiffs try, therefore, to avoid these metrics, stating in conclusory fashion that a significant number of witnesses and documents will be located in New York.  (Opp. 9–10.)  But at most, Plaintiffs show that some of the alleged misstatements at issue relate to allegedly subprime-backed assets held by U.S. subsidiaries of RBS.  But of far more significance in litigation under the 1933 Act are the central disclosure decisions relating to those assets, which undisputedly were made by U.K. personnel exclusively in the U.K.[20]  Moreover, as to other categories of claims—such as those related to the ABN acquisition and to RBS's capitalization—the underlying facts arise entirely outside the U.S. (in the U.K. exclusively or, in the case of ABN, the U.K. and Holland).

---

[20] This Court has granted a *forum non conveniens* motion even when certain key party witnesses were located in the U.S., when the majority of all witnesses, and a significant number of non-party witnesses, were located abroad in the alternative forum.  *Dabbous*, 2009 WL 1403930, at *4.

With respect to another private factor, access to evidence, Plaintiffs state that the parties in a U.S. proceeding will have at least as much discovery as parties in an English case.  (Opp. 9.) But neither they nor their expert can credibly deny that proceeding in a U.S. forum would inhibit "ease of access" to evidence (*Gulf Oil*, 330 U.S. at 508) because obtaining oral and documentary evidence from non-parties residing in the U.K. requires compliance with the Hague Convention, which is costly and time consuming.  (*See* 10/21/09 Burr Decl. [Dkt. No. 202] ¶¶ 5–8, 31.) Further, Plaintiffs are simply incorrect that access to U.S. witnesses would necessarily be limited if tried in England.  (Opp. 11.)  The Supreme Court rejected this claim in *Intel Corp. v. Advanced Micro Devices, Inc.*, holding that when providing judicial assistance to a foreign proceeding there is "no threshold requirement that evidence sought from a federal district court would be discoverable under the law governing the foreign proceeding."  542 U.S. 241, 247 (2004). Notably, the cases Plaintiffs cite predate this decision.[21]

Finally, Plaintiffs and their expert rely on several non-binding U.S. district court cases to assert that a U.K. court would give preclusive effect to a U.S. judgment in a class action.  More relevant is what *English* courts have said on this topic.  The only English decision on point stated, in *dicta*, that an English court would *not* respect such a U.S. judgment.  (*See* 5/26/11 Peel Decl. [Dkt. No. 201] ¶ 55.)  At best, it is an open question whether an English court would give *res judicata* effect to a U.S. judgment or settlement.  (*See generally id.* ¶¶ 43–88.)  As such, if

---

[21] Nor are Plaintiffs correct that RBS is required, at this point in the proceeding, to identify specific witnesses who would be unwilling to come to the U.S. for trial.  The Supreme Court has expressly rejected such a requirement in the context of a *forum non conveniens* motion.  *Piper Aircraft*, 454 U.S. at 258 (rejecting proposition that defendants "must submit affidavits identifying the witnesses they would call and the testimony [they] would provide if the trial were held in the alternative forum" because "[r]equiring extensive investigation would defeat the purpose of their motion").  Plaintiffs cite *Cyberscan Techs., Inc. v. Sema Ltd.*, No. 06 Civ. 526, 2006 WL 3690651, at *10 (S.D.N.Y. Dec. 13, 2006), but that case overlooks this on-point Supreme Court authority and is factually distinguishable.  The witnesses there were located in multiple locations around the world with the near-majority plurality in the U.S.; at least twelve witnesses resided in the U.S. (with the majority in New York), five were in London, four in Geneva, three in South Africa, and three elsewhere in Europe.  Here, by contrast, a clear  majority of witnesses reside in the U.K.  (*See* RBS FNC Br. 18.)

this case were tried in the U.S., RBS might be subject to a second suit in the U.K. by absent class members who were dissatisfied with a U.S. judgment (or the terms of a settlement).

### C.      The U.K. Is An Adequate And Appropriate Alternative Forum

Plaintiffs fail to show that the U.K.—which federal courts have routinely held to be an adequate forum—would be inadequate in this case.  But while Plaintiffs are correct to note (Opp. 18) that there has not yet been an instance under the U.K.'s relatively new group litigation process in which the precise securities claims at issue here have been litigated,[22] it is undisputed that there is no jurisdictional impediment to an English Court's adjudicating their '33 Act claims. (5/26/11 Peel Decl. ¶¶ 38–42.)  More importantly, the *forum non conveniens* doctrine does not require the Court to find an *identical* cause of action or process in the alternative forum.  English common and statutory law undisputedly has parallel causes of action for misrepresentation, and courts need only ask whether the alternative forum is "adequate," not whether it is "equivalent." (*See* RBS FNC Br. 11 n.13.)

Further, it is well settled that differences in procedure, such as the lack of a class-action mechanism in the U.K., do not make an alternative forum inadequate.  Where other collective action mechanisms exist, such as the group litigation procedure in the U.K., courts have found the alternative forum adequate.[23]  Plaintiffs cite *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74 (D. Mass. 2002), but that case is from outside this Circuit and does not appear even to follow First Circuit precedent.  *See Howe v. Goldcorp Inv., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) (in determining adequacy of alternative forum "small differences in standards and

---

[22] Neither Plaintiffs nor their expert acknowledge the import of *Tew v. Bank of Scotland and Barclay's Bank (Shared Appreciation Mortgages)* (2010), which demonstrated the capacity of the U.K's Group Litigation Order procedure to handle different categories of claims by large numbers of claimants for purely financial loss arising from culpable civil wrongdoing by banks.  (*See* RBS FNC Br. 12.)

[23] *See, e.g.*, *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002) (joinder mechanisms made Ecuador adequate forum); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984*, 809 F.2d 195, 199 (2d Cir. 1987) ("representative suits" made India adequate forum).

procedural differences . . . are beside the point"). English courts are specifically not inadequate for prohibiting contingency fees and having a loser-pays system. *Murray v. British Broad. Corp.*, 81 F.3d 287, 292–93 (2d Cir. 1996). (*Cf.* 5/24/11 Andrews Decl. ¶¶ 17–22 (discussing plaintiff-friendly features of the English cost structure).) The U.K. forum, which will necessary host the overwhelming majority of claims against RBS arising from this litigation, is thus amply adequate to hear the residue that, for now, remains in the U.S.

## CONCLUSION

For the foregoing reasons and those contained in our opening brief, to the extent any preferred-share claims survive the accompanying motion to dismiss under Fed. R. Civ. P. 12(b)(6) and (2), those claims should be dismissed on the basis of *forum non convenien*s, in favor of the U.K.

Dated:  September 9, 2011

<div style="margin-left:40%">

Respectfully submitted,

/s/ Andrea J. Robinson
Robert W. Trenchard
David S. Lesser
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Telephone:  212-230-8800
Fax: 212-230-8888

Andrea J. Robinson
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone:  617-526-6000
Fax: 617-526-5000

*Counsel for The Royal Bank of Scotland Group plc*

</div>

- 17 -